Rajan O. Dhungana (SBN: 297794)
    rdhungana@fedpractice.com
FEDERAL PRACTICE GROUP
14481 Aspen Street
Hesperia, CA 92344
Telephone: (310) 795-6905

Eric S. Montalvo (*Pro Hac Vice*)
    emontalvo@fedpractice.com
FEDERAL PRACTICE GROUP
1750 K Street, N.W., Suite 900
Washington, DC 20006
Telephone: (202) 862-4360
Fax: (888) 899-6053

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### (Eastern Division)

| | |
|---|---|
| MOSES HEREDIA,<br><br>              Plaintiff,<br><br>vs.<br><br>MTK GLOBAL SPORTS MANAGEMENT, LLC; MTK GLOBAL USA, LLC; GOLDEN BOY PROMOTIONS, INC.; PAUL D. GIBSON; and DANIEL KINAHAN,<br><br>              Defendants. | Case No.: 5:20-cv-02618-JWH-KKx<br><br>**THIRD AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

-1-

1    Plaintiff Mr. Moses Heredia ("Mr. Heredia" or "Plaintiff") brings this
2    Complaint against the Defendants MTK Global Sports Management, LLC
3    ("MTK"), MTK Global USA, LLC ("MTK USA"), Golden Boy Promotions, Inc.
4    ("GBP" or "Golden Boy"), Mr. Paul D. Gibson ("Mr. Gibson"), and Mr. Daniel
5    Kinahan ("Mr. Kinahan") (collectively, "Defendants") and alleges, based on
6    knowledge as to himself and his own acts and on information and belief as to all
7    other matters, as follows:

8                          **NATURE OF THE CASE**

9         1.     This case, at its core, arises from an effort undertaken by Mr. Kinahan
10   to present himself and his associates as legitimate business persons through the
11   establishment of "legitimate businesses" such as his various and numbered boxing
12   concerns to include MTK USA and MTK Global, to launder criminal proceeds,
13   and use those proceeds to "steal" fighters from the duly licensed promotors and
14   managers using their extraordinary financial wherewithal and "reputations" to
15   bully their way into the world of professional boxing.  The infusion of cash into the
16   world of professional boxing took the industry by storm and Mr. Kinahan and his
17   associated businesses soon became a global the force to be reckoned with.  One of
18   his businesses, MTK, after pillaging the European market then set its sights on the
19   United States.  Mr. Kinahan and his surrogates targeted for acquisition Mr. Joseph
20   Diaz ("Mr. Diaz"), a recently-crowned world champion who was a fighter in a
21   lucrative weight class and who had strong marketability and profitability potential.
22   MTK found an ally for this acquisition in Golden Boy.  Golden Boy and its agents,
23   in particular Robert Diaz and his counsel, had become increasingly hostile to Mr.
24   Heredia given his fierce negotiation positions taken on behalf of Mr. Diaz and their
25   other fighters to ensure fight purses were commensurate with their value and not in
26   line with Golden Boy's approach to allocate the least amount of the purse possible
27   to the fighter so that Golden Boy's profitability was maximized.  Golden Boy had
28   historically and unsuccessfully attempted to induce fighters to leave Mr. Heredia's

THIRD AMENDED COMPLAINT

team, which was raised with Golden Boy leadership prior to Mr. Kinahan's entry into the U.S. market.

2.      For eight years, Mr. Heredia managed Mr. Diaz' boxing career, culminating in Mr. Diaz winning a world championship.  Despite Mr. Heredia having had an exclusive boxer-manager contract with Mr. Diaz, the Defendants, most of whom were not licensed as a managers as required under California law, lured Mr. Diaz away from Mr. Heredia's management, interfering with the boxer-manager contract between Mr. Heredia and Mr. Diaz, ultimately to Mr. Heredia's financial and professional detriment.

3.      Defendants MTK, Mr. Kinahan, and Mr. Gibson all have connections with organized crime; Mr. Kinahan, in particular, is alleged by the United States Government to be operating a "Transnational Criminal Organization" and was recently designated as a Specially Designated National.  Their actions in this case are violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act and entitle Mr. Heredia to treble damages.

## PARTIES

4.      Plaintiff Moses Heredia is an individual residing in San Bernardino County, California.

5.      Defendant MTK Global Sports Management, LLC, is a Dubai, UAE business entity with license number 785135 and having its registered office at PO Box 454833, Al Barsha Post Office, Dubai, United Arab Emirates. MTK Global Sports Management, LTD, is a wholly owned subsidiary of MTK Global Sports Management, LLC operating out of the United Kingdom with its principal place of business at 20-22 Wenlock Road, London, England, N1 7GU.  On or about April 20, 2022, and because of its connections with Mr. Kinahan, MTK announced that it was completely shutting down at the end of April, 2022.

6.      Defendant MTK Global USA, LLC is a Delaware limited liability company, with a registered agent, Paracorp Incorporated, at 2140 S Dupont HWY,

THIRD AMENDED COMPLAINT

Camden, DE 19934. Upon information and belief, MTK controls MTK USA.

7.      Defendant Golden Boy Promotions, Inc., is a California corporation with its principal place of business at 626 Wilshire Blvd, Suite 350, Los Angeles, CA 90017.

8.      Defendant Paul D. Gibson is MTK's Chief Strategy Officer and an individual residing in Alicante, Valencian Community, Spain.

9.      Defendant Daniel Kinahan is a co-founder and owner of MTK and an individual residing in Dubai, UAE.

10.     On April 11, 2022, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) designated the Kinahan Organized Crime Group (KOGC), as a "Transnational Criminal Organization," and designated Mr. Kinahan, along with several other KOCG members, as Specially Designated Nationals. The U.S. accused the KOGC of smuggling deadly narcotics, including cocaine, to Europe, and declared it "a threat to the entire licit economy through its role in international money laundering."

11.     In a statement, the U.S. said Mr. Kinahan runs the day-to-day operations of the organization. As part of the sanctions, OFAC prohibited any U.S. persons or businesses from working with Mr. Kinahan or any member of the KOGC.

12.     The United States Government offered a $5 million reward each for information that will lead to the "financial destruction" of the KOGC or the arrest and conviction of its three leaders, including Mr. Kinahan.

13.     Each and every Defendant was the agent, servant, employee, joint venture, partner, subsidiary, and/or co-conspirator of each other Defendant, and in performing or failing to perform the acts alleged herein each Defendant was acting individually as well as through and in the foregoing alleged capacity within the course and scope of such agency, employment, joint venture, partnership, subsidiary, and/or conspiracy.

THIRD AMENDED COMPLAINT

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

15.    Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district. Defendants MTK, Mr. Gibson, and Mr. Kinahan do substantial business in this judicial district, have substantial minimum contacts with this judicial district, and/or intentionally availed itself of the benefits and protections of California law through the promotion, sale, marketing, and provision of services in California.  Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant GBP is subject to personal jurisdiction in this judicial district and resides in this district.

## FEDERAL AND CALIFORNIA LAW

16.    Under federal law, the term "boxing manager" means a "person who receives compensation for service as an agent or representative of a boxer." *See* 15 U.S.C. § 6301.

17.    Under California law, the term "boxing manager" means, "any person who … undertakes … to represent in any way the interest of any professional boxer … ." Cal. Bus. & Prof. Code § 18628. A boxing manger must be properly licensed within the State of California to execute his/her duties under the law. *See* Cal. Bus. & Prof. Code § 18642; 4 CCR § 216.

18.    Under federal law, the term "boxing promoter" means "the person primarily responsible for organizing, promoting, and producing a professional boxing match." 15 U.S.C. § 6301.

19.    Under California law, the term "boxing promoter" means "a corporation, partnership, association, individual, or other organization which conducts, holds, or gives a boxing or martial arts contest, match, or exhibition." Cal. Bus. & Prof. Code § 18622.

20.     Federal law creates a "firewall" between managers and promoters in order to protect the boxer. 15 U.S.C. § 6308.

21.     As with managers, promoters are required to have a license. Cal. Bus. & Prof. Code § 18641; *see also* 4 CCR § 213.

22.     A licensed promoter may do business with other licensed promoters. Cal. Bus. & Prof. Code § 18668.

23.     Violations of the federal Professional Boxing Safety Act of 1996 (PBSA), as amended by the Muhammad Ali Boxing Reform Act of 2000 ("Ali Act") carry civil and criminal penalties. *See, generally,* 15 U.S.C. § 6309.The public policy behind the statutory scheme, *inter alia*, is to ensure transparency with respect to how a boxer receives income.

## BRIEF STATEMENT OF FACTS

### A. Mr. Diaz and Mr. Heredia had a long-standing and successful boxer-manager relationship.

24.     Mr. Heredia has known Mr. Diaz since Mr. Diaz competed as an amateur boxer prior to his qualification for the 2012 Summer Olympics. After Mr. Diaz completed in the 2012 Summer Olympic Games in London, he became a professional boxer.

25.     Mr. Heredia managed Mr. Diaz's boxing career for almost a decade. During this time, Mr. Heredia brought Mr. Diaz three world championship bouts and negotiated the 2017 Promotion Agreement with GBP.

26.     Diaz and GBP signed the Promotion Agreement on March 22, 2017. The Promotion Agreement expired on March 21, 2022.

27.     The terms of the Promotion Agreement provided Mr. Diaz with a $150,000 signing bonus and guaranteed two bouts with purses of $150,000 and $200,000 shortly after the signing of the agreement.

28.     In his later arbitration award, the Executive Director of the California State Athletic Commission ("Commission") stated that this Promotion Agreement

THIRD AMENDED COMPLAINT

was "lucrative" for Mr. Diaz. The Promotion Agreement also contained a net proceeds clause should Mr. Diaz be the "A" side of a main event bout on Pay-Per-View (PPV).

29.    The Promotion Agreement contained a "no assignment" clause for the boxer, which stated: "Neither the benefits nor the duties of Boxer [Mr. Diaz] under this Agreement may be assigned or transferred for any reason."

30.    The Promotion Agreement also required Mr. Diaz to list his representatives, if any. Mr. Diaz listed Moses Heredia and Ralph Heredia.

31.    Mr. Diaz fought ten bouts under Mr. Heredia's management, pursuant to a Boxer-Manager Contract dated February 23, 2017 ("2017 Contract") and his Promotion Agreement dated March 22, 2017. At all times relevant to this Complaint, the 2017 Contract between Mr. Heredia and third-party Mr. Diaz was valid.  The existence of this 2017 Contract was public knowledge, being listed on the Commission's website, and all Defendants knew of the 2017 Contract.  There were no issues with the relationship for over three years, until the Defendants in this case lured Mr. Diaz away from Mr. Heredia's management.

**B. Mr. Kinahan, through MTK and its affiliates, is deeply connected to professional boxing and is also an international narco-terrorist, who has recently been sanctioned by the United States Government as a result of his involvement in criminal activity to include money laundering, and which also resulted in the seizure of Mr. Kinahan's assets by the United Arab Emirates.**

32.    MTK was co-founded by Mr. Kinahan. Mr. Kinahan is alleged to run the day-to-day operations of the Kinahan Organized Crime Group ("KOCG") in Ireland. The KOCG is allegedly responsible for, *inter alia*, several murders, drug trafficking, and money laundering (criminal activity). The KOCG is believed to be one of Europe's biggest criminal cartels. Law enforcement believes that Mr.

THIRD AMENDED COMPLAINT

Kinahan started various legitimate business entities to launder ill-gotten gains from criminal activity resulting in some of them already being placed on a sanctioned list. As a result of Mr. Kinahan's being sanctioned, any person or business engaging in business with him and his entities may be subject to the same consequences; MTK Global has suffered from a complete exodus of fighters and business to business relationships resulting in their decision to cease operations as of the end of April, 2022. More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

33. Law enforcement believes that Mr. Kinahan started MTK to launder ill-gotten gains from criminal activity . More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

34. Mr. Kinahan is wanted for questioning by several law enforcement agencies due to the murderous activities of the KOCG. On or about September 16, 2018, the United States Customs and Border Protection (CBP) banned Mr. Kinahan and roughly 26 other members of the KOCG from entering America due to narco-terrorism concerns.

35. In 2016, Mr. Kinahan fled Ireland to Dubai, UAE after a boxing match he promoted ended in violence at the Regency Hotel in Dublin, Ireland. During that boxing match, several masked gunmen fired AK-47s into the crowd, killing one person and injuring several more. This shooting was an alleged attempt on Mr. Kinahan's life by a rival crime family.

36. On April 11, 2022, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) designated the Kinahan Organized Crime Group as a "Transnational Criminal Organization," and designated Mr. Kinahan, along with several other KOCG members, as Specially Designated Nationals.

37. OFAC accused the KOGC of smuggling deadly narcotics, including

THIRD AMENDED COMPLAINT

cocaine, to Europe, and declared it "a threat to the entire licit economy through its role in international money laundering."

38.     In a statement, OFAC stated that Mr. Kinahan runs the day-to-day operations of the organization.

39.     As part of the sanctions, OFAC prohibited any U.S. persons or businesses from working with Mr. Kinahan or any member of the KOGC.  The U.S. has offered a $5 million reward each for information that will lead to the "financial destruction" of the KOGC or the arrest and conviction of each of its leaders, including Mr. Kinahan.

40.     The United Arab Emirates (UAE) has joined in what has now become a global investigation into the life and accused crimes of Mr. Kinahan.  The UAE froze all identified assets of the Kinahan Organized Crime Group along with issuing sanctions on Mr. Kinahan as well as his known associates: his father Christopher Vincent 'Christy' Kinahan Sr., and his brother Christy Jr.

41.     U.S. businesses are already forbidden from conducting business with Mr. Kinahan and the six others named as key members of the KOCG, along with three identified businesses.

42.     UAE has taken the same measures, which will greatly impact what has become a growing boxing scene in Dubai. For example, Mr. Kinahan developed a relationship with a fledgling UAE promotional company called "Probellum."  Probellum recently held a two-night event in March 2022 attended by Mr. Kinahan as well as Rai Taimoor Khan, the Provincial Minister of Punjab for Youth Affairs, Sports, Archaeology and Tourism.

43.     Khan tweeted pictures he took with Mr. Kinahan and associate Sandra Vaughan, and mentioning a meeting with "Probellum on aligning vision on boxing for Punjab & how to make this sport bigger for our youth. Looking forward to hosting Daniel in Lahore to discuss Pakistan's first International fight with foreign world class boxers InshAllah. Will share more info in the upcoming weeks."

THIRD AMENDED COMPLAINT

44.     Vaughan purchased MTK Global from Matthew Macklin – Kinahan's close friend and a former middleweight title challenger – in 2017. The company was known as MGM Marbella at the time before being renamed to MTK ("Mack The Knife," after Macklin's ring moniker).

45.     Vaughan assumed the role of CEO before stepping down from the position in 2020, though she and Kinahan remain at least friendly, and influential enough for the Punjabi provincial minister to believe they represented Probellum in their meeting.

46.     The matter was admitted by Probellum officials as a mistaken classification once OFAC announced its sanctions against Mr. Kinahan.

### C. Mr. Kinahan controls MTK and its affiliates.

47.     MTK has claimed that it cut ties with Mr. Kinahan in 2017.  This claim is belied by the boxing word's near-immediate reaction to Mr. Kinahan's being sanctioned by OFAC.

48.     MTK USA may have been the contracting party with Mr. Diaz but all of the interactions regarding his fights and Mr. Diaz's matters were directed by MTK personnel to include Paul Gibson as reflected in emails exchanges between VGC and Golden Boy.

49.     Within days OFAC's designation of Mr. Kinahan as a Specially Designated National, and despite Mr. Kinahan denying connections to any co-defendant MTK entity, the boxing world has dropped Mr. Kinahan and co-defendant MTK knowing that their continued connection to Mr. Kinahan and his businesses would endanger their liberty and financial interests.

50. Indeed, shortly after Mr. Kinahan's designation as a Specially Designated National, co-defendant MTK announced on its website, www.mtkglobal.com, "Since leading promoters have now informed us that they will be severing all ties with MTK and will no longer work with our fighters, we have taken the difficult decision to cease operations at the end of this month."

THIRD AMENDED COMPLAINT

51.     In an exclusive interview with an Irish news organization, Top Rank founder and chairman Mr. Bob Arum said: "We all know what MTK was and who controlled it and once the US spoke as forcefully as they did, nobody involved in boxing was going to have anything to do with them."

52.     Asked if Mr. Kinahan, to his knowledge, continues to be involved in running MTK, Mr. Arum stated: "A hundred per cent. He founded it, it's his company." Mr. Arum further added, "He can say what he wants, I know for fact from some of the stuff that he did, that it was his company – whatever the books said."

53.     Mr. Arum had done business with Mr. Kinahan and MTK but he cut ties with both after OFAC's April 11, 2022 designations of Mr. Kinahan and the KOCG.

54.     Despite the strong evidence that Mr. Kinahan ran or operated MTK, Mr. Kinahan represented to this Court otherwise under penalty of perjury on March 14, 2022, stating, "I do not work for and am not employed by MTK Global Sports Management, LLC, MTK Global USA, LLC, Golden Boy Productions, Inc., Golden Boy Promotions, Inc., VGC, LLP, or Paul D. Gibson." [ECF 73-1]

**D. MTK, its affiliates, and Mr. Kinahan laundered  proceeds from Mr. Kinahan's and KOCG's criminal activities to pay the money through MTK and MTK USA to help lure Mr. Diaz away from Mr. Heredia's management.**

55.     On August 4, 2020, MTK USA, through an employee of MTK, signed what is titled and purported to be a business advisory agreement with Mr. Diaz, unbeknownst to Mr. Heredia.  Mr. Heredia became aware of the signing though a text message sent by Mr. Diaz to Mr. Ralph Heredia, Mr. Heredia's brother, on August 9, 2020 and later through press releases and social media on August 12, 2020. Mr. Diaz texted Ralph Heredia on August 9, 2020 stating: "I signed an advisory deal with MTK, it's being Announced tomorrow. I'm doing this for my

THIRD AMENDED COMPLAINT

career and feel like it's the best choice. It's time for a change. [flexed arm emoji]."
This was an intentional act by Defendants MTK, MTK USA, Mr. Kinahan, and
Mr. Gibson designed to induce a breach or disruption of the contractual
relationship between Mr. Heredia and Mr. Diaz, and it did in fact breach or disrupt
the contractual relationship between Mr. Heredia and Mr. Diaz.  The 2017 Contract
would otherwise have been performed but for these Defendants' alleged
misconduct.

56.     Per the terms of the MTK USA purported business advisory
agreement with Mr. Diaz, MTK USA advanced $100,000 to Mr. Diaz upon
execution of the agreement. These funds are believed to be the proceeds of
criminal activity generated by Mr. Kinahan and his KOCG, laundered through
MTK, Mr. Kinahan, and his KOCG.

57.     At all relevant times MTK received or obtained the money used to pay
Mr. Diaz, either directly or indirectly from a pattern of racketeering activity by Mr.
Kinahan's laundering of proceeds from his and his KOCG's  criminal activities.
More information concerning the nature of Mr. Kinahan's involvement in MTK
will be known after a reasonable opportunity for further investigation or discovery.

58.     MTK is associated with Mr. Daniel Kinahan and his KOCG. The
KOCG is an association-in-fact that operates one of Europe's largest criminal
cartels  and money laundering operations according to several law enforcement
agencies. Mr. Kinahan co-founded MTK with Matthew "Mack The Knife"
Macklin. Mr. Kinahan conceived and co-founded MTK in an attempt to launder
illicit proceeds from criminal activity  through a seemingly lawful business. At this
time we have no indication that Mr. Macklin knowingly participated in any of Mr.
Kinahan's criminal enterprise activity. He, along with numerous other boxing
professionals, is under scrutiny by U.S. authorities was recently denied entry into
the United States as a result of the U.S. Treasury's recent actions against Mr.
Kinahan and his KOCG.  More information concerning the nature of Mr.

THIRD AMENDED COMPLAINT

Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

59.     MTK received or obtained money, either directly or indirectly, from criminal activity  and money laundering through its association with Mr. Kinahan. More information concerning the nature of Mr. Kinahan's involvement in MTK will be known after a reasonable opportunity for further investigation or discovery.

60.     At all times relevant to this third amended Complaint, Mr. Kinahan continued to arrange boxing matches that involved MTK fighters. These matches were steeped in money obtained from Mr. Kinahan's and KOCG's criminal activity  and these monies were siphoned off Mr. Kinahan's and KOCG's criminal activity  proceeds and then laundered through MTK as what are presented as legitimate business expenses. MTK then used this money to attempt to bring in more fighters and arrange more fights so that more criminal activity  proceeds could be laundered through what appeared to be a legitimate business.

61.     MTK's thirst for new boxers supported the KOCG's money laundering needs. This thirst brought MTK to the US market and to the interference with Mr. Diaz and Mr. Heredia. More information concerning the nature of Mr. Kinahan's involvement in MTK will be known after a reasonable opportunity for further investigation or discovery.

62.     MTK engaged in a pattern of racketeering activity by approaching several US fighters and offered similar "marketing advisor" arrangements. More information concerning the nature of MTK's entry into the U.S. boxing market will be known after a reasonable opportunity for further investigation or discovery.

63.     MTK's racketeering activity continues to involve itself in criminal activity  and money laundering through its association with Mr. Kinahan.

These acts are likely to be repeated in the future. MTK advertised on its website that it is one of the biggest forces in boxing and is encouraging children as young as 15 to sign up with them to get more and more boxers in its control to

THIRD AMENDED COMPLAINT

continue the money laundering operation. This also includes a drive to become a dominant player in the United States as MTK continues its expansion into the United States. More information concerning the nature of MTK's entry into the U.S. boxing market will be known after a reasonable opportunity for further investigation or discovery.

64.     MTK has participated as a principal in the pattern of racketeering activity. MTK either committed or aided, abetted, counseled, commanded, induced, or procured the commission of several predicate acts that form a pattern of racketeering activity. More information concerning the nature of Mr. Kinahan's involvement in MTK will be known after a reasonable opportunity for further investigation or discovery.

65.     MTK also willfully caused the commission of two or more alleged predicate acts that make up the pattern of racketeering activity. MTK committed these predicate acts with intent or knowledge. MTK knows that Mr. Kinahan is involved in criminal activity  and money laundering and yet MTK still associates with Mr. Kinahan and does business regularly with Mr. Kinahan. Further, MTK itself is engaged in predicate acts when it provided these illicit funds to Mr. Diaz.

66.     MTK uses the income or proceeds derived from the racketeering activity to acquire, maintain, or operate an enterprise. An "enterprise" may consist of an individual, partnership, corporation, association, or other legal entity. Here, MTK has attempted to acquire an interest in Mr. Joseph Diaz, as a professional boxer. MTK provided Mr. Diaz $100,000 to induce him to breach his contract with Plaintiff without proper licensure, contractual, or lawful authority. These funds are directly or indirectly derived from racketeering activity as described above.

67.     MTK receives funds directly or indirectly from Mr. Kinahan, which are derived from racketeering activity such as criminal activity  and money laundering. MTK itself is laundering the illicit proceeds of the KOCG criminal activity  enterprise. More information concerning the nature of Mr. Kinahan's

THIRD AMENDED COMPLAINT

involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

68.     MTK is engaged in interstate and foreign commence. It is a foreign business entity operating in the United States, namely California. MTK is using and abusing US law in an attempt to gain a foothold in a lucrative market to continue its money laundering operation. More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

The acts of MTK, Mr. Kinahan, and Mr. Gibson have caused damage to Plaintiff: they used laundered racketeering income to injure Plaintiff.

### E. MTK USA, with MTK and GBP, improperly lured Mr. Diaz from Mr. Heredia's management and unlawfully negotiated bouts for Mr. Diaz.

69.     On August 4, 2020, MTK USA, through an employee of MTK, signed what is titled and purported to be a business advisory agreement with Mr. Diaz, unbeknownst to Mr. Heredia. This was an intentional act by Defendant GBP designed to induce a breach or disruption of the contractual relationship between Mr. Heredia and Mr. Diaz, and it did in fact breach or disrupt the contractual relationship between Mr. Heredia and Mr. Diaz.  The 2017 Contract would otherwise have been performed but for the Defendant's alleged misconduct.

70.     Mr. Heredia became aware of the signing though a text message sent by Mr. Diaz to Mr. Ralph Heredia, Mr. Heredia's brother, on August 9, 2020 and later through press releases and social media on August 12, 2020. Mr. Diaz texted Ralph Heredia on August 9, 2020 stating: "I signed an advisory deal with MTK, it's being Announced tomorrow. I'm doing this for my career and feel like it's the best choice. It's time for a change. [flexed arm emoji]."

71.     Thereafter Mr. Heredia and Ralph Heredia called Mr. Diaz, but Mr.

THIRD AMENDED COMPLAINT

Diaz did not respond and stopped communicating with Mr. Heredia.

72.     After Mr. Diaz signed the "business advisory" agreement, GBP and a law firm, VGC, LLP ("VGC") negotiated for Mr. Diaz to engage in a title defense on February 13, 2021. Emails and letters between GBP and VGC in November 2010 demonstrate that individuals from these entities were directly negotiating, while cutting out Mr. Heredia from the negotiations, despite the 2017 Contract being valid and in full force and effect at that time.

73.     Mr. Heredia was not involved in scheduling the fight and did not provide his written permission for the bout, despite the 2017 Contract requiring him to do so. Mr. Diaz failed to make weight prior to the fight and was stripped of his title.

74.     Although the fight went forward as scheduled, Mr. Diaz was required to pay a $100,000 penalty (20% of his purse) for missing weight. The fight ended in a draw, taking Diaz' record to 33-1-1. Per the 2017 Contract, Heredia should have received 18% ($72,000) of Mr. Diaz' reduced purse from the fight.

75.     Mr. Diaz still has not paid Mr. Heredia that required sum, and Mr. Heredia has had to file a California state court action to enforce this portion of the arbitration award.

76.     While the 2017 Contract was still valid and in full force and effect between Mr. Heredia and Mr. Diaz, GBP negotiated another bout for Mr. Diaz, this one on July 9, 2021.

77.     With GBP freezing out Mr. Heredia from communicating with his fighter, Mr. Diaz, Mr. Heredia was also not involved in scheduling this fight and did not provide his required written permission for the bout.

78.     Mr. Diaz' purse for the July 9, 2021 fight was $500,000. Per the 2017 Contract, Heredia was entitled to 18% ($90,000) of Mr. Diaz' purse from the fight.

79.     In an arbitration over Mr. Diaz' breach of the 2017 Contract, the

THIRD AMENDED COMPLAINT

arbitrator decided in favor of Mr. Heredia.  Mr. Diaz did not pay Mr. Diaz that sum until 10 days after ordered to in the arbitration award.

80.     During the course of the arbitration process, GBP in coordination with VGC and MTK / MTK USA, presented an altered bout agreement to the Commission for a significantly lower amount than the $500,000 in an effort to reduce the amount of the payout to Mr. Heredia. The Commission rejected this attempt to interfere with the 2017 Contract and disapproved the altered bout agreement.

81.     In his decision on July 10, 2021, the Executive Director ultimately ordered GBP to withhold $90,000 from Mr. Diaz's purse, which was 18% of the full $500,000 bout payout to Mr. Diaz.

82.     The bouts on February 13, 2021 and July 9, 2021 were negotiated in part by MTK / MTK USA and their employees and agents and VGC. None of MTK, MTK USA, Mr. Kinahan, Mr. Gibson, nor VGC possesses the proper licensure to perform either boxing management or promotional services in California.

83.     These representations also violated US federal law, which prohibits one company from providing both boxing management and promotion services. *See* 15 U.S.C. § 6308.

84.     As detailed further below, per the terms of the MTK USA purported "business advisory" agreement with Mr. Diaz, MTK USA advanced $100,000 to Mr. Diaz upon execution of the agreement. These funds are believed to be laundered proceeds of criminal activities conducted by Mr. Kinahan and his KOCG.

85.     The purported business advisory agreement states MTK USA is Mr. Diaz's sole and exclusive business advisor.

THIRD AMENDED COMPLAINT

86.     MTK and MTK USA's purported business advisory agreement with Mr. Diaz is seemingly only about business advisements. However, the actions of Mr. Gibson, MTK / MTK USA and VGC show this is actually a boxing management contract. Mr. Paul Gibson, an MTK employee, directly negotiated the terms of a bout between Mr. Diaz and another fighter, Mr. Shavkatdzhon Rakhimov, on February 13, 2021. Further, these Defendants negotiated for and arranged a second bout on July 9, 2021.

87.     Mr. Heredia asked Mr. Steve Bash, an attorney duly licensed in California, to investigate this "business advisory" agreement.

88.     Mr. Bash called Mr. Bob Yalen, CEO of MTK on August 30, 2020. Mr. Yalen claimed not to have knowledge of the MTK USA agreement with Mr. Diaz but stated he would inquire into it.

89.     However, Mr. Yalen is the signatory for MTK USA on the August 4, 2020 agreement and is quoted in a press release dated August 12, 2020 stating "We are honoured to welcome a boxing superstar in world champion JoJo Diaz to the team. His amazing record speaks for itself and he's one of the best pound for pound boxers in the world, so to have him sign with MTK Global is a massive statement of intent in terms of our expansion into America. He currently holds the IBF super-featherweight belt, and we're determined to help him build on that great success."

90.     On August 14, 2020, Mr. James Greeley of VGC reached out to Mr. Bash stating that Mr. Yalen asked him to get in touch. Mr. Greeley stated he represented Mr. Diaz. Thereafter they had a call to discuss MTK's intention. Mr. Bash requested a copy of the MTK USA agreement, which was not provided.

91.     On August 20, 2020 at around 8:00 pm, Mr. Greeley emailed Mr. Bash asking for a phone call. On August 21, 2020, Mr. Bash responded that Mr. Heredia requested not to have any further communications until the MTK USA agreement is provided.

THIRD AMENDED COMPLAINT

92.     A few hours later, Mr. Greeley responded stating various claims against Mr. Heredia and requesting to see all offers from GBP. Shortly thereafter, Mr. Bash responded by providing the information from GBP. During this email exchange Mr. Greeley's rhetoric continued to increase. At some point after this email Mr. Greeley instructed GBP to communicate with him as Diaz's legal counsel—and not Mr. Heredia—and by September 14, 2020, Mr. Greeley instructed Mr. Bash to tell Mr. Heredia not to have any communications with Golden Boy that purport to be on Mr. Diaz's behalf.

93.     VGC abandoned this position during the arbitration on June 10, 2021 as memorialized by the decision of the arbitrator.

94.     Shortly thereafter, on October 7, 2020, a complaint by Mr. Diaz was filed and litigation ensued. *See* Docket No. 5:20-cv-02332-JWH-KK (C.D. Cal.).

95.     The MTK USA "business advisory" agreement was finally disclosed during the arbitration on June 10, 2021.

96.     When Mr. Diaz signed the MTK USA purported business advisory agreement and ceased communication with Mr. Heredia, he breached the 2017 Contract.

97.     Without the MTK USA agreement and no communication from Mr. Diaz, Mr. Heredia sought to confirm his rights under the 2017 Contract. The terms of the 2017 Contract required that any dispute be submitted for arbitration within two weeks after the origin of the dispute.

98.     In accordance with this provision, on August 20, 2020, Mr. Heredia filed an arbitration request with the Commission with respect to Mr. Diaz's breach of contract pursuant to the terms of the 2017 Contract and relevant statutory and regulatory provisions.

99.     The 2017 Contract states, in relevant part: "Boxer [Mr. Diaz] Agrees … that Boxer will not, during the term of this agreement, take or engage in any boxing contests, exhibitions or training exercises without first having obtained the

-19-

written permission of Manager [Mr. Heredia] to do so."

100.   The Commission accepted the arbitration request, however, due to delays perpetuated by Diaz, the arbitration did not take place until June 10, 2021.

101.   The arbitrator found the 2017 Contract between Mr. Heredia and Mr. Diaz to be valid, and Mr. Diaz was ordered to pay Mr. Heredia his full management fees for the two aforementioned bouts that were negotiated without his assistance.

102.   One of those payments was made, albeit late and in the face of significant scrutiny by the California commission, and the second has not yet been made.  Mr. Greely informed the California State Commission they were without authority to compel payment order pursuant to the Arbitration decision (not appealed by Diaz), which the California Commission rejects and Mr. Heredia was left with no other options to collect these sums, and recently had to file a California state enforcement action to attempt to collect that second payment owed to him by Mr. Diaz.

103.   During the arbitration on June 10, 2021, the Executive Director of the Commission found that Mr. Diaz and Mr. Heredia's relationship was irreparably harmed.

104.   On July 10, 2021, the Executive Director, through his decision, canceled the remainder of the 2017 Contract due to the irreparable nature of the relationship. Mr. Heredia has been harmed by the early termination of this contract.

105.   The early termination would not have occurred if MTK and MTK USA did not induce the breach of the Boxer-Manager Contract and GBP did not facilitate or allow MTK, MTK USA, and Mr. Gibson to substitute as Mr. Diaz's managers.

106.   VGC, as MTK or MTK USA's proxy, negotiated bouts for Mr. Diaz while the 2017 Contract was in full legal force and effect, usurping Mr. Heredia's role as Mr. Diaz' lawful and exclusive manager at the time.

THIRD AMENDED COMPLAINT

107.   For example, in a November 11, 2020 email from VGC to GBP, VGC states: "We received your letter. We will, of course, present any legitimate offer to Mr. Diaz. A legitimate offer contains at least the following elements: (1) an opponent; (2) a purse; (3) a date; (4) and a location. Your note is missing half of those, and instead gives an undefined two month timeframe for a bout with no location set. This overture is pretext meant to create the illusion of contractual compliance where it does not exist."

108.   No individual in VGC or MTK, nor Mr. Kinahan, is licensed to perform boxing management functions in the State of California. *See* Cal. Bus. & Prof. Code § 18628; *see generally* 15 U.S.C. §§ 6301-6313.

109.   These actions, by Mr. Kinahan's MTK and MTK USA, through VGC, are definitional management services as defined by Cal. Bus. & Prof. Code §18628 and were taken with respect to Mr. Diaz in violation of the 2017 Contract.

110.   VGC and MTK did this despite knowing that Mr. Diaz had a valid Boxer-Manager Contract with Mr. Heredia. More information concerning the nature of the interactions between VGC, MTK, and GBP will be known after a reasonable opportunity for further investigation or discovery.

### F.  Mr. Diaz instructed Golden Boy to withhold funds lawfully earned by, and owed to, Mr. Heredia.

111.   GBP and Mr. Heredia have a long history. They have worked together for several years. Notwithstanding their long business relationship and GBP's knowledge of MTK's violations of the law, GBP has negotiated for its own financial gain with MTK as if MTK was the manager of Mr. Diaz in violation of the Muhammad Ali Boxing Reform Act.

112.   Mr. Diaz and GBP advertised bouts for Mr. Diaz on February 13, 2021 and on July 9, 2021. These bouts were premised on the 2017 promotional agreement with GBP that Mr. Heredia had previously negotiated for Mr. Diaz. This is yet another time MTK and GBP have worked together and intentionally

THIRD AMENDED COMPLAINT

frozen out Mr. Heredia from the process, despite him being Mr. Diaz's lawful and exclusive boxing manager.

113.    Payment in connection with boxing bouts is a bifurcated process. Prior to the bout itself, the promoter and boxer meet, without the boxer's manager, and the boxer directs the promoter to cut checks to members of his team, including his manager. The checks are held by the promoter until after the bout, at which time the promoter delivers the checks to the appropriate payees.

114.    Per the 2017 Contract, Mr. Heredia should have received 18% ($72,000) of Mr. Diaz' reduced purse from the February 13, 2021 bout. MTK, MTK USA, and Mr. Diaz' counsel advised Mr. Diaz to instruct GBP not to release those funds that Mr. Diaz lawfully owed Mr. Heredia under the 2017 Contract and in accord with the Promotion Term Sheet between GBP, Diaz and Heredia. Mr. Diaz still has not paid Mr. Heredia that required sum, and Mr. Heredia has had to file a California state court action to enforce this portion of the arbitration award.

115.    While the 2017 Contract was still valid and in full force and effect between Mr. Heredia and Mr. Diaz, GBP negotiated another bout for Mr. Diaz, this one on July 9, 2021. With GBP freezing out Mr. Heredia from communicating with his fighter, Mr. Diaz, Heredia was also not involved in scheduling this fight and did not provide his required written permission for the bout. Mr. Diaz' purse for the July 9, 2021 fight was $500,000. Per the 2017 Contract, Mr. Heredia was entitled to 18% ($90,000) of Mr. Diaz' purse from the fight. As a result of the Defendants' interference Mr. Diaz instructed GBP not to pay Mr. Heredia his lawfully-owed management fees under the 2017 Contract. Mr. Diaz did not pay Mr. Diaz that sum until 10 days after ordered to in the arbitration award. Mr. Heredia was left with no choice but to file a California state court enforcement action against Mr. Diaz to collect this sum, which is lawfully Mr. Heredia's under the 2017 Contract and the Arbitration award.

116.    The Defendants have engaged in a years-long campaign to ruin Mr.

Heredia's reputation in the community through lies, surrogates, and blatantly false allegations, and frivolous/ legally unsupportable complaints.

117.   The damages have been significant.  Mr. Heredia was in negotiations with at least ten potential international Olympians, world champions, and amateur boxers that were free agents with no contract with any manager in an attempt to build on their unprecedented success of having two world champions, including one homegrown over several years – something that is considered a unicorn in the world of boxing.

118.   These actions were strategically undertaken to have a devasting impact upon Mr. Heredia particularly in light of the Summer Olympics of 2021, which is prime recruitment period for boxing managers to attract new talent to their stables.  The defamatory nature and aggressive strategy funded by defendants to preserve their position and take out the one manager whose success was a threat to them has cost Mr. Heredia millions in fighter recruitment.

119.   GBP has disregarded its contractual obligations with respect to the 2017 promotional agreement with respect to Plaintiff.

120.   MTK, MTK USA, their agents, and GBP openly and notoriously interfered with the boxing management contract between Mr. Diaz and Mr. Heredia. Further, MTK, MTK USA, and GBP caused Mr. Diaz to breach the 2017 Contract with Mr. Heredia on at least two separate occasions.

MTK personnel signed the MTK USA "business advisory agreement." This suggests that it is a legal fiction that MTK and MTK USA had a distinct corporate existence.  That there is such a unity of interest and ownership between MTK and MTK USA further suggests that the separate personalities of the corporations no longer exist and that, if the acts of MTK USA are treated as those of it alone, an inequitable result would follow in that MTK would be able to unfairly shield itself from liability for its misdeeds in this case.  **CAUSES OF ACTION**

## **FIRST CAUSE OF ACTION**

THIRD AMENDED COMPLAINT

**RICO § 1962(a) – Acquiring an Interest in an Enterprise by Use of Income**

(Against MTK, MTK USA, Mr. Kinahan, and Mr. Gibson)

121.   Plaintiff incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

122.   MTK is an enterprise engaged in and whose activities affect interstate commerce. MTK is an international boxing management and promotion company and engages in marketing boxing and other fighting sport events through television and the internet. MTK is operating in several markets to include this judicial district. MTK is associated with Mr. Kinahan and Mr. Gibson is MTK's chief strategy officer. More information concerning the nature of Mr. Kinahan's involvement in MTK will be known after a reasonable opportunity for further investigation or discovery.

123.   MTK derived income, directly or indirectly, from a pattern of racketeering activity. Namely, through MTK's association with Mr. Kinahan and the KOCG, MTK has accepted income from criminal activity  and money laundering. Any investment by or through Mr. Kinahan necessarily is income derived, directly or indirectly, from criminal activity  and money laundering. More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery. Upon information and belief, these acts have occurred more than once, are related to one another, and are continuous under both the closed-end continuity theory and the open-ended continuity theory as the relationship between MTK and the KOCG has been established over time and is likely to be repeated into the future.

124.   MTK used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise. Specifically, MTK was co-founded my Mr. Daniel Kinahan who is the reported leader of the KOCG in Ireland. The KOCG is known by several governments, including the United States Government

THIRD AMENDED COMPLAINT

of engaging in narco-terrorism, criminal activity , and money laundering. MTK states that it has severed ties with Mr. Kinahan. However, while official ties on paper may have been severed, Mr. Kinahan is still influencing and controlling MTK. As recently as November 16, 2020 it is reported that MTK is still associated with Mr. Daniel Kinahan. MTK received income from Mr. Daniel Kinahan and the KOCG that was derived from a pattern of racketeering activity in an interstate enterprise. More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery. MTK then used this income derived from a pattern of racketeering activity to acquire an interest in Mr. Joseph "JoJo" Diaz, Jr, an individual. Enterprises may consist of individuals.

125.   The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

126.   MTK participated as a principle in the pattern of racketeering activity. With knowledge of the KOCG and Mr. Kinahan's criminal activity  and money laundering, MTK conspired with or aided and abetted the KOCG and Mr. Kinahan to allow MTK to be used a front for money laundering. More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery. MTK received income from the predicate acts, directly or indirectly, and then invested that income in the acquisition of an interest in Mr. Joseph Diaz, Jr, an enterprise, which is engaged in interstate and international commerce.

127.   As direct and proximate result of the MTK's racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in their business and property in that: Plaintiff has an exclusive management boxer-manager contract with Mr. Diaz. The income MTK is investing into Mr. Diaz is directly causing harm to the business relationship between Plaintiff and Mr. Diaz and has caused Mr. Diaz to stop communicating with Plaintiff resulting in several

THIRD AMENDED COMPLAINT

previously contracted for services in the management of Mr. Diaz to spoil. Further, the interference has caused harm to Plaintiff's business reputation and goodwill and interference with prospective commercial relations. Mexican American boxers also have the highest draw in the boxing sport. Loss of world champion affects their standing in the boxing management community and amongst boxing promoters.

128.   WHEREFORE, Plaintiff requests that this Court enter judgment against the MTK, MTK USA, Mr. Kinahan, and Mr. Gibson as follows: actual damages, treble damages, reasonable attorney's fees, and the costs of bringing the suit.

## SECOND CAUSE OF ACTION

## RICO § 1962(b) – Acquiring or Maintaining an Interest in or Control of an Enterprise

(Against MTK, MTK USA, Mr. Kinahan, and Mr. Gibson)

129.   Plaintiff incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

130.   MTK is an enterprise engaged in and whose activities affect interstate commerce.

131.   MTK acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity. Specifically, on or about, August 12, 2020, MTK provided Mr. Joseph Diaz, Jr. with an advance of $100,000 in exchange signing for a purported business advisory agreement in violation of the current boxer-manager contract signed between Mr. Diaz and Plaintiff.

132.   Mr. Diaz is an individual and individuals are considered "enterprises."

133.   The advance MTK provided Mr. Diaz was derived, directly or indirectly from the predicate acts of criminal activity  and money laundering as described above. MTK is associated with and conspires with Mr. Kinahan and the KOCG which is one of Europe's largest  criminal  cartels. More information

THIRD AMENDED COMPLAINT

concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery. MTK continues to maintain this interest in Mr. Diaz and recently tweeted about a February 13, 2021 mandatory title bout between Mr. Diaz and Mr. Shavkatdzhon Rakhimov. This bout was scheduled without input from or communication with Plaintiff. Further, MTK holds out on its website that Mr. Diaz is one of "their" boxers.

134.   The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

135.   MTK has directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

136.   As direct and proximate result of the MTK's racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in their business and property in that: Plaintiff has an exclusive management boxer-manager contract with Mr. Diaz. The income MTK is investing into Mr. Diaz is directly causing harm to the business relationship between Plaintiff and Mr. Diaz and has caused Mr. Diaz to stop communicating with Plaintiff resulting in several previously contracted for services in the management of Mr. Diaz to spoil. Further, the interference has caused harm to Plaintiff's business reputation and goodwill and interference with prospective commercial relations. Mexican American boxers also have the highest draw in the boxing sport. Loss of world champion affects their standing in the boxing management community and amongst boxing promoters.

137.   WHEREFORE, Plaintiff requests that this Court enter judgment against MTK, MTK USA, Mr. Kinahan, and Mr. Gibson as follows: actual damages, treble damages, reasonable attorney's fees, and the costs of bringing the suit.

THIRD AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD CAUSE OF ACTION**

**RICO § 1962(c) – Conduct the Affairs of the Enterprise**

(Against MTK, MTK USA, Mr. Kinahan, and Mr. Gibson)

138.   Plaintiff incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

139.   MTK is an enterprise engaged in and whose activities affect interstate commerce.

140.   The Kinahan Organized Crime Group (KOCG) is an association-in-fact. *See Boyle v. United States*, 556 U.S. 938, 945-46 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)). The KOCG is an enterprise engaged in and whose activities affect interstate commerce.

141.   The purported leader of the KOCG, Mr. Daniel Kinahan, co-founded MTK as a front business to launder illicit proceeds from criminal activity . MTK and the KOCG have also formed an association-in-fact to further this scheme. The more boxers under MTK allows the KOCG to launder more money from criminal activity . More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

142.   MTK is associated with or employed by the MTK/KOCG association-in-fact enterprise. MTK is associated with the KOCG as described above due to its relationship with Mr. Daniel Kinahan. More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

143.   MTK agreed to and did conduct and participate in the conduct of the MTK/KOCG association-in-fact enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally and tortuously interfering with Plaintiff's boxer-manager contract. Specifically, MTK through its association with the KOCG has been using income derived, directly or indirectly,

THIRD AMENDED COMPLAINT

from KOCGs racketeering activities which include criminal activity and money laundering. MTK used this income derived from the KOCG to provide Mr. Diaz an advance of $100,000 on his next bout. MTK did so to invest in or acquire an interest in Mr. Diaz as a professional boxer as described above. MTK also benefits from these transactions as MTK receives additional money. Stated another way, MTK is allowed to re-invest the profits of the MTK/KOCG association-in-fact enterprise to continue to grow and expand. In doing so, MTK is becoming a large player in the boxing industry and destroying smaller family run operations like Plaintiff's.

144.   MTK knows that the KOCG is involved in criminal activity and money laundering.

145.   Pursuant to and in furtherance of their scheme, the MTK/KOCG association-in-fact committed multiple related acts of criminal activity and money laundering. More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

146.   The acts of criminal activity and money laundering set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

147.   MTK has directly and indirectly conducted and participated in the conduct of the MTK/KOCG association-in-fact enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

"In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs. Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position

THIRD AMENDED COMPLAINT

in the enterprise, but some part in directing the enterprise's affairs is required."

*Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993); *See also Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1281 (11th Cir. 2006) ("… a RICO defendant must 'conduct' or 'participate in' the affairs of some larger enterprise and not just its own affairs."). More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

148.   As a direct and proximate result of the MTK, Mr. Kinahan, and Mr. Gibson's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in their business and property in that: Plaintiff has an exclusive management boxer-manager contract with Mr. Diaz. The conduct of the MTK/KOCG association-in-fact enterprise directly interferes with this contractual relationship. This interference has caused harm to the business relationship between Plaintiff and Mr. Diaz, interfered with other boxing contracts, and has caused Mr. Diaz to stop communicating with Plaintiff resulting in several previously contracted for services in the management of Mr. Diaz to spoil. Further, the interference has caused harm to Plaintiff's business reputation and goodwill and interference with prospective commercial relations. Boxers of Mexican ethnicity are currently the highest draw in the profession of boxing and a loss of a world champion Mexican boxer has wide ranging adverse impacts on the recruiting and retention efforts of Mr. Heredia and his ability to negotiate with promotional companies which is further demonstrated by GBP's willingness to ignore its contractual standing despite several years of a professional relationship.

149.   WHEREFORE, Plaintiff requests that this Court enter judgment against MTK, MTK USA, Mr. Kinahan, and Mr. Gibson as follows: actual damages, treble damages, reasonable attorney's fees, and the costs of bringing the suit.

THIRD AMENDED COMPLAINT

## FOURTH CAUSE OF ACTION

### RICO § 1962(d) – Conspiracy to Conduct the Affairs of the Enterprise

(Against MTK, MTK USA, Mr. Kinahan, and Mr. Gibson)

150.    Plaintiff incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

151.    As set forth above, the MTK agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c). Specifically MTK conspired with the KOCG association-in-fact enterprise to: (1) use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise (§ 1962(a)); (2) acquire or maintain interests in the Mr. Diaz as a professional boxer through a pattern of racketeering activity (§ 1962(b)); and (3) conduct and participate in the conduct of the affairs of the MTK/KOCG association-in-fact enterprise through a pattern of racketeering activity (§ 1962(c)). More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

152.    MTK has intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the MTK/KOCG association-in-fact enterprise through a pattern of racketeering activity.

153.    MTK knew that its predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d). More information concerning the nature of Mr. Kinahan's involvement in MTK and money laundering will be known after a reasonable opportunity for further investigation or discovery.

THIRD AMENDED COMPLAINT

154.   As direct and proximate result of the MTK's conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in their business and property in that: Plaintiff has an exclusive management boxer-manager contract with Mr. Diaz. The conduct of the MTK/KOCG association-in-fact enterprise directly interferes with this contractual relationship.

155.   The income MTK is investing into Mr. Diaz is directly causing harm to the business relationship between Plaintiff and Mr. Diaz and has caused Mr. Diaz to stop communicating with Plaintiff resulting in several previously contracted for services in the management of Mr. Diaz to spoil. Further, the interference has caused harm to Plaintiff's business reputation and goodwill and interference with prospective commercial relations. Mexican American boxers also have the highest draw in the boxing sport. Loss of world champion affects their standing in the boxing management community and amongst boxing promoters.

156.   WHEREFORE, Plaintiff requests that this Court enter judgment against MTK, MTK USA, Mr. Kinahan, and Mr. Gibson as follows: actual damages, treble damages, reasonable attorney's fees, and the costs of bringing the suit.

## FIFTH CAUSE OF ACTION

### Tortious Interference with Contract – Boxer Manager Contract

(Against MTK, MTK USA, Mr. Gibson, and GBP)

157.   Plaintiff incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

158.   At all relevant times, there was a Boxer-Manager contract (2017 Contract) between Mr. Heredia and a third party, Mr. Joseph Diaz, Jr. This contract was signed on February 23, 2017 before the California State Athletic Commission and would have lasted five years, but on July 10, 2021 was canceled by the Executive Director of the Commission.  During all relevant times this contract was

-32-

valid and enforceable.

159.   Each defendant knew of the 2017 Contract between Mr. Heredia and Mr. Diaz and that it required Mr. Heredia to be paid 18% of Mr. Diaz' bout income as a management fee.

160.   As a result of the Defendants' interference Mr. Diaz instructed GBP not to pay Mr. Heredia his lawfully-owed management fees on two separate occasions: once in connection with a February 13, 2021 bout, and once in connection with a July 9, 2021 bout.

161.   MTK, MTK USA, Mr. Gibson, and GBP performed intentional acts designed to induce a breach or disruption of the contractual relationship between Mr. Heredia and Mr. Diaz by instructing Mr. Diaz to order GBP to withhold from Mr. Heredia his contractually-required 18% management fee from the February 13, 2021 bout – which Mr. Diaz still has not paid – and from the July 9, 2021 bout, which Mr. Heredia was not paid until 10 days after the arbitration award ordered it.

162.   MTK, MTK USA, Mr. Gibson, and GBP did, in fact, breach or disrupt the contractual relationship between Mr. Heredia and Mr. Diaz by withholding from Mr. Heredia his contractually-required 18% management fee from the February 13, 2021 bout – which Mr. Diaz still has not paid –  and from the July 9, 2021 bout, which Mr. Heredia was not paid until 10 days after the arbitration award ordered it.

163.   But for MTK, MTK USA, Mr. Gibson, and GBP's actions in interfering, the payment of Mr. Heredia's bout fees, owed to him under the 2017 Contract, would have been timely performed.

164.   MTK, MTK USA, Mr. Gibson, and GBP's actions caused Mr. Heredia damages, by their instructing Mr. Diaz to order GBP to withhold from Mr. Heredia monies contractually-owed to him by Mr. Diaz, thus causing Mr. Heredia to lose the use of the funds that he was lawfully owed during the time that they were unlawfully withheld from him, for the July 9, 2021 bout, and to this day, for

the February 13, 2021 bout.

165.   Further, MTK, MTK USA, Mr. Gibson, and GBP's actions have harmed Mr. Heredia in other ways.  For example, Mr. Heredia lost oversight of Mr. Diaz, the boxer he managed. Mr. Heredia is being smeared on social media and have lost business goodwill as others see their rights and contracts being trampled upon by MTK, MTK USA, Mr. Gibson, and GBP. Further, Mr. Heredia's relationship with other currently signed boxers has been hampered. Mr. Heredia's business relationship with GBP has also been negatively affected.

166.   Moreover, MTK, MTK USA, Mr. Gibson, and GBP's actions ensured the deterioration of this longstanding remarkably successful personal and professional relationship between Mr. Heredia and Mr. Diaz, which triggered the need for arbitration, which then resulted in a reduced fight percentage allocation by the California Commission, who had to balance the fighter's future income against the enforceable contractual rights that existed as reflected in the arbitration award. These additional damages are directly tied to the irreparable harm to this relationship, as confirmed by the Arbitration, that was committed by this group of corporate raiders who were acting without any contractual or lawful authority to conduct business within any jurisdiction and in particular the State of California.

167.   MTK, MTK USA, and their agents to include Mr. Gibson and VGC, and GBP's conduct were the substantial factors in causing Plaintiff's harm. But for the interference of MTK, MTK USA, Mr. Gibson and GBP, Plaintiff's contract with Mr. Diaz would not have been interfered with and harm would not have been caused. The conduct of MTK, MTK USA, Mr. Gibson, and GBP is the substantial factor in causing Plaintiff's harm.

168.   WHEREFORE, Plaintiff requests that this Court enter judgment against these defendants as follows: actual damages, reasonable attorney's fees, and the costs of bringing the suit, all in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**

**Tortious Interference with Contract – Promoter-Manager Contract**

(Against MTK and MTK USA)

169.   Plaintiff incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

170.   At all relevant times, there was a boxing promotion contract between Defendant GBP, and Mr. Joseph Diaz, Jr. Plaintiff also signed this agreement as a representative of Mr. Diaz and is a third-party beneficiary. This contract was signed on March 22, 2017 and lasts for five years.

171.   This contract is valid and enforceable.

172.   MTK and MTK USA's conduct and GBP's collusion prevented performance or made the performance of this contract more expensive or difficult. Mr. Diaz does not to communicate with Mr. Heredia as MTK and MTK USA arranged a mandatory title bout with GBP on February 13, 2021 and another bout on July 9, 2021. MTK and MTK USA are "strangers" to this contract and are liable in tort for their intentional interference. MTK and MTK USA's conduct includes directing GBP not to communicate with Mr. Heredia, Mr. Diaz's boxing manager.

173.   These actions have caused Mr. Heredia additional time and expenses to include hiring counsel to assert his rights. Mr. Heredia cannot fulfill his role as Mr. Diaz's boxing representative and negotiate bouts on Mr. Diaz's behalf.

174.   MTK and MTK USA intended to disrupt the performance of this contract and/or knew that disruption of performance as certain or substantially certain to occur.

175.   Mr. Joseph Diaz no longer communicates with Mr. Heredia concerning his boxing career.

176.   MTK claims to be a "business" or "marketing advisor" for Mr. Diaz, however, MTK and MTK USA do not communicate with Mr. Heredia. Instead, MTK and MTK USA are performing management roles for Mr. Diaz and attempting to step into the shoes of Mr. Heredia as the boxer's representative under

1   the promotion agreement.

2        177.   MTK is not licensed or qualified as a boxing manager as required by

3   California law.

4        178.   As a result of the Defendants' interference Mr. Diaz instructed GBP

5   not to pay Mr. Heredia his lawfully-owed management fees under the Boxer-

6   Manager Contract for the February 13, 2021 bout. MTK, MTK USA, and their

7   agents want this disruption to occur as their goal is to have Mr. Diaz become one

8   of their boxers. In order to do so, they must destroy, through whatever means they

9   have available, the valid and existing contract between Mr. Diaz, GBP and Mr.

10  Heredia.

11       179.   Mr. Heredia has been harmed by the actions of MTK and MTK USA.

12  Mr. Heredia does not have oversight of the boxer he is managing. MTK and MTK

13  USA have inserted themselves as the boxer's representative and have displaced

14  Mr. Heredia. Further, Mr. Heredia's relationship with other currently signed boxers

15  has been hampered. Plaintiff's business relationship with GBP has also been

16  negatively affected.

17       180.   MTK and MTK USA's conduct are the substantial factors in causing

18  Plaintiff's harm. But for the interference of MTK and MTK USA, Plaintiff's role

19  as Mr. Diaz's representative under the promotion contract would not have been

20  interfered with and harm would not have been caused.

### SEVENTH CAUSE OF ACTION

### Inducing Breach of Contract – Boxer-Manager Contract

### (Against MTK, MTK USA, and GBP)

24       181.   Plaintiff incorporates by reference and realleges each and every

25  allegation contained in the paragraphs above as though fully set forth herein.

26       182.   Defendants MTK and MTK USA intentionally caused Mr. Joseph

27  Diaz, Jr. to breach his Boxer-Manager Contract with Mr. Heredia.

28       183.   At all relevant times, there was a Boxer-Manager Contract (2017

THIRD AMENDED COMPLAINT

Contract) between Mr. Heredia and a third party, Mr. Joseph Diaz, Jr. This contract was signed on February 23, 2017 before the California State Athletic Commission and would have lasted five years, but on July 10, 2021 was canceled by the Executive Director of the Commission.  During all relevant times this contract was valid and enforceable.

184.   MTK, MTK USA, and GBP knew that this contract existed, and that it required Mr. Heredia to be paid 18% of Mr. Diaz' bout income as a management fee.

185.   As a result of the Defendants' interference Mr. Diaz instructed GBP not to pay Mr. Heredia his lawfully-owed management fees on two separate occasions: once in connection with a February 13, 2021 bout, and once in connection with a July 9, 2021 bout.

186.   MTK, MTK USA, Mr. Gibson, and GBP performed intentional acts designed to induce a breach or disruption of the contractual relationship between Mr. Heredia and Mr. Diaz by instructing Mr. Diaz to order GBP to withhold from Mr. Heredia his contractually-required 18% management fee from the February 13, 2021 bout – which Mr. Diaz still has not paid –  and from the July 9, 2021 bout, which Mr. Heredia was not paid until 10 days after the arbitration award ordered it..

187.   MTK, MTK USA, Mr. Gibson, and GBP did, in fact, breach or disrupt the contractual relationship between Mr. Heredia and Mr. Diaz by withholding from Mr. Heredia his contractually-required 18% management fee from the February 13, 2021 bout – which Mr. Diaz still has not paid –  and from the July 9, 2021 bout, which Mr. Heredia was not paid until 10 days after the arbitration award ordered it.

188.   But for MTK, MTK USA, Mr. Gibson, and GBP's actions in interfering, the payment of Mr. Heredia's bout fees, owed to him under the 2017 Contract, would have been timely performed.

THIRD AMENDED COMPLAINT

189.   MTK, MTK USA, Mr. Gibson, and GBP's actions caused Mr. Heredia damages, by their instructing Mr. Diaz to order GBP to withhold from Mr. Heredia monies contractually-owed to him by Mr. Diaz, thus causing Mr. Heredia to lose the use of the funds that he was lawfully owed during the time that they were unlawfully withheld from him, for the July 9, 2021 bout, and to this day, for the February 13, 2021 bout.

190.   Further, MTK, MTK USA, Mr. Gibson, and GBP's actions have harmed Mr. Heredia in other ways.  For example, Mr. Heredia lost oversight of Mr. Diaz, the boxer he managed. Mr. Heredia is being smeared on social media and have lost business goodwill as others see their rights and contracts being trampled upon by MTK, MTK USA, Mr. Gibson, and GBP.

191.   Further, Mr. Heredia's relationship with other currently signed boxers has been hampered. Mr. Heredia's business relationship with GBP has also been negatively affected.  MTK, MTK USA, and their agents to include Mr. Gibson and VGC, and GBP's conduct were the substantial factors in causing Plaintiff's harm. But for the interference of MTK, MTK USA, Mr. Gibson and GBP, Plaintiff's contract with Mr. Diaz would not have been interfered with and harm would not have been caused. The conduct of MTK, MTK USA, Mr. Gibson, and GBP is the substantial factor in causing Plaintiff's harm.

192.   The conduct of MTK, MTK Global, and GBP are the substantial factors in causing Plaintiff's harm. A person is not justified in inducing a breach of contract simply because they are in competition with one of the parties to the contract and seeks to further their own economic advantage at the expense of another.

193.   WHEREFORE, Plaintiff requests that this Court enter judgment against these defendants as follows: actual damages, reasonable attorney's fees, and the costs of bringing the suit, all in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

-38-

**Intentional Interference with Prospective Economic Relations**

(Against MTK, MTK USA, and GBP)

194.   Plaintiff incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

195.   Defendants MTK, MTK USA, and GBP intentionally interfered with an economic relationship between Mr. Heredia and Mr. Joseph Diaz, Jr. that probably would have resulted in an economic benefit to Mr. Heredia. Namely, Mr. Heredia had a contract with Mr. Diaz for boxing management and due to the interference Defendants MTK, MTK USA, and GBP have impacted the future relationship between Mr. Diaz and Mr. Heredia and Mr. Heredia's ability to attract other promising boxers to his stable.

196.   At all relevant times, there was a Boxer-Manager Contract (2017 Contract) between Mr. Heredia and a third party, Mr. Joseph Diaz, Jr. This contract was signed on February 23, 2017 before the California State Athletic Commission and would have lasted five years, but on July 10, 2021 was canceled by the Executive Director of the Commission.  During all relevant times this contract was valid and enforceable.

197.   MTK, MTK USA, and GBP knew that this contract existed, and that it required Mr. Heredia to be paid 18% of Mr. Diaz' bout income as a management fee. As a result of the Defendants' interference Mr. Diaz instructed GBP not to pay Mr. Heredia his lawfully-owed management fees on two separate occasions: once in connection with a February 13, 2021 bout, and once in connection with a July 9, 2021 bout.

198.   MTK, MTK USA, and GBP performed intentional acts designed to induce a breach or disruption of the contractual relationship between Mr. Heredia and Mr. Diaz by their instructing Mr. Diaz to order GBP to withhold from Mr. Heredia his contractually-required 18% management fee from the February 13, 2021 bout  and from the July 9, 2021 bout, which Mr. Heredia was not paid until

THIRD AMENDED COMPLAINT

10 days after the arbitration award ordered it.

199.   MTK, MTK USA, and GBP did, in fact, breach or disrupt the contractual relationship between Mr. Heredia and Mr. Diaz by withholding from Mr. Heredia his contractually-required 18% management fee from the February 13, 2021 bout – which Mr. Diaz still has not paid – and from the July 9, 2021 bout, which Mr. Heredia was not paid until 10 days after the arbitration award ordered it. MTK, MTK USA, and GBP's actions in breaching or disrupting the contractual relationship between Mr. Heredia and Mr. Diaz not only interfered with Mr. Heredia's expectancy, but the defendants engaged in conduct that was wrongful by some legal measure other than the fact of interference itself, for example, by instructing Mr. Diaz to order GBP to withhold funds lawfully earned by, and owed to, Mr. Heredia, this causing Mr. Heredia financial and reputational harm.

200.   But for MTK, MTK USA, and GBP's actions in interfering, the payment of Mr. Heredia's bout fees, owed to him under the 2017 Contract, would have been timely performed and Mr. Heredia would have been better able to attract other boxers to his management stable, which would have earned him additional management fees.

201.   MTK, MTK USA, Mr. Gibson, and GBP's actions caused Mr. Heredia damages, by instructing Mr. Diaz to order GBP to withhold from Mr. Heredia monies contractually-owed to him by Mr. Diaz, thus causing Mr. Heredia to lose the use of the funds that he was lawfully owed during the time that they were unlawfully withheld from him, for the July 9, 2021 bout, and to this day, for the February 13, 2021 bout.

202.   Further, MTK, MTK USA, Mr. Gibson, and GBP's actions have harmed Mr. Heredia in other ways.  For example, Mr. Heredia lost oversight of Mr. Diaz, the boxer he managed. Mr. Heredia is being smeared on social media and has lost business goodwill as others see their rights and contracts being trampled upon by MTK, MTK USA, and GBP.

203.   Further, Mr. Heredia's relationship with other currently signed boxers has been hampered.  Even more, Mr. Heredia's ability to attract new promising boxers to his stable has been hampered by this interference, thus potentially costing him management fees from his management of those boxers who elected not to sign with him.  Finally, Mr. Heredia's business relationship with GBP has also been negatively affected.

204.   MTK, MTK USA, and their agents to include VGC, and GBP's conduct were the substantial factors in causing Plaintiff's harm. But for the interference of MTK, MTK USA, Mr. Gibson and GBP, Plaintiff's contract with Mr. Diaz would not have been interfered with and harm would not have been caused. The conduct of MTK, MTK USA, and GBP is the substantial factor in causing Plaintiff's harm.

205.   WHEREFORE, Plaintiff requests that this Court enter judgment against these defendants as follows: actual damages, reasonable attorney's fees, and the costs of bringing the suit, all in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### Negligent Interference with Prospective Economic Relations

(Against MTK and MTK USA)

206.   Plaintiff incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

207.   MTK USA and MTK know or should have known of the relationship.

208.   MTK USA and MTK know or should have known that this relationship would be disrupted if they failed to act with reasonable care.

209.   MTK USA and MTK failed to act with reasonable care.

210.   MTK USA and MTK have engaged in wrongful conduct through, *inter alia*, inducing breach of contract, tortious interference with contract, violations of statutory authority with respect to boxing management.

211.   Mr. Heredia's relationship with Mr. Diaz has been disrupted by MTK

-41-

THIRD AMENDED COMPLAINT

USA, and MTK's actions.

212.   MTK USA and MTK's wrongful conduct are a substantial factor in causing harm to Mr. Heredia.

213.   This wrongful conduct has resulted in financial harm to Mr. Heredia to include loss of management fees from Mr. Diaz.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and an award against Defendants as follows:

1.   For compensatory damages in an amount to be determined at trial;

2.   For treble damages in an amount to be determined at trial;

3.   For pre- and post-judgment interest at the maximum rate allowed by law;

4.   For recovery of reasonable attorneys' fees;

5.   For the costs of the suit; and

6.   For such other and further relief as the Court deems just and proper.

7.   Jury trial is demanded.

Dated: April 29, 2022          Respectfully submitted,


/s/ *Rajan O. Dhungana*
Rajan O. Dhungana (SBN: 297794)
FEDERAL PRACTICE GROUP
14481 Aspen Street
Hesperia, CA 92344
Telephone: (310) 795-6905
rdhungana@fedpractice.com

/s/ *Eric S. Montalvo*
Eric S. Montalvo (*Pro Hac Vice*)
FEDERAL PRACTICE GROUP
1750 K Street, N.W., Suite 900
Washington, D.C. 20006

THIRD AMENDED COMPLAINT

Telephone: (202) 862-4360
Fax: (888) 899-6053
emontalvo@fedpractice.com

*Attorneys for Plaintiff*
Moses Heredia

THIRD AMENDED COMPLAINT