# Exhibit A

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**(EASTERN DIVISION)**

| | |
|---|---|
| MOSES HEREDIA, | 5:20-cv-02618-JWH-kk |
| Plaintiff, | **AFFIDAVIT OF MOSES HEREDIA ISO DAMAGES** |
| v. | |
| MTK GLOBAL SPORTS MANAGEMENT, LLC, *et al*., | |
| Defendants. | |

# <u>AFFIDAVIT OF MOSES HEREDIA</u>

I, Moses Heredia, hereby declare as follows:

1. I have personal knowledge of the following facts and, if called as a witness, I could and would testify competently with respect thereto.

2. I am a boxing manager duly licensed before the California State Athletic Commission (hereinafter "Commission").

3. I am the owner of Heredia Boxing Management ("HBM"), Inc., a duly registered California Corporation. Together with my brother Ralph Heredia, HBM has managed high-level boxers for 15 years.

4. I met Joseph ("Mr. Diaz") Diaz, Jr. around 2011 in El Monte, California. At the time, Mr. Diaz, then 19, was attempting to qualify for a spot on the United States Olympic Team after fighting for the L.A. Matadors in the World Series of Boxing.

5. In 2012, Mr. Diaz qualified for the United States Olympics for the London Olympic Games. Shortly after the Olympics in August 2012, Mr. Diaz wanted to turn professional and sign a promotional contract. Mr. Diaz approached my brother and me for a promotional contract. At the time, we viewed Mr. Diaz as a humble, happy, and hardworking young man. My brother Ralph and I were already working with other boxers and felt we

could negotiate a favorable promotional contract to help Mr. Diaz begin his professional career.

6. On September 4, 2012, Mr. Diaz, Ralph, and I signed a Boxer-Manager Contract (No. M-2012-0012) after Mr. Diaz turned professional. A representative of the Commission oversaw the signing of this new contract. As per all of our standard contracts at HBM, the contract was for 5 years. Per the contract, I received 20% for our management services.

7. The contract was on the preapproved two-page form drafted by the Commission. The contract was approved by the Commission and the Commission retained a copy.

8. Shortly thereafter, I arranged a meeting with Todd DuBoef, President of Top Rank, at the Polo Lounge of the Beverly Hills Hotel to discuss a long-term promotional agreement for Mr. Diaz.

9. I also arranged a meeting with Gary Shaw, who had an exclusive relationship with Showtime Networks at the time. Ralph and I also met with Golden Boy Promotions ("GBP"), as we had a pre-existing relationship dating back to 2010 and were working with GBP on Mr. Sharif Bogere's career, another upcoming boxer.

10. On December 7, 2012, we signed a Promotion Contract Term Sheet with GBP.

AFFIDAVIT OF MOSES HEREDIA

11. On December 15, 2012, Mr. Diaz began his professional boxing career in a bout against Vicente Alfaro Martinez. Mr. Diaz won, and this win kicked off an extremely successful streak.

12. Mr. Diaz had a string of career successes throughout the term of the first (2012-2017) Boxer Manager agreement, including capturing the NABF Featherweight title 3 years after his professional debut and defending his NABF title several times.

13. Four years into our Boxer-Manager relationship, Mr. Diaz was the #3 ranked featherweight in the world by the WBC, #4 in the WBO, and #6 in the IBF.

14. Oftentimes, Mr. Diaz would receive purses that were above his guaranteed minimums and GBP would write him separate checks for "training expenses," so that other 2012 Olympians like Errol Spence, Rau'Shee Warren, Marcus Browne, Dominic Breazeale, and Terrell Gausha, all of whom were managed by Al Haymon and were getting paid less by GBP, would not know that Mr. Diaz was in fact earning more. This was a testament to Mr. Diaz's rising star power.

15. We always had Mr. Diaz's best interests at heart when negotiating bout earnings with GBP, even when those negotiations with GBP became increasingly more difficult and contentious over time.

AFFIDAVIT OF MOSES HEREDIA

16. Our relationship with Mr. Diaz was very strong and familial during the first Management contract. Mr. Diaz was a hard-working, responsible, and respectful athlete who was close to his family, loved ones, trainers, and managers.

17. On February 23, 2017, and after signing an official Release pursuant to Commission rules, Mr. Diaz and I signed a new Boxer-Manager Contract (No. 2017-0006). Mr. Larry Ervin from the Commission oversaw and witnessed the Release and signing of this new contract. The new Boxer-Manager Contract reduced the Manager's fees from the 20% rate of the first management contract to 18%, and was again for 5 years (to conclude in February 2022). In signing this contract, Mr. Diaz, my brother Ralph, and I all recognized the high potential for Mr. Diaz to achieve great success during this 5-year term.

18. Heather Jackson of the Commission approved this contract on February 24, 2017, and provided me with a "Notice of Approved Contract." The contract was on the preapproved two-page form drafted and approved by the Commission.

19. Prior to signing the new Boxer-Manager contract on February 23, 2017, Ralph and I were already negotiating a renewal of the promotional agreement with GBP.

20. Our relationship with Mr. Roberto Diaz (no relation to Mr. Diaz) of GBP became strained as Mr. Roberto Diaz was pushing Mr. Diaz to resign a new promotional agreement early, to the extent that Mr. Roberto Diaz refused to offer Mr. Diaz a future bout until he did. However, the initial drafts of the GBP promotional contract were not satisfactory to us or Mr. Diaz.

21. GBP insisted that the new Agreement allow GBP to control Mr. Diaz's trainers and, specifically, to remove Mr. Diaz's father as his trainer. This was a big problem for Mr. Diaz as he specifically requested full authority in choosing his trainers, including as a modification in our management agreement. Accordingly, we negotiated hard to represent Mr. Diaz to get his preferred terms.

22. GBP was also unwilling to provide larger compensation for specific bouts or if Mr. Diaz reached certain milestones throughout the term. Mr. Diaz was also seeking a larger signing bonus than his previous bonus in 2012.

23. The final version abutted a GBP imposed deadline wherein GBP wanted to advertise the undercard for upcoming PPV bouts with Canelo Álvarez. GBP used the 2012 agreement as a template which had both Ralph and myself listed on the term sheet as managers. The negotiations were intense, and it would take another month to get the promotional agreement term sheet signed.

24. In the end, GBP left both Ralph and me on the promotion agreement as managers. Looking to finalize the agreement under a deadline, both of us signed. Nonetheless, I was always responsible for all decisions made.

25. After several months of negotiations, I was able to achieve the sought compensation and concessions on behalf of Mr. Diaz, which included, amongst others, a lucrative signing bonus for Mr. Diaz, purse minimums that were significantly greater than the previous promotional contract with GBP, guaranteed fights on the biggest cards and platforms that GBP promoted, performance bonuses, training expenses, and a new and potentially rewarding Pay-Per-View (PPV) revenue share should Mr. Diaz become a PPV main event fighter.

26. The negotiations were extremely difficult with GBP, and nearly fell apart on numerous occasions.

27. Mr. Diaz was extremely satisfied with the new deal, and we went out to dinner to celebrate after signing the new Promotional contract.

28. Under this contract, Mr. Diaz ultimately fought 10 bouts: 1) May 6, 2017 against Manuel Ávila, 2) September 16, 2017 against Rafael Rivera, 3) February 22, 2018 against Victor Terrazas, 4) May 19, 2018 against Gary Russell, Jr., 5) August 11, 2018 against Jesús Rojas, 6) February 19, 2019 against Charles Huerta, 7) May 4, 2019 against Freddy Fonseca, 8)

September 21, 2019 against Jesus Cuadro, 9) January 30, 2020 against Tevin Farmer, and 10) February 3, 2021 against Shavkatdzhon Rakhimov. The gap from January 30, 2020, to February 3, 2021, was due to the COVID-19 pandemic, which caused the boxing industry to come to a complete halt, precluding any fights from happening until early 2021. The opportunity for a manager to continue fulfilling their obligations to a fighter was suspended during this time.

29. I also made sure that these high-exposure PPV shows would help position Mr. Diaz into a World Title opportunity. Indeed, Mr. Diaz was offered that World Title opportunity just one year into the new management Contract.

30. On May 19, 2018, Mr. Diaz challenged for the WBC World Featherweight title against Gary Russell. Despite failing to capture the WBC world title, I worked hard to get Mr. Diaz another world title opportunity.

31. After the failed Gary Russell title challenge, and through my efforts and negotiations as Manager, Mr. Diaz won four consecutive bouts against unranked, tune-up style opponents. The purses for these four bouts were all exponentially higher than his minimum purse requirements under his promotional agreement with GBP.

32. These well-paying, yet "safe" bouts allowed Mr. Diaz to rise in the World Rankings and put him in consideration for another World Title opportunity.

Specifically, we carefully guided Mr. Diaz to an IBF World Title challenge bout against long-reigning Champion Tevin Farmer.

33. Once again, I was in heated and adversarial contract negotiations with GBP for the World Title bout with Mr. Farmer. We were able to secure the World Title challenge and on a major show that took place during Super Bowl weekend in Miami on January 30, 2020.

34. Mr. Diaz won the IBF super featherweight title in his bout against Mr. Tevin Farmer. This win immediately skyrocketed Mr. Diaz's demand, and greatly enhanced our stature in the industry.

35. We were posed to capitalize on Mr. Diaz's championship, both by securing higher purses for Mr. Diaz, and by attracting new talent to our stable of boxers.

36. Prior to Mr. Diaz's title win, Ralph and I met with Mr. Stephen Espinoza in Las Vegas in November 2019. Mr. Espinoza was interested in featuring Mr. Diaz in a potential march against Tank Davis, due to Mr. Diaz's position as a rising star and the fact that Mr. Diaz's fighting style presented a great counterpoint for Tank Davis. After Mr. Diaz's title win in January 2020, the potential for a champion v. champion, Davis v. Diaz fight was all-but-certain, with a massive potential for monetary gain and even greater heightened publicity.

37. In addition, following Mr. Diaz's title win, at minimum, my brother and I expected to onboard 3-5 new potential boxers, each for 5 year terms, each of whom could have easily demanded $100,000 in purse money per fight.

38. On such fighter was Terence Crawford, whom my brother Ralph had first gotten to know very well from a young age and had identified Mr. Crawford's potential. He is currently the number one Welter Weight in the world.  Over the years, my brother and I had built and maintained a relationship with Mr. Crawford. After Mr. Diaz's win, we entered discussions with Crawford to be managed by us.

39. On or about August 12, 2020, I learned through social media that Mr. Diaz had signed an agreement with a rival boxing management company, MTK Global ("MTK"). Due to this interference, we were no longer able to communicate with Mr. Diaz, as he refused to talk to us. MTK also spread rumors about my brother and I, including lies suggesting we were skimming and stealing from our stable of fighters.

40. Despite the valid and enforceable 2017 Boxer-Manager contract, Mr. Diaz had never contacted me regarding his dealings with MTK.

41. My previous communication with Mr. Diaz was on July 24, 2020 (less than 3 weeks prior to the August 12, 2020, social media post), when Mr. Diaz texted me with a very common request to borrow money, referencing future

plans and potential earnings indicating that he was excited to continue working with my brother and I for the foreseeable future. *See* Enclosure 1.

42. Despite this, just a few weeks after receiving $4,000 from me, and nine days after receiving yet additional money to pay for his essential needs (such as rent and phone bill), Mr. Diaz had suddenly signed a competing agreement with MTK and ceased all communications with me.

43. Based on my understanding, Mr. Diaz received an advance/loan of $100,000 on his next bout for signing this agreement with MTK. MTK provided this advance/loan in exchange for Mr. Diaz signing what they term as "marketing advisory" agreement.

44. On August 12, 2020, Mr. Diaz and MTK publicly posted that they had signed a contract.

45. MTK posted this press release on their website calling it a "new signing" and CEO Bob Yalen welcoming Diaz "to the team."

46. With respect to Mr. Diaz, he hired a law firm, VGC, LLP to, among other things, assist with his negotiations with GBP. VGC first reached out to GBP in September 2020 and directed GBP to cease all communications with me regarding Mr. Diaz's upcoming mandatory title defense and to negotiate exclusively with MTK instead.

47. But for the actions of MTK, the match against Tank Davis would have taken place. Diaz and GBP cut off all communication, which made it impossible to proceed with further negotiations.

48. It was clear that the newly formed partnerships between GBP, MTK, and Top Rank which uniformly took a hostile position toward our team signaled to fighters that our ability to secure bouts was unlikely and viewed us as incapable of furthering their careers making us ineffective as managers and unemployable.

49. MTK and GBP unilaterally set the terms for the bout which took place on February 13, 2021, against Mr. Shavkatdzhon Rakhimov.

50. Defendants did not involve me as Mr. Diaz's boxing manager in the negotiations.

51. Mr. Diaz did not involve me in his training camp for this bout as he had done in all of his professional bouts.

52. Mr. Diaz' contracted purse with GBP for the Rakhimov bout was $500,000, which is the minimum purse requirement negotiated and agreed to for such a bout in Mr. Diaz' promotional contract that I negotiated and secured in 2017.

53. Mr. Diaz received the exact minimum benefit he was entitled to based on his promotional agreement; however, we would have negotiated a better outcome for Mr. Diaz.

54. On February 13, 2021, Mr. Diaz, after being advised by VGC and MTK, directed GBP not to pay the $90,000 manager fee owed to me under my Boxer Manager Contract.

55. Through the remaining duration of the contract, and based on our years of experience in the industry, Mr. Diaz essentially lost the opportunity to feature in the match with Tank Davis.

56. We would have earned a substantial amount, and with Mr. Diaz's status as a champion and unique fighting style as compared to Tank Diaz, we could have negotiated a higher purse amount, likely ranging from 50% to 60% of the revenue generated from the fight. In addition, the pay per view payout would have increased due to heightened interest in a champion v. champion fight.

57. The interference from MTK and its partners also denied me $360,000 in money due for Mr. Diaz's matches over the remainder of the 2017-2022 contract term. From 2021 to 2022, Mr. Diaz made $2.5 million over 4 matches. Although we could have negotiated higher purse amounts for Mr. Diaz, we were entitled to 18%, at $450,000.

58. I was only paid $90,000 for the above period, meaning I have not been paid the remaining $360,000 due to me under the contract.

59. My brother and I were extremely close to Mr. Diaz prior to the interference of MTK. I believe the unavoidable isolation and distance due to the COVID-19 pandemic (and the resulting pause on training and scheduling fights), coupled with Mr. Diaz's bad habits, made him vulnerable.

60. If MTK had not blatantly and illegally interfered, we would have signed Mr. Diaz to another 5-year contract. We continued to text and communicate with Mr. Diaz up until a few weeks before MTK's interference. My brother and I even provided him with financial assistance by giving him advances and interest-free loans. If MTK had not wrongfully interfered, we would have continued to guide Mr. Diaz to greater successes, not just with the Davis v. Diaz fight.

61. After Mr. Diaz attained the title, his average purse was $737,500.00, with one purse at $1.5 million. Over a 5-year contract, post-championship, we would have negotiated high-paying purse amounts, for at least two matches a year. Over 5 years, 10 matches minimum, Mr. Diaz would have earned at least $7,375,000 in a 5-year follow-on contract, from 2022 to 2027.

62. We would have received around 18-20% of the purse amounts. At 18%, I would have received $1,327,500.

63. The impact on my reputation also caused me to lose 3-5 potential boxer clients, including Terence Crawford. Each new boxer candidate brings the I potential to be the next champion or rising star.

64. In fact, my understanding is that Mr. Crawford recently earned $10,000,000 dollars for one fight. This one fight alone would have generated $1,800,000 in management fees.

65. In my experience, especially with our post-title reputation, each new fighter would have been able to command a minimum of $100,000 per purse. Over the standard 10 fights over the 5-year contract term, we would have received at minimum $180,000 per fighter.

66. As such, the loss of new boxer clients cost me $540,000 to $900,000, and that amount does not include the potential for any one fighter to break through to higher-level fights, just as Crawford has.

67. The stress of dealing with this ongoing situation has also caused me untold emotional harm. My brother and I dedicated ourselves to building our reputation and our business. Our professional reputation was just reaching the apex of the boxing industry when we were targeted by MTK and its partners. The damage they have caused is substantial, and they have destroyed our business relationship with our top fighter, with whom we invested our time, money, and personal relationships with. MTK and its

partners have damaged our reputation with their false allegations, and adversely impacted our business's performance.

68. The personal toll has also been heavy on me and my brother. This series of events has inflicted untold stress and emotional harm, from which it will be difficult to recover fully.

69. Based on the foregoing, I believe I am entitled to a minimum of $10,732,500 as a result of Defendants' actions.

I declare under the penalty of perjury that the foregoing is true and correct, and that this Affidavit was executed this April 04, 2024, at Los Angeles, California.

Moses Heredia

# Enclosure 1

Hey what's up Moses! I thought I replied. Thanks you, I'm excited for this new journey as well. Big things to come, the future is bright. I was wondering if you can do me a favor Moses. I need some money around 4K for personal use and to cover my gf's tuition for school. I've been trying to get ahold of Ralph. But I know he's being isolated and try to get better. I'll pay back with the remaining amount I owe after this next fight. Hope all is well, everything been good over here been training everyday at the teamsters gym. Cutting the weight and getting ready for my fight date. We gotta a lot to accomplish still and a lot of money to make.

# Exhibit B

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### (EASTERN DIVISION)

| | |
|---|---|
| MOSES HEREDIA, | 5:20-cv-02618-JWH-kk |
| Plaintiff, | **AFFIDAVIT OF RALPH HEREDIA ISO DAMAGES** |
| v. | |
| MTK GLOBAL SPORTS MANAGEMENT, LLC, *et al*., | |
| Defendants. | |

## <u>AFFIDAVIT OF RALPH HEREDIA</u>

I, Ralph Heredia, hereby declare as follows:

1.     I have personal knowledge of the following facts and, if called as a witness, I could and would testify competently with respect thereto.

2.     I met Joseph "Mr. Diaz" Diaz, Jr.  ("Mr. Diaz") around 2009 or 2010 in the Teamsters Boxing Gym in El Monte, California. I used to train with Mr. Ben Lira, along with Mr. Diaz's father, Joseph Diaz Sr. Mr. Lira introduced me to Mr. Diaz, and that is when our friendship with Mr. Diaz and his family began.

3.     On September 4, 2012, Mr. Diaz, Moses Heredia, and I signed a Boxer-Manager Contract with the California State Athletic Commission. Both Moses and I were duly licensed boxing managers at the time.

4.     Shortly thereafter, Moses and I met Top Rank and Golden Boy Promotions ("GBP") to field promotional offers.  We also met with Gary Shaw who at the time had a close business relationship with Showtime Networks.

5.     GBP made the best offer to Mr. Diaz. The promotional contract with GBP included a $100,000 signing bonus, monthly stipends of $2,500 for the first year of the contract ($30,000 total), and $150,000 in performance bonuses.  Mr. Diaz would also receive bout purses that were higher than the other U.S. Olympians managed by Al Haymon and promoted by GBP.

6.      On December 7, 2012, Mr. Diaz signed the promotional agreement with GBP. Moses and I served as his managers on this contract.

7.      On December 15, 2012, Mr. Diaz began his professional boxing career in a bout against Vicente Alfaro Martinez (Mr. Diaz had also participated in World Series of Boxing bouts in 2011 for the "LA Matadors" which were considered professional in the State of California).

8.      During the first Boxer-Manager agreement signed in 2012, Mr. Diaz was very easy to work with and a consummate professional.  His dedication and work ethic paid off as he won the NABF Featherweight title 3 years after his professional debut and defended his NABF title several times.  Four years into our Boxer-Manager relationship, Mr. Diaz had an undefeated record of 23 wins and no losses and was the #3 ranked featherweight in the world by the WBC, #4 in the WBO, and #6 in the IBF.

9.      Moses and I worked very hard to make sure Mr. Diaz had the best training and was compensated well by GBP. We negotiated for very favorable bouts against the most favorable opponents, sponsorship agreements with national companies such as Jersey Mike's, Corona, and Tecate, and very favorable purses for a boxer at that point of his career.  We always had Mr. Diaz's best interests at hand when negotiating bouts with GBP, even when those negotiations with GBP became increasingly more difficult and contentious.

10.     The relationship with GBP slowly turned sour when Roberto Diaz (no relation to Mr. Diaz) became increasingly more difficult to negotiate with as Mr. Diaz and other boxers under our management rose to higher and higher levels in the sport. As more time went on, there was a greater divide between Roberto's interests and the interests of our fighters.

11.     On February 23, 2017, Mr. Diaz, Moses Heredia, and I signed a Release for the original Boxer-Manager Contract. On the same day, Mr. Diaz and Moses Heredia signed a new Boxer-Manager Contract, which was presided over by CSAC Representative Larry Ervin. The new Boxer-Manager Contract reduced the Manager's fees from the 20% rate under the first management contract to 18%, pursuant to an agreement made between Moses and Mr. Diaz.

12.     I had allowed my boxing manager license to expire and did not sign the 2017 Boxer-Manager Contract. I would simply work for Heredia Boxing Management ("HBM") and help the fighters who I had grown a close relationship with.  Moses, who continued to have a cordial relationship with GBP, became the sole licensed manager for HBM.

13.     Under this contract, Mr. Diaz ultimately fought 10 bouts: 1) May 6, 2017 against Manuel Ávila, 2) September 16, 2017 against Rafael Rivera, 3) February 22, 2018 against Victor Terrazas, 4) May 19, 2018 against Gary Russell, Jr., 5) August 11, 2018 against Jesús Rojas, 6) February 19, 2019 against Charles

Huerta, 7) May 4, 2019 against Freddy Fonseca, 8) September 21, 2019 against Jesus Cuadro, 9) January 30, 2020 against Tevin Farmer, and 10) February 3, 2021 against Shavkatdzhon Rakhimov. The gap from January 30, 2020, to February 3, 2021, was due to the COVID-19 pandemic, which caused the boxing industry to come to a complete halt, precluding any fights from happening until early 2021. The opportunity for a manager to continue fulfilling their obligations to a fighter was suspended during this time.

14.     Despite losing his first world title opportunity to Gary Russell, Mr. Diaz was rehabilitated immediately with an interim WBA World Title shot against Jesus Rojas.

15.     The purses for these four bouts far exceeded his minimum purse requirements outlined in his promotional agreement with GBP. These lucrative yet "safe" bouts contributed to Mr. Diaz's rise in the World Rankings, positioning him as a contender for another World Title opportunity. As such, we strategically guided Mr. Diaz towards an IBF World Title challenge against the long-reigning Champion, Tevin Farmer.

16.     On January 30, 2020, Mr. Diaz secured victory over Tevin Farmer, and became the International Boxing Federation World Super Featherweight championship.  This win instantaneously surged Mr. Diaz's demand and significantly elevated our standing within the industry.

17.     Moses and I were expecting to capitalize on Mr. Diaz's championship, aiming to secure increasingly higher purses for him while also attracting new talent to our stable of boxers.

18.     Prior to Mr. Diaz's title win in January 2020, I met with Mr. Stephen Espinoza in Las Vegas in November 2019 at the Canelo Álvarez and Sergey Kovalev fight. Mr. Espinoza expressed interest in showcasing Mr. Diaz in a potential match against Tank Davis, due to Mr. Diaz's status as a rising star and his fighting style, which served as a compelling counterpoint for Tank Davis. Following Mr. Diaz's title win in January 2020, the likelihood of a champion v. champion, Davis v. Diaz fight became highly probable, promising substantial financial gain and heightened publicity. The prospect of a pay-per-view match would have resulted in a large windfall for Mr. Diaz and HBM. I feel confident that with our reputation and negotiation experience, and with Mr. Diaz's position as a newly crowned champion, Mr. Diaz would have commanded a 50% share of the gross pay-per-view revenue at minimum, potentially even a 60% share.

19.     In addition, following Mr. Diaz's title win, at minimum, we expected to onboard 3-5 new potential boxers, each for 5-year terms, each of whom could have easily demanded $100,000 in purse money per fight, from which we would have earned 18-20%.

20.     One such prospective client was Terence Crawford. I first met Terence Crawford in 2009, when Terence and one of my boxers, Sharif Bogere, were training with Kenny Adams, head coach of the American national boxing team and an Olympic legend. We had identified Terence as a talented prospect from early on, and maintained communication over the years.

21.     Following the title victory with Mr. Diaz in January 2020, we began serious discussions about adding Mr. Crawford to our stable. It is my belief that we were very close to signing Mr. Crawford to our stable.

22.     On or about August 12, 2020, Mr. Diaz texted me stating he had signed with MTK Global, a rival management and promotion company headquartered in Dubai, UAE.

23.     Despite the valid and enforceable 2017 Boxer-Manager contract, Mr. Diaz had never contacted me regarding his dealings with MTK.

24.     I called Mr. Diaz several times and Mr. Diaz never returned my call. After this text message, Mr. Diaz never contacted Moses or me again even after several attempts by Moses and me to call him.

25.     Reportedly, MTK Global offered an advance/loan of $100,000 on Mr. Diaz's future bout earnings. MTK Global provided this advance in exchange for Mr. Diaz signing what they term as "marketing advisory" agreement.

26.     Due to the sudden interference by MTK, we were unable to make the match against Tank Davis come to fruition. We were unable to communicate with Mr. Diaz and were prevented from organizing bouts on his behalf, directly due to MTK and its partners.

27.     Moses and I discovered that MTK and its partners had been tarnishing our reputation, which included spreading false rumors alleging that we had embezzled from our fighters. This significant damage to our reputation led to our inability to secure a deal with Terence Crawford.

28.     Additionally, we became aware that other fighters were hesitant to work with us, influenced by the belief that we might not be able to facilitate appropriate matches and negotiations, or due to the unfounded accusations spread by MTK.

29.     MTK also directly negotiated with GBP concerning the bout between Mr. Diaz and his mandatory contender, Mr. Shavkatdzhon Rakhimov, which we had already previously negotiated. Moses and I learned this bout was unilaterally scheduled by MTK and GBP without our involvement, through a public announcement.

30.     Mr. Diaz's contracted purse with GBP for the Rakhimov bout was $500,000, meeting the minimum purse requirement that was negotiated and agreed upon by HBM in Mr. Diaz's 2017 promotional agreement. It is my belief that we

could have secured a higher purse, due to OUR's experience and demonstrated track record when it came to negotiating purses.

31.     On February 12, 2021, Mr. Diaz failed to make weight by 3.6 pounds and was stripped of his IBF World Title, a result partially due to poor management and bad influence. Throughout our relationship, we had been able to steer Mr. Diaz clear of obstacles, by providing him with financial support through interest-free loans, setting up training camps in remote venues to limit and remove distractions, and by coordinating his care with Mr. Diaz's family. The guidance Moses and I provided undoubtedly had a positive impact, as Mr. Diaz was able to rise through the ranks quickly by qualifying and winning matches.

32.     On February 13, 2021, Mr. Diaz, after being advised by VGC and MTK, directed GBP not to pay the $90,000 manager fee owed to us under the 2017 Boxer Manager Contract.

33.     After the title win, and drawing from our extensive experience in the industry, Moses and I were in the process of securing a lucrative high-profile match on Showtime with Tank Davis. However, Mr. Diaz effectively missed out on the chance to participate in the match with Tank Davis, due to the interference caused by MTK. Mr. Diaz refused to speak with us, as instructed by MTK and its partners. This prevented us from scheduling the fight as we intended, and prevented us and Mr. Diaz from receiving a large payout.

34.     The replacement for Mr. Diaz, Ryan Garcia, who was not a champion at the time, earned $30 million from the bout. We could have earned a minimum of $5.4 million from the match. However, considering Mr. Diaz's status as a champion and his unique fighting style compared to Tank Davis, we believed there was potential to negotiate an even higher purse amount. Additionally, the pay-per-view revenue would likely have increased significantly due to heightened interest from fans for a champion v. champion fight.

35.     The interference from MTK and its partners also denied us $360,000 in money due for Mr. Diaz's matches over the remainder of the 2017-2022 contract term. From 2021 to 2022, Mr. Diaz made $2.5 million over 4 matches. Although we could have negotiated higher purse amounts for Mr. Diaz, we were entitled to 18%, at $450,000.

36.     We were only paid $90,000 for the above period, meaning we have not been paid the remaining $360,000 due to us under the contract.

37.     My brother and I were extremely close to Mr. Diaz prior to the interference of MTK. I believe the unavoidable isolation and distance due to the COVID-19 pandemic (and the resulting pause on training and scheduling fights), coupled with Mr. Diaz's bad habits, made him vulnerable.

AFFIDAVIT OF RALPH HEREDIA

38.    If MTK had not blatantly and illegally interfered, we would have signed Mr. Diaz to another 5-year contract. We continued to text and communicate with Mr. Diaz up until a few weeks before MTK's interference. My brother and I continued to provide him with financial assistance by giving him advances and interest-free loans. If MTK had not wrongfully interfered, we would have continued guiding Mr. Diaz to greater successes, not just with the Davis v. Diaz fight.

39.    After Mr. Diaz attained the title, his average purse was $737,500.00, with one purse at $1.5 million. Over a 5-year contract, post-championship, we would have negotiated high-paying purse amounts, for at least two matches a year. Over 5 years, 10 matches minimum, Mr. Diaz would have earned at least $7,375,000 in a 5-year follow-on contract, from 2022 to 2027.

40.    We would have received around 18-20% of the purse amounts. At 18%, we would have received $1,327,500 for a contract extension.

41.    The impact on our reputation also caused us to lose 3-5 potential boxer clients, including Terence Crawford. Each new boxer candidate brings the potential to be the next champion or rising star.

42.    In fact, it is my understanding that Mr. Crawford recently earned $10,000,000 for one fight. This one fight alone would have generated $1,800,000 in management fees.

43.     In my experience, especially with our post-title reputation, each new
fighter would have been able to command a minimum $100,000 purse. Over the
standard 10 fights over a 5-year contract term typically used by my brother and I,
we would have received at minimum $180,000 per fighter.

44.     The loss of new boxer clients cost us at least $540,000 to $900,000.

45.     The stress of dealing with this ongoing situation has caused me untold
emotional harm. Mr. Diaz's abrupt departure was devastating for me. We had
cultivated a deep relationship over time, and I considered him like family. We had
gone to great lengths to support him in every possible way, and it was truly
shocking to see what had transpired.

46.     Before Mr. Diaz communicated his alignment with MTK, there were
no signs that he would abandon the infrastructure and support that existed within
our team. Mr. Diaz needed a strong person to guide and keep him on track, and we
were always there for him in both his personal and professional life. I had a close
relationship with his parents, and from my perspective, we had created something
truly special.

47.     I poured my heart and soul into Mr. Diaz's growth and success, both
as a person and as a boxing professional. He wasn't just a "boxer" to me — he was
family. Relationships always have their ups and downs, but there was never an
indication that things would escalate to this extent. Seeing his career and personal

life deteriorate after he left was also heartbreaking. He still possessed the talent to achieve great things, but it was evident that he had lost his way.

48.     Mr. Diaz's sudden departure at the hands of MTK was a betrayal, and it was made worse by the blatant lies being circulated. Mr. Diaz is aware there was no theft on our part. He can acknowledge the quality of the care we provided him professionally (and personally). Any and all commitments made to him were fulfilled, and Mr. Diaz knows in his heart that his actions have had a devastating impact on me, my brother, and his own professional career.

49.     The world values reputation and integrity, and after 15 years dedicated to this industry, I had built professional relationships with key figures in the boxing profession. The harm caused was not only monetary; it was deeply emotional. I felt embarrassed to speak with others in the industry because of the questions I faced, having to explain that I couldn't divulge details due to pending cases, but assuring them that the truth would eventually come out.

50.     It is my belief that MTK had a clear plan. Their objective was to recruit as many premier fighters as possible and, in the process, dismantle the individuals responsible for those fighters, with no regard for the sacrifices and relationships, professional or otherwise, that led these young men to success.

51.     My brother and I had reached the pinnacle of our careers and we were excited that, after 15 years of hard work, we could now take on more young men

and help them reach their full potential. All of this was abruptly taken from us by MTK's the blatant and wrongful interference.

52.    We continue to be devastated by this situation. Neither my brother nor I deserved this, and the same goes for Mr. Diaz. We are saddened to see his current standing, as we have invested so much for his success.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed April 04, 2024, in Los Angeles, CA.

Ralph Heredia

# Exhibit C

1
2
3
4
5
6
             **UNITED STATES DISTRICT COURT**
7
            **CENTRAL DISTRICT OF CALIFORNIA**
8
               **(EASTERN DIVISION)**
9
MOSES HEREDIA,

5:20-cv-02618-JWH-kk

10
        Plaintiff,

**AFFIDAVIT OF STEPHEN**
11
**ESPINOZA IN SUPPORT OF**
**DAMAGES**
12
v.
13
MTK GLOBAL SPORTS
14
MANAGEMENT, LLC, *et al.*,
15
        Defendants.
16
17
18
19
20
21
22
23
24
25
26
27
28

# AFFIDAVIT OF STEPHEN ESPINOZA

I, Stephen Espinoza, do hereby solemnly affirm and declare, under penalty of perjury, the following statements:

1. From November 2011 through December 2023, I led the sports programming department at Showtime Networks, Inc., most recently as President of Sports & Event Programming.  In that role, I was responsible for developing and executing the overall sports programming strategy for Showtime and managing all sports and event programming for Showtime and its pay-per-view distribution division, Showtime Pay-Per-View, including, perhaps most notably, Showtime's long-running boxing franchises, Showtime Championship Boxing and ShoBox: The New Generation.  My responsibilities included overseeing the research and development of potential boxing matches, with the ultimate objective being to produce and telecast the boxers and boxing matches with the greatest audience appeal and largest viewership and revenue generation potential.

2. During my tenure at the network, I negotiated, programmed, and produced hundreds of professional boxing matches, including many of the biggest and most significant boxing matches in the sport. In 2013, I negotiated a landmark exclusive deal with global boxing superstar Floyd Mayweather, Jr. Under that historic deal, across seven Mayweather events, Showtime Pay-

Per-View generated more than 14 million domestic pay-per-view buys and over $1.2 billion in domestic revenue over a span of just four years.

3. Under my leadership, Showtime Pay-Per-View produced and distributed the three highest-grossing pay-per-view events in television history (Mayweather vs. Pacquiao, Mayweather vs. McGregor, and Mayweather vs. Canelo).

4. Prior to my role at Showtime, I was a partner at Ziffren Brittenham LLP, a preeminent entertainment law firm, where my practice focus was sports and entertainment. At the firm, I represented a variety of filmmakers, performers and athletes, including professional boxers Oscar De La Hoya and Mike Tyson, who generated a total of over $500 million in pay-per-view revenues under my representation. I also served as lead counsel for De La Hoya's Golden Boy Promotions from the formation of the company in 2002 until November 2011.

5. Through my representation of Tyson, De La Hoya, and Golden Boy Promotions, and my subsequent work at Showtime, I have been directly involved in the five highest-grossing pay-per-view events of all time (including De La Hoya vs. Mayweather and Tyson vs. Lewis, as De La Hoya/Golden Boy's lawyer and Tyson's lawyer, respectively).

6. The 2023 calendar year was a particularly strong year for Showtime's boxing franchises – the strongest year in the 37-year history of Showtime Sports, in the eyes of many knowledgeable boxing experts – as Showtime produced and distributed several highly anticipated and highly lucrative boxing matches, including the long-awaited Errol Spence vs. Terence Crawford match for the undisputed welterweight world title in July 2023 and the Canelo Alvarez vs. Jermell Charlo match for the undisputed super middleweight world title in September 2023.

7. In addition, in April 2023, Showtime produced and distributed the Gervonta Davis vs. Ryan Garcia match, which generated approximately 1.2 million domestic pay-per-view purchases (approximately $100,000,000 in domestic pay-per-view gross revenue), ranking as the sixth-highest grossing pay-per-view event in television history.

8. Showtime also telecast the following fights for Mr. Joseph Diaz Jr. ("Diaz"):

   o December 15, 2012: Vicente Alfaro Martinez  v. Joseph Diaz Jr.,
   o June 08, 2013: Rigoberto Casillas v. Joseph Diaz Jr.,
   o August 24, 2013: Noel Mendoza v. Joseph Diaz Jr.,
   o March 08, 2014: Jovany Fuentes 5 v. Joseph Diaz Jr.,
   o April 26, 2014: Luis Maldonado 3 v. Joseph Diaz Jr.,
   o May 19, 2018: Gary Allen Russell Jr v. Joseph Diaz Jr.,

9. Messrs. Ralph and Moses Heredia are well-known figures in the professional boxing industry. Heredia Boxing Management ("HBM") is known for its successful management of fighters, having notably steered two individuals

to world championship titles. HBM navigated Mr. Diaz's career trajectory from Olympic amateur to winning the IBF World Super Featherweight championship in January 2020. Diaz's defeat of Tevin Farmer created substantial buzz in the boxing community, due to the difficulty of his path and the emergence of Mr. Diaz as a young new world champion.

10. A fighter's suitability for a televised headline (or so-called "main event") fight depends on various factors, including the fighter's skill set, boxing style, marketability, fan base, ticket-selling and revenue-generating potential, availability of suitable opponents, and other factors. Only a minority of fighters achieve televised main event status, given the scarcity of televised dates and the highly competitive landscape. Having dependable and knowledgeable management is critical to a fighter's success in this area. In my opinion, HBM is a dependable and knowledgeable management team.

11. I had initially identified Mr. Diaz as a fighter who met the above-stated criteria for headlining a televised event in 2019, prior to his championship victory in January 2020. In 2019, among the fighters who had been regularly appearing on Showtime was Gervonta Davis, one of the most popular, skilled and exciting fighters across the super featherweight, lightweight, and super lightweight divisions. Mr. Davis had won the title of IBF World Super Featherweight Champion in 2017 and the title of WBA Super World Super

Featherweight Champion in 2018. Mr. Davis was a formidable fighter and one of the most popular young boxers in the sport at that time. His stature required a suitably impressive opponent, preferably a rising talent.

12. On or about November 2019, I discussed the potential for a Davis vs. Diaz fight with Mr. Ralph Heredia and Moses Heredia of HBM. The HBM team indicated their interest in having Mr. Diaz participate in a bout against Mr. Davis.

13. Based on our discussion, it was my understanding that HBM would be willing to facilitate negotiations with Diaz's promoter GBP, paving the way for what would potentially be a highly anticipated main event.  Mr. Davis was scheduled to participate in a bout against former world champion Yuriorkis Gamboa on December 29, 2019 (a bout which Mr. Davis ultimately won), and Mr. Davis would be free to engage in negotiations to fight Mr. Diaz (or any other opponent) in 2020.

14. Diaz later secured the IBF World Super Featherweight title in his bout against Tevin Farmer in January 2020.  Diaz's win significantly increased his value as an opponent for Davis and strengthened his position relative to other potential opponents for Davis.

15. It is my understanding that shortly thereafter, MTK Global took control of Mr. Diaz's career, and from that point forward HBM was no longer included

AFFIDAVIT OF STEPHEN ESPINOZA

in any discussions or negotiations of Mr. Diaz's bouts, and there were no further discussions regarding Mr. Diaz's participation in a bout against Mr. Davis.

16. On October 31, 2020, Mr. Davis participated in boxing match against former world champion Leo Santa Cruz. It was Mr. Davis's first bout distributed via pay-per-view, which is generally a more lucrative opportunity for participating boxers than non-pay-per-view events, due to the incremental revenues generated by pay-per-view distribution.

17. Although the Davis vs. Diaz fight did not materialize, a fight between Mr. Davis and Ryan Garcia, also in GBP's camp, did materialize in April 2023, and it generated approximately 1.2 million pay-per-view buys and approximately $100 million in domestic pay-per-view revenues, with both Mr. Davis and Mr. Garcia receiving career-high paydays, to my knowledge and belief.

18. Based on my twenty years of experience in the boxing industry, I believe that a matchup between Mr. Davis and Mr. Diaz – who were both world champions in 2020, when the fight could potentially have materialized – would have been very well-received and would have generated substantial revenue, with total potential gross revenues generated by such a bout most likely exceeding $15,000,000.

AFFIDAVIT OF STEPHEN ESPINOZA

I declare under the penalty of perjury that the foregoing is true and correct, and that this Affidavit was executed this April 03, 2024, in New York City, New York.


STEPHEN ESPINOZA

AFFIDAVIT OF STEPHEN ESPINOZA

# Exhibit D

1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## (EASTERN DIVISION)

| | |
|---|---|
| MOSES HEREDIA,<br><br>        Plaintiff,<br><br>v.<br><br>MTK GLOBAL SPORTS<br>MANAGEMENT, LLC, *et al*.,<br><br>        Defendants. | 5:20-cv-02618-JWH-kk<br><br>**AFFIDAVIT OF STEVEN BASH<br>IN SUPPORT OF DAMAGES** |

## <u>AFFIDAVIT OF STEVE BASH</u>

My name is Steven Bash.  I am over eighteen years of age.  I have personal knowledge of the information set forth in this declaration.

1. I am a licensed attorney in the State of California.  My practice includes sports and entertainment law, with emphasis on the combat sports of Boxing and Mixed Martial Arts ("MMA").

2. Since 2005, I have worked (and continue to work) with numerous professional fighters, companies, and brands in the organization, coordination, and production of boxing and MMA bouts and events.  Over the course of my career, I have worked both with and against the Heredia brothers, Ralph and Moses (the two routinely manage their stable of fighters as a team), and I am very familiar with their performance and reputation in the industry.

3. My company Bash Boxing, Inc. is a licensed promoter with the California State Athletic Commission (the "Commission") and has also been licensed in other states in the past.  I have also been a licensed second manager, and matchmaker in the State of California and I have worked with numerous other licensed promoters, managers, and fighters.

4. I have been designated as an expert witness in the business of Boxing in the past and can testify as to the information below.

5.  The Heredia brothers have had extraordinary success in the industry.  They have successfully managed very talented fighters including four champions: Sharif Bogere, Francisco Vargas, Luis Felciano, and Joseph Diaz, Jr.  Their management of Diaz is noteworthy because they transitioned him from the amateur ranks and were able to overcome many of the challenges faced within the boxing professional in route to Diaz attaining the IBF Super Featherweight World Title.  This is an extraordinary achievement and directly tied to the Heredia brothers' management style and aggressive negotiation positions they have maintained over the years.  A review of Diaz's performances while under the supervision of the Heredias and the "post- Heredia" era clearly demonstrates the difference a quality management team can have on a talented fighter.

6.  Diaz has a reputation for engaging in vices and an inability to manage his personal finances.  The Heredias were largely successful in containing his proclivities. This included extending personal loans to Diaz as needed between fights as he was making his way up the ranks.  The scurrilous and demonstrably false accusations from MTK, alleging that the Heredias were stealing fighter monies, were made with deliberate intention, as MTK simultaneously acted to induce Diaz to breach his contract with the Heredias.  This coordinated effort was intended to neuter and destroy the Heredias'

professional standing in the boxing arena. These false accusations made it almost impossible for the Heredias to remediate their relationship with Diaz and effectively blocked them from any additional fighters joining their team at the same time they had reached the pinnacle of their professional boxing management careers.

7. In addition to the loss of monies the Heredias suffered from being deprived of their portion of Joseph Diaz' earnings, the dissemination of false information regarding Ralph Heredia  (propagated from MTK, as well as major promoters that MTK was doing business with at the time such as Top Rank and Top Rank's principal Bob Arum[1], and Golden Boy Promotions), was a death blow to the hard-earned reputation and success the Heredias earned as world class boxing managers. Instead of signing additional boxers and therefore rightly capitalizing on having just successfully guided Joseph Diaz from his professional debut to the top of professional boxing's mountain with a major world title, Ralph Heredia and his company were branded as pariahs.  Any prospective boxing client who read or heard of the accusations lobbied against the Heredias would inevitably decline to work

_____

[1] *See* Enclosure 1. Bob Arum has made public statements that are unfavorable towards the Heredia management team. Top Rank chairman Bob Arum, who promoted champions from the MTK stable such as Fury and Taylor, has also openly acknowledged making payments of $4,000,000 to Daniel Kinahan for each of Tyson Fury's four fights spanning from 2019 to 2021.

AFFIDAVIT OF STEVEN BASH

with the Heredias, as signing with the Heredias would be the end of the boxer's career.

8. In the sport of professional boxing, a manager's ability to sign a fighter often comes down to his reputation and ability to work with major promoters. Prior to the MTK interference, the Heredias' stock as managers was at an all-time high.  In a very competitive business, any manager who guided a boxer to the world title is in pole position to gain more boxing clients as a result.  This is equivalent to an individual who recently won or represented an Oscar or Grammy. A "Champion Manager'" gains considerable leverage in negotiations with promoters and is exponentially more desirable to work with boxers.  The Heredias' worth on the market went up tremendously as then multi-champion managers after Joseph Diaz won his title. As managers of a champion, they were well-positioned to negotiate high rates, typically ranging from 40%-60% of the fight revenue depending on the opponent, especially given their formidable reputation as tenacious negotiators on behalf of their fighters.

9. But as high as the Heredias' reputational stock was at the time, the damage caused by MTK caused that to plummet.  Prospective boxers looking for a manager would avoid the Heredias, as it was clear that the major promoters,

whom the Heredias would need to make deals with on the boxer's behalf, would ostracize the Heredias.

10. Top Rank and Golden Boy (two out of three of the top promoters) took adverse public positions against the Heredias. To a prospective boxer, this meant that even if they wanted to sign with the Heredias, they would have to accept the reality that it would be virtually impossible for the Heredias to secure any fights and/or significant purses with the key promoters, making the Heredias ineffectual. MTK's false allegations over stealing from the fighter proceeds otherwise rendered the Heredias unapproachable. If a sizeable industry participant speaks poorly about a manager (whether it be true or not), a prospective boxing client will be hesitant to work with that manager for fear that the promoter will not want to sign that boxer.

11. Conversely, during this period time, other managers who had aligned themselves with MTK or had not been targeted with negative publicity benefited from their ability to sign prospective boxers. For example, West Coast boxing manager Rick Mirigian went from one client, World Champion Jose Ramirez, to a signing spree after aligning himself with MTK Global. He signed many boxers that could have worked with the Heredias but ended up shunning them. Many of these boxers that were signed by Mirigian in

conjunction with MTK earned, and are still earning, $200,000 to $500,000 per bout.

12. Rick Mirigian, a manager with nowhere near the competency or reach of the Heredias, signed the following fighters upon the effective absence of the Heredias from the professional boxing scene:

- https://www.ringtv.com/613188-rick-mirigian-and-mtk-global-ink-rising-star-vergil-ortiz-jr/

- https://www.ringtv.com/613359-joshua-franco-signs-with-mtk-global-and-rick-mirigian-following-andrew-moloney-rematch-controversy/

- https://www.ringtv.com/616212-arnold-barboza-signs-advisor-deal-with-mtk-global/

- https://www.ringtv.com/613456-hector-tanajara-jr-signs-deals-with-mtk-global-and-rick-mirigian/

- https://www.ringtv.com/618087-rick-mirigian-signs-rising-star-batyrzhan-jukembayev/

- https://www.badlefthook.com/2020/11/23/21611586/lindolfo-delgado-latest-sign-mtk-global-rick-mirigian-boxing-news-2020

13. On the East Coast, Manager David McWater rode the success of Teofimo Lopez who won a World Title and signed many boxers based on his success. Prior to McWater's success with Teofimo Lopez, he was a relatively

unknown boxing manager. Nonetheless, McWater needed Teofimo Lopez signed by Top Rank so that they could promote Lopez to the world title opportunities that he has had. For the Heredias, working with Top Rank was precluded as a result of Top Rank's relationship with MTK.

- https://www.ringtv.com/602710-meet-manager-david-mcwater-whose-roots-began-in-abject-poverty-and-ended-in-the-penthouse/

14. If the reputation and integrity of the Heredias had not been damaged by these public statements about them, the Heredias would have parlayed their success with Diaz to other boxing clients that could have equaled or surpassed the earnings achieved with Diaz. The Heredias, unfortunately, were not able to benefit from their investment and work put into elevating Joseph Diaz to the world championship because of the transgressions upon them.

15. To the best of my knowledge and belief, this deprived the Heredias from adding, at minimum, 3-5 incoming fighters to their stable, although this number could be far higher, especially when considering other managers who have fared in the vacuum.

Absent the events leading to Diaz's departure, the Heredia team stood to benefit from at least three valuable additions to their stable. The Heredias were known to invest substantially in its fighters, and their track record of

success over the years had garnered attention from many within the industry. With Diaz securing the title, the interest in the Heredia team acquiring more fighters was high. Diaz was in line to face other high-caliber, lucrative opponents post-title win, and with his belt, he could command higher purse percentages and significantly increased purse amounts.

16. Regarding damages, with 5-year standard contracts, and a conservative estimated minimum purse of $100,000 (definitely attainable with the Heredias' negotiation abilities and management experience), I believe it is reasonable to conservatively estimate that the false allegations and reputational damage cost the Heredias at least $540,000 to $900,000 in future earnings from these additions to the Heredias stable.

17. The Heredias are also entitled to the amount of money owed pursuant to their valid management agreement until its natural conclusion around February 2022.

18. Based on my direct knowledge of the parties involved and my professional experience and knowledge, it is my professional assessment that there also existed no reason for Diaz to decline re-signing with the Heredia team moving forward. Their personal relationship was strong, and their success as a team was evident.

19. At the time, some of the marquee boxers included Ryan Garcia, Gervonta Davis (who remains undefeated), and Isaac Cruz. These fighters, who were contemporaries of Diaz, have continued to draw high purses and revenue percentages in accordance with their star power. For instance, a recent match between Garcia and Davis generated approximately $100,000,000 in revenue.

I declare under the penalty of perjury that the foregoing is true and correct, and that this Affidavit was executed this March 30, 2024, at Los Angeles, California.

Steven Bash

# Enclosure 1



# Joseph Diaz Jr. lost his title and his car. Now he's fighting to get it all back



By Mike Coppinger   Mar 9, 2021

INDIO, Calif. — Joseph Diaz Jr., stepped outside his Southern California home one September day and noticed something was missing: his Lexus RC350.

Naturally, he called the police and filed a stolen vehicle report. Turns out his longtime managers, Ralph and Moses Heredia, repossessed the coupe.

The brothers held the title on the car, a vehicle they purchased for the fighter in November 2019 with an agreement that Diaz would pay it off. After he defeated Tevin Farmer in January 2020 to win his first world championship, Diaz says he paid $25,000 toward the vehicle with another $4,000 invested toward cosmetic upgrades. He says he planned to pay off the rest after his most recent fight against Shavkatdzhon Rakhimov last month.

ADVERTISEMENT

Get more from The Athletic, free.   Sign Up



**Get Home Ice Advantage!**

Get your NHL tickets.

BUY TICKETS

At a pivotal moment in his life, Diaz was sans transportation for nearly two weeks (and also had to replace the car down $29,000). His now-fiancee was pregnant with his first child (a boy, Zenith, was born in November) and Diaz was also about to begin training for his first title defense.

Diaz viewed the vehicle incident as retribution by his managers for his decision in August to bring on new advisors, which he says set off a chain of events that threw his life — and boxing career — into disarray.

Since signing with MTK Global in August, the Heredia brothers sued his new management company for racketeering, Diaz lost the junior lightweight belt he worked his entire life for after weighing in 3.5 pounds over the limit, then was held to a majority draw against Rakhimov (a fight Diaz was favored to win).

All of the outside distractions, he says, played a part in how he fared inside the ropes.

"I was dealing with a lot of stuff with my lawyers and my ex-managers," Diaz tells The Athletic, "and it's about staying focused and determined and staying hungry to the point where I'm not gaining that much weight."



Diaz added new representation in August, he says, because he wasn't getting all he was initially promised by his management company. He wanted better fights, more promotion, more sponsorship deals. None were coming his way.

When he signed with MTK, becoming the first American champion in that stable, he was sure the new relationship would take his career to the next level. After all, MTK worked with some of the biggest fighters in the world including Tyson Fury, Josh Taylor and Billy Joe Saunders.

"This is going to impact my career in a big way and make me the star that I feel I am. Not just in the U.S., but globally," he told The Athletic at the time. "I'm really going to take advantage of this opportunity and become a unified champion and make sure I deliver very exciting fights for MTK, the fans and for everybody."

**Get more from The Athletic, free.**    Sign Up



Joseph Diaz Jr., right, ended his bout with Shavkatdzhon Rakhimov in February in a draw. (Tom Hogan / Golden Boy)

The Heredias' attorney, Eric Montalvo of Federal Practice Group, didn't return a voice message seeking comment.

Diaz's decision to add MTK bothered the Heredia brothers who, as his managers, would be forced to work with and relinquish power to the new advisors.

"They took it as disrespect," Diaz, a 2012 Olympian, told The Athletic. "I feel like MTK is going to benefit me by promoting my name more and getting me the biggest fights. It would have benefited everybody … myself … Ralph and Moses … if they would have kept it cordial and been understanding of everything I'm trying to do in my career and in my life."

ADVERTISEMENT



StubHub

Court is in session. Be there.

Experience all the NBA action live.

BUY TICKETS

"I was always in the back. I wasn't being promoted and getting the marketing and sponsorship deals I feel like I should have had at that time. I told them many times I wanted to bring someone in. They never listened to me. They always wanted to make sure … they have leverage over me."

**Get more from The Athletic, free.**   Sign Up

promising to pursue damages in federal court.

"The Heredias did not just fail to protect my interests. They also actively stole from me," Diaz said in a sworn declaration filed with the California State Athletic Commission.

Now, Diaz awaits an arbitration hearing scheduled for later this month where the California State Athletic Commission will rule on the validity of his contract with the Heredias.

There's also two pending lawsuits: one filed by Diaz against Ralph Heredia on Oct. 6 in Superior Court in California alleging that his half-brother, Moses Heredia, was the manager "on paper" while Ralph served as the de facto manager. The reason? Moses was licensed in California while Ralph wasn't, "likely due to the fact that he has been hiding his true identity," per a copy of the complaint obtained by The Athletic. Managers in boxing must be licensed by the state athletic commission.

Then on Dec. 18, Heredia Boxing Management and Moses Heredia responded with a lawsuit filed in U.S. District Court in California. Diaz wasn't named, but the suit alleged four counts of racketeering against MTK, its co-founder, Daniel Kinahan; and its chief strategy officer, Paul Gibson.

Also named in the lawsuit: Golden Boy and VGC LLP (the law firm representing Diaz) with four counts of tortious interference against both parties (and MTK) along with one count of breach of promoter-manager contract vs. GBP.

———— A ————

Diaz is one of the brightest young fighters in boxing today. The 28-year-old claimed the 130-pound title with an impressive performance against Tevin Farmer in January 2020, winning via unanimous decision.

But after competing three times in each of 2018 and 2019, Diaz fought only once in the past year due to the pandemic. He ballooned in weight and was forced to spend training camp for his fight with Rakhimov shedding pounds quickly. The time grew even shorter after the fight was moved one week earlier from its initial date of Feb. 20.

When he weighed 3.5 pounds over the limit, the boxing world was shocked.

"The reason I lost (the title) is because of my mistake; I didn't lose it any other way. … It was my fault, man. I'm not blaming that there was no sauna or anything. It was a bad situation because of COVID but that doesn't make it any (excuse) for me that I didn't make weight."

**The Athletic**   NFL   NBA   MLB   NCAAF   NHL   NCAAM   NCAAW   Premier League   MLS   NWSL   ···   Subscribe for $2



Joseph Diaz Jr. missed weight for his bout with Shavkatdzhon Rakhimov in February by 3.5 pounds. (Tom Hogan / Golden Boy / Getty Images)

JoJo woke up early Friday before the fight in an attempt to lose the final few pounds. He shadowboxed for an hour but didn't sweat at all. He was surprised. Usually, the beads start falling about 20 minutes in.

He ran for 30 or 40 minutes; no sweat whatsoever.

"I completely held onto the water weight," he says. "I was in shape, I went the full 12 rounds and was pushing the Russian guy back. My body just gave out. I tried to make the weight but my body was like enough is enough.

"At the end of the day, I didn't want to not make weight and lose my belt at the scale. I did the hot bath. … It's not like I didn't try. I really did try to keep that title around my waist. I trained my ass off for this fight."

Diaz says part of the reason for his issues both on the scales in the ring last month was distractions dealing with his management. And it isn't stopping any time soon.

His next bout, per sources, could come this summer against Roger Gutierrez, a fellow Golden Boy Promotions fighter. The Venezuelan is coming off a career-best victory, a decision over Rene Alvarado in January. If the fight happens, it shapes up as another action fight for Diaz but first, he has a legal battle to attend to.

Diaz hired an attorney, Jim Greeley, who contends that while the Heredias saw Diaz's move to bring in an advisor as an act of aggression, it was never meant as such.

"The Heredias held a position of trust as Diaz's managers and fiduciaries," he says. "Rather than working to advance Diaz's career as is their job and legal duty, the evidence shows the Heredias have launched a deliberate campaign to attack and harm Diaz, work against his interests, and interfere with his career.

**Get more from The Athletic, free.**   Sign Up

☰  **The Athletic**    NFL  NBA  MLB  NCAAF  NHL  NCAAM  NCAAW  Premier League  MLS  NWSL  ⋯    Subscribe for $2

"They have revealed they are Diaz's enemies, not his managers, and they will pay the consequences for illegally abusing his trust and causing him injury."

Court documents show that Rafael Heredia Tarango, previously known as Rafael Bustamante, was convicted in 1993 of conspiracy to possess and distribute 12 kilograms of cocaine.

"The guy (Ralph) Heredia is a convicted felon and cheated the fighter and filed legal papers about Kinahan being involved with the fighter, JoJo Diaz. Nonsense," says Top Rank chairman Bob Arum, who promotes champions from the MTK stable such as Fury and Taylor.

MTK is also no stranger to controversy as Kinahan has been named by the Irish high court as the leader of a drug cartel. He's denied the allegations and has never been charged.



Diaz is no longer a champion, but he still figures prominently into the stacked title picture at 130 pounds. There's Oscar Valdez, who just scored a hellacious knockout of Miguel Berchelt in an ESPN title tilt; Gervonta Davis, the biggest star in the division; Shakur Stevenson, a budding star who held a title at 126 pounds; and then Jamel Herring and Carl Frampton, who will vie for Herring's title April 3 in Dubai.

Like Diaz, Herring and Frampton are advised by MTK, potentially setting up Diaz for the winner later this year. Also out there: Farmer, who Diaz soundly beat last year.

There was a rematch clause in the contract for the Farmer fight, but efforts to finalize the bout were complicated by the pandemic and the deadline passed, voiding the deal.

"I was fine doing the rematch," Diaz says. "Ralph said 'no,' because the contract would be voided so we wouldn't be fighting for the measly amount. So if they wanted me to fight Farmer again, I could make more money.

"If the money was right, I would have taken the rematch without a doubt, but Golden Boy and Ralph, they were trying to make it seem like the money wasn't there."

**Get more from The Athletic, free.**    Sign Up



Joseph Diaz has no shortage of top-tier opponents in the coming months. (Ed Mulholland / Matchroom Boxing USA)

Instead, Diaz proceeded with his mandated title defense vs. Rakhimov. All the while, Farmer lobbed insults at Diaz and when he missed weight, Farmer celebrated on social media. After the draw result, Farmer took yet another victory lap.

"For him to even be celebrating someone's — I wouldn't even say downfall because I still won the fight and I honestly thought I was robbed — for him to even praise that I'm doing bad, for him to act that type of way, he's a coward," Diaz says.

But Diaz vows to change himself, starting with keeping his weight down in between fights. And before his next ring foray, he could have clarity — calm, even — in relation to the ongoing situation with the Heredias.

*(Top photo: Ed Mulholland / Matchroom Boxing USA)*

**National**
Boxing
Bundesliga
Champions League
Championship
College Football
College Sports
Copa America
Copa del Rey
Culture
Europa League
European Championship

Men's World Cup
Mixed Martial Arts
MLB
MLS
Motorsports
NASCAR
NBA
NFL
NHL
NWSL
Olympics

**US**
Arizona
Atlanta
Baltimore
Bay Area
Boston
Buffalo
Carolina
Chicago
Cincinnati
Cleveland
Columbus

Memphis
Miami
Minnesota
Nashville
New Orleans
New York
Oklahoma
Oregon
Orlando
Philadelphia
Pittsburgh

**Canada**
Calgary
Edmonton
Montreal
Montréal (français)
Ottawa
Toronto
Vancouver
Winnipeg

**Partners**
Tickets by StubHub

**Subscribe**
Start Subscription
Buy a Gift
Student Discount
Group Subscriptions

**HQ**
About Us
Careers
Code of Conduct
Editorial Guidelines
Business Inquiries
Press Inquiries

Get more from The Athletic, free.   Sign Up



Listen Now:     Spotify

Search 🔍

☰ NAVIGATION                                                                f  t  i  ⌨



## Bob Arum Comments on Kinahan, Top Rank, Probellum and MTK

Posted on 04/15/2022

f Share    t Tweet    G+ Google+    ✉ Email

By Michael Kane

Top Rank boss, Bob Arum, confirmed that he paid alleged Irish gangland leader Daniel Kinahan $4 million for each of Tyson Fury's four fights from 2019 through to 2021.

The money was paid to Dubai based Hoopoe Sports Agent, as consulting fees owed to Kinahan, Arum has said. The four bouts were the two Deontay Wilder fights, Tom Schwarz and Otto Wallin fights.

Arum's confirmation comes as U.S authorities placed Kinahan on a wanted list with a $5 million reward. At a press conference last Tuesday in Dublin, U.S officials placed Kinahan, his father and brother, as well as other known associates under sanctions, including freezing any U.S Bank accounts and credit cards. Hoopoe Sports Agent was one of the sanctioned companies.

Asked how he came to be involved with Kinahan, Arum told Yahoo Sports, "Kinahan called me and we had a long conversation. He has kids and he said he wanted to get out of that other stuff. He said to me, 'Bob, I've done some bad things in my life. I admit that. But I'm not involved with that any more. I'm just trying to clean up my life and be a legitimate business man.' I wasn't involved in any of the things he might have done before and he was telling me he wasn't doing anything."

Arum and Top Rank have started to disassociate with Kinahan over the last year.

"There came a time that we discovered that he might still have been involved in some nefarious activities," Arum said. "That was enough for us."

Ahead of the Tyson Fury v Dillian Whyte fight on April 23rd, Arum has no fears of any U.S authorities raiding the event.

"We are complying with all government laws and regulations, as we always do," Arum said. "But I don't expect anything [like a seizure] to occur because Kinahan has had no involvement in this event whatsoever."

Kinahan helped form MTK Global in 2012 which is a promotional company that has Tyson Fury, among many other boxing stars, as clients. Arum said that Top Rank would no longer offer accreditation to MTK and Probellum (another boxing promoter which started life as MTK's MMA arm).

Both MTK and Probellum have stated in press releases that Kinahan has no involvement in both companies and Probellum also stated that they are a rival promotional company to Top Rank and have never worked alongside them.

MTK said in their statement:

MTK Global will comply fully with the sanctions made by the US government against Daniel Kinahan.

MTK parted ways with Mr Kinahan in February 2017. He has had no interest in the business since then, and will have no future involvement with us.

MTK operates ethically, transparently and lawfully. We will cooperate fully with all authorities and assist with any ongoing investigations.

"MTK Global will take every measure to ensure the company, and those who deal with it are fully compliant with the US sanctions announced this week and take this matter extremely seriously," added Bob Yalen, CEO of MTK Global.

Probellum statement read as:

Probellum takes the sanctions made by the US Treasury extremely seriously and the business and its employees will be fully compliant with them.

We have retained counsel in the US to ensure that we fully comply with all rules, regulations and requirements related to this matter, including not working with any individual or company that has been placed under US sanctions.

This includes Daniel Kinahan and we can confirm that we will not have any business relationship or communication with him whatsoever.

Bob Arum's comments implying that Top Rank has ceased a business relationship with Probellum are baseless.

Top Rank is a competitor and since Probellum's inception, Top Rank has never worked directly with us. Any suggestions that Daniel Kinahan is a shareholder or owner of Probellum are false and defamatory.

 Share   🐦 Tweet   G+ Google+   ✉ Email

## LEAVE A COMMENT



**DuckDuckGo blocked these comments to prevent Facebook from tracking you**

We blocked Facebook from tracking you when the page loaded. If you unblock this content, Facebook will know your activity. **Learn More**

Unblock Comments

## MORE HEADLINES

### Oscar De La Hoya Believes Ryan Garcia – Gervonta Davis Will Be Announced "In The Next Few Days"

JANUARY 25TH

### Mike Tyson Taken To Court By Woman Claiming He Raped Her In Early 90s

JANUARY 25TH

### Artur Beterbiev Ready For Weekend Throwdown With Anthony Yarde

JANUARY 24TH

**Oleksandr Usyk To Tyson Fury: "I'm Ready To Box You Even Without Any Prize Money!"**

JANUARY 24TH

---

**Anthony Joshua Reportedly Set To Face Jermaine Franklin In April**

JANUARY 23RD

---

Load More Articles





EP 61: Kathy Duva and
Heather Hardy

♥ 1  💬

00:00                                           01:16:29

**EP 60: Boxinginsider Promotes Its First Event Recap**

MAY 11TH

---

**EP 59: BoxingInsider Fight Night Hype**

APRIL 27TH

View More Episodes ›

---

WHAT'S
# Trending

**1.**      **Oleksandr Usyk Addresses Russia In Video: "What Hitler Didn't Do, Your President Continues To Do"**

JANUARY 19TH

**2.**      **Caleb Plant-David Benavidez Set For March**

JANUARY 19TH

**3.**      **Tim Bradley On Gervonta Davis: "He's A Piece Of S--T"**

JANUARY 15TH

**4.**      **Liam Smith Stops Chris Eubank Jr In Fourth Round**

JANUARY 21ST

**5.**      **Oleksandr Usyk To Tyson Fury: "I'm Ready To Box You Even Without Any Prize Money!"**

JANUARY 24TH



//pixfuture

**AI Advertising Worldwide Reach**

Start your campaign and spend wise while reaching millions of users Worldwide!

Start Campaign >

FOLLOW

# BoxingInsider

 Spotify

 Apple Podcasts

 Facebook

 Twitter

 Instagram

 YouTube

Tweets by BoxingInsider



ABOUT

Established in 1997 as a premier boxing destination. The staff of BoxingInsider.com love hearing from people all over the world.

© 2023 BOXINGINSIDER LLC
ALL RIGHTS RESERVED

**I**NFORMATIVE

HEADLINES
SCHEDULE
COLUMNS
INTERVIEWS
RESULTS
ODDS

MMA
OLYMPIC BOXING
FITNESS
TRAINING
WORKOUT
WEIGHT LOSS

MEDIA

VIDEOS
BOXING LINKS
RING GIRLS

SITE

CONTACT
PRIVACY POLICY

SUBSCRIBE TODAY



# Exhibit E



CLICK HERE FOR LINK

Exh. E - Video of Diaz and Feliciano

# Exhibit F

Fri, 3:24 PM

Hey what's up Moses! I thought I replied. Thanks you, I'm excited for this new journey as well. Big things to come, the future is bright. I was wondering if you can do me a favor Moses. I need some money around 4K for personal use and to cover my gf's tuition for school. I've been trying to get ahold of Ralph. But I know he's being isolated and try to get better. I'll pay back with the remaining amount I owe after this next fight. Hope all is well, everything been good over here been training everyday at the teamsters gym. Cutting the weight and getting ready for my fight date. We gotta a lot to accomplish still and a lot of money to make.

Sat, Jul 25, 4:58 AM

# Exhibit G

  ratings  schedule  results  date  champions  people  events   wiki   forum   follow  **login**


Count on **advanced solutions.**

SWITCH TODAY
(855) 571-7878

## Joseph Diaz

| 33 | 5 | 1 |
|----|----|----|
| 15 KOs | 0 KOs | |

🔴 Box-pro   👤 Box-am   👤 All Bouts



 wiki

| | | | |
|---|---|---|---|
| division | light | ID# | 634717 |
| rating | ⭐⭐⭐⭐✨ | birth name | Joseph Pedroza Diaz Jr. |
| | 🌐 #45 / 2,264 | sex | ♂ male |
| | 🇺🇸 #12 / 315 | alias | Jo Jo |
| bouts | 39 | age | 31 |
| rounds | 305 | nationality | 🇺🇸 USA |
| KOs | 45.45% | stance | southpaw |
| career | 2012-2024 | height | 5′ 6″ / 168cm |
| debut | 2012-12-15 | reach ⓘ | 64″ / 163cm |
| | | residence | 🇺🇸 Downey, California, USA |
| | | birth place | 🇺🇸 South El Monte, California, USA |
| | | followers 👁 | 366 |
| | | manager/agent | register as manager |
| | | promoter | register as promoter |

FEATURED VIDEOS



New customers get
**25% off**
Promo code: NEW25
**Shop Now**
**vistaprint**
Skip Ad ▷▷

## Box-pro 39 bouts

| date | | w-l-d | last 6 | | result | | | | |
|------|--|-------|--------|--|--------|--|--|--|--|
| ✅ 2024-02-15 | Jesus Antonio Perez Campos | 24 5 0 | 🔴🔴🟢🟢 | 🇺🇸 Commerce Casino, Commerce | **L-SD** ⭐⭐⭐✨✨ | 📅 event | 🥊 bout |  wiki |

| | ratings | schedule | results | date | champions | people | events | clubs/gyms | titles | score |
|---|---|---|---|---|---|---|---|---|---|---|



Diaz deducted 1 pt for throwing opponent to the canvas rd 5.

✓ 2023-07-08  **Jerry Perez**  14 2 1  🔴🟢🟢 🇺🇸 AT&T Center, San Antonio  **W-UD** ⭐⭐☆☆☆  event  bout  wiki

ref: Mark Calo-oy   Gregorio Alvarez 97-93   Raul Caiz Jr 98-92   Ignacio Robles 97-93

✓ 2023-03-18  **Mercito Gesta**  33 3 3  🟢🟢🔴🟢 🇺🇸 Walter Pyramid, Long Beach  **L-SD** ⭐⭐⭐⭐☆  event  bout  wiki

ref: Ray Corona   Pam Hayashida 97-93   Alejandro Rochin 91-99   Pat Russell 92-98

✓ 2022-10-29  **William Zepeda Segura**  26 0 0  🟢🟢🟢🟢🟢 🇺🇸 Pechanga Arena, San Diego  **L-UD** ⭐⭐⭐⭐☆  event  bout  wiki

ref: Thomas Taylor   Carla Caiz 109-119   Fernando Villarreal 110-118   Zachary Young 109-119

Diaz cut below left eye from legal punches rd 4 & cut right eye from accidental headbutt rd 6.

✓ 2021-12-04  **Devin Haney***  26 0 0  🟢🟢🟢🟢🟢 🇺🇸 MGM Grand, Grand Garden Arena, Las Vegas  **L-UD** ⭐⭐⭐⭐☆  event  bout  wiki

ref: Russell Mora   Tim Cheatham 112-116   Max DeLuca 111-117   Dave Moretti 111-117

🏆 WBC World Light (supervisor: Tito Gonzalez Rodriguez)

✓ 2021-07-09  **Javier Fortuna**  36 2 1  🔴🟢🟢🟢 🇺🇸 Banc of California Stadium, Los Angeles  **W-UD** ⭐⭐⭐⭐☆  event  bout  wiki

ref: Raul Caiz Jr   Karen Holderfield 116-111   Michael Tate 117-110   Zachary Young 115-112

🏆 WBC Interim World Light (supervisor: Alberto Guerra)

Diaz deducted 1 pt rd 4 for hitting behind the head.
Diaz cut left eye from accidental headbutt rd 3

✓ 2021-02-13  **Shavkatdzhon Rakhimov**  15 0 0  🟢🟢🟢🟢🟢 🇺🇸 Fantasy Springs Casino, Indio  **D-MD** ⭐⭐⭐⭐⭐  event  bout  wiki

ref: Thomas Taylor   Robert Hoyle 115-113   Fernando Villarreal 114-114   Zachary Young 114-114

🏆 IBF World Super Feather (vacant)

Title on the line for Rakhimov only due to Diaz missing weight. Diaz cut left eye accidental headbutt rd 12.

✓ 2020-01-30  **Tevin Farmer**  30 4 1  🟢🟢🟢🟢⚪ 🇺🇸 Meridian at Island Gardens, Miami  **W-UD** ⭐⭐⭐⭐⭐  event  bout  wiki

ref: Samuel Burgos   Richard Green 115-113   Alex Levin 115-113   John Rupert 116-112

🏆 IBF World Super Feather (supervisor: Melvina Lathan)

❓ 2019-09-21  **Jesus Cuadro**  18 5 0  🔴🟢🟢 🔴🟢 🇲🇽 Auditorio del Estado, Mexicali  **W-MD** ⭐⭐☆☆☆  event  bout  wiki

ref: Roberto Ramirez Jr   Uriel Aguilera 114-114   Gustavo Jarquin 115-113   Alfredo Polanco 116-112

✓ 2019-05-04  **Freddy Fonseca**  26 2 1  🟢🟢🟢🟢🟢 🇺🇸 T-Mobile Arena, Las Vegas  **W-TKO** ⭐⭐☆☆☆  event  bout  wiki

🕐 2:07  ref: Kenny Bayless   Patricia Morse Jarman 60-53   John McKaie 60-53   Glenn Trowbridge 60-53

Vacant WBA Gold Super Featherweight Title (Supervisor: George Martinez).
Fonseca down in round six.

✓ 2019-02-09  **Charles Huerta**  20 5 0  🟢🟢🟢 🔴🟢 🇺🇸 Fantasy Springs Casino, Indio  **W-UD** ⭐⭐☆☆☆  event  bout  wiki

ref: Edward Hernandez Sr   Rudy Barragan 99-91   Sergio Caiz 99-91   Tony Crebs 99-91

✓ 2018-08-11  **Jesus Rojas**  26 1 2  🟢🟢🟢🟢🟢 🇺🇸 The Avalon, Hollywood  **W-UD** ⭐⭐⭐⭐☆  event  bout  wiki

ref: Raul Caiz Jr   Jerry Cantu 116-112   Max DeLuca 117-111   Levi Martinez 115-113

🏆 WBA World Feather (supervisor: Robert Mack)

D?az overweight, thus unable to win the title. Rojas keeps world title - WBA rules.

✓ 2018-05-19  **Gary Allen Russell Jr**  28 1 0  🟢🟢🟢🟢🟢 🇺🇸 MGM National Harbor, Oxon Hill  **L-UD** ⭐⭐⭐⭐⭐  event  bout  wiki

ref: Kenny Chevalier   Dave Braslow 113-115   Dave Moretti 111-117   Nathan Palmer 111-117

🏆 WBC World Feather (supervisor: Bob Yalen)

ratings    schedule    results    date    champions    people    events    clubs/gyms    titles    score

| | | | | | |
|---|---|---|---|---|---|
| ✓ 2018-02-22 | **Victor Terrazas** | 38 4 2 | Fantasy Springs Casino, Indio | W-KO ★★☆☆☆ | event bout wiki |

🕐 3:00   ref: Edward Hernandez Sr   Raul Caiz Sr   Lou Moret   Pat Russell

🏆 North American Boxing Federation Feather (supervisor: Mohammad Noor)
🏆 WBO NABO Feather (supervisor: Genaro Rodriguez)

Terrazas down twice rd 1 & counted out from body shot rd 3.

| | | | | | |
|---|---|---|---|---|---|
| ✓ 2017-09-16 | **Rafael Rivera** | 25 0 2 | T-Mobile Arena, Las Vegas | W-UD ★★★☆☆ | event bout wiki |

ref: Tony Weeks   Tim Cheatham 119-109   Burt A Clements 120-108   Glenn Feldman 119-109

🏆 WBO NABO Feather

| | | | | | |
|---|---|---|---|---|---|
| ✓ 2017-05-06 | **Manuel Avila** | 22 0 0 | T-Mobile Arena, Las Vegas | W-UD ★★★★☆ | event bout wiki |

ref: Tony Weeks   Burt A Clements 100-90   Max DeLuca 99-91   Richard Ocasio 99-91

🏆 North American Boxing Federation Feather
🏆 WBO NABO Feather (vacant)

| | | | | | |
|---|---|---|---|---|---|
| ✓ 2016-12-17 | **Horacio Garcia** | 30 1 1 | Forum, Inglewood | W-UD ★★★☆☆ | event bout wiki |

ref: Raul Caiz Jr   Tom Carusone 100-90   Max DeLuca 100-90   Pat Russell 100-90

🏆 North American Boxing Federation Feather (supervisor: Craig Hubble)

| | | | | | |
|---|---|---|---|---|---|
| ✓ 2016-09-17 | **Andrew Cancio** | 17 3 2 | AT&T Stadium, Arlington | W-TKO ★★★★☆ | event bout wiki |

🕐 2:27   ref: Gregorio Alvarez   Glen Rick Crocker   Don Griffin   Jesse Reyes

🏆 North American Boxing Federation Feather (supervisor: Tito Gonzalez Rodriguez)

Cancio cut on bridge of nose from punch rd 3. Cancio stopped standing in rd 9.

Advertisement

| | | | | | |
|---|---|---|---|---|---|
| ✓ 2016-07-30 | **Victor Proa** | 28 1 2 | Fantasy Springs Casino, Indio | W-KO ★☆☆☆☆ | event bout wiki |

🕐 1:07   ref: Raul Caiz Jr   Max DeLuca   Lou Moret   Alejandro Rochin

🏆 North American Boxing Federation Feather (supervisor: Travis Ford)

Proa down in rd 2. Proa stopped standing

| | | | | | |
|---|---|---|---|---|---|
| ✓ 2016-03-26 | **Jayson Velez*** | 23 1 1 | Oracle Arena, Oakland | W-UD ★★★☆☆ | event bout wiki |

ref: Edward Collantes   Kermit Bayless 99-91   Michael Tate 98-92   Marshall Walker 99-91

🏆 North American Boxing Federation Feather

| | | | | | |
|---|---|---|---|---|---|
| ✓ 2015-12-18 | **Hugo Partida** | 21 6 2 | Fantasy Springs Casino, Indio | W-TKO ★★☆☆☆ | event bout wiki |

🕐 1:32   ref: Pat Russell   Tony Crebs   Edward Hernandez Sr   Lou Moret

🏆 North American Boxing Federation Feather (vacant) (supervisor: Craig Hubble)

No knockdowns. Partida helpless on the ropes.

| | | | | | |
|---|---|---|---|---|---|
| ✓ 2015-10-23 | **Ruben Tamayo** | 26 6 4 | Fantasy Springs Casino, Indio | W-UD ★☆☆☆☆ | event bout wiki |

ref: Edward Hernandez Sr   Ray Corona 100-90   David Denkin 100-90   Lou Moret 100-90

| | | | | | |
|---|---|---|---|---|---|
| ✓ 2015-07-11 | **Rene Alvarado** | 22 4 0 | Sports Arena, Los Angeles | W-UD ★★★☆☆ | event bout wiki |

ref: Thomas Taylor   Max DeLuca 98-91   Edward Hernandez Sr 96-93   Zachary Young 95-94

Alvarado down in rd 1.

| ratings | schedule | results | date | champions | people | events | clubs/gyms | titles | score |

✅ 2015-05-09  ~~Giovanni Segura~~ Morales  15 2 0  🇺🇸 Minute Maid Park, Houston  **W-UD** ⭐☆☆☆☆  event  bout  W wiki

ref: Sam Garza   Levi Martinez 99-91   Randy Russell 100-90   Barry Yeats 100-90

✅ 2015-03-06  **Juan Luis Hernandez**  17 4 1  ●●●● 🇺🇸 Belasco Theater, Los Angeles  **W-TKO** ⭐☆☆☆☆  event  bout  W wiki

🕐 3:00   ref: Jack Reiss   Carla Caiz 20-17   Barry Druxman 20-17   Zachary Young 20-17

Hernandez down once in round 2, and twice in round 2, with a 3rd knockdown coming right as the bell sounds.
Referee Jack Reiss rules the punch as being after the bell. Hernandez refuses to continue and the bout is officially ruled a tko win for Diaz.

✅ 2014-12-08  **Jose Angel Beranza**  36 31 2  ●●●●● 🇺🇸 Cowboys Dance Hall, San Antonio  **W-UD** ⭐☆☆☆☆  event  bout  W wiki

ref: Rafael Ramos   Mark Calo-oy 100-90   Ursolo Perez 100-90   Christopher Souster 100-90

✅ 2014-11-13  **Roberto Castaneda**  21 7 1  ●●●● 🇺🇸 Fantasy Springs Casino, Indio  **W-RTD** ⭐⭐☆☆☆  event  bout  W wiki

🕐 3:00   ref: Raul Caiz Sr   Tony Crebs   Max DeLuca   Edward Hernandez Sr

No knockdowns; Right hand injury

✅ 2014-09-29  **Raul Hidalgo**  22 11 0  ●●●● 🇺🇸 State Farm Arena, Hidalgo  **W-TKO** ⭐☆☆☆☆  event  bout  W wiki

🕐 2:13   ref: Humberto Zavala   David Avalos   Luis Escalona   Perry Hillin

Hidalgo down in 1st rd. and three times in rd 7

✅ 2014-07-09  **Jose Robles Olvera**  12 1 1  ●●●●● 🇺🇸 Hard Rock Hotel and Casino, The Joint, Las Vegas  **W-UD** ⭐⭐☆☆☆  event  bout  W wiki

ref: Tony Weeks   Robert Hoyle 99-91   Patricia Morse Jarman 98-92   Jerry Roth 99-91

✅ 2014-04-26  **Luis Maldonado**  36 12 1  ●●●●● 🇺🇸 StubHub Center, Carson  **W-UD** ⭐☆☆☆☆  event  bout  W wiki

ref: Thomas Taylor   Sergio Caiz 60-54   Tony Crebs 60-54   Daniel Sandoval 60-54

✅ 2014-03-08  **Jovany Fuentes**  5 3 0  ●●●● 🇺🇸 MGM Grand, Grand Garden Arena, Las Vegas  **W-TKO** ⭐☆☆☆☆  event  bout  W wiki

🕐 2:59   ref: Russell Mora   Robert Bennett   Eric Cheek   David Sutherland

✅ 2013-12-13  **Carlos Rodriguez**  18 12 4  ●●● 🇺🇸 Fantasy Springs Casino, Indio  **W-TKO** ⭐☆☆☆☆  event  bout  W wiki

🕐 1:13   ref: Raul Caiz Jr   Max DeLuca   Thomas Taylor   Fritz Werner

✅ 2013-08-24  **Noel Mendoza**  6 2 0  ●●● 🇺🇸 StubHub Center, Carson  **W-KO** ⭐☆☆☆☆  event  bout  W wiki

🕐 1:54   ref: Raul Caiz Jr   Gwen Farrell Adair   Thomas Taylor   Fernando Villarreal

Mendoza down twice in 3rd rd.

✅ 2013-07-20  **Luis Cosme**  8 2 1  ●●● 🇺🇸 Fantasy Springs Casino, Indio  **W-KO** ⭐☆☆☆☆  event  bout  W wiki

🕐 2:09   ref: Jack Reiss   Carla Caiz   Pat Russell   Fernando Villarreal

Cosme down and counted out from body shot

✅ 2013-06-08  **Rigoberto Casillas**  8 10 1  ●●●● 🇺🇸 Home Depot Center, Carson  **W-RTD** ⭐☆☆☆☆  event  bout  W wiki

🕐 3:00   ref: Lou Moret   Carla Caiz   Patrick Connolly   Fritz Werner

✅ 2013-05-03  **Eric Gotay**  3 1 0  ●●● 🇺🇸 The Cosmopolitan of Las Vegas, Chelsea Ballroom, Las Vegas  **W-TKO** ⭐☆☆☆☆  event  bout  W wiki

🕐 2:13   ref: Vic Drakulich   Robert Bennett 20-18   Adalaide Byrd 20-18   Herb Santos 20-18

Gotay down once in 3rd. rd.

✅ 2013-03-16  **Alberto Cupido**  7 7 2  ●●●● 🇲🇽 Grand Oasis Arena, Cancun  **W-UD** ⭐☆☆☆☆  event  bout  W wiki

ref: Rafael Mendoza   Carlos Perez 60-55   Mario Portela 60-54   Alicia Ramirez 59-55

✅ 2013-02-02  **Jose Ruiz**  2 2 0  ●●● 🇺🇸 The Cosmopolitan of Las Vegas, Chelsea Ballroom, Las Vegas  **W-TKO** ⭐☆☆☆☆  event  bout  W wiki

🕐 2:03   ref: Robert Byrd   Burt A Clements   Duane Ford   Lisa Giampa



ratings    schedule    results    date    champions    people    events    clubs/gyms    titles    score

2012-12-15 **Vicente Alfaro Martinez**    5 2 0    ●●●●● Sports Arena, Los Angeles    W-UD

ref: Thomas Taylor    Carla Caiz 40-35    Marty Denkin 40-35    Gwen Farrell Adair 40-35

Alfaro down in rd 4



Count on
**advanced solutions.**

SWITCH TODAY

(855) 571-7878

Count on
**advanced solutions.**

SWITCH TODAY

(855) 571-7878

vistaprint

©BoxRec is the official record keeper for 410 sports authorities worldwide, it is not under direct control of any single authority. Data may be incomplete/inaccurate.

Editors    About    Contact    Terms    Widgets    Cookies

🇬🇧 EN    🇨🇳 CN    🇩🇪 DE    🇪🇸 ES    🇫🇷 FR    🇵🇱 PL    🇷🇺 RU

# Exhibit H

STATE OF CALIFORNIA—STATE AND CONSUMER SERVICES AGENCY                                        EDMUND G. BROWN JR., Governor



**STATE OF CALIFORNIA**

# dca

**DEPARTMENT OF CONSUMER AFFAIRS**

**CALIFORNIA STATE ATHLETIC COMMISSION**
2005 EVERGREEN ST., STE. #2010
SACRAMENTO, CA 95815
WWW.DCA.CA.GOV/CSAC
(916) 263-2195 FAX (916) 263-2197



## CALIFORNIA STATE ATHLETIC COMMISSION
### BOXER – MANAGER CONTRACT
#### PLEASE READ ENTIRE CONTRACT BEFORE SIGNING

THIS CONTRACT MADE THIS **4th** DAY OF **September**, AT **Upland**, CALIFORNIA, BY AND BETWEEN **Rafael Heredia / Moses Heredia**, LM# _____ OF **Laguna Niguel** (HEREAFTER "MANAGER" (LEGAL NAME) AND **Joseph Diaz Jr.**, LB# _____ OF **South El Monte** (HEREAFTER "BOXER" (LEGAL NAME).

In consideration of mutual promises contained herein, the above parties agree to and with each other and with the California State Athletic Commission (hereinafter "commission"), in order to induce its acceptance hereof as follows:

### A. BOXER AGREES:

1. Pursuant to Rule 222, no contract may exceed five (5) years. Boxer understands that he or she may negotiate the term of this contract with Manager *before* signing this contract. Subject to the approval of this contract by Commission, to render services from **9/4/2012** to **9/3/2017** solely and exclusively for Manager in such boxing contest, exhibition, or training exercises as Manager shall from time to time direct, whether in California or elsewhere.

2. To pay Manager **20%** percent (shall *not* exceed 33 1/3 percent – Rule 221) of any sum of money Boxer earns for any services described in Paragraph A.1. rendered by Boxer pursuant to this contract. Boxer understands that he may negotiate the actual percentage figure with Manager *before* signing this contract. Said **20%** percent shall be determined incurred by Boxer in the performance of Boxer's duties hereunder.

3. To fulfill faithfully any contract entered into Boxer's behalf by Manager for rendition of the services described above during the term **MH** of this agreement.

4. That Manager may render services to others during the term of this agreement.

5. To attend all training, exercising, and other necessary work as Manager shall require, and to proceed and travel by any means of conveyance when required to do so by Manager for the performance of his or her duties under this contract. Manager reserves the right to select trainers. *Manager waives the right to select trainers, fighter will have final right to select trainers.*

6. That Boxer will not, during the term of this agreement, take or engage in any boxing contests, exhibitions or training exercises without first having obtained the written permission of Manager to do so.

### B. MANAGER AGREES:

1. To guarantee Boxer that the Boxer's share of money earned pursuant to this contract shall not be less than **N/A** per year during the term of this contract or Manager will pay Boxer the difference between the amount actually earned and **N/A**

2. To use Manager's best efforts to secure remunerative boxing contests and at all time to act in the best interest of Boxer.

3. To make no contract for a boxing contest where Manager has a direct or indirect financial or contractual interest in Boxer's opponent.

4. To render a full, true, accurate and itemized accounting to Boxer and to the Commission if the commission so requests. Said accounting shall include, with respect to each other contest, exhibition or match: (a) the amount of money received by Manager pertaining to the contest, exhibition, or match; (b) the amount of money actually paid to boxer, (c) the amount of money owed to Manager by Boxer, provided, however, that no sum of money shall be claimed under this subsection which cannot be substantiated by a receipt signed by the Boxer within thirty (30) days after Boxer sends a written demand of an accounting, by certified mail to Manager. Boxer shall send a copy of any demand made to Manager to the Commission by regular mail.

5. To keep Manager's records available to and open for inspection by Boxer and/or the Commission upon demand.

### C. BOXER AND MANAGER FURTHER AGREE:

1. That all contests or exhibitions of boxing and conducted under this contract in the State of California shall in all respects be in conformity with the laws of the State of California and rules and regulations now or hereafter adopted by the Commission.

2. This contract may be declared null and void if at any time during the term the Manager, after notice from the Commission pursuant to the provisions of Rule 221, is not duly licensed by the Commission.

3. To make the required contributions to the Boxer's pension plan pursuant to Rule 401.

4. All controversies arising between the parties hereto, including but not limited to controversies concerning the validity and/or enforceability of this contract, shall be submitted for arbitration in the following manner:

   Within two (2) weeks after the origin of such dispute and of a desire and willingness to refer such dispute to arbitration, whereupon the Commission of the existence of such dispute and of a desire and willingness to refer such dispute to arbitration, whereupon the Commission shall by itself, or through another duly appointed by it, conduct a hearing at a time and place reasonably convenient to all interested parties and witnesses; notification of the time and place of such hearing shall be given to all interested persons at their last known places of address. The parties hereto agree in the event of submission of any such controversy to arbitration, that the decision of such arbitrator shall be final and binding upon the parties hereto and each of them to he bound thereby.

1

M-2012-0012

**C.   (CONTINUED)**

5.   The arbitrator may terminate this contract if Manager fails to obtain a good faith offer of a boxing match, exhibition or contest from a responsible person, firm or corporation for at least four (4) consecutive months, during all of which time Boxer shall have been ready, willing, able and available to accept and perform such services.

6.   Manager and Boxer both certify and promise to each other and to the Commission, to induce its approval hereof that no other person or party in any way or in any degree shares or participates in the ring earnings of the Boxer or in the Manager's or Boxers portion of such earnings, that the Boxer and Manager have no other agreements with each other concerning compensation to the Boxer's career, and that no oral or written agreement exists concerning such sharing or participation.

7.   Manager and Boxer both certify and promise to each other and to the Commission, to induce its approval hereof, that no oral or written agreement exists between them other than this contract, that the Boxer has no other agreement with any other person concerning his or her boxing activities, and that no change in or addition to this contract is valid or will be enforced unless it is made a part of this contract in writing and approved by a Commission representative.

8.   This agreement is not valid until and unless both parties appear at the same time before the Commission or a Commission representative for the approval and acceptance of this agreement by the California State Athletic Commission.

9.   This agreement may only be modified by the Manager and the Boxer in writing.  Any such modification shall be added to this contract and approved by the Commission in writing before it is effective.

10.   This agreement may be terminated by the Manager and the Boxer executing a Release of Contract form provided by the Commission. This agreement may not be terminated until such a Release of Contract is executed by the Manager and Boxer and is submitted to and approved by the Commission.

The parties hereto have read and signed this contract and agreement in each other's presence and in the presence of the Commission Representative who has orally reviewed the terms of this contract with the Boxer on this ___4th___ day of ___September___.

**THIS CONTRACT IS NOT VALID UNTIL THE DATE ON WHICH IT HAS BEEN SIGNED AS APPROVED BY THE COMMISSION'S EXECUTIVE OFFICER OR DESIGNEE.**

**IF THE PARTIES HAVE ANY OTHER AGREEMENTS CONCERNING THE BOXER'S COMPENSATION OR CAREER THAN THOSE SET FORTH ON THIS CONTRACT, THEY MAY NOT BE ENFORCED BY THE COMMISSION.**

WITNESSED BY COMMISSION REPRESENTATIVE

BOXER

MANAGER

CO-MANAGER (IF ANY)

CO-MANAGER (IF ANY)

ACCEPTED AND APPROVED BY EXECUTIVE OFFICER OR DESIGNEE

DATE

I hereby acknowledge that the provisions of this contract reviewed with me and by a Commission Representative.

BOXER

9/4/12

DATE

M-2012-0012



STATE OF CALIFORNIA



BUSINESS, CONSUMER SERVICES, AND HOUSING AGENCY · GOVERNOR EDMUND G. BROWN JR.
**CALIFORNIA STATE ATHLETIC COMMISSION**
2005 Evergreen Street, Suite 2010 | Sacramento, CA 95815
P (916) 263-2195  F (916) 263-2197
csac@dca.ca.gov | www.dca.ca.gov/csac

FEB 2 4 2017

### BOXER/MANAGER and BOXER/PROMOTER
# RELEASE OF CONTRACT

Dated _____2/23/17_____

*We, the undersigned, hereby mutually release each other from any further liability or obligation by virtue of that certain contract entered into and filed with the State Athletic Commission of California on or about the ___23___ day of ___February___ 20_17_ for a period of ___5___ years.*

*We hereby agree that said contract is to be considered canceled and void and of no effect; this release to be effective from the __23__ day of __February__, 20_17_.*

*NOTE: This release must be signed in the presence of an Athletic Commission Inspector or employee or it must be executed in the presence of a Notary Public and his/her seal affixed hereto. In either case, it will only be effective when all parties to the contract have signed this release, and it has been filed with the Athletic Commission.*

| | | | |
|---|---|---|---|
| **BOXER** | Printed Name  JOSEPH DIAZ | Signature | Date  2/23/17 |
| **PROMOTER** | Printed Name  MANNIX VAUN Heredia | Signature | Date  2-23-17 |
| **MANAGER** | Printed Name  Moses Heredia | Signature | Date  2/23/17 |
| **CSAC** | Inspector/Representative Printed Name  LARRY ERVIN | Signature | Date  2/23/17 |

STATE OF CALIFORNIA.........................}
                         } §
County of _____}

On this _____ of _____, 20____, before me came
_____ and _____ to me known and known to me to be the individuals described in, and who executed the foregoing instrument and they duly acknowledge to me that they executed the same.

Sworn to before me this _____ day
of _____, 20_____,

_____
*Notary Public*

Contract Release
Rev.2014

M-2012-0012



STATE OF CALIFORNIA
**dca**
DEPARTMENT OF CONSUMER AFFAIRS

BUSINESS, CONSUMER SERVICES, AND HOUSING AGENCY • GOVERNOR EDMUND G. BROWN JR.
**CALIFORNIA STATE ATHLETIC COMMISSION**
2005 Evergreen Street, Suite 2010 | Sacramento, CA 95815
P (916) 263-2195  F (916) 263-2197
csac@dca.ca.gov | www.dca.ca.gov/csac



BOXER/MANAGER and BOXER/PROMOTER
# RELEASE OF CONTRACT                M-1012-0012

Dated _3/22/17_

*We, the undersigned, hereby mutually release each other from any further liability or obligation by virtue of that certain contract entered into and filed with the State Athletic Commission of California on or about the _22_ day of _MARCH_, 20_17_ for a period of _5_ years.*

*We hereby agree that said contract is to be considered canceled and void and of no effect; this release to be effective from the _22_ day of _MARCH_, 20_17_.*

*NOTE: This release must be signed in the presence of an Athletic Commission Inspector or employee or it must be executed in the presence of a Notary Public and his/her seal affixed hereto. In either case, it will only be effective when all parties to the contract have signed this release, and it has been filed with the Athletic Commission.*

| | | | |
|---|---|---|---|
| JOSEPH Pedroza DIAZ | | | 3/22/17 |
| BOXER | Printed Name | Signature | Date |
| GolDEN Boy PROMOTION | Rolando Arellano | | 3/22/17 |
| PROMOTER | Printed Name | Signature | Date |
| MOSICS T HEREDIA | | | 3/22/17 |
| MANAGER | Printed Name | Signature | Date |
| LARRY ERVIN | | | 3/22/17 |
| CSAC | Inspector/Representative Printed Name | Signature | Date |

STATE OF CALIFORNIA.........................}
County of _Los ANGELES_ } §

On this _22ND_ of _MARCH_, 20_17_, before me came
JOSEPH DIAZ, ROLANDO ARELLANO and MOSES HEREDIA LARRY ERVIN to me known and known to me to be the individuals described in, and who executed the foregoing instrument and they duly acknowledge to me that they executed the same.

SHAUNA NATASHA DAVIS
Commission # 2112001
Notary Public - California
Los Angeles County
My Comm. Expires May 17, 2019

Sworn to before me this _22_ day
of _MARCH_, 20_17_.

_____
Notary Public

Contract Release
Rev.2014

M-1012-0012

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                         CIVIL CODE § 1189

┌─────────────────────────────────────────────────────────────────────┐
│ A notary public or other officer completing this certificate verifies only the identity of the individual who signed the │
│ document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. │
└─────────────────────────────────────────────────────────────────────┘

State of California                        )
County of __LOS ANGELES__                  )

On __MARCH 22, 2017__ before me, __SHAUNA DAVIS, NOTARY PUBLIC__ ,
      *Date*                 *Here Insert Name and Title of the Officer*

personally appeared __JOSEPH PEDROZA DIAZ, ROLANDO ARELLANO, MOSES HEREDIA__
                            *Name(s) of Signer(s)*

__AND LARRY ERVIN__ ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

```
┌───────────────────────────────────┐
│  SHAUNA NATASHA DAVIS             │
│  Commission # 2112001             │
│  Notary Public - California       │
│  Los Angeles County               │
│  My Comm. Expires May 17, 2019    │
└───────────────────────────────────┘
```

Signature _____
              *Signature of Notary Public*

      *Place Notary Seal Above*

━━━━━━━━━━━━━━━━━━━━━━━━━ **OPTIONAL** ━━━━━━━━━━━━━━━━━━━━━━━━━
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited  ☐ General | ☐ Partner — ☐ Limited  ☐ General |
| ☐ Individual       ☐ Attorney in Fact | ☐ Individual       ☐ Attorney in Fact |
| ☐ Trustee       ☐ Guardian or Conservator | ☐ Trustee       ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

# Exhibit I



DEPARTMENT OF CONSUMER AFFAIRS
BUSINESS, CONSUMER SERVICES, AND HOUSING AGENCY  •  GOVERNOR EDMUND G. BROWN JR.
**CALIFORNIA STATE ATHLETIC COMMISSION**
2005 Evergreen Street, Suite 2010 | Sacramento, CA 95815
Phone: (916) 263-2195  |  Fax: (916) 263-2197
Website: www.dca.ca.gov/csac  |  Email: csac@dca.ca.gov



February 24, 2017

Moses Heredia
9 Brownsbury Rd
Laguna Niguel, CA 92677

### RE: NOTICE OF APPROVED CONTRACT

Dear Mr. Heredia:

The California State Athletic Commission has approved the attached Manager-Fighter Contract(s) summarized below.

| Contract #: M-2017-0006 | | | |
|---|---|---|---|
| **Manager:** | Moses Heredia | **Management Share:** | 18% |
| **Co- Manager:** | N/A | **Start Date:** | 02/23/2017 |
| **Athlete Name:** | **Joseph Diaz Jr.** | **Expiration Date:** | 02/22/2022 |

If you have any other questions or concerns regarding this contract, please contact me at the Commission office main line at (916) 263-2195 or via email at csac@dca.ca.gov.

Sincerely,

Heather Jackson
Staff Services Analyst
California State Athletic Commission

Enclosure(s): Approved Contract



**STATE OF CALIFORNIA**

**dca**
**DEPARTMENT OF CONSUMER AFFAIRS**

BUSINESS, CONSUMER SERVICES, AND HOUSING AGENCY · GOVERNOR EDMUND G. BROWN JR.

**CALIFORNIA STATE ATHLETIC COMMISSION**
2005 Evergreen Street, Suite 2010 | Sacramento, CA 95815
P (916) 263-2195  F (916) 263-2197
csac@dca.ca.gov | www.dca.ca.gov/csac

# BOXER - MANAGER CONTRACT

*PLEASE READ ENTIRE CONTRACT BEFORE SIGNING*

THIS CONTRACT MADE THIS **23** DAY OF **Fsbrany**, AT **LA Verne**, CALIFORNIA, BY AND

BETWEEN **MOSES HEREDIA** LM#: **10535** OF **LAGUNA NI/eGH** (HEREAFTER "MANAGER" (LEGAL NAME)

AND **JOSEPH DIAZ JR.** FED ID#: **CA037384** OF **Glendura, CA** (HEREAFTER "ATHLETE" (LEGAL NAME).

In consideration of mutual promises contained herein, the above parties agree to and with each other and with the California State Athletic Commission (hereinafter "Commission"), in order to induce its acceptance hereof as follows:

## A.  BOXER AGREES:

1. Pursuant to Rule 222, no contract may exceed five (5) years. Boxer understands that he or she may negotiate the term of this contract with Manager *before* signing this contract. Subject to the approval of this contract by Commission, to render services from **2/23/17** to **2/24/22** solely and exclusively for Manager in such boxing contest, exhibition, or training exercises as Manager shall from time to time direct, whether in California or elsewhere.

2. To pay Manager **18%** percent (shall *not* exceed 33 1/3 percent – Rule 221) of any sum of money Boxer earns for any services described in Paragraph A.1. rendered by Boxer pursuant to this contract. Boxer understands that he may negotiate the actual percentage figure with Manager *before* signing this contract. Said **18%** percent shall be determined incurred by Boxer in the performance of Boxer's duties hereunder.

3. To fulfill faithfully any contract entered into Boxer's behalf by Manager for rendition of the services described above during the term of this agreement. MANA C3 WAIVES RIGHTS TO Select TRAINER, ~IGHTON will have Final RSoHTS

4. That Manager may render services to others during the term of this agreement. To Select TRAINBL.

5. To attend all training, exercising, and other necessary work as Manager shall require, and to proceed and travel by any means of conveyance when required to do so by Manager for the performance of his or her duties under this contract. Manager reserves the right to select trainers.

6. That Boxer will not, during the term of this agreement, take or engage in any boxing contests, exhibitions or training exercises without first having obtained the written permission of Manager to do so.

## B.  MANAGER AGREES:

1. To guarantee Boxer that the Boxer's share of money earned pursuant to this contract shall not be less than **2 FIGHT** Per yr *per year* during the term of this contract or Manager will pay Boxer the difference between the amount actually earned and **2 FIGHTS**

2. To use Manager's best efforts to secure remunerative boxing contests and at all time to act in the best interest of Boxer.

3. To make no contract for a boxing contest where Manager has a direct or indirect financial or contractual interest in Boxer's opponent.

4. To render a full, true, accurate and itemized accounting to Boxer and to the Commission if the Commission so requests. Said accounting shall include, with respect to each other contest, exhibition or match: (a) the amount of money received by Manager pertaining to the contest, exhibition, or match; (b) the amount of money actually paid to boxer, (c) the amount of money owed to Manager by Boxer, provided, however, that no sum of money shall be claimed under this subsection which cannot be substantiated by a receipt signed by the Boxer within thirty (30) days after Boxer sends a written demand of an accounting, by certified mail to Manager. Boxer shall send a copy of any demand made to Manager to the Commission by regular mail.

5. To keep Manager's records available to and open for inspection by Boxer and/or the Commission upon demand.

## C.  BOXER AND MANAGER FURTHER AGREE:

1. That all contests or exhibitions of boxing and conducted under this contract in the State of California shall in all respects be in conformity with the laws of the State of California and rules and regulations now or hereafter adopted by the Commission.

2. This contract may be declared null and void if at any time during the term the Manager, after notice from the Commission pursuant to the provisions of Rule 221, is not duly licensed by the Commission.

3. To make the required contributions to the Boxer's pension plan pursuant to Rule 401.

4. All controversies arising between the parties hereto, including but not limited to controversies concerning the validity and/or enforceability of this contract, shall be submitted for arbitration in the following manner:
   Within two (2) weeks after the origin of such dispute and of a desire and willingness to refer such dispute to arbitration, whereupon the Commission of the existence of such dispute and of such dispute and of a desire and willingness to refer such dispute to arbitration, whereupon the Commission shall by itself, or through another duly appointed by it, conduct a hearing at a time and place reasonably convenient to all interested parties and witnesses; notification of the time and place of such hearing shall be given to all interested persons at their last known places of address. The parties hereto agree in the event of submission of any such controversy to arbitration, that the decision of such arbitrator shall be final and binding upon the parties hereto and each of them to be bound thereby.

Contract ID: **M-2017-0006**
Page 1 of 2

**C.   (CONTINUED)**

5.   The arbitrator may terminate this contract if Manager fails to obtain a good faith offer of a boxing match, exhibition or contest from a responsible person, firm or corporation for at least four (4) consecutive months, during all of which time Boxer shall have been ready, willing, able and available to accept and perform such services.

6.   Manager and Boxer both certify and promise to each other and to the Commission, to induce its approval hereof that no other person or party in any way or in any degree shares or participates in the ring earnings of the Boxer or in the Manager's or Boxers portion of such earnings, that the Boxer and Manager have no other agreements with each other concerning compensation to the Boxer's career, and that no oral or written agreement exists concerning such sharing or participation.

7.   Manager and Boxer both certify and promise to each other and to the Commission, to induce its approval hereof, that no oral or written agreement exists between them other than this contract, that the Boxer has no other agreement with any other person concerning his or her boxing activities, and that no change in or addition to this contract is valid or will be enforced unless it is made a part of this contract in writing and approved by a Commission representative.

8.   This agreement is not valid until and unless both parties appear at the same time before the Commission or a Commission representative for the approval and acceptance of this agreement by the California State Athletic Commission.

9.   This agreement may only be modified by the Manager and the Boxer in writing. Any such modification shall be added to this contract and approved by the Commission in writing before it is effective.

10.  This agreement may be terminated by the Manager and the Boxer executing a Release of Contract form provided by the Commission. This agreement may not be terminated until such a Release of Contract is executed by the Manager and Boxer and is submitted to and approved by the Commission.

The parties hereto have read and signed this contract and agreement in each other's presence and in the presence of the Commission Representative who has orally reviewed the terms of this contract with the Boxer on this ____23____ day of ____February____ __2017__.

**THIS CONTRACT IS NOT VALID UNTIL THE DATE ON WHICH IT HAS BEEN SIGNED AS APPROVED BY THE COMMISSION'S EXECUTIVE OFFICER OR DESIGNEE.**

**IF THE PARTIES HAVE ANY OTHER AGREEMENTS CONCERNING THE BOXER'S COMPENSATION OR CAREER THAN THOSE SET FORTH ON THIS CONTRACT, THEY MAY NOT BE ENFORCED BY THE COMMISSION.**

Commission Representative Signature

Print Name: _____

Boxer's Signature

Print Name: **Joseph Diaz Jr.**

Manager's Signature

Print Name: **Moses Heredia**

Co-Manager's Signature *(if applicable)*

Print Name: _____

Co-Manager's Signature *(if applicable)*

Print Name: _____

Accepted and Approved by Executive Officer or Designee

Date   2/24/17

I hereby acknowledge that the provisions of this contract reviewed with me and by a Commission Representative.

Boxer's Signature

Print Name:        **Joseph Diaz Jr.**

Date   2/23/17

Contract ID: **M-2017-0006**

Page 2 of 2

# Exhibit J



# Exhibit K

Atkinson-Baker, Inc.
www.depo.com

```
 1              BEFORE THE STATE ATHLETIC COMMISSION

 2                DEPARTMENT OF CONSUMER AFFAIRS

 3                     STATE OF CALIFORNIA

 4

 5   In the Matter of the        )
     Arbitration Between:        )
 6                               )
                                 )
 7   MOSES HEREDIA AND JOSEPH    )
     DIAZ,                       )
 8                               )
                                 )
 9

10

11          DEPOSITION OF TRANSCRIPT OF PROCEEDINGS

12                 THURSDAY, JUNE 10, 2021

13                 LOS ANGELES, CALIFORNIA

14

15

16

17

18

19

20

21

22   ATKINSON-BAKER, A VERITEXT COMPANY
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:  JEANINE CURCIONE
                   CSR NO. 10223, RPR
25   FILE NO.:  AF04308
```

**CERTIFIED COPY**

```
1   TRANSCRIPT OF PROCEEDINGS, taken on June 10, 2021 at

2   10:27 A.M., before Jeanine Curcione, C.S.R. No. 10223,

3   RPR, pursuant to notice.

4
    APPEARANCES OF COUNSEL:
5
    ANDY FOSTER, ARBITRATOR
6
    FOR THE COMPLAINANT:
7
        ATTORNEY GENERAL OF CALIFORNIA
8       BY:  WILLIAM D. GARDNER, DEPUTY ATTORNEY GENERAL
        BY:  ARMANDO ZAMBRANO, SUPERVISING DEPUTY
9           ATTORNEY GENERAL
        300 South Spring Street
10      Suite 1702
        Los Angeles, California 90013
11      Phone: (213)269-6292
        e-mail: William.Gardner@doj.ca.gov
12      e-mail: Armando.Zambrano@doj.ca.gov

13  FOR THE RESPONDENT MOSES HEREDIA:

14      FEDERAL PRACTICE GROUP
        BY:  ERIC S. MONTALVO, ESQ.
15      BY:  JASON MOY, ESQ.
        1750 K STREET, NW
16      9th Floor
        Washington, DC 20006
17      Phone: (202)888-8199
        e-mail:  emontalvo@fedpractice.com
18

19  FOR THE COMPLAINANT JOSEPH DIAZ:

20      VGC, LLP
        1515 7th Street
21      Suite 106
        Santa Monica, California 90401
22      Phone: (424)272-9855
        BY:  JAMES L. GREELEY, ESQ.
23      BY:  DIYARI VASQUEZ, ESQ.
        e-mail: jgreeley@vgcllp.com
24

25
```

Atkinson-Baker, Inc.
www.depo.com

```
 1                        INDEX

 2

 3   WITNESS:  JOSEPH DIAZ

 4   EXAMINATION            DIRECT

 5   BY MR. GREELEY         87

 6   EXAMINATION            CROSS

 7   BY MR. MONTALVO         95

 8

 9   WITNESS:  MOSES HEREDIA

10   EXAMINATION            DIRECT

11   BY MR. MONTALVO        148

12

13   WITNESS:  RALPH HEREDIA

14   EXAMINATION            DIRECT

15   BY MR. MONTALVO        162

16

17   WITNESS:  STEVEN BASH

18   EXAMINATION            DIRECT

19   BY MR. MONTALVO        162

20

21

22

23

24

25
```

1           LOS ANGELES, CALIFORNIA;

2           THURSDAY, JUNE 10, 2021, 10:27 A.M.

3

4           MR. FOSTER:  We're on the record in the matter

5   of the arbitration between Moses Heredia and Joseph

6   Diaz.  I'm Deputy Attorney General William Gardner

7   serving as counsel for Andrew Foster in his capacity as

8   executive officer of the California State Athletic

9   Commission.  Mr. Foster as we can see is present

10  virtually as all parties are.

11          Also present today is supervising Deputy

12  Attorney General Armando Zambrano who will be assisting

13  in today's proceedings.  Mr. Foster will be conducting

14  the arbitration although I will be here to respond to

15  legal issues and questions that might arise, but

16  Mr. Foster will hear and decide all factual issues in

17  this case and is the ultimate decision maker for the

18  commission in this arbitration.

19          Today's date is June 10, 2021.  The time is

20  approximately 10:27 A.M.  We're convening virtually by

21  Zoom, as we know, pursuant to a request for arbitration

22  filed by Moses Heredia.  A notice of hearing was duly

23  served on the parties who are Moses Heredia and Joseph

24  Diaz.  The commission will take official notice of its

25  records that Moses Heredia is a licensed manager in the

1  State of California and Joseph Diaz is a licensed boxer

2  in the State of California.  And for the record as we

3  can see both parties are present with counsel.

4       It is my understanding as we heard earlier that

5  Mr. Heredia has secured the services of a court

6  reporter to make a record of the arbitration

7  proceedings, and on that note we should keep in mind

8  that we speak slowly and one at a time so that a full

9  and accurate record of today's proceedings can be

10 prepared.

11      Before we start the arbitration I would like to

12 turn some time over to Mr. Foster, executive officer of

13 the commission, to make a brief statement about today's

14 proceedings.

15      Mr. Foster?

16      MR. FOSTER:  We're going to start this.  I read

17 both the briefs but this is -- I've done a lot of these

18 things and this is a lot harder over Zoom to do this

19 next exercise but I'm going to attempt it because I

20 just want you guys to understand, Joseph, this is your

21 career we're dealing with.  You got that fight on

22 July 9 coming up.  I watched you fight, your last fight

23 over at Fantasy Springs.

24      This is your career and I take this very

25 serious.  Mr. Heredia you've managed Mr. Diaz for a

Atkinson-Baker, Inc.
www.depo.com

1  long time.  This is what I'll tell you man, both you

2  guys, if you have me decide the issue you're going to

3  both be upset.  I can almost promise you that.  I think

4  there's some issues on both sides here and nobody is

5  going to be happy.  If you guys can work this out

6  before we have to issue an opinion that would be the --

7  that would be the best thing.

8       I can tell you -- and we're going to hear the

9  testimony but at 30,000 feet this is kind of where I'm

10  at.  I think this is a valid contract, the one from

11  '17.  I think it is.  Having said that, Mr. Heredia,

12  there's some issues.  There's some issues from your own

13  brief, not my brief.  It's the brief you submitted to

14  the commission.  There's irreparable harm.  Those are

15  your words, not my words.

16       And so Mr. Diaz's career is what we're talking

17  about here and really this is talking about -- this is

18  all about, as all these things are this boils down to

19  money.  You guys should try to work this out before I

20  up and decide I have to hear this testimony and I give

21  the opinion.  If you guys can work it out right now

22  that would be probably preferable because if I have to

23  decide this nobody is going to be happy.  You can go

24  back and ask everybody --

25            (Technical difficulties.)

Atkinson-Baker, Inc.
www.depo.com

1      MR. FOSTER:  Do they want to take the time to do

2   the exercise or no?

3      MR. GARDNER:  You went on mute for a minute.

4   Have you finished your statements regarding that issue?

5      MR. FOSTER:  I have.

6      MR. GARDNER:  Do the parties wish to have some

7   time to based on what you've heard from Mr. Foster to

8   see if there's room for any sort of pre-arbitration

9   settlement negotiations in which case Mr. Foster would

10  step out and not be privy to those conversations.  Are

11  the parties interested in doing that?

12      MR. MONTALVO:  Mr. Heredia is.

13      MR. GREELEY:  I think we're always open to

14  having a conversation.  That said, we've come this far.

15  We're prepared to present and it sounded like

16  Mr. Foster and correct me if I am wrong but it sounded

17  like there would be time after that presentation is

18  done before the opinion is rendered to have the

19  conversation.  But all that said we feel extremely

20  strongly in our position and we would like to present

21  it.  We'd like to present the law on the issue.

22      MR. GARDNER:  So is that -- is that -- is it

23  your preference that you don't engage in these

24  pre-arbitration negotiations that have been proposed?

25      MR. GREELEY:  Well, I'll ask my client,

1  Mr. Diaz.  Our preference I think just in sequencing

2  would be to have the presentation and then entertain

3  any conversations after that point but before the

4  opinion is rendered.

5       MR. GARDNER:  I believe the way that it's going

6  to play out at this point is that Mr. Foster is

7  offering a time before we get going where you all, I

8  think everyone has likely read the briefs and examined

9  the exhibits that have been produced and Mr. Foster is

10 offering a pre-arbitration opportunity for the parties

11 to discuss the possibility of settlement.

12      If you choose not to of course that's fine.

13 Once the arbitration has been submitted there will be a

14 decision forthcoming.  So I think that was the point.

15 And one other thing I'd like to separate from what

16 we're talking about it appears someone may be recording

17 the proceedings.  Who's recording the proceedings?

18      MR. FOSTER:  That's CSAC.

19      MR. GARDNER:  Otherwise I wanted to make sure

20 that the parties were in agreement that the recording

21 take place.

22      So back to the issue of any pre-arbitration

23 settlement negotiations, is that something that sounds

24 the petitioner for arbitration Mr. Heredia is

25 interested in that, and it sounds like Mr. Diaz may or

Atkinson-Baker, Inc.
www.depo.com

1  may not be.  So where are we on that?

2      MR. GREELEY:  If we can pause for a moment and I

3  can have an offline conversation with Mr. Diaz since we

4  haven't discussed it in advance.  We're not in the same

5  location.  We can come back in hopefully five minutes

6  and give you an answer on that.

7      MR. GARDNER:  Thank you.  Let's go off the

8  record and come back at 10:45.

9          (Recess taken.)

10     MR. GARDNER:  Back on the record.  Mr. Greeley,

11 were you able to determine whether you were interested

12 in engaging in pre-arbitration settlement discussions?

13     MR. GREELEY:  Yes, sir, we're willing to have

14 the discussion.

15     MR. GARDNER:  Great.  In that case I will ask

16 Mr. Foster to take his leave and let's not record

17 anything that transpires.  Would the parties -- do you

18 want to do it by the Zoom or do you want to do it among

19 yourselves through telephone?  We're here to -- I'm

20 here, Mr. Zambrano is here to try to work with you to

21 help you get to where you want to be.  Mr. Foster is

22 not going to be listening in or taking part in any of

23 these settlement discussions.  What's your preference?

24     MR. GREELEY:  I assume the settlement

25 discussions will be confidential, yes?

```
1        MR. GARDNER:  Yes.

2        MR. GREELEY:  So we're indifferent.  Whatever

3   Mr. Montalvo and Mr. Heredia prefers.

4        MR. MONTALVO:  Is it okay if I confer with him

5   real quick?  I think Zoom would be appropriate since

6   we're all here.

7        We're fine with Zoom if they're amenable to

8   that.

9        MR. GARDNER:  Sure.  If there's any concerns

10  about the confidentiality you guys are welcome to jump

11  back on the teams meeting.  Otherwise we will make sure

12  it's confidential.  Mr. Foster is not going to be privy

13  to any of these discussions.  You good to stay with

14  Zoom?

15       MR. GREELEY:  We're fine with that.

16       MR. GARDNER:  Do you want us to check back at

17  11:15 and see where you guys are?

18       MR. GREELEY:  That's fine with us.

19            (Recess taken.)

20       MR. GARDNER:  Would you like to offer an opening

21  statement?

22       MR. MONTALVO:  Yes, sir.

23       Good afternoon, gentlemen, first I also

24  acknowledge that as I previously stated Mr. Moses

25  Heredia is sitting next to me.  So it's a limitation on
```

1  the camera and we don't want the echo so he's present

2  and is listening to my comments.  The crux of the issue

3  today seems to be the lawfulness of this particular

4  contract as the majority of the brief that Mr. Diaz's

5  counsel has put together has focused on, so first I

6  would say that as we refer to the case the evidence

7  will show in the case law that Mr. Diaz's counsel is

8  actually quoted, the law comes down to a new 7 years is

9  not started until the statute -- unless the new

10  agreement is struck while the employee is free from any

11  existing contract.  Able to consider competitive offers

12  and able to negotiate for his true value in the

13  marketplace.

14        So the structure as the evidence will show

15  in the commission is such that Mr. Diaz or any fighter

16  will go into the commission and as the evidence will

17  show there's going to be a presiding official, in this

18  case Mr. Ervin, and he in this particular instance as

19  will demonstrate by the documents indicates that he

20  would have met with the fighter, would have sat down

21  and gone through an informing session.

22        There's a release as the evidence will show

23  of the prior contract and everything was done in accord

24  with the commission rules and Mr. Diaz was fully

25  informed that he could walk away from that table at any

```
1   point in time and he chose not to do so and reenter the
2   contract.
3            So the law and the procedure and the facts
4   in this particular case will show that the contract is
5   valid.  As previously indicated some of the assertions
6   that have been raised are just factually incorrect.
7   Mr. Ralph Heredia's license should have become an issue
8   which we don't believe is relevant.  Did have proper
9   licensure but just in terms of record completeness.
10           We'd also indicate that the manager
11  contracts were actually approved by the commission and
12  this is also reflected by the numbers at the bottom of
13  the contract starting with M and the year and so as the
14  commission is well aware that once the -- once
15  Sacramento approves the contracts they issue the
16  appropriate designated tracker and both of the
17  contracts raised by Diaz's counsel indicate that as
18  such.
19           The promotion agreement is potentially
20  something that we will be discussing as well and as the
21  record will show that there is a clause in that
22  contract under 12 which indicates that the boxer must
23  disclose all of the representatives that he may have
24  and this is one of the reasons why Mr. Ralph Heredia
25  had signed that particular document but he is not the
```

1   licensed manager at issue here today.

2            And we'll get into other facts that sort of

3   demonstrate that Mr. Moses during the entirety of this

4   particular contract period worked very diligently to

5   get Mr. Jojo Diaz a very favorable contract term, very

6   favorable sign on terms, negotiated very vigorously to

7   enhance his financial return on his performances and

8   set him up for world championship opportunities and the

9   communications that are reflected in e-mail and what

10  you'll hear in testimony demonstrate in no uncertain

11  terms that Mr. Moses Heredia was focused on the

12  business of Mr. Jojo Diaz fighting and to fight under

13  the best circumstances available and was very

14  aggressive in obtaining not only the best contract

15  terms but also sponsorships.

16           So as we look at the record today

17  Mr. Heredia is sad that the relationship has become

18  broken and that they will not continue to participate

19  in these matters together but there is still a contract

20  in place and Mr. Diaz has benefited from that contract

21  and we would ask the commission at the close to find

22  the contract enforceable, find that their percentage is

23  still owed to Mr. Heredia and that there should be some

24  enlargement of time regarding the term of the contract

25  due to his injury as well as minor Covid impact and

1  then also Mr. Diaz's choice not to further engage with

2  the Heredias to facilitate their participation as

3  managers.  Thank you, and I look forward to presenting

4  our evidence.

5          MR. GARDNER:  Thank you, Mr. Montalvo.

6  Mr. Greeley, do you wish to offer an open statement?

7          MR. GREELEY:  Yes.  Thank you.  The question is

8  Mr. Montalvo has identified is whether the 2017 boxer

9  management contract is valid and enforceable and the

10  answer is a simple one.  It's no.  The reason that it's

11  simple is that in California the illegality of a

12  contract is decided as a matter of law, not fact, so we

13  don't need to resolve any disputes of fact to arrive at

14  the answer to that legal question.

15         The contract is void as a matter of law based on

16  the undisputed facts, the facts as everyone agrees as

17  I'll explain in my presentation of evidence.  It's

18  illegal and must be terminated under California law for

19  three separate equally valid reasons.  One is the

20  seven-year rule.  It's a black and white law in

21  California, section 2855 of the California Labor Code,

22  says a personal services contract or series of such

23  contracts longer than seven years is illegal.

24         The California courts have said boxing

25  management contracts qualify so this section of the

Atkinson-Baker, Inc.
www.depo.com

1  California Labor Code applies to boxing management

2  contracts such as this one.  And the Heredias contracts

3  are nine and a half years in length.  There's no

4  dispute about that.  It's what the contracts say.  It's

5  what the Heredias have said in their declarations and

6  their brief, talking about the ten-year relationship.

7  So they may have followed the commission procedures I

8  think is what Mr. Montalvo is saying for making sure

9  that they appeared before the commission, they signed

10  with the boxer and all of that may be true, but those

11  contracts violated the California Labor Code.  That's

12  what we're talking about.

13       That's the seven-year rule.  So they're void as

14  a matter of law and no fact can change that.

15  Mr. Montalvo referred to the fact that Moses worked

16  diligently and set up Mr. Diaz for championship

17  opportunities.  That well may be but no fact can

18  revalidate a void contract under the law.  The 2012

19  contract was released at the same signing session on

20  the same day that the 2017 contract was signed,

21  February 23, 2017.

22       There was no space of time between the

23  contracts.  It was a continuous uninterrupted term of

24  nine and a half years.  That is longer than seven

25  years, it is therefore illegal.  The second basis on

1  which the contracts must be invalidated, California law

2  requires all boxing managers to be licensed.  An

3  arrangement with an unlicensed manager is illegal.

4  Ralph Heredia admitted in his declaration under penalty

5  of perjury that he was unlicensed during the 2017

6  contract.

7       California law requires all managers to sign

8  commission-approved management agreements.  Ralph

9  Heredia has admitted in his declaration that he did not

10 sign the 2017 management agreement.  He was at the

11 signing, he sat next to Mr. Diaz but he did not sign

12 the document.  Again, these are not facts in dispute.

13 These are Ralph Heredia's words and what he submitted.

14       We're not -- in my opening argument we don't

15 need to get into any disputes of fact.  We just have

16 the law on our side.  Ralph Heredia's unlicensed

17 management of Mr. Diaz during the term of the 2017

18 contract was against California law and not just civil

19 law but it's a misdemeanor under criminal law and there

20 is no dispute about the fact that Ralph Heredia managed

21 Mr. Diaz.

22       He submitted exhibits showing that he arranged

23 the Tevin Farmer fight and approved it's terms in 2019.

24 He submitted a declaration in which he said he worked

25 tirelessly to arrange that fight.  He received money

1  both directly and through his entity Heredia Boxing

2  Management in exchange for -- as a management fee for

3  management services.  His own attorney has referred to

4  him as a manager during that time period.

5        He negotiated the 2017 Golden Boy agreement

6  during that time period as Mr. Diaz's manager.  He met

7  with the president of Golden Boy as recently as 2020 on

8  behalf of Mr. Diaz so these are all facts, again, in

9  this declaration.

10        I'm going to present very little evidence today

11  that I'm bringing to the table or that is Mr. Diaz's

12  contention.  We're going to focus just on what Ralph

13  and Mr. Moses Heredia said and that's enough.  There's

14  really no reason to go further than that.

15        The third basis that the contract must be

16  terminated under California law is that the Heredias

17  abused their position of trust and they systematically

18  breeched the contract for their own benefit at

19  Mr. Diaz's expense.  And that sounds like it may be in

20  dispute but even here there are certain key facts that

21  are not in dispute.

22        The contract in 2017 allowed for 18 percent

23  management fee.  The Heredias took 20 percent.  They've

24  admitted they took 20 percent.  It's in their papers.

25  They provided records showing they took 20 percent

Atkinson-Baker, Inc.
www.depo.com

1  under a contract that allowed for 18, that's a clear

2  breach, it's illegal.  Again, there's no fact that

3  excuses that.  And once a manager breaches a contract,

4  the fighter no longer needs to perform under that

5  contract.  So based solely on what the claimant has

6  submitted here to the commission without getting Diaz's

7  side of the story at all, those are three separate

8  bases based on their evidence.  We can stop after the

9  first one, the seven-year rule.  If we're going follow

10  the law today then we must terminate the agreement

11  between Moses Heredia and Jojo Diaz.  There's no gray

12  area.  There's no room for daylight under California

13  law.

14       Finally, we'll talk about the true history of

15  the Heredias' conduct here.  This is not necessary to

16  prove the illegality of the contract.  The foregoing is

17  sufficient, but it's important to understand what we're

18  seeking to protect the boxer against.  After all, that

19  is the stated public policy of California that's

20  effected in its regulatory system that the commission

21  upholds, the protection of the boxer against managerial

22  abuse.  We'll talk about that history of California law

23  both in the statute and in the cases.

24       And then the last point I think is really a

25  common sense point and if we leave here with nothing

1  else today it's what Mr. Foster said to us at the

2  outset.  The parties agree the boxer manager

3  relationship has been irreparably harmed.  This is a

4  quote from page 3 of the Heredias' brief.  Again, it's

5  not our contention.  The boxer manager relationship has

6  been irreparably harmed.  It can't be repaired and we

7  agree on that.  That's common ground.  Neither side

8  wants to be in business with the other and what other

9  possible interpretation could there be of the Heredias

10  putting forth a gratuitous declaration and other

11  allegations about Jojo being out of control, a

12  degenerate gambler, a drug user, a criminal.

13       There's no other possible interpretation of

14  those allegations other than the Heredias don't believe

15  Mr. Diaz can be managed.  They don't believe he can

16  perform under the contract.  Those allegations don't go

17  to the enforceability of the contract.  If they do at

18  all it's -- those are arguments to invalidate the

19  contract.

20       MR. MONTALVO:  I would object.  This sounds like

21  an argument, not an opening statement based on the

22  evidence that will be shown.

23       MR. GARDNER:  I believe that we are drifting

24  into that.  We're kind of relaxed rules around here but

25  it's a point well made.

Atkinson-Baker, Inc.
www.depo.com

1        MR. GREELEY:  Okay.  The question is from this

2   last point why are we even entertaining the slightest

3   possibility of continuing a relationship here if the

4   evidence shows based on the submissions that both sides

5   are in agreement that this is a relationship that can't

6   be fixed.

7        And that is really the summation of what I

8   believe our presentation and evidence will show.  It

9   will be largely based, again, on what the claimant has

10  submitted.  We feel we need to do very little beyond

11  that.  We feel they made the case for us.  Thank you.

12       MR. GARDNER:  Thank you, Mr. Greeley.  Well, at

13  this time we'll be turning things over to Mr. Foster as

14  the arbitrator and again, Mr. Heredia has the burden

15  here and feel free to call your first witness, present

16  your evidence as you see fit.  Thank you.

17       MR. MONTALVO:  Mr. Foster, can I proceed?

18       MR. FOSTER:  Mr. Montalvo, show me what you

19  have.

20       MR. MONTALVO:  Roger that, sir.  So the first

21  thing I'd like to refer to -- I'm going to go through

22  some of the documentary evidence before we get into

23  testimony so it will go a little smoother.  I'd like

24  you to reference the contract at issue which is Diaz

25  0010, the Bates numbers.

1      MR. FOSTER:  I'm looking at it.

2      MR. MONTALVO:  Yes, sir.  And if you look at

3  page 2 of that document which is 0011 you can see

4  Mr. Ervin's name and signature, that he was present on

5  the day of the execution of this contract.

6      MR. FOSTER:  Yes.

7      MR. MONTALVO:  Next I'm going to refer to case

8  law that is referred to by counsel.  That's at Diaz

9  Bates number 0 -- page number I'm referring to is Diaz

10  0288.

11      MR. GARDNER:  Do you know what exhibit number

12  that is?

13      MR. MONTALVO:  Exhibit 21 of Mr. Diaz's

14  submission.

15      MR. FOSTER:  My computer is running slow.  Give

16  me one second.

17      MR. MONTALVO:  Understood.  Yes, sir.

18      MR. GARDNER:  Mr. Foster, I've pulled it up I

19  think.  Hopefully I've shared my screen.  Are you guys

20  able to see?

21      MR. MONTALVO:  Yes, sir.  Page 10, sir.  Numeric

22  page 10 of the document.

23      MR. FOSTER:  Okay.

24      MR. MONTALVO:  I can't see the whole page.  Is

25  there a way to make it a full page or can you see the

1  whole page?  That's the more important part.  Keep

2  going.  Down to the bottom left.  The last paragraph on

3  the left.  One more page down, sir.  Page 9.  So if you

4  see that highlighted portion right there, sir, on the

5  bottom left and I just run through that because it's

6  instructive to the things that are going to be

7  presented.  It says, "Therefore, an employee may not be

8  compelled to serve one employer for more than seven

9  years where a subsequent personal services contract is

10  reached while on original agreement remains in effect

11  and the combined term is seven years.  A new seven

12  years is not started under the statute unless the new

13  agreement is struck while the employee is free from any

14  existing contract, able to consider competitive offers

15  and able to negotiate for his true value in the

16  marketplace."

17       And we believe that the commission's procedures

18  as administered by Mr. Ervin address that particular

19  issue and we believe that that is the controlling

20  discussion there.

21       MR. FOSTER:  You're talking about -- I mean, I'm

22  very familiar with this particular statute.  This

23  argument was brought up in the Andre Ward arbitration,

24  the second one, very, very familiar with this.

25  Mr. Diaz needed a chance to test the market or at least

Atkinson-Baker, Inc.
www.depo.com

1  be released for a moment.  That's if the first

2  agreement was indeed valid.  But --

3       MR. MONTALVO:  That's right.

4       MR. FOSTER:  But you're saying that because

5  Larry released him and that he signed a new one, are

6  you saying -- I mean, I'm just asking.  Are you making

7  the argument, the ten minutes that he was released

8  there or however long it took to sign the new one that

9  that satisfied the statute?

10       MR. MONTALVO:  No, sir.  There's an extra step

11  in between those two.  So step one is there's a

12  release.  Step two is that there's a discussion that's

13  had with the fighter to explain that since he's been

14  released he can contract with other persons, he can

15  walk out.  He's free to do whatever he needs to do and

16  so he gives the opportunity -- the fighter an

17  opportunity for him and the fighter to have a

18  discussion about that to make sure he fully understands

19  that he is not obligated to enter into another contract

20  on that day whatsoever.

21       So that's the conversation that resolves the

22  issue of or the period where he has the opportunity to

23  walk away and he could have just walked out the door

24  and whatever he thought was agreed to with Heredias

25  would no longer be enforcement and they had no

1  authority to force him to do that and that's the whole

2  point of that exercise, sir.

3      MR. FOSTER:  I'm aware of that.  Let me ask a

4  question.  Did Mr. Heredia provide Mr. Diaz a signing

5  bonus on the second contract?

6      MR. MONTALVO:  No, sir.

7      MR. FOSTER:  So he didn't provide him any --

8  between the first contract which the validity is in

9  question and the second contract which is not in

10  question in my mind, the second contract though

11  didn't -- didn't Mr. Diaz negotiate the thing down from

12  20 to 18?  Seems like I recall that.  20 percent to

13  18 percent?

14      MR. MONTALVO:  That's correct.  Yes, sir.

15      MR. FOSTER:  So there was some negotiation going

16  on.

17      MR. MONTALVO:  Sure.  There was a discussion

18  before the signing agreement because that's how would

19  you get there is you would have that discussion.  But

20  it's not binding.  He could have been discussing it

21  with other persons as well.  He could have shopped

22  himself to other managers during that period of time to

23  discuss that.  Clearly he's demonstrated the ability to

24  do that because that's what he did with the MTK

25  agreement, so there was nothing preventing him from

1  having those discussions with the Heredias or any other

2  party.

3       MR. FOSTER:  Okay.  Proceed.

4       MR. MONTALVO:  Yes, sir.  I'd also like to point

5  to Diaz Exhibit 255 and Bates number 255.  I can read

6  it quickly if you refer to that.  Counsel has put in

7  this -- the federal proceeding which is not really

8  relevant but to the extent that this issue has been

9  raised the court concluded on 0255, lines 10, 11 and

10 then -- I'll wait until he gets there.  Sorry.  Page 9,

11 sir.  Exhibit 16.  He's got it.  Very next page.

12      So if you look at lines 10, 11, sir, on the

13 left.  If you see that starting with, "The court

14 concludes."  Yes, sir, thank you very much.  "The court

15 concludes that Heredia, being Mr. Ralph Heredia, is a

16 non-signatory to the management contract and does not

17 have the right to compel arbitration under the

18 agreement," so basically the federal court is saying

19 Ralph Heredia is not a party to this contract.

20      In addition if you look at lines 22 through 24

21 they're also indicating that Heredia Boxing Management

22 is also not a party to the management contract.  So

23 what we have left here is what we know and that's that

24 Moses Heredia is the signatory to the contract and it

25 was done in accordance with the law both state and

 1  statutory law.

 2        I'd like to next point to -- it's going to be --

 3  it's Exhibit 28 Heredia, Bates number 0210.

 4        MR. FOSTER:  Give me a second to get there.

 5        MR. MONTALVO:  Yes, sir.  I appreciate it.  I

 6  understand.

 7        MR. FOSTER:  Okay.

 8        MR. MONTALVO:  So Exhibit 28.  So if you take a

 9  quick look at this e-mail exchange what it's indicative

10  of is that Mr. Diaz throughout for good or for bad was

11  continually looking to renegotiate his five

12  percentages.  He was looking for money in advance and

13  he tended to burn through cash more than I guess we'd

14  hope.  So if you look at this sort of discussion and

15  then also pair that with Mr. Diaz's exhibit which is

16  the MTK contract under Bates 0037 as Exhibit 4, Bates

17  0037 and looking at subparagraph 4 under terms and

18  conditions, MTK agrees.

19        MR. FOSTER:  Tell me that exhibit number again?

20        MR. MONTALVO:  Yes, sir.  That's Exhibit number

21  4.  It's Mr. Diaz's Exhibit 4.  And it's up on the

22  screen, sir.

23        MR. FOSTER:  Okay.

24        MR. MONTALVO:  So just looking at under terms

25  and conditions number 4, again, this is consistent with

Atkinson-Baker, Inc.
www.depo.com

1  Mr. Diaz's pattern of seeking sort of cash, you know,

2  in payment in future bouts.  Just to address this, you

3  know, why is Mr. Diaz continuing to mortgage his

4  future.  This is sort of a pattern and I'm not saying

5  that's a good thing.  It's just consistent across the

6  entirety of his career that give me some cash now and

7  then I'll repay you through my next bout which is a

8  continuing theme.

9        I'll next point to Mr. Diaz's Exhibit 5, the

10  first page of that exhibit which is 0043.  So if you

11  look at that paragraph and this is Ms. Sophia Conejo,

12  she's indicating on behalf of the commission to

13  Mr. Diaz's counsel, records prior to my arrival were

14  not kept very well.  Which is true.  And so she was not

15  able to validate some of the documents but as you'll

16  see in the enclosures that we're going to send which

17  include Mr. Ralph Heredias' license and the tracking

18  numbers, the certification numbers that were given

19  after the approval of the state, both of these

20  contracts were, you know, sent and looked at by the

21  commission but at the end of the day the 2017 release

22  resolves anything prior to that date.  So while we

23  don't believe it's highly relevant it just addresses

24  some of the allegations that things were not done in

25  accordance with the procedure or the commission.

```
 1        Next I'd address -- this is Diaz Exhibit 3.  I
 2   would first go to page 0014 or Bates 0014, excuse me.
 3   It's the next page after that.
 4        MR. FOSTER:  Okay.
 5        Q.  BY MR. MONTALVO:  Yes, sir.  And once
 6   again, you'll see a similar procedure here for
 7   Golden Boys promotion contract where Mr. Ervin
 8   also presided there and was present where it
 9   appears that both Moses Heredia, the manager and
10   then Mr. Ralph Heredia were present, and as you
11   look at the release of the contract, it involves
12   Golden Boy, Mr. Moses and Mr. Ervin and that was
13   what was signed off on, on the same day.  And then
14   I would point to page 11 of that which is Bates
15   0032 if you could go down it's subparagraph 12,
16   boxer's representative.
17        MR. FOSTER:  Give me a second to get there.
18        MR. MONTALVO:  Yes, sir.  I really appreciate
19   your patience with me as well.
20        MR. FOSTER:  I'm there.
21        MR. MONTALVO:  Yes, sir.  Pulling it up on the
22   screen as well.  If you look sort of about halfway down
23   where it says, "Therefore, boxer agrees."  It's that
24   last paragraph.  It's -- you got it.  About six --
25        MR. FOSTER:  I see it.
```

Atkinson-Baker, Inc.
www.depo.com

1          MR. MONTALVO:  "Agrees to disclose managers,

2    advisors, consultants, representatives to the promoter

3    at the date of the signing agreement."  One of the

4    requirements there was you guys show me who's going to

5    be involved here like right now.  So they did that in

6    front of the commission.  They did that in front of

7    Golden Boy.  Did they mistype Ralph Heredia as a

8    manager?  Sure.  Ralph didn't write that.  He just

9    signed the piece of paper.

10          So stuff happens clearly.  Documents have

11   different information in it, but you, you know, it was

12   a requirement that Mr. Heredia at that time disclose

13   anything he may be doing.  I think they call that the

14   Al Hamon provision -- Haymon.  Sorry.  Haymon.  I'm not

15   a fight guy but Al Haymon provision that Golden Boy is

16   included because they want to make sure they understand

17   who's going to be at the table and who they're going to

18   be potentially dealing with.  So -- let me go through

19   my notes.

20          MR. FOSTER:  I'm not trying to speed you along.

21   You got all the time you need within the allotment, but

22   where are you going?  I'm seeing this.  You've

23   submitted it.  I've looked at it.  Where are you going

24   with it?  Like what are you trying to get me to see?

25          MR. MONTALVO:  Well, sir, the primary allegation

Atkinson-Baker, Inc.
www.depo.com

1  is that the contract is not valid.  I mean that's sort

2  of where --

3       MR. FOSTER:  And I get that.  And look, you've

4  showed me that it is valid.

5       MR. MONTALVO:  All right.  So that's it.  I'm

6  not trying to waste time, sir, but that's the big

7  argument that's been brought to the table so I just

8  want to make sure.

9       MR. FOSTER:  I'm not trying to -- you can take

10  more time if you want.  I'm familiar with this issue

11  because we've had this issue has come up in past

12  arbitrations so I'm familiar with the seven-year issue.

13       MR. MONTALVO:  All right.  I'm not trying to

14  belabor the point.  I just want to make sure that you

15  didn't say well, you didn't tell me that and then I'm

16  in a different problem.

17       MR. FOSTER:  Please take all the time you need.

18       MR. MONTALVO:  Let me go through my notes.  I

19  think I laid out the key documents.  Because once I

20  call -- I'm going to call Mr. Bash here real quick

21  unless you allow me to call Mr. Diaz first.  I'm not

22  sure the procedure there.

23       MR. FOSTER:  You can go but let me tell you,

24  because this came from your brief, not from

25  Mr. Greeley's brief, this came from Heredia's brief.

Atkinson-Baker, Inc.
www.depo.com

1  Mr. Diaz has a fight here coming up soon and I would

2  rather, sir, he be focusing on that fight that's

3  against a real good opponent than sitting here in

4  arbitration dealing with this stuff.  That would be my

5  preference, but unfortunately we are where we're at.

6         Now, my concern is it says in your brief, not

7  their brief, your brief, that things are irreparably

8  harmed.  It can't be fixed.  You don't want to manage

9  him anymore or whatever, it's irreparably harmed and in

10 the same breath you want me to extend the contract.

11 When I read that and it was twice, not once.  When I

12 read that there was almost a contradiction in my way of

13 thinking.

14        And listen, just by me saying that I'm convinced

15 the contract is valid.  The contract is not valid

16 somebody else can tell me it's not valid, it's

17 whatever, but I'm convinced the contract is valid.

18 What I'm not convinced is that Mr. Heredia can continue

19 to manage Mr. Diaz.  And you've already said the things

20 is irreparably harm.  This becomes a money question.

21 That's what this becomes is a money question in my

22 view.  This is about money.

23        And so listen, you call whoever you need to.

24 You call but you've convinced me the contract is valid.

25 I believe the contract is valid.  I don't believe

Atkinson-Baker, Inc.
www.depo.com

1  Mr. Heredia can continue to manage Mr. Diaz.  I believe

2  that relationship is broken per your documents.  Not my

3  documents, your documents.

4       MR. MONTALVO:  Yes, sir.

5       MR. FOSTER:  So I think the focus should be on

6  what are you trying to get out of the issue?  You don't

7  want to manage him anymore.  I think you got a valid

8  contract.  What -- why are we here?  What do you want?

9  You guys did the arbitration.  Tell me what you want

10  because I saw what you wanted in your thing --

11       MR. MONTALVO:  Okay.  I can tease it out.  Yes,

12  sir.  Understand that when the arbitration was filed

13  and I'm not going to spend a lot of time on this but it

14  was filed back in September I believe and there was an

15  effort at that time to repair the relationship and what

16  happened shortly thereafter is a very visceral and

17  nasty attack on Mr. Ralph Heredia and that lawsuit that

18  came out, Twitter attacks.  There's been a pretty wide

19  ranging evisceration of Mr. Heredia in the media and he

20  restrained himself.

21       Obviously we're focused on -- I mean, they sent

22  the lawsuit to Golden Boy to frustrate that

23  relationship.  They -- so there was a lot of stuff

24  happening that made our current position untenable

25  because it was clear that Mr. Diaz did not want to

Atkinson-Baker, Inc.
www.depo.com

1    proceed forward.  Now, excepting that, if that

2    continues to be the case, because the Heredias have

3    always believed that they can continue to manage and do

4    a better job.  They think that he would have retained

5    the belt.  They think that they would have advocated

6    for that Golden Boy, the pay-per-view money.  So they

7    left that on the table.  They negotiated that Farmer

8    situation so that -- the idea was that he was going to

9    fight the mandatory and for the same money he would

10   have had to fight Farmer and then parlay that into a

11   higher pay day with Farmer 2.

12        So there was a plan.  They had the camps set

13   aside.  There was a whole thing they had going on.  So

14   the Heredias have had nothing but desire to see

15   Mr. Jojo Diaz succeed.  We believe they absolutely

16   contributed.  There was no difference in what they had

17   agreed to under that promotion agreement.  Under the

18   last agreement that in fact we believe that less money

19   was put into his pocket because they didn't exercise

20   all the aspects of that agreement but that they were

21   entitled to be paid at that last fight and those monies

22   were not paid.  And then we believe that through the

23   remaining end of the contract they should receive some

24   percentage moving forward and if that requires them to

25   do things I think they're willing to do that.

1       So -- because they do have the ability to help

2  him if you look at the -- just the sponsorship issue

3  alone when the Heredias were in control of him he had

4  Cognac, Hennessy, Tecate, Jersey Mikes.  Last go around

5  sponsorships were a dealer that Mr. Diaz owed money to

6  and a local Nissan dealership.  So the Heredias have

7  his interest in mind square one.

8       They believe they can continue to help him, but

9  regardless there was a contract.  They fulfilled their

10 terms and they should be -- if he's not willing to move

11 forward then they got to -- we believe they should pay

12 some percentage on the remainder of the contract and

13 whether it's extended or not because of Covid or the

14 injuries or any of those things that's within the

15 arbitrator's discretion.

16      MR. FOSTER:  But in your brief, not their brief

17 because I would except this from their brief, your

18 brief, Will, didn't it say the thing is irreparably --

19 put that up on the screen because that's the part I'm

20 focused on.

21      MR. MONTALVO:  That's a lawyer word not a

22 Heredia word.  I'll take responsibility for that choice

23 of words.

24      MR. GREELEY:  I think it is a Heredia word.

25 It's in his declaration as well.

1      MR. FOSTER:  Mr. Montalvo, isn't it in the brief

2   that I read the -- the thing that struck me more than

3   anything in that entire brief was the boxer management

4   relationship has been irreparably harmed.

5      MR. MONTALVO:  Yes, sir.  And we believe that

6   that is accurate as it relates to the activities that

7   MTK and VGC have put down.  I don't know the

8   relationship, what Mr. Diaz's interest is to work with

9   the Heredias, but from a business standpoint MTK has

10  directed and VGC has directed that Golden Boy not

11  cooperate with the Heredias.  I don't know if that's

12  repairable at this point.  Yes, that is in the brief.

13     MR. FOSTER:  So yeah, that's all I'm saying is I

14  think that we have to -- Mr. Diaz is not going to leave

15  here today or when we get done with this thing I can't

16  see a situation based on your own brief where Mr. Diaz

17  leaves here with the Heredias in control of his boxing

18  career.  I don't think that would be good for boxing.

19  I don't think that would be good for Mr. Diaz.

20     This becomes a money question.  You have a

21  contract that I believe is valid.  I believe it.  Now,

22  Mr. Greeley is going to try to convince me that it's

23  not valid.  He might be able to do it, I don't know.

24  But I know about this seven-year rule, I did the whole

25  Andre Ward situation with that.  How much is this

Atkinson-Baker, Inc.
www.depo.com

1   worth?  There's a number.

2        And you guys -- and by the way, let's be very

3   clear.  I talked to Will about this yesterday.  I'm not

4   a debt collection agency.  Commission does boxing.  I'm

5   not here to collect Mr. Diaz's cell phone bill.  That's

6   a different place.  I'm here to talk about the $72,000

7   that -- not 90.  72.  Not 90.  72 that was from earlier

8   this year because there's no way in the world that I'm

9   going to -- in this now he was overweight because there

10  probably wasn't a sauna because of the Covid bubble so

11  he couldn't cut the weight and he lost a hundred grand.

12  I'm sure he didn't want to lose that hundred grand.  If

13  he could have cut the weight he would have.  Weight

14  cutting is a big problem in this sport.

15       Mr. Diaz missed a couple of times.  He misses

16  again he's probably going up a weight class on the

17  thing, so I wouldn't miss again.  But he missed

18  probably because of the Covid bubble.  Now, he lost

19  $100,000.  You can't say okay, the management gets

20  another 18,000 because he missed weight because we

21  weren't there.  The whole thing in your brief was sort

22  of like okay, he missed weight before but it was

23  because he was growing.  I thought to myself maybe he

24  was still growing.  It's not three pounds this time.

25  You see what I mean --

Atkinson-Baker, Inc.
www.depo.com

1        MR. MONTALVO:  I get it, sir.  Just to address

2   the weight issue and I don't dispute it.  I accept the

3   72 but the point being that when he showed up to camp

4   he was at 172.  And so there was a standing rule with

5   the Heredias that he was not to exceed a certain number

6   so that he could make sure he met that weight.  So from

7   a management standpoint had they been in charge we

8   believe there was a much higher likely a success that

9   he would not have been in the position that he was in.

10  But notwithstanding, the 72 I'm not here to dispute

11  that.  So 72 is the number that I'm fine with.

12        MR. FOSTER:  That's one number, okay, and then

13  the contracts -- I think you got a valid contract.

14  Mr. Greeley is going to have his time but the focus

15  should be on what this thing is worth.  You know what I

16  mean?  What is it worth?  Because what I can tell you,

17  sir, is based on the brief and based on the irreparable

18  harm language I don't see it being a good idea for

19  boxing, a good idea for Mr. Diaz's career to tie him up

20  for years with managers he doesn't want to utilize.

21        MR. MONTALVO:  I agree.

22        MR. FOSTER:  To me this is about money.

23        MR. MONTALVO:  So in light of the structure here

24  we believe that the 72 is an appropriate number and we

25  believe that the contract is set to end in 2022.  We

Atkinson-Baker, Inc.
www.depo.com

1  believe that's the next two to three fights and we

2  believe that Mr. Heredia should get the percentage that

3  he contracted for, for those remaining fights.

4       MR. FOSTER:  Even if he doesn't do anything to

5  get it.

6       MR. MONTALVO:  Well, if he needs to do something

7  he can do that but that's the deal and there was an

8  opportunity to deal with that and he's operating under

9  the promotion agreement that allows him to get that

10  money.  So they did negotiate.  He's working off of the

11  work product that they put in motion that covers this

12  period of time.  He's benefiting financially from those

13  negotiations.

14       MR. FOSTER:  I think -- I think that Mr. Heredia

15  has done a good job managing Mr. Diaz up to this point.

16  I think that.

17       MR. MONTALVO:  Yes, sir.  And I'm saying that

18  the promotion agreement is what covers his revenue

19  moving forward and so at least until the end of the

20  contract and so there's nothing else that needs to be

21  done essentially.  I mean, the basic financials have

22  already been set in motion.

23       MR. FOSTER:  But there was a breakdown at some

24  point between the fighter and the management.

25       MR. MONTALVO:  I would say in my opinion, sir,

1  as humble as I can be I think that was a manufactured

2  breakdown.  I think somebody else came to the party.

3  If you look at some of the things in Jojo Diaz's

4  declaration he's been informed that Ralph Heredia was

5  not a licensed manager.  That these contracts are not

6  valid, that they're trying to bamboozle you and they're

7  not treating you well and they're not taking care of

8  you.

9       So I think the breakdown was something that was

10  created for him to get to this point and not his own

11  position and he reflects that in this declaration

12  because he keeps saying I was told by my attorney this

13  wasn't good to go.  I was told by my attorney they were

14  doing something wrong.  I don't think there really

15  truly was a breakdown.  I think there was some

16  misinformation that he based his decision off of.

17       MR. GREELEY:  I'll represent that there's

18  nothing in Jojo Diaz's declaration that reveals an

19  attorney-client privilege.  That was never something

20  that we would do.  My attorney told me some kind of

21  advice.  I don't believe that would be appropriate to

22  reveal.

23       MR. FOSTER:  Look, I think there's some issues,

24  Mr. Montalvo, on both sides.

25       MR. MONTALVO:  Yes, sir.

```
 1        MR. FOSTER:  Mr. Diaz, I think it's fair and I'm
 2  going to ask him in a minute but from your own
 3  declaration Mr. Heredia thinks this thing is
 4  irreparably harmed.
 5        MR. MONTALVO:  We will stipulate to that issue,
 6  yes.
 7        MR. FOSTER:  And I think Mr. Diaz probably does
 8  not want to work with Mr. Heredia anymore.  I think
 9  that's probably fair.
10        MR. MONTALVO:  I believe I agree with that as
11  well, yes, sir.
12        MR. FOSTER:  I just have to go back and look at
13  some of my personal experience.  I have to go back and
14  try to think about things that happened to me or
15  whatever.  Let me tell you something for a long time
16  ago I fought some and I had a manager and gave him
17  money and the whole thing like that.  Guess what?  If
18  he come and took my car or something like that, that
19  would have made me upset.  There's things on both sides
20  that are happening here.
21        MR. MONTALVO:  Yes, sir.
22        MR. FOSTER:  This -- but I do think you got a
23  valid contract.  And there needs to be a number.  There
24  needs to be a number on how much this thing is worth.
25  Not an imaginary, far out there -- because let me tell
```

1  you something.  This is what I assume people are

2  banking on.  I assume he thinks he's going to beat

3  Mr. Fortuna, the fight on July 9 and then we'll be in a

4  better position and then there will be more money --

5  you see what I mean?

6       MR. MONTALVO:  Yes, sir.

7       MR. FOSTER:  It's kind of like contradictory

8  when I read the brief because Mr. Diaz couldn't be

9  going downhill or they wouldn't be wanting to take this

10 bet.  Do you see what I mean?  That's why I need you

11 guys to come up with -- I don't need.  This is what I

12 suggest.  You come up with a solid real number that I

13 can look at because I know what Mr. Diaz is getting on

14 his next fight and then after that I don't know.  And I

15 don't think he knows.  If he wins the next fight it's

16 going to be really good for you.  If he loses the next

17 fight it won't be good for you.  You know, you'll lose

18 80 percent probably.  I know the way boxing works.  I

19 do it every day of my life.  I would like to see an

20 actual number of how much you think this contract is

21 worth.  Because I've got kind of an idea in my mind of

22 what I think it's worth.

23      MR. MONTALVO:  Well, I think if I came up with a

24 number it's 150 for the next -- that would come out of

25 the next bout that would cover the previous bout and

1  this current bout and then some percentage between 10

2  and 18 if we're looking at it to cover the next two

3  fights he may have.  And we think he'll probably do

4  another couple of fights and when he is benefiting from

5  the contract, that Golden Boy contract, the promotion

6  agreement to put him in a position and he's got that

7  pay per view clause that was aggressively negotiated

8  and they set him up in a position where he has the

9  ability to recover from the weight issue and set

10  himself up for success.

11      So we do believe there's value there.  We

12  believe that 150 off the next bout would get us at

13  least current and a fair number and he's willing to

14  take a shave off the subsequent fights.

15      MR. FOSTER:  Mr. Montalvo, what I'm asking you

16  to do is I'm asking you to come up with a number so

17  Mr. Diaz can be done with this.  I want him to be done

18  with this today.

19      MR. MONTALVO:  Okay.

20      MR. FOSTER:  I can't have -- and it's not good

21  for boxing and I know I'm just the executive officer

22  but I do look after the fighters.  It's kind of my job

23  and I cannot have him going in July 9 with this in the

24  back of his mind.  I want this to be done today.

25      MR. MONTALVO:  Okay.  I would say between 225

1  and 250, sir.

2        MR. FOSTER:  All right.  Give me a second to

3  write this down.

4        MR. GARDNER:  And just so the parties are aware,

5  Mr. Montalvo, you've used about 45 minutes of your time

6  of the two hours allotted.

7        MR. MONTALVO:  Thank you, sir.

8        MR. FOSTER:  I'd like to let Mr. Montalvo say

9  whatever he'd like to say.  Whatever you want to tell

10  me but I want to give you a pretty good idea of where

11  I'm at and where I think this thing is going.

12        MR. MONTALVO:  I would say that where I'm coming

13  with the 250 number, sir, is if he wins the next fight,

14  which we believe Jojo will because he's got the skills

15  against this opponent.  We believe he'll prevail.  That

16  sets him up for much higher paydays moving forward.

17  Again, he'll be benefiting from the existing promotion

18  contract that was negotiated by Mr. Heredia.

19        MR. FOSTER:  Mr. Montalvo, you've got plenty of

20  time.  You can say whatever else.  I'm not trying to

21  take your time.  These were my questions going into

22  this.

23        MR. MONTALVO:  I mean, I think we just cut to

24  the chase.  I think we'd like to hear from Mr. Jojo and

25  that would be important to sort of round this out

1  because we're only hearing it from our side but as we
2  said we still believe there's value.  I can have
3  Mr. Bash go through why that is but you've already
4  indicated you're tracking on that stuff so I don't want
5  to waste time on that.  The contract is valid so we're
6  available for any other questions but --
7          MR. FOSTER:  I have some more money, money
8  questions because to me it's about money.  He's not
9  going to leave here today.  We're going to get this
10 done.
11         MR. MONTALVO:  Yes, sir.  So let's work on the
12 money.
13         MR. FOSTER:  I'm talking about money and if you
14 need to bring Mr. Bash in here that's fine.  You think
15 the thing is worth a quarter of a million dollars or
16 225 a quarter -- those are your words.
17         MR. MONTALVO:  Yes, sir.  But let me -- may I go
18 talk to Mr. Bash here?  Because he's really the fight
19 guy so let me make sure I'm not stepping out of turn
20 because I was operating off a percentage issue
21 completely because what I understood what Mr. Bash
22 explained to me is that a manager is at the whim of the
23 future and so he cannot benefit from something that the
24 fighter doesn't preform on.  It's a risk.
25         MR. FOSTER:  Mr. Montalvo, I 1,000 percent get

Atkinson-Baker, Inc.
www.depo.com

1  that and Mr. Diaz and Mr. Heredia have made a lot of

2  money together.

3          MR. MONTALVO:  Yes, sir.

4          MR. FOSTER:  They had a good run and like I've

5  said before, I thought Mr. Heredia did a good job for

6  Mr. Diaz.  Mr. Diaz doesn't want to work with him

7  anymore.  I hear probably some on both sides there.

8  It's a money question and we're not talking about in

9  the future anymore because this is ending today.

10          MR. MONTALVO:  Understood, sir.

11          MR. FOSTER:  We're not going to mortgage

12  Mr. Diaz's future past -- I know what's happened.

13  Look, and I've already told Mr. Greeley this and I told

14  him -- I think it was Mr. Greeley.  I think we talked

15  before the fight.

16          MR. GREELEY:  We did.

17          MR. FOSTER:  Look, that 72 grand I've already --

18  I already think that's owed.  I do.  I think that's

19  owed.  Now --

20          MR. GREELEY:  Can I ask you a question about

21  that, Mr. Foster?  Because my understanding was that

22  Mr. Diaz -- and I'm obviously not conceding that

23  anything is over but my understanding was that purse

24  was reduced to 350 for that Rakhimov fight which would

25  be more like 62.  If you're looking at an 18 percent,

1   63.

2        MR. FOSTER:  Well, Mr. Greeley, let me tell you

3   about that.  I've heard that too.  Don't mean that --

4   and this is something you'll go back and talk with your

5   client or whoever about, I don't know but what got

6   turned into the commission was a hundred grand.

7        MR. GREELEY:  Okay.  I'll talk to him about it.

8        MR. FOSTER:  So you guys -- that's a whole

9   different ball of wax.

10        MR. GREELEY:  Got it.

11        MR. FOSTER:  Mr. Montalvo, so by my math I know

12   what Mr. Diaz is making on the next fight and I think

13   he'll make weight on that fight so that will add -- I

14   know exactly how much that will add and then, you know,

15   then after that we don't know how much Mr. Diaz is

16   going to get.  We don't have any idea.  If he wins it

17   might be seven figures or close.  Not exactly but it

18   might be close.  It might be close.  If he loses not so

19   much.

20        MR. MONTALVO:  That's why we were willing to go

21   with a percentage piece and I know you want to do it

22   today and I accept that but that's why I was proposing

23   the percentage piece because we're not going to get

24   anything that isn't there but there would be something

25   if there is.

1          MR. FOSTER:  You see what I'm talking about

2     though?

3          MR. MONTALVO:  Yes, sir.  I understand.

4          MR. FOSTER:  He couldn't be going downhill or

5     you wouldn't take the bet.

6          MR. MONTALVO:  It wasn't from the bet.  It was

7     more from being reasonable.  This is not about money

8     grubbing out of Mr. Diaz.  It's about trying to end

9     this relationship and be fair.

10          MR. FOSTER:  And I told you guys early on both

11     sides are going to be mad, so get ready.

12          MR. MONTALVO:  Yes, sir.  And the way he pays

13     his bills is through his purses so I think that if he's

14     going to direct 250 that's a shave.  He's not really

15     reaching into any other fight, that's early terminating

16     the contract and I think that's a fair resolution to

17     this.

18          MR. FOSTER:  Mr. Montalvo, I'm at 162 based on

19     the first one that I feel like he owes and provided he

20     fights the next one and then I think that -- I mean, I

21     would be inclined to look at something but I don't

22     think he deserves a whole other -- you don't know what

23     Mr. Diaz is going to get next time.  I have concrete

24     numbers on what he got the first time and what he's

25     getting July 9.

 1        MR. MONTALVO:  Yes, sir.

 2        MR. FOSTER:  We're not in the speculation game.

 3   I got to end this today.  This has been going on a long

 4   time.

 5        MR. MONTALVO:  May I confer with Mr. Heredia for

 6   about five minutes?

 7        MR. FOSTER:  Sure.  Let's take a little recess,

 8   five or ten minute full break.

 9        MR. MONTALVO:  Thank you, sir.

10        MR. GARDNER:  Let's come back at 2:30.  Is that

11   fine?

12        MR. FOSTER:  2:30 is great.

13             (Recess taken.)

14        MR. GARDNER:  We're back on the record.  Go

15   ahead, Mr. Montalvo.

16        MR. MONTALVO:  Yes, sir.  So we were at numbers

17   and trying to do quick math and it's never a good thing

18   but I hear you, I think you said 162, sir.  At least

19   getting us through and in looking through and

20   discussing with Mr. Heredia regardless of what this

21   next fight holds there's a definite subsequent fight

22   that's almost certain that's going to happen and that's

23   going to be Farmer 2 and so --

24        MR. FOSTER:  What are you talking about?  That

25   right there, you've nailed it.  How much is that worth?

1 And I kind of have an idea.  But look, he has to beat

2 Fortuna to get that fight.

3        MR. MONTALVO:  Understood, yes, sir.

4        MR. FOSTER:  So if I'm not -- I don't want --

5 like I said, many times already we're not going to play

6 this out long time in advance.  I know what he made at

7 Fantasy.  I know what he's making at the soccer field

8 and I have a pretty good idea of what he would make

9 against Farmer, at least a real good educated guess.

10 But I also know what he would make if he lost that

11 Fortuna fight.  I have a pretty good idea of what that

12 would be as well.  So --

13        MR. MONTALVO:  Just --

14        MR. FOSTER:  Let me tell you what -- you keep

15 talking, I'm going to tell you who the favorite is on

16 the next fight because I think it's relevant for this

17 conversation.

18        MR. MONTALVO:  I'm betting on Jojo Diaz anyways

19 so -- sorry.  No betting.

20        MR. FOSTER:  It's basically a 50/50 fight.  It's

21 basically a 50/50 fight.

22        MR. MONTALVO:  So I think if he continues on

23 track and he gets rehabilitated, like what Mr. Heredia

24 did after the Russell situation I think Mr. Diaz has

25 demonstrated that even against some adversity he's able

Atkinson-Baker, Inc.
www.depo.com

1  to sort of weather through and come out and I think we

2  do have a favorable view of his future.  I'm sure he

3  does as well.

4        But we're willing to split the 50/50 odds with

5  you if that's what seems to make sense so we can put a

6  button in this.  I guess we need to come up with an

7  evaluation of that Farmer or that X there and we're

8  walking away from the other one to two fights that come

9  after that.

10        MR. FOSTER:  What we can Mr. Montalvo if you

11  want to save the balance of your time you can consult

12  with whoever and decide how much you think this thing's

13  worth.  Like I said, it's all just trying to provide me

14  information.  I have an idea of what it's worth but I

15  certainly want to hear from Mr. Greeley on his

16  arguments.  Certainly I want to hear what he thinks

17  this is worth.

18        MR. MONTALVO:  Okay.  If I can save the balance

19  of my time and maybe we get in Mr. Greeley's

20  presentation.

21        MR. FOSTER:  Is that allowed, Will?

22        MR. GARDNER:  Certainly.

23        MR. FOSTER:  Okay.  Mr. Montalvo, if you're done

24  right now I'm going to let Mr. Greeley -- Mr. Greeley

25  are you ready to tell me what you think?

1        MR. GREELEY:  Yes, sir.  I just want to point

2   out we somehow got into a discussion of numbers and I

3   did want to say that the arbitration demand filed by

4   Moses Heredia does not make any request for damages.

5   It's a request for declaratory relief.  It's asking the

6   commission to rule on the validity of the contract.

7        We asked the commission before responding to it

8   whether it's appropriate for us on behalf of Mr. Diaz

9   to bring a counter-claim because we believe that the

10  Heredias owe Mr. Diaz money and we've outlined some of

11  the reasons why.  And we were told by a commission

12  representative that the commission could not award

13  money damages so we therefore brought an action in

14  federal court for monetary damages.

15       And I think Moses Heredia acknowledged this

16  distinct between the two forums as well.  In August

17  2020 he e-mailed Mr. Diaz and told him that he was

18  going to arbitrate the validity of the contract before

19  the commission and he was going to bring a separate

20  action for monetary damages in federal court.

21       So -- and Mr. Foster, you'll recall the

22  conversation you mentioned in February where I informed

23  you that the commission had told us this about the

24  monetary damages, you had your counsel Ken -- I forget

25  his last name, apologies on the line, and you said,

1  "Yeah, I think that's right.  Ken, is that right?  We

2  can't award money damages."

3        MR. FOSTER:  Mr. Greeley, that was involving --

4  that was involving the request for us to withhold money

5  from Mr. Diaz's purse at the bout.  Listen, we get that

6  request a lot.  You can just imagine the number of

7  requests we get about that.  We can't do it during that

8  time.

9        MR. GREELEY:  Understood.

10        MR. FOSTER:  Will, am I right?  We've done this

11  a lot of times, haven't we?  Where we ordered payments

12  and these kind of things.

13        MR. GARDNER:  In resolution or dissolution of

14  these types of contracts?

15        MR. FOSTER:  No, like in these arbitrations.

16  Like when you write the decision and we say, okay, how

17  much is this worth and stuff.  Don't we do this all the

18  time?  We've done it a lot of times.

19        MR. GARDNER:  Yes, I've seen that in past

20  decisions, that is correct.

21        MR. FOSTER:  But we can't do it during the

22  thing.  I couldn't -- I suppose I could, Mr. Greeley,

23  if I wanted to but I could have exercised some

24  discretion but it's not a good practice and I never --

25  listen, if I had told Mr. Diaz I'm going to take

Atkinson-Baker, Inc.
www.depo.com

1   $62,000 or at that time $90,000 from his Fight at

2   Fancy, the week of the fight, A, that messes with his

3   head and B, he might have took his ball and went home.

4         MR. GREELEY:  No, I don't think Jojo would have

5   done that but I appreciate your point and I appreciate

6   you not acting at that time.  I just wanted to make a

7   point, we have taken zero discovery into damages.

8   We've had zero discovery in this matter.  We have a

9   number of ideas about damages and at the appropriate

10  time in the federal court action we are going to have a

11  forensic accountant examine all of the money flow and

12  we're going to have a damages expert who is going to

13  present our case for damages and I just don't know

14  today on this record of Mr. Montalvo saying well, we

15  kind of think the contract is worth this or this and

16  maybe you'll have a fight in the future.

17        To me that's just not the record on which a

18  concrete damages can be assessed on either side.  And I

19  feel like when all is said and done we'll certainly be

20  getting a check written to us, not the other way

21  around.  But I just wanted to preface that.  I'll get

22  into the bulk of my presentation now and I'm going to

23  do a little bit differently if it's okay with you,

24  Mr. Foster.  We prepared a PowerPoint presentation that

25  I'd like to go through.  It has excerpts of the

1  exhibits.  So that you don't have to kind of look for

2  them, we'll present them on the screen.  Is that

3  acceptable?

4       MR. FOSTER:  Sure.  I think, Patricia, can you

5  let Mr. Greeley have the screen share thing?

6       MR. GREELEY:  My partner, Ms. Vazquez I believe

7  can put up the exhibits.

8       So as I said in the outset, the illegality of

9  the boxing management contract in California is a

10  matter of law.  I said we don't need to get into

11  disputes of fact to determine that, and that's not just

12  my opinion, that's the law of California and that's

13  really what drives the answer to the question that's

14  before us today, put to the commission by Moses Heredia

15  whether the 2017 contract between Heredia and Diaz is

16  legal, valid and enforceable or illegal, invalid and

17  unenforceable.

18       And the district court for the Central District

19  of California in 2001 in the very well known case of

20  De La Hoya versus Top Rank wrote about Oscar

21  De La Hoya's management contract, whether a contract is

22  illegal is a matter of law appropriately resolved on

23  summary judgment.  So again, that means we don't have

24  to submit any factual disputes to a fact finder,

25  whether a judge or a jury.

1        So all you need to determine whether a contract

2   is illegal such as the one being litigated today is to

3   look at the contract itself and we will and the

4   invalidity of the 2017 Heredia Diaz contract is obvious

5   on the face of that document.  The court in De La Hoya

6   also wrote an illegal contract is void.  It cannot be

7   ratified by subsequent act and no person can be

8   estopped to deny its validity.  The illegality of a

9   contract cannot be waived because the parties are not

10  at liberty to waive or ignore the requirements of the

11  law.

12       So that means once a contract is illegal under

13  the law as this one is there's no fact that will revive

14  it.  It doesn't matter if the Heredias did a bang up

15  job.  It doesn't matter if Jojo Diaz gambles his money

16  away.  It doesn't matter what his high school

17  girlfriend has to say about him after he broke up with

18  her in a declaration that's strangely submitted to the

19  commission today.

20       That all is a distraction and as I mentioned

21  earlier, if that were relevant it would really have the

22  opposite effect I think that the claimant is trying to

23  prove.  All of those things would go to the

24  un-enforceability of the contract, not to uphold it.

25       MR. FOSTER:  Mr. Greeley, I apologize.  I don't

1  mean to interrupt but can Ms. Vasquez share this again?

2  For some reason it went off my screen.

3       MR. GREELEY:  Sure.  It says we're screen

4  sharing.  Are you able to see that?  I think you're on

5  mute, Mr. Foster.

6       MR. FOSTER:  Let me ask Patricia.  Patricia, how

7  come like when I go back and forth the screen

8  disappears?  What do I need to do to make the screen go

9  over on one of my other monitors?

10           (Discussion held off the record.)

11       MR. GREELEY:  California has a long history of

12  regulating boxing management contracts with the purpose

13  of protecting boxers from financial abuse and you,

14  Mr. Foster, and the commission know this.  The 1974

15  case in the Northern District of California, George

16  Foreman Associates versus Foreman does a good job of

17  summarizing some of that history.  That's a case sited

18  by the De La Hoya court.

19       And the commission in its opinions over time has

20  cited this history as well including in the Ronda

21  Rousey decision in 2014 which involved termination of a

22  contract because of the lack of licensing of the

23  manager.

24       MR. FOSTER:  I did that one also.

25       MR. GREELEY:  Yes, sir, I saw you were involved

Atkinson-Baker, Inc.
www.depo.com

1  in that one and I'll refer to that in a bit.  So in

2  1945 the California attorney general investigated the

3  history of abuses in boxing in California and there

4  really were two key findings.  One, boxers had been

5  taken advantage of by their managers financially and

6  the quote that I think we've heard already today was

7  part of that finding and that is that boxers have been

8  forced to quote, "mortgage their futures."  Mortgage

9  their futures to their managers at a point of

10  vulnerability in their careers.

11      Two, the second finding is there had been

12  underworld figures historically associated with the

13  sport which affected its integrity and therefore

14  threatened the public.  And so from those two findings

15  emerged a very clear policy in California and that's

16  been cited by courts in California since at least the

17  1940s and it was referred to by the Hudson versus Craft

18  court which again the commission has cited.

19      In 1949 it called this policy unusually strong.

20  There's an unusually strong public policy to protect

21  boxers from abusive contracts so this is a well

22  established at least 70-year-old policy in California

23  and to enforce it.  The California legislature has

24  enacted what the De La Hoya court referred to as

25  California statutes and regulations regarding managers

1  and promoters and the California public policy to

2  closely police the financial arrangements of California

3  boxers.

4        And the California courts have in turn taken

5  this public policy and the statutes and applied them to

6  boxing management contracts specifically.  And in one

7  such statute in California that I mentioned in my

8  opening was California Labor Code Section 2855.  That

9  is a contract to render personal services may not be

10  enforced against the employee beyond seven years from

11  the commencement of service under it.

12        That's the statute.  The California courts

13  including famously the De La Hoya court, that's De La

14  Hoya versus Top Rank case and in the interest of full

15  disclosure Top Rank has been a client of mine but I was

16  not involved in that case.  That case involved an

17  agreement between Oscar De La Hoya of course, and Top

18  Rank.

19        The court determined that was a management

20  contract notwithstanding the fact it was titled a

21  promotional contract.  It had an original term of five

22  years and one month.  The parties signed an amendment

23  in 1994 to that 1992 contract that made the term of

24  that De La Hoya Top Rank contract extend so long as the

25  term of Top Rank's contract with HBO extended.

Atkinson-Baker, Inc.
www.depo.com

1       The parties, Top Rank and De La Hoya signed

2   another amendment in 1996.  That amendment said it

3   superceded the prior contract and then in 1997 the HBO

4   contract was amended to extend its term until 2002.

5   Meaning that the De La Hoya Top Rank contract was also

6   extended and now had a term from 1992 to 2002.

7       So in 2000 after seven years had elapsed De La

8   Hoya filed a lawsuit against Top Rank and he asked the

9   court to recognize his right to terminate the contract

10  and the court agreed with him.  And it wrote Section

11  2855, "Prohibits a boxer from being compelled to serve

12  one employer for more than seven years unless a new

13  agreement is struck while the employee is free from any

14  existing contract, able to consider competitive offers

15  and able to negotiate for his true value in the

16  marketplace."

17      Mr. Montalvo referred to that quote before and I

18  want to unpack that a bit.  It makes sense to serve the

19  public policy objective of protecting the fighter from

20  abuse of contracts because as we all know a

21  professional boxer is lucky to have a career longer

22  that seven years.  And he's likely to sign as Mr. Diaz

23  did his first management agreement as a teenager.

24      He's unlikely as was the case with Mr. Diaz to

25  have a sophisticated understanding at that point of

1  business dealings or have lawyers or other advisors who

2  could counsel him on the management contract and

3  protect his interests and so it's especially important

4  that this first manager cannot lock him in for the

5  entirety of his career before he has the chance to test

6  the market because that would be of course abusive.

7  That would be mortgaging his future at an early

8  vulnerable point in the career.  It would be like an

9  MBA player being in his rookie contract for ten years

10  and that's frankly exactly what the Heredias have tried

11  here.

12      In fact, to your point, Mr. Foster, they now say

13  nine and a half years isn't long enough.  We want to

14  extend to ten and a half years.  Mr. Diaz is in his

15  20s, I mean, that's nearly half of his life and it's

16  been the entirety of his professional career.

17      He's been under the management of the Heredias

18  for a combined uninterrupted total of nine and a half

19  years.  There has been no interruption and there are

20  not facts in dispute as to the dates of those

21  contracts.  The 2012 contract was signed on

22  September 4, 2012 and the term expired September 3,

23  2017.  Before that contract expired while Mr. Diaz was

24  still under contract on February 23, 2017 he signed a

25  new contract that expired on February 22, 2022.

1        There's no dispute about the math.  That's

2   longer than seven years, it's close to ten years.

3   That's nearly identical to the fact pattern of the De

4   La Hoya case and the contract is illegal and it's void

5   for the same reasons that the De La Hoya court found

6   that that contract was invalid.

7        The De La Hoya case is good law in California

8   and in the De La Hoya case as Mr. Montalvo and Heredia

9   have tried to do here, they say well, no, the

10  seven-year rule didn't apply.  Top Rank tried to get

11  around that by arguing that the 1996 amendment that I

12  mentioned restarted the seven-year test.  Restarted the

13  term because the 1996 amendment specifically said that

14  it was a new contract that superceded the original 1992

15  contract, just as Mr. Montalvo is saying well, this new

16  2017 contract is a new contract that restarted the

17  term.

18       And the court rejected that argument very

19  clearly.  The court considered it and it rejected it

20  and it said the legislative history of Section 2855

21  demonstrates that midterm contract extensions do not

22  restart the seven-year period even if they're labeled

23  as amendments or superceding agreements as this one was

24  here.

25       MR. FOSTER:  Mr. Greeley, you might help with

1  this and I was trying to study these documents as you

2  were putting them up.  What -- when was the release

3  signed?

4        MR. GREELEY:  It was signed on the same day that

5  the new agreement was signed, February 23, 2017.  So

6  what happened is --

7        MR. FOSTER:  Wait.  Try to help me here.  I'm

8  just trying to think this through.  Now, it was just up

9  on the screen.  That's what got me thinking about this.

10  This thing -- this thing was released before it

11  expired.

12        MR. GREELEY:  Correct.

13        MR. FOSTER:  So it's like what, eight or nine

14  months, whatever, seven months before it expired so he

15  released it, renegotiated down so it went from 20 to 18

16  and then he signed a new agreement.

17        MR. GREELEY:  Yes, sir.  This was prenegotiated

18  and that's in Ralph Heredia's declaration that this was

19  negotiated by Ralph Heredia in -- over Christmas

20  December 2016.

21        MR. FOSTER:  Mr. Greeley, what I'm saying is

22  like look, I don't think this is like the De La Hoya

23  case in the fact that Oscar never had the chance like

24  if Bob Arum hadn't signed the release he could have

25  just went off and left.  He wouldn't -- but see, like

1  it was -- I'm just calling balls and strikes here,

2  Mr. Greeley.  This new agreement was in Mr. Diaz's

3  favor.  He got 2 percentage extra.

4       Now, I am very interested in hearing about this

5  20 percent that was supposed to be 18 when the new

6  contract -- I did not know about that.  Very interested

7  in that particular point but I don't think -- Will, am

8  I missing something here?  I mean --

9       MR. GARDNER:  Well, I think your point appears

10  to be that there was a release signed prior to the

11  execution of the subsequent contract and the terms

12  indicate that there was negotiation, so if that is the

13  point you're making then I'd say you're not missing

14  anything.

15       MR. FOSTER:  Mr. Greeley, what happens a lot of

16  times -- and I know exactly what you're talking about

17  where like we have these managers who want to try to

18  like get like an extension going and they'll -- their

19  boxer will be doing pretty good and they'll want an

20  extension or whatever.  So what happens is like they'll

21  say well, let's just extend the contract and if that

22  does exceed -- I think it's five years for California.

23  But -- for contracts, but if it exceeds five years then

24  we say no, no, that's against the commission rules.

25       But what's happened here was he -- like before

Atkinson-Baker, Inc.
www.depo.com

1  the thing even expired Mr. Diaz released him on both of

2  them, signed a new one.  Now, I understand it was the

3  same day and I get that but it was seven or eight

4  months before the initial one was supposed to expire so

5  Mr. Diaz negotiated in his favor or somebody negotiated

6  for him.  Somebody.  He got a better deal so he got it.

7  That's why that contention that I make is why I think

8  this next one is valid.  I mean, the one from '17.

9          MR. GREELEY:  And Mr. Foster, with all due

10  respect that's just not how the law works.

11          MR. FOSTER:  That's why I have lawyers.

12          MR. GREELEY:  There's a continuous term and it

13  doesn't matter, we don't -- we'll get into why Mr. Diaz

14  entered this but the fact that it was done mid term,

15  that supports our side.  If it would have expired he

16  would have gotten to talk to other managers.  He would

17  have gotten to see what his value was in the

18  marketplace at the end of the first five years of his

19  career.

20          That's what the law specifically requires.  A

21  new seven years is not started under the statute unless

22  a new agreement is struck while the employee is free

23  from any existing contract.  Number one, he was not

24  free.  These were signed contemporaneously, the

25  release -- secondly, he's able to consider competitive

1  offers and able to negotiate for his true valve.

2       Mr. Heredia will explain was in a one bidder

3  negotiation process for both the 2012 agreement and the

4  2017 agreement.  Mr. Diaz was not able to entertain

5  offers from any other managers.  He was brought in

6  during the term of his 2012 agreement before it had

7  expired put, in front of the commission and signed a

8  new deal.  There wasn't one day, no one could point to

9  one day on the calendar that he was free of a contract.

10       MR. FOSTER:  He could have.  He could have.

11       MR. GREELEY:  Well, we can ask him if he could

12  have.  Because what you'll hear from him is that at the

13  time Moses -- rather Ralph approached him, he owed

14  Ralph quite a bit of money and that's a whole other

15  issue about mortgaging one's future and keeping him

16  financially beholden to Ralph.  So he didn't have a lot

17  of leverage because at all points in his career if he

18  wanted to walk away there was this debt hanging over

19  his head.

20       MR. FOSTER:  But like I said, Mr. Greeley, I'm

21  not -- this whole deal about the cell phone bills and

22  the rest of that stuff, I'm not getting into that.

23  This is not the forum.  I'm not a debt collection

24  agency.  I'm sure there's a different place that does

25  that kind of thing like a court or something but I

Case 5:20-cv-02618-JWH-SSC   Document 184-1   Filed 04/04/24   Page 156 of 433   Page ID
#:2606
Atkinson-Baker, Inc.
www.depo.com

1  don't know, they said 40 grand, 42,000?  It was a lot

2  of money that they wanted in their deal for like

3  various loans or whatever.  That's not what the

4  commission does.  We deal with contracts.

5       Now, your contention is it's continuous.  My

6  contention is unless there was a gun held to his head

7  or whatever I don't feel like -- I mean, it's not

8  uncommon that a boxer will sign a release and sign a

9  new agreement the same day but they have to sign the

10  release.  Had he signed a new agreement without that

11  release, then I agree with you.  But he had the

12  release.

13       MR. GREELEY:  Yes, but there was no day --

14  there's been no day since 2012 that he has not been

15  under the contractual management of the Heredias.

16  That's the fact.  And --

17       MR. FOSTER:  There was one day.  It was one day.

18       MR. GREELEY:  With all due respect if you

19  believe ten minutes satisfies the legal requirement for

20  him to be able to test the market and entertain other

21  offers when there's no other manager sitting there that

22  he's negotiating with, those ten minutes satisfied --

23  then there's no seven-year rule.  There's just no

24  seven-year rule.  And the legislature contemplated that

25  and they specifically talked about these mid term

 1  extensions and they said that doesn't cut it.

 2       MR. FOSTER:  Did you read my decision in the

 3  Andre Ward case?  The second one?

 4       MR. GREELEY:  I did and it's distinctive from

 5  here.  The decision there was that Mr. Ward was -- he

 6  had waived his right to argue Section 2855 and the

 7  seven-year rule because he had filed the arbitration

 8  under the contract.  He had invoked the contract.  He

 9  had not said that the contract was illegal and then

10  later in time at the arbitration he tried to pivot and

11  say well, now I think it's illegal and the decision

12  said no, no, that ship has sailed.

13       So that seven-year rule was not considered in

14  connection with that.  That argument was discarded.  It

15  was viewed he waived it.  And with respect to Mr. De La

16  Hoya, I respectfully disagree with you that it's not

17  the same.  Mr. De La Hoya signed multiple extensions.

18  He signed in '94.  He signed in '96.  Each time it was

19  voluntary.  No one held a gun to his head and said you

20  got to do it and he got better deals.  It's the exact

21  same fact pattern.

22       I think the legislature has looked at this, the

23  court has looked at this.  Seven years is seven years.

24  No one is contending that Diaz didn't do it voluntarily

25  but that's just simply not a consideration under the

1  law.  It's just not.  It's a black and white issue.

2        That's why I told Mr. Montalvo and I firmly

3  believe this, in 20 years practicing with a focus on

4  litigating disputes under commercial contracts under

5  California law, I don't know that I've seen a slam dunk

6  like this.  It's a black and white issue that's

7  normally not litigated because it's a summary judgment

8  issue just like it was in De La Hoya.

9        They say is it longer than seven years or is it

10  shorter?  This one is nine and a half so we feel very,

11  very strongly in this argument.  We don't feel there's

12  a court out there in California that would disagree

13  with us on this.

14        MR. FOSTER:  A lot of them are like this where a

15  boxer will sign a release and sign a new deal.  This

16  happens -- this is not an infrequent thing.  This is

17  not like something -- this is not a unique situation

18  for Mr. Diaz that he signed a new agreement.  This is

19  fairly common in boxing that -- especially when a boxer

20  starts getting a little bit better and at that time

21  Mr. Diaz's career was really taking off in 2017.  Like

22  he was really starting to come --

23        MR. GREELEY:  Absolutely.  Mr. Heredia realized

24  that and that's why he sought to lock him up before the

25  2017 contract expired and Mr. Diaz could find out what

1   his true worth was.  He had been beholden to

2   Mr. Heredias since he was fourteen years old.  He

3   hasn't been about to test his value at any point.

4         We feel very strongly about that legal argument

5   and I don't think there's any daylight in the position.

6   This is not a unique case.  You're absolutely right,

7   it's the exact situation that courts have looked at

8   before and found in our favor and terminated the

9   contract.

10        MR. GARDNER:  Mr. Greeley, I just had a quick

11   question.  Are you aware of any controlling case law on

12   this issue as opposed to non-published opinions in

13   which this case actually the court didn't even -- I

14   think the issue of the applicability of this labor code

15   section seven-year rule was never even vetted.  It was

16   just accepted by all parties.  Do you have any case law

17   on that point other than this unpublished decision?

18        MR. GREELEY:  I'm sorry.  Which unpublished

19   decision?  The De La Hoya versus --

20        MR. GARDNER:  Yes.

21        MR. GREELEY:  The De La Hoya versus Top Rank is

22   a published opinion.  We'll get back to you on that.  I

23   don't have the cases that we briefed at my fingertips

24   but we can provide other authority.

25        We'll move on.  I appreciate your thoughts on

Atkinson-Baker, Inc.
www.depo.com

1  that, Mr. Foster, and please stop me at any point if

2  you have further questions or comments.  More than

3  happy to respond.  But the second reason that this

4  contract is illegal is because it concealed from the

5  commission the unlicensed boxing activities by Ralph

6  Heredia.

7        MR. FOSTER:  Let me just -- I do have a comment

8  on this one.  When you set out your outline that your

9  legal basis number 3 is the one that I'm most focused

10  on.  But let's talk about legal basis number 2.

11        MR. GREELEY:  Yes, sir.

12        MR. FOSTER:  And Will can find exactly the point

13  in the contract that Mr. Diaz signed and Mr. Heredia

14  signed but this whole idea of Ralph Heredia not being

15  licensed, now listen, I'm not saying that's okay.  What

16  I am saying is both parties knew that he wasn't

17  licensed, certainly Mr. Heredia knew and Mr. Diaz

18  worked with him so until he didn't want to anymore.

19        So I think like that's not a great argument to

20  make because Mr. Heredia wasn't licensed but I was

21  working with -- I guess what I'm saying is this,

22  Mr. Greeley, if they were still on good terms I

23  wouldn't be getting a call saying, hey, I want to get

24  out of this deal because I don't want my manager

25  anymore because he doesn't have a license.

1      You see what I mean?  I understand your legal

2   arguments but I think really where I'm focused on --

3   and feel free, you got plenty of time, you can go

4   through all of it because you prepared it, but number 3

5   is really where I'm focused on.  I don't think they

6   work together no more.

7      MR. GREELEY:  Yes, sir.  I think they're

8   interrelated insomuch as Mr. Diaz felt that his rights

9   were being abused under the contract, he felt that

10   money was being taken from him that shouldn't have

11   been, that's number 3.  So that's why he retained

12   counsel to look into all of this and when we did we

13   found out that the entire arrangement was illicit, it

14   was illegal.

15      And I think number 2 I'd like to go over because

16   I think it should be particularly offensive to you

17   insomuch as Mr. Ralph Heredia, who by the way is not

18   here today apparently which is kind of part of the

19   point; right?  He's escaping any kind of accountability

20   to you and the commission but collecting management

21   fees which is a big problem under a regulatory scheme.

22   It renders it pretty toothless.

23      But the fact of the matter is that we looked

24   into this, we said none of this money that's going to

25   Ralph Heredia and his entity should be going there.

1  It's all outside of the regulatory scheme and so I

2  think I'd like to drill down on that a little bit more.

3  Obviously I can skip over the first couple of slides.

4  We're all aware that licensing is required and we're

5  all aware that the courts have looked at this, the

6  commission has looked at this and, frankly, it's not

7  just a violation of statute or civil law, it's a

8  violation of criminal law.  I say that because it's

9  taken seriously, very seriously in California, this

10  unlicensed management.

11       And Mr. Heredia what he submitted -- again, I

12  haven't gotten anything that we've put up or that

13  Mr. Diaz has said.  I will say this, that your

14  assumption which I understand your assumption that he

15  knew that Mr. Heredia was unlicensed, that is contrary

16  to his testimony and the declaration he submitted.

17       And in my understanding and he'll testify to

18  this and I'll ask him, he only recently found out about

19  the lack of a license and he thought Ralph was licensed

20  and Ralph himself has said that he was licensed in 2012

21  and he held himself out as a manager to Jojo Diaz.

22       So Jojo Diaz didn't go and make a freedom of

23  information request.  He didn't know about the lack of

24  a licensing and now Mr. Heredia has come forward and

25  admitted that he didn't have a license in 2017.  So in

Atkinson-Baker, Inc.
www.depo.com

1  any event, and it almost doesn't matter whether he was

2  licensed in 2012 or not.  It matters for our damages

3  because if he wasn't, we're going to disgorge any money

4  that went to him because it shouldn't have gone to him.

5  It was an unenforceable contract.

6       For purposes of the 2017 contract, we can skip

7  over it for now because Mr. Heredia admits that he had

8  no license at the time of the 2017 contract and he

9  admits that he acted as a manager nonetheless.  He was

10  the one who negotiated the 2017 contract with Mr. Diaz.

11  And these are his words in paragraph 13 of his

12  declaration, "We began discussions on continuing our

13  managerial relationship during Christmas 2016."

14       That's Ralph's declaration.  He is negotiating

15  the contract, Diaz has the same recollection.  Ralph

16  approached him about a new contract.  He said it was

17  urgent they extend their agreement and Diaz and Ralph

18  negotiated new terms at Ralph's house and no one else

19  was there.  Heredia did not sign the 2017 contract.  He

20  admits this as well.  Ralph Heredia.  He was at the

21  signing.  He sat next to Jojo but he didn't sign the

22  agreement.  So what was he doing there?

23       After that point in February 2017 -- and by the

24  way, this is all in the context, again, of Ralph

25  Heredia saying, I did not manage Jojo Diaz from 2017

1  forward.  I felt like my presence would be a hindrance

2  to the boxer so I did not manage him.  I didn't have a

3  good relationship with Roberto Diaz at Golden Boy so I

4  decided I would step away from management.  I let my

5  license lapse and I no longer managed Jojo Diaz under

6  the 2017 agreement.  That's his sworn testimony.

7        I want to compare that to what he actually

8  submitted, what the Heredias actually submitted in the

9  evidence and exhibits.  And in the remainder of his

10  testimony in his declaration.  He negotiated the

11  2017 --

12        MR. FOSTER:  Mr. Greeley, I'm just asking,

13  didn't Mr. Diaz and Mr. Heredia both promise to the

14  commission that no other people were involved and they

15  both signed it?

16        MR. GREELEY:  Yes, that's absolutely right.

17  That was Moses Heredia's -- I don't know if that's a

18  representation that Jojo Diaz could make as one of the

19  parties to the contract on his side of the coin, there

20  was no one sharing in his proceeds.  There was no other

21  fighter off the books that he was sharing any money

22  with.

23        It was Moses Heredia who said, I'm the only

24  manager.  There's no one else that has a financial

25  interest in this fighter and that was not true.  And

Atkinson-Baker, Inc.
www.depo.com

1  they provided checks to that effect.

2      MR. FOSTER:  Let me ask Mr. Diaz a question on

3  the record.  Will, are we under oath or no?  Is this

4  thing under oath?

5      MR. GARDNER:  We can swear can him in, in two

6  seconds if we'd like.

7      MR. FOSTER:  I'll just ask him.

8      Mr. Diaz, did you know about Ralph Heredia?  Did

9  you know he was helping Moses Heredia out when you

10  signed the contract in 2017?  Did you know that?

11      THE WITNESS:  I did know that.  As far as my

12  concern Ralph Heredia was my main manager.  I would go

13  do everything with Ralph even from 2017, 2018, even all

14  the way to the time of the Farmer fight when that was

15  the last time we actually did business together, two or

16  three months prior when everything was going sideways

17  because Ralph and Golden Boy, I guess they wanted me to

18  fight Rene Alvarado to keep everything in house with

19  them.

20      But I'm the one that actually told Ralph and

21  demanded Ralph that I want to go after the Tevin Farmer

22  fight so he ended up talking to Robert Diaz and talking

23  to Golden Boy, Ralph Heredia ended up talking to them,

24  sending e-mails.  Me and Ralph actually went to the

25  Logan Paul and KSI fight where we actually, me and

1  Ralph actually talked to Eddie Hearn as well and

2  negotiated the deal to lock in the Tevin Farmer fight.

3       MR. FOSTER:  Mr. Greeley, you can proceed.

4       MR. GREELEY:  And our view is it's the duty of

5  the manager and the fiduciary in that position to

6  inform the fighter what is the right way to structure

7  this deal.  Mr. Diaz has been consistent throughout

8  that he viewed Ralph Heredia alone as his manager.  And

9  he'll testify, I asked him the other day, he wasn't

10 even aware at that signing where Ralph signed next to

11 him that Ralph hadn't signed the contract.

12      It was certainly not that he didn't know Ralph

13 was involved.  He thought only Ralph was involved in

14 directing and controlling his boxing activities and him

15 being the recipient of the management fee and in

16 arranging the fights and that's what the documents that

17 Mr. Ralph Heredia and Moses Heredia submitted show.

18      Let's go to claimant's Exhibit 6.  Again, these

19 are all their exhibits, not ours.  So on the one hand

20 Ralph Heredia says I wasn't managing after the signing

21 of the contract in February 23, 2017 because --

22      MR. MONTALVO:  We would object -- this is an

23 objection at this point because this is all argument

24 and we keep referring to evidence that's going to be

25 presented but it's being proffered by counsel so I'd

Atkinson-Baker, Inc.
www.depo.com

1  like to -- if he's going to present the evidence let's

2  get the evidence presented and then we can move to his

3  argument.

4        MR. GARDNER:  Let me -- I'm going to let

5  Mr. Foster of course rule on this but as I recall these

6  documents were admitted and if counsel is referencing

7  something that's been admitted that would seem to be

8  appropriate.  But of course it's Mr. Foster's call.

9        MR. FOSTER:  Mr. Montalvo, I appreciate your

10  concern but Mr. Greeley, it seems like he's just

11  making -- he's doing his job.  Proceed, sir.  You're

12  doing fine.

13        MR. GREELEY:  Thank you.  We can consider it a

14  closing argument if you'd like.  I'm trying to get out

15  my presentation and I'm so far just referencing what

16  Mr. Montalvo submitted.

17        MR. FOSTER:  When you get done with your closing

18  argument I'll give you the same kind of spiel that I

19  gave -- the same kind of speech I gave Mr. Montalvo and

20  then you guys can talk it over.

21        MR. GREELEY:  Fair enough.  So again, I'm going

22  back to this claim by Ralph Heredia that he was not

23  managing in 2017.  This is an e-mail from Golden Boy

24  only to Ralph Heredia with a promotional term sheet for

25  fight terms.  If we go to a March 17 e-mail, this is

1  from Ralph back to Golden Boy and he's referencing

2  Ralph is speaking with Robert Diaz who he said he had

3  no relationship with and that's why he couldn't manage

4  anymore but he's referencing a phone call him and Eric

5  Gomez, the president of Golden Boy, he's talking about

6  discussing the new contract including material terms

7  and the split of economics.

8       And so I'm not sure what he's doing here if he's

9  not managing Mr. Diaz's boxing activities.  He's

10  negotiating his promotional agreement.  This is

11  March 2017 after the February 2017 management agreement

12  was signed.  And then five days later less there be any

13  doubt about whether Ralph was a manager and considered

14  himself a manager he signed as a manager.  Signed the

15  Golden Boy agreement.

16       And that's a written admission on a binding

17  contract and that is not in dispute.  Ralph has not

18  come forward and said that's not my signature.  So from

19  our perspective that's the end of the issue on that.

20  Ralph admitted in writing to being Mr. Diaz's manager.

21       Now, again, let's compare that to the

22  declaration that Ralph submitted under oath.  He says,

23  "My friendship with Roberto is over."  This is Roberto

24  Diaz of Golden Boy, "and I realize that my continued

25  involvement in the management of our fighters would

1  potentially be a hindrance in achieving our fighter's

2  ultimate goal."

3        So he says he didn't sign the 2017 management

4  agreement with Diaz on February 23, 2017 on the

5  commission form because of his contentious relationship

6  with Golden Boy.  And he says further that Moses took

7  over the negotiation with Golden Boy in March, he says

8  over the next month and was able to get $150,000

9  signing bonus.

10        But we just looked at the e-mails from March and

11  they're from Ralph and he was having calls with Robert

12  Diaz and he was referencing the $150,000 signing bonus.

13  And he attached these e-mails.  These are Heredia's

14  e-mails that accompany this declaration.  So I also

15  want to --

16        MR. FOSTER:  Maybe I'm being slow.  I'm just a

17  little confused and I want to understand.  So I'm -- so

18  I know all these players that you're talking about so

19  you're saying that in this e-mail here, can you just

20  explain it again for me, just this thing that's on the

21  screen.

22        MR. GREELEY:  Yes, sir.  So we've alleged that

23  the 2017 contract is illegal and void because it was

24  meant to conceal from the commission the fact that Jojo

25  Diaz's true manager Ralph Heredia was unlicensed and

Case 5:20-cv-02618-JWH-SSC   Document 184-1   Filed 04/04/24   Page 170 of 433   Page ID
#:2620
Atkinson-Baker, Inc.
www.depo.com

1  management activities by someone without a license is

2  against the law and voids the contract.  That's clear.

3      Mr. Ralph Heredia and Moses Heredia have come

4  back and said no, no.  It's true.  Ralph didn't have a

5  license but he stepped away from management in 2017.

6  He was no longer the manager and therefore the

7  agreement is kosher and you cannot void it based on

8  Ralph's involvement.  And we're showing you in Ralph's

9  own e-mails and his own declaration that he was

10  involved.  He was negotiating with Golden Boy.

11      MR. FOSTER:  Over the course of the next month

12  Moses had made great progress through proxies at Golden

13  Boy, mainly Orlando and George but knew that Robert was

14  behind all the decision making.  I guess I'm confused

15  because I'm reading it and I hear what you're saying

16  but it looks like Moses is trying to do things to try

17  to help Mr. Diaz.

18      MR. GREELEY:  Right and if we go back to the

19  exhibit that's on the screen it shows that it was

20  Mr. Ralph Heredia, not Moses who was doing those

21  things.  Ralph Heredia said I stepped away and Moses is

22  involved and in fact -- is this being shared?

23      MR. FOSTER:  Yeah, I can see the PowerPoint.

24      MR. GREELEY:  That's Ralph saying he spoke to

25  Robert and Eric.  That's Ralph saying he discussed the

1  new contract.  That's Ralph saying he discussed the

2  $150,000 signing bonus.  That's Ralph during the term

3  of the 2017 management agreement with Diaz that he did

4  not sign on the commission form, he said he was not

5  managing at that point.  He is leading the negotiation

6  with Golden Boy for the promotional agreement.  He is

7  doing management activities that require a license.  He

8  has admitted that he doesn't have a license.

9        MR. FOSTER:  This is not an unheard of type

10  thing when like say you've got a large management

11  company.  I'm not saying the Heredias are a large

12  management company but if you have a large

13  management -- I'll give you a promotion example.  Dana

14  White is listed as the match maker for UFC.  Sean

15  Shelby does all the matching.  It's one of his

16  employees and he's just -- or one of his -- I don't

17  know if he's an independent contractor or employee but

18  he works for him.

19        I hear what you're saying but I don't know --

20  and I'm willing to listen to arguments.  I just don't

21  know if having the brother who obviously Mr. Diaz

22  knows, everybody knew who this was.  They're not like

23  trying to hide Ralph Heredia.  He's not being hidden.

24  He's out there sending e-mails or whatever.  Mr. Diaz

25  has signed with Moses like I guess I'm saying is does

 1 it really invalidate the whole contract because his
 2 brother is trying to help him out?
 3        MR. GREELEY:  Yes, it does.  100 percent and it
 4 was hidden.  He didn't sign that 2017 contract.
 5        MR. FOSTER:  I thought Moses signed it.
 6        MR. GREELEY:  Moses signed it and Ralph was the
 7 true manager and then Ralph turned around three weeks
 8 later and signed the Golden Boy agreement saying he was
 9 manager.
10        MR. FOSTER:  I'll be interested to hear it from
11 Moses on that in a minute because I thought those guys
12 worked together like they were brothers and they kind
13 of had fighters and -- look, I'm -- I don't know them.
14 This is my first time meeting the Heredias today on the
15 Zoom.  I've not even spoken one time to Moses on this
16 whole arbitration.  I've spoken to his lawyer.  But I
17 had just heard from the industry folks that these
18 brothers and Moses had the -- I don't know.
19        MR. GREELEY:  I can -- my argument is if you
20 were going to send a message today that someone can act
21 as a manager without a license so long as they find
22 someone to sign the commission form then you don't have
23 a regulatory scheme.  There's no reason to impose the
24 licensing requirement.  I don't have a license but I
25 can go find a Moses and say sign this up for me.  I do

1  everything with the fighter but what's the point of

2  having a requirement to licensure?

3        MR. FOSTER:  I don't think that's a fair way to

4  put it.  Like for example, like I'll give you another

5  piece of the regulatory scheme that involves Golden

6  Boy.  Like when Sugar Ray Leonard wants to do his

7  charity event they get Golden Boy to promote it for

8  them.  They use Golden Boy's promoter's license, Robert

9  matches fights, all the things are happening but

10 everybody knows its Sugar Ray's charity thing, and

11 we're not coming for a Golden Boy show.  That's one

12 license type.

13       Another license type is like you have a large

14 management company which like there's lots of managers

15 but I'm trying to think of one that has a lot of

16 fighters but you don't say if one of their agents is

17 helping the person out as an employee -- you're an

18 attorney so like if your paralegal or somebody like

19 that calls and tries to help out, it doesn't make the

20 deal that you're working on -- I don't think that Ralph

21 Heredia working with his brother on one of his fighters

22 is like -- I'm not saying it's exactly kosher.  There's

23 probably some issues with it.  I'd like my attorneys to

24 weigh in on this to see if I'm missing something here.

25 It doesn't seem like that's --

1     MR. GARDNER:  I'm curious about the fact is that

2  both parties to this contract represented to the

3  commission that no other individuals were -- had a hand

4  in the management and yet both parties knew and both

5  parties were fine with it until this relationship

6  soured.

7     How is it that knowingly misrepresenting things

8  to get the commission to sign off on this contract

9  which on its face is valid, how does that -- why should

10  the commission invalidate it under those circumstances?

11     MR. GREELEY:  I'm sorry.  Why should the

12  commission invalidate a contract that was knowingly

13  false?

14     MR. GARDNER:  If this contract is valid on its

15  face and both parties basically misrepresented things

16  under C6 of the contract, why would it invalidate the

17  entire contract vis-à-vis the boxer and the manager of

18  record as opposed to if there's some third party who

19  thinks they're a beneficiary to it, then that is an

20  invalid contract and anything related to that party

21  can't be enforced but why does it invalidate this

22  contract?

23     MR. GREELEY:  The contract with knowingly false

24  representations is not an enforceable contract.  That's

25  fairly, you know, Hornbook contract law.  That is an

1    invalid contract.  That contract has been breached at

2    the moment pen is put to paper.  And particularly when

3    they're doing it with the purpose of trying to evade a

4    regulatory scheme and submitting that to the

5    commission.  I can ask Mr. Diaz whether he knew --

6          MR. GARDNER:  I think Mr. Foster asked him that

7    and he said he did.

8          MR. GREELEY:  No.  He did not know that he was

9    making a representation that Ralph Heredia was not his

10   manager.  Certainly he would not have done that.

11         MR. GARDNER:  He didn't read the contract.  Is

12   that what we're saying?

13         MR. GREELEY:  That's what I'm saying.  He was a

14   24-year-old boxer who did not have a good idea of legal

15   reps and warranties and he had no representation in

16   signing that contract except Moses and Ralph Heredia

17   and it was Moses and Ralph Heredia who were trying to

18   pull one over on the commission.  What Jojo thought and

19   I'll let him say it in his own words was that Ralph was

20   a manager and he believed that Ralph was a valid

21   manager and it turned out that he wasn't.  Maybe we can

22   skip here to me asking Jojo this because I don't want

23   to testify on his behalf.

24         MR. GARDNER:  Does Mr. Heredia have a management

25   company?

1      MR. GREELEY:  He's got an unlicensed management

2   company, Heredia Boxing Management, and that's where

3   the checks were written from Jojo's purse.  They

4   produced them and if you look at that entity on the

5   California Secretary of State website it's got two

6   officers.  Moses Heredia and Ralph Heredia is the CFO.

7   So Ralph Heredia doesn't have a license.  He's an

8   officer and a director of an entity that's engaged in

9   unlicensed boxing management and is receiving the

10  proceeds.

11      MR. GARDNER:  Were the payments under the

12  contract that were made for the 18 percent, were those

13  made to Moses Heredia or were those payments made to

14  Ralph?

15      MR. GREELEY:  Heredia Boxing Management.  You

16  can see it on the screen of which Ralph is the CFO and

17  officer and a director.  If you look at the California

18  Business and Professions Code in terms of what the

19  definition of a manager is, it includes any officer,

20  director or shareholder or member of a corporation or

21  organization which receives or is entitled to receive

22  more than 10 percent of the gross purse of any

23  professional boxer.  Heredia Boxing Management made

24  more than 10 percent of the gross purse.  Ralph Heredia

25  is both the director and officer.

Atkinson-Baker, Inc.
www.depo.com

```
 1        MR. FOSTER:  Who's the CEO?
 2        MR. GREELEY:  Well, it should say here.  Moses
 3   is CEO.  Ralph is CFO and they're both directors.
 4   They're codirectors.
 5        MR. FOSTER:  Okay.
 6        MR. GREELEY:  Maybe on this issue I can ask Jojo
 7   a couple of questions if that makes sense.
 8        MR. FOSTER:  Of course.  Whatever you want to
 9   do.
10        MR. GARDNER:  Let's go ahead and swear the
11   witnesses as we should.  Mr. Diaz, would you please
12   state and spell your name for the record.
13        THE WITNESS:  Joseph Diaz, J-o-s-e-p-h.
14   D-i-a-z.
15        MR. GARDNER:  Mr. Diaz, will you please raise
16   your right hand.
17                    JOSEPH DIAZ,
18            having been first duly sworn, was
19            examined and testified as follows:
20
21                 [DIRECT EXAMINATION
22   BY MR. GREELEY:
23        Q.  Thank you, Jojo.  As you may have heard we
24   were talking about your boxing manager so I wanted to
25   ask you some questions about that if that's okay with
```

Atkinson-Baker, Inc.
www.depo.com

1   you?

2           A.   Yeah, that's fine.

3           Q.   Have you had a boxing manager?

4           A.   Yes.  Ralph.  Ralph Heredia.

5           Q.   When did you first meet Ralph Heredia?

6           A.   About when I was 14, 15 years old.

7           Q.   And how did you meet him?

8           A.   I met him at my Santa Monica boxing gym.

9   Ben was training him and he started looking at me,

10  starting talking to me here and there and then he

11  started buying me shit and started getting involved in

12  my career here and there and he just kept a

13  relationship with me.  Kept a casual relationship and

14  then I started winning, I started doing good.  And then

15  once I made it all the way to the Olympic trials won

16  the Olympic trials, I was going to the Olympics that's

17  when Ralph actually pursued.

18              Ralph asked me that he wanted to actually

19  manage me as a professional fighter so in the amateurs

20  he was paying me before -- before I even went to the

21  pros he started paying me $3,500 a month for about a

22  year, year and a half and the agreement was that he had

23  the first choice to be my manager after the Olympic

24  trials.

25          Q.   Let me make sure I understand.  This is

1  while you were an amateur he was giving you $3500 a

2  month, is that what you said?

3      A.  I was 16, going on 17 and barely turning 18.

4      Q.  And in exchange for that he said to you that

5  he had the right of first refusal I think you said to

6  be your manager once you turned pro?

7      A.  That's correct.  Yeah.  After the Olympics.

8      Q.  And had you met Moses Heredia at this time?

9      A.  I didn't meet Moses Heredia -- actually, I

10  did.  I met him because they worked together and I went

11  to the office and he came in one time, I said what's up

12  to him but after the Olympics that's when Moses Heredia

13  got involved because that's when I actually signed the

14  manager deal.

15      Q.  And did you have an understanding of what

16  would happen with that money that you had been paid,

17  the 3500 a month if you did not sign a management deal

18  with Ralph Heredia after the Olympics?

19      A.  I just assumed I would have to pay it back.

20      Q.  You said you did sign with Ralph Heredia

21  after the Olympics?

22      A.  Yes, I did.  He actually went to the

23  Olympics with me.  He went to London with me and my

24  family.

25      MR. FOSTER:  I have a clarifying question.  I

1  don't mean to interrupt.  Mr. Diaz, did you say you

2  didn't think you would have to pay it back or did you

3  think you would have to pay it back.

4       THE WITNESS:  I assumed I would have to pay it

5  back if I didn't sign with him.

6       MR. FOSTER:  Okay.  Got it.

7       Q.  BY MR. GREELEY:  Did you talk to any

8  other boxing managers before you signed that 2012

9  agreement?

10      A.  No, I didn't.  Ralph was already making it

11  seem like he was the management so he was already

12  talking to Golden Boy and talking to Top Rank when I

13  was already competing in the London games.

14      Q.  And did he keep giving you money after you

15  signed the 2012 management agreement, did Ralph?

16      A.  No.  After the 2012 agreement Ralph didn't

17  give me anything because I ended up signing a deal with

18  Golden Boy.  I got a signing bonus and then I got a

19  monthly stipend from Golden Boy so after that Ralph

20  stopped paying me.

21      Q.  How often did you talk to Ralph after you

22  signed the --

23      A.  Every day.  Every day.

24      Q.  And how often did you talk to Moses?

25      A.  I hardly ever talked to Moses.  Even to this

Atkinson-Baker, Inc.
www.depo.com

1  day me and Moses hardly ever talked.  I'd only see him

2  when I go to the office.  I'll see him when I'm at the

3  fights and sometimes once in a blue moon after we have

4  a meeting at their office we would go out and have some

5  dinner and stuff like that but nothing more.

6        Q.   Okay.  And did you know whether or not Ralph

7  was licensed as a manager in California?

8        A.   No, I didn't.

9        Q.   Did you --

10        A.   He told me that he was.  He told me that he

11  was.

12        Q.   Did he ever tell you at any point between

13  the time you met him and today that he was not

14  licensed?

15        A.   No, he didn't.

16        Q.   Did you speak to Moses about boxing, about

17  your fights, your career and that kind of thing?

18        A.   The only time I would talk to Moses was when

19  I would see him at the office and he would just tell me

20  like, hey, how you doing, how's training camp going,

21  you looking good.  It was a good fight.  Just the

22  regular boxes shit that people always want to talk to

23  me about but Moses would actually sometimes when there

24  was deals to be made Moses would get involved with

25  Ralph and they would go to the Golden Boy office and

1  get things done but I would never, ever be involved

2  with them in those situations or even in those

3  meetings.  I never got no cc.  I never got no e-mails

4  from Ralph, from Moses or from Golden Boy regarding my

5  next fights or anything.  They always kept it a secret

6  and between them and their lawyers.  They were saying

7  they were my lawyers.

8          Q.  I want to ask you about some things that

9  Moses Heredia submitted in a declaration in connection

10  with the current arbitration.  Did Moses Heredia, was

11  he ever involved in your training camp for your bouts?

12          A.  No.  He was never involved.

13          Q.  Did Moses Heredia ever monitor your

14  training?

15          A.  Never.  Never.

16          Q.  Did Moses Heredia ever monitor your diet?

17          A.  Nope.  The only thing that Moses told me

18  about was the diet that he had and that he was eating

19  some Bison meat or something like that but other than

20  that he never told me about any diet or anything.

21          Q.  And did Moses ever drive you to the gym?

22          A.  Never.  I never even drove inside Moses'

23  car.

24          Q.  So he never picked you up from the gym

25  either?

Atkinson-Baker, Inc.
www.depo.com

1         A.   No.   It was always Ralph.   The only person

2    that would come once in a great while is Ralph Heredia.

3    And I would say out of all the time I've been with

4    Ralph and Moses he probably did ten visits inside the

5    boxing gym, that's about it.

6         Q.   Did Moses ever go to the boxing gym when you

7    were training?

8         A.   No.   I think the only time he went, he only

9    went to one media workout but no boxing gym.

10        Q.   Okay.   Did Moses and Ralph or either of them

11   ever give you any accounting of what you had paid them

12   under these management contracts, either the 2012

13   contract or the 2017 contract?

14        A.   No.   They didn't.

15        Q.   Okay.   Did Ralph Heredia extend loans to

16   you?

17        A.   Yes.   Ralph loaned me money, whenever I

18   needed some money he would give me some loans.

19        Q.   Did you ever sign a loan agreement?

20        A.   No.

21        Q.   Was there interest on the loans?

22        A.   Yeah.   Some of the loans there was interest.

23        Q.   And did you pay that interest?

24        A.   Yes.   Well, I didn't know exactly what I

25   owed him because he would always just keep it

1  supposedly noted on a paper and I would just tell him

2  just let me know what it is.  And then sometimes I

3  would question it but then Ralph would always try to

4  belittle me.  That's the thing about Ralph.  He always

5  used to try to belittle me or make it seem like I

6  didn't know what I was talking about so I would just

7  agree to it and pay whatever he said it was.

8         Q.  So from your perception was Moses helping

9  out Ralph with your management or was it Ralph who was

10  helping out Moses?

11        A.  No.  I think Moses -- Ralph was the one in

12  charge and Moses was the one that would just -- Ralph

13  was the one in charge but Moses was the one that would

14  try to get the deals done with Golden Boy as well.

15        Q.  Okay.  I'm going to come back if it's okay

16  with you and ask you some other questions on some other

17  topics but I just wanted to go over that issue of your

18  manager since we were at that point in the presentation

19  so thank you.

20        MR. MONTALVO:  Mr. Gardner, what's the sequence

21  for cross?  Are we allowed to cross after these

22  sections?

23        MR. GARDNER:  Yes.  Do you have some

24  cross-examination following that last line of direct

25  examination?

1       MR. MONTALVO:  Yes, sir.

2       MR. GARDNER:  Okay.  Go ahead.

3

4                   [CROSS-EXAMINATION

5  BY MR. MONTALVO:

6       Q.  Good afternoon, Mr. Diaz.  I'm going to be

7  going through some of your testimony and then also your

8  declaration.  One of the allegations that you've made

9  is that you -- that Moses was not managing you.  But

10 you're also saying at the same time that he is the one

11 that was going to Golden Boy to help negotiate your

12 contracts.  Do I understand your testimony correct?

13      A.  Yeah.  I never said that he wasn't.  Of

14 course he was helping out whenever he had to but he was

15 doing the bare minimum.  He never took me to the gym.

16 He never said about my diet or never did pick me up or

17 anything like that so he did the bare minimum as far as

18 what he needed to do.

19      Q.  Were you ever looking at any of the e-mails

20 that he was sending to represent you with Golden Boy to

21 negotiate the bouts or any of that stuff?

22      A.  He never showed me any e-mails.  The only

23 person that showed me e-mails was Ralph when I was at

24 his house.  Sometimes he would show me e-mails what

25 Robert said and what they were going about but I always

Atkinson-Baker, Inc.
www.depo.com

1  told Ralph and I always told Moses that I wanted to get

2  cc'd and I wanted to have those e-mails but they never

3  did.

4        Q.  So you're not really aware of what Moses did

5  or did not do vis-à-vis Golden Boy?

6        A.  Exactly.

7        Q.  In terms of these loans, is that something

8  that Mr. Heredia -- Ralph Heredia would approach you or

9  Mr. Moses to say, hey, we want to give you a loan and

10  you don't have to pay it back or let's take an extra

11  percentage or how would those conversations come up?

12        A.  Well, I needed some money because I wasn't

13  making as much -- that's why I was always on Ralph's

14  ass and always telling him that I wanted to get paid

15  more because I'd seen everybody else that was on the

16  same level as me, my Olympic teammates.  Errol Spence,

17  Rau'Shee Warren, Terrel Gausha, Marcus Brown, all these

18  fighters they graduated the same year as me.  They went

19  pro the same year as me.  Maybe five or six months

20  earlier but these guys already were making a lot of

21  money.

22             They were making over six figures.  They

23  were making 150,000 and at that time I was only making

24  $25,000.  And at that time I was taking care of my

25  parents, taking care of my family.  So I didn't have

1  that much money to provide for them so I would always

2  ask Ralph for some loans and he would give me the loans

3  but I had to pay him back.

4       Q.  And was that a typical course of dealing

5  over your relationship with him when you were in a

6  money crunch you would come to Ralph to ask him for

7  money?

8       A.  Yeah.  Because he told me not to go anywhere

9  else.  He said he would take care of it for me.

10       Q.  And did he take care of you?

11       A.  Yeah, he took care of me.  He gave me those

12  loans and I had to pay him back.  Yeah, he did.

13       Q.  Did sometimes he structure those loans where

14  he would, you know, take an additional percentage out

15  of your next fight because you didn't have the cash?

16       A.  No.

17       Q.  You never had an agreement where you were

18  asking him to take an additional percentage out of the

19  next bout?

20       A.  No.  Those agreements with those e-mails,

21  that was when I was getting out of the contract and I

22  told him that in order -- because I already knew that

23  the contract was getting up so I wanted to get a

24  signing bonus from Ralph and Moses and I let them know

25  that that -- if they give me the signing bonus they

1 could be taking this type of percentage off of every

2 fight but I needed the upfront money.

3          Q.  I'm going to refer you to -- just one quick

4 moment.  So what you're referring to is the 18 to

5 20 percent after you signed the original management

6 agreement in 2017, then you knew that the promotion

7 agreement was looking pretty lucrative and so you

8 could, you know, get some advancement on that so that's

9 when you agreed to the additional 2 percent?

10          A.  No.  I never agreed to the 2 percent.  I

11 never agreed to that additional 2 percent.

12          Q.  2 percent?

13          A.  Yeah, I never agreed to the 2 percent.  It

14 was always 18 percent.  I actually went -- when I ended

15 up negotiating that deal with Ralph, it was at Ralph's

16 house and me and him sat down and at that time I owed

17 him money so I was already -- he already had leverage

18 over me where he knew that -- he knew that he already

19 had control over me and he knew that I was going to

20 sign a deal but at that time I knew I was hot and I

21 knew I was going to be making some money so I was

22 trying to negotiate a deal where I told him I wanted 10

23 percent.

24          He started laughing, he started giggling, he

25 started like trying to belittle me like he always does

Atkinson-Baker, Inc.
www.depo.com

1  and he ended up telling me some stuff.  I ended up

2  disagreeing.  We agreed to 18 percent and then after

3  that, after two, three days later that's when we went

4  to the office and we signed the deal with Moses.  Moses

5  and Ralph and I guess that guy Larry and my father was

6  there, he was present as well.

7      Q.  Let's drill down a little more on that.

8  First off after you signed the promotion agreement and

9  the management agreement in 2017, you approved all of

10  the checks moving forward once you had your fights;

11  correct?

12      A.  Yeah.

13      Q.  And so within those disbursements you were

14  approving this 20 percent that we're talking about?

15      A.  Yes.  Because that 20 percent was supposed

16  to be for my lawyers but they weren't for my employers

17  because I never got any CCs.  They were for you guys.

18  You guys were getting paid for that and I never agreed

19  to that.  It was always -- it was always beneficial for

20  Ralph and for Moses.  I never got any CCs.  I never

21  actually even got any e-mails from you guys and you

22  guys were supposed to be my lawyers but you weren't.

23  You were Ralph and Moses' lawyers not mine.

24      Q.  I don't know what you're referring to

25  because I was not their lawyer for any purpose --

1        A.   Whoever the lawyer is, I don't even know who

2   it was.

3        MR. GARDNER:  Let's take a break.  We'll come

4   back at 4:00 o'clock.

5           (Recess taken.)

6        MR. MONTALVO:  Jojo, where we left of is you

7   said the 2 percent was solely related to the use of

8   attorneys; is that correct?  Do I understand what you

9   said?

10       A.   Yes.

11       MR. GREELEY:  Objection.  Mischaracterizes the

12  testimony.  Go ahead, Jojo.

13       THE WITNESS:  Yes.

14       Q.   BY MR. MONTALVO:  I'm going to refer

15  you to Bates stamp 0242.  You can pull that up

16  real quick.

17       MR. FOSTER:  Is this in the Diaz exhibits?

18       MR. MONTALVO:  It's in the Heredia exhibits.

19  It's Exhibit number 31.  It's check number 3014442.

20       MR. FOSTER:  I'm there.  Which check is it

21  again?

22       MR. MONTALVO:  I'm referring to 3014442.

23  It's --

24       MR. FOSTER:  It's for $53,500.

25       MR. MONTALVO:  Yes, sir.

Atkinson-Baker, Inc.
www.depo.com

```
 1          Q.  Can you see that, Mr. Diaz?  Mr. Diaz?

 2          A.  Yeah, I can see it.

 3          Q.  So I just want to walk through this.  Do you

 4   remember what happened in January of 2020, what fight

 5   was that?

 6          A.  January 2020, that was my Tevin Farmer

 7   fight.

 8          Q.  And was the amount 300K?  Was that the top

 9   number?

10          A.  Yes.

11          Q.  And then let's just say 20 percent would be

12   60K.  Do you agree with that so far?

13          A.  Yes.

14          Q.  And do you see that 6K where it says corner,

15   6500?

16          A.  Yes, I do.

17          Q.  And do you see the net total of 53500?

18          A.  Yes.

19          Q.  So if you did the math and you can do that

20   on your phone I guess.  But I came out to that's about

21   17 percent of 300K and you got the 6500 go in a corner

22   and I believe corner, and you can correct me if I'm

23   wrong would include people like Ben Lira, Joel Diaz,

24   Daryl Hudson or Antonio Diaz.  Does that make sense?

25          A.  Yes, but I paid personally Ben Lira and I
```

Atkinson-Baker, Inc.
www.depo.com

1  pay Daryl Hudson, and this right here, this 6500 was

2  for Gerald Diaz [phonetic] that Ralph said he was going

3  to take care of, Ralph Diaz -- not Ralph.  Gerald Diaz

4  and Tony Diaz.  He said that he was going take care of

5  that.

6          Q.  When you say take care of it, you mean pay

7  it out of money that he was receiving; correct?

8          A.  That's correct.

9          Q.  So they received -- Mr. Moses received the

10  5350 and then the two individuals you just mentioned,

11  is it Joel Diaz, J-o-e-l for the court reporter?

12          A.  That's correct.

13          Q.  And Daryl would be D-a-r-y-l?

14          A.  No.  Tony.  Tony Diaz.

15          Q.  Oh, excuse me.  Tony Diaz.  So Joel Diaz and

16  Tony, T-o-n-y?

17          A.  Yes.

18          Q.  Received the monies from that.  And so in

19  this instance when we're talking about that percentage,

20  is that something that would happen in your fights,

21  that they would pay the corners?

22          A.  Well, Ralph said that he was going to do

23  that because I was paying an extra -- I believe I paid

24  Daryl Hudson about 15 to $20,000 that fight and I was

25  actually paying my father 10 percent and paying other

Atkinson-Baker, Inc.
www.depo.com

1 people as well during that time so he said that he was
2 going to take care of Tony and Joel because he's the
3 one that insisted on me training and having training
4 camp out over there.
5      Q.  So these were the type of conversations you
6 would have with Ralph on these fights as you moved
7 forward; is that correct?
8      A.  Yes.
9      Q.  And you also I want to refer you to an
10 e-mail that we pulled up earlier which is going to be
11 Exhibit 28, Heredia.  And it's Bates 0210.  Do you
12 remember this e-mail?  Can you see it, Mr. Diaz?
13      A.  Yes, I can see it.
14      Q.  So in here you indicated that you never
15 negotiated a future purse before but it seems like in
16 this e-mail that's exactly what you're doing.  You're
17 saying you want to increase to 30 percent and then you
18 have a number of different other payments that you're
19 discussing with the totals and whatnot, including
20 Rolex, Porsche and all that stuff.  Do you remember
21 this e-mail?
22      A.  Yes, I do because this is when I knew that
23 Ralph and Golden Boy wanted me to fight Rene Alvarado
24 so I wanted to pursue the Tevin Farmer fight so I
25 wanted to make that Tevin Farmer fight happen because I

 1  knew I was going to able to generate more money.  With

 2  the Rene Alvarado fight it wasn't going to make no

 3  sense financially for me to make any money with the

 4  Rene Alvarado fight that Ralph and Golden Boy were

 5  pushing.  So I actually wrote this out to Ralph because

 6  I wanted to make something happen and at that time I

 7  was in a financial situation where I needed to -- I

 8  needed some help and I knew that this was the

 9  opportunity to capitalize on because I was the one that

10  was making the Tevin fight happen.

11        Q.  I just have a few questions on this

12  particular e-mail.  First you indicated that it was a

13  pleasure working with you guys for my whole career as a

14  boxer.  Is that true?

15        A.  Yeah.

16        Q.  And then later on you're talking about

17  you're negotiating and you're thinking that this is a

18  fair offer and so this is what you're presenting to

19  them; correct?

20        A.  Correct.

21        Q.  And then down below at the end of the first

22  page it indicates that you're going to pay off a loan

23  and then it seems like you already had an understanding

24  you were going to be fighting Tevin Farmer at this

25  point?

Atkinson-Baker, Inc.
www.depo.com

1          A.  Not understanding, it was already being

2     made.  It was already almost done.

3          Q.  So that was already in the works.  You knew

4     you were going to be fighting Tevin Farmer?  So this

5     was a negotiation --

6          A.  I didn't know I was going to fight Tevin

7     Farmer.  I was very confident because I wasn't going to

8     accept anything else.

9          Q.  But you're basing this negotiation off the

10    Tevin Farmer fight which ultimately did take place;

11    correct?

12         A.  Yeah.

13         Q.  And so who's Fernando in this e-mail?

14         A.  Fernando?

15         Q.  It's on the second page.

16         A.  I don't see the second page.

17         Q.  Can you please scroll down?  Can you see

18    that now?

19         A.  Yes.

20         Q.  If we go down, from the top down for getting

21    the Chase account and all that what's LALO?

22         A.  There's my personal business that I don't

23    want to discuss.  This is all my personal finances that

24    I was negotiating that I shouldn't even be discussing.

25    What's the point of this?

1          MR. FOSTER:  Mr. Montalvo, I got to agree with

2     Mr. Diaz.  This is pretty personal.  I like the first

3     part of the e-mail because that relates to the

4     management side.

5          MR. MONTALVO:  Yes, sir.

6          MR. FOSTER:  Like I know I wouldn't want all my

7     stuff laid out in front of the ten or 11 people.

8          MR. MONTALVO:  I understand.  The issue is not

9     to embarrass Mr. Diaz.  It's that there's been a

10    representation that there wasn't an accounting done and

11    Mr. Diaz --

12         THE WITNESS:  I did my own accounting.  I wrote

13    all this down.

14         MR. FOSTER:  Can you take it off the screen?  I

15    don't want it on the screen anymore.

16         Q.  BY MR. MONTALVO:  But ultimately the

17    way you were going to pay for this was to take it

18    out of your next purse; is that correct?

19         A.  That's correct.

20         Q.  And the 30 percent was to negotiate through

21    your future fights to take care of these debts that you

22    wanted to resolve or investments if they were that.

23         A.  Uh-huh.  Yes.

24         MR. MONTALVO:  If you could just give me one

25    brief moment I think I'm done for now.  Just give me

1  one second to look at my documents.

2        I'm good with this part of the cross and I'll

3  hand it back over to Mr. Greeley.

4        MR. GREELEY:  Thank you.  I want to address a

5  couple of issues that arose in that cross-examination.

6  First, I'm a little confused as to what Mr. Montalvo is

7  attempting to establish by showing all of these

8  interactions and financial dealings between Mr. Diaz

9  and Ralph Heredia.

10        It absolutely cements the fact that Ralph

11  Heredia was managing Jojo Diaz without a license and

12  the fact that Mr. Diaz was to pay back advances to

13  Ralph Heredia further underscores that.  Advances

14  against what?  Out of his fight proceeds.  Advances

15  against a management fee?  There is no other

16  relationship between Mr. Heredia and Mr. Diaz.

17        Mr. Heredia is not a commercial lender.  So that

18  was the nature of the relationship and the advances.  I

19  just want to further say because there was some

20  questions about whether Moses Heredia was or was not a

21  manager, we are not denying and Mr. Diaz testified to

22  this that Moses Heredia was also a manager.  But that

23  doesn't change the fact that Ralph Heredia was a

24  manager during this period.  And he was unlicensed in

25  performing those activities.

1        The De La Hoya court that we talked about
2   earlier said in invalidating the Top Rank De La Hoya
3   contract obviously more than one individual may direct
4   or control a boxer's activities, represent his interest
5   in precuring or arranging fights or be entitled to more
6   than 10 percent of his gross purse and that's
7   absolutely the case here.  There were two.  They signed
8   as comanagers in 2012 on the commission form.  They
9   signed as comanagers in 2017 on the Golden Boy form.
10  But Mr. Ralph Heredia knowing that his management from
11  that point of the 2017 contract forward at least was
12  illegal did not sign the 2017 agreement.
13        MR. FOSTER:  Mr. Greeley, I have a question.  I
14  went back and looked at your stuff because you
15  mentioned the 2012 contract.  Is it your contention
16  that that contract is invalid?
17        MR. GREELEY:  Well, yes, sir.  And it wasn't
18  until today and I'm not certain why that we saw a
19  purported license from Ralph Heredia and that was
20  e-mailed to us in the additional exhibits.  We have not
21  validated that.  The commission -- when we spoke to the
22  commission we made more than one Freedom of Information
23  act.  Your representative said no record of any Ralph
24  Heredia ever having applied for or received a boxing
25  manager license.

1        MR. FOSTER:  We're in agreement with that.  Now,

2   listen, I'm not -- whether he had one or whether he

3   didn't, look, that was a little bit forward but I think

4   we can all agree that the executive officer never did

5   approve that particular contract.

6        MR. GREELEY:  That's correct.

7        MR. FOSTER:  In any case, my point I'm making

8   about that particular contract is let's say that one is

9   invalid just for purposes of this argument, this

10  discussion you and I are having right now.  2012

11  contract is invalid that would make that 2017 contract

12  invalid using your seven year logic because that first

13  one wasn't worth the paper it was written on.

14        Now, I tend to think because he signed that

15  release that's what the difference between -- by the

16  way, we went and looked during our break, that De La

17  Hoya -- it's a court case, it's interesting and I can

18  look at it but it's not a published opinion.  It's not

19  a citable opinion.

20        MR. GREELEY:  It's a citable opinion, sir.

21        MR. FOSTER:  Was it done -- Will, is it a court

22  of appeals opinion, is that where it's at?

23        MR. GARDNER:  It's a district court opinion and

24  our research shows it as unpublished.

25        MR. GREELEY:  California courts allow its

 1  citation.

 2       MR. GARDNER:  Yes, it's citeable.  Mr. Foster is

 3  not an attorney but we're talking about controlling

 4  case law.

 5       MR. FOSTER:  That's what I'm talking about.

 6  It's like we don't have to follow that particular --

 7  that -- I digress.  I think the difference is it's like

 8  either the 2012 was valid or invalid.  If it's valid

 9  they signed a release.  If it's invalid the 2017 is the

10  first real one.  See what I mean.  I'm not trying to --

11       MR. GREELEY:  I understand the point.  I think

12  we addressed that in our brief.  Mr. Diaz viewed it as

13  valid.  He was told it was valid.  He performed under

14  it so the effect is that he was under that management

15  of the Heredias for nine and a half continuous years.

16  Whether retroactively we look back and say oh, Ralph

17  Heredia duped us all.  He never had a license to begin

18  with, is a different issue.  From Jojo's perspective he

19  gave 20 percent of his purse to Ralph Heredia during

20  that entire period so he was under the management.

21       MR. FOSTER:  And that's the efforts to negotiate

22  boxing stuff for him so it's not --

23       MR. GREELEY:  May I address that, sir, because I

24  think we need to look at the Rousey case; right?  And

25  that was really the argument it was a quantum meruit

Atkinson-Baker, Inc.
www.depo.com

1  argument that Harvey the manager in the Rousey case

2  made -- the Harvey, the purported manager of Ronda

3  Rousey not licensed and he came to the commission and

4  said I've given Ronda Rousey $85,000 that she owes me,

5  just like Ralph Heredia is saying.  And I've supported

6  her in her entire career and I performed all these

7  services.  I've taken her from amateur to the UFC, she

8  signed a deal with the UFC and I've done all of these

9  things.

10        And what the commission said there was that

11  Harvey, doesn't matter that he put in the money.

12  Doesn't matter that he supported Rousey.  He cannot

13  avail himself of the commission's help because he

14  has -- he has violated the regulatory scheme.

15        MR. FOSTER:  But let me tell you the difference

16  between that case and this case.  That case had all

17  these other pieces to the contract.  It had like

18  modeling and acting and all the rest of this stuff.  So

19  what I did was I separated the commission section which

20  was just fighting.  Which was the bear minimum of what

21  Ms. Rousey was making.

22        This was not like a lot of money.  I'm talking

23  about the commission stuff was -- so we said okay.

24  That part is invalid.  You don't get no money for that.

25  You didn't have a license, and guess what we did with

Atkinson-Baker, Inc.
www.depo.com

1  the rest of it?  The bulk of it?  We kicked it over to

2  some other court.  I didn't want to deal with that.

3       MR. GREELEY:  Understood.

4       MR. FOSTER:  And this case is about -- well, the

5  only similarities -- there's very few similarities but

6  there is one similarity in that the Heredias have put

7  in a lot of stuff about loans and all this stuff that

8  I'm not going to deal with.  That's not my deal.  What

9  I'm dealing with is going to deal with the fight

10  contract.

11       MR. GREELEY:  Yes, sir.

12       MR. FOSTER:  Now, I have, you know -- we're

13  going to look at your evidence and my attorneys will

14  look at it but you got plenty of time.  You can finish

15  your thing but your section 3, your point 3 of your

16  presentation is really where I'm focused on.  I don't

17  think these guys can work together.

18       MR. GREELEY:  I agree with you there.  I would

19  like to point out another portion of that opinion in

20  the Rousey case.  It was about not just invalidating --

21  the reason that you invalidated the contract and kicked

22  the remainder of it is because Harvey was not licensed

23  so he had violated the statutory scheme designed for

24  the protection of athletes.  "And therefore Harvey will

25  receive no help from this commission in enforcing this

1  illegal fighter-manager contract."

2      Now, we've got Ralph Heredia admittedly coming

3  without a license coming forward and saying, hey, I

4  need the commission's help in having Jojo write me a

5  check and the commission in that Rousey case yourself,

6  Mr. Foster, said it's about the message that that would

7  send.  Knowing they will receive no help in recovering

8  for their illegal activities managers are less likely

9  to enter into illegal arrangements and the same

10  principle applies here.

11      If you send a message to the general market that

12  Ralph Heredia should get paid out of this contract then

13  you're encouraging those illegal managing activities.

14  You're not discouraging them.

15      MR. FOSTER:  I believe there's a difference

16  between the two because if we ask Moses Heredia here --

17  another thing, Mr. Greeley, where is Ralph Heredia?

18      MR. GREELEY:  That's the point.

19      MR. FOSTER:  We're here with all these folks.

20  He's needed for this arbitration and he's -- so we're

21  going to ask Moses here in a little while did he manage

22  Mr. Diaz and I'm sure the answer is going to be the

23  affirmative.  We got plenty of evidence that says he

24  was managing Mr. Diaz, mountains of evidence that says

25  he was working to manage Mr. Diaz but he was also

Atkinson-Baker, Inc.
www.depo.com

1   working with his brother to do it too.  And I don't --
2   I don't really see a lot of -- there's a daylight --
3   Mr. Ralph was doing it totally by himself I think you
4   got a Rousey case.
5        This is not the same thing because you've got
6   the brother working with the other brother and the
7   brother has the license and the other brother is
8   like -- I don't know if he's an employee or working
9   with -- I don't know.  But it's not the same concept.
10  It's absolutely not the same deal as Rousey.
11       MR. GREELEY:  It's not because they attempted to
12  conceal it whereas Harvey didn't try to do that.  So
13  you've heard from Mr. Diaz that Ralph approached him,
14  initiated the relationship, consummated the
15  relationship.  He viewed Ralph as his manager.  Ralph
16  viewed him as the manager.  Ralph had held himself out
17  in the media as the manager.  He paid Ralph directly as
18  the manager and the only reason Ralph isn't on the
19  contract is because he didn't have a license so he put
20  up Moses to sign the contract.  To me that's much more
21  nefarious than the Harvey case with Rousey where he
22  came forward and said yeah, I don't have a license.
23       MR. MONTALVO:  That's disregard of the facts in
24  the record so I think we need an opportunity before we
25  draw conclusions on this to present.

1        MR. GREELEY:  Excuse me.  I don't think I
2   interrupted you.
3        MR. MONTALVO:  I was asked a question --
4        MR. GARDNER:  Let me clarify.  I'm going to stop
5   everyone.  If you have an objection, of course feel
6   free to raise it.  You have time left, Mr. Montalvo,
7   and you will be able to -- it does appear Mr. Greeley
8   is going through some evidence but in large part it's
9   almost a closing summation rather than your standard
10  presentation of evidence.  He's allowed to do that.
11  And you'll have the time to -- you have some time left.
12  If you have an objection by all means raise it but
13  otherwise just know that you'll have your opportunity.
14       MR. MONTALVO:  Yes, sir.  I think I was trying
15  to respond to Mr. Foster regarding the availability of
16  Mr. Heredia.  I thought I was asked a question but
17  that's fine.  Mr. Greeley can take it.
18       MR. GREELEY:  Thank you.  I want to make that
19  point.  The entire problem here is what you honed in
20  on.  Why isn't Ralph Heredia here?  Because he didn't
21  sign the contract.  He's been paid as a manager, he's
22  acted as a manager but he doesn't need to answer to you
23  as a manager which is the point of requiring licensing.
24  Which is the point of requiring a commission-approved
25  form, which is the point of requiring that the managers

Atkinson-Baker, Inc.
www.depo.com

1  sign it so they're accountable and that you can track

2  their activities and you can make them answer to you

3  and they can be subject to the arbitration provision.

4        We put Ralph Heredia on our witness list.  He

5  has not appeared.  Mr. Montalvo represents him.  He has

6  not appeared and the commission apparently doesn't have

7  jurisdiction over him because he doesn't have a

8  license.  So he's operating in the margins behind the

9  scenes as a manager and you can't regulate it.  That's

10  a major problem.  And for me it's shocking to sit here

11  and go, Gee, what is the value of this management

12  contract?  Well, I'll tell you what the value of a

13  management contract is to an unlicensed manager, it's

14  zero.  Less than zero because we should go back and

15  discourage every single payment that was made to Ralph

16  Heredia when he didn't have a license and that should

17  come back to Jojo Diaz at a minimum.  So if we're going

18  to talk numbers let's go back to 2012.

19        MR. FOSTER:  You got an accounting of that?

20        MR. GREELEY:  We don't have an accounting of

21  anything.  That's the whole point.  We we've asked for

22  an accounting.  We wrote a letter.  It's in our

23  exhibits.  It wasn't responded to.  There's some

24  Mickey-Mouse spreadsheet put in this -- in submission.

25  They have a legal obligation as a manager to provide an

1  accounting.  I've asked Jojo Diaz in his direct

2  examination whether he was ever provided with that.  He

3  has not.  We've demanded it as his counsel.

4       We have not received it and that was my earlier

5  point.  We need that accounting.  We need to see what's

6  what because that money should never have gone on to an

7  unlicensed manager.  And we should not be contemplated

8  paying more money to an unlicensed manager who's

9  admitted under oath he's not licensed.  And the

10  evidence that Mr. Montalvo presented and confronted

11  Mr. Diaz with in cross-examination demonstrates that.

12  Ralph Heredia was neck deep in the financial dealings

13  and taking money from the fighter's purse.

14       So I just -- there's a licensing regulatory

15  scheme or there's not.  And the decision that let's not

16  worry about the fact that Ralph Heredia was not

17  licensed is to turn our back on that regulatory scheme

18  and say it's not worth anything.  And it sends a very,

19  very dangerous message in my view because Mr. Diaz has

20  had to be licensed.

21       He's had to live with the commission regulation.

22  He's here today.  So why isn't the counter-party?  Why

23  isn't the person he's written all those checks to?

24  He's written checks directly to Ralph Heredia which is

25  in our exhibits for $221,000 directly to Ralph Heredia

1  since 2017.  There's another 200 X to Heredia Boxing

2  Management of which Heredia, Ralph, is an officer and

3  director.  That's $467,000 that's gone to Ralph Heredia

4  who doesn't have a license and Heredia Boxing

5  Management who doesn't have a license since 2017.  And

6  there's not one check that anyone has shown me that's

7  gone to a guy with a license.  I haven't seen one check

8  that's gone to Moses Heredia.  I think that's a pretty

9  major problem for the commission.

10      MR. GARDNER:  Mr. Greeley, I just have a quick

11  question on the points that you were making so that

12  Mr. Foster can hone in on that.  Are there checks

13  written from the purse -- from the payout of the purse

14  directly to Ralph?  Is that what you're saying?

15      MR. GREELEY:  I'm saying that was not done

16  because I don't believe that would have been approved

17  by the commission so to our knowledge that was not

18  done.  These were written directly to Ralph Heredia

19  directly during the term of the 2017 contract.

20  Mr. Diaz was able to go back and look at what was

21  written under this 2017 contract.

22      And so those are the checks that were written

23  directly to Mr. Ralph Heredia.  They totaled $221,000.

24  And as Mr. Montalvo I think has referenced those to

25  some extent were advances against the purse proceeds so

1  the answer according to what I think Mr. Montalvo has

2  shown is yes, those were related to percentages of the

3  purse.

4       So I think that's a licensing issue.  I think

5  there's no need to belabor that any further.  I think

6  it's clear based on what Ralph Heredia and his counsel

7  and Moses Heredia have submitted that Ralph Heredia

8  notwithstanding the fact that he submitted a sworn

9  declaration saying he wasn't managing was in fact

10 managing with respect to every single aspect of the

11 definition of a manager.

12      He arranged the Tevin Farmer fight and approved

13 its terms.  That's in an e-mail that he submitted.  He

14 directed and controlled the boxing activities by

15 negotiating the 2017 Golden Boy agreement which he

16 signed as a manager and he received proceeds as a

17 manager.  He received a percentage of the purse both

18 via his Heredia Boxing Management entity which itself

19 is unlicensed and directly in checks from Mr. Diaz.

20      And I do think to Mr. Foster's point there

21 absolutely needs to be an accounting.  There needs to

22 be a full reckoning going back all the way back to

23 2012.

24      MR. FOSTER:  Real quick before you get to part

25 3, Moses did sign the 2017 agreement; correct?

```
 1          MR. GREELEY:  Yes, he did.

 2          MR. FOSTER:  So up on the top it says this is

 3  between Ralph and Moses.  You see that?  You've seen it

 4  a bunch of times.  You know it says that and when

 5  Joseph Diaz wrote the checks it was to Heredia Boxing

 6  Management was it not?

 7          MR. GREELEY:  Yes, sir.  Golden Boy was writing

 8  those checks if I'm not mistaken.

 9          MR. FOSTER:  Out of his purse.  And this was

10  Moses as the CEO of that company.

11          MR. GREELEY:  According to the Secretary of

12  State website, yeah, he's one of two officers.

13          MR. FOSTER:  He's the head guy of the company.

14  There's probably only two or three of them, two of them

15  I guess.  But they have some boxers.

16          MR. GREELEY:  I don't know whether they do or

17  they don't.  I don't think they should since I'm not

18  aware that entity has a management license.

19          MR. FOSTER:  Moses has a management license.

20  Moses is doing business as the Heredia Boxing Company.

21          MR. GREELEY:  I don't think so.  I don't think

22  that's a Dba, I think that's a separate corporate

23  entity according to the Secretary of State website.

24  And Heredia Boxing Management has filed a lawsuit in

25  federal court alleging that they are a beneficiary of
```

1  the 2017 contract.  So again, you've got now two

2  unlicensed parties, Heredia Boxing Management on the

3  one hand and Ralph Heredia on the other that are

4  purporting to share in the proceeds and --

5        MR. FOSTER:  Who filed the lawsuit in federal

6  court, did they file it or did you file it?

7        MR. GREELEY:  The sequence of events was as I

8  mentioned after checking with the commission and asking

9  whether we could bring a counter-claim in this

10  proceeding for money damages and being told no, we

11  filed a lawsuit in federal court against Ralph Heredia

12  on behalf of Jojo Diaz seeking damages for among other

13  things the car that was taken from Mr. Diaz, the

14  additional monies that were taken from him above and

15  beyond the clear percentage in the contract and also to

16  the extent that these contracts are proven not to be

17  valid because of the licensing issue.

18        We believe that Mr. Ralph Heredia should have to

19  return all of the monies that he purported to receive

20  as a licensed manager when he was not.  We believe kind

21  of retribution for this at the end of last year with

22  this case ongoing, Heredia Boxing Management and Moses

23  Heredia filed a lawsuit not against Jojo Diaz but

24  against MTK, my law firm, VGC LLP and Golden Boy

25  claiming that -- and certain individuals who I

1  understand don't live in the country, alleging that we

2  were all in a RICO conspiracy and that VGC specifically

3  was the agent of an international drug cartel which is

4  almost -- I almost choke on the words a little bit as I

5  say it.

6         You know, a little bit of background on my firm

7  which I cofounded with two partners, one in New York

8  and one in San Francisco.  I'm a Harvard Law School

9  graduate.  I practiced at O'Melveney and Myers for 15

10 years under among others Warren Christopher, the former

11 Secretary of State, for Bill Clinton, Dan Petricelli

12 [phonetic] was my mentor.  I founded a boutique law

13 firm with other highly pedigreed attorneys from top

14 five or ten law schools with major firm experience.

15        We're a boutique firm that we believe delivers

16 top level big firm service at reduced rates and we have

17 institutional clients including publicly traded clients

18 so this was certainly not a welcomed event and you see

19 we believe it was done to simply put pressure on

20 Mr. Diaz and to attack his advisors.  We believe that

21 the Heredias knew that if Mr. Diaz were able to get

22 qualified advise he would realize that he was being

23 victimized and taken advantage of under a structure

24 that was not legal.

25        So we believe this was simply a transparent act

1  to exert pressure and it was immediately publicized

2  including as you can see here in Law 360, "Boxer's

3  manager accusing law firm of VGC of racketeering."

4  Now, that was a fraudulent lawsuit and we responded

5  with what's called a Rule 11 letter which your

6  attorneys will inform you means that it's a demand

7  that's required under federal law before actually

8  moving the court for sanctions.

9        It's a demand that the party filing this

10  withdraw it and it says this is a fraudulent claim.  If

11  we need to respond to it you will be penalized and the

12  court will sanction you.  And we received word back

13  from Mr. Montalvo's firm we'll amend the complaint.

14  And they amended the complaint and withdrew the

15  allegation that my firm was an agent of an

16  international drug cartel and racketeering and I don't

17  know what else because the complaint quite frankly was

18  incomprehensible.  As to Golden Boy I didn't

19  understand --

20        MR. FOSTER:  Mr. Greeley, we don't have to go

21  into this.  I have my personal opinion.  I felt like

22  this is -- it seemed preposterous to me but we're not

23  here to talk about that.  You guys are a good law

24  company.  I looked you up and the whole thing.  I don't

25  know how that got wrapped up into an arbitration about

1  boxing but here we are.  We don't have to go down that.

2  You got that number 3 section about --

3       MR. GREELEY:  Yes, sir, I do think it -- it

4  relates to number 3 insomuch as when Ralph and Moses

5  decided based on an announcement about the MTK contract

6  which they have never read until we submitted it with

7  this arbitration, when they decided that's it, we're

8  going into attack mode, we believe they employed

9  certain illicit tactics to try to punish and exact

10 retribution on Jojo instead of talking with him and

11 instead of trying to figure it out which is where we

12 started.

13      But I'll go to reason number 3 which is the

14 breaches of the contract.  And I'll get to the

15 remainder later without belaboring the facts.

16      MR. GARDNER:  Mr. Greeley, just for your

17 information you've got 15 minutes.  Just so you know.

18      MR. GREELEY:  Thank you.  Again, this is not in

19 dispute.  This is a written contract for 18 percent

20 approved by the commission for 18 percent and there's

21 been an admission on the other side that Moses and

22 Ralph took 20 percent and they've attempted to excuse

23 that by saying well, there were some certain costs that

24 we paid and there was a handshake deal.  There's an

25 accounting that refers to things like well, roughly

1    5,000 here or there.

2          It doesn't really matter what the purported

3    excuse is.  The contract says in paragraph 9, "This

4    agreement may only be modified by the manager and the

5    boxer in writing.  Any such modification shall be added

6    to this contract and approved by the commission in

7    writing before it is effective."

8          So if the two sides decided well, we'd rather do

9    20 percent and have the Heredias pay for some things,

10   then that needs to be amended and it wasn't.  And

11   that's not in dispute.  So the contract is breached on

12   that basis alone.  And again, we don't have to get into

13   a he said, she said battle because all of this is

14   admitted.

15         Mr. Gardner mentioned paragraph C6 of the

16   contract.  "The manager and boxer both certify and

17   promise to each other and the commission that there is

18   no party that in any way shares or participates in the

19   ring earnings of the boxer," and there's been

20   admissions including by Mr. Montalvo today that Ralph

21   Heredia was in fact sharing in those proceeds.

22         So that was a misrepresentation and that was a

23   misrepresentation on the manager's side and that

24   invalidates frankly the contract.  You can't have a

25   contract that's enforceable based on knowingly false

1  misrepresentations.  So that's another breach of the

2  contract.

3       All of these loans that we're talking about not

4  only cements the fact that Ralph Heredia was in fact a

5  manager but they themselves are breaches of the

6  contract because 50,000 here, 60,000 there, paragraphs

7  B4 and B5 regulate how advances may be made and they

8  dictate that they must be documented.  And they dictate

9  that there must be accountings provided included within

10 30 days after a boxer sends a written demand which we

11 did and we received none.

12      And there is a number of undocumented loans

13 which --

14      MR. FOSTER:  Are you talking about the loans

15 that he gave?  See, those loans that, Mr. Montalvo you

16 need to hear this.  You need to understand what I'm

17 saying.  These loans, there's a way to do these on

18 advances of the purse.  I do it frequently.  I never

19 have done this for Mr. Diaz.  This wasn't done.  That's

20 why I'm not dealing with that particular piece of this.

21      Now, I'm sure there's a different way to get the

22 money back, court or whatever it is.  Like a different

23 way.  But the 40 grand or whatever it is, the cable

24 bill and all the rest of that stuff that advancement,

25 that money was never given to the commission.  When I

Atkinson-Baker, Inc.
www.depo.com

1   do advances for various folks I have to sign it,

2   there's a bunch of attorneys involved and they bless it

3   and they help me with it and we send it back and they

4   get their money.  That's what happens.

5          It never happened with Mr. Diaz so if it didn't

6   happen with Mr. Diaz you can't come back to the

7   commission and say oh, I want to get this money.

8   That's not the way that works.

9          MR. GREELEY:  Not only that, Mr. Foster, but

10   it's a breach of contract and a violation of California

11   law and that's what this statute -- what is the statute

12   here?

13          MR. FOSTER:  You're an attorney but I disagree

14   with it's a breach.  Like if he takes a loan out from

15   Mr. Heredia and don't tell the commission but he takes

16   a loan what would be a breach is if Mr. Heredia wants

17   to sack his -- and get his purse and take money from

18   his purse beyond the deal.  That would be problematic.

19   But like if he just takes a loan for his cable bill,

20   there's not a problem there.  That's between two

21   people.

22          MR. GREELEY:  Yeah, you know, this is the

23   statute which regulates the process for that kind of

24   transaction and my point is that the Heredias did not

25   follow that and that's a further violation of

Atkinson-Baker, Inc.
www.depo.com

1  California law.  Any manager who advances or loans any

2  money to any boxers which the Heredias admit they did

3  must furnish a statement under penalty of perjury to

4  the boxer every 90 days.

5      MR. FOSTER:  Mr. Greeley, that's what I'm saying

6  is you've made the point time and time again, Ralph

7  Heredia is not licensed as a manager.

8      MR. GREELEY:  No, but he's acted as one.  That's

9  the whole point.  He's directed the boxing activities.

10 He's arranged fights and he's taken money from the

11 purse.  He's a manager.  He just doesn't have a

12 license.  That doesn't mean he doesn't fit the

13 definition of manager under the law, he's absolutely a

14 boxing manager.  That's the whole problem here.  That's

15 why the contract is illegal.  His management activities

16 which indisputably he engaged in were unlicensed.

17     MR. FOSTER:  Or another way to look at it is he

18 works for his brother.

19     MR. GREELEY:  Well, if we can all work for our

20 brother then who need to get licensed?

21     MR. FOSTER:  There's one license for the

22 Ultimate Fighting Championship, there's one license for

23 Golden Boy, Eric Gomez and Oscar, they have one

24 license.  They have a bunch of employees.  When I call

25 Carla or whoever over at Golden Boy and she's asking --

1  they're making decisions to the commission, they're

2  representing to the commission on behalf of Golden Boy,

3  Golden Boy decisions but I'm not going back to Oscar or

4  Eric and saying, hey, is this okay.  It's the --

5  you know what I mean.  It's the same.

6          MR. GREELEY:  I know what you mean.  If Moses

7  and Ralph are putting on events like Golden Boy and

8  they had a Carla who was assigning the seats and

9  running the operations and understanding the facility

10 that would be one thing.  They have no other business.

11 They're a boxing management company and there's two

12 guys and all they're doing is negotiating boxing deals

13 on behalf of a fighter, fixing fights and taking the

14 management fees.

15          That's all they do.  There's no Carla.  There's

16 no secretary.  I'm not saying that if they hired a

17 front desk woman that she would suddenly be operating

18 in violation of the law.  That's not the contention.

19 Ralph Heredia, we heard from Jojo, Ralph Heredia,

20 that's his manager.  Moses he met one time before the

21 2012 agreement and he talked him a handful of times

22 since.

23          So from his perspective that's another reason,

24 there's no way he can just go forward with a

25 relationship with Moses Heredia, he never had a

Atkinson-Baker, Inc.
www.depo.com

1 relationship to speak of.  He had the relationship with

2 Ralph.

3        So look, the other part about this is in terms

4 of the public policy that we're trying to highlight

5 today and protect the boxers against, we're trying to

6 avoid the exact kind of situation that occurs here with

7 all of these undocumented loans.  We're trying to avoid

8 the fighter from mortgaging his future.  And you heard

9 from Jojo that initially Ralph Heredia gave him 3500 a

10 month in order for some right of first refusal as a

11 teenager.

12        He gave advances under 2012 contract, never with

13 a written loan agreement.  He would tell Jojo what you

14 got to pay plus you got to pay a little bit more here

15 for interest.  And then under the 2017 contract

16 arguably he was taking Jojo's own money and loaning it

17 back to him.  He was taking 20 percent rather than 18

18 and saying here, Jojo, here's an advance.  Well, no.

19 You took an extra 2 percent.

20        So to hear them say that this was some kind

21 altruistic act doesn't ring true on our side of the

22 table.  They themselves are the ones who alleged Jojo

23 was irresponsible with money, they say he had a

24 gambling problem.  So they're funding a gambling

25 addiction?  They're doing this in our view to prey in

1  on the fighter which is exactly what the commission is

2  supposed to protect against and the law is supposed to

3  protect against.

4       He should not be beholden to Ralph Heredia.  He

5  should not be forced into signing another 2017

6  agreement because he can't afford not to because he's

7  in so much debt with the guy who's be loansharking and

8  I'm sorry to use that term but that's what undocumented

9  street loans are.  They're loan sharking.

10       So I think this is not some oh, we helped him

11  out.  This is how we established control over him and

12  made sure that he would be with us because we believed

13  if I can put myself in their position that if he went

14  out and actually tested his value in the market he'd

15  get a much better deal from a much more qualified

16  manager.

17       So that's the extent of the, really in a nut

18  shell the breaches of the 2017 agreement.  Briefly

19  we've touched on it.  We believe the 2012 agreement is

20  also invalid because it wasn't approved by the

21  commission on its face and because Mr. Ralph Heredia

22  who is a comanager and received monies under it and

23  performed licensed activities under it, or activities

24  requiring a license, was not licensed.  And even if

25  this purported kind of notecard that we got in the

1  e-mail, that was a license that went from August 2012

2  to only 2013 so even if that's authenticate the

3  remaining four years plus of the contract were -- he

4  did not have a license through to the 2017 agreement.

5       Beyond that I would just say I don't want to get

6  into the criminal background, et cetera.  It's awkward

7  and uncomfortable subject, I certainly won't belabor it

8  but I do think that I would briefly say that I invite

9  you, Mr. Foster, to look at the reports of

10  Mr. Heredia's past and I would further say that

11  Mr. Heredia's declaration he brings up the fact that he

12  told Mr. Diaz about this past recently.  It was last

13  year and I asked Mr. Diaz about that.  I can ask him

14  again although I know I have limited time but in his

15  view and we can hear from him if you prefer it this

16  way, but in his view he did not know about Ralph

17  Heredia's past until last year.

18       Ralph Heredia came to him from out of the blue

19  from Mr. Diaz's perspective and he said, here, here's

20  this book about Darryl Henley.  It's called

21  "Intercepted."  It's about Darryl Henley's drug

22  trafficking and ultimate imprisonment.  You should read

23  this, this is me in there is what Ralph Heredia told

24  him.

25       And he told Mr. Diaz and we can verify it with

1  him, that he used to be a drug kingpin and he did a

2  significant amount of prison time and finally that he

3  was affiliated with the Mexican Mafia.  And Mr. Heredia

4  says in his declaration that he did this so that maybe

5  Jojo could avoid the same kind of I think he said,

6  youthful indiscretions that I engaged in.

7       If you read the case and the LA Times reports

8  are out, it's really not a youthful indiscretion, it's

9  pretty serious stuff and one of the four guys in the

10  deal ended up shot dead and there were threats made to

11  Mr. Henley's mother at gunpoint.  Mr. Henley's car

12  which also happens to be --

13       MR. GARDNER:  Mr. Greeley, you've got two

14  minutes, just FYI.

15       MR. GREELEY:  My point is that's relevant, A, I

16  think because Mr. Heredia raised it once the

17  relationship was going south and Jojo Diaz if you'd

18  like to ask him told me that he perceived that as a

19  threat.  Look at this.  This is who I am.  This is what

20  I'm capable of.  But also it goes to credibility.

21  Ralph Heredia is a witness.  He's made himself a

22  witness.  He signed a declaration under oath.  Very

23  briefly, the law says if you've been convicted of

24  crimes of moral turpitude there should be a presumption

25  that you're not a reliable witness.

Case 5:20-cv-02618-JWH-SSC   Document 184-1   Filed 04/04/24   Page 224 of 433   Page ID
#:2674
Atkinson-Baker, Inc.
www.depo.com

1          Second, it goes to the licensing issue

2   potentially.  It goes to perhaps why Ralph did not feel

3   that he would be able to be found suitable as a

4   licensee under the 2017 agreement.  I think number 3,

5   it goes to the public policy that we discussed at the

6   outset to some extent.  If a manager is involved in

7   these activities and going to the fighter and saying

8   I'm affiliated with the Mexican Mafia that's the kind

9   of underworld connection and I don't know whether it's

10  true or it's not but that's the kind of thing from the

11  1945 attorney general's report that they were seeking

12  to protect fighters and the public against.

13         And then four, I think it goes to a pattern of

14  behavior.  It helps to explain a lot of the same

15  tactics that were then used once the Heredias decided

16  the relationship had gone south here.

17         In closing, again, I was personally involved

18  when that announcement was made by MTK.  I had been

19  engaged by Mr. Diaz.  I had a conversation with Steve

20  Bash in which he told me from the outset, hey, the

21  Heredias were upset by this announcement.  I told him I

22  think it could be a good thing.  If MTK is coming in as

23  a business advisor then it can make a bigger pot for

24  everyone.  It can raise Jojo's profile.  Are they

25  looking to be his manager or are they looking to

1  coexist?  And Steve Bash himself went out and contacted

2  MTK and he came back and he wrote an e-mail to Golden

3  Boy saying, MTK has no intent to usurp your management

4  responsibilities.

5       We told them, MTK from what we know is going to

6  coexist and hunt sponsorships and they had never seen

7  the MTK agreement and yet they turned around and filed

8  this entire arbitration action without ever talking to

9  Jojo, without ever seeing the agreement and actually

10 getting messaging to the contrary of their arguments

11 here which is that the MTK agreement was totally

12 separate from their management.

13      So the reason we're here is because they decided

14 they're going to war.  Not because we raised a question

15 whether the contract was enforceable.

16      MR. GARDNER:  Thank you, Mr. Greeley.  That's

17 time.  Mr. Foster, did you have any questions before we

18 move back and let Mr. Montalvo proceed?  He's got 40

19 minutes left.

20      MR. FOSTER:  I wanted to just ask him -- I'm

21 going to come back to him, I can come back to him if I

22 want to.  I want to hear from Mr. Montalvo.  I have a

23 few questions.  Mr. Montalvo, I have a question for

24 you.  Where's Ralph?

25      MR. MONTALVO:  We called him back.  He's sitting

1  right outside the door.

2        MR. FOSTER:  Don't you think we should hear from

3  him?

4        MR. GARDNER:  If they'd like to call him it's

5  certainly an appropriate witness.

6        MR. FOSTER:  If we call him we've got to give

7  Mr. Greeley some time to do the cross stuff so we're

8  going to make this fair.

9        MR. GARDNER:  Mr. Foster, you do have discretion

10 to extend time up to two hours so, however, you would

11 want to do that.

12       MR. FOSTER:  Mr. Montalvo, you go right ahead.

13 You heard what Mr. Greeley had to say.

14       MR. MONTALVO:  I've heard quite a bit.  Yes,

15 sir.

16       First off, as the last point that was made I

17 think the conversation and when we call Mr. Bash to

18 this it was we can continue to talk but we want to see

19 the agreement to understand what the swim lanes are.

20 So there was a specific request to obtain that contract

21 early on immediately and VGC never complied.  So that's

22 the first issue.

23       The second issue is MTK and what's going on so

24 VGC counsel has gone on for quite a length of time

25 saying we don't want to leverage this young man's

1  future.  We don't want to hold him hostage.  We don't

2  want people taking money from him that are

3  unsupervised.  I just ask you to look at the MTK

4  contract.  Who is supervising that contract under the

5  commission?  Who is supervising the hundred K that he's

6  been given as an advance for future fights?  Who's

7  supervising that?

8        He's talking about compliance and who's

9  negotiating fights.  We got Paul Gibson from MTK

10  negotiating with Golden Boy.  We've got VGC in a

11  letter, this is Exhibit number 25, Heredia, Bates

12  number 0199 where they go to far lengths to engage in

13  exactly definitional 18628 management functions to

14  negotiate about, threaten to Golden Boy to release him

15  from a contract within 24 hours, accusing everybody in

16  between of what's going on.  And I'm not aware that VGC

17  is licensed to do management activities as required

18  under the statute which says --

19        MR. GREELEY:  It's not required.

20        MR. MONTALVO:  Excuse me.  "Otherwise an

21  attorney shall be licensed as a manager in order to

22  engage in any and all activities," described in the

23  section under subsection 18628.

24        MR. GREELEY:  Can you the read the entirety of

25  it?

1        MR. MONTALVO:  If you need me to read that I

2   would like extra time.

3        MR. GARDNER:  I would just say these are

4   arguments being made by counsel, Mr. Greeley, just as

5   you made.  We understand you don't agree with them.

6        MR. GREELEY:  I'd just like for accuracy of the

7   record.

8        MR. GARDNER:  He cited it.  It's up to him if he

9   wants to read the whole thing.  Cite it again and we'll

10  make sure to take a look at it.

11        MR. MONTALVO:  What I'm citing to is sections

12  18628, subsection A which provides the definition of

13  manager and the last subsection that I quoted is,

14  "Otherwise an attorney shall be licensed as a manager

15  in order to engage in any and all of the activities

16  described in this section."  So there's a departure

17  from certain activities and then when you get into the

18  management activities you're required to have a

19  management license.  This is an attorney.  He's

20  required to have that management license, for example,

21  Steve Bash is an attorney and also has a management

22  license and that's the way -- or had a license at some

23  point.

24        This issue of who's in control and who's doing

25  the managing, we just sent the parties some additional

1  e-mails regarding Mr. Moses Heredia engaging Golden Boy

2  and negotiating the terms of this agreement.  This bout

3  agreement.  So it's very detailed.  He is the person

4  that is doing negotiation.  He's controlling what is

5  happening there and he is the one that is controlling

6  the matters, as we refer back to the corporation as you

7  recall Mr. Ralph Heredia is CFO.  He's handling

8  finances.

9       If he's working on behalf of his brother for

10  whatever reason and he says this is how I want stuff to

11  be happening as long as it's in compliance it's good to

12  go.  The checks he can direct to Heredia Boxing

13  Management.  Heredia Boxing Management is not a

14  contracted entity with the management company.  That's

15  not how it works.  The commission has already

16  identified that that's not what happens.

17       An individual goes in, gets that license and

18  then there's an apparatus that implements the functions

19  of that license and that's exactly what's been

20  happening here.  As far --

21       MR. GARDNER:  Hold on one second.  Never mind.

22  I lost Mr. Foster on my screen but he's back.

23       MR. MONTALVO:  Mr. Foster, can you still hear

24  me?

25       MR. FOSTER:  Yes, sir, I can.

1       MR. MONTALVO:  All right.  If you go through

2  Mr. Jojo Diaz's declaration and we sent you some

3  additional exhibits and I'm going to call Moses here

4  shortly, you've got him saying well, I didn't know.

5  Okay.  Let's go back to the more important part.  If

6  you look at page three of his declaration under

7  subparagraph 6, this is the declaration of Jojo Diaz,

8  Joseph Diaz.  It says, "My attorneys have informed me

9  that Ralph Heredia is not a licensed manager.  My

10 attorneys have informed me that the 2012 contract was

11 never approved.  Prior to engaging my attorneys I did

12 not understand."

13      So what is going on here is Mr. Diaz is taking

14 leave from VGC to tell him what to put in this document

15 and what to say.  The problem is they didn't understand

16 everything that was happening.  They talked about these

17 tickets that he got.  We sent you, the commission, that

18 Ralph -- or Moses paid for those tickets.  You have

19 that exhibit.

20      He's talking about the fact that he had greater

21 opportunity to move on and engage other people in the

22 community and so he brought on MTK and this is

23 important, sir, because we are disparaging Mr. Heredia,

24 Ralph Heredia in a serious way, and this is a repeated

25 tactic.  As the commission is well aware there's a

Atkinson-Baker, Inc.
www.depo.com

1   14-day requirement to go into arbitration if there's a

2   problem.  And so what happens is Moses Heredia finds

3   out that Jojo Diaz is jumping ship and not going to use

4   them as managers anymore and they did what they're

5   required to do under the contract and that's to put a

6   notice into the arbitration to see if it could be

7   resolved.

8        That's what they did and that's what they're

9   required under the contract to do.  And what

10  Mr. Greeley is now arguing is that because Mr. Heredia

11  has some criminal past from 1993, whatever it may be

12  and we can debate that for days, that somehow that

13  makes him unqualified to do anything in this world.

14       The point is, what does Jojo Diaz go do?  He

15  engages MTK and Daniel Kinahand, whatever you want to

16  say, I didn't make this up.

17       MR. FOSTER:  Let's not go there.  Look, he's

18  not -- I can read the Internet too but it's not about

19  Mr. Heredia's criminal history or --

20       MR. MONTALVO:  I understand.  That's what I'm

21  saying, sir.  You raise it but you got to look at both

22  sides of the situation.  If that's even relevant which

23  I don't believe it is.

24       MR. FOSTER:  I didn't raise it.  Others raised

25  it.

1       MR. MONTALVO:  I understand that.  So I'll leave

2   that point.  You go through and, you know, any harm to

3   Jojo Diaz relating to the Heredias versus sponsorship

4   and all the better matches, greater purses, well,

5   again, I just point to the fact and I'll talk to Moses

6   Heredia about this, he had Tecate, Jersey Mikes,

7   Hennessy.  You look at what just happened in this last

8   fight and he had a jeweler that he owed money for some

9   Rolex and this other local Nissan dealer.

10       So when you start comparing what Moses Heredia

11   negotiated and if you look at the e-mails we just sent

12   it's very clear what's happening there.  And what was

13   negotiated and why.  And the benefits that Mr. Jojo

14   Diaz got from that promotional agreement which is not

15   in dispute at all, he was operating in his best

16   interests at all times.  And in point of fact you see

17   even in the e-mail of 2019 where Jojo Diaz is

18   acknowledging that.  Excuse me, sir?

19       MR. GREELEY:  I'm sorry to interrupt.  You said

20   you sent e-mails?  I don't know that -- Mr. Gardner,

21   I'm certainly not trying to raise just technical

22   objections here but if there's been additional exhibits

23   after my time has expired I think that's problematic.

24       MR. GARDNER:  I was trying to look at my e-mail

25   as well.  Mr. Montalvo, you sent -- I'm seeing in my

1   e-mail box two PDFs and you're saying those are two

2   e-mails strings that you intend to offer?

3          MR. MONTALVO:  That's correct, yes, sir.

4          MR. GARDNER:  It will be Mr. Foster's decision

5   but we've been adding things.  If Mr. Greeley wants to

6   address them that's fine, but Mr. Foster, how do you

7   feel about the admission of these in keeping with what

8   we did earlier today?

9          MR. FOSTER:  Yeah, I guess this is fine but --

10  look, like I said, I want to get it right.

11         Mr. Greeley, and it's totally fine, no problem.

12  I just wanted to make sure you're aware your camera is

13  off.

14         MR. GREELEY:  Sorry, I didn't realize it.  I'm

15  back.

16         MR. FOSTER:  No worries.

17         MR. GARDNER:  So Mr. Greeley, have you received

18  those e-mails?

19         MR. GREELEY:  Ms. Vasquez says we have.  We got

20  them at 4:30 or so.

21         MR. FOSTER:  I haven't read them.

22         MR. GARDNER:  I haven't looked at them either.

23  I'm just trying -- they've been referenced.

24         MR. GREELEY:  To the extent I get any kind of

25  input into this, we did send some additional e-mails as

Atkinson-Baker, Inc.
www.depo.com

1  soon as they came to our attention yesterday, 24 hours

2  ago.  I think at 5:00 o'clock after eight hours where

3  all of the arguments that Mr. Montalvo is responding to

4  were known, wherein our briefs have been presented, I

5  think it's a little bit late to be adding additional

6  e-mails that were in their possession.

7       MR. GARDNER:  Mr. Foster, I'm not sure how you

8  feel about it.  If we're adding supplemental exhibits

9  past the deadline of the ten days, we've added some,

10  these are two more.  We can give counsel a chance to

11  look at them and see if he has any questions about them

12  but I don't know if you wish --

13       MR. FOSTER:  Let's just -- before I up and

14  decide, I sort of agree with Mr. Greeley.  This is like

15  literally 11th hour stuff.  It was a little bit

16  different before we started this thing.  Now we're near

17  the end of it and there's new -- I appreciate you

18  sending this Mr. Montalvo because it shows -- I can see

19  what you're wanting us to see but you can kind of

20  explain it into the record.

21       MR. MONTALVO:  Yes, sir.  I just -- first of

22  all, my integrity has been impugned several times so if

23  I want to go off a source document I'm trying to make

24  sure the record as you said in the beginning is

25  complete and this goes directly to rebuttal because of

1  what Mr. Greeley has been putting out that Mr. Moses

2  did not have anything to contribute in terms of

3  management.  And so this --

4      MR. GREELEY:  That's the opposite of what I

5  said.  We acknowledged that he was the manager.

6  Absolutely acknowledged and Mr. Diaz testified to that

7  as well.

8      MR. MONTALVO:  Well, if Moses Heredia is the

9  manager, the dueful and the contract is valid and the

10  monies were being directed as Moses directed them which

11  he did to a joint account which was managed by Ralph

12  Heredia as the CFO then I think we've solved whether or

13  not this contract is enforceable and should be

14  accounted for.

15      I'll let -- since Moses Heredia has been sitting

16  here for quite some time I'm going to let him speak to

17  some of these issues.

18      MR. FOSTER:  Mr. Montalvo, I just want to ask

19  one question of Mr. Greeley so it's on the record.  I

20  think I already know the answer but I just want to put

21  it into the record so we have it.

22      Mr. Greeley, there's been a lot of talk about

23  Mr. Ralph Heredia not being licensed as a manager yet I

24  can see where some of this is going.  Mr. Montalvo is

25  citing the fact that MTK acted as an advisor to

Atkinson-Baker, Inc.
www.depo.com

1  Mr. Diaz is not licensed.  Can you kind of give what

2  your take is on the difference between a manager and an

3  advisor?

4         MR. GREELEY:  Sure.  Part of it -- well, there's

5  three prongs.  One is directing boxing activities,

6  meaning activities within the ring.  The other is

7  arranging fights and the third is taking more than 10

8  percent of the fight proceeds.  And we've been

9  transparent in producing the MTK agreement.  It's

10  specific to sponsorship and other monetization

11  opportunities outside of the ring.

12         That says it on its face, and there is no

13  percentage of ring proceeds.  There's 10 percent of

14  those additional sponsorship opportunities.  We've

15  shown the e-mail where Steve Bash way back when claims

16  to have spoken with MTK directly and says based on

17  my -- this is Ralph and Moses' lawyer, based on my

18  conversation with MTK Global their new role in Jojo

19  Diaz's career is solely in an advisory capacity and

20  it's not their intention to interfere with the

21  contractual managerial relationship.  After they were

22  told that they turned around and filed this arbitration

23  saying that MTK did in fact intend to interfere.

24         So yeah, I think that's the main distinction, is

25  that in Jojo's view and in MTK's view as from what I

Atkinson-Baker, Inc.
www.depo.com

1  can tell from the contract, they intended to make that

2  outside of the ring opportunities which Jojo didn't

3  think he was adequately receiving.

4       Also, more of kind of a marketing and raising of

5  a profile type of activity, hopefully in turn to mean

6  that he had more demand for his fights and got bigger

7  purses and I think that was the basis of Mr. Bash's

8  statement to me when we first spoke which was I told

9  Ralph and Moses this could be a good thing.  This could

10  make more money for everyone.  So that's where I think

11  the division of labors is divided.

12       MR. FOSTER:  I just wanted you to put that.  By

13  the way I agree with you but I just wanted that on the

14  record for the difference between management versus --

15  I mean, when I read that I thought it was -- it

16  reminded me sort of the way that Harvey was doing with

17  Ronda on stuff outside of the case.

18       MR. GREELEY:  Understood.  And just one more

19  point.  This was not my agreement.  Steve Bash said the

20  Heredias wanted to see it.  Steve Bash talked with MTK.

21  Mr. Montalvo said VGC did not comply but this was not

22  my agreement to give.  It's an agreement between two

23  separate parties, that is their business and

24  confidential as between them.

25       MR. FOSTER:  Mr. Montalvo, this is absolutely

1  your time.  Do what you need to do.

2        MR. MONTALVO:  Yes, sir.  Just to bring us back

3  around, the manager who was doing the management

4  activities is Moses Heredia.  And that's the record

5  that we have.  So I'll let Mr. Moses Heredia speak to a

6  few questions and to the counsel since he's had to sit

7  here on the sidelines.

8        MR. GARDNER:  Before you do so, sir, let me just

9  swear him in.

10       Mr. Heredia, can you please state and spell your

11  name for the record.

12       THE WITNESS:  Yes, it's Moses, last name is

13  Heredia, H-e-r-e-d-i-a.

14                    MOSES HEREDIA

15            having been first duly sworn, was

16            examined and testified as follows:

17       MR. GARDNER:  Mr. Montalvo, you got 22 minutes.

18       MR. MONTALVO:  Okay.  We'll keep it tight.

19

20                    [DIRECT EXAMINATION

21  BY MR. MONTALVO:

22       Q.  So how long have you known Jojo Diaz?

23       A.  Oh, Jesus, probably -- I would say 2010,

24  2011.  Somewhere around there.

25       Q.  And what types of interaction did you have

Atkinson-Baker, Inc.
www.depo.com

1   with him over the period of time?

2          A.   More of an older brother figure.  Always

3   gave him advice and encouraged him to do well and

4   continue on a good path.

5          Q.   Did you attend fights?

6          A.   I attended all of his fights in his career,

7   maybe I missed about three for being either not feeling

8   well or other opportunities that I was out of the

9   country.

10         Q.   And when it came to the 2017 agreement did

11   you have any conversations with Jojo?

12         A.   Yes.  We had several conversations and

13   negotiations about that and my brother took specific

14   orders from me as far as he would report back to me

15   about talks.  If I was absent for a conversation,

16   obviously just like Al Haymon has Sam Watson and his

17   kids and Louis DeCubas.  I have even David Walter has a

18   couple of people -- sorry about that guys, like Joe

19   that -- and Ron Reso [phonetic] and Tim.  So even like

20   Frank Espinoza, another manager, has his son.

21              At the end of the day I have Carmina Ledesma

22   [phonetic], I have Valerie Tovali [phonetic].  I can't

23   run all by myself.  I have people like my brother who

24   report to me about things that are going on out there

25   and Jojo Diaz, guys, just so everyone is on the record,

1  I had a champion before Jojo.  I had Francisco Vargas

2  before Jojo.  I had other fighters so it's not solely

3  all about Jojo and I love Jojo and I care for Jojo

4  still and I pray for Jojo to this day.

5         MR. GREELEY:  I'd like to move to strike

6  everything after the first sentence as nonresponsive.

7         THE WITNESS:  So getting back to what I was

8  saying, it's known in the boxing world that one person

9  cannot handle every task, every moment.  Right now I

10 have another fighter fighting this coming month in

11 Texas.  He's fighting on June 19.  Actually like in

12 nine days.  I have my brother working on that right now

13 as far as he took him to the doctor.  He took him for

14 the credentials.  It's just known that one person can't

15 pick up Jojo at the gym every day or take him somewhere

16 so I relied a lot on my employees and my staff.

17         MR. GARDNER:  Mr. Heredia, one second.

18 Mr. Foster, on the objection that was interposed, are

19 you agreeable to the witness testifying in this

20 narrative form?

21         MR. FOSTER:  It's fine.

22         MR. GARDNER:  Thank you.

23         THE WITNESS:  Thank you.  Listen, I'm more of a

24 hands on and Jojo said this.  Jojo, you said this

25 earlier.  I've been here all day.  Jojo said when

Atkinson-Baker, Inc.
www.depo.com

1  there's big deals, when there's big things, when

2  there's contract issues, where there's negotiations,

3  look at his history. His history, I negotiated that

4  agreement in 2012, 2017. He's made a lot of great

5  money. He's done well in his success.

6       Listen, my job at the end of the day is to work

7  the deals in the office, negotiate. Jojo's job is in

8  the ring. Of course he didn't see all the e-mails that

9  were going back and forth. One e-mail I didn't want

10 him to see where -- was when they didn't want his dad.

11 They were trash talking Jojo and his dad, that his dad

12 is not worthy of a trainer.

13      Oscar De La Hoya and I got into that. I was

14 able to get Jojo's dad on the contract. I fought for

15 that. So Jojo -- I didn't want Jojo to be privy to

16 that that and hurt his feelings and mess with his

17 mindset. He's a boxer. I'm the guy with the brains in

18 the back that you won't see all the time.

19      I'm not an Al Haymon. I'm a small Al Haymon

20 that works in back behind the scenes. You may not see

21 me or hear from me but I'm out there busting my rear to

22 get him on these promotions and sponsorships, all of

23 the great deals. And when we signed him in 2017 of

24 course he didn't go anywhere else. He made $350,000

25 just in signing bonuses, somewhere to that matter

1  because the first two fights were worth so much.  And

2  of course he shocked me and he was getting calls from

3  other competitors and other managers.  He told my

4  brother and my brother told me that Al Haymon's people

5  was after him, the two young kids.  I can't remember

6  the name, Watson's kids, but no here no there.

7      Listen, his career and to this day I want him to

8  do well.  I wish him nothing but the best and I have

9  him in my prayers all the time.  Jojo is a great

10 athlete.  Never, never said that he was not a great

11 athlete.  And my job and duties were to push buttons

12 and that's all I did for all those nine years or nine

13 and a half years.

14      At the end of the day I still feel that we did a

15 great job for the future.  I paved the road for him.

16 This fight that he fought with Tevin Farmer, I

17 initiated that when I -- by Jojo's direction.  I called

18 IBF by Jojo's direction.  I went against Golden Boy

19 because Golden Boy went behind Jojo and I to try to

20 make the rematch with Farmer.  Jojo as upset.

21      So then I went ahead and smoothed that out and I

22 paved the road and he fought the gentleman Rakhimov in

23 February and got the purse that was paid from the

24 promotional agreement of all those careers.  Now, a lot

25 of boxers are not that privy to make that much money

1   and those purses were very well negotiated.

2          I shopped his negotiated contract before I

3   signed him in 2017 again with different promoters.  And

4   it led me back to -- what's his name?  Golden Boy.

5   Because they were favorable and there was a lot of

6   small fights there and for the small fights that Jojo

7   was fighting really -- they were opponents but there

8   were no big names.  He made huge amount of six figure,

9   dollar figure purses.

10          So that being said, I don't want to speak too

11   much, Mr. Arbitrator.  We've never met and we never had

12   the opportunity and I heard you.  The only reason, sir,

13   is because we've never had any issues.  I love my

14   fighters.  I take care of my fighters.  I don't do it

15   for the money, I do it for the love of the sport.

16          And my brother, what he was doing, he had a

17   past, and what he was doing he seen Jojo derailing

18   sometimes so he would lure him back in.  I couldn't do

19   it.  I didn't have the patience.  My brother did that,

20   he had a softer heart than I did.  I was more the

21   business guy and would tell Jojo, you know.

22          My brother was more of a bank and a loan guy to

23   Jojo which I disagreed.  That was one of the issues

24   that my brother and I would get into.  We had static

25   and friction and Jojo would always go to my brother and

1  he had his soft spot.  Jojo is a smart individual and

2  he would convince my brother and then my brother would

3  hear the wrath from me.

4        But at the end of the day there's nothing that

5  we didn't do -- no one wants Jojo to do better in his

6  career than my brother and myself and Jojo can attest

7  to that.  I never wanted to harm him in any way.  We

8  never did anything malicious.  I think it was like two

9  weeks before I heard that Jojo went.

10        Jojo texted me and he wanted a loan for $4,000;

11  I gave it to him.  I said, "I love you, Jojo."  I

12  talked to him on the phone.  "Jojo, I love you.  I'm

13  praying for you.  Be good, do the right thing," and I

14  left him $4,000 underneath the mat because it was

15  Covid.  Two weeks before I heard that he went with MTK.

16  I was crushed, I was hurt.

17        I tell you what, my brother was more crushed and

18  hurt because he had a personal connection, a day to day

19  that he would do my, not my dirty work, more my leg

20  work, where he had more of a personal relationship with

21  Jojo.  I can tell that.  My brother doesn't have

22  children.  Jojo was his child.

23        MR. FOSTER:  I have a question.  You said you

24  were hurt and crushed.  I mean, could it not have been

25  a situation where MTK could have coexisted with you

1  guys?

2      THE WITNESS:  A thousand percent and I wanted

3  that.  We tried reaching out to Jojo.  We had several

4  times we wanted to reach out but we couldn't get a

5  response.  I texted Jojo one time, I even have it, I

6  could show you.  Who's your attorney?  What's going on?

7  Respond back to me.

8      So at the end of the day I wanted to work with

9  Jojo.  I didn't know we were on bad terms.  I found out

10  June 1 or whenever this happened.  That's when I found

11  out that there was an issue.  There was never an issue

12  for nine and a half years until he signed with MTK.

13  I'm sorry for that.  To this day I feel terrible.

14      I have better things to do.  Jojo has better

15  things to do.  He has a fight coming up.  I want him to

16  win.  Even if we were parting ways today, Jojo, I want

17  the best for you, I want you to win for your family.  I

18  always told you that.  I always whispered in your

19  years.  Hey, do it for your family, man.  Good luck and

20  I love you bro and that's it.

21      I was just an older brother to him, that's what

22  I was.  I still want that for him, even if we're not in

23  business anymore.  I will watch his fights and be there

24  for him.

25      MR. FOSTER:  Mr. Heredia, I'm going to ask you

1  the same question I asked your attorney this morning,

2  and I'm going to come to Mr. Greeley.  Look, we can do

3  this however, he can ask you questions, whatever, but

4  what do you think this is worth?  A number.  I want a

5  number.

6        THE WITNESS:  At the end of the day, like I

7  said, we did it more for love of the sport.  At the end

8  of the day we're parting ways and I get that now.  I'm

9  crushed but if I were to throw a number out there I

10 would say 300 would be fair.

11        MR. FOSTER:  How much?

12        THE WITNESS:  300,000, sir.

13        MR. FOSTER:  Mr. Greeley, you got a number?

14        MR. GREELEY:  Zero.  And I think Ralph Heredia

15 should have to write a check to Mr. Diaz for all of the

16 management fees that he received without a license

17 going back to the original contract and further damages

18 to be proven as I mentioned.  We're going to get

19 discovery into how the money actually flowed and we're

20 going to do that in the federal court action.

21        MR. FOSTER:  You're going to deal with that in

22 federal court.  We're just dealing with the boxing.

23        MR. GREELEY:  It's difficult to understand who

24 should pay whom if we don't have all the numbers before

25 us and we don't have discovery into how much money the

1  Heredias received in the course of their relationship.

2  They gave us a little spreadsheet that's three months

3  of expenses that they paid.  That's the quote, unquote,

4  accounting that we received of a nine and a half year

5  relationship.

6       MR. FOSTER:  Mr. Greeley, I mean, by Mr. Diaz's

7  own admission they've loaned him some money over the

8  years, I mean he -- they got that.  I'm not a

9  collection agency.  We're not doing that or whatever

10  but you'll get to the bottom of that in a different

11  way.  I'm talking about ending this contract and Jojo

12  Diaz is leaving without the Heredias today.

13       I've got 300,000 from one side.  I've got zero

14  from the other so we're $300,000 apart.

15       MR. GREELEY:  I think we're further apart from

16  that.  Again, I think Ralph Heredia should have to

17  return management fees he received without a license.

18  Those were not legitimately paid to him.  And Heredia

19  Boxing is not a licensed entity either.

20       THE WITNESS:  Excuse me.  May I interject?  This

21  is Moses.  With all due respect, Mr. Greeley, since day

22  one, since 2012 I was licensed and I'm still licensed

23  to this day and Ralph reported to me and I was the only

24  licensee there.  So at the end of the day we were

25  licensed.  And it's interesting that it was never an

Atkinson-Baker, Inc.
www.depo.com

1   issue until recently.  All the years went by and all of

2   a sudden it's an issue.

3          MR. GREELEY:  How old are you?

4          MR. GARDNER:  We're not going to go back and

5   forth.  If you have some cross-examination --

6          MR. GREELEY:  I do.

7          MR. GARDNER:  If direct is finished we'll go

8   down that road.  Where are we on direct here?

9          MR. FOSTER:  Mr. Montalvo, you finished or do

10  you have more questions?

11         MR. MONTALVO:  May I ask how much time I have,

12  Mr. Gardner?

13         MR. FOSTER:  Just do you have more questions.

14         MR. GARDNER:  You have 14 official minutes.

15  Mr. Foster has discretion to offer more.

16         MR. MONTALVO:  Just to follow up on it, I do,

17  Mr. Foster.  May I proceed?

18         MR. FOSTER:  Sure.

19         Q.  BY MR. MONTALVO:  So as to the number,

20  how are you coming up with that calculation?

21         A.  We were supposed to get 72 on the previous

22  fight, I'm including that as well.  Listen, I know

23  Jojo, Jojo is a great kid and I think he's going to do

24  well and I think the next fight after this one that

25  he's going to fight next month he's -- it could be a

1  million dollar purse and that was my dream.  My dream

2  was to have him do a million dollar purse.  That was

3  our dream.  He always brought that up.  He purchased --

4        MR. FOSTER:  Are you talking about July 9?

5        THE WITNESS:  No.  The one after that.  If he

6  wins -- I'm sorry.  If he wins this coming fight, which

7  listen, I already have him winning so after this fight,

8  sir, it's potentially -- because he's going to win the

9  interim WBC.  It's the title shot after that and he's

10 next in line.  So to me it's a million dollar plus

11 fight.  So that's where I came up with my number.

12       MR. FOSTER:  Didn't he fight Gary Russell for

13 that once already or was that a different belt?

14       THE WITNESS:  He fought for that but that was

15 when he was at 126.  So that was Gary Russell and he

16 fought for the WBC and he bounced back after that.

17 Jojo bounced back.  Jojo snapped out of it.  We came

18 hard and we came strong.  And he got two more world

19 title shots at that time with Jesus Rojas and then this

20 one with Tevin Farmer.

21       And Jojo, you're here.  Listen, we did

22 everything for you as far as you're career and you had

23 three world titles.  We did the best for you.  We

24 fought for you.  We wanted the best.  We never did

25 anything maliciously or tarnished you or wanted --

Atkinson-Baker, Inc.
www.depo.com

1  handicapped you in any way and you were in my car.  You

2  said earlier you weren't and I obviously get upset.

3  Not upset, I say more hurt because I took you to go

4  meet De La Hoya.  That's where you got his phone

5  number.  You were in my car.  You even commented about

6  the car.

7      So no here nor there.  I don't want to go back

8  on that.  At the end of the day -- on Jesus Rojas, on

9  your declaration you said that you never missed weight.

10 Let me correct that for the record.  You did miss

11 weight for Jesus Rojas and I told my brother to give

12 you a hundred percent of the purse.  I didn't take no

13 percentages of that because we felt so bad for you.

14     MR. GARDNER:  Mr. Heredia, if we can just have

15 your testimony be directed to the arbitrator as opposed

16 to directed at Mr. Diaz that would be the appropriate

17 way to provide testimony.

18     THE WITNESS:  I apologize.  I've never done one

19 of these things, it's my first time so Mr. Foster, I

20 apologize.  So Jojo missed weight on Jesus Rojas and

21 that was a world title fight after the Gary Russell and

22 we gave him the management fees, I didn't keep them.  I

23 gave him a hundred percent of it.  I gave him the

24 $10,000 and I didn't keep anything.  It's on that

25 spreadsheet I sent you guys.

Atkinson-Baker, Inc.
www.depo.com

1          That is good faith.  That's shows that we
2     were -- I was coming from a good place; my brother was
3     coming from a good place.  We don't want no harm.  We
4     wanted him to succeed.  I was not gouging him.  I never
5     took anything from him.  Yes, Jojo would take loans and
6     yes, Jojo would pay them back.  I'm not saying he never
7     paid them back.  He would pay them back on every fight.
8          So Jojo was well.  He did good.  We did well for
9     him.  We had a great run, we had a great run.  And I
10    still want you to succeed, Jojo, and I wish you all the
11    best in this coming fight and you'll be champion again.
12          MR. FOSTER:  That's good, Mr. Heredia.  We're
13    just parting ways today and we're just trying to figure
14    it out.  Figure out the way but I can assure you
15    without a doubt and I want Mr. Diaz to hear it and you
16    to hear it, whatever, it's going to be officially
17    separated after today.  Mr. Diaz can pursue his own
18    manager, you can have different boxers because I know
19    you work with us.  And he can focus on July 9.
20          Mr. Montalvo, keep going if you've got more
21    questions.
22          MR. MONTALVO:  Not for Mr. Heredia but I could
23    also call Mr. Ralph Heredia or Mr. Bash.
24          MR. FOSTER:  I'd like to hear from Ralph.
25          MR. GARDNER:  Okay.  Let's allow Mr. Greeley

Atkinson-Baker, Inc.
www.depo.com

```
1  some cross-examination if he so chooses.
2       MR. GREELEY:  No.  I'll pass.
3       MR. GARDNER:  All right.
4       MR. MONTALVO:  Can we take a five-minute break?
5       MR. GARDNER:  Let's come back in five minutes.
6            (Recess taken.)
7       MR. GARDNER:  Mr. Montalvo, do you have Ralph
8  Heredia there?
9       MR. MONTALVO:  Yes, sir.
10      MR. GARDNER:  Mr. Heredia, can you please state
11 and spell your name for the record.
12      THE WITNESS:  Ralph, R-a-l-p-h, Heredia,
13 H-e-r-e-d-i-a.
14                    RALPH HEREDIA,
15           having been first duly sworn, was
16           examined and testified as follows:
17
18      MR. GARDNER:  You can proceed, Mr. Montalvo.
19
20                   [DIRECT EXAMINATION
21 BY MR. MONTALVO:
22      Q.  Thank you.  I'm just going to ask you a few
23 questions and I know Mr. Foster wants to ask you a few
24 questions.  How long have you had a relationship with
25 Mr. Diaz?
```

Atkinson-Baker, Inc.
www.depo.com

1        A.   I met Jojo I would say 2010, 2011 at

2   Tinsters Gym [phonetic] so I would say close to ten

3   years, maybe a little over but I believe he was 16 at

4   the time.

5        Q.   And how did you meet him?  What brought you

6   to the gym?

7        A.   I used to train with Mr. Lira.  He used to

8   personalize train me, I liked to stay in shape and I

9   noticed Jojo, he's a kid that I liked his attitude and

10  he was pretty confident so I noticed him and after I

11  don't know, a few months I was introduced to Jojo by

12  Mr. Ben Lira.

13       Q.   We heard from Mr. Diaz that you went to the

14  Olympics with him?

15       A.   Yes.

16       Q.   Then you came back and what happened then

17  with the relationship?

18       A.   Well, we came back, Jojo of course was an

19  Olympian and so he was being targeted by several

20  managers and one of the managers that was hot on him

21  was Al Haymon so I guess Eddy -- excuse me -- Ernie

22  Gabion at that time was working with Everlast, he works

23  with Golden Boy now.  I guess Al Haymon reached out to

24  Ernie because he was interested in signing Jojo.  And

25  the way I found that out is Jojo's father called me and

 1  told me that, you know, that Ernie had called him and

 2  he wanted to set up a meeting with Al Haymon so they

 3  could go ahead and sign him because Al Haymon wanted to

 4  sign all the Olympians.

 5          So I'm not sure if he ever talked to Al

 6  Haymon or what -- how far he went but I was aware that

 7  Al Haymon was after him because the father told me so.

 8  I don't know who else he talked to besides Al Haymon

 9  and that's after that I guess we had a pause.  And then

10  I don't know if it was a month after that conversation

11  from the father, Jojo and the father said that they

12  were interested in working with us since we were there

13  and since we had been helping him out.

14          And at that time it was important for Jojo's

15  family to go to London and I guess they had a car wash,

16  a fundraiser car wash so they could raise money so the

17  whole family could go and Jojo and I'm not sure if the

18  father was present at the time.  I believe he was.

19  They came to me and said they fell short on the

20  fundraiser and they didn't have enough for the parents

21  to travel so I immediately talked to my brother and I

22  called Jojo and told him, you know what, Jojo, we know

23  this is a big opportunity for you and we're going to go

24  ahead and pay for your mom and dad to be in London

25  because this is huge.

Atkinson-Baker, Inc.
www.depo.com

1          So after they came back from London -- I'm

2    sorry.  Got ahead of myself.  After that, that's when

3    he was hot and Al was after him and probably other

4    managers, but they wanted to show that they were

5    grateful for what we did and they came and asked if

6    we'd be interested in managing him and I said of

7    course.

8          Q.  We're on limited time and I apologize.  Did

9    you eventually become a licensed manager and then take

10   over as his manager with your brother?

11         A.  Yes.  Me and my brother got the license.  I

12   believe it was the same day, and yes, we both were

13   working with Jojo at the beginning.  Correct.

14         Q.  Just speak real brief to the relationship

15   between you and your brother as far as business.  Do

16   you guys do your own thing?  Do you coordinate?  How

17   does that operate on a regular basis?

18         A.  Well, my brother is the business mind.  He's

19   the one that does all the negotiations in business.  I

20   do report to him but I'm more of the guy that is more

21   involved as far as making sure the fighters have what

22   they need or anything that the fighter needs.  For

23   example, I was doing a lot of -- I hate to say this but

24   it was more like babysitting for Jojo because Jojo's

25   Mercedes had got repossessed because he got a loan on

1  his title and he had nobody that could take him to the

2  gym or where he needed to be.  So either I Uber him or

3  I'll pick him up but most of my time was occupying to

4  make sure that Jojo was at the gym, whatever he needed.

5  I used to pick him up to take him to the doctor.

6  Whenever he had an injury, anything that needed to be

7  done, Jojo would rely on me to drive him around.  It

8  needed to be done and he was in a bad place because

9  unfortunately after his car got repossessed he was

10 going through some issues and his girl left him and I

11 wanted to help him out because he confided in me why he

12 was in that position --

13      Q.  I'm sorry --

14      MR. GARDNER:  Mr. Montalvo, you've got three

15 minutes left just so you know.

16      MR. GREELEY:  Maybe we can use it just not

17 getting into personal issues for Mr. Diaz.  I don't

18 think it's a productive use of time or goes to the

19 merits.

20      Q.  BY MR. MONTALVO:  After you developed

21 the relationship and you were going through this

22 at some point in time you had a relationship with

23 Mr. Diaz at Golden Boy; isn't that correct?

24      A.  Robert Diaz.

25      Q.  Robert Diaz.  For some period of time was

Atkinson-Baker, Inc.
www.depo.com

1  that a good relationship that you had with Golden Boy?

2       A.  Me and Robert became very good friends over

3  time.  He'd invited me over to his house for

4  barbecues --

5       Q.  I just need to keep you short --

6       A.  Yes, sorry, sorry, yes.

7       Q.  Did that relationship deteriorate at some

8  point?

9       A.  Yes, it did.

10      Q.  And what do you believe is the basis for

11  that deterioration?  Why did you and Robert Diaz start

12  having issues?

13      A.  Because we were always trying to get --

14      Q.  Who's we?

15      A.  Me and my brother were trying to get what's

16  best for Jojo is what we thought that purses --

17      Q.  So you're aggressively negotiating?

18      A.  Negotiating, yes.  But the relationship when

19  it went bad with Robert it was because of another

20  fighter that we had Vargas and he became a world

21  champion and right before that they wanted to pay some

22  purses that we thought they were worth a lot more.

23      Q.  There were disputes that you had with

24  Mr. Diaz.  So as you moved forward you guys decided at

25  some point that Moses was going to take the lead moving

1   forward; is that accurate?

2       A.   That's correct.

3       Q.   You didn't answer my question from earlier.

4   What's the relationship with you and your brother?  Do

5   you do it collaboratively?  Does he do his own thing?

6   How does that work between the two of you?

7       A.   My brother is the one that sits back in the

8   office and goes over details of contracts or

9   negotiations.

10      Q.   Do you do anything in this management

11  relationship that he's got a license for without his

12  approval or authority or direction?

13      A.   Everything is a hundred percent through my

14  brother's approval.  Now, if Robert Diaz or somebody

15  relays something to me I'll bring it to my brother,

16  whether it was a phone call or whatever it was I'll

17  bring it to my brother but my brother is the one that

18  did from A to Z the negotiations on the contract.  The

19  bouts.  Whether it was with Golden Boy's attorney --

20      MR. MONTALVO:  I'm down to one minute.  I would

21  like to have Steve Bash just talk for maybe a minute

22  and I know there's some additional questions.  May I

23  proceed that way?

24      MR. GARDNER:  Well, yes, of course, and as you

25  know, Mr. Foster can allocate some more time but are

1  you finished with this witness?

2         MR. MONTALVO:  Yes.  I'd like to allocate my

3  last minute to Mr. Bash.

4         MR. GARDNER:  Sure.  I think it would be

5  appropriate for any cross-examination to take place

6  right now if Mr. Greeley cares to.

7         MR. GREELEY:  I don't have any questions.

8         MR. GARDNER:  Okay.  Thank you.  Sure.  If

9  you've got another witness let's go ahead.

10        Could you please state and spell your name for

11  the record.

12        THE WITNESS:  Steven Bash, S-t-e-v-e-n, B-a-s-h.

13        MR. GARDNER:  And please raise your right hand.

14

15                      STEVEN BASH,

16            having been first duly sworn, was

17            examined and testified as follows:

18

19                    [DIRECT EXAMINATION

20  BY MR. MONTALVO:

21        Q.  Just a few quick questions, Mr. Bash.  One,

22  you're an attorney and also used to be a licensed

23  manager in the State of California?

24        A.  Yes.  And I've worn other hats in boxing as

25  well.

Atkinson-Baker, Inc.
www.depo.com

1     Q.  And as it relates to your relationship with

2   the Heredias can you speak to the commission very

3   specifically and we only have a limited amount of time

4   as to the value add and who was really running or in

5   control of what was negotiated in 2017?

6     A.  Well, 2017 was the first time that the

7   Heredias had reached out to me.  I can testify that

8   most of my communication were with both of them,

9   however, most of the e-mails came with Moses.  We had

10  met around 2012 when I had -- I was representing a

11  fighter that was with Golden Boy.  We met at a barbecue

12  at Robert Diaz's house and I believe I saw them in 2011

13  when I represented a fighter that actually fought one

14  of their fighters so I guess we were on opposite sides.

15        But in 2017 was when they first reached out

16  to me to simply help for me to consult and give them

17  some pointers on a new promotional agreement that Moses

18  was essentially negotiating with Golden Boy Promotions.

19  The negotiations were difficult based on the e-mails

20  that Moses sent me and at some point because there was

21  a huge time limit and Golden Boy was threatening to

22  scrap the entire deal and offer Joseph Diaz a $30,000

23  fight as opposed to $150,000 bonus and $150,000 for a

24  small regional title and $200,000 for his next fight, I

25  was actually out of the country.  But I knew George

1  Guyogos [phonetic] from previous dealings so I had

2  contacted him to try to essentially just put the

3  finishing touches on some of the issues that still

4  remained, including I believe some training fees and

5  some performance bonuses if Jojo had won the world

6  title that were a carryover from the previous contract

7  that Moses had insisted were going to be in this

8  contract and there was a clause that Golden Boy threw

9  in there that they wanted to have authority to choose

10 Joseph's trainer at the time.

11        Q.  And based on everything --

12        MR. GARDNER:  Mr. Foster, just real quick.  I'm

13 sorry to interrupt this.  Would you care to hear from

14 this witness and allocate some more time just to cover

15 that base?

16        MR. FOSTER:  Yes.  And after this, let's do

17 this.  After this I'll make a statement or two and then

18 we'll ask for the parties if they'll just turn in their

19 closing statements next week.

20        MR. GARDNER:  We can do written closings, sure.

21 I just wanted to check with you on the allocation of

22 additional time.  All right.

23        MR. MONTALVO:  Just for clarification purposes

24 how much time are we talking about?

25        MR. FOSTER:  I'm interested to hear from

1  Mr. Bash.

2         MR. MONTALVO:  I just have a few more questions,

3  sir.

4         Q.  So just in terms of value add to Jojo Diaz's

5  career as far as the Heredias are concerned can you

6  speak to how they created value for Jojo Diaz?

7         A.  Look, I was honest with them.  When I looked

8  at the contract I thought it was a pretty rich

9  contract.  I had seen the Golden Boy contract on

10 several occasions.  From comparison wise I represented

11 a fighter Paulie Malignaggi who was a formal world

12 champion when he signed with Golden Boy and he got the

13 75,000 as opposed to $150,000 bonus.  His first fight

14 was for $25,000 because he was on his way back.  He

15 became a world champion under Golden Boy's banner so --

16        MR. GREELEY:  Mr. Gardner, sorry to interrupt

17 you, Mr. Bash, can I just interject, this kind of

18 sounds like expert opinion testimony and I'm not

19 exactly sure where we're going with it but we didn't

20 call an expert to rebut what value add may mean.

21        MR. GARDNER:  Do you have an objection and the

22 nature of it is?

23        MR. GREELEY:  I believe it's improper opinion

24 testimony from a fact witness.

25        MR. GARDNER:  Okay.  It occurred to me I thought

Atkinson-Baker, Inc.
www.depo.com

1  I was hearing him recount experience and testimony

2  based on firsthand knowledge of this negotiation.

3  Mr. Foster, what's your take on that?

4        MR. FOSTER:  I mean Steve Bash -- Mr. Greeley is

5  right.  He is kind of an expert in this field but this

6  seems like firsthand he's talking about things that he

7  knows about, like firsthand knowledge about.  So yeah,

8  I'm absolutely interested to hear what Steve Bash has

9  to say.

10        MR. GREELEY:  I am too.  I thought the question

11  was if he could speak to the value add that the

12  Heredias made and I don't have any problems with

13  hearing about Steve Bash's experiences, I'm just

14  wondering where it's leading.  That was the question,

15  Mr. Gardner, is it leading to some opinion?

16        MR. FOSTER:  You're right.  Look, I already have

17  my -- I think the -- I already said this on the record.

18  I think the Heredias did a good job for Mr. Diaz so if

19  Mr. Bash agrees with him good for him.

20        THE WITNESS:  I'm simply replying to what I told

21  them at the point which was I went point by point of

22  the contract, I was doing it overseas and I said look,

23  he's making $150,000 for an NABF for a regional title

24  fight when usually a fighter makes 15 to $25,000 for

25  that type of fight.  Everybody knows it.  The

Atkinson-Baker, Inc.
www.depo.com

1  California commission knows it.

2       So I went through the contract and I utilized

3  whatever knowledge I had and whatever experience I had

4  with that particular contract as well as other

5  promoters contracts dating from the Don King contract

6  that I first saw in 2005.  I gave them some suggestions

7  and Moses had a lot of issues that he wanted to make

8  sure were taken care of so one of the suggestions was

9  to add a pay per view revenue share.

10      I literally e-mailed Moses and I have that

11  e-mail and I know we've been giving you exhibits or

12  additional exhibits but it was literally an e-mail to

13  Moses where I said here's the language from Paulie's

14  contract.  So as far as the promotional contract that

15  essentially would set the course for the next five

16  years of Joseph Diaz's career aside from some issues

17  that needed to be resolved, it was an incredibly -- a

18  comparatively very rich contract, particularly if he

19  becomes a world champion and keeps his title.

20      Q.  So my next question is, sir, is there is

21  some dispute as to how that impacted his most recent

22  fight, the mandatory fight.

23      A.  Look, everyone has an opinion, so from

24  April 2017 which was basically a month after Joseph

25  Diaz signed his promotional contract with Golden Boy

Atkinson-Baker, Inc.
www.depo.com

1  until December 2019, so for two and a half years I had

2  zero contact with either Moses Heredia or Ralph

3  Heredia.  When Joseph Diaz was set to fight Tevin

4  Farmer for the voluntary world title defense, once

5  again, last minute Moses reached out to me and said,

6  you know, here's the proposed bout agreement from

7  Golden Boy.  There's some issues here with respect to

8  rematch clauses and he had a lot of questions with

9  respect to mandatory bouts, the IBF and things like

10  that, and this is not expert testimony in any way, I'm

11  just giving you fact.

12            I've represented multiple IBF world

13  champions.  I've represented even more boxers that

14  fought for an IBF title eliminator and so I told them

15  point blank, I said, hey, you may have an issue here

16  because his mandatory actually exists and it will

17  become due and aside from issues with that particular

18  bout agreement, I said a 12-month rematch clause will

19  not be accepted.

20            And so if he wins the world title --

21  particularly a rematch clause for $500,000 which was

22  under value for a world champion defending his title

23  and so I told him there's other ways to make money

24  potentially but you have to limit certain things and at

25  that point we -- it's an opinion I guess because there

1  could be an argument and I actually had this argument

2  with Mr. Greeley or at least he started the argument,

3  but to defend your title for 500,000 plus a potential

4  bonus for revenue share against a relatively inferior

5  opponent is oftentimes better because you get your

6  mandatory out of the way.  And if he would have had the

7  Farmer rematch of 500,000 he would have been forced to

8  defend his title against his mandatory within 90 days,

9  assuming IBF would even allow it because IBF's rules do

10  not actually allow what they call return matches or

11  rematch clauses.

12          So I'm not saying it's because of me but I

13  can testify that Moses was intimately involved and he

14  certainly went to bat, not so much on every fight even

15  though he was involved but really -- and this is

16  something I think that separates great managers from

17  maybe good managers business wise, he sought -- he had

18  forethought.  What happens when he becomes a world

19  champion and what happens when he actually wins this

20  fight and then might have to be held to a rematch

21  clause or anything else.

22          So from April 2017 to December 9, 2017 no

23  contact whatever, some consultancy.  I did not

24  communicate with Golden Boy directly on that Farmer

25  bout agreement and then when the rematch clause became

1   an issue Moses called me.  Actually it's one of the few

2   times that he called me himself because I'll be honest

3   with you, when I met them in 2012 at Robert Diaz's

4   house, Ralph and Moses and this is I think a couple

5   months -- it was the summer of 2012.  Paulie Malignaggi

6   had just won the world title and he was there as well

7   and Ralph and Moses were introduced to me as, by Robert

8   Diaz, as Joseph Diaz's managers.

9           So in my mind I actually thought both of

10  them were managers but in my mind, I've dealt with many

11  people in boxing and so for every David McWater there's

12  literally three or four people including Ron Rizzo who

13  used to work at the New York State Athletic Commission,

14  Joe Quiambao who was Lou DiBella's matchmaker and Tim

15  Newenhousen [phonetic] who he's a manager, he manages

16  fighters but he really was at that time under David

17  McWater who manages Teofimo Lopez and just was I think

18  named manager of the year.

19          So it's commonplace that even somebody I'm

20  dealing with that I assume is a manager there's one

21  individual that's on the contract.  So I helped him out

22  with the issue with the rematch clause because there

23  was a threat of lawsuit from Lou DiBella, Farmer's

24  promoter and then that was it.  And then when Joseph

25  Diaz signed with MTK I tried to assist to, you know,

Atkinson-Baker, Inc.
www.depo.com

1  make peace or resolve things but it didn't work out.

2        Q.   Did you request a copy of the MTK contract?

3        A.   Yeah.  So the timeline specifically -- and

4  again, I have the e-mails if you'd like to see it was

5  the very first thing I did was I called my friends at

6  Top Rank, Brad Goodman specifically and Bruce Trampler

7  because I knew they knew Bob Yalen who had just been

8  named CEO of MTK Global.  I said, "Hey, I'm trying to

9  help these guys out, there's an issue with Joseph Diaz.

10  Do you guys know Bob Yalen?"

11        They immediately gave me Bob Yalen's cell

12  phone.  I contacted Bob.  Bob told me that he had just

13  gotten back in town, that he wasn't actually involved

14  in the deal.  It was done overseas but he would look

15  into it and get back to me.  He did mention on the

16  phone that "We're not looking to step on any toes.  For

17  the most part every fighter we get involved with we

18  cooperate with the manager ahead of time," which didn't

19  occur in this case and I basically said, "Look, just

20  let me know what your intentions are but I appreciate

21  your forwardness," and that was it.

22        A couple of days later I received an e-mail

23  from James Greeley.  The e-mail specifically said, "Bob

24  Yalen told me to contact you.  I represent Joseph Diaz.

25  Let's set up a call."  And I think his assistant was

Atkinson-Baker, Inc.
www.depo.com

1 copied on that e-mail.  We eventually set up a call.  I

2 remember the call because I was driving to San Diego.

3 We had a cordial conversation and -- but Mr. Greeley

4 did bring up some issues that he had with Moses, Ralph,

5 whatever, similar to what he's been saying now and then

6 things basically took a turn for the worse.

7            At some point I found out through folks I

8 know in boxing that Mr. Greeley is a former colleague

9 of Harrison Whitman who is Top Ranks former attorney

10 who I had a relationship with, who is now MTK Global's

11 attorney.  And honestly as soon as I found that out and

12 a couple of e-mails that Mr. Greeley sent to me I

13 realized that this was going to be one big mess.

14       MR. GARDNER:  Okay.  Let's maybe just provide

15 pertinent testimony on the issue here.  Did you have

16 any further questions, Mr. Montalvo?

17       MR. MONTALVO:  If you could just give me ten

18 seconds here, sir.

19       MR. FOSTER:  Mr. Montalvo, let's get one maybe

20 more question and kind of wrap it up.

21       Q.  BY MR. MONTALVO:  Could you just walk

22 us through Mr. Ervin, that whole -- I think you

23 have some experience with how that works.

24       A.  So I presided over several signings, mainly

25 between managers and boxers.  I wasn't present for this

Atkinson-Baker, Inc.
www.depo.com

1  one because I never was involved before March of 2017.

2  But Larry Ervin has been with the commission since I

3  started in boxing.  He's presided over thousands of

4  these signings with Larry particularly as well as

5  others, Armando Gutierrez I presided in a signing with.

6  Several folks who are no longer with the commission.

7          This is an over an hour process.  He goes

8  through every single line of the bout agreement and in

9  an instance where a managerial or promotional agreement

10  is terminated in order to have a cut off line, he

11  specifically says to the fighter, you are a free man

12  right now.  You can walk away and the only way we

13  continue is if you tell me that this is exactly what

14  you want to do right here and now.

15          MR. MONTALVO:  I don't have any further

16  questions, sir.

17          MR. GARDNER:  Okay.  Do you have any questions

18  for the witness, Mr. Foster?

19          MR. FOSTER:  I'm familiar with the way the

20  contract signings work as well.  So I appreciate that.

21  Will, can we make some closing remarks and we'll be

22  done?

23          MR. GARDNER:  Let's have you do that.  I would

24  like to just before I turn it over to you for that

25  purpose, there was an issue of as I understand it we're

1  admitting Exhibits 38 through 52 from Mr. Diaz's

2  counsel.  We're admitting the four additional exhibits

3  from Mr. Montalvo from today and then there was the

4  issue of those two late afternoon e-mails.  Where are

5  we on that, Mr. Foster?

6       MR. FOSTER:  We'll take them.  We'll take them.

7  It's fine.  You're going to tell everybody to send in

8  their final remarks soon?  Like when?

9       MR. GARDNER:  On that issue the arbitrator has

10 requested written closings so we would request that

11 written closings be provided by next Wednesday.  That

12 will give you a week and we would ask that they be

13 limited to 15 pages.  Feel free to go short of that if

14 you'd like.  So if you could just submit those by the

15 end of the day next Wednesday.

16      MR. FOSTER:  I'll just make some closing remarks

17 and we'll be done.  Mr. Diaz, are you still there?  Is

18 your camera off?

19      THE WITNESS:  I'm here.  Sorry about that.

20      MR. FOSTER:  No problem.  Mr. Heredia, is your

21 client there?  I can see him in the background.  Moses.

22 Okay.

23      I dealt with the attorneys all day and I

24 appreciate that but it's you guys that are the deal and

25 I said this this morning and I'm going to say it again,

Atkinson-Baker, Inc.
www.depo.com

1  Mr. Greeley, you did a good job with this thing.  You

2  really did.  Mr. Montalvo, you did a good job.

3  Mr. Greeley, there's a lot of points that you brought

4  up and I have to give some real thought on.  I hoped

5  you guys could settle it this morning.  I promise you

6  I'm going to do the best I can.  That's what I said

7  this morning.  I can tell you it's going to be true.

8  Maybe one of you is going to be happy with my decision.

9  Hardly anybody ever wins a hundred percent on these

10  deals.  It's rare.  I don't think it has ever happened.

11  So it is what it is but Mr. Diaz, you are free as of

12  today or whenever of this contract.  We've already

13  established that.  That part is done.

14         THE WITNESS:  Thank you.

15         MR. FOSTER:  What comes of that, there's

16  always -- I still think and I know Mr. Greeley doesn't

17  agree with me but I still think from what I heard the

18  contract is a valid contract.  I believe that.  So I

19  have to figure out what that's worth.  And that's the

20  deal that it's worth -- whatever I do though,

21  Mr. Heredia, I want you to understand, me and Will, I

22  am nowhere near making my decision.  I'm just trying to

23  give Mr. Diaz some foresight into what's happening

24  here.  Whatever I do with this contract, I do think

25  it's valid.

1         And Mr. Greeley, you're an excellent lawyer so
2    you may be able to prove me wrong or whatever but
3    that's in a different place.  But whatever I do with
4    it, Mr. Diaz, I know what you're making on your next
5    fight.  I know because we're the commission and we know
6    those things.  And I am not going to take all his money
7    and just hand it over.  You know what I mean?  That's
8    not the way it works.  He'll have taxes to pay and
9    various folks to pay and whatever.  So whatever I
10   decide to do with this contract I'm going to give
11   Mr. Diaz some ample opportunity -- he's done, he's done
12   but I'm not going to make it so he can't live if that
13   makes sense.  I mean, you understand where I'm coming
14   from.
15         By the way, Mr. Heredia, I just -- me and Will's
16   got to look at it and I got to go through it but
17   $300,000 is a little north of where my mind is at, a
18   lot north.  But I do think the contract is valid.  And
19   I think that fight in Fantasy Springs, I think this
20   next fight coming up and then we can think about things
21   but I don't want you to be shocked when you see the
22   order if it's where my mind is at because I've got to
23   have it so Mr. Diaz, A, has an incentive to fight and
24   B, can pay his bills and can live a good life because
25   I'm interested in that.

Atkinson-Baker, Inc.
www.depo.com

1        And I understand you put in time and the whole

2    thing like that.  But anyway, I just wanted to say

3    thank you for your time, Mr. Montalvo, you did great.

4    Mr. Greeley, I was really impressed with your lawyering

5    so thank you for your time.

6            MR. GREELEY:  Thank you, sir.

7            MR. GARDNER:  I'd like to thank everyone as

8    well.  It's been a long day.  Appreciate everyone's

9    courtesy and cooperation and professionalism.  Good

10   luck to everyone and I look forward to receiving those

11   closing briefs next week.

12              (Ending time 6:10 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Atkinson-Baker, Inc.
www.depo.com

```
1                    REPORTER'S CERTIFICATE

2

3          I, JEANINE CURCIONE, C.S.R. NO. 10223, RPR, in

4    and for the State of California, do hereby certify:

5          That said proceedings were taken down by me in

6    shorthand at the time and place therein named, and

7    thereafter reduced to typewriting under my direction,

8    and the same is a true, correct and complete transcript

9    of said proceedings.

10         I further certify that I am not interested in

11   the event of the action.

12         Witness my hand this 17th day of June, 2021.

13                    _____

14                    _____

15                    Certified Shorthand
                      Reporter for the
16                    State of California

17

18

19

20

21

22

23

24

25
```

Atkinson-Baker, Inc.
www.depo.com

Index: $10,000..300,000

---

**$**

**$10,000** 160:24

**$100,000** 36:19

**$150,000** 79:8, 12 81:2 170:23 172:13 173:23

**$20,000** 102:24

**$200,000** 170:24

**$221,000** 117:25 118:23

**$25,000** 96:24 172:14 173:24

**$3,500** 88:21

**$30,000** 170:22

**$300,000** 157:14 183:17

**$350,000** 151:24

**$3500** 89:1

**$4,000** 154:10, 14

**$467,000** 118:3

**$500,000** 175:21

**$53,500** 100:24

**$62,000** 53:1

**$72,000** 36:6

**$85,000** 111:4

**$90,000** 53:1

---

**0**

**0** 21:9

**0010** 20:25

**0011** 21:3

**0014** 28:2

**0032** 28:15

**0037** 26:16,17

**0043** 27:10

---

**0199** 137:12

**0210** 26:3 103:11

**0242** 100:15

**0255** 25:9

**0288** 21:10

---

**1**

**1** 155:10

**1,000** 44:25

**10** 2:1 4:2,19 21:21,22 25:9,12 42:1 86:22,24 98:22 102:25 108:6 146:7,13

**100** 82:3

**10223** 2:2

**106** 2:21

**10:27** 2:2 4:2,20

**10:45** 9:8

**11** 25:9,12 28:14 106:7 123:5

**11:15** 10:17

**11th** 144:15

**12** 12:22 28:15

**12-month** 175:18

**126** 159:15

**13** 73:11

**14** 88:6 158:14

**14-day** 141:1

**148** 3:11

**15** 88:6 102:24 122:9 124:17 173:24 181:13

**150** 41:24 42:12

**150,000** 96:23

**16** 25:11 89:3 163:3

---

**162** 3:15,19 47:18 48:18

**17** 6:11 64:8 77:25 89:3 101:21

**1702** 2:10

**172** 37:4

**18** 17:22 18:1 24:12,13 42:2 45:25 62:15 63:5 86:12 89:3 98:4, 14 99:2 124:19, 20 130:17

**18,000** 36:20

**18628** 137:13,23 138:12

**19** 150:11

**1940s** 57:17

**1945** 57:2 134:11

**1949** 57:19

**1974** 56:14

**1992** 58:23 59:6 61:14

**1993** 141:11

**1994** 58:23

**1996** 59:2 61:11, 13

**1997** 59:3

---

**2**

**2** 21:3 33:11 48:23 63:3 70:10 71:15 98:9,10, 11,12,13 100:7 130:19

**20** 17:23,24,25 24:12 62:15 63:5 68:3 98:5 99:14, 15 101:11 110:19 124:22 125:9 130:17

**200** 118:1

---

**2000** 59:7

**20006** 2:16

**2001** 54:19

**2002** 59:4,6

**2005** 174:6

**2010** 148:23 163:1

**2011** 148:24 163:1 170:12

**2012** 15:18 60:21,22 65:3,6 66:14 72:20 73:2 90:8,15,16 93:12 108:8,15 109:10 110:8 116:18 119:23 129:21 130:12 131:19 132:1 140:10 151:4 157:22 170:10 177:3,5

**2013** 132:2

**2014** 56:21

**2016** 62:20 73:13

**2017** 14:8 15:20, 21 16:5,10,17 17:5,22 27:21 54:15 55:4 60:23,24 61:16 62:5 65:4 68:21, 25 72:25 73:6,8, 10,19,23,25 74:6,11 75:10,13 76:21 77:23 78:11 79:3,4,23 80:5 81:3 82:4 93:13 98:6 99:9 108:9,11,12 109:11 110:9 118:1,5,19,21 119:15,25 121:1 130:15 131:5,18 132:4 134:4 149:10 151:4,23 153:3 170:5,6,15 174:24 176:22 180:1

**2018** 75:13

---

**2019** 16:23 142:17 175:1

**20006** 2:16

**202 888-8199** 2:17

**2020** 17:7 51:17 101:4,6

**2021** 2:1 4:2,19

**2022** 37:25 60:25

**20s** 60:15

**21** 21:13

**213 269-6292** 2:11

**22** 25:20 60:25 148:17

**225** 42:25 44:16

**23** 15:21 60:24 62:5 76:21 79:4

**24** 25:20 137:15 144:1

**24-year-old** 85:14

**25** 137:11

**250** 43:1,13 47:14

**255** 25:5

**28** 26:3,8 103:11

**2855** 14:21 58:8 59:11 61:20 67:6

**2:30** 48:10,12

---

**3**

**3** 19:4 28:1 60:22 70:9 71:4,11 112:15 119:25 124:2,4,13 134:4

**30** 103:17 106:20 126:10

**30,000** 6:9

**300** 156:10

**300,000** 156:12

Atkinson-Baker, Inc.
www.depo.com

157:13

**300K** 101:8,21

**3014442** 100:19, 22

**31** 100:19

**350** 45:24

**3500** 89:17 130:9

**360** 123:2

**38** 181:1

---

**4**

**4** 26:16,17,21,25 60:22

**40** 66:1 126:23 135:18

**42,000** 66:1

**424 272-9855** 2:22

**45** 43:5

**4:00** 100:4

**4:30** 143:20

---

**5**

**5** 27:9

**5,000** 125:1

**50,000** 126:6

**50/50** 49:20,21 50:4

**500,000** 176:3,7

**52** 181:1

**5350** 102:10

**53500** 101:17

**5:00** 144:2

---

**6**

**6** 76:18 140:7

---

**60,000** 126:6

**60K** 101:12

**62** 45:25

**63** 46:1

**6500** 101:15,21 102:1

**6:10** 184:12

**6K** 101:14

---

**7**

**7** 11:8

**70-year-old** 57:22

**72** 36:7 37:3,10, 11,24 45:17 158:21

**75,000** 172:13

**7th** 2:20

---

**8**

**80** 41:18

**87** 3:5

---

**9**

**9** 5:22 22:3 25:10 41:3 42:23 47:25 125:3 159:4 161:19 176:22

**90** 36:7 128:4 176:8

**90013** 2:10

**90401** 2:21

**94** 67:18

**95** 3:7

**96** 67:18

**9th** 2:16

---

**A**

**A.M.** 2:2 4:2,20

**ability** 24:23 34:1 42:9

**absent** 149:15

**absolutely** 33:15 68:23 69:6 74:16 107:10 108:7 114:10 119:21 128:13 145:6 147:25 173:8

**abuse** 18:22 56:13 59:20

**abused** 17:17 71:9

**abuses** 57:3

**abusive** 57:21 60:6

**accept** 37:2 46:22 105:8

**acceptable** 54:3

**accepted** 69:16 175:19

**accompany** 79:14

**accord** 11:23

**accordance** 25:25 27:25

**account** 105:21 145:11

**accountability** 71:19

**accountable** 116:1

**accountant** 53:11

**accounted** 145:14

**accounting** 93:11 106:10,12 116:19,20,22

---

117:1,5 119:21 124:25 157:4

**accoutings** 126:9

**accuracy** 138:6

**accurate** 5:9 35:6 168:1

**accusing** 123:3 137:15

**achieving** 79:1

**acknowledge** 10:24

**acknowledged** 51:15 145:5,6

**acknowledging** 142:18

**act** 55:7 82:20 108:23 122:25 130:21

**acted** 73:9 115:22 128:8 145:25

**acting** 53:6 111:18

**action** 51:13,20 53:10 135:8 156:20

**activities** 35:6 70:5 76:14 78:9 80:1 81:7 107:25 108:4 113:8,13 116:2 119:14 128:9,15 131:23 134:7 137:17,22 138:15,17,18 146:5,6 148:4

**activity** 147:5

**actual** 41:20

**add** 46:13,14 170:4 172:4,20 173:11 174:9

**added** 125:5 144:9

**addiction** 130:25

---

**adding** 143:5 144:5,8

**addition** 25:20

**additional** 97:14,18 98:9,11 108:20 121:14 138:25 140:3 142:22 143:25 144:5 146:14 168:22 171:22 174:12 181:2

**address** 22:18 27:2 28:1 37:1 107:4 110:23 143:6

**addressed** 110:12

**addresses** 27:23

**adequately** 147:3

**administered** 22:18

**admission** 78:16 124:21 143:7 157:7

**admissions** 125:20

**admit** 128:2

**admits** 73:7,9, 20

**admitted** 16:4,9 17:24 72:25 77:6,7 78:20 81:8 117:9 125:14

**admittedly** 113:2

**admitting** 181:1,2

**advance** 9:4 26:12 49:6 130:18 137:6

**advancement** 98:8 126:24

Atkinson-Baker, Inc.
www.depo.com

**advances**
107:12,13,14,18
118:25 126:7,18
127:1 128:1
130:12

**advantage** 57:5
122:23

**adversity** 49:25

**advice** 39:21
149:3

**advise** 122:22

**advisor** 134:23
145:25 146:3

**advisors** 29:2
60:1 122:20

**advisory** 146:19

**advocated** 33:5

**affected** 57:13

**affiliated** 133:3
134:8

**affirmative**
113:23

**afford** 131:6

**afternoon** 10:23
95:6 181:4

**agency** 36:4
65:24 157:9

**agent** 122:3
123:15

**agents** 83:16

**aggressive**
13:14

**aggressively**
42:7 167:17

**agree** 19:2,7
37:21 40:10
66:11 94:7
101:12 106:1
109:4 112:18
138:5 144:14
147:13 182:17

**agreeable**
150:19

**agreed** 23:24
33:17 59:10
98:9,10,11,13
99:2,18

**agreement** 8:20
11:10 12:19
16:10 17:5 18:10
20:5 22:10,13
23:2 24:18,25
25:18 29:3
33:17,18,20
38:9,18 42:6
58:17 59:13,23
62:5,16 63:2
64:22 65:3,4,6
66:9,10 68:18
73:17,22 74:6
78:10,11,15 79:4
80:7 81:3,6 82:8
88:22 90:9,15,16
93:19 97:17
98:6,7 99:8,9
108:12 109:1
119:15,25 125:4
129:21 130:13
131:6,18,19
132:4 134:4
135:7,9,11
136:19 139:2,3
142:14 146:9
147:19,22
149:10 151:4
152:24 170:17
175:6,18 176:25
180:8,9

**agreements**
16:8 61:23 97:20

**agrees** 14:16
26:18 28:23 29:1
173:19

**ahead** 48:15
87:10 95:2
100:12 136:12
152:21 164:3,24
165:2 169:9
178:18

**allegation** 29:25
123:15

**allegations**
19:11,14,16
27:24 95:8

**alleged** 79:22
130:22

**alleging** 120:25
122:1

**allocate** 168:25
169:2 171:14

**allocation**
171:21

**allotment** 29:21

**allotted** 43:6

**allowed** 17:22
18:1 50:21 94:21
115:10

**altruistic** 130:21

**Alvarado** 75:18
103:23 104:2,4

**amateur** 89:1
111:7

**amateurs** 88:19

**amenable** 10:7

**amend** 123:13

**amended** 59:4
123:14 125:10

**amendment**
58:22 59:2
61:11,13

**amendments**
61:23

**amount** 101:8
133:2 153:8
170:3

**ample** 183:11

**Andre** 22:23
35:25 67:3

**Andrew** 4:7

**ANDY** 2:5

**Angeles** 2:10
4:1

**announcement**
124:5 134:18,21

**Antonio** 101:24

**anymore** 31:9
32:7 40:8 45:7,9
70:18,25 78:4
106:15 141:4
155:23

**apologies** 51:25

**apologize** 55:25
160:18,20 165:8

**apparatus**
139:18

**apparently**
71:18 116:6

**appeals** 109:22

**APPEARANCE
S** 2:4

**appeared** 15:9
116:5,6

**appears** 8:16
28:9 63:9

**applicability**
69:14

**applied** 58:5
108:24

**applies** 15:1
113:10

**apply** 61:10

**approach** 96:8

**approached**
65:13 73:16
114:13

**appropriately**
54:22

**approval** 27:19
168:12,14

**approve** 109:5

**approved** 12:11
16:23 99:9
118:16 119:12
124:20 125:6
131:20 140:11

**approves** 12:15

**approving**
99:14

**approximately**
4:20

**April** 174:24
176:22

**arbitrate** 51:18

**arbitration** 4:5,
14,18,21 5:6,11
8:13,24 22:23
25:17 31:4 32:9,
12 51:3 67:7,10
82:16 92:10
113:20 116:3
123:25 124:7
135:8 141:1,6
146:22

**arbitrations**
30:12 52:15

**arbitrator** 2:5
20:14 153:11
160:15 181:9

**arbitrator's**
34:15

**area** 18:12

**arguably** 130:16

**argue** 67:6

**arguing** 61:11
141:10

**argument** 16:14
19:21 22:23 23:7
30:7 61:18 67:14
68:11 69:4 70:19
76:23 77:3,14,18
82:19 109:9
110:25 111:1
176:1,2

**arguments**
19:18 50:16 71:2
81:20 135:10
138:4 144:3

**arise** 4:15

**Armando** 2:8
4:12 180:5

**Armando.
zambrano@doj.
ca.gov** 2:12

Atkinson-Baker, Inc.
www.depo.com

**arose** 107:5

**arrange** 16:25

**arranged** 16:22 119:12 128:10

**arrangement** 16:3 71:13

**arrangements** 58:2 113:9

**arranging** 76:16 108:5 146:7

**arrival** 27:13

**arrive** 14:13

**Arum** 62:24

**aspect** 119:10

**aspects** 33:20

**ass** 96:14

**assertions** 12:5

**assessed** 53:18

**assigning** 129:8

**assist** 177:25

**assistant** 178:25

**assisting** 4:12

**Associates** 56:16

**assume** 9:24 41:1,2 177:20

**assumed** 89:19 90:4

**assuming** 176:9

**assumption** 72:14

**assure** 161:14

**athlete** 152:10, 11

**athletes** 112:24

**Athletic** 4:8 177:13

**attached** 79:13

**attack** 32:17 122:20 124:8

**attacks** 32:18

**attempt** 5:19

**attempted** 114:11 124:22

**attempting** 107:7

**attend** 149:5

**attended** 149:6

**attention** 144:1

**attest** 154:6

**attitude** 163:9

**attorney** 2:7,8,9 4:6,12 17:3 39:12,13,20 57:2 83:18 110:3 127:13 134:11 137:21 138:14, 19,21 155:6 156:1 168:19 169:22 179:9,11

**attorney-client** 39:19

**attorneys** 83:23 100:8 112:13 122:13 123:6 127:2 140:8,10, 11 181:23

**August** 51:16 132:1

**authenticate** 132:2

**authority** 24:1 69:24 168:12 171:9

**avail** 111:13

**availability** 115:15

**avoid** 130:6,7 133:5

**award** 51:12 52:2

**aware** 12:14 24:3 43:4 69:11 72:4,5 76:10 96:4 120:18 137:16 140:25 143:12 164:6

**awkward** 132:6

———

**B**

**B-A-S-H** 169:12

**B4** 126:7

**B5** 126:7

**babysitting** 165:24

**back** 6:24 8:22 9:5,8,10 10:11, 16 32:14 40:12, 13 42:24 46:4 48:10,14 56:7 69:22 77:22 78:1 80:4,18 89:19 90:2,3,5 94:15 96:10 97:3,12 100:4 107:3,12 108:14 110:16 116:14,17,18 117:17 118:20 119:22 123:12 126:22 127:3,6 129:3 130:17 135:2,18,21,25 139:6,22 140:5 143:15 146:15 148:2 149:14 150:7 151:9,18, 20 153:4,18 155:7 156:17 158:4 159:16,17 160:7 161:6,7 162:5 163:16,18 165:1 168:7 172:14 178:13, 15

**background** 122:6 132:6 181:21

**bad** 26:10 155:9 160:13 166:8 167:19

**balance** 50:11, 18

**ball** 46:9 53:3

**balls** 63:1

**bamboozle** 39:6

**bang** 55:14

**bank** 153:22

**banking** 41:2

**banner** 172:15

**barbecue** 170:11

**barbecues** 167:4

**bare** 95:15,17

**barely** 89:3

**base** 171:15

**based** 7:7 14:15 18:5,8 19:21 20:4,9 35:16 37:17 39:16 47:18 80:7 119:6 124:5 125:25 146:16,17 170:19 171:11 173:2

**bases** 18:8

**Bash** 3:17 30:20 44:3,14,18,21 134:20 135:1 136:17 138:21 146:15 147:19, 20 161:23 168:21 169:3,12, 15,21 172:1,17 173:4,8,19

**Bash's** 147:7 173:13

**basic** 38:21

**basically** 25:18 49:20,21 84:15 174:24 178:19 179:6

**basing** 105:9

**basis** 15:25 17:15 70:9,10 125:12 147:7 165:17 167:10

**bat** 176:14

**Bates** 20:25 21:9 25:5 26:3, 16 28:2,14 100:15 103:11 137:11

**battle** 125:13

**bear** 111:20

**beat** 41:2 49:1

**began** 73:12

**begin** 110:17

**beginning** 144:24 165:13

**behalf** 17:8 27:12 51:8 85:23 121:12 129:2,13 139:9

**behavior** 134:14

**beholden** 65:16 69:1 131:4

**belabor** 30:14 119:5 132:7

**belaboring** 124:15

**believed** 33:3 85:20 131:12

**belittle** 94:4,5 98:25

**belt** 33:5 159:13

**Ben** 88:9 101:23, 25 163:12

**beneficial** 99:19

**beneficiary** 84:19 120:25

**benefit** 17:18 44:23

**benefited** 13:20

**benefiting** 38:12 42:4 43:17

benefits 142:13

bet 41:10 47:5,6

betting 49:18,19

bidder 65:2

big 30:6 36:14 71:21 122:16 151:1 153:8 164:23 179:13

bigger 134:23 147:6

bill 36:5 122:11 126:24 127:19

bills 47:13 65:21 183:24

binding 24:20 78:16

Bison 92:19

bit 53:23 57:1 59:18 65:14 68:20 72:2 109:3 122:4,6 130:14 136:14 144:5,15

black 14:20 68:1,6

blank 175:15

bless 127:2

blue 91:3 132:18

Bob 62:24 178:7, 10,11,12,23

boils 6:18

bonus 24:5 79:9,12 81:2 90:18 97:24,25 170:23 172:13 176:4

bonuses 151:25 171:5

book 132:20

books 74:21

bottom 12:12 22:2,5 157:10

bounced 159:16,17

bout 27:7 41:25 42:1,12 52:5 97:19 139:2 175:6,18 176:25 180:8

boutique 122:12,15

bouts 27:2 92:11 95:21 168:19 175:9

box 143:1

boxer 5:1 12:22 14:8 15:10 18:18,21 19:2,5 28:23 35:3 59:11,21 63:19 66:8 68:15,19 74:2 84:17 85:14 86:23 104:14 125:5,16,19 126:10 128:4 151:17

boxer's 28:16 108:4 123:2

boxers 56:13 57:4,7,21 58:3 120:15 128:2 130:5 152:25 161:18 175:13 179:25

boxes 91:22

boxing 14:24 15:1 16:2 17:1 25:21 35:17,18 36:4 37:19 41:18 42:21 54:9 56:12 57:3 58:6 68:19 70:5 76:14 78:9 86:2,9,15,23 87:24 88:3,8 90:8 91:16 93:5, 6,9 108:24 110:22 118:1,4 119:14,18 120:5, 20,24 121:2,22 124:1 128:9,14 129:11,12 139:12,13 146:5 150:8 156:22 157:19 169:24

177:11 179:8 180:3

Boy 17:5,7 28:12 29:7,15 32:22 33:6 35:10 42:5 74:3 75:17,23 77:23 78:1,5,15, 24 79:6,7 80:10, 13 81:6 82:8 83:6,7,11 90:12, 18,19 91:25 92:4 94:14 95:11,20 96:5 103:23 104:4 108:9 119:15 120:7 121:24 123:18 128:23,25 129:2, 3,7 135:3 137:10,14 139:1 152:18,19 153:4 163:23 166:23 167:1 170:11,18, 21 171:8 172:9, 12 174:25 175:7 176:24

Boy's 83:8 168:19 172:15

Boys 28:7

Brad 178:6

brains 151:17

breach 18:2 126:1 127:10,14, 16

breached 85:1 125:11

breaches 18:3 124:14 126:5 131:18

break 48:8 100:3 109:16 162:4

breakdown 38:23 39:2,9,15

breath 31:10

breeched 17:18

briefed 69:23

briefly 131:18 132:8 133:23

briefs 5:17 8:8 144:4 184:11

bring 44:14 51:9,19 121:9 148:2 168:15,17 179:4

bringing 17:11

brings 132:11

bro 155:20

broke 55:17

broken 13:18 32:2

brother 81:21 82:2 83:21 114:1,6,7 128:18,20 139:9 149:2,13,23 150:12 152:4 153:16,19,22,24, 25 154:2,6,17,21 155:21 160:11 161:2 164:21 165:10,11,15,18 167:15 168:4,7, 15,17

brother's 168:14

brothers 82:12, 18

brought 22:23 30:7 51:13 65:5 140:22 159:3 163:5 182:3

Brown 96:17

Bruce 178:6

bubble 36:10,18

bulk 53:22 112:1

bunch 120:4 127:2 128:24

burden 20:14

burn 26:13

business 13:12 19:8 35:9 60:1 75:15 86:18 105:22 120:20

129:10 134:23 147:23 153:21 155:23 165:15, 18,19 176:17

busting 151:21

button 50:6

buttons 152:11

buying 88:11

C

C.S.R. 2:2

C6 84:16 125:15

cable 126:23 127:19

calculation 158:20

calendar 65:9

California 2:7, 10,21 4:1,8 5:1,2 14:11,18,21,24 15:1,11 16:1,7, 18 17:16 18:12, 19,22 54:9,12,19 56:11,15 57:2,3, 15,16,22,23,25 58:1,2,4,7,8,12 61:7 63:22 68:5, 12 72:9 86:5,17 91:7 109:25 127:10 128:1 169:23 174:1

call 20:15 29:13 30:20,21 31:23, 24 70:23 77:8 78:4 128:24 136:4,6,17 140:3 161:23 168:16 172:20 176:10 178:25 179:1,2

called 57:19 123:5 132:20 135:25 152:17 163:25 164:1,22 177:1,2 178:5

calling 63:1

Atkinson-Baker, Inc.
www.depo.com

Index: calls..commission

**calls** 79:11 83:19 152:2

**camera** 11:1 143:12 181:18

**camp** 37:3 91:20 92:11 103:4

**camps** 33:12

**capable** 133:20

**capacity** 4:7 146:19

**capitalize** 104:9

**car** 40:18 92:23 121:13 133:11 160:1,5,6 164:15,16 166:9

**care** 39:7 96:24, 25 97:9,10,11 102:3,4,6 103:2 106:21 150:3 153:14 171:13 174:8

**career** 5:21,24 6:16 27:6 35:18 37:19 59:21 60:5,8,16 64:19 65:17 68:21 88:12 91:17 104:13 111:6 146:19 149:6 152:7 154:6 159:22 172:5 174:16

**careers** 57:10 152:24

**cares** 169:6

**Carla** 128:25 129:8,15

**Carmina** 149:21

**carryover** 171:6

**cartel** 122:3 123:16

**case** 4:17 7:9 9:15 11:6,7,18 12:4 20:11 21:7 33:2 53:13 54:19 56:15,17 58:14,

16 59:24 61:4,7, 8 62:23 67:3 69:6,11,13,16 108:7 109:7,17 110:4,24 111:1, 16 112:4,20 113:5 114:4,21 121:22 133:7 147:17 178:19

**cases** 18:23 69:23

**cash** 26:13 27:1, 6 97:15

**casual** 88:13

**cc'd** 96:2

**CCS** 99:17,20

**cell** 36:5 65:21 178:11

**cements** 107:10 126:4

**Central** 54:18

**CEO** 87:1,3 120:10 178:8

**certification** 27:18

**certify** 125:16

**cetera** 132:6

**CFO** 86:6,16 87:3 139:7 145:12

**champion** 150:1 161:11 167:21 172:12, 15 174:19 175:22 176:19

**champions** 175:13

**championship** 13:8 15:16 128:22

**chance** 22:25 60:5 62:23 144:10

**change** 15:14 107:23

**charge** 37:7 94:12,13

**charity** 83:7,10

**chase** 43:24 105:21

**check** 10:16 53:20 100:19,20 113:5 118:6,7 156:15 171:21

**checking** 121:8

**checks** 75:1 86:3 99:10 117:23,24 118:12,22 119:19 120:5,8 139:12

**child** 154:22

**children** 154:22

**choice** 14:1 34:22 88:23

**choke** 122:4

**choose** 8:12 171:9

**chooses** 162:1

**chose** 12:1

**Christmas** 62:19 73:13

**Christopher** 122:10

**circumstances** 13:13 84:10

**citable** 109:19, 20

**citation** 110:1

**Cite** 138:9

**citeable** 110:2

**cited** 56:20 57:16,18 138:8

**citing** 138:11 145:25

**civil** 16:18 72:7

**claim** 77:22

123:10

**claimant** 18:5 20:9 55:22

**claimant's** 76:18

**claiming** 121:25

**claims** 146:15

**clarification** 171:23

**clarify** 115:4

**clarifying** 89:25

**class** 36:16

**clause** 12:21 42:7 171:8 175:18,21 176:21,25 177:22

**clauses** 175:8 176:11

**clear** 18:1 32:25 36:3 57:15 80:2 119:6 121:15 142:12

**client** 7:25 46:5 58:15 181:21

**clients** 122:17

**Clinton** 122:11

**close** 13:21 46:17,18 61:2 163:2

**closely** 58:2

**closing** 77:14, 17 115:9 134:17 171:19 180:21 181:16 184:11

**closings** 171:20 181:10,11

**code** 14:21 15:1, 11 58:8 69:14 86:18

**codirectors** 87:4

**coexist** 135:1,6

**coexisted** 154:25

**cofounded** 122:7

**Cognac** 34:4

**coin** 74:19

**collaboratively** 168:5

**colleague** 179:8

**collect** 36:5

**collecting** 71:20

**collection** 36:4 65:23 157:9

**comanager** 131:22

**comanagers** 108:8,9

**combined** 22:11 60:18

**commencement** 58:11

**comment** 70:7

**commented** 160:5

**comments** 11:2 70:2

**commercial** 68:4 107:17

**commission** 4:9,18,24 5:13 6:14 11:15,16,24 12:11,14 13:21 15:7,9 18:6,20 27:12,21,25 29:6 36:4 46:6 51:6,7, 11,12,19,23 54:14 55:19 56:14,19 57:18 63:24 65:7 66:4 70:5 71:20 72:6 74:14 79:5,24 81:4 82:22 84:3, 8,10,12 85:5,18 108:8,21,22 111:3,10,19,23

112:25 113:5 116:6 117:21 118:9,17 121:8 124:20 125:6,17 126:25 127:7,15 129:1,2 131:1,21 137:5 139:15 140:17,25 170:2 174:1 177:13 180:2,6 183:5

**commission's** 22:17 111:13 113:4

**commission-approved** 16:8 115:24

**common** 18:25 19:7 68:19

**commonplace** 177:19

**communicate** 176:24

**communication** 170:8

**communications** 13:9

**community** 140:22

**company** 81:11, 12 83:14 85:25 86:2 120:10,13, 20 123:24 129:11 139:14

**comparatively** 174:18

**compare** 74:7 78:21

**comparing** 142:10

**comparison** 172:10

**compel** 25:17

**compelled** 22:8 59:11

**competing** 90:13

**competitive** 11:11 22:14 59:14 64:25

**competitors** 152:3

**COMPLAINANT** 2:6,19

**complaint** 123:13,14,17

**complete** 144:25

**completely** 44:21

**completeness** 12:9

**compliance** 137:8 139:11

**complied** 136:21

**comply** 147:21

**computer** 21:15

**conceal** 79:24 114:12

**concealed** 70:4

**conceding** 45:22

**concept** 114:9

**concern** 31:6 75:12 77:10

**concerned** 172:5

**concerns** 10:9

**concluded** 25:9

**concludes** 25:14,15

**conclusions** 114:25

**concrete** 47:23 53:18

**conditions** 26:18,25

**conduct** 18:15

**conducting** 4:13

**Conejo** 27:11

**confer** 10:4 48:5

**confided** 166:11

**confident** 105:7 163:10

**confidential** 9:25 10:12 147:24

**confidentiality** 10:10

**confronted** 117:10

**confused** 79:17 80:14 107:6

**connection** 67:14 92:9 134:9 154:18

**consideration** 67:25

**considered** 61:19 67:13 78:13

**consistent** 26:25 27:5 76:7

**conspiracy** 122:2

**consult** 50:11 170:16

**consultancy** 176:23

**consultants** 29:2

**consummated** 114:14

**contact** 175:2 176:23 178:24

**contacted** 135:1 171:2 178:12

**contemplated** 66:24 117:7

**contemporaneously** 64:24

**contending** 67:24

**contention** 17:12 19:5 64:7 66:5,6 108:15 129:18

**contentious** 79:5

**context** 73:24

**continually** 26:11

**continue** 13:18 31:18 32:1 33:3 34:8 136:18 149:4 180:13

**continued** 78:24

**continues** 33:2 49:22

**continuing** 20:3 27:3,8 73:12

**continuous** 15:23 64:12 66:5 110:15

**contract** 6:10 11:4,11,23 12:2, 4,13,22 13:4,5, 14,19,20,22,24 14:9,12,15,22 15:18,19,20 16:6,18 17:15, 18,22 18:1,3,5, 16 19:16,17,19 20:24 21:5 22:9, 14 23:14,19 24:5,8,9,10 25:16,19,22,24 26:16 28:7,11 30:1 31:10,15, 17,24,25 32:8 33:23 34:9,12 35:21 37:13,25 38:20 40:23 41:20 42:5 43:18 44:5 47:16 51:6, 18 53:15 54:9, 15,21 55:1,3,4,6,

9,12,24 56:22 58:9,20,21,23, 24,25 59:3,4,5,9, 14 60:2,9,21,23, 24,25 61:4,6,14, 15,16,21 63:6, 11,21 64:23 65:9 67:8,9 68:25 69:9 70:4,13 71:9 73:5,6,8,10, 15,16,19 74:19 75:10 76:11,21 78:6,17 79:23 80:2 81:1 82:1,4 84:2,8,12,14,16, 17,20,22,23,24, 25 85:1,11,16 86:12 93:13 97:21,23 108:3, 11,15,16 109:5, 8,11 111:17 112:10,21 113:1, 12 114:19,20 115:21 116:12, 13 118:19,21 121:1,15 124:5, 14,19 125:3,6, 11,16,24,25 126:2,6 127:10 128:15 130:12, 15 132:3 135:15 136:20 137:4,15 140:10 141:5,9 145:9,13 147:1 151:2,14 153:2 156:17 157:11 168:18 171:6,8 172:8,9 173:22 174:2,4,5,14,18, 25 177:21 178:2 180:20 182:12, 18,24 183:10,18

**contracted** 38:3 139:14

**contractor** 81:17

**contracts** 12:11,15,17 14:23,25 15:2,4, 11,23 16:1 27:20 37:13 39:5 52:14 56:12 57:21 58:6 59:20 60:21

Atkinson-Baker, Inc.
www.depo.com

63:23 66:4 68:4
93:12 95:12
121:16 168:8
174:5

**contractual**
66:15 146:21

**contradiction**
31:12

**contradictory**
41:7

**contrary** 72:15
135:10

**contribute**
145:2

**contributed**
33:16

**control** 19:11
34:3 35:17 98:19
108:4 131:11
138:24 170:5

**controlled**
119:14

**controlling**
22:19 69:11
76:14 110:3
139:4,5

**convening** 4:20

**conversation**
7:14,19 9:3
23:21 49:17
51:22 134:19
136:17 146:18
149:15 164:10
179:3

**conversations**
7:10 8:3 96:11
103:5 149:11,12

**convicted**
133:23

**convince** 35:22
154:2

**convinced**
31:14,17,18,24

**cooperate**
35:11 178:18

**cooperation**
184:9

**coordinate**
165:16

**copied** 179:1

**copy** 178:2

**cordial** 179:3

**corner** 101:14,
21,22

**corners** 102:21

**corporate**
120:22

**corporation**
86:20 139:6

**correct** 7:16
24:14 52:20
62:12 89:7 95:12
99:11 100:8
101:22 102:7,8,
12 103:7 104:19,
20 105:11
106:18,19 109:6
119:25 143:3
160:10 165:13
166:23 168:2

**costs** 124:23

**counsel** 2:4 4:7
5:3 11:5,7 12:17
21:8 25:6 27:13
51:24 60:2 71:12
76:25 77:6 117:3
119:6 136:24
138:4 144:10
148:6 181:2

**counter-claim**
51:9 121:9

**counter-party**
117:22

**country** 122:1
149:9 170:25

**couple** 36:15
42:4 72:3 87:7
107:5 149:18
177:4 178:22
179:12

**court** 5:5 25:9,

13,14,18 51:14,
20 53:10 54:18
55:5 56:18
57:18,24 58:13,
19 59:9,10 61:5,
18,19 65:25
67:23 68:12
69:13 102:11
108:1 109:17,21,
23 112:2 120:25
121:6,11 123:8,
12 126:22
156:20,22

**courtesy** 184:9

**courts** 14:24
57:16 58:4,12
69:7 72:5 109:25

**cover** 41:25 42:2
171:14

**covers** 38:11,18

**Covid** 13:25
34:13 36:10,18
154:15

**Craft** 57:17

**created** 39:10
172:6

**credentials**
150:14

**credibility**
133:20

**crimes** 133:24

**criminal** 16:19
19:12 72:8 132:6
141:11,19

**cross** 3:6 94:21
107:2 136:7

**cross-
examination**
94:24 95:4 107:5
117:11 158:5
162:1 169:5

**crunch** 97:6

**crushed** 154:16,
17,24 156:9

**crux** 11:2

**CSAC** 8:18

**Curcione** 2:2

**curious** 84:1

**current** 32:24
42:1,13 92:10

**cut** 36:11,13
43:23 67:1
180:10

**cutting** 36:14

---

**D**

**D-A-R-Y-L**
102:13

**D-I-A-Z** 87:14

**dad** 151:10,11,
14 164:24

**damages** 51:4,
13,14,20,24 52:2
53:7,9,12,13,18
73:2 121:10,12
156:17

**Dan** 122:11

**Dana** 81:13

**dangerous**
117:19

**Daniel** 141:15

**Darryl** 132:20,21

**Daryl** 101:24
102:1,13,24

**date** 4:19 27:22
29:3

**dates** 60:20

**dating** 174:5

**David** 149:17
177:11,16

**day** 15:20 21:5
23:20 27:21
28:13 33:11
41:19 62:4 64:3
65:8,9 66:9,13,
14,17 76:9 90:23
91:1 149:21
150:4,15,25

**CSAC** section continues...

**CSAC** 8:18

151:6 152:7,14
154:4,18 155:8,
13 156:6,8
157:21,23,24
160:8 165:12
181:15,23 184:8

**daylight** 18:12
69:5 114:2

**days** 78:12 99:3
126:10 128:4
141:12 144:9
150:12 176:8
178:22

**Dba** 120:22

**DC** 2:16

**De** 54:20,21 55:5
56:18 57:24
58:13,17,24
59:1,5,7 61:3,5,
7,8 62:22 67:15,
17 68:8 69:19,21
108:1,2 109:16
151:13 160:4

**dead** 133:10

**deadline** 144:9

**deal** 38:7,8 64:6
65:8,21 66:2,4
68:15 70:24
76:2,7 83:20
89:14,17 90:17
98:15,20,22 99:4
111:8 112:2,8,9
114:10 124:24
127:18 131:15
133:10 156:21
170:22 178:14
181:24 182:20

**dealer** 34:5
142:9

**dealership** 34:6

**dealing** 5:21
29:18 31:4 97:4
112:9 126:20
156:22 177:20

**dealings** 60:1
107:8 117:12
171:1

Atkinson-Baker, Inc.
www.depo.com

**deals** 67:20 91:14 94:14 129:12 151:1,7,23 182:10

**dealt** 177:10 181:23

**debate** 141:12

**debt** 36:4 65:18,23 131:7

**debts** 106:21

**December** 62:20 175:1 176:22

**decide** 4:16 6:2,20,23 50:12 144:14 183:10

**decided** 14:12 74:4 124:5,7 125:8 134:15 135:13 167:24

**decision** 4:17 8:14 39:16 52:16 56:21 67:2,5,11 69:17,19 80:14 117:15 143:4 182:8,22

**decisions** 52:20 129:1,3

**declaration** 16:4,9,24 17:9 19:10 34:25 39:4,11,18 40:3 55:18 62:18 72:16 73:12,14 74:10 78:22 79:14 80:9 92:9 95:8 119:9 132:11 133:4,22 140:2,6,7 160:9

**declarations** 15:5

**declaratory** 51:5

**Decubas** 149:17

**deep** 117:12

**defend** 176:3,8

**defending** 175:22

**defense** 175:4

**definite** 48:21

**definition** 86:19 119:11 128:13 138:12

**definitional** 137:13

**degenerate** 19:12

**delivers** 122:15

**demand** 51:3 123:6,9 126:10 147:6

**demanded** 75:21 117:3

**demonstrate** 11:19 13:3,10

**demonstrated** 24:23 49:25

**demonstrates** 61:21 117:11

**deny** 55:8

**denying** 107:21

**departure** 138:16

**Deputy** 2:8 4:6,11

**derailing** 153:17

**deserves** 47:22

**designated** 12:16

**designed** 112:23

**desire** 33:14

**desk** 129:17

**detailed** 139:3

**details** 168:8

**deteriorate** 167:7

**deterioration** 167:11

**determine** 9:11 54:11 55:1

**determined** 58:19

**developed** 166:20

**Diaz** 2:19 3:3 4:6,24 5:1,25 8:1,25 9:3 11:15,24 13:5,12,20 15:16 16:11,17,21 17:8 18:11 19:15 20:24 21:8,9 22:25 24:4,11 25:5 26:10 27:3 28:1 30:21 31:1,19 32:1,25 33:15 34:5 35:14,16,19 36:15 38:15 40:1,7 41:8,13 42:17 45:1,6,22 46:12,15 47:8,23 49:18,24 51:8,10,17 52:25 54:15 55:4,15 59:22,24 60:14,23 64:1,5,13 65:4 67:24 68:18,25 70:13,17 71:8 72:13,21,22 73:10,15,17,25 74:3,5,13,18 75:2,8,22 76:7 78:2,24 79:4,12 80:17 81:3,21,24 85:5 87:11,13,15,17 90:1 95:6 100:17 101:1,23,24 102:2,3,4,11,14,15 103:12 106:2,9,11 107:8,11,12,16,21 110:12 113:22,24,25 114:13 116:17 117:1,11,19 118:20 119:19 120:5 121:12,13,23 122:20,21 126:19 127:5,6 132:12,13,25 133:17 134:19 140:7,8,13 141:3,14 142:3,14,17 145:6 146:1 148:22 149:25 156:15 157:12 160:16 161:15,17 162:25 163:13 166:17,23,24,25 167:11,24 168:14 170:22 172:6 173:18 174:25 175:3 177:8,25 178:9,24 181:17 182:11,23 183:4,11,23

**Diaz's** 6:16 11:4,7 12:17 14:1 17:6,11,19 18:6 21:13 26:15,21 27:1,9,13 35:8 36:5 37:19 39:3,18 45:12 52:5 63:2 68:21 78:9,20 79:25 132:19 140:2 146:19 157:6 170:12 172:4 174:16 177:3,8 181:1

**Dibella** 177:23

**Dibella's** 177:14

**dictate** 126:8

**Diego** 179:2

**diet** 92:16,18,20 95:16

**difference** 33:16 109:15 110:7 111:15 113:15 146:2 147:14

**differently** 53:23

**difficult** 156:23 170:19

**difficulties** 6:25

**digress** 110:7

**diligently** 13:4 15:16

**dinner** 91:5

**direct** 3:4,10,14,18 47:14 87:21 94:24 108:3 117:1 139:12 148:20 158:7,8 162:20 169:19

**directed** 35:10 119:14 128:9 145:10 160:15,16

**directing** 76:14 146:5

**direction** 152:17,18 168:12

**directly** 17:1 114:17 117:24,25 118:14,18,19,23 119:19 144:25 146:16 176:24

**director** 86:8,17,20,25 118:3

**directors** 87:3

**dirty** 154:19

**disagree** 67:16 68:12 127:13

**disagreed** 153:23

**disagreeing** 99:2

**disappears** 56:8

**disbursements** 99:13

**discarded** 67:14

**disclose** 12:23 29:1,12

**disclosure** 58:15

**discourage** 116:15

**discouraging** 113:14

**discovery** 53:7, 8 156:19,25

**discretion** 34:15 52:24 136:9 158:15

**discuss** 8:11 24:23 105:23

**discussed** 9:4 80:25 81:1 134:5

**discussing** 12:20 24:20 48:20 78:6 103:19 105:24

**discussion** 9:14 22:20 23:12,18 24:17, 19 26:14 51:2 56:10 109:10

**discussions** 9:12,23,25 10:13 25:1 73:12

**disgorge** 73:3

**disparaging** 140:23

**dispute** 15:4 16:12,20 17:20, 21 37:2,10 60:20 61:1 78:17 124:19 125:11 142:15 174:21

**disputes** 14:13 16:15 54:11,24 68:4 167:23

**disregard** 114:23

**dissolution** 52:13

**distinct** 51:16

**distinction** 146:24

**distinctive** 67:4

**distraction** 55:20

**district** 54:18 56:15 109:23

**divided** 147:11

**division** 147:11

**DIYARI** 2:23

**doctor** 150:13 166:5

**document** 12:25 16:12 21:3,22 55:5 140:14 144:23

**documentary** 20:22

**documented** 126:8

**documents** 11:19 27:15 29:10 30:19 32:2,3 62:1 76:16 77:6 107:1

**dollar** 153:9 159:1,2,10

**dollars** 44:15

**Don** 174:5

**door** 23:23 136:1

**doubt** 78:13 161:15

**downhill** 41:9 47:4

**draw** 114:25

**dream** 159:1,3

**drifting** 19:23

**drill** 72:2 99:7

**drive** 92:21 166:7

**drives** 54:13

**driving** 179:2

**drove** 92:22

**drug** 19:12 122:3 123:16 132:21 133:1

**due** 13:25 64:9 66:18 157:21 175:17

**dueful** 145:9

**duly** 4:22 87:18 148:15 162:15 169:16

**dunk** 68:5

**duped** 110:17

**duties** 152:11

**duty** 76:4

---

**E**

**e-mail** 2:11,12, 17,23 13:9 26:9 77:23,25 79:19 103:10,12,16,21 104:12 105:13 106:3 119:13 132:1 135:2 142:17,24 143:1 146:15 151:9 174:11,12 178:22,23 179:1

**e-mailed** 51:17 108:20 174:10

**e-mails** 75:24 79:10,13,14 80:9 81:24 92:3 95:19,22,23,24 96:2 97:20 99:21 139:1 142:11,20 143:2,18,25 144:6 151:8 170:9,19 178:4 179:12 181:4

**earlier** 5:4 36:7 55:21 96:20 103:10 108:2 117:4 143:8 150:25 160:2 168:3

**early** 47:10,15 60:7 136:21

**earnings** 125:19

**eating** 92:18

**echo** 11:1

**economics** 78:7

**Eddie** 76:1

**Eddy** 163:21

**educated** 49:9

**effect** 22:10 55:22 75:1 110:14

**effected** 18:20

**effective** 125:7

**effort** 32:15

**efforts** 110:21

**elapsed** 59:7

**eliminator** 175:14

**embarrass** 106:9

**emerged** 57:15

**emontalvo@ fedpractice. com** 2:17

**employed** 124:8

**employee** 11:10 22:7,13 58:10 59:13 64:22 81:17 83:17 114:8

**employees** 81:16 128:24 150:16

**employer** 22:8 59:12

**employers** 99:16

**enacted** 57:24

**enclosures** 27:16

**encouraged** 149:3

**encouraging** 113:13

**end** 27:21 33:23 37:25 38:19 47:8 48:3 64:18 78:19 104:21 121:21 144:17 149:21 151:6 152:14 154:4 155:8 156:6,7 157:24 160:8 181:15

**ended** 75:22,23 90:17 98:14 99:1 133:10

**ending** 45:9 157:11 184:12

**enforce** 57:23

**enforceability** 19:17

**enforceable** 13:22 14:9 54:16 84:24 125:25 135:15 145:13

**enforced** 58:10 84:21

**enforcement** 23:25

**enforcing** 112:25

**engage** 7:23 14:1 137:12,22 138:15 140:21

**engaged** 86:8 128:16 133:6 134:19

**engages** 141:15

**engaging** 9:12 139:1 140:11

**enhance** 13:7

**enlargement** 13:24

**enter** 23:19 113:9

**entered** 64:14

**entertain** 8:2

65:4 66:20

**entertaining** 20:2

**entire** 35:3 71:13 84:17 110:20 111:6 115:19 135:8 170:22

**entirety** 13:3 27:6 60:5,16 137:24

**entitled** 33:21 86:21 108:5

**entity** 17:1 71:25 86:4,8 119:18 120:18,23 139:14 157:19

**equally** 14:19

**Eric** 2:14 78:4 80:25 128:23 129:4

**Ernie** 163:21,24 164:1

**Errol** 96:16

**Ervin** 11:18 22:18 28:7,12 179:22 180:2

**Ervin's** 21:4

**escaping** 71:19

**Espinoza** 149:20

**ESQ** 2:14,15,22, 23

**essentially** 38:21 170:18 171:2 174:15

**establish** 107:7

**established** 57:22 131:11 182:13

**estopped** 55:8

**evade** 85:3

**evaluation** 50:7

**event** 73:1 83:7 122:18

**events** 121:7 129:7

**eventually** 165:9 179:1

**Everlast** 163:22

**everyone's** 184:8

**evidence** 11:6, 14,16,22 14:4,17 17:10 18:8 19:22 20:4,8,16,22 74:9 76:24 77:1, 2 112:13 113:23, 24 115:8,10 117:10

**evisceration** 32:19

**exact** 67:20 69:7 124:9 130:6

**examination** 3:4,6,10,14,18 87:21 94:25 117:2 148:20 162:20 169:19

**examine** 53:11

**examined** 8:8 87:19 148:16 162:16 169:17

**exceed** 37:5 63:22

**exceeds** 63:23

**excellent** 183:1

**excepting** 33:1

**excerpts** 53:25

**exchange** 17:2 26:9 89:4

**excuse** 28:2 102:15 115:1 124:22 125:3 137:20 142:18 157:20 163:21

**excuses** 18:3

**execution** 21:5 63:11

**executive** 4:8 5:12 42:21 109:4

**exercise** 5:19 7:2 24:2 33:19

**exercised** 52:23

**exert** 123:1

**exhibit** 21:11,13 25:5,11 26:3,8, 15,16,19,20,21 27:9,10 28:1 76:18 80:19 100:19 103:11 137:11 140:19

**exhibits** 8:9 16:22 54:1,7 74:9 76:19 100:17,18 108:20 116:23 117:25 140:3 142:22 144:8 174:11,12 181:1, 2

**existing** 11:11 22:14 43:17 59:14 64:23

**exists** 175:16

**expense** 17:19

**expenses** 157:3

**experience** 40:13 122:14 173:1 174:3 179:23

**experiences** 173:13

**expert** 53:12 172:18,20 173:5 175:10

**expire** 64:4

**expired** 60:22, 23,25 62:11,14 64:1,15 65:7 68:25 142:23

**explain** 14:17 23:13 65:2 79:20

134:14 144:20

**explained** 44:22

**extend** 31:10 58:24 59:4 60:14 63:21 73:17 93:15 136:10

**extended** 34:13 58:25 59:6

**extension** 63:18,20

**extensions** 61:21 67:1,17

**extent** 25:8 118:25 121:16 131:17 134:6 143:24

**extra** 23:10 63:3 96:10 102:23 130:19 138:2

**extremely** 7:19

---

**F**

**face** 55:5 84:9, 15 131:21 146:12

**facilitate** 14:2

**facility** 129:9

**fact** 14:12,13 15:14,15,17 16:15,20 18:2 33:18 54:11,24 55:13 58:20 60:12 61:3 62:23 64:14 66:16 67:21 71:23 79:24 80:22 84:1 107:10,12,23 117:16 119:8,9 125:21 126:4 132:11 140:20 142:5,16 145:25 146:23 172:24 175:11

**facts** 12:3 13:2 14:16 16:12 17:8,20 60:20

114:23 124:15

**factual** 4:16 54:24

**factually** 12:6

**fair** 40:1,9 42:13 47:9,16 77:21 83:3 104:18 136:8 156:10

**fairly** 68:19 84:25

**faith** 161:1

**false** 84:13,23 125:25

**familiar** 22:22, 24 30:10,12 180:19

**family** 89:24 96:25 155:17,19 164:15,17

**famously** 58:13

**Fancy** 53:2

**Fantasy** 5:23 49:7 183:19

**Farmer** 16:23 33:7,10,11 48:23 49:9 50:7 75:14, 21 76:2 101:6 103:24,25 104:24 105:4,7, 10 119:12 152:16,20 159:20 175:4 176:7,24

**Farmer's** 177:23

**father** 99:5 102:25 163:25 164:7,11,18

**favor** 63:3 64:5 69:8

**favorable** 13:5,6 50:2 153:5

**favorite** 49:15

**February** 15:21 51:22 60:24,25

Atkinson-Baker, Inc.
www.depo.com

62:5 73:23 76:21
78:11 79:4
152:23

**federal** 2:14
25:7,18 51:14,20
53:10 120:25
121:5,11 123:7
156:20,22

**fee** 17:2,23 76:15
107:15

**feel** 7:19 20:10,
11,15 47:19
53:19 66:7
68:10,11 69:4
71:3 115:5 134:2
143:7 144:8
152:14 155:13
181:13

**feeling** 149:7

**feelings** 151:16

**fees** 71:21
129:14 156:16
157:17 160:22
171:4

**feet** 6:9

**fell** 164:19

**felt** 71:8,9 74:1
123:21 160:13

**Fernando**
105:13,14

**fiduciary** 76:5

**field** 49:7 173:5

**fight** 5:21,22
13:12 16:23,25
29:15 31:1,2
33:9,10,21 41:3,
14,15,17 43:13
44:18 45:15,24
46:12,13 47:15
48:21 49:2,11,
16,20,21 53:1,2,
16 75:14,18,22,
25 76:2 77:25
91:21 97:15 98:2
101:4,7 102:24
103:23,24,25
104:2,4,10
105:6,10 107:14

112:9 119:12
142:8 146:8
152:16 155:15
158:22,24,25
159:6,7,11,12
160:21 161:7,11
170:23,24
172:13 173:24,
25 174:22 175:3
176:14,20 183:5,
19,20,23

**fighter** 11:15,20
18:4 23:13,16,17
38:24 44:24
59:19 74:21,25
76:6 83:1 88:19
129:13 130:8
131:1 134:7
150:10 165:22
167:20 170:11,
13 172:11
173:24 178:17
180:11

**fighter's** 79:1
117:13

**fighter-
manager** 113:1

**fighters** 42:22
78:25 82:13
83:16,21 96:18
134:12 150:2
153:14 165:21
170:14 177:16

**fighting** 13:12
104:24 105:4
111:20 128:22
150:10,11 153:7

**fights** 38:1,3
42:3,4,14 47:20
50:8 76:16 83:9
91:3,17 92:5
99:10 102:20
103:6 106:21
108:5 128:10
129:13 137:6,9
146:7 147:6
149:5,6 152:1
153:6 155:23

**figure** 124:11
149:2 153:8,9
161:13,14

182:19

**figures** 46:17
57:12 96:22

**file** 121:6

**filed** 4:22 32:12,
14 51:3 59:8
67:7 120:24
121:5,11,23
135:7 146:22

**filing** 123:9

**final** 181:8

**finally** 18:14
133:2

**finances** 105:23
139:8

**financial** 13:7
56:13 58:2 74:24
104:7 107:8
117:12

**financially**
38:12 57:5 65:16
104:3

**financials** 38:21

**find** 13:21,22
68:25 70:12
82:21,25

**finder** 54:24

**finding** 57:7,11

**findings** 57:4,14

**finds** 141:2

**fine** 8:12 10:7,
15,18 37:11
44:14 48:11
77:12 84:5 88:2
115:17 143:6,9,
11 150:21 181:7

**fingertips** 69:23

**finish** 112:14

**finished** 7:4
158:7,9 169:1

**finishing** 171:3

**firm** 121:24
122:6,13,14,15,

16 123:3,13,15

**firmly** 68:2

**firsthand** 173:2,
6,7

**fit** 20:16 128:12

**five-minute**
162:4

**fixed** 20:6 31:8

**fixing** 129:13

**Floor** 2:16

**flow** 53:11

**flowed** 156:19

**focus** 17:12 32:5
37:14 68:3
161:19

**focused** 11:5
13:11 32:21
34:20 70:9 71:2,
5 112:16

**focusing** 31:2

**folks** 82:17
113:19 127:1
179:7 180:6
183:9

**follow** 18:9
110:6 127:25
158:16

**force** 24:1

**forced** 57:8
131:5 176:7

**foregoing** 18:16

**Foreman** 56:16

**forensic** 53:11

**foresight**
182:23

**forethought**
176:18

**forget** 51:24

**form** 79:5 81:4
82:22 108:8,9
115:25 150:20

**formal** 172:11

**forthcoming**
8:14

**Fortuna** 41:3
49:2,11

**forum** 65:23

**forums** 51:16

**forward** 14:3
33:1,24 34:11
38:19 43:16
72:24 74:1 78:18
99:10 103:7
108:11 109:3
113:3 114:22
129:24 167:24
168:1 184:10

**forwardness**
178:21

**Foster** 2:5 4:4,7,
9,13,16 5:12,15,
16 7:1,5,7,9,16
8:6,9,18 9:16,21
10:12 19:1
20:13,17,18
21:1,6,15,18,23
22:21 23:4 24:3,
7,15 25:3 26:4,7,
19,23 28:4,17,
20,25 29:20
30:3,9,17,23
32:5 34:16 35:1,
13 37:12,22
38:4,14,23 39:23
40:1,7,12,22
41:7 42:15,20
43:2,8,19 44:7,
13,25 45:4,11,
17,21 46:2,8,11
47:1,4,10,18
48:2,7,12,24
49:4,14,20
50:10,21,23
51:21 52:3,10,
15,21 53:24 54:4
55:25 56:5,6,14,
24 60:12 61:25
62:7,13,21 63:15
64:9,11 65:10,20
66:17 67:2 68:14
70:1,7,12 74:12
75:2,7 76:3 77:5,

9,17 79:16 80:11,23 81:9 82:5,10 83:3 85:6 87:1,5,8 89:25 90:6 100:17,20,24 106:1,6,14 108:13 109:1,7, 21 110:2,5,21 111:15 112:4,12 113:6,15,19 115:15 116:19 118:12 119:24 120:2,9,13,19 121:5 123:20 126:14 127:9,13 128:5,17,21 132:9 135:17,20 136:2,6,9,12 139:22,23,25 141:17,24 143:6, 9,16,21 144:7,13 145:18 147:12, 25 150:18,21 154:23 155:25 156:11,13,21 157:6 158:9,13, 15,17,18 159:4, 12 160:19 161:12,24 162:23 168:25 171:12,16,25 173:3,4,16 179:19 180:18, 19 181:5,6,16,20 182:15

**Foster's** 77:8 119:20 143:4

**fought** 40:16 151:14 152:16, 22 159:14,16,24 170:13 175:14

**found** 61:5 69:8 71:13 72:18 134:3 155:9,10 163:25 179:7,11

**founded** 122:12

**fourteen** 69:2

**Francisco** 122:8 150:1

**Frank** 149:20

**frankly** 60:10 72:6 123:17 125:24

**fraudulent** 123:4,10

**free** 11:10 20:15 22:13 23:15 59:13 64:22,24 65:9 71:3 115:6 180:11 181:13 182:11

**freedom** 72:22 108:22

**frequently** 126:18

**friction** 153:25

**friends** 167:2 178:5

**friendship** 78:23

**front** 29:6 65:7 106:7 129:17

**frustrate** 32:22

**fulfilled** 34:9

**full** 5:8 21:25 48:8 58:14 119:22

**fully** 11:24 23:18

**functions** 137:13 139:18

**funding** 130:24

**fundraiser** 164:16,20

**furnish** 128:3

**future** 27:2,4 44:23 45:9,12 50:2 53:16 60:7 65:15 103:15 106:21 130:8 137:1,6 152:15

**futures** 57:8,9

**FYI** 133:14

**G**

**Gabion** 163:22

**gambler** 19:12

**gambles** 55:15

**gambling** 130:24

**game** 48:2

**games** 90:13

**Gardner** 2:8 4:6 7:3,6,22 8:5,19 9:7,10,15 10:1,9, 16,20 14:5 19:23 20:12 21:11,18 43:4 48:10,14 50:22 52:13,19 63:9 69:10,20 75:5 77:4 84:1, 14 85:6,11,24 86:11 87:10,15 94:20,23 95:2 100:3 109:23 110:2 115:4 118:10 124:16 125:15 133:13 135:16 136:4,9 138:3,8 139:21 142:20,24 143:4, 17,22 144:7 148:8,17 150:17, 22 158:4,7,12,14 160:14 161:25 162:3,5,7,10,18 166:14 168:24 169:4,8,13 171:12,20 172:16,21,25 173:15 179:14 180:17,23 181:9 184:7

**Gary** 159:12,15 160:21

**Gausha** 96:17

**gave** 40:16 77:19 97:11 110:19 126:15 130:9,12 149:3 154:11 157:2

160:22,23 174:6 178:11

**Gee** 116:11

**general** 2:7,8,9 4:6,12 57:2 113:11

**general's** 134:11

**generate** 104:1

**gentleman** 152:22

**gentlemen** 10:23

**George** 56:15 80:13 170:25

**Gerald** 102:2,3

**Gibson** 137:9

**giggling** 98:24

**girl** 166:10

**girlfriend** 55:17

**give** 6:20 9:6 21:15 26:4 27:6 28:17 43:2,10 77:18 81:13 83:4 90:17 93:11,18 96:9 97:2,25 106:24,25 136:6 144:10 146:1 147:22 160:11 170:16 179:17 181:12 182:4,23 183:10

**giving** 89:1 90:14 174:11 175:11

**Global** 146:18 178:8

**Global's** 179:10

**goal** 79:2

**Golden** 17:5,7 28:7,12 29:7,15 32:22 33:6 35:10 42:5 74:3 75:17, 23 77:23 78:1,5, 15,24 79:6,7

80:10,12 81:6 82:8 83:5,7,8,11 90:12,18,19 91:25 92:4 94:14 95:11,20 96:5 103:23 104:4 108:9 119:15 120:7 121:24 123:18 128:23, 25 129:2,3,7 135:2 137:10,14 139:1 152:18,19 153:4 163:23 166:23 167:1 168:19 170:11, 18,21 171:8 172:9,12,15 174:25 175:7 176:24

**Gomez** 78:5 128:23

**good** 10:13,23 26:10 27:5 31:3 35:18,19 37:18, 19 38:15 39:13 41:16,17 42:20 43:10 45:4,5 48:17 49:8,9,11 52:24 56:16 61:7 63:19 70:22 74:3 85:14 88:14 91:21 95:6 107:2 123:23 134:22 139:11 147:9 149:4 154:13 155:19 161:1,2, 3,8,12 167:1,2 173:18,19 176:17 182:1,2 183:24 184:9

**Goodman** 178:6

**gouging** 161:4

**graduate** 122:9

**graduated** 96:18

**grand** 36:11,12 45:17 46:6 66:1 126:23

**grateful** 165:5

Atkinson-Baker, Inc.
www.depo.com

Index: gratuitous..Heredia

**gratuitous** 19:10

**gray** 18:11

**great** 9:15 48:12 70:19 80:12 93:2 151:4,23 152:9, 10,15 158:23 161:9 176:16 184:3

**greater** 140:20 142:4

**Greeley** 2:22 3:5 7:13,25 9:2,10, 13,24 10:2,15,18 14:6,7 20:1,12 34:24 35:22 37:14 39:17 45:13,14,16,20 46:2,7,10 50:15, 24 51:1 52:3,9, 22 53:4 54:5,6 55:25 56:3,11,25 61:25 62:4,12, 17,21 63:2,15 64:9,12 65:11,20 66:13,18 67:4 68:23 69:10,18, 21 70:11,22 71:7 74:12,16 76:3,4 77:10,13,21 79:22 80:18,24 82:3,6,19 84:11, 23 85:8,13 86:1, 15 87:2,6,22 90:7 100:11 107:3,4 108:13, 17 109:6,20,25 110:11,23 112:3, 11,18 113:17,18 114:11 115:1,7, 17,18 116:20 118:10,15 120:1, 7,11,16,21 121:7 123:20 124:3,16, 18 127:9,22 128:5,8,19 129:6 133:13,15 135:16 136:7,13 137:19,24 138:4, 6 141:10 142:19 143:5,11,14,17, 19,24 144:14

145:1,4,19,22 146:4 147:18 150:5 156:2,13, 14,23 157:6,15, 21 158:3,6 161:25 162:2 166:16 169:6,7 172:16,23 173:4, 10 176:2 178:23 179:3,8,12 182:1,3,16 183:1 184:4,6

**Greeley's** 30:25 50:19

**gross** 86:22,24 108:6

**ground** 19:7

**GROUP** 2:14

**growing** 36:23, 24

**grubbing** 47:8

**guess** 26:13 40:17 49:9 50:6 70:21 75:17 80:14 81:25 99:5 101:20 111:25 120:15 143:9 163:21,23 164:9, 15 170:14 175:25

**gun** 66:6 67:19

**gunpoint** 133:11

**Gutierrez** 180:5

**guy** 29:15 44:19 99:5 118:7 120:13 131:7 151:17 153:21, 22 165:20

**Guyogos** 171:1

**guys** 5:20 6:2,5, 19,21 10:10,17 21:19 29:4 32:9 36:2 41:11 46:8 47:10 77:20 82:11 96:20 99:17,18,21,22 104:13 112:17

123:23 129:12 133:9 149:18,25 155:1 160:25 165:16 167:24 178:9,10 181:24 182:5

**gym** 88:8 92:21, 24 93:5,6,9 95:15 150:15 163:2,6 166:2,4

---

**H**

**H-E-R-E-D-I-A** 148:13 162:13

**half** 15:3,24 60:13,14,15,18 68:10 88:22 110:15 152:13 155:12 157:4 175:1

**halfway** 28:22

**Hamon** 29:14

**hand** 76:19 84:3 87:16 107:3 121:3 169:13 183:7

**handful** 129:21

**handicapped** 160:1

**handle** 150:9

**handling** 139:7

**hands** 150:24

**handshake** 124:24

**hanging** 65:18

**happen** 48:22 89:16 102:20 103:25 104:6,10 127:6

**happened** 32:16 40:14 45:12 62:6 63:25 101:4 127:5 142:7 155:10 163:16 182:10

**happening** 32:24 40:20 83:9 139:5,11,20 140:16 142:12 182:23

**happy** 6:5,23 70:3 182:8

**hard** 159:18

**harder** 5:18

**harm** 6:14 31:20 37:18 142:2 154:7 161:3

**harmed** 19:3,6 31:8,9 35:4 40:4

**Harrison** 179:9

**Harvard** 122:8

**Harvey** 111:1,2, 11 112:22,24 114:12,21 147:16

**hate** 165:23

**hats** 169:24

**Haymon** 29:14, 15 149:16 151:19 163:21, 23 164:2,3,6,7,8

**Haymon's** 152:4

**HBO** 58:25 59:3

**he'll** 42:3 43:15, 17 46:13 72:17 76:9 183:8

**head** 53:3 65:19 66:6 67:19 120:13

**hear** 4:16 6:8,20 13:10 43:24 45:7 48:18 50:15,16 65:12 80:15 81:19 82:10 126:16 130:20 132:15 135:22 136:2 139:23 151:21 154:3 161:15,16,24 171:13,25 173:8

**heard** 5:4 7:7 46:3 57:6 82:17 87:23 114:13 129:19 130:8 136:13,14 153:12 154:9,15 163:13 182:17

**hearing** 4:22 44:1 63:4 173:1, 13

**Hearn** 76:1

**heart** 153:20

**held** 56:10 66:6 67:19 72:21 114:16 176:20

**helped** 131:10 177:21

**helping** 75:9 83:17 94:8,10 95:14 164:13

**helps** 134:14

**Henley** 132:20

**Henley's** 132:21 133:11

**Hennessy** 34:4 142:7

**Heredia** 2:13 3:9,13 4:5,22,23, 25 5:5,25 6:11 7:12 8:24 10:3, 25 12:24 13:11, 17,23 16:4,9,20 17:1,13 18:11 20:14 24:4 25:15,19,21,24 26:3 28:9,10 29:7,12 31:18 32:1,17,19 34:22,24 38:2,14 39:4 40:3,8 43:18 45:1,5 48:5,20 49:23 51:4,15 54:14,15 55:4 61:8 62:19 65:2 68:23 70:6, 13,14,17,20 71:17,25 72:11, 15,24 73:7,19, 20,25 74:13,23

Atkinson-Baker, Inc.
www.depo.com

75:8,9,12,23 76:8,17,20 77:22,24 79:25 80:3,20,21 81:23 83:21 85:9,16, 17,24 86:2,6,7, 13,15,23,24 88:4,5 89:8,9,12, 18,20 92:9,10, 13,16 93:2,15 96:8 100:18 103:11 107:9,11, 13,16,17,20,22, 23 108:10,19,24 110:17,19 111:5 113:2,12,16,17 115:16,20 116:4, 16 117:12,16,24, 25 118:1,2,3,4,8, 18,23 119:6,7,18 120:5,20,24 121:2,3,11,18, 22,23 125:21 126:4 127:15,16 128:7 129:19,25 130:9 131:4,21 132:18,23 133:3, 16,21 137:11 139:1,7,12,13 140:9,23,24 141:2,10 142:6, 10 145:8,12,15, 23 148:4,5,10, 13,14 150:17 155:25 156:14 157:16,18 160:14 161:12, 22,23 162:8,10, 12,14 175:2,3 181:20 182:21 183:15

**Heredia's** 12:7 16:13,16 30:25 62:18 74:17 79:13 132:10,11, 17 141:19

**Heredias** 14:2 15:2,5 17:16,23 19:9,14 23:24 25:1 33:2,14 34:3,6 35:9,11, 17 37:5 51:10 55:14 60:10,17

66:15 69:2 74:8 81:11 82:14 110:15 112:6 122:21 125:9 127:24 128:2 134:15,21 142:3 147:20 157:1,12 170:2,7 172:5 173:12,18

**Heredias'** 18:15 19:4 27:17

**hey** 70:23 91:20 96:9 113:3 129:4 134:20 155:19 175:15 178:8

**hidden** 81:23 82:4

**hide** 81:23

**high** 55:16

**higher** 33:11 37:8 43:16

**highlight** 130:4

**highlighted** 22:4

**highly** 27:23 122:13

**hindrance** 74:1 79:1

**hired** 129:16

**historically** 57:12

**history** 18:14,22 56:11,17,20 57:3 61:20 141:19 151:3

**hold** 137:1 139:21

**holds** 48:21

**home** 53:3

**hone** 118:12

**honed** 115:19

**honest** 172:7 177:2

**honestly** 179:11

**hope** 26:14

**hoped** 182:4

**Hornbook** 84:25

**hostage** 137:1

**hot** 98:20 163:20 165:3

**hour** 144:15 180:7

**hours** 43:6 136:10 137:15 144:1,2

**house** 73:18 75:18 95:24 98:16 167:3 170:12 177:4

**how's** 91:20

**Hoya** 54:20 55:5 56:18 57:24 58:13,14,17,24 59:1,5,8 61:4,5, 7,8 62:22 67:16, 17 68:8 69:19,21 108:1,2 109:17 151:13 160:4

**Hoya's** 54:21

**Hudson** 57:17 101:24 102:1,24

**huge** 153:8 164:25 170:21

**humble** 39:1

**hundred** 36:11, 12 46:6 137:5 160:12,23 168:13 182:9

**hunt** 135:6

**hurt** 151:16 154:16,18,24 160:3

---

**I**

**IBF** 152:18 175:9,12,14

176:9

**IBF's** 176:9

**idea** 33:8 37:18, 19 41:21 43:10 46:16 49:1,8,11 50:14 70:14 85:14

**ideas** 53:9

**identical** 61:3

**identified** 14:8 139:16

**ignore** 55:10

**illegal** 14:18,23 15:25 16:3 18:2 54:16,22 55:2,6, 12 61:4 67:9,11 70:4 71:14 79:23 108:12 113:1,8, 9,13 128:15

**illegality** 14:11 18:16 54:8 55:8

**illicit** 71:13 124:9

**imaginary** 40:25

**imagine** 52:6

**immediately** 123:1 136:21 164:21 178:11

**impact** 13:25

**impacted** 174:21

**implements** 139:18

**important** 18:17 22:1 43:25 60:3 140:5,23 164:14

**impose** 82:23

**impressed** 184:4

**imprisonment** 132:22

**improper** 172:23

**impugned** 144:22

**incentive** 183:23

**inclined** 47:21

**include** 27:17 101:23

**included** 29:16 126:9

**includes** 86:19

**including** 56:20 58:13 78:6 103:19 122:17 123:2 125:20 158:22 171:4 177:12

**incomprehensible** 123:18

**incorrect** 12:6

**increase** 103:17

**incredibly** 174:17

**independent** 81:17

**INDEX** 3:1

**indicating** 25:21 27:12

**indicative** 26:9

**indifferent** 10:2

**indiscretion** 133:8

**indiscretions** 133:6

**indisputably** 128:16

**individual** 108:3 139:17 154:1 177:21

**individuals** 84:3 102:10 121:25

**industry** 82:17

**inferior** 176:4

**inform** 76:6 123:6

**information** 29:11 50:14 72:23 108:22 124:17

**informed** 11:25 39:4 51:22 140:8,10

**informing** 11:21

**infrequent** 68:16

**initial** 64:4

**initially** 130:9

**initiated** 114:14 152:17

**injuries** 34:14

**injury** 13:25 166:6

**input** 143:25

**inside** 92:22 93:4

**insisted** 103:3 171:7

**insomuch** 71:8, 17 124:4

**instance** 11:18 102:19 180:9

**institutional** 122:17

**instructive** 22:6

**integrity** 57:13 144:22

**intend** 143:2 146:23

**intended** 147:1

**intent** 135:3

**intention** 146:20

**intentions** 178:20

**interaction** 148:25

**interactions** 107:8

**Intercepted** 132:21

**interest** 34:7 35:8 58:14 74:25 93:21,22,23 108:4 130:15

**interested** 7:11 8:25 9:11 63:4,6 82:10 163:24 164:12 165:6 171:25 173:8 183:25

**interesting** 109:17 157:25

**interests** 60:3 142:16

**interfere** 146:20,23

**interim** 159:9

**interject** 157:20 172:17

**international** 122:3 123:16

**Internet** 141:18

**interposed** 150:18

**interpretation** 19:9,13

**interrelated** 71:8

**interrupt** 56:1 90:1 142:19 171:13 172:16

**interrupted** 115:2

**interruption** 60:19

**intimately** 176:13

**introduced**

163:11 177:7

**invalid** 54:16 61:6 84:20 85:1 108:16 109:9,11, 12 110:8,9 111:24 131:20

**invalidate** 19:18 82:1 84:10,12, 16,21

**invalidated** 16:1 112:21

**invalidates** 125:24

**invalidating** 108:2 112:20

**invalidity** 55:4

**investigated** 57:2

**investments** 106:22

**invite** 132:8

**invited** 167:3

**invoked** 67:8

**involved** 29:5 56:21,25 58:16 74:14 76:13 80:10,22 88:11 89:13 91:24 92:1,11,12 127:2 134:6,17 165:21 176:13,15 178:13,17 180:1

**involvement** 78:25 80:8

**involves** 28:11 83:5

**involving** 52:3,4

**irreparable** 6:14 37:17

**irreparably** 19:3,6 31:7,9,20 34:18 35:4 40:4

**irresponsible** 130:23

**issue** 6:2,6 7:4, 21 8:22 11:2 12:7,15 13:1 20:24 22:19 23:22 25:8 30:10,11,12 32:6 34:2 37:2 40:5 42:9 44:20 65:15 68:1,6,8 69:12, 14 78:19 87:6 94:17 106:8 110:18 119:4 121:17 134:1 136:22,23 138:24 155:11 158:1,2 175:15 177:1,22 178:9 179:15 180:25 181:4,9

**issues** 4:15,16 6:4,12 39:23 83:23 107:5 145:17 151:2 153:13,23 166:10,17 167:12 171:3 174:7,16 175:7, 17 179:4

**J**

**J-O-E-L** 102:11

**J-O-S-E-P-H** 87:13

**James** 2:22 178:23

**January** 101:4,6

**JASON** 2:15

**Jeanine** 2:2

**Jersey** 34:4 142:6

**Jesus** 148:23 159:19 160:8,11, 20

**jeweler** 142:8

**jgreeley@ vgcllp.com** 2:23

**job** 33:4 38:15 42:22 45:5 55:15 56:16 77:11 151:6,7 152:11, 15 173:18 182:1, 2

**Joe** 149:18 177:14

**Joel** 101:23 102:11,15 103:2

**joint** 145:11

**Jojo** 13:5,12 18:11 19:11 33:15 39:3,18 43:14,24 49:18 53:4 55:15 72:21,22 73:21, 25 74:5,18 79:24 85:18,22 87:6,23 100:6,12 107:11 113:4 116:17 117:1 121:12,23 124:10 129:19 130:9,13,18,22 133:5,17 135:9 140:2,7 141:3,14 142:3,13,17 146:18 147:2 148:22 149:11, 25 150:1,2,3,4, 15,24,25 151:11, 15 152:9,19,20 153:6,17,21,23, 25 154:1,5,6,9, 10,11,12,21,22 155:3,5,9,14,16 157:11 158:23 159:17,21 160:20 161:5,6, 8,10 163:1,9,11, 18,24 164:11,17, 22 165:13,24 166:4,7 167:16 171:5 172:4,6

**Jojo's** 86:3 110:18 130:16 134:24 146:25 151:7,14 152:17, 18 163:25 164:14 165:24

**Joseph** 2:19 3:3

4:5,23 5:1,20
87:13,17 120:5
140:8 170:22
174:16,24 175:3
177:8,24 178:9,
24

**Joseph's**
171:10

**judge** 54:25

**judgment** 54:23
68:7

**July** 5:22 41:3
42:23 47:25
159:4 161:19

**jump** 10:10

**jumping** 141:3

**June** 2:1 4:2,19
150:11 155:10

**jurisdiction**
116:7

**jury** 54:25

―――――

**K**

**keeping** 65:15
143:7

**Ken** 51:24 52:1

**key** 17:20 30:19
57:4

**kicked** 112:1,21

**kid** 158:23 163:9

**kids** 149:17
152:5,6

**Kinahand**
141:15

**kind** 6:9 19:24
39:20 41:7,21
42:22 49:1 52:12
53:15 54:1 65:25
71:18,19 77:18,
19 82:12 91:17
121:20 127:23
130:6,20 131:25
133:5 134:8,10
143:24 144:19

146:1 147:4
172:17 173:5
179:20

**King** 174:5

**kingpin** 133:1

**knew** 70:16,17
72:15 80:13
81:22 84:4 85:5
97:22 98:6,18,
19,20,21 103:22
104:1,8 105:3
122:21 170:25
178:7

**knowing** 108:10
113:7

**knowingly** 84:7,
12,23 125:25

**knowledge**
118:17 173:2,7
174:3

**kosher** 80:7
83:22

**KSI** 75:25

―――――

**L**

**La** 54:20,21 55:5
56:18 57:24
58:13,17,24
59:1,5,7 61:4,5,
7,8 62:22 67:15,
17 68:8 69:19,21
108:1,2 109:16
133:7 151:13
160:4

**labeled** 61:22

**labor** 14:21 15:1,
11 58:8 69:14

**labors** 147:11

**lack** 56:22 72:19,
23

**laid** 30:19 106:7

**LALO** 105:21

**lanes** 136:19

**language** 37:18

174:13

**lapse** 74:5

**large** 81:10,11,
12 83:13 115:8

**largely** 20:9

**Larry** 23:5 99:5
180:2,4

**late** 144:5 181:4

**laughing** 98:24

**law** 7:21 11:7,8
12:3 14:12,15,
18,20 15:14,18
16:1,7,16,18,19
17:16 18:10,13,
22 21:8 25:25
26:1 54:10,12,22
55:11,13 61:7
64:10,20 68:1,5
69:11,16 72:7,8
80:2 84:25 110:4
121:24 122:8,12,
14 123:2,3,7,23
127:11 128:1,13
129:18 131:2
133:23

**lawfulness** 11:3

**lawsuit** 32:17,22
59:8 120:24
121:5,11,23
123:4 177:23

**lawyer** 34:21
82:16 99:25
100:1 146:17
183:1

**lawyering** 184:4

**lawyers** 60:1
64:11 92:6,7
99:16,22,23

**lead** 167:25

**leading** 81:5
173:14,15

**leave** 9:16 18:25
35:14 44:9
140:14 142:1

**leaves** 35:17

**leaving** 157:12

**led** 153:4

**Ledesma**
149:21

**left** 22:2,3,5
25:13,23 33:7
62:25 100:6
115:6,11 135:19
154:14 166:10,
15

**leg** 154:19

**legal** 4:15 14:14
54:16 66:19 69:4
70:9,10 71:1
85:14 116:25
122:24

**legislative**
61:20

**legislature**
57:23 66:24
67:22

**legitimately**
157:18

**lender** 107:17

**length** 15:3
136:24

**lengths** 137:12

**Leonard** 83:6

**letter** 116:22
123:5 137:11

**level** 96:16
122:16

**leverage** 65:17
98:17 136:25

**liberty** 55:10

**license** 12:7
27:17 70:25
72:19,25 73:8
74:5 80:1,5 81:7,
8 82:21,24 83:8,
12,13 86:7
107:11 108:19,
25 110:17
111:25 113:3
114:7,19,22
116:8,16 118:4,

5,7 120:18,19
128:12,21,22,24
131:24 132:1,4
138:19,20,22
139:17,19
156:16 157:17
165:11 168:11

**licensed** 4:25
5:1 13:1 16:2
39:5 70:15,17,20
72:19,20 73:2
91:7,14 111:3
112:22 117:9,17,
20 121:20 128:7,
20 131:23,24
137:17,21
138:14 140:9
145:23 146:1
157:19,22,25
165:9 169:22

**licensee** 134:4
157:24

**licensing** 56:22
72:4,24 82:24
115:23 117:14
119:4 121:17
134:1

**licensure** 12:9
83:2

**life** 41:19 60:15
183:24

**light** 37:23

**limit** 170:21
175:24

**limitation** 10:25

**limited** 132:14
165:8 170:3
181:13

**lines** 25:9,12,20

**Lira** 101:23,25
163:7,12

**list** 116:4

**listed** 81:14

**listen** 31:14,23
52:5,25 70:15
81:20 109:2
150:23 151:6

Atkinson-Baker, Inc.
www.depo.com

152:7 158:22
159:7,21

**listening** 9:22
11:2

**literally** 144:15
174:10,12
177:12

**litigated** 55:2
68:7

**litigating** 68:4

**live** 117:21 122:1
183:12,24

**LLP** 2:20 121:24

**loan** 93:19 96:9
104:22 127:14,
16,19 130:13
131:9 153:22
154:10 165:25

**loaned** 93:17
157:7

**loaning** 130:16

**loans** 66:3
93:15,18,21,22
96:7 97:2,12,13
112:7 126:3,12,
14,15,17 128:1
130:7 131:9
161:5

**loansharking**
131:7

**local** 34:6 142:9

**location** 9:5

**lock** 60:4 68:24
76:2

**Logan** 75:25

**logic** 109:12

**London** 89:23
90:13 164:15,24
165:1

**long** 6:1 23:8
40:15 48:3 49:6
56:11 58:24
60:13 82:21
139:11 148:22
162:24 184:8

**longer** 14:23
15:24 18:4 23:25
59:21 61:2 68:9
74:5 80:6 180:6

**looked** 27:20
29:23 67:22,23
69:7 71:23 72:5,
6 79:10 108:14
109:16 123:24
143:22 172:7

**Lopez** 177:17

**Los** 2:10 4:1

**lose** 36:12 41:17

**loses** 41:16
46:18

**lost** 36:11,18
49:10 139:22

**lot** 5:17,18
32:13,23 45:1
52:6,11,18 63:15
65:16 66:1 68:14
83:15 96:20
111:22 112:7
114:2 134:14
145:22 150:16
151:4 152:24
153:5 165:23
167:22 174:7
175:8 182:3
183:18

**lots** 83:14

**Lou** 177:14,23

**Louis** 149:17

**love** 150:3
153:13,15
154:11,12
155:20 156:7

**luck** 155:19
184:10

**lucky** 59:21

**lucrative** 98:7

**lure** 153:18

———————

**M**

**mad** 47:11

**made** 19:25
20:11 32:24
40:19 45:1 49:6
58:23 80:12
86:12,13,23
88:15 91:24 95:8
105:2 108:22
111:2 116:15
126:7 128:6
131:12 133:10,
21 134:18
136:16 138:4,5
151:4,24 153:8
173:12

**Mafia** 133:3
134:8

**main** 75:12
146:24

**major** 116:10
118:9 122:14

**majority** 11:4

**make** 5:6,13
8:19 10:11 21:25
23:18 29:16
30:8,14 37:6
44:19 46:13
49:8,10 50:5
51:4 53:6 56:8
64:7 70:20 72:22
74:18 83:19
88:25 94:5
101:24 103:25
104:2,3,6 109:11
115:18 116:2
134:23 136:8
138:10 141:16
143:12 144:23
147:1,10 152:20,
25 166:4 171:17
174:7 175:23
178:1 180:21
181:16 183:12

**maker** 4:17
81:14

**makes** 59:18
87:7 141:13
173:24 183:13

**making** 15:8
23:6 46:12 49:7
63:13 77:11

80:14 85:9 90:10
96:13,20,22,23
98:21 104:10
109:7 111:21
118:11 129:1
165:21 173:23
182:22 183:4

**malicious** 154:8

**maliciously**
159:25

**Malignaggi**
172:11 177:5

**man** 6:1 155:19
180:11

**man's** 136:25

**manage** 31:8,19
32:1,7 33:3
73:25 74:2 78:3
88:19 113:21,25

**managed** 5:25
16:20 19:15 74:5
145:11

**management**
14:9,25 15:1
16:8,10,17 17:2,
3,23 25:16,21,22
35:3 36:19 37:7
38:24 54:9,21
56:12 58:6,19
59:23 60:2,17
66:15 71:20
72:10 74:4 76:15
78:11,25 79:3
80:1,5 81:3,7,10,
12,13 83:14 84:4
85:24 86:1,2,9,
15,23 89:17
90:11,15 93:12
94:9 98:5 99:9
106:4 107:15
108:10 110:14,
20 116:11,13
118:2,5 119:18
120:6,18,19,24
121:2,22 128:15
129:11,14 135:3,
12 137:13,17
138:18,19,20,21
139:13,14 145:3
147:14 148:3

156:16 157:17
160:22 168:10

**manager** 4:25
12:10 13:1 16:3
17:4,6 18:3 19:2,
5 28:9 29:8 39:5
40:16 44:22
56:23 60:4 66:21
70:24 72:21 73:9
74:24 75:12
76:5,8 78:13,14,
20 79:25 80:6
82:7,9,21 84:17
85:10,20,21
86:19 87:24
88:3,23 89:6,14
91:7 94:18
107:21,22,24
108:25 111:1,2
114:15,16,17,18
115:21,22,23
116:9,13,25
117:7,8 119:11,
16,17 121:20
123:3 125:4,16
126:5 128:1,7,
11,13,14 129:20
131:16 134:6,25
137:21 138:13,
14 140:9 145:5,
9,23 146:2 148:3
149:20 161:18
165:9,10 169:23
177:15,18,20
178:18

**manager's**
125:23

**managerial**
18:21 73:13
146:21 180:9

**managers** 14:3
16:2,7 24:22
29:1 37:20 57:5,
9,25 63:17 64:16
65:5 83:14 90:8
113:8 115:25
141:4 152:3
163:20 165:4
176:16,17 177:8,
10 179:25

**manages**
177:15,17

managing 38:15 76:20 77:23 78:9 81:5 95:9 107:11 113:13,24 119:9, 10 138:25 165:6

mandatory 33:9 174:22 175:9,16 176:6,8

manufactured 39:1

March 77:25 78:11 79:7,10 180:1

Marcus 96:17

margins 116:8

market 22:25 60:6 66:20 113:11 131:14

marketing 147:4

marketplace 11:13 22:16 59:16 64:18

mat 154:14

match 81:14

matches 83:9 142:4 176:10

matching 81:15

matchmaker 177:14

material 78:6

math 46:11 48:17 61:1 101:19

matter 4:4 14:12,15 15:14 53:8 54:10,22 55:14,15,16 64:13 71:23 73:1 111:11,12 125:2 151:25

matters 13:19 73:2 139:6

MBA 60:9

Mcwater 177:11,17

meaning 59:5 146:6

means 54:23 55:12 115:12 123:6

meant 79:24

meat 92:19

media 32:19 93:9 114:17

meet 88:5,7 89:9 160:4 163:5

meeting 10:11 82:14 91:4 164:2

meetings 92:3

member 86:20

mention 178:15

mentioned 51:22 55:20 58:7 61:12 102:10 108:15 121:8 125:15 156:18

mentor 122:12

Mercedes 165:25

merits 166:19

meruit 110:25

mess 151:16 179:13

message 82:20 113:6,11 117:19

messaging 135:10

messes 53:2

met 11:20 17:6 37:6 88:8 89:8, 10 91:13 129:20 153:11 163:1 170:10,11 177:3

Mexican 133:3 134:8

Mickey-mouse 116:24

mid 64:14 66:25

midterm 61:21

Mikes 34:4 142:6

million 44:15 159:1,2,10

mind 5:7 24:10 34:7 41:21 42:24 139:21 165:18 177:9,10 183:17, 22

mindset 151:17

mine 58:15 99:23

minimum 95:15, 17 111:20 116:17

minor 13:25

minute 7:3 40:2 48:8 82:11 168:20,21 169:3 175:5

minutes 9:5 23:7 43:5 48:6 66:19,22 124:17 133:14 135:19 148:17 158:14 162:5 166:15

Mischaracterizes 100:11

misdemeanor 16:19

misinformation 39:16

misrepresentation 125:22,23

misrepresentations 126:1

misrepresented 84:15

misrepresenting 84:7

missed 36:15, 17,20,22 149:7 160:9,20

misses 36:15

missing 63:8,13 83:24

mistaken 120:8

mistype 29:7

mode 124:8

modeling 111:18

modification 125:5

modified 125:4

mom 164:24

moment 9:2 23:1 85:2 98:4 106:25 150:9

monetary 51:14,20,24

monetization 146:10

money 6:19 16:25 26:12 31:20,21,22 33:6,9,18 34:5 35:20 37:22 38:10 40:17 41:4 44:7,8,12,13 45:2,8 47:7 51:10,13 52:2,4 53:11 55:15 65:14 66:2 71:10,24 73:3 74:21 89:16 90:14 93:17,18 96:12,21 97:1,6, 7 98:2,17,21 102:7 104:1,3 111:11,22,24 117:6,8,13 121:10 126:22, 25 127:4,7,17 128:2,10 130:16, 23 137:2 142:8 147:10 151:5 152:25 153:15 156:19,25 157:7

164:16 175:23 183:6

Monica 2:21 88:8

monies 33:21 102:18 121:14, 19 131:22 145:10

monitor 92:13, 16

monitors 56:9

Montalvo 2:14 3:7,11,15,19 7:12 10:3,4,22 14:5,8 15:8,15 19:20 20:17,18, 20 21:2,7,13,17, 21,24 23:3,10 24:6,14,17 25:4 26:5,8,20,24 28:5,18,21 29:1, 25 30:5,13,18 32:4,17 34:21 35:1,5 37:1,21, 23 38:6,17,25 39:24,25 40:5, 10,21 41:6,23 42:15,19,25 43:5,7,8,12,19, 23 44:11,17,25 45:3,10 46:11,20 47:3,6,12,18 48:1,5,9,15,16 49:3,13,18,22 50:10,18,23 53:14 59:17 61:8,15 68:2 76:22 77:9,16,19 94:20 95:1,5 100:6,14,18,22, 25 106:1,5,8,16, 24 107:6 114:23 115:3,6,14 116:5 117:10 118:24 119:1 125:20 126:15 135:18, 22,23,25 136:12, 14 137:20 138:1, 11 139:23 140:1 141:20 142:1,25 143:3 144:3,18, 21 145:8,18,24

147:21,25 148:2, 17,18,21 158:9, 11,16,19 161:20, 22 162:4,7,9,18, 21 166:14,20 168:20 169:2,20 171:23 172:2 179:16,17,19,21 180:15 181:3 182:2 184:3

**Montalvo's** 123:13

**month** 58:22 79:8 80:11 88:21 89:2,17 130:10 150:10 158:25 164:10 174:24

**monthly** 90:19

**months** 62:14 64:4 75:16 96:19 157:2 163:11 177:5

**moon** 91:3

**moral** 133:24

**morning** 156:1 181:25 182:5,7

**mortgage** 27:3 45:11 57:8

**mortgaging** 60:7 65:15 130:8

**Moses** 2:13 3:9 4:5,22,23,25 10:24 13:3,11 15:15 17:13 18:11 25:24 28:9,12 51:4,15 54:14 65:13 74:17,23 75:9 76:17 79:6 80:3, 12,16,20,21 81:25 82:5,6,11, 15,18,25 85:16, 17 86:6,13 87:2 89:8,9,12 90:24, 25 91:1,16,18, 23,24 92:4,9,10, 13,16,17,21 93:4,6,10 94:8, 10,11,12,13 95:9

96:1,4,9 97:24 99:4,20 102:9 107:20,22 113:16,21 114:20 118:8 119:7,25 120:3, 10,19,20 121:22 124:4,21 129:6, 20,25 139:1 140:3,18 141:2 142:5,10 145:1, 8,10,15 147:9 148:4,5,12,14 157:21 167:25 170:9,17,20 171:7 174:7,10, 13 175:2,5 176:13 177:1,4,7 179:4 181:21

**Moses'** 92:22 99:23 146:17

**mother** 133:11

**motion** 38:11,22

**mountains** 113:24

**move** 34:10 69:25 77:2 135:18 140:21 150:5

**moved** 103:6 167:24

**moving** 33:24 38:19 43:16 99:10 123:8 167:25

**MOY** 2:15

**MTK** 24:24 26:16,18 35:7,9 121:24 124:5 134:18,22 135:2, 3,5,7,11 136:23 137:3,9 140:22 141:15 145:25 146:9,16,18,23 147:20 154:15, 25 155:12 177:25 178:2,8 179:10

**MTK's** 146:25

**multiple** 67:17 175:12

**mute** 7:3 56:5

**Myers** 122:9

**N**

**NABF** 173:23

**nailed** 48:25

**named** 177:18 178:8

**names** 153:8

**narrative** 150:20

**nasty** 32:17

**nature** 107:18 172:22

**neck** 117:12

**needed** 22:25 93:18 95:18 96:12 98:2 104:7,8 113:20 166:2,4,6,8 174:17

**nefarious** 114:21

**negotiate** 11:12 22:15 24:11 38:10 59:15 65:1 95:11,21 98:22 106:20 110:21 137:14 151:7

**negotiated** 13:6 17:5 33:7 42:7 43:18 62:19 64:5 73:10,18 74:10 76:2 103:15 142:11,13 151:3 153:1,2 170:5

**negotiating** 66:22 73:14 78:10 80:10 98:15 104:17 105:24 119:15 129:12 137:9,10 139:2 167:17,18

170:18

**negotiation** 24:15 63:12 65:3 79:7 81:5 105:5, 9 139:4 173:2

**negotiations** 7:9,24 8:23 38:13 149:13 151:2 165:19 168:9,18 170:19

**net** 101:17

**Newenhousen** 177:15

**Nissan** 34:6 142:9

**non-published** 69:12

**non-signatory** 25:16

**nonetheless** 73:9

**nonresponsive** 150:6

**north** 183:17,18

**Northern** 56:15

**note** 5:7

**notecard** 131:25

**noted** 94:1

**notes** 29:19 30:18

**notice** 2:3 4:22, 24 141:6

**noticed** 163:9, 10

**notwithstanding** 37:10 58:20 119:8

**number** 21:9,11 25:5 26:3,19,20, 25 36:1 37:5,11, 12,24 40:23,24 41:12,20,24 42:13,16 43:13

52:6 53:9 64:23 70:9,10 71:4,11, 15 100:19 101:9 103:18 124:2,4, 13 126:12 134:4 137:11,12 156:4, 5,9,13 158:19 159:11 160:5

**numbers** 12:12 20:25 27:18 47:24 48:16 51:2 116:18 156:24

**Numeric** 21:21

**nut** 131:17

**NW** 2:15

**O**

**O'MELVENEY** 122:9

**oath** 75:3,4 78:22 117:9 133:22

**object** 19:20 76:22

**objection** 76:23 100:11 115:5,12 150:18 172:21

**objections** 142:22

**objective** 59:19

**obligated** 23:19

**obligation** 116:25

**obtain** 136:20

**obtaining** 13:14

**obvious** 55:4

**occasions** 172:10

**occupying** 166:3

**occur** 178:19

**occurred** 172:25

occurs 130:6

odds 50:4

offensive 71:16

offer 10:20 14:6 104:18 143:2 158:15 170:22

offering 8:7,10

offers 11:11 22:14 59:14 65:1,5 66:21

office 89:11 91:2,4,19,25 99:4 151:7 168:8

officer 4:8 5:12 42:21 86:8,17, 19,25 109:4 118:2

officers 86:6 120:12

official 4:24 11:17 158:14

officially 161:16

offline 9:3

oftentimes 176:5

older 149:2 155:21

Olympian 163:19

Olympians 164:4

Olympic 88:15, 16,23 96:16

Olympics 88:16 89:7,12,18,21,23 163:14

one's 65:15

ongoing 121:22

open 7:13 14:6

opening 10:20 16:14 19:21 58:8

operate 165:17

operating 38:8 44:20 116:8 129:17 142:15

operations 129:9

opinion 6:6,21 7:18 8:4 38:25 54:12 69:22 109:18,19,20,22, 23 112:19 123:21 172:18, 23 173:15 174:23 175:25

opinions 56:19 69:12

opponent 31:3 43:15 176:5

opponents 153:7

opportunities 13:8 15:17 146:11,14 147:2 149:8

opportunity 8:10 23:16,17,22 38:8 104:9 114:24 115:13 140:21 153:12 164:23 183:11

opposed 69:12 84:18 160:15 170:23 172:13

opposite 55:22 145:4 170:14

order 97:22 130:10 137:21 138:15 180:10 183:22

ordered 52:11

orders 149:14

organization 86:21

original 22:10 58:21 61:14 98:5 156:17

Orlando 80:13

Oscar 54:20 58:17 62:23 128:23 129:3 151:13

outline 70:8

outlined 51:10

outset 19:2 54:8 134:6,20

overseas 173:22 178:14

overweight 36:9

owe 51:10

owed 13:23 34:5 45:18,19 65:13 93:25 98:16 142:8

owes 47:19 111:4

---

**P**

p.m. 184:12

pages 181:13

paid 33:21,22 89:16 93:11 96:14 99:18 101:25 102:23 113:12 114:17 115:21 124:24 140:18 152:23 157:3,18 161:7

pair 26:15

paper 29:9 85:2 94:1 109:13

papers 17:24

paragraph 22:2 27:11 28:24 73:11 125:3,15

paragraphs 126:6

paralegal 83:18

parents 96:25 164:20

parlay 33:10

part 9:22 22:1 34:19 57:7 71:18 106:3 107:2 111:24 115:8 119:24 130:3 140:5 146:4 178:17 182:13

participate 13:18

participates 125:18

participation 14:2

parties 4:10,23 5:3 7:6,11 8:10, 20 9:17 19:2 43:4 55:9 58:22 59:1 69:16 70:16 74:19 84:2,4,5, 15 121:2 138:25 147:23 171:18

parting 155:16 156:8 161:13

partner 54:6

partners 122:7

party 25:2,19,22 39:2 84:18,20 123:9 125:18

pass 162:2

past 30:11 45:12 52:19 132:10,12, 17 141:11 144:9 153:17

path 149:4

patience 28:19 153:19

Patricia 54:4 56:6

pattern 27:1,4 61:3 67:21 134:13

Paul 75:25 137:9

Paulie 172:11 177:5

Paulie's 174:13

pause 9:2 164:9

paved 152:15,22

pay 33:11 34:11 42:7 89:19 90:2, 3,4 93:23 94:7 96:10 97:3,12 102:1,6,21 104:22 106:17 107:12 125:9 130:14 156:24 161:6,7 164:24 167:21 174:9 183:8,9,24

pay-per-view 33:6

paydays 43:16

paying 88:20,21 90:20 102:23,25 117:8

payment 27:2 116:15

payments 52:11 86:11,13 103:18

payout 118:13

pays 47:12

PDFS 143:1

peace 178:1

pedigreed 122:13

pen 85:2

penalized 123:11

penalty 16:4 128:3

people 41:1 74:14 91:22 101:23 103:1 106:7 127:21 137:2 140:21 149:18,23 152:4 177:11,12

perceived 133:18

Atkinson-Baker, Inc.
www.depo.com

**percent** 17:22, 23,24,25 24:12, 13 41:18 44:25 45:25 63:5 82:3 86:12,22,24 98:5,9,10,11,12, 13,14,23 99:2, 14,15 100:7 101:11,21 102:25 103:17 106:20 108:6 110:19 124:19, 20,22 125:9 130:17,19 146:8, 13 155:2 160:12, 23 168:13 182:9

**percentage** 13:22 33:24 34:12 38:2 42:1 44:20 46:21,23 63:3 96:11 97:14,18 98:1 102:19 119:17 121:15 146:13

**percentages** 26:12 119:2 160:13

**perception** 94:8

**perform** 18:4 19:16

**performance** 171:5

**performances** 13:7

**performed** 110:13 111:6 131:23

**performing** 107:25

**period** 13:4 17:4,6 23:22 24:22 38:12 61:22 107:24 110:20 149:1 166:25

**perjury** 16:5 128:3

**person** 55:7 83:17 93:1 95:23

117:23 139:3 150:8,14

**personal** 14:22 22:9 40:13 58:9 105:22,23 106:2 123:21 154:18, 20 166:17

**personalize** 163:8

**personally** 101:25 134:17

**persons** 23:14 24:21

**perspective** 78:19 110:18 129:23 132:19

**pertinent** 179:15

**petitioner** 8:24

**Petricelli** 122:11

**phone** 2:11,17, 22 36:5 65:21 78:4 101:20 154:12 160:4 168:16 178:12, 16

**phonetic** 102:2 122:12 149:19, 22 163:2 171:1 177:15

**pick** 95:16 150:15 166:3,5

**picked** 92:24

**piece** 29:9 46:21,23 83:5 126:20

**pieces** 111:17

**pivot** 67:10

**place** 8:21 13:20 36:6 65:24 105:10 161:2,3 166:8 169:5 183:3

**plan** 33:12

**play** 8:6 49:5

**player** 60:9

**players** 79:18

**pleasure** 104:13

**plenty** 43:19 71:3 112:14 113:23

**pocket** 33:19

**point** 8:3,6,14 12:1 18:24,25 19:25 20:2 24:2 25:4 26:2 27:9 28:14 30:14 35:12 37:3 38:15,24 39:10 51:1 53:5,7 57:9 59:25 60:8,12 63:7,9,13 65:8 69:3,17 70:1,12 71:19 73:23 76:23 81:5 83:1 91:12 94:18 104:25 105:25 108:11 109:7 110:11 112:15, 19 113:18 115:19,23,24,25 116:21 117:5 119:20 127:24 128:6,9 133:15 136:16 138:23 141:14 142:2,5, 16 147:19 166:22 167:8,25 170:20 173:21 175:15,25 179:7

**pointers** 170:17

**points** 65:17 118:11 182:3

**police** 58:2

**policy** 18:19 57:15,19,20,22 58:1,5 59:19 130:4 134:5

**Porsche** 103:20

**portion** 22:4 112:19

**position** 7:20 17:17 32:24 37:9

39:11 41:4 42:6, 8 69:5 76:5 131:13 166:12

**possession** 144:6

**possibility** 8:11 20:3

**pot** 134:23

**potential** 176:3

**potentially** 12:19 29:18 79:1 134:2 159:8 175:24

**pounds** 36:24

**Powerpoint** 53:24 80:23

**practice** 2:14 52:24

**practiced** 122:9

**practicing** 68:3

**pray** 150:4

**prayers** 152:9

**praying** 154:13

**pre-arbitration** 7:8,24 8:10,22 9:12

**precuring** 108:5

**preface** 53:21

**prefer** 132:15

**preferable** 6:22

**preference** 7:23 8:1 9:23 31:5

**prefers** 10:3

**preform** 44:24

**prenegotiated** 62:17

**prepared** 5:10 7:15 53:24 71:4

**preposterous** 123:22

**presence** 74:1

**present** 4:9,11 5:3 7:15,20,21 11:1 17:10 20:15 21:4 28:8,10 53:13 54:2 77:1 99:6 114:25 164:18 179:25

**presentation** 7:17 8:2 14:17 20:8 50:20 53:22,24 77:15 94:18 112:16 115:10

**presented** 22:7 76:25 77:2 117:10 144:4

**presenting** 14:3 104:18

**presided** 28:8 179:24 180:3,5

**president** 17:7 78:5

**presiding** 11:17

**pressure** 122:19 123:1

**presumption** 133:24

**pretty** 32:18 43:10 49:8,11 63:19 71:22 98:7 106:2 118:8 133:9 163:10 172:8

**prevail** 43:15

**preventing** 24:25

**previous** 41:25 158:21 171:1,6

**previously** 10:24 12:5

**prey** 130:25

**primary** 29:25

**principle** 113:10

**prior** 11:23 27:13,22 59:3 63:10 75:16

140:11

**prison** 133:2

**privilege** 39:19

**privy** 7:10 10:12
151:15 152:25

**pro** 89:6 96:19

**problem** 30:16
36:14 71:21
115:19 116:10
118:9 127:20
128:14 130:24
140:15 141:2
143:11 181:20

**problematic**
127:18 142:23

**problems**
173:12

**procedure** 12:3
27:25 28:6 30:22

**procedures**
15:7 22:17

**proceed** 20:17
25:3 33:1 76:3
77:11 135:18
158:17 162:18
168:23

**proceeding**
25:7 121:10

**proceedings**
2:1 4:13 5:7,9,14
8:17

**proceeds** 74:20
86:10 107:14
118:25 119:16
121:4 125:21
146:8,13

**process** 65:3
127:23 180:7

**produced** 8:9
86:4

**producing**
146:9

**product** 38:11

**productive**
166:18

**professional**
59:21 60:16
86:23 88:19

**professionalis
m** 184:9

**Professions**
86:18

**proffered** 76:25

**profile** 134:24
147:5

**progress** 80:12

**Prohibits** 59:11

**promise** 6:3
74:13 125:17
182:5

**promote** 83:7

**promoter** 29:2
177:24

**promoter's**
83:8

**promoters** 58:1
153:3 174:5

**promotion**
12:19 28:7 33:17
38:9,18 42:5
43:17 81:13 98:6
99:8

**promotional**
58:21 77:24
78:10 81:6
142:14 152:24
170:17 174:14,
25 180:9

**promotions**
151:22 170:18

**prongs** 146:5

**proper** 12:8

**proposed** 7:24
175:6

**proposing**
46:22

**pros** 88:21

**protect** 18:18
57:20 60:3 130:5

131:2,3 134:12

**protecting**
56:13 59:19

**protection**
18:21 112:24

**prove** 18:16
55:23 183:2

**proven** 121:16
156:18

**provide** 24:4,7
50:13 69:24 97:1
116:25 160:17
179:14

**provided** 17:25
47:19 75:1 117:2
126:9 181:11

**provision**
29:14,15 116:3

**proxies** 80:12

**public** 18:19
57:14,20 58:1,5
59:19 130:4
134:5,12

**publicized**
123:1

**publicly** 122:17

**published**
69:22 109:18

**pull** 85:18
100:15

**pulled** 21:18
103:10

**Pulling** 28:21

**punish** 124:9

**purchased**
159:3

**purported**
108:19 111:2
121:19 125:2
131:25

**purporting**
121:4

**purpose** 56:12
85:3 99:25

180:25

**purposes** 73:6
109:9 171:23

**purse** 45:23
52:5 86:3,22,24
103:15 106:18
108:6 110:19
117:13 118:13,
25 119:3,17
120:9 126:18
127:17,18
128:11 152:23
159:1,2 160:12

**purses** 47:13
142:4 147:7
153:1,9 167:16,
22

**pursuant** 2:3
4:21

**pursue** 103:24
161:17

**pursued** 88:17

**push** 152:11

**pushing** 104:5

**put** 11:5 25:6
33:19 34:19 35:7
38:11 42:6 50:5
54:7,14 65:7
72:12 83:4 85:2
111:11 112:6
114:19 116:4,24
122:19 131:13
140:14 141:5
145:20 147:12
171:2 184:1

**putting** 19:10
62:2 129:7 145:1

___

**Q**

**qualified** 122:22
131:15

**qualify** 14:25

**quantum**
110:25

**quarter** 44:15,16

**question** 14:7,
14 20:1 24:4,9,
10 31:20,21
35:20 45:8,20
54:13 69:11 75:2
89:25 94:3
108:13 115:3,16
118:11 135:14,
23 145:19
154:23 156:1
168:3 173:10,14
174:20 179:20

**questions** 4:15
43:21 44:6,8
70:2 87:7,25
94:16 104:11
107:20 135:17,
23 144:11 148:6
156:3 158:10,13
161:21 162:23,
24 168:22 169:7,
21 172:2 175:8
179:16 180:16,
17

**Quiambao**
177:14

**quick** 10:5 26:9
30:20 48:17
69:10 98:3
100:16 118:10
119:24 169:21
171:12

**quickly** 25:6

**quote** 19:4 57:6,
8 59:17 157:3

**quoted** 11:8
138:13

___

**R**

**R-A-L-P-H**
162:12

**racketeering**
123:3,16

**raise** 87:15
115:6,12 134:24
141:21,24
142:21 164:16
169:13

**raised** 12:6,17 25:9 133:16 135:14 141:24

**raising** 147:4

**Rakhimov** 45:24 152:22

**Ralph** 3:13 12:7, 24 16:4,8,13,16, 20 17:12 25:15, 19 27:17 28:10 29:7,8 32:17 39:4 62:18,19 65:13,14,16 70:5,14 71:17,25 72:19,20 73:15, 17,20,24 75:8, 12,13,17,20,21, 23,24 76:1,8,10, 11,12,13,17,20 77:22,24 78:1,2, 13,17,20,22 79:11,25 80:3,4, 20,21,24,25 81:1,2,23 82:6,7 83:20 85:9,16, 17,19,20 86:6,7, 14,16,24 87:3 88:4,5,17,18 89:18,20 90:10, 15,16,19,21 91:6,25 92:4 93:1,2,4,10,15, 17 94:3,4,9,11, 12 95:23 96:1,8 97:2,6,24 98:15 99:5,20,23 102:2,3,22 103:6,23 104:4,5 107:9,10,13,23 108:10,19,23 110:16,19 111:5 113:2,12,17 114:3,13,15,16, 17,18 115:20 116:4,15 117:12, 16,24,25 118:2, 3,14,18,23 119:6,7 120:3 121:3,11,18 124:4,22 125:20 126:4 128:6 129:7,19 130:2,9 131:4,21 132:16,

18,23 133:21 134:2 135:24 139:7 140:9,18, 24 145:11,23 146:17 147:9 156:14 157:16, 23 161:23,24 162:7,12,14 175:2 177:4,7 179:4

**Ralph's** 73:14, 18 80:8 96:13 98:15

**ranging** 32:19

**Rank** 54:20 58:14,15,18,24 59:1,5,8 61:10 69:21 90:12 108:2 178:6

**Rank's** 58:25

**Ranks** 179:9

**rare** 182:10

**rates** 122:16

**ratified** 55:7

**Rau'shee** 96:17

**Ray** 83:6

**Ray's** 83:10

**reach** 155:4

**reached** 22:10 163:23 170:7,15 175:5

**reaching** 47:15 155:3

**read** 5:16 8:8 25:5 31:11,12 35:2 41:8 67:2 85:11 124:6 132:22 133:7 137:24 138:1,9 141:18 143:21 147:15

**reading** 80:15

**ready** 47:11 50:25

**real** 10:5 30:20 31:3 41:12 49:9 100:16 110:10 119:24 165:14 171:12 182:4

**realize** 78:24 122:22 143:14

**realized** 68:23 179:13

**rear** 151:21

**reason** 14:10 17:14 56:2 70:3 82:23 112:21 114:18 124:13 129:23 135:13 139:10 153:12

**reasonable** 47:7

**reasons** 12:24 14:19 51:11 61:5

**rebut** 172:20

**rebuttal** 144:25

**recall** 24:12 51:21 77:5 139:7

**receive** 33:23 86:21 112:25 113:7 121:19

**received** 16:25 102:9,18 108:24 117:4 119:16,17 123:12 126:11 131:22 143:17 156:16 157:1,4, 17 178:22

**receives** 86:21

**receiving** 86:9 102:7 147:3 184:10

**recent** 174:21

**recently** 17:7 72:18 132:12 158:1

**recess** 9:9 10:19 48:7,13 100:5 162:6

**recipient** 76:15

**reckoning** 119:22

**recognize** 59:9

**recollection** 73:15

**record** 4:4 5:2,6, 9 9:8,10,16 12:9, 21 13:16 48:14 53:14,17 56:10 75:3 84:18 87:12 108:23 114:24 138:7 144:20,24 145:19,21 147:14 148:4,11 149:25 160:10 162:11 169:11 173:17

**recording** 8:16, 17,20

**records** 4:25 17:25 27:13

**recount** 173:1

**recover** 42:9

**recovering** 113:7

**reduced** 45:24 122:16

**reenter** 12:1

**refer** 11:6 20:21 21:7 25:6 57:1 98:3 100:14 103:9 139:6

**reference** 20:24

**referenced** 118:24 143:23

**referencing** 77:6,15 78:1,4 79:12

**referred** 15:15 17:3 21:8 57:17, 24 59:17

**referring** 21:9 76:24 98:4 99:24 100:22

**refers** 124:25

**reflected** 12:12 13:9

**reflects** 39:11

**refusal** 89:5 130:10

**regional** 170:24 173:23

**regular** 91:22 165:17

**regulate** 116:9 126:7

**regulates** 127:23

**regulating** 56:12

**regulation** 117:21

**regulations** 57:25

**regulatory** 18:20 71:21 72:1 82:23 83:5 85:4 111:14 117:14, 17

**rehabilitated** 49:23

**rejected** 61:18, 19

**related** 84:20 100:7 119:2

**relates** 35:6 106:3 124:4 170:1

**relating** 142:3

**relationship** 13:17 15:6 19:3, 5 20:3,5 32:2,15, 23 35:4,8 47:9 73:13 74:3 78:3 79:5 84:5 88:13 97:5 107:16,18 114:14,15 129:25 130:1 133:17 134:16 146:21 154:20

157:1,5 162:24
163:17 165:14
166:21,22 167:1,
7,18 168:4,11
170:1 179:10

relaxed 19:24

relays 168:15

release 11:22
23:12 27:21
28:11 62:2,24
63:10 64:25
66:8,10,11,12
68:15 109:15
110:9 137:14

released 15:19
23:1,5,7,14
62:10,15 64:1

relevant 12:8
25:8 27:23 49:16
55:21 133:15
141:22

reliable 133:25

relied 150:16

relief 51:5

rely 166:7

remainder
34:12 74:9
112:22 124:15

remained 171:4

remaining
33:23 38:3 132:3

remains 22:10

remarks 180:21
181:8,16

rematch 152:20
175:8,18,21
176:7,11,20,25
177:22

remember
101:4 103:12,20
152:5 179:2

reminded
147:16

render 58:9

rendered 7:18
8:4

renders 71:22

Rene 75:18
103:23 104:2,4

renegotiate
26:11

renegotiated
62:15

repair 32:15

repairable
35:12

repaired 19:6

repay 27:7

repeated 140:24

replying 173:20

report 134:11
149:14,24
165:20

reported 157:23

reporter 5:6
102:11

reports 132:9
133:7

repossessed
165:25 166:9

represent 39:17
95:20 108:4
178:24

representation
74:18 85:9,15
106:10

representations 84:24

representative
28:16 51:12
108:23

representatives
12:23 29:2

represented
84:2 170:13
172:10 175:12,
13

representing
129:2 170:10

represents
116:5

reps 85:15

request 4:21
51:4,5 52:4,6
72:23 136:20
178:2 181:10

requested
181:10

requests 52:7

require 81:7

required 72:4
123:7 137:17,19
138:18,20 141:5,
9

requirement
29:12 66:19
82:24 83:2 141:1

requirements
29:4 55:10

requires 16:2,7
33:24 64:20

requiring
115:23,24,25
131:24

research 109:24

Reso 149:19

resolution
47:16 52:13

resolve 14:13
106:22 178:1

resolved 54:22
141:7 174:17

resolves 23:21
27:22

respect 64:10
66:18 67:15
119:10 157:21
175:7,9

respectfully
67:16

respond 4:14
70:3 115:15
123:11 155:7

responded
116:23 123:4

RESPONDENT
2:13

responding
51:7 144:3

response 155:5

responsibilities
135:4

responsibility
34:22

rest 65:22
111:18 112:1
126:24

restart 61:22

restarted 61:12,
16

restrained
32:20

retained 33:4
71:11

retribution
121:21 124:10

retroactively
110:16

return 13:7
121:19 157:17
176:10

revalidate 15:18

reveal 39:22

reveals 39:18

revenue 38:18
174:9 176:4

revive 55:13

rich 172:8
174:18

RICO 122:2

rights 71:8

ring 125:19

130:21 146:6,11,
13 147:2 151:8

risk 44:24

Rizzo 177:12

road 152:15,22
158:8

Robert 75:22
78:2 79:11
80:13,25 83:8
95:25 166:24,25
167:2,11,19
168:14 170:12
177:3,7

Roberto 74:3
78:23

Roger 20:20

Rojas 159:19
160:8,11,20

role 146:18

Rolex 103:20
142:9

Ron 149:19
177:12

Ronda 56:20
111:2,4 147:17

rookie 60:9

room 7:8 18:12

roughly 124:25

round 43:25

Rousey 56:21
110:24 111:1,3,
4,12,21 112:20
113:5 114:4,10,
21

RPR 2:3

rule 14:20 15:13
18:9 35:24 37:4
51:6 61:10
66:23,24 67:7,13
69:15 77:5 123:5

rules 11:24
19:24 63:24
176:9

**run** 22:5 45:4
149:23 161:9

**running** 21:15
129:9 170:4

**Russell** 49:24
159:12,15
160:21

___

**S**

**S-T-E-V-E-N**
169:12

**sack** 127:17

**Sacramento**
12:15

**sad** 13:17

**sailed** 67:12

**Sam** 149:16

**San** 122:8 179:2

**sanction** 123:12

**sanctions** 123:8

**Santa** 2:21 88:8

**sat** 11:20 16:11
73:21 98:16

**satisfied** 23:9
66:22

**satisfies** 66:19

**sauna** 36:10

**save** 50:11,18

**scenes** 116:9
151:20

**scheme** 71:21
72:1 82:23 83:5
85:4 111:14
112:23 117:15,
17

**school** 55:16
122:8

**schools** 122:14

**scrap** 170:22

**screen** 21:19
26:22 28:22

34:19 54:2,5
56:2,3,7,8 62:9
79:21 80:19
86:16 106:14,15
139:22

**scroll** 105:17

**Sean** 81:14

**seats** 129:8

**seconds** 75:6
179:18

**secret** 92:5

**secretary** 86:5
120:11,23
122:11 129:16

**section** 14:21,
25 58:8 59:10
61:20 67:6 69:15
111:19 112:15
124:2 137:23
138:16

**sections** 94:22
138:11

**secured** 5:5

**seeking** 18:18
27:1 121:12
134:11

**send** 27:16
82:20 113:7,11
127:3 143:25
181:7

**sending** 75:24
81:24 95:20
144:18

**sends** 117:18
126:10

**sense** 18:25
50:5 59:18 87:7
101:24 104:3
183:13

**sentence** 150:6

**separate** 8:15
14:19 18:7 51:19
120:22 135:12
147:23

**separated**
111:19 161:17

**separates**
176:16

**September**
32:14 60:22

**sequence** 94:20
121:7

**sequencing** 8:1

**series** 14:22

**serve** 22:8
59:11,18

**served** 4:23

**service** 58:11
122:16

**services** 5:5
14:22 17:3 22:9
58:9 111:7

**serving** 4:7

**session** 11:21
15:19

**set** 13:8 15:16
33:12 37:25
38:22 42:8,9
70:8 164:2
174:15 175:3
178:25 179:1

**sets** 43:16

**settle** 182:5

**settlement** 7:9
8:11,23 9:12,23,
24

**seven-year**
14:20 15:13 18:9
30:12 35:24
61:10,12,22
66:23,24 67:7,13
69:15

**shape** 163:8

**share** 54:5 56:1
121:4 174:9
176:4

**shared** 21:19
80:22

**shareholder**
86:20

**shares** 125:18

**sharing** 56:4
74:20,21 125:21

**sharking** 131:9

**shave** 42:14
47:14

**sheet** 77:24

**Shelby** 81:15

**shell** 131:18

**ship** 67:12 141:3

**shit** 88:11 91:22

**shocked** 152:2
183:21

**shocking**
116:10

**shopped** 24:21
153:2

**short** 164:19
167:5 181:13

**shorter** 68:10

**shortly** 32:16
140:4

**shot** 133:10
159:9

**shots** 159:19

**show** 11:7,14,
17,22 12:4,21
20:8,18 29:4
76:17 83:11
95:24 155:6
165:4

**showed** 30:4
37:3 95:22,23

**showing** 16:22
17:25 80:8 107:7

**shown** 19:22
118:6 119:2
146:15

**shows** 20:4
80:19 109:24
144:18 161:1

**side** 16:16 18:7
19:7 44:1 53:18

64:15 74:19
106:4 124:21
125:23 130:21
157:13

**sidelines** 148:7

**sides** 6:4 20:4
39:24 40:19 45:7
47:11 125:8
141:22 170:14

**sideways** 75:16

**sign** 13:6 16:7,
10,11 23:8 59:22
66:8,9 68:15
73:19,21 79:3
81:4 82:4,22,25
84:8 89:17,20
90:5 93:19 98:20
108:12 114:20
115:21 116:1
119:25 127:1
164:3,4

**signatory** 25:24

**signature** 21:4
78:18

**signed** 12:25
15:9,20 23:5
28:13 29:9 58:22
59:1 60:21,24
62:3,4,5,16,24
63:10 64:2,24
65:7 66:10
67:17,18 68:18
70:13,14 74:15
75:10 76:10,11
78:12,14 81:25
82:5,6,8 89:13
90:8,15,22 98:5
99:4,8 108:7,9
109:14 110:9
111:8 119:16
133:22 151:23
153:3 155:12
172:12 174:25
177:25

**significant**
133:2

**signing** 15:19
16:11 24:4,18
29:3 73:21
76:10,20 79:9,12

81:2 85:16 90:17,18 97:24, 25 131:5 151:25 163:24 180:5

**signings** 179:24 180:4,20

**similar** 28:6 179:5

**similarities** 112:5

**similarity** 112:6

**simple** 14:10,11

**simply** 67:25 122:19,25 170:16 173:20

**single** 116:15 119:10 180:8

**sir** 9:13 10:22 20:20 21:2,17,21 22:3,4 23:10 24:2,6,14 25:4, 11,12,14 26:5, 20,22 28:5,18,21 29:25 30:6 31:2 32:4,12 35:5 37:1,17 38:17,25 39:25 40:11,21 41:6 43:1,7,13 44:11,17 45:3,10 47:3,12 48:1,9, 16,18 49:3 51:1 56:25 62:17 70:11 71:7 77:11 79:22 95:1 100:25 106:5 108:17 109:20 110:23 112:11 115:14 120:7 124:3 136:15 139:25 140:23 141:21 142:18 143:3 144:21 148:2,8 153:12 156:12 159:8 162:9 172:3 174:20 179:18 180:16 184:6

**sit** 116:10 148:6

**sited** 56:17

**sits** 168:7

**sitting** 10:25 31:3 66:21 135:25 145:15

**situation** 33:8 35:16,25 49:24 68:17 69:7 104:7 130:6 141:22 154:25

**situations** 92:2

**skills** 43:14

**skip** 72:3 73:6 85:22

**slam** 68:5

**slides** 72:3

**slightest** 20:2

**slow** 21:15 79:16

**slowly** 5:8

**small** 151:19 153:6 170:24

**smart** 154:1

**smoothed** 152:21

**smoother** 20:23

**snapped** 159:17

**soccer** 49:7

**soft** 154:1

**softer** 153:20

**solely** 18:5 100:7 146:19 150:2

**solid** 41:12

**solved** 145:12

**son** 149:20

**Sophia** 27:11

**sophisticated** 59:25

**sort** 7:8 13:2 26:14 27:1,4 28:22 30:1 36:21

43:25 50:1 144:14 147:16

**sought** 68:24 176:17

**sounded** 7:15, 16

**sounds** 8:23,25 17:19 19:20 172:18

**source** 144:23

**soured** 84:6

**south** 2:9 133:17 134:16

**space** 15:22

**speak** 5:8 91:16 130:1 145:16 148:5 153:10 165:14 170:2 172:6 173:11

**speaking** 78:2

**specific** 136:20 146:10 149:13

**specifically** 58:6 61:13 64:20 66:25 122:2 170:3 178:3,6,23 180:11

**speculation** 48:2

**speech** 77:19

**speed** 29:20

**spell** 87:12 148:10 162:11 169:10

**Spence** 96:16

**spend** 32:13

**spiel** 77:18

**split** 50:4 78:7

**spoke** 80:24 108:21 147:8

**spoken** 82:15, 16 146:16

**sponsorship** 34:2 142:3 146:10,14

**sponsorships** 13:15 34:5 135:6 151:22

**sport** 36:14 57:13 153:15 156:7

**spot** 154:1

**spreadsheet** 116:24 157:2 160:25

**Spring** 2:9

**Springs** 5:23 183:19

**square** 34:7

**staff** 150:16

**stamp** 100:15

**standard** 115:9

**standing** 37:4

**standpoint** 35:9 37:7

**start** 5:11,16 142:10 167:11

**started** 11:9 22:12 64:21 88:9,11,14,21 98:24,25 124:12 144:16 176:2 180:3

**starting** 12:13 25:13 68:22 88:10

**starts** 68:20

**state** 4:8 5:1,2 25:25 27:19 86:5 87:12 120:12,23 122:11 148:10 162:10 169:10, 23 177:13

**stated** 10:24 18:19

**statement** 5:13

10:21 14:6 19:21 128:3 147:8 171:17

**statements** 7:4 171:19

**static** 153:24

**statute** 11:9 18:23 22:12,22 23:9 58:7,12 64:21 72:7 127:11,23 137:18

**statutes** 57:25 58:5

**statutory** 26:1 112:23

**stay** 10:13 163:8

**step** 7:10 23:10, 11,12 74:4 178:16

**stepped** 80:5,21

**stepping** 44:19

**Steve** 134:19 135:1 138:21 146:15 147:19, 20 168:21 173:4, 8,13

**Steven** 3:17 169:12,15

**stipend** 90:19

**stipulate** 40:5

**stop** 18:8 70:1 115:4

**stopped** 90:20

**story** 18:7

**strangely** 55:18

**street** 2:9,15,20 131:9

**strike** 150:5

**strikes** 63:1

**strings** 143:2

**strong** 57:19,20 159:18

**strongly** 7:20 68:11 69:4

**struck** 11:10 22:13 35:2 59:13 64:22

**structure** 11:14 37:23 76:6 97:13 122:23

**study** 62:1

**stuff** 29:10 31:4 32:23 44:4 52:17 65:22 91:5 95:21 99:1 103:20 106:7 108:14 110:22 111:18, 23 112:7 126:24 133:9 136:7 139:10 144:15 147:17

**subject** 116:3 132:7

**submission** 21:14 116:24

**submissions** 20:4

**submit** 54:24 181:14

**submitted** 6:13 8:13 16:13,22,24 18:6 20:10 29:23 55:18 72:11,16 74:8 76:17 77:16 78:22 92:9 119:7,8,13 124:6

**submitting** 85:4

**subparagraph** 26:17 28:15 140:7

**subsection** 137:23 138:12, 13

**subsequent** 22:9 42:14 48:21 55:7 63:11

**succeed** 33:15 161:4,10

**success** 37:8 42:10 151:5

**sudden** 158:2

**suddenly** 129:17

**sufficient** 18:17

**Sugar** 83:6,10

**suggest** 41:12

**suggestions** 174:6,8

**suitable** 134:3

**Suite** 2:10,21

**summarizing** 56:17

**summary** 54:23 68:7

**summation** 20:7 115:9

**summer** 177:5

**superceded** 59:3 61:14

**superceding** 61:23

**supervising** 2:8 4:11 137:4,5,7

**supplemental** 144:8

**supported** 111:5,12

**supports** 64:15

**suppose** 52:22

**supposed** 63:5 64:4 99:15,22 131:2 158:21

**supposedly** 94:1

**swear** 75:5 87:10 148:9

**swim** 136:19

**sworn** 74:6 87:18 119:8 148:15 162:15

169:16

**system** 18:20

**systematically** 17:17

---

**T**

**T-O-N-Y** 102:16

**table** 11:25 17:11 29:17 30:7 33:7 130:22

**tactic** 140:25

**tactics** 124:9 134:15

**takes** 127:14,15, 19

**taking** 9:22 39:7 68:21 96:24,25 98:1 117:13 129:13 130:16, 17 137:2 140:13 146:7

**talk** 18:14,22 36:6 44:18 46:4, 7 64:16 70:10 77:20 90:7,21,24 91:18,22 116:18 123:23 136:18 142:5 145:22 168:21

**talked** 36:3 45:14 66:25 76:1 90:25 91:1 108:1 129:21 140:16 147:20 154:12 164:5,8,21

**talking** 6:16,17 8:16 15:6,12 22:21 44:13 45:8 47:1 48:24 49:15 63:16 75:22,23 78:5 79:18 87:24 88:10 90:12 94:6 99:14 102:19 104:16 110:3,5 111:22 124:10 126:3,14 135:8 137:8 140:20

151:11 157:11 159:4 171:24 173:6

**talks** 149:15

**targeted** 163:19

**tarnished** 159:25

**task** 150:9

**taxes** 183:8

**teammates** 96:16

**teams** 10:11

**tease** 32:11

**Tecate** 34:4 142:6

**technical** 6:25 142:21

**teenager** 59:23 130:11

**telephone** 9:19

**telling** 96:14 99:1

**ten** 23:7 48:8 60:9,14 61:2 66:19,22 93:4 106:7 122:14 144:9 163:2 179:17

**ten-year** 15:6

**tend** 109:14

**tended** 26:13

**Teofimo** 177:17

**term** 13:5,24 15:23 16:17 22:11 58:21,23, 25 59:4,6 60:22 61:13,17 64:12, 14 65:6 66:25 77:24 81:2 118:19 131:8

**terminate** 18:10 59:9

**terminated**

14:18 17:16 69:8 180:10

**terminating** 47:15

**termination** 56:21

**terms** 12:9 13:6, 11,15 16:23 26:17,24 34:10 63:11 70:22 73:18 77:25 78:6 86:18 96:7 119:13 130:3 139:2 145:2 155:9 172:4

**Terrel** 96:17

**terrible** 155:13

**test** 22:25 60:5 61:12 66:20 69:3

**tested** 131:14

**testified** 87:19 107:21 145:6 148:16 162:16 169:17

**testify** 72:17 76:9 85:23 170:7 176:13

**testifying** 150:19

**testimony** 6:9, 20 13:10 20:23 72:16 74:6,10 95:7,12 100:12 160:15,17 172:18,24 173:1 175:10 179:15

**Tevin** 16:23 75:21 76:2 101:6 103:24,25 104:10,24 105:4, 6,10 119:12 152:16 159:20 175:3

**Texas** 150:11

**texted** 154:10 155:5

theme 27:8

thing 6:7 8:15 20:21 24:11 27:5 32:10 33:13 34:18 35:2,15 36:17,21 37:15 40:3,17,24 43:11 44:15 48:17 52:22 54:5 62:10 64:1 65:25 68:16 75:4 79:20 81:10 83:10 91:17 92:17 94:4 112:15 113:17 114:5 123:24 129:10 134:10, 22 138:9 144:16 147:9 154:13 165:16 168:5 178:5 182:1 184:2

thing's 50:12

things 5:18 6:18 20:13 22:6 27:24 31:7,19 33:25 34:14 39:3 40:14,19 52:12 55:23 80:16,21 83:9 84:7,15 92:1,8 111:9 121:13 124:25 125:9 143:5 149:24 151:1 155:14,15 160:19 173:6 175:9,24 178:1 179:6 183:6,20

thinking 31:13 62:9 104:17

thinks 40:3 41:2 50:16 84:19

thought 23:24 36:23 45:5 72:19 76:13 82:5,11 85:18 115:16 147:15 167:16, 22 172:8,25 173:10 177:9 182:4

thoughts 69:25

thousand 155:2

thousands 180:3

threat 133:19 177:23

threaten 137:14

threatened 57:14

threatening 170:21

threats 133:10

threw 171:8

throw 156:9

THURSDAY 4:2

tickets 140:17, 18

tie 37:19

tight 148:18

Tim 149:19 177:14

time 4:19 5:8,12 6:1 7:1,7,17 8:7 12:1 13:24 15:22 17:4,6 20:13 24:22 29:12,21 30:6,10,17 32:13,15 36:24 37:14 38:12 40:15 43:5,20,21 44:5 47:23,24 48:4 49:6 50:11, 19 52:8,18 53:1, 6,10 56:19 65:13 67:10,18 68:20 71:3 73:8 75:14, 15 82:14,15 89:8,11 91:13,18 93:3,8 95:10 96:23,24 98:16, 20 103:1 104:6 112:14 115:6,11 128:6 129:20 132:14 133:2 135:17 136:7,10, 24 138:2 142:23 145:16 148:1 149:1 151:18

152:9 155:5 158:11 159:19 160:19 163:4,22 164:14,18 165:8 166:3,18,22,25 167:3 168:25 170:3,6,21 171:10,14,22,24 177:16 178:18 184:1,3,5,12

timeline 178:3

times 36:15 49:5 52:11,18 63:16 120:4 129:21 133:7 142:16 144:22 155:4 177:2

Tinsters 163:2

tirelessly 16:25

title 159:9,19 160:21 166:1 170:24 171:6 173:23 174:19 175:4,14,20,22 176:3,8 177:6

titled 58:20

titles 159:23

today 4:11 11:3 13:1,16 17:10 18:10 19:1 35:15 42:18,24 44:9 45:9 46:22 48:3 53:14 54:14 55:2,19 57:6 71:18 82:14,20 91:13 108:18 117:22 125:20 130:5 143:8 155:16 157:12 161:13,17 181:3 182:12

today's 4:13,19 5:9,13

toes 178:16

told 39:12,13,20 45:13 47:10 51:11,17,23 52:25 68:2 75:20 91:10 92:17,20

96:1 97:8,22 98:22 110:13 121:10 132:12, 23,25 133:18 134:20,21 135:5 146:22 147:8 152:3,4 155:18 160:11 164:1,7, 22 173:20 175:14,23 178:12,24

Tony 102:4,14, 15,16 103:2

toothless 71:22

top 54:20 58:14, 15,17,24,25 59:1,5,8 61:10 69:21 90:12 101:8 105:20 108:2 120:2 122:13,16 178:6 179:9

topics 94:17

total 60:18 101:17

totaled 118:23

totally 114:3 135:11 143:11

totals 103:19

touched 131:19

touches 171:3

Tovali 149:22

town 178:13

track 49:23 116:1

tracker 12:16

tracking 27:17 44:4

traded 122:17

trafficking 132:22

train 163:7,8

trainer 151:12 171:10

training 88:9 91:20 92:11,14 93:7 103:3 171:4

Trampler 178:6

transaction 127:24

TRANSCRIPT 2:1

transparent 122:25 146:9

transpires 9:17

trash 151:11

travel 164:21

treating 39:7

trials 88:15,16, 24

true 11:12 15:10 18:14 22:15 27:14 59:15 65:1 69:1 74:25 79:25 80:4 82:7 104:14 130:21 134:10 182:7

trust 17:17

turn 5:12 44:19 58:4 117:17 147:5 171:18 179:6 180:24

turned 46:6 82:7 85:21 89:6 135:7 146:22

turning 20:13 89:3

turpitude 133:24

Twitter 32:18

type 81:9 83:12, 13 98:1 103:5 147:5 173:25

types 52:14 148:25

typical 97:4

Atkinson-Baker, Inc.
www.depo.com

**U**

**Uber** 166:2

**UFC** 81:14
111:7,8

**Uh-huh** 106:23

**ultimate** 4:17
79:2 128:22
132:22

**ultimately**
105:10 106:16

**un-enforceability**
55:24

**uncertain** 13:10

**uncomfortable**
132:7

**uncommon**
66:8

**underneath**
154:14

**underscores**
107:13

**understand**
5:20 18:17 26:6
29:16 32:12 47:3
64:2 71:1 72:14
79:17 88:25
95:12 100:8
106:8 110:11
122:1 123:19
126:16 136:19
138:5 140:12,15
141:20 142:1
156:23 180:25
182:21 183:13
184:1

**understanding**
5:4 45:21,23
59:25 72:17
89:15 104:23
105:1 129:9

**understands**
23:18

**understood**
21:17 44:21

45:10 49:3 52:9
112:3 147:18

**underworld**
57:12 134:9

**undisputed**
14:16

**undocumented**
126:12 130:7
131:8

**unenforceable**
54:17 73:5

**unheard** 81:9

**uninterrupted**
15:23 60:18

**unique** 68:17
69:6

**unlicensed**
16:3,5,16 70:5
72:10,15 79:25
86:1,9 107:24
116:13 117:7,8
119:19 121:2
128:16

**unpack** 59:18

**unpublished**
69:17,18 109:24

**unqualified**
141:13

**unquote** 157:3

**unsupervised**
137:3

**untenable**
32:24

**unusually**
57:19,20

**upfront** 98:2

**uphold** 55:24

**upholds** 18:21

**upset** 6:3 40:19
134:21 152:20
160:2,3

**urgent** 73:17

**user** 19:12

**usurp** 135:3

**utilize** 37:20

**utilized** 174:2

**V**

**Valerie** 149:22

**valid** 6:10 12:5
14:9,19 23:2
30:1,4 31:15,16,
17,24,25 32:7
35:21,23 37:13
39:6 40:23 44:5
54:16 64:8 84:9,
14 85:20 110:8,
13 121:17 145:9
182:18,25
183:18

**validate** 27:15

**validated**
108:21

**validity** 24:8
51:6,18 55:8

**valve** 65:1

**Vargas** 150:1
167:20

**Vasquez** 2:23
56:1 143:19

**Vazquez** 54:6

**verify** 132:25

**versus** 54:20
56:16 57:17
58:14 69:19,21
142:3 147:14

**vetted** 69:15

**VGC** 2:20 35:7,
10 121:24 122:2
123:3 136:21,24
137:10,16
140:14 147:21

**victimized**
122:23

**view** 31:22 42:7
50:2 76:4 117:19
130:25 132:15,

16 146:25 174:9

**viewed** 67:15
76:8 110:12
114:15,16

**vigorously** 13:6

**violated** 15:11
111:14 112:23

**violation** 72:7,8
127:10,25
129:18

**virtually** 4:10,20

**vis-à-vis** 84:17
96:5

**visceral** 32:16

**visits** 93:4

**void** 14:15
15:13,18 55:6
61:4 79:23 80:7

**voids** 80:2

**voluntarily**
67:24

**voluntary** 67:19
175:4

**vulnerability**
57:10

**vulnerable** 60:8

**W**

**wait** 25:10 62:7

**waive** 55:10

**waived** 55:9
67:6,15

**walk** 11:25
23:15,23 65:18
101:3 179:21
180:12

**walked** 23:23

**walking** 50:8

**Walter** 149:17

**wanted** 8:19
32:10 52:23
53:6,21 65:18

66:2 75:17 87:24
88:18 94:17
96:1,2,14 97:23
98:22 103:23,24,
25 104:6 106:22
135:20 143:12
147:12,13,20
154:7,10 155:2,
4,8 159:24,25
161:4 164:2,3
165:4 166:11
167:21 171:9,21
174:7 184:2

**wanting** 41:9
144:19

**war** 135:14

**Ward** 22:23
35:25 67:3,5

**warranties**
85:15

**Warren** 96:17
122:10

**wash** 164:15,16

**Washington**
2:16

**waste** 30:6 44:5

**watch** 155:23

**watched** 5:22

**Watson** 149:16

**Watson's** 152:6

**wax** 46:9

**ways** 155:16
156:8 161:13
175:23

**WBC** 159:9,16

**weather** 50:1

**website** 86:5
120:12,23

**Wednesday**
181:11,15

**week** 53:2
171:19 181:12
184:11

Atkinson-Baker, Inc.
www.depo.com

**weeks** 82:7
154:9,15

**weigh** 83:24

**weight** 36:11,13,
16,20,22 37:2,6
42:9 46:13
160:9,11,20

**welcomed**
122:18

**whatnot** 103:19

**whatsoever**
23:20

**whim** 44:22

**whispered**
155:18

**white** 14:20
68:1,6 81:14

**Whitman** 179:9

**wide** 32:18

**Will's** 183:15

**William** 2:8 4:6

**William.
gardner@doj.
ca.gov** 2:11

**win** 155:16,17
159:8

**winning** 88:14
159:7

**wins** 41:15
43:13 46:16
159:6 175:20
176:19 182:9

**wise** 172:10
176:17

**withdraw**
123:10

**withdrew**
123:14

**withhold** 52:4

**witnesses**
87:11

**woman** 129:17

**won** 88:15 171:5
177:6

**wondering**
173:14

**word** 34:21,22,
24 123:12

**words** 6:15
16:13 34:23
44:16 73:11
85:19 122:4

**work** 6:5,19,21
9:20 35:8 38:11
40:8 44:11 45:6
71:6 112:17
128:19 151:6
154:19,20 155:8
161:19 168:6
177:13 178:1
180:20

**worked** 13:4
15:15 16:24
70:18 82:12
89:10

**working** 38:10
70:21 83:20,21
104:13 113:25
114:1,6,8 139:9
150:12 163:22
164:12 165:13

**workout** 93:9

**works** 41:18
64:10 81:18
105:3 127:8
128:18 139:15
151:20 163:22
179:23 183:8

**world** 13:8 36:8
141:13 150:8
159:18,23
160:21 167:20
171:5 172:11,15
174:19 175:4,12,
20,22 176:18
177:6

**worn** 169:24

**worries** 143:16

**worry** 117:16

**worse** 179:6

**worth** 36:1
37:15,16 40:24
41:21,22 44:15
48:25 50:13,14,
17 52:17 53:15
69:1 109:13
117:18 152:1
156:4 167:22
182:19,20

**worthy** 151:12

**wrap** 179:20

**wrapped** 123:25

**wrath** 154:3

**write** 29:8 43:3
52:16 113:4
156:15

**writing** 78:20
120:7 125:5,7

**written** 53:20
78:16 86:3
109:13 117:23,
24 118:13,18,21,
22 124:19
126:10 130:13
171:20 181:10,
11

**wrong** 7:16
39:14 101:23
183:2

**wrote** 54:20 55:6
59:10 104:5
106:12 116:22
120:5 135:2

**Y**

**Yalen** 178:7,10,
24

**Yalen's** 178:11

**year** 12:13 36:8
88:22 96:18,19
109:12 121:21
132:13,17 157:4
177:18

**years** 11:8 14:23
15:3,24,25 22:9,

11,12 37:20
58:10,22 59:7,
12,22 60:9,13,
14,19 61:2
63:22,23 64:18,
21 67:23 68:3,9
69:2 88:6 110:15
122:10 132:3
152:12,13
155:12,19 157:8
158:1 163:3
174:16 175:1

**yesterday** 36:3
144:1

**York** 122:7
177:13

**young** 136:25
152:5

**youthful** 133:6,8

**Z**

**Zambrano** 2:8
4:12 9:20

**Zoom** 4:21 5:18
9:18 10:5,7,14
82:15

# Exhibit L

<table>
<tr><td colspan="2"><strong>Fill in this information to identify your case:</strong></td></tr>
</table>

United States Bankruptcy Court for the:

CENTRAL DISTRICT OF CALIFORNIA

Case number *(if known)* _____

Chapter you are filing under:

■ Chapter 7
☐ Chapter 11
☐ Chapter 12
☐ Chapter 13

☐ Check if this is an amended filing

## Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy

**12/22**

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

| Part 1: | Identify Yourself |
| --- | --- |

|  | | **About Debtor 1:** | **About Debtor 2 (Spouse Only in a Joint Case):** |
| --- | --- | --- | --- |
| **1.** | **Your full name** <br><br> Write the name that is on your government-issued picture identification (for example, your driver's license or passport). <br><br> Bring your picture identification to your meeting with the trustee. | **Joseph** <br> First name <br><br> **Pedroza** <br> Middle name <br><br> **Diaz, Jr.** <br> Last name and Suffix (Sr., Jr., II, III) | First name <br><br> Middle name <br><br> Last name and Suffix (Sr., Jr., II, III) |
| **2.** | **All other names you have used in the last 8 years** <br><br> Include your married or maiden names and any assumed, trade names and *doing business as* names. <br><br> Do NOT list the name of any separate legal entity such as a corporation, partnership, or LLC that is not filing this petition. | | |
| **3.** | **Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | xxx-xx-7806 | |

| Debtor 1 | **Joseph Pedroza Diaz, Jr.** | Case number *(if known)* | |

| | **About Debtor 1:** | **About Debtor 2 (Spouse Only in a Joint Case):** |
|---|---|---|
| **4.** **Your Employer Identification Number (EIN), if any.** | | |
| | EIN | EIN |

| | | |
|---|---|---|
| **5.** **Where you live** | **204 N. Grand Ave**<br>**Covina, CA 91724** | **If Debtor 2 lives at a different address:** |
| | Number, Street, City, State & ZIP Code | Number, Street, City, State & ZIP Code |
| | **Los Angeles** | |
| | County | County |
| | **If your mailing address is different from the one above, fill it in here.** Note that the court will send any notices to you at this mailing address. | **If Debtor 2's mailing address is different from yours, fill it in here.** Note that the court will send any notices to this mailing address. |
| | Number, P.O. Box, Street, City, State & ZIP Code | Number, P.O. Box, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| **6.** **Why you are choosing *this district* to file for bankruptcy** | *Check one:*<br><br>■ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) | *Check one:*<br><br>☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) |

Debtor 1   **Joseph Pedroza Diaz, Jr.**

Case number *(if known)* _____

| Part 2: | **Tell the Court About Your Bankruptcy Case** |
|---|---|

**7.** **The chapter of the Bankruptcy Code you are choosing to file under**

*Check one.* (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010))*. Also, go to the top of page 1 and check the appropriate box.

- ■ Chapter 7
- ☐ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13

**8.** **How you will pay the fee**

- ■ **I will pay the entire fee when I file my petition**. Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

- ☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

- ☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

**9.** **Have you filed for bankruptcy within the last 8 years?**

- ■ No.
- ☐ Yes.

| | | | | |
|---|---|---|---|---|
| District | _____ | When | _____ | Case number | _____ |
| District | _____ | When | _____ | Case number | _____ |
| District | _____ | When | _____ | Case number | _____ |

**10.** **Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

- ■ No
- ☐ Yes.

| | | | |
|---|---|---|---|
| Debtor | _____ | Relationship to you | _____ |
| District | _____ When _____ | Case number, if known | _____ |
| Debtor | _____ | Relationship to you | _____ |
| District | _____ When _____ | Case number, if known | _____ |

**11.** **Do you rent your residence?**

- ☐ No.   Go to line 12.
- ■ Yes.  Has your landlord obtained an eviction judgment against you?

  - ■ No. Go to line 12.

  - ☐ Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it with this bankruptcy petition.

| Debtor 1 | Joseph Pedroza Diaz, Jr. | Case number *(if known)* |
|---|---|---|

---

| **Part 3:** | **Report About Any Businesses You Own as a Sole Proprietor** |
|---|---|

**12. Are you a sole proprietor of any full- or part-time business?**

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

☐ No.   Go to Part 4.

☑ Yes.   Name and location of business

**Joseph Pedroza Diaz, Jr.**
Name of business, if any

**204 N. Grand Ave**
**Covina, CA 91724**
Number, Street, City, State & ZIP Code

*Check the appropriate box to describe your business:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☑ None of the above

**13. Are you filing under Chapter 11 of the Bankruptcy Code, and are you a *small business debtor* or a debtor as defined by 11 U.S.C. § 1182(1)?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor or a debtor choosing to proceed under Subchapter V so that it can set appropriate deadlines. If you indicate that you are a small business debtor or you are choosing to proceed under Subchapter V, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).*

☑ No.   I am not filing under Chapter 11.

☐ No.   I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes.   I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I do not choose to proceed under Subchapter V of Chapter 11.

☐ Yes.   I am filing under Chapter 11, I am a debtor according to the definition in § 1182(1) of the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

---

| **Part 4:** | **Report if You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention** |
|---|---|

**14. Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

☑ No.

☐ Yes.   What is the hazard?   _____

If immediate attention is needed, why is it needed?   _____

Where is the property?   _____
Number, Street, City, State & Zip Code

---

| Debtor 1 | Joseph Pedroza Diaz, Jr. | | Case number *(if known)* |
|---|---|---|---|

**Part 5:     Explain Your Efforts to Receive a Briefing About Credit Counseling**

**15.  Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**

*You must check one:*

■ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy. If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

Debtor 1    Joseph Pedroza Diaz, Jr.                                              Case number (if known)

**Part 6:    Answer These Questions for Reporting Purposes**

16.  **What kind of debts do you have?**

16a.   Are your debts primarily consumer debts? *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☐ No. Go to line 16b

■ Yes. Go to line 17.

16b.   Are your debts primarily business debts? *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.

☐ Yes. Go to line 17.

16c.   State the type of debts you owe that are not consumer debts or business debts

---

17.  **Are you filing under Chapter 7?**

☐ No.    I am not filing under Chapter 7. Go to line 18.

**Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?**

■ Yes    I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

■ No

☐ Yes

18.  **How many Creditors do you estimate that you owe?**

| | | |
|---|---|---|
| ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

19.  **How much do you estimate your assets to be worth?**

| | | |
|---|---|---|
| ■ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

20.  **How much do you estimate your liabilities to be?**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ■ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**Part 7:    Sign Below**

For you    I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Joseph Pedroza Diaz, Jr.                              Signature of Debtor 2
Signature of Debtor 1

Executed on    **February 14, 2024**              Executed on
                MM / DD / YYYY                                      MM / DD / YYYY

---

Debtor 1    **Joseph Pedroza Diaz, Jr.**                                    Case number *(if known)* _____

---

**For your attorney, if you are represented by one**

**If you are not represented by an attorney, you do not need to file this page.**

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

**/s/ Kevin Tang**                                      Date    **February 15, 2024**
Signature of Attorney for Debtor                                MM / DD / YYYY

**Kevin Tang**
Printed name

**Tang & Associates**
Firm name

**17011 Beach Blvd Suite 900**
**Huntington Beach, CA 92647**
Number, Street, City, State & ZIP Code

Contact phone    **714-594-7022**              Email address    **kevin@tang-associates.com**

**291051 CA**
Bar number & State

---

Official Form 101          **Voluntary Petition for Individuals Filing for Bankruptcy**          page 7

**STATEMENT OF RELATED CASES**
**INFORMATION REQUIRED BY LBR 1015-2**
**UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA**

1. A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, his/her spouse, his or her current or former domestic partner, an affiliate of the debtor, any copartnership or joint venture of which debtor is or formerly was a general or limited partner, or member, or any corporation of which the debtor is a director, officer, or person in control, as follows: (Set forth the complete number and title of each such of prior proceeding, date filed, nature thereof, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

2. (If petitioner is a partnership or joint venture) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor or an affiliate of the debtor, or a general partner in the debtor, a relative of the general partner, general partner of, or person in control of the debtor, partnership in which the debtor is a general partner, general partner of the debtor, or person in control of the debtor as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of the proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

3. (If petitioner is a corporation) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, or any of its affiliates or subsidiaries, a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is general partner, a general partner of the debtor, a relative of the general partner, director, officer, or person in control of the debtor, or any persons, firms or corporations owning 20% or more of its voting stock as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

4. (If petitioner is an individual) A petition under the Bankruptcy Reform Act of 1978, including amendments thereof, has been filed by or against the debtor within the last 180 days: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed at **Covina**                          , California.

Date:        **February 14, 2024**

**Joseph Pedroza Diaz, Jr.**
Signature of Debtor 1

Signature of Debtor 2

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**F 1015-2.1.STMT.RELATED.CASES**

October 2018                                      Page 1

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | **Joseph Pedroza Diaz, Jr.** |
| | First Name     Middle Name     Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name     Middle Name     Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number | |
| (if known) | |

☐ Check if this is an amended filing

## Official Form 106Sum
## Summary of Your Assets and Liabilities and Certain Statistical Information          12/15

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Fill out all of your schedules first; then complete the information on this form. If you are filing amended schedules after you file your original forms, you must fill out a new *Summary* and check the box at the top of this page.**

### Part 1:   Summarize Your Assets

| | **Your assets**<br>Value of what you own |
|---|---|
| 1. **Schedule A/B: Property** (Official Form 106A/B) | |
| 1a. Copy line 55, Total real estate, from Schedule A/B.......................................... | $          0.00 |
| 1b. Copy line 62, Total personal property, from Schedule A/B................................. | $       29,050.97 |
| 1c. Copy line 63, Total of all property on Schedule A/B......................................... | $       29,050.97 |

### Part 2:   Summarize Your Liabilities

| | **Your liabilities**<br>Amount you owe |
|---|---|
| 2. *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 106D) | |
| 2a. Copy the total you listed in Column A, *Amount of claim,* at the bottom of the last page of Part 1 of *Schedule D...* | $          0.00 |
| 3. *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 106E/F) | |
| 3a. Copy the total claims from Part 1 (priority unsecured claims) from line 6e of *Schedule E/F*............................... | $        546.00 |
| 3b. Copy the total claims from Part 2 (nonpriority unsecured claims) from line 6j of *Schedule E/F*........................... | $      72,731.00 |
| **Your total liabilities** | $       73,277.00 |

### Part 3:   Summarize Your Income and Expenses

| | |
|---|---|
| 4. *Schedule I: Your Income* (Official Form 106I)<br>Copy your combined monthly income from line 12 of *Schedule I*............................... | $       1,000.00 |
| 5. *Schedule J: Your Expenses* (Official Form 106J)<br>Copy your monthly expenses from line 22c of *Schedule J*.......................... | $         975.00 |

### Part 4:   Answer These Questions for Administrative and Statistical Records

6. **Are you filing for bankruptcy under Chapters 7, 11, or 13?**

   ☐ No. You have nothing to report on this part of the form. Check this box and submit this form to the court with your other schedules.

   ■ Yes

7. **What kind of debt do you have?**

   ■ **Your debts are primarily consumer debts.** *Consumer debts* are those "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Fill out lines 8-9g for statistical purposes. 28 U.S.C. § 159.

   ☐ **Your debts are not primarily consumer debts.** You have nothing to report on this part of the form. *Check this box* and submit this form to the court with your other schedules.

Software Copyright (c) 1996-2023 Best Case, LLC - www.bestcase.com

Debtor 1    **Joseph Pedroza Diaz, Jr.**                                          Case number *(if known)*

8.   **From the *Statement of Your Current Monthly Income*:** Copy your total current monthly income from Official Form
     122A-1 Line 11; **OR**, Form 122B Line 11; **OR**, Form 122C-1 Line 14.                        $              5,000.00

9.   **Copy the following special categories of claims from Part 4, line 6 of *Schedule E/F*:**

| From Part 4 on *Schedule E/F*, copy the following: | Total claim |
|---|---|
| 9a. Domestic support obligations (Copy line 6a.) | $          546.00 |
| 9b. Taxes and certain other debts you owe the government. (Copy line 6b.) | $          0.00 |
| 9c. Claims for death or personal injury while you were intoxicated. (Copy line 6c.) | $          0.00 |
| 9d. Student loans. (Copy line 6f.) | $          0.00 |
| 9e. Obligations arising out of a separation agreement or divorce that you did not report as priority claims. (Copy line 6g.) | $          0.00 |
| 9f. Debts to pension or profit-sharing plans, and other similar debts. (Copy line 6h.) | +$          0.00 |
| 9g. **Total.** Add lines 9a through 9f. | $          546.00 |

Software Copyright (c) 1996-2023 Best Case, LLC - www.bestcase.com

| Fill in this information to identify your case and this filing: | | | |
|---|---|---|---|
| Debtor 1 | **Joseph Pedroza Diaz, Jr.** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse, if filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| Case number | | | |

☐ Check if this is an amended filing

Official Form 106A/B

# Schedule A/B: Property

12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:** Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

   ■ No. Go to Part 2.
   ☐ Yes. Where is the property?

**Part 2:** Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

   ■ No
   ☐ Yes

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
   *Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

   ■ No
   ☐ Yes

5. **Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here**...........................................................................................=>

   | $0.00 |
   |---|

**Part 3:** Describe Your Personal and Household Items

**Do you own or have any legal or equitable interest in any of the following items?**

Current value of the portion you own?
Do not deduct secured claims or exemptions.

6. **Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware
   ☐ No
   ■ Yes. Describe.....

   | Home furnishings | $500.00 |
   |---|---|

| Debtor 1 | **Joseph Pedroza Diaz, Jr.** | | Case number *(if known)* |

**7. Electronics**

*Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games

☐ No

■ Yes. Describe.....

| Electronics | $300.00 |

**8. Collectibles of value**

*Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles

■ No

☐ Yes. Describe.....

**9. Equipment for sports and hobbies**

*Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments

☐ No

■ Yes. Describe.....

| Boxing Equipment | $3,000.00 |

**10. Firearms**

*Examples:* Pistols, rifles, shotguns, ammunition, and related equipment

■ No

☐ Yes. Describe.....

**11. Clothes**

*Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories

☐ No

■ Yes. Describe.....

| Clothes | $250.00 |

**12. Jewelry**

*Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver

■ No

☐ Yes. Describe.....

**13. Non-farm animals**

*Examples:* Dogs, cats, birds, horses

■ No

☐ Yes. Describe.....

**14. Any other personal and household items you did not already list, including any health aids you did not list**

■ No

☐ Yes. Give specific information.....

**15. Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here .............................................................** | $4,050.00 |

**Part 4:** Describe Your Financial Assets

Do you own or have any legal or equitable interest in any of the following? | **Current value of the portion you own?** Do not deduct secured claims or exemptions.

| Debtor 1 | **Joseph Pedroza Diaz, Jr.** | Case number *(if known)* |
|---|---|---|

**16. Cash**
*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition

■ No
☐ Yes.................................................................................................................................

**17. Deposits of money**
*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.

☐ No
■ Yes......................         Institution name:

| | 17.1. | **Checking** | **Chase** | | **$0.97** |
|---|---|---|---|---|---|

**18. Bonds, mutual funds, or publicly traded stocks**
*Examples:* Bond funds, investment accounts with brokerage firms, money market accounts

■ No
☐ Yes..................         Institution or issuer name:

**19. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**

■ No
☐ Yes. Give specific information about them...................
         Name of entity:                                          % of ownership:

**20. Government and corporate bonds and other negotiable and non-negotiable instruments**
*Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
*Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.

■ No
☐ Yes. Give specific information about them
         Issuer name:

**21. Retirement or pension accounts**
*Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans

■ No
☐ Yes. List each account separately.
         Type of account:                Institution name:

**22. Security deposits and prepayments**
Your share of all unused deposits you have made so that you may continue service or use from a company
*Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others

■ No
☐ Yes. ....................         Institution name or individual:

**23. Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)

■ No
☐ Yes.............         Issuer name and description.

**24. Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).

■ No
☐ Yes.............         Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

**25. Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**

■ No
☐ Yes. Give specific information about them...

**26. Patents, copyrights, trademarks, trade secrets, and other intellectual property**
*Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements

■ No
☐ Yes. Give specific information about them...

| Debtor 1 | Joseph Pedroza Diaz, Jr. | Case number *(if known)* |
|---|---|---|

**27. Licenses, franchises, and other general intangibles**
*Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses

■ No
☐ Yes. Give specific information about them...

| Money or property owed to you? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

**28. Tax refunds owed to you**
■ No
☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

**29. Family support**
*Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement

■ No
☐ Yes. Give specific information......

**30. Other amounts someone owes you**
*Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay, workers' compensation, Social Security benefits; unpaid loans you made to someone else

■ No
☐ Yes. Give specific information..

**31. Interests in insurance policies**
*Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance

■ No
☐ Yes. Name the insurance company of each policy and list its value.
Company name:                    Beneficiary:                    Surrender or refund value:

**32. Any interest in property that is due from someone who has died**
If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.

■ No
☐ Yes. Give specific information..

**33. Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
*Examples:* Accidents, employment disputes, insurance claims, or rights to sue

■ No
☐ Yes. Describe each claim.........

**34. Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
■ No
☐ Yes. Describe each claim.........

**35. Any financial assets you did not already list**
☐ No
■ Yes. Give specific information..

| Account Receivable from Golden Boy Promotion for Purse | $25,000.00 |
|---|---|

**36. Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here.....................................................................................................................**   | $25,000.97 |

**Part 5:** Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.

**37. Do you own or have any legal or equitable interest in any business-related property?**
■ No. Go to Part 6.

| Debtor 1 | **Joseph Pedroza Diaz, Jr.** | | Case number *(if known)* | |

☐ Yes. Go to line 38.

| **Part 6:** | **Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.** |
|---|---|
| | If you own or have an interest in farmland, list it in Part 1. |

46. **Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**

   ■ No. Go to Part 7.

   ☐ Yes. Go to line 47.

| **Part 7:** | **Describe All Property You Own or Have an Interest in That You Did Not List Above** |
|---|---|

53. **Do you have other property of any kind you did not already list?**
   *Examples:* Season tickets, country club membership

   ■ No

   ☐ Yes. Give specific information.........

54. **Add the dollar value of all of your entries from Part 7. Write that number here** ................................... | $0.00 |

| **Part 8:** | **List the Totals of Each Part of this Form** |
|---|---|

55. **Part 1: Total real estate, line 2** ........................................................................................... | $0.00 |

56. **Part 2: Total vehicles, line 5** | $0.00 |
57. **Part 3: Total personal and household items, line 15** | $4,050.00 |
58. **Part 4: Total financial assets, line 36** | $25,000.97 |
59. **Part 5: Total business-related property, line 45** | $0.00 |
60. **Part 6: Total farm- and fishing-related property, line 52** | $0.00 |
61. **Part 7: Total other property not listed, line 54** + | $0.00 |

62. **Total personal property.** Add lines 56 through 61... | $29,050.97 | Copy personal property total | $29,050.97 |

63. **Total of all property on Schedule A/B.** Add line 55 + line 62 | $29,050.97 |

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Joseph Pedroza Diaz, Jr.** |
| | First Name  Middle Name  Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name  Middle Name  Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number | |
| (if known) | |

☐ Check if this is an amended filing

## Official Form 106C
## Schedule C: The Property You Claim as Exempt                    4/22

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.**

### Part 1:  Identify the Property You Claim as Exempt

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   ■ You are claiming state and federal nonbankruptcy exemptions.  11 U.S.C. § 522(b)(3)

   ☐ You are claiming federal exemptions.  11 U.S.C. § 522(b)(2)

2. **For any property you list on *Schedule A/B* that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own  Copy the value from *Schedule A/B* | Amount of the exemption you claim  *Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **Home furnishings**  Line from *Schedule A/B*: **6.1** | $500.00 | ■ $500.00  ☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. §§ 703.140(b)(3), 703.150 |
| **Electronics**  Line from *Schedule A/B*: **7.1** | $300.00 | ■ $300.00  ☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. §§ 703.140(b)(3), 703.150 |
| **Boxing Equipment**  Line from *Schedule A/B*: **9.1** | $3,000.00 | ■ $3,000.00  ☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. §§ 703.140(b)(5), 703.150 |
| **Clothes**  Line from *Schedule A/B*: **11.1** | $250.00 | ■ $250.00  ☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. §§ 703.140(b)(3), 703.150 |
| **Checking: Chase**  Line from *Schedule A/B*: **17.1** | $0.97 | ■ $0.97  ☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. §§ 703.140(b)(5), 703.150 |

Debtor 1  **Joseph Pedroza Diaz, Jr.**                                    Case number (if known)

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **Account Receivable from Golden Boy Promotion for Purse**<br>Line from *Schedule A/B*: **35.1** | **$25,000.00** | ■  **$25,000.00**<br>☐  100% of fair market value, up to any applicable statutory limit | **C.C.P. §§ 703.140(b)(5), 703.150** |

3. **Are you claiming a homestead exemption of more than $189,050?**
   (Subject to adjustment on 4/01/25 and every 3 years after that for cases filed on or after the date of adjustment.)

   ■ No

   ☐ Yes. Did you acquire the property covered by the exemption within 1,215 days before you filed this case?

   ☐ No

   ☐ Yes

Official Form 106C                    **Schedule C: The Property You Claim as Exempt**                    page 2 of 2

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Joseph Pedroza Diaz, Jr.** |
| | First Name · Middle Name · Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name · Middle Name · Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number (if known) | _____ |

☐ Check if this is an amended filing

Official Form 106D

# Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

**1. Do any creditors have claims secured by your property?**

■ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

☐ Yes. Fill in all of the information below.

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Joseph Pedroza Diaz, Jr.** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number (if known) | |

☐ Check if this is an amended filing

Official Form 106E/F
## Schedule E/F: Creditors Who Have Unsecured Claims          12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY claims and Part 2 for creditors with NONPRIORITY claims. List the other party to any executory contracts or unexpired leases that could result in a claim.  Also list executory contracts on Schedule A/B: Property (Official Form 106A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G). Do not include any creditors with partially secured claims that are listed in Schedule D: Creditors Who Have Claims Secured by Property. If more space is needed, copy the Part you need, fill it out, number the entries in the boxes on the left. Attach the Continuation Page to this page. If you have no information to report in a Part, do not file that Part. On the top of any additional pages, write your name and case number (if known).

**Part 1:**    List All of Your PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims against you?**

   ☐ No. Go to Part 2.

   ■ Yes.

2. **List all of your priority unsecured claims.** If a creditor has more than one priority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. If a claim has both priority and nonpriority amounts, list that claim here and show both priority and nonpriority amounts. As much as possible, list the claims in alphabetical order according to the creditor's name. If you have more than two priority unsecured claims, fill out the Continuation Page of Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.

   (For an explanation of each type of claim, see the instructions for this form in the instruction booklet.)

| | | Total claim | Priority amount | Nonpriority amount |
|---|---|---|---|---|
| 2.1 | **Franchise Tax Board** <br> Priority Creditor's Name | Last 4 digits of account number _____ | | |
| | **Bankruptcy Section MS A340** <br> **PO BOX 2952** <br> **Sacramento, CA 95812-2952** <br> Number Street City State Zip Code | | | |

Last 4 digits of account number _____    **Unknown**    **$0.00**    **$0.00**

When was the debt incurred? _____

As of the date you file, the claim is: Check all that apply

**Who incurred the debt?** Check one.

■ Debtor 1 only      ☐ Contingent

☐ Debtor 2 only      ☐ Unliquidated

☐ Debtor 1 and Debtor 2 only      ☐ Disputed

☐ At least one of the debtors and another    **Type of PRIORITY unsecured claim:**

☐ **Check if this claim is for a  community debt**    ☐ Domestic support obligations

**Is the claim subject to offset?**    ■ Taxes and certain other debts you owe the government

■ No      ☐ Claims for death or personal injury while you were intoxicated

☐ Yes      ☐ Other. Specify _____

                       **2019-2022**

Debtor 1  **Joseph Pedroza Diaz, Jr.**                                    Case number *(if known)* _____

| 2.2 | **Internal Revenue Service** | Last 4 digits of account number ____ | **Unknown** | **$0.00** | **$0.00** |

Priority Creditor's Name
**PO BOX 7346**
**Philadelphia, PA 19101**
Number Street City State Zip Code

**When was the debt incurred?** _____

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
■ **Check if this claim is for a  community debt**

**Type of PRIORITY unsecured claim:**

☐ Domestic support obligations
■ Taxes and certain other debts you owe the government
☐ Claims for death or personal injury while you were intoxicated
☐ Other. Specify _____

**Is the claim subject to offset?**

■ No
☐ Yes

**2019-2022**

---

| 2.3 | **Riverside County Department of Child Sup** | Last 4 digits of account number **1701** | **$546.00** | **$0.00** | **$546.00** |

Priority Creditor's Name
**Attn: Bankruptcy**
**2041 Iowa Avenue**
**Riverside, CA 92507**
Number Street City State Zip Code

**When was the debt incurred?**  **Opened 01/22  Last Active 10/31/23**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
■ **Check if this claim is for a  community debt**

**Type of PRIORITY unsecured claim:**

■ Domestic support obligations
☐ Taxes and certain other debts you owe the government
☐ Claims for death or personal injury while you were intoxicated
☐ Other. Specify _____

**Is the claim subject to offset?**

■ No
☐ Yes

**Family Support**

---

| **Part 2:** | **List All of Your NONPRIORITY Unsecured Claims** |

3. **Do any creditors have nonpriority unsecured claims against you?**

☐ No. You have nothing to report in this part. Submit this form to the court with your other schedules.

■ Yes.

4. **List all of your nonpriority unsecured claims in the alphabetical order of the creditor who holds each claim.** If a creditor has more than one nonpriority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. Do not list claims already included in Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.If you have more than three nonpriority unsecured claims fill out the Continuation Page of Part 2.

**Total claim**

Debtor 1  **Joseph Pedroza Diaz, Jr.**

Case number *(if known)* _____

| 4.1 | **Franchise Tax Board** | Last 4 digits of account number _____ | **Unknown** |

Nonpriority Creditor's Name
**Bankruptcy Section MS A340**
**PO BOX 2952**
**Sacramento, CA 95812-2952**

When was the debt incurred? _____

Number Street City State Zip Code

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
■ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify   **2018**

---

| 4.2 | **Internal Revenue Service** | Last 4 digits of account number _____ | **Unknown** |

Nonpriority Creditor's Name
**PO BOX 7346**
**Philadelphia, PA 19101**

When was the debt incurred? _____

Number Street City State Zip Code

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
■ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify   **2018**

---

| 4.3 | **Moses Heredia** | Last 4 digits of account number _____ | **$72,731.00** |

Nonpriority Creditor's Name
**1 Morning Dove**
**Laguna Niguel, CA 92677**

When was the debt incurred? _____

Number Street City State Zip Code

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
■ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify   **Arbitration award**

---

| **Part 3:** | **List Others to Be Notified About a Debt That You Already Listed** |

**5.** Use this page only if you have others to be notified about your bankruptcy, for a debt that you already listed in Parts 1 or 2. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the original creditor in Parts 1 or 2, then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Parts 1 or 2, list the additional creditors here. If you do not have additional persons to be notified for any debts in Parts 1 or 2, do not fill out or submit this page.

Name and Address
**Moses Heredia**

On which entry in Part 1 or Part 2 did you list the original creditor?
Line **4.3** of (*Check one*):   ☐ Part 1: Creditors with Priority Unsecured Claims

Debtor 1  **Joseph Pedroza Diaz, Jr.**

Case number (if known) _____

**c/o Federal Practice Group**
**431 N Brookhurst St Ste 130**
**Anaheim, CA 92801**

■ Part 2: Creditors with Nonpriority Unsecured Claims

Last 4 digits of account number _____

| Part 4: | Add the Amounts for Each Type of Unsecured Claim |
|---|---|

6. Total the amounts of certain types of unsecured claims. This information is for statistical reporting purposes only. 28 U.S.C. §159. Add the amounts for each type of unsecured claim.

| | | | | Total Claim |
|---|---|---|---|---|
| **Total claims from Part 1** | 6a. | **Domestic support obligations** | 6a. | $ 546.00 |
| | 6b. | **Taxes and certain other debts you owe the government** | 6b. | $ 0.00 |
| | 6c. | **Claims for death or personal injury while you were intoxicated** | 6c. | $ 0.00 |
| | 6d. | **Other.** Add all other priority unsecured claims. Write that amount here. | 6d. | $ 0.00 |
| | 6e. | **Total Priority.** Add lines 6a through 6d. | 6e. | $ 546.00 |

| | | | | Total Claim |
|---|---|---|---|---|
| **Total claims from Part 2** | 6f. | **Student loans** | 6f. | $ 0.00 |
| | 6g. | **Obligations arising out of a separation agreement or divorce that you did not report as priority claims** | 6g. | $ 0.00 |
| | 6h. | **Debts to pension or profit-sharing plans, and other similar debts** | 6h. | $ 0.00 |
| | 6i. | **Other.** Add all other nonpriority unsecured claims. Write that amount here. | 6i. | $ 72,731.00 |
| | 6j. | **Total Nonpriority.** Add lines 6f through 6i. | 6j. | $ 72,731.00 |

| Fill in this information to identify your case: | |
|---|---|

| Debtor 1 | **Joseph Pedroza Diaz, Jr.** | |
|---|---|---|
| | First Name · Middle Name · Last Name | |

| Debtor 2 | | |
|---|---|---|
| (Spouse if, filing) | First Name · Middle Name · Last Name | |

| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

Case number
(if known) _____

☐ Check if this is an
amended filing

## Official Form 106G
## Schedule G: Executory Contracts and Unexpired Leases                    12/15

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the additional page, fill it out, number the entries, and attach it to this page. On the top of any additional pages, write your name and case number (if known).**

1.  **Do you have any executory contracts or unexpired leases?**
    ■ No. Check this box and file this form with the court with your other schedules. You have nothing else to report on this form.
    ☐ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B:Property* (Official Form 106 A/B).

2.  **List separately each person or company with whom you have the contract or lease. Then state what each contract or lease is for (for example, rent, vehicle lease, cell phone).** See the instructions for this form in the instruction booklet for more examples of executory contracts and unexpired leases.

| Person or company with whom you have the contract or lease | State what the contract or lease is for |
|---|---|
| Name, Number, Street, City, State and ZIP Code | |
| **2.1** Name | |
| Number · Street | |
| City · State · ZIP Code | |
| **2.2** Name | |
| Number · Street | |
| City · State · ZIP Code | |
| **2.3** Name | |
| Number · Street | |
| City · State · ZIP Code | |
| **2.4** Name | |
| Number · Street | |
| City · State · ZIP Code | |
| **2.5** Name | |
| Number · Street | |
| City · State · ZIP Code | |

| Fill in this information to identify your case: | |
|---|---|

Debtor 1  **Joseph Pedroza Diaz, Jr.**
First Name        Middle Name        Last Name

Debtor 2
(Spouse if, filing)  First Name        Middle Name        Last Name

United States Bankruptcy Court for the:  CENTRAL DISTRICT OF CALIFORNIA

Case number
(if known)

☐ Check if this is an
   amended filing

## Official Form 106H
## Schedule H: Your Codebtors                                              12/15

Codebtors are people or entities who are also liable for any debts you may have. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, and number the entries in the boxes on the left. Attach the Additional Page to this page. On the top of any Additional Pages, write your name and case number (if known). Answer every question.

**1. Do you have any codebtors?** (If you are filing a joint case, do not list either spouse as a codebtor.)

☑ No
☐ Yes

**2. Within the last 8 years, have you lived in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, and Wisconsin.)

☐ No. Go to line 3.
☑ Yes. Did your spouse, former spouse, or legal equivalent live with you at the time?

   ☑ No
   ☐ Yes.

   In which community state or territory did you live?  __-NONE-__ . Fill in the name and current address of that person.

   _____
   Name of your spouse, former spouse, or legal equivalent
   Number, Street, City, State & Zip Code

**3. In Column 1, list all of your codebtors. Do not include your spouse as a codebtor if your spouse is filing with you. List the person shown in line 2 again as a codebtor only if that person is a guarantor or cosigner. Make sure you have listed the creditor on Schedule D (Official Form 106D), Schedule E/F (Official Form 106E/F), or Schedule G (Official Form 106G). Use Schedule D, Schedule E/F, or Schedule G to fill out Column 2.**

| Column 1: **Your codebtor**<br>Name, Number, Street, City, State and ZIP Code | Column 2: **The creditor to whom you owe the debt**<br>Check all schedules that apply: |
|---|---|
| **3.1** _____<br>Name<br><br>_____<br>Number        Street<br>_____<br>City        State        ZIP Code | ☐ Schedule D, line _____<br>☐ Schedule E/F, line _____<br>☐ Schedule G, line _____ |
| **3.2** _____<br>Name<br><br>_____<br>Number        Street<br>_____<br>City        State        ZIP Code | ☐ Schedule D, line _____<br>☐ Schedule E/F, line _____<br>☐ Schedule G, line _____ |

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | **Joseph Pedroza Diaz, Jr.** |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number (If known) | |

Check if this is:
☐ An amended filing
☐ A supplement showing postpetition chapter 13 income as of the following date:

_____
MM / DD/ YYYY

<u>Official Form 106I</u>

## Schedule I: Your Income

12/15

Be as complete and accurate as possible. If two married people are filing together (Debtor 1 and Debtor 2), both are equally responsible for supplying correct information. If you are married and not filing jointly, and your spouse is living with you, include information about your spouse. If you are separated and your spouse is not filing with you, do not include information about your spouse. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:**    Describe Employment

1. **Fill in your employment information.**

   If you have more than one job, attach a separate page with information about additional employers.

   Include part-time, seasonal, or self-employed work.

   Occupation may include student or homemaker, if it applies.

| | | Debtor 1 | Debtor 2 or non-filing spouse |
|---|---|---|---|
| Employment status | | ☒ Employed ☐ Not employed | ☐ Employed ☐ Not employed |
| Occupation | | **Pro Boxer** | |
| Employer's name | | **Golden Boy Promotion LLC** | |
| Employer's address | | **626 Wilshire Blvd #350 Los Angeles, CA 90017** | |
| How long employed there? | | **12 years** | |

**Part 2:**    Give Details About Monthly Income

**Estimate monthly income as of the date you file this form.** If you have nothing to report for any line, write $0 in the space. Include your non-filing spouse unless you are separated.

If you or your non-filing spouse have more than one employer, combine the information for all employers for that person on the lines below. If you need more space, attach a separate sheet to this form.

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| 2. | List monthly gross wages, salary, and commissions (before all payroll deductions).  If not paid monthly, calculate what the monthly wage would be. | 2. | $ 0.00 | $ N/A |
| 3. | Estimate and list monthly overtime pay. | 3. | +$ 0.00 | +$ N/A |
| 4. | Calculate gross income. Add line 2 + line 3. | 4. | $ 0.00 | $ N/A |

Debtor 1 **Joseph Pedroza Diaz, Jr.**                                          Case number (*if known*) _____

|  | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|
| Copy line 4 here ............................ | 4. | $ 0.00 | $ N/A |

5. **List all payroll deductions:**

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| 5a. | Tax, Medicare, and Social Security deductions | 5a. | $ 0.00 | $ N/A |
| 5b. | Mandatory contributions for retirement plans | 5b. | $ 0.00 | $ N/A |
| 5c. | Voluntary contributions for retirement plans | 5c. | $ 0.00 | $ N/A |
| 5d. | Required repayments of retirement fund loans | 5d. | $ 0.00 | $ N/A |
| 5e. | Insurance | 5e. | $ 0.00 | $ N/A |
| 5f. | Domestic support obligations | 5f. | $ 0.00 | $ N/A |
| 5g. | Union dues | 5g. | $ 0.00 | $ N/A |
| 5h. | Other deductions. Specify: _____ | 5h.+ | $ 0.00 | + $ N/A |

6. **Add the payroll deductions.** Add lines 5a+5b+5c+5d+5e+5f+5g+5h.   6.   $ 0.00   $ N/A

7. **Calculate total monthly take-home pay.** Subtract line 6 from line 4.   7.   $ 0.00   $ N/A

8. **List all other income regularly received:**

| 8a. | **Net income from rental property and from operating a business, profession, or farm** Attach a statement for each property and business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income. | 8a. | $ 1,000.00 | $ N/A |
|---|---|---|---|---|
| 8b. | **Interest and dividends** | 8b. | $ 0.00 | $ N/A |
| 8c. | **Family support payments that you, a non-filing spouse, or a dependent regularly receive** Include alimony, spousal support, child support, maintenance, divorce settlement, and property settlement. | 8c. | $ 0.00 | $ N/A |
| 8d. | **Unemployment compensation** | 8d. | $ 0.00 | $ N/A |
| 8e. | **Social Security** | 8e. | $ 0.00 | $ N/A |
| 8f. | **Other government assistance that you regularly receive** Include cash assistance and the value (if known) of any non-cash assistance that you receive, such as food stamps (benefits under the Supplemental Nutrition Assistance Program) or housing subsidies. Specify: _____ | 8f. | $ 0.00 | $ N/A |
| 8g. | **Pension or retirement income** | 8g. | $ 0.00 | $ N/A |
| 8h. | **Other monthly income. Specify:** _____ | 8h.+ | $ 0.00 | + $ N/A |

9. **Add all other income.** Add lines 8a+8b+8c+8d+8e+8f+8g+8h.   9.   $ 1,000.00   $ N/A

10. **Calculate monthly income.** Add line 7 + line 9.   10.   $ 1,000.00 + $ N/A = $ 1,000.00
Add the entries in line 10 for Debtor 1 and Debtor 2 or non-filing spouse.

11. **State all other regular contributions to the expenses that you list in** *Schedule J.*
Include contributions from an unmarried partner, members of your household, your dependents, your roommates, and other friends or relatives.
Do not include any amounts already included in lines 2-10 or amounts that are not available to pay expenses listed in *Schedule J.*
Specify: _____   11.   +$ 0.00

12. **Add the amount in the last column of line 10 to the amount in line 11.** The result is the combined monthly income.
Write that amount on the *Summary of Schedules* and *Statistical Summary of Certain Liabilities* and Related *Data,* if it applies   12.   $ 1,000.00
**Combined monthly income**

13. **Do you expect an increase or decrease within the year after you file this form?**
☑ No.
☐ Yes. Explain: **Debtor is a professional boxer and currently has no fights lined up in the near future.**

Fill in this information to identify your case:

Debtor 1    **Joseph Pedroza Diaz, Jr.**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:    CENTRAL DISTRICT OF CALIFORNIA

Case number
(If known)

Check if this is:
☐ An amended filing
☐ A supplement showing postpetition chapter 13 expenses as of the following date:

_____
MM / DD / YYYY

## Official Form 106J
## Schedule J: Your Expenses                                                    12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach another sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:    Describe Your Household**

1.   **Is this a joint case?**

☐ No. Go to line 2.
☐ Yes. **Does Debtor 2 live in a separate household?**
          ☐ No
          ☐ Yes. Debtor 2 must file Official Form 106J-2, *Expenses for Separate Household* of Debtor 2.

2.   **Do you have dependents?**    ☐ No

Do not list Debtor 1 and Debtor 2.        ■ Yes. Fill out this information for each dependent..............

Do not state the dependents names.

| Dependent's relationship to Debtor 1 or Debtor 2 | Dependent's age | Does dependent live with you? |
|---|---|---|
| **Son** | **3** | ☐ No  ■ Yes |
| **Daughter** | **7 weeks** | ☐ No  ■ Yes |
|  |  | ☐ No  ☐ Yes |
|  |  | ☐ No  ☐ Yes |

3.   **Do your expenses include expenses of people other than yourself and your dependents?**    ■ No  ☐ Yes

**Part 2:    Estimate Your Ongoing Monthly Expenses**

Estimate your expenses as of your bankruptcy filing date unless you are using this form as a supplement in a Chapter 13 case to report expenses as of a date after the bankruptcy is filed. If this is a supplemental *Schedule J*, check the box at the top of the form and fill in the applicable date.

Include expenses paid for with non-cash government assistance if you know the value of such assistance and have included it on *Schedule I: Your Income* (Official Form 106I.)

|  | **Your expenses** |
|---|---|

4.   **The rental or home ownership expenses for your residence.** Include first mortgage payments and any rent for the ground or lot.                         4.  $              0.00

     **If not included in line 4:**

     4a.   Real estate taxes                                          4a.  $              0.00
     4b.   Property, homeowner's, or renter's insurance              4b.  $              0.00
     4c.   Home maintenance, repair, and upkeep expenses             4c.  $              0.00
     4d.   Homeowner's association or condominium dues               4d.  $              0.00
5.   **Additional mortgage payments for your residence,** such as home equity loans    5.  $              0.00

| Debtor 1 | **Joseph Pedroza Diaz, Jr.** | Case number (if known) | |
|---|---|---|---|

| 6. | **Utilities:** | | | |
|---|---|---|---|---|
| | 6a. | Electricity, heat, natural gas | 6a. $ | 0.00 |
| | 6b. | Water, sewer, garbage collection | 6b. $ | 0.00 |
| | 6c. | Telephone, cell phone, Internet, satellite, and cable services | 6c. $ | 25.00 |
| | 6d. | Other. Specify: | 6d. $ | 0.00 |
| 7. | **Food and housekeeping supplies** | | 7. $ | 500.00 |
| 8. | **Childcare and children's education costs** | | 8. $ | 0.00 |
| 9. | **Clothing, laundry, and dry cleaning** | | 9. $ | 0.00 |
| 10. | **Personal care products and services** | | 10. $ | 0.00 |
| 11. | **Medical and dental expenses** | | 11. $ | 0.00 |
| 12. | **Transportation.** Include gas, maintenance, bus or train fare. Do not include car payments. | | 12. $ | 450.00 |
| 13. | **Entertainment, clubs, recreation, newspapers, magazines, and books** | | 13. $ | 0.00 |
| 14. | **Charitable contributions and religious donations** | | 14. $ | 0.00 |
| 15. | **Insurance.** Do not include insurance deducted from your pay or included in lines 4 or 20. | | | |
| | 15a. | Life insurance | 15a. $ | 0.00 |
| | 15b. | Health insurance | 15b. $ | 0.00 |
| | 15c. | Vehicle insurance | 15c. $ | 0.00 |
| | 15d. | Other insurance. Specify: | 15d. $ | 0.00 |
| 16. | **Taxes.** Do not include taxes deducted from your pay or included in lines 4 or 20. Specify: | | 16. $ | 0.00 |
| 17. | **Installment or lease payments:** | | | |
| | 17a. | Car payments for Vehicle 1 | 17a. $ | 0.00 |
| | 17b. | Car payments for Vehicle 2 | 17b. $ | 0.00 |
| | 17c. | Other. Specify: | 17c. $ | 0.00 |
| | 17d. | Other. Specify: | 17d. $ | 0.00 |
| 18. | **Your payments of alimony, maintenance, and support that you did not report as deducted from your pay on line 5, Schedule I, Your Income (Official Form 106I).** | | 18. $ | 0.00 |
| 19. | **Other payments you make to support others who do not live with you.** Specify: | | 19. $ | 0.00 |
| 20. | **Other real property expenses not included in lines 4 or 5 of this form or on Schedule I: Your Income.** | | | |
| | 20a. | Mortgages on other property | 20a. $ | 0.00 |
| | 20b. | Real estate taxes | 20b. $ | 0.00 |
| | 20c. | Property, homeowner's, or renter's insurance | 20c. $ | 0.00 |
| | 20d. | Maintenance, repair, and upkeep expenses | 20d. $ | 0.00 |
| | 20e. | Homeowner's association or condominium dues | 20e. $ | 0.00 |
| 21. | **Other:** Specify: | | 21. +$ | 0.00 |

| 22. | **Calculate your monthly expenses** | | |
|---|---|---|---|
| | 22a. Add lines 4 through 21. | $ | 975.00 |
| | 22b. Copy line 22 (monthly expenses for Debtor 2), if any, from Official Form 106J-2 | $ | |
| | 22c. Add line 22a and 22b. The result is your monthly expenses. | $ | 975.00 |

| 23. | **Calculate your monthly net income.** | | |
|---|---|---|---|
| | 23a. Copy line 12 (your combined monthly income) from Schedule I. | 23a. $ | 1,000.00 |
| | 23b. Copy your monthly expenses from line 22c above. | 23b. -$ | 975.00 |
| | 23c. Subtract your monthly expenses from your monthly income. The result is your monthly net income. | 23c. $ | 25.00 |

24. **Do you expect an increase or decrease in your expenses within the year after you file this form?**
For example, do you expect to finish paying for your car loan within the year or do you expect your mortgage payment to increase or decrease because of a modification to the terms of your mortgage?

☐ No.

■ Yes. Explain here: **Living with his girlfriends parents and they are covering all living expenses. Girlfriend is currently pregnant.**

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | Joseph Pedroza Diaz, Jr. | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the: CENTRAL DISTRICT OF CALIFORNIA

Case number
(if known) _____

☐ Check if this is an
amended filing

## Official Form 106Dec
# Declaration About an Individual Debtor's Schedules

12/15

If two married people are filing together, both are equally responsible for supplying correct information.

You must file this form whenever you file bankruptcy schedules or amended schedules. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Sign Below

Did you pay or agree to pay someone who is NOT an attorney to help you fill out bankruptcy forms?

■ No

☐ Yes. Name of person _____    Attach Bankruptcy Petition Preparer's Notice, Declaration, and Signature (Official Form 119)

Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct.

X _____    X _____
Joseph Pedroza Diaz, Jr.                   Signature of Debtor 2
Signature of Debtor 1

Date **February 14, 2024**    Date _____

| Fill in this information to identify your case: | |
|---|---|

| Debtor 1 | **Joseph Pedroza Diaz, Jr.** | | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| Case number | | | |
| (if known) | | | |

☐ Check if this is an amended filing

## Official Form 107
# Statement of Financial Affairs for Individuals Filing for Bankruptcy
04/22

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:** Give Details About Your Marital Status and Where You Lived Before

1. **What is your current marital status?**

   ☐ Married
   ☑ Not married

2. **During the last 3 years, have you lived anywhere other than where you live now?**

   ☐ No
   ☑ Yes. List all of the places you lived in the last 3 years. Do not include where you live now.

| Debtor 1: | Dates Debtor 1 lived there | Debtor 2 Prior Address: | Dates Debtor 2 lived there |
|---|---|---|---|
| **250 N College Drive #I13 Upland, CA 91786** | From-To: **2022 - 2023** | ☐ Same as Debtor 1 | ☐ Same as Debtor 1 From-To: |

3. **Within the last 8 years, did you ever live with a spouse or legal equivalent in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin.)

   ☑ No
   ☐ Yes. Make sure you fill out *Schedule H: Your Codebtors* (Official Form 106H).

**Part 2** Explain the Sources of Your Income

4. **Did you have any income from employment or from operating a business during this year or the two previous calendar years?**
   Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.
   If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

   ☐ No
   ☑ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | Sources of income Check all that apply. | Gross income (before deductions and exclusions) | Sources of income Check all that apply. | Gross income (before deductions and exclusions) |
| From January 1 of current year until the date you filed for bankruptcy: | ☐ Wages, commissions, bonuses, tips | **$6,000.00** | ☐ Wages, commissions, bonuses, tips | |
| | ☑ Operating a business | | ☐ Operating a business | |

Debtor 1    **Joseph Pedroza Diaz, Jr.**           Case number *(if known)*

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) | **Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) |
| **For last calendar year:**<br>(January 1 to December 31, 2023 ) | ☐ Wages, commissions, bonuses, tips | $55,000.00 | ☐ Wages, commissions, bonuses, tips | |
| | ☑ Operating a business | | ☐ Operating a business | |
| **For the calendar year before that:**<br>(January 1 to December 31, 2022 ) | ☐ Wages, commissions, bonuses, tips | $130,000.00 | ☐ Wages, commissions, bonuses, tips | |
| | ☑ Operating a business | | ☐ Operating a business | |

**5.**   **Did you receive any other income during this year or the two previous calendar years?**
Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

List each source and the gross income from each source separately. Do not include income that you listed in line 4.

☑ No
☐ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income**<br>Describe below. | **Gross income from each source**<br>(before deductions and exclusions) | **Sources of income**<br>Describe below. | **Gross income**<br>(before deductions and exclusions) |

| Part 3: | List Certain Payments You Made Before You Filed for Bankruptcy |
|---|---|

**6.**   **Are either Debtor 1's or Debtor 2's debts primarily consumer debts?**

☐   No.    **Neither Debtor 1 nor Debtor 2 has primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

     During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $7,575* or more?
     ☐ No.    Go to line 7.
     ☐ Yes    List below each creditor to whom you paid a total of $7,575* or more in one or more payments and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.
     * Subject to adjustment on 4/01/25 and every 3 years after that for cases filed on or after the date of adjustment.

☑   Yes.    **Debtor 1 or Debtor 2 or both have primarily consumer debts.**
     During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?

     ☑ No.    Go to line 7.
     ☐ Yes    List below each creditor to whom you paid a total of $600 or more and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|

**7.**   **Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**
*Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

☑ No
☐ Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|

**8.**   **Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an**

Debtor 1    **Joseph Pedroza Diaz, Jr.**                                    Case number *(if known)*

---

**insider?**
Include payments on debts guaranteed or cosigned by an insider.

☑ No
☐ Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment Include creditor's name |
|---|---|---|---|---|

**Part 4:    Identify Legal Actions, Repossessions, and Foreclosures**

9.  **Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?**
    List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

☐ No
☑ Yes. Fill in the details.

| Case title Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Moses Heredia v. Joseph Diaz, Jr.** **22STCP00395** | Civil | **Superior Court of California County of Los Angeles 111 North Hill Street Los Angeles, CA 90012** | ☐ Pending ☐ On appeal ☐ Concluded |

10. **Within 1 year before you filed for bankruptcy, was any of your property repossessed, foreclosed, garnished, attached, seized, or levied?**
    Check all that apply and fill in the details below.

☑ No. Go to line 11.
☐ Yes. Fill in the information below.

| Creditor Name and Address | Describe the Property Explain what happened | Date | Value of the property |
|---|---|---|---|

11. **Within 90 days before you filed for bankruptcy, did any creditor, including a bank or financial institution, set off any amounts from your accounts or refuse to make a payment because you owed a debt?**

☑ No
☐ Yes. Fill in the details.

| Creditor Name and Address | Describe the action the creditor took | Date action was taken | Amount |
|---|---|---|---|

12. **Within 1 year before you filed for bankruptcy, was any of your property in the possession of an assignee for the benefit of creditors, a court-appointed receiver, a custodian, or another official?**

☑ No
☐ Yes

**Part 5:    List Certain Gifts and Contributions**

13. **Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?**

☑ No
☐ Yes. Fill in the details for each gift.

| Gifts with a total value of more than $600 per person Person to Whom You Gave the Gift and Address: | Describe the gifts | Dates you gave the gifts | Value |
|---|---|---|---|

14. **Within 2 years before you filed for bankruptcy, did you give any gifts or contributions with a total value of more than $600 to any charity?**

☑ No
☐ Yes. Fill in the details for each gift or contribution.

| Gifts or contributions to charities that total more than $600 Charity's Name Address (Number, Street, City, State and ZIP Code) | Describe what you contributed | Dates you contributed | Value |
|---|---|---|---|

Debtor 1 **Joseph Pedroza Diaz, Jr.**           Case number (*if known*)

---

| Part 6: | List Certain Losses |
|---|---|

**15.** Within 1 year before you filed for bankruptcy or since you filed for bankruptcy, did you lose anything because of theft, fire, other disaster, or gambling?

☑ No
☐ Yes. Fill in the details.

| Describe the property you lost and how the loss occurred | Describe any insurance coverage for the loss<br><br>Include the amount that insurance has paid. List pending insurance claims on line 33 of *Schedule A/B: Property*. | Date of your loss | Value of property lost |
|---|---|---|---|

| Part 7: | List Certain Payments or Transfers |
|---|---|

**16.** Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?
Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

☐ No
☑ Yes. Fill in the details.

| Person Who Was Paid<br>Address<br>Email or website address<br>Person Who Made the Payment, if Not You | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| **Tang & Associates**<br>**17011 Beach Blvd Suite 900**<br>**Huntington Beach, CA 92647**<br>kevin@tang-associates.com | **Attorney Fees of $1463, plus filing fee of $338, and credit report fee of $37** | **11/10/2023** | **$1,838.00** |

**17.** Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?
Do not include any payment or transfer that you listed on line 16.

☑ No
☐ Yes. Fill in the details.

| Person Who Was Paid<br>Address | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|

**18.** Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?
Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property). Do not include gifts and transfers that you have already listed on this statement.

☑ No
☐ Yes. Fill in the details.

| Person Who Received Transfer<br>Address<br><br>Person's relationship to you | Description and value of property transferred | Describe any property or payments received or debts paid in exchange | Date transfer was made |
|---|---|---|---|

**19.** Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary? (These are often called *asset-protection devices*.)

☑ No
☐ Yes. Fill in the details.

| Name of trust | Description and value of the property transferred | Date Transfer was made |
|---|---|---|

---

Debtor 1    **Joseph Pedroza Diaz, Jr.**                                                                              Case number *(if known)*

---

| Part 8: | List of Certain Financial Accounts, Instruments, Safe Deposit Boxes, and Storage Units |

20. **Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?**
Include checking, savings, money market, or other financial accounts; certificates of deposit; shares in banks, credit unions, brokerage houses, pension funds, cooperatives, associations, and other financial institutions.
- [✔] No
- [ ] Yes. Fill in the details.

| Name of Financial Institution and Address *(Number, Street, City, State and ZIP Code)* | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

21. **Do you now have, or did you have within 1 year before you filed for bankruptcy, any safe deposit box or other depository for securities, cash, or other valuables?**
- [✔] No
- [ ] Yes. Fill in the details.

| Name of Financial Institution Address *(Number, Street, City, State and ZIP Code)* | Who else had access to it? Address *(Number, Street, City, State and ZIP Code)* | Describe the contents | Do you still have it? |
|---|---|---|---|

22. **Have you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?**
- [✔] No
- [ ] Yes. Fill in the details.

| Name of Storage Facility Address *(Number, Street, City, State and ZIP Code)* | Who else has or had access to it? Address *(Number, Street, City, State and ZIP Code)* | Describe the contents | Do you still have it? |
|---|---|---|---|

| Part 9: | Identify Property You Hold or Control for Someone Else |

23. **Do you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone.**
- [✔] No
- [ ] Yes.  Fill in the details.

| Owner's Name Address *(Number, Street, City, State and ZIP Code)* | Where is the property? *(Number, Street, City, State and ZIP Code)* | Describe the property | Value |
|---|---|---|---|

| Part 10: | Give Details About Environmental Information |

For the purpose of Part 10, the following definitions apply:

- [✔] *Environmental law* means any federal, state, or local statute or regulation concerning pollution, contamination, releases of hazardous or toxic substances, wastes, or material into the air, land, soil, surface water, groundwater, or other medium, including statutes or regulations controlling the cleanup of these substances, wastes, or material.
- [✔] *Site* means any location, facility, or property as defined under any environmental law, whether you now own, operate, or utilize it or used to own, operate, or utilize it, including disposal sites.
- [✔] *Hazardous material* means anything an environmental law defines as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, contaminant, or similar term.

Report all notices, releases, and proceedings that you know about, regardless of when they occurred.

24. **Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?**
- [✔] No
- [ ] Yes. Fill in the details.

| Name of site Address *(Number, Street, City, State and ZIP Code)* | Governmental unit Address *(Number, Street, City, State and ZIP Code)* | Environmental law, if you know it | Date of notice |
|---|---|---|---|

Debtor 1    Joseph Pedroza Diaz, Jr.                        Case number (*if known*) _____

**25. Have you notified any governmental unit of any release of hazardous material?**

☑ No
☐ Yes. Fill in the details.

| Name of site<br>Address (Number, Street, City, State and ZIP Code) | Governmental unit<br>Address (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|
| | | | |

**26. Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

☑ No
☐ Yes. Fill in the details.

| Case Title<br>Case Number | Court or agency<br>Name<br>Address (Number, Street, City, State and ZIP Code) | Nature of the case | Status of the case |
|---|---|---|---|
| | | | |

**Part 11:**    **Give Details About Your Business or Connections to Any Business**

**27. Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?**

     ☑ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time

     ☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)

     ☐ A partner in a partnership

     ☐ An officer, director, or managing executive of a corporation

     ☐ An owner of at least 5% of the voting or equity securities of a corporation

☐ No. None of the above applies. Go to Part 12.

☑ Yes. Check all that apply above and fill in the details below for each business.

| Business Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Describe the nature of the business<br><br>Name of accountant or bookkeeper | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|
| Joseph Pedroza Diaz, Jr.<br>204 N. Grand Ave<br>Covina, CA 91724 | **Professuibak Boxer** | EIN:<br><br>From-To    2012-Current |

**28. Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.**

☑ No
☐ Yes. Fill in the details below.

| Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Date Issued |
|---|---|
| | |

Debtor 1    Joseph Pedroza Diaz, Jr. _____    Case number (if known) _____

## Part 12:    Sign Below

I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

_____                    _____
Joseph Pedroza Diaz, Jr.                              Signature of Debtor 2
Signature of Debtor 1

Date    February 14, 2024 _____           Date    _____

Did you attach additional pages to *Your Statement of Financial Affairs for Individuals Filing for Bankruptcy* (Official Form 107)?

☑ No
☐ Yes

Did you pay or agree to pay someone who is not an attorney to help you fill out bankruptcy forms?

☑ No
☐ Yes. Name of Person _____. Attach the *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

<table>
<tr><td colspan="3"><strong>Fill in this information to identify your case:</strong></td></tr>
</table>

| | | | |
|---|---|---|---|
| Debtor 1 | **Joseph Pedroza Diaz, Jr.** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| Case number | | | |
| (if known) | | | |

☐ Check if this is an
amended filing

## Official Form 108
# Statement of Intention for Individuals Filing Under Chapter 7     12/15

If you are an individual filing under chapter 7, you must fill out this form if:

■ creditors have claims secured by your property, or

■ you have leased personal property and the lease has not expired.

**You must file this form with the court within 30 days after you file your bankruptcy petition or by the date set for the meeting of creditors, whichever is earlier, unless the court extends the time for cause. You must also send copies to the creditors and lessors you list on the form**

If two married people are filing together in a joint case, both are equally responsible for supplying correct information. Both debtors must sign and date the form.

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known).

### Part 1:     List Your Creditors Who Have Secured Claims

1. **For any creditors that you listed in Part 1 of Schedule D: Creditors Who Have Claims Secured by Property (Official Form 106D), fill in the information below.**

| Identify the creditor and the property that is collateral | What do you intend to do with the property that secures a debt? | Did you claim the property as exempt on Schedule C? |
|---|---|---|
| Creditor's name:<br><br>Description of property securing debt: | ☐ Surrender the property.<br>☐ Retain the property and redeem it.<br>☐ Retain the property and enter into a *Reaffirmation Agreement*.<br>☐ Retain the property and [explain]: | ☐ No<br><br>☐ Yes |
| Creditor's name:<br><br>Description of property securing debt: | ☐ Surrender the property.<br>☐ Retain the property and redeem it.<br>☐ Retain the property and enter into a *Reaffirmation Agreement*.<br>☐ Retain the property and [explain]: | ☐ No<br><br>☐ Yes |
| Creditor's name:<br><br>Description of property securing debt: | ☐ Surrender the property.<br>☐ Retain the property and redeem it.<br>☐ Retain the property and enter into a *Reaffirmation Agreement*.<br>☐ Retain the property and [explain]: | ☐ No<br><br>☐ Yes |
| Creditor's | ☐ Surrender the property. | ☐ No |

| Debtor 1 | Joseph Pedroza Diaz, Jr. | Case number (if known) | |
|---|---|---|---|

| name: | | ☐ Retain the property and redeem it. | |
| Description of property securing debt: | | ☐ Retain the property and enter into a Reaffirmation Agreement. | ☐ Yes |
| | | ☐ Retain the property and [explain] | |

### Part 2: List Your Unexpired Personal Property Leases

For any unexpired personal property lease that you listed in Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G), fill in the information below. Do not list real estate leases. Unexpired leases are leases that are still in effect; the lease period has not yet ended. You may assume an unexpired personal property lease if the trustee does not assume it. 11 U.S.C. § 365(p)(2).

| Describe your unexpired personal property leases | Will the lease be assumed? |
|---|---|
| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |
| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |
| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |
| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |
| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |
| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |
| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |

### Part 3: Sign Below

Under penalty of perjury, I declare that I have indicated my intention about any property of my estate that secures a debt and any personal property that is subject to an unexpired lease.

X _____
Joseph Pedroza Diaz, Jr.
Signature of Debtor 1

X _____
Signature of Debtor 2

Date **February 14, 2024**

Date _____

Official Form 108    Statement of Intention for Individuals Filing Under Chapter 7    page 2

# Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)

This notice is for you if:

> You are an individual filing for bankruptcy, and
>
> Your debts are primarily consumer debts. *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

**The types of bankruptcy that are available to individuals**

Individuals who meet the qualifications may file under one of four different chapters of Bankruptcy Code:

> Chapter 7 - Liquidation
>
> Chapter 11 - Reorganization
>
> Chapter 12 - Voluntary repayment plan for family farmers or fishermen
>
> Chapter 13 - Voluntary repayment plan for individuals with regular income

**You should have an attorney review your decision to file for bankruptcy and the choice of chapter.**

| Chapter 7: | Liquidation |
|---|---|
| $245 | filing fee |
| $78 | administrative fee |
| + $15 | trustee surcharge |
| $338 | total fee |

Chapter 7 is for individuals who have financial difficulty preventing them from paying their debts and who are willing to allow their non-exempt property to be used to pay their creditors. The primary purpose of filing under chapter 7 is to have your debts discharged. The bankruptcy discharge relieves you after bankruptcy from having to pay many of your pre-bankruptcy debts. Exceptions exist for particular debts, and liens on property may still be enforced after discharge. For example, a creditor may have the right to foreclose a home mortgage or repossess an automobile.

However, if the court finds that you have committed certain kinds of improper conduct described in the Bankruptcy Code, the court may deny your discharge.

You should know that even if you file chapter 7 and you receive a discharge, some debts are not discharged under the law. Therefore, you may still be responsible to pay:

> most taxes;
>
> most student loans;
>
> domestic support and property settlement obligations;

most fines, penalties, forfeitures, and criminal restitution obligations; and

certain debts that are not listed in your bankruptcy papers.

You may also be required to pay debts arising from:

fraud or theft;

fraud or defalcation while acting in breach of fiduciary capacity;

intentional injuries that you inflicted; and

death or personal injury caused by operating a motor vehicle, vessel, or aircraft while intoxicated from alcohol or drugs.

If your debts are primarily consumer debts, the court can dismiss your chapter 7 case if it finds that you have enough income to repay creditors a certain amount. You must file *Chapter 7 Statement of Your Current Monthly Income* (Official Form 122A–1) if you are an individual filing for bankruptcy under chapter 7. This form will determine your current monthly income and compare whether your income is more than the median income that applies in your state.

If your income is not above the median for your state, you will not have to complete the other chapter 7 form, the *Chapter 7 Means Test Calculation* (Official Form 122A–2).

If your income is above the median for your state, you must file a second form —the *Chapter 7 Means Test Calculation* (Official Form 122A–2). The calculations on the form— sometimes called the *Means Test*—deduct from your income living expenses and payments on certain debts to determine any amount available to pay unsecured creditors. If

your income is more than the median income for your state of residence and family size, depending on the results of the *Means Test*, the U.S. trustee, bankruptcy administrator, or creditors can file a motion to dismiss your case under § 707(b) of the Bankruptcy Code. If a motion is filed, the court will decide if your case should be dismissed. To avoid dismissal, you may choose to proceed under another chapter of the Bankruptcy Code.

If you are an individual filing for chapter 7 bankruptcy, the trustee may sell your property to pay your debts, subject to your right to exempt the property or a portion of the proceeds from the sale of the property. The property, and the proceeds from property that your bankruptcy trustee sells or liquidates that you are entitled to, is called *exempt property*. Exemptions may enable you to keep your home, a car, clothing, and household items or to receive some of the proceeds if the property is sold.

Exemptions are not automatic. To exempt property, you must list it on *Schedule C: The Property You Claim as Exempt* (Official Form 106C). If you do not list the property, the trustee may sell it and pay all of the proceeds to your creditors.

## Chapter 11: Reorganization

| | | |
|---|---|---|
| | $1,167 | filing fee |
| + | $571 | administrative fee |
| | $1,738 | total fee |

Chapter 11 is often used for reorganizing a business, but is also available to individuals. The provisions of chapter 11 are too complicated to summarize briefly.

**Read These Important Warnings**

Because bankruptcy can have serious long-term financial and legal consequences, including loss of your property, you should hire an attorney and carefully consider all of your options before you file. Only an attorney can give you legal advice about what can happen as a result of filing for bankruptcy and what your options are. If you do file for bankruptcy, an attorney can help you fill out the forms properly and protect you, your family, your home, and your possessions.

Although the law allows you to represent yourself in bankruptcy court, you should understand that many people find it difficult to represent themselves successfully. The rules are technical, and a mistake or inaction may harm you. If you file without an attorney, you are still responsible for knowing and following all of the legal requirements.

You should not file for bankruptcy if you are not eligible to file or if you do not intend to file the necessary documents.

Bankruptcy fraud is a serious crime; you could be fined and imprisoned if you commit fraud in your bankruptcy case. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Chapter 12: Repayment plan for family farmers or fishermen

|   | $200 | filing fee |
|---|------|------------|
| + | $78  | administrative fee |
|   | $278 | total fee |

Similar to chapter 13, chapter 12 permits family farmers and fishermen to repay their debts over a period of time using future earnings and to discharge some debts that are not paid.

### Chapter 13: Repayment plan for individuals with regular income

|   | $235 | filing fee |
|---|------|------------|
| + | $78  | administrative fee |
|   | $313 | total fee |

Chapter 13 is for individuals who have regular income and would like to pay all or part of their debts in installments over a period of time and to discharge some debts that are not paid. You are eligible for chapter 13 only if your debts are not more than certain dollar amounts set forth in 11 U.S.C. § 109.

Under chapter 13, you must file with the court a plan to repay your creditors all or part of the money that you owe them, usually using your future earnings. If the court approves your plan, the court will allow you to repay your debts, as adjusted by the plan, within 3 years or 5 years, depending on your income and other factors.

After you make all the payments under your plan, many of your debts are discharged. The debts that are not discharged and that you may still be responsible to pay include:

> domestic support obligations,
>
> most student loans,
>
> certain taxes,
>
> debts for fraud or theft,
>
> debts for fraud or defalcation while acting in a fiduciary capacity,
>
> most criminal fines and restitution obligations,
>
> certain debts that are not listed in your bankruptcy papers,
>
> certain debts for acts that caused death or personal injury, and
>
> certain long-term secured debts.

**Warning: File Your Forms on Time**

Section 521(a)(1) of the Bankruptcy Code requires that you promptly file detailed information about your creditors, assets, liabilities, income, expenses and general financial condition. The court may dismiss your bankruptcy case if you do not file this information within the deadlines set by the Bankruptcy Code, the Bankruptcy Rules, and the local rules of the court.

For more information about the documents and their deadlines, go to:
http://www.uscourts.gov/forms/bankruptcy-forms

**Bankruptcy crimes have serious consequences**

If you knowingly and fraudulently conceal assets or make a false oath or statement under penalty of perjury—either orally or in writing—in connection with a bankruptcy case, you may be fined, imprisoned, or both.

All information you supply in connection with a bankruptcy case is subject to examination by the Attorney General acting through the Office of the U.S. Trustee, the Office of the U.S. Attorney, and other offices and employees of the U.S. Department of Justice.

**Make sure the court has your mailing address**

The bankruptcy court sends notices to the mailing address you list on *Voluntary Petition for Individuals Filing for Bankruptcy* (Official Form 101). To ensure that you receive information about your case, Bankruptcy Rule 4002 requires that you notify the court of any changes in your address.

A married couple may file a bankruptcy case together—called a *joint case.* If you file a joint case and each spouse lists the same mailing address on the bankruptcy petition, the bankruptcy court generally will mail you and your spouse one copy of each notice, unless you file a statement with the court asking that each spouse receive separate copies.

**Understand which services you could receive from credit counseling agencies**

The law generally requires that you receive a credit counseling briefing from an approved credit counseling agency. 11 U.S.C. § 109(h). If you are filing a joint case, both spouses must receive the briefing. With limited exceptions, you must receive it within the 180 days *before* you file your bankruptcy petition. This briefing is usually conducted by telephone or on the Internet.

In addition, after filing a bankruptcy case, you generally must complete a financial management instructional course before you can receive a discharge. If you are filing a joint case, both spouses must complete the course.

You can obtain the list of agencies approved to provide both the briefing and the instructional course from: http://www.uscourts.gov/services-forms/bankruptcy/credit-counseling-and-debtor-education-courses.

In Alabama and North Carolina, go to: http://www.uscourts.gov/services-forms/bankruptcy/credit-counseling-and-debtor-education-courses.

If you do not have access to a computer, the clerk of the bankruptcy court may be able to help you obtain the list.

B2030 (Form 2030) (12/15)

# United States Bankruptcy Court
## Central District of California

In re **Joseph Pedroza Diaz, Jr.** _____ Case No. _____

Debtor(s)                    Chapter    **7** _____

# DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)

1. Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

   For legal services, I have agreed to accept .............................. $ _____ **1,463.00**

   Prior to the filing of this statement I have received ............... $ _____ **1,463.00**

   Balance Due ............................................................................ $ _____ **0.00**

2. $ **338.00** of the filing fee has been paid.

3. The source of the compensation paid to me was:

   ■ Debtor       ☐ Other (specify):

4. The source of compensation to be paid to me is:

   ■ Debtor       ☐ Other (specify):

5. ■ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

   ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached.

6. In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

   a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
   b. Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
   c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
   d. [Other provisions as needed]
      **Negotiations with secured creditors to reduce to market value; exemption planning; preparation and filing of reaffirmation agreements and applications as needed; preparation and filing of motions pursuant to 11 USC 522(f)(2)(A) for avoidance of liens on household goods.**

7. By agreement with the debtor(s), the above-disclosed fee does not include the following service:
   **Representation of the debtors in any dischargeability actions, judicial lien avoidances, relief from stay actions or any other adversary proceeding.**

---

### CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

**February 15, 2024** _____        /s/ Kevin Tang _____
_Date_                                                **Kevin Tang**
                                                      _Signature of Attorney_
                                                      **Tang & Associates**
                                                      **17011 Beach Blvd Suite 900**
                                                      **Huntington Beach, CA 92647**
                                                      **714-594-7022  Fax: 714-421-4439**
                                                      **kevin@tang-associates.com**
                                                      _Name of law firm_

| Fill in this information to identify your case: | Check one box only as directed in this form and in Form 122A-1Supp: |
|---|---|

Fill in this information to identify your case:

Debtor 1    **Joseph Pedroza Diaz, Jr.**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Central District of California

Case number
(if known)

Check one box only as directed in this form and in Form 122A-1Supp:

☑ 1. There is no presumption of abuse.

☐ 2. The calculation to determine if a presumption of abuse applies will be made under *Chapter 7 Means Test Calculation* (Official Form 122A-2).

☐ 3. The Means Test does not apply now because of qualified military service but it could apply later.

☐ Check if this is an amended filing

## Official Form 122A – 1
# Chapter 7 Statement of Your Current Monthly Income
**12/19**

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for being accurate. If more space is needed, attach a separate sheet to this form. Include the line number to which the additional information applies. On the top of any additional pages, write your name and case number (if known). If you believe that you are exempted from a presumption of abuse because you do not have primarily consumer debts or because of qualifying military service, complete and file *Statement of Exemption from Presumption of Abuse Under § 707(b)(2)* (Official Form 122A-1Supp) with this form.

**Part 1:**    Calculate Your Current Monthly Income

1. **What is your marital and filing status?** Check one only.

   ☑ **Not married.** Fill out Column A, lines 2-11.

   ☐ **Married and your spouse is filing with you.** Fill out both Columns A and B, lines 2-11.

   ☐ **Married and your spouse is NOT filing with you.** You and your spouse are:

     ☐ **Living in the same household and are not legally separated.** Fill out both Columns A and B, lines 2-11.

     ☐ **Living separately or are legally separated.** Fill out Column A, lines 2-11; do not fill out Column B. By checking this box, you declare under penalty of perjury that you and your spouse are legally separated under nonbankruptcy law that applies or that you and your spouse are living apart for reasons that do not include evading the Means Test requirements. 11 U.S.C § 707(b)(7)(B).

Fill in the average monthly income that you received from all sources, derived during the 6 full months before you file this bankruptcy case. 11 U.S.C. § 101(10A). For example, if you are filing on September 15, the 6-month period would be March 1 through August 31. If the amount of your monthly income varied during the 6 months, add the income for all 6 months and divide the total by 6. Fill in the result. Do not include any income amount more than once. For example, if both spouses own the same rental property, put the income from that property in one column only. If you have nothing to report for any line, write $0 in the space.

| | | Column A<br>Debtor 1 | Column B<br>Debtor 2 or<br>non-filing spouse |
|---|---|---|---|
| 2. | **Your gross wages, salary, tips, bonuses, overtime, and commissions** (before all payroll deductions). | $ 0.00 | $ |
| 3. | **Alimony and maintenance payments.** Do not include payments from a spouse if Column B is filled in. | $ 0.00 | $ |
| 4. | **All amounts from any source which are regularly paid for household expenses of you or your dependents, including child support.** Include regular contributions from an unmarried partner, members of your household, your dependents, parents, and roommates. Include regular contributions from a spouse only if Column B is not filled in. Do not include payments you listed on line 3. | $ 0.00 | $ |

5. **Net income from operating a business, profession, or farm**

| | Debtor 1 | | | |
|---|---|---|---|---|
| Gross receipts (before all deductions) | $ 5,000.00 | | | |
| Ordinary and necessary operating expenses | -$ 0.00 | | | |
| Net monthly income from a business, profession, or farm | $ 5,000.00 | Copy here -> $ 5,000.00 | $ |

6. **Net income from rental and other real property**

| | Debtor 1 | | |
|---|---|---|---|
| Gross receipts (before all deductions) | $ 0.00 | | |
| Ordinary and necessary operating expenses | -$ 0.00 | | |
| Net monthly income from rental or other real property | $ 0.00 | Copy here -> $ 0.00 | $ |

| 7. | **Interest, dividends, and royalties** | $ 0.00 | $ |
|---|---|---|---|

Debtor 1  **Joseph Pedroza Diaz, Jr.** _____  Case number (*if known*) _____

|  | | Column A<br>Debtor 1 | Column B<br>Debtor 2 or<br>non-filing spouse |
|---|---|---|---|

8. **Unemployment compensation** — $ 0.00 / $ ___

   Do not enter the amount if you contend that the amount received was a benefit under the Social Security Act. Instead, list it here:

   For you _____ $ 0.00

   For your spouse _____ $ ___

9. **Pension or retirement income.** Do not include any amount received that was a benefit under the Social Security Act. Also, except as stated in the next sentence, do not include any compensation, pension, pay, annuity, or allowance paid by the United States Government in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services. If you received any retired pay paid under chapter 61 of title 10, then include that pay only to the extent that it does not exceed the amount of retired pay to which you would otherwise be entitled if retired under any provision of title 10 other than chapter 61 of that title. — $ 0.00 / $ ___

10. **Income from all other sources not listed above.** Specify the source and amount. Do not include any benefits received under the Social Security Act; payments received as a victim of a war crime, a crime against humanity, or international or domestic terrorism; or compensation  pension, pay, annuity, or allowance paid by the United States Government in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services. If necessary, list other sources on a separate page and put the total below..

    . _____ $ 0.00 / $ ___

    _____ $ 0.00 / $ ___

    Total amounts from separate pages, if any.  + $ 0.00 / $ ___

11. **Calculate your total current monthly income.** Add lines 2 through 10 for each column. Then add the total for Column A to the total for Column B.  $ 5,000.00 + $ ___ = $ 5,000.00

    **Total current monthly income**

| **Part 2:** | Determine Whether the Means Test Applies to You |
|---|---|

12. **Calculate your current monthly income for the year.** Follow these steps:

    12a. Copy your total current monthly income from line 11 ........... **Copy line 11 here=>**  $ 5,000.00

    Multiply by 12 (the number of months in a year)  **x 12**

    12b. The result is your annual income for this part of the form  12b. $ 60,000.00

13. **Calculate the median family income that applies to you.** Follow these steps:

    Fill in the state in which you live.  **CA**

    Fill in the number of people in your household.  **3**

    Fill in the median family income for your state and size of household.  13. $ 105,130.00

    To find a list of applicable median income amounts, go online using the link specified in the separate instructions for this form. This list may also be available at the bankruptcy clerk's office.

14. **How do the lines compare?**

    14a. ☑ Line 12b is less than or equal to line 13. On the top of page 1, check box 1, *There is no presumption of abuse.*
    Go to Part 3. Do NOT fill out or file Official Form 122A-2.

    14b. ☐ Line 12b is more than line 13. On the top of page 1, check box 2, *The presumption of abuse is determined by Form 122A-2.*
    Go to Part 3 and fill out Form 122A–2.

Debtor 1   **Joseph Pedroza Diaz, Jr.**                                  Case number (if known)

| Part 3: | **Sign Below** |
|---|---|

By signing here, I declare under penalty of perjury that the information on this statement and in any attachments is true and correct.

X _____

**Joseph Pedroza Diaz, Jr.**
Signature of Debtor 1

Date **February 14, 2024**
MM / DD / YYYY

If you checked line 14a, do NOT fill out or file Form 122A-2.

If you checked line 14b, fill out Form 122A-2 and file it with this form.

| Debtor 1 | **Joseph Pedroza Diaz, Jr.** | Case number (*if known*) | |

### Current Monthly Income Details for the Debtor

**Debtor Income Details:**
Income for the Period **08/01/2023** to **01/31/2024**.

**Line 5 - Income from operation of a business, profession, or farm**
Source of Income: **Self Employment Income**
Constant income of  **5,000.00**  per month.
Constant expense of  **0.00**  per month.
Net Income  **5,000.00**  per month.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **Kevin Tang**<br>**17011 Beach Blvd Suite 900**<br>**Huntington Beach, CA 92647**<br>**714-594-7022 Fax: 714-421-4439**<br>California State Bar Number: **291051 CA**<br>**kevin@tang-associates.com** | |

☐  Debtor(s) appearing without an attorney

■  Attorney for Debtor

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

In re:

**Joseph Pedroza Diaz, Jr.**

CASE NO.:

CHAPTER: **7**

### VERIFICATION OF MASTER
### MAILING LIST OF CREDITORS

[LBR 1007-1(a)]

Debtor(s).

Pursuant to LBR 1007-1(a), the Debtor, or the Debtor's attorney if applicable, certifies under penalty of perjury that the master mailing list of creditors filed in this bankruptcy case, consisting of **1** sheet(s) is complete, correct, and consistent with the Debtor's schedules and I/we assume all responsibility for errors and omissions.

Date: **February 14, 2024**

_____
Signature of Debtor 1

Date: _____

_____
Signature of Debtor 2 (joint debtor) ) (if applicable)

Date: **February 14, 2024**

_____
Signature of Attorney for Debtor (if applicable)

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2015

**F 1007-1.MAILING.LIST.VERIFICATION**

Joseph Pedroza Diaz, Jr.
204 N. Grand Ave
Covina, CA 91724


Kevin Tang
Tang & Associates
17011 Beach Blvd Suite 900
Huntington Beach, CA 92647


Franchise Tax Board
Bankruptcy Section MS A340
PO BOX 2952
Sacramento, CA 95812-2952


Internal Revenue Service
PO BOX 7346
Philadelphia, PA 19101


Moses Heredia
1 Morning Dove
Laguna Niguel, CA 92677


Moses Heredia
c/o Federal Practice Group
431 N Brookhurst St Ste 130
Anaheim, CA 92801


Riverside County Department of Child Sup
Attn: Bankruptcy
2041 Iowa Avenue
Riverside, CA 92507

# Exhibit M



**rafaelheredia7**  ...



**View insights**

♡  ○  ◁                                                    ⊡

 Liked by **team_rodriguez87** and **28 others**
**rafaelheredia7** Vin diesel Jojo Olympic team mates and myself killing it in London.

View all 5 comments

December 4, 2014

# Exhibit N



The Federal Practice Group

**Date: 4/4/2024**

801 17th Street, NW

Suite 250

Washington, DC 20006

**Client**: Heredia, Ralph (MTK)

**Attorney Fees**: $492,136.60

**Costs**: $21,017.59

**Total Fees and Costs**: $513,154.19

**Total Hours**: 837.7

## Attorney Fees

| Date | User | Rate | Hours | Total | Description |
|------|------|------|-------|-------|-------------|
| 10/30/2020 | Jason Moy | $717.00 | 0.8 | $573.60 | Review case file |
| 11/9/2020 | Ian Hargreaves | $520.00 | 0.1 | $52.00 | Email to Jason |
| 11/13/2020 | Jason Moy | $717.00 | 0.3 | $215.10 | Telephone call to ESM in re complaint and jurisdiction issues |
| 11/13/2020 | Jason Moy | $717.00 | 0.5 | $358.50 | Review 12b6 research by IH and YY |
| 11/13/2020 | Jason Moy | $717.00 | 0.5 | $358.50 | Research failure to join an indispensable party. |
| 11/13/2020 | Jason Moy | $717.00 | 1.7 | $1,218.90 | Research on complaint jurisdiction |
| 11/13/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to ESM in re pro hac |
| 11/18/2020 | Jason Moy | $717.00 | 1.1 | $788.70 | Research filing a civil RICO suit |
| 11/19/2020 | Jason Moy | $717.00 | 0.2 | $143.40 | Research calendar dates - email to DC and JEL to calendar. |
| 11/19/2020 | Jason Moy | $717.00 | 0.2 | $143.40 | Research MTK and possible money laundering |
| 11/19/2020 | Carol Thompson | $697.00 | 0.4 | $278.80 | Review the complaint. |
| 11/19/2020 | Jason Moy | $717.00 | 0.9 | $645.30 | Telephone call to ESM, WC, and CAT in re strategy on the case. |
| 11/19/2020 | Jason Moy | $717.00 | 1 | $717.00 | Research RICO possibility; search for predicate acts of MTK. |
| 11/30/2020 | Jason Moy | $717.00 | 5.5 | $3,943.50 | Draft complaint |
| 12/1/2020 | Jason Moy | $717.00 | 0.4 | $286.80 | Email to ESM with civil RICO research |

| 12/1/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Telephone call from ESM in re complaint and civil RICO |
|---|---|---|---|---|---|
| 12/4/2020 | Jason Moy | $717.00 | 0.9 | $645.30 | Email to team on possible issues in the manager K. (researched and drafted in the email sent). |
| 12/4/2020 | Carol Thompson | $697.00 | 0.8 | $557.60 | Review and revise the complaint. |
| 12/6/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re factual matters |
| 12/7/2020 | Jason Moy | $717.00 | 1.1 | $788.70 | Research Civil Rico |
| 12/8/2020 | Jason Moy | $717.00 | 1.6 | $1,147.20 | Draft complaint |
| 12/8/2020 | Jason Moy | $717.00 | 0.6 | $430.20 | Telephone call from ESM in re MTD. |
| 12/8/2020 | Jason Moy | $717.00 | 1.8 | $1,290.60 | Draft table of authorities; research local rules for other formatting requirements. |
| 12/8/2020 | Jason Moy | $717.00 | 2 | $1,434.00 | Draft RICO portion of complaint. |
| 12/9/2020 | Ji-Eun Lee | $220.00 | 0.4 | $88.00 | Review JWM's email and call with JWM re pro hac package. |
| 12/9/2020 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Modify pro hac package for RD's review and follow up via email. |
| 12/9/2020 | Carol Thompson | $697.00 | 0.8 | $557.60 | Revise the complaint. |
| 12/10/2020 | Jason Moy | $717.00 | 5.4 | $3,871.80 | Draft complaint |
| 12/12/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Review Email from ESM in re complaint |
| 12/14/2020 | Jason Moy | $717.00 | 1.8 | $1,290.60 | Revise complaint v4 |
| 12/14/2020 | Jason Moy | $717.00 | 0.4 | $286.80 | Telephone call from ESM to go over complaint |
| 12/14/2020 | Jason Moy | $717.00 | 0.3 | $215.10 | Research into Mack the knife LTD |
| 12/14/2020 | Jason Moy | $717.00 | 3 | $2,151.00 | Revise complaint |
| 12/16/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to RH with updated complaint |
| 12/16/2020 | Jason Moy | $717.00 | 0.7 | $501.90 | Telephone call to RH in re update |
| 12/16/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re how to achieve service of process |
| 12/16/2020 | Jason Moy | $717.00 | 1.8 | $1,290.60 | Revise complaint |
| 12/16/2020 | Jason Moy | $717.00 | 1.5 | $1,075.50 | Research calendar of events |
| 12/17/2020 | Jason Moy | $717.00 | 0.8 | $573.60 | Revise complaint. |
| 12/17/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Dubai counsel |
| 12/17/2020 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Telephone call to JWM to discuss complaint |
| 12/17/2020 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Research on local process server in LA county and follow up with the attorneys via email. |
| 12/17/2020 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call from ESM discussing complaint |
| 12/17/2020 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Review the emails from JWM/RD and calendar multiple deadlines and follow up emails with DC. |

| 12/17/2020 | Jason Moy | $717.00 | 0.7 | $501.90 | Research unfair comp in ca |
|---|---|---|---|---|---|
| 12/17/2020 | Jason Moy | $717.00 | 0.2 | $143.40 | Review proposed order |
| 12/18/2020 | Jason Moy | $717.00 | 0.2 | $143.40 | Email to RD concerning emailing a word copy to the judge's chamber email with the working copy of proposed order |
| 12/18/2020 | Jason Moy | $717.00 | 1.2 | $860.40 | Revise final draft with ESM comments. |
| 12/18/2020 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Email to RD re: Heredia complaint edits |
| 12/18/2020 | Jason Moy | $717.00 | 0.3 | $215.10 | Research service of process and summons |
| 12/18/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to ESM and RD with the final draft |
| 12/18/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re whether plaintiff responded. |
| 12/18/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Telephone call from ESM in re complaint |
| 12/18/2020 | Jason Moy | $717.00 | 0.9 | $645.30 | Revise complaint and draft associated documents |
| 12/18/2020 | Jason Moy | $717.00 | 0.4 | $286.80 | Telephone call to RH |
| 12/19/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | texting with ESM in re case |
| 12/21/2020 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Email to Paul Healy re: questions regarding the case |
| 12/21/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Dubai firm with complaint. |
| 12/21/2020 | Carol Thompson | $697.00 | 1 | $697.00 | Review the filed complaint and response to motion to dismiss. |
| 12/22/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re complaint filing and summons / notice of interested parties. |
| 12/22/2020 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re news articles surrounding the filing of the complaint. |
| 12/22/2020 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Email to the local process server company re the service and follow up with RD/JWM via email. |
| 12/23/2020 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Order the certificate of good standing via DC bar online and follow up with the attorneys via email. |
| 12/23/2020 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Check the status of the certificate of good standing from NJ to DC and follow up with the attorneys via email. |
| 12/23/2020 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Pacer Search and review the docket report and email to RD/JWM/ESM re Notice of Pro Hac Vice Application Due. |
| 12/23/2020 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Emails with another process server company. |
| 12/27/2020 | Jason Moy | $717.00 | 2 | $1,434.00 | Draft reply to PI opposition. (with associated research) |

3

| 12/27/2020 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call from ESM and RD |
|---|---|---|---|---|---|
| 12/28/2020 | Jason Moy | $717.00 | 0.7 | $501.90 | Revise reply after getting revisions from BC and RD. |
| 12/28/2020 | Jason Moy | $717.00 | 2.6 | $1,864.20 | Draft reply |
| 1/4/2021 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Phone call with JWM to discuss case |
| 1/4/2021 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Phone call with JWM and RD to discuss case updates |
| 1/4/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Telephone call from ESM and ROD in re case update. |
| 1/4/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Review the PACER docket report and download the order and follow up with the attorneys via email. |
| 1/4/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call from ESM to discuss the case |
| 1/4/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review CM/ECF documents |
| 1/4/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to ESM and ROD in re continuance and judge v. magistrate. |
| 1/5/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Telephone call to RH in re LF with ESM |
| 1/5/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review docket reports for both actions |
| 1/5/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Review/inquire case docket reports via PACER and follow up with JWM via email. |
| 1/5/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Emails to the process server company re international service. |
| 1/5/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Telephone call to JWM in re requirements. |
| 1/5/2021 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Telephone call from RH in re: LF with JWM |
| 1/5/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call from JEL in re requirements |
| 1/6/2021 | Jason Moy | $717.00 | 1.1 | $788.70 | Telephone call to MH, RH, ESM, ROD, and Steve Bash. |
| 1/6/2021 | Jason Moy | $717.00 | 0.6 | $430.20 | Telephone call to RD for an update |
| 1/6/2021 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Telephone call with JWM, RD re: updates |
| 1/6/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call from JEL in re: service of summons |
| 1/6/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Call with JWM in re service of summons. |
| 1/6/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to JEL in re service. |
| 1/6/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call to ESM and ROD in re update |
| 1/6/2021 | Eric Montalvo | $751.00 | 1.1 | $826.10 | Conference call with JWM, RD, Heredia, Bash |
| 1/6/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Meeting with Dubai firm seeking how to serve process on MTK and Mr. Kinahan in Dubai via Zoom with ESM and CAT. |

| 1/6/2021 | Carol Thompson | $697.00 | 0.1 | $69.70 | Conference call with ESM, JWM, and Dubai counsel re effecting service of MTK. |
|---|---|---|---|---|---|
| 1/8/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to RH in re JoJo DUI case |
| 1/12/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Research on service of process in UAE and Spain |
| 1/12/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to ESM, RD, CAT in re Dubai service. |
| 1/12/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Research FRCP 11 |
| 1/12/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Telephone call to Mr. Slate in re process service in Spain |
| 1/12/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Draft email for ESM review on costs |
| 1/12/2021 | Jason Moy | $717.00 | 0.7 | $501.90 | Telephone call to ESM to discuss the case |
| 1/12/2021 | Jason Moy | $717.00 | 1 | $717.00 | Draft thoughts on amending complaint; emailed to ESM/ROD |
| 1/13/2021 | Jason Moy | $717.00 | 2 | $1,434.00 | Draft amended complaint |
| 1/13/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re amending complaint. |
| 1/14/2021 | Jason Moy | $717.00 | 1.6 | $1,147.20 | Draft second submission of motion to dismiss |
| 1/14/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Pull up docket reports from PACER re Diaz & MTK matters and follow up with the attorneys via email. |
| 1/14/2021 | Jason Moy | $717.00 | 0.4 | $286.80 | Telephone call to ESM, RD, and CAT |
| 1/15/2021 | Jason Moy | $717.00 | 0.4 | $286.80 | Research cal ethics rules in re confidential emails |
| 1/15/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Research legislative history Cal. Bus and Prof Code 18628 |
| 1/15/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Confer with JWM and send an invoice to the client via email. (No Charge Recommended). |
| 1/15/2021 | Jason Moy | $717.00 | 1.5 | $1,075.50 | Revise amended complaint. |
| 1/15/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Telephone call to ESM |
| 1/18/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Revise amended complaint; email to team for filing |
| 1/19/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re motion to dismiss |
| 1/19/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download amended complaint and summons via PACER and follow up with RD/JWM/ESM via email. |
| 1/20/2021 | Eric Montalvo | $751.00 | 1.2 | $901.20 | Conference call with JWM, Heredia, Bash |
| 1/20/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download motion and memorandum via PACER and follow up with JWM/ESM/RD via email. |

| 1/20/2021 | Jason Moy | $717.00 | 1.2 | $860.40 | Meeting with MH, RH, Mr. Bash and ESM |
|-----------|-----------|---------|-----|---------|---------------------------------------|
| 1/20/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re phone call |
| 1/21/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download summons via PACER and follow up with the attorneys via email. |
| 1/21/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Review letters sent by Mr. Bash |
| 1/22/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download summons via PACER and follow up with the attorneys via email. |
| 1/23/2021 | Ji-Eun Lee | $220.00 | 0.3 | $66.00 | Review the filings/docket report/ the rule and email to RD re calendaring and status. |
| 1/25/2021 | Carol Thompson | $697.00 | 0.1 | $69.70 | Phone call with JWM re service of summons. |
| 1/25/2021 | Jason Moy | $717.00 | 0.9 | $645.30 | Research service and waiver of service; emailed to team; completed various CACD forms. |
| 1/25/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download additional summons via PACER and follow up with the attorneys via email. |
| 1/26/2021 | Jason Moy | $717.00 | 1.5 | $1,075.50 | Research constructive trusts |
| 1/27/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Review information on constructive trusts sent by ESM |
| 1/27/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Email to ESM, RD, CAT on constructive trusts |
| 1/27/2021 | Carol Thompson | $697.00 | 0.6 | $418.20 | Phone call with JWM re the constructive trust. |
| 1/28/2021 | Jason Moy | $717.00 | 3.4 | $2,437.80 | Draft memo on constructive trusts |
| 1/28/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to DH of FR in re constructive trusts |
| 1/29/2021 | Jason Moy | $717.00 | 0.7 | $501.90 | Telephone call to RH |
| 1/29/2021 | Jason Moy | $717.00 | 0.4 | $286.80 | Draft emails for RD/ESM for service |
| 1/29/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download plaintiff's opposition and follow up with RD/JWM. |
| 1/29/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to CAT in re TRO / PI |
| 1/29/2021 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Telephone call to JWM |
| 1/29/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call from ESM |
| 1/30/2021 | Jason Moy | $717.00 | 1.9 | $1,362.30 | Draft PI |
| 1/30/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review Email from Dubai firm |
| 2/1/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Pull up docket report and email to DC/RPW/ESM re EDVA case. |
| 2/1/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Review email from DC and response email to DC/RD including judge's chambers' contact info. |
| 2/1/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Pull up emails re Steven Bash and follow up with ESM/DC via email. |

| 2/1/2021 | Ji-Eun Lee | $220.00 | 0.3 | $66.00 | Review EDVA filings and follow up with ESM/DC via email. |
|---|---|---|---|---|---|
| 2/1/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Call from DC/ESM re document search for Friday's filing. |
| 2/2/2021 | Ji-Eun Lee | $220.00 | 0.5 | $110.00 | Review emails from JWM and search case information from Pomona Courthouse and El Monte Courthouse and follow up with JWM via email. |
| 2/2/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Review email from ESM/DC and transfer the video file to the team via LeapFile. |
| 2/2/2021 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Email to Heredia's re: records on MTK |
| 2/3/2021 | Ji-Eun Lee | $220.00 | 0.4 | $88.00 | Review email from JWM and research re MTK business in the US and follow up with JWM/RD/ESM via email. |
| 2/3/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Review email from JWM, review the filings, and email to Dubai Firm re status of assistance in serving MTK and Mr. Kinahan in UAE. |
| 2/3/2021 | Jason Moy | $717.00 | 1 | $717.00 | Research whether criminal activity can be a cause for irreparable harm; email to ESM and team. |
| 2/3/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Revise spreadsheet |
| 2/3/2021 | Ji-Eun Lee | $220.00 | 0.3 | $66.00 | Review email from JWM and modify waiver service form and follow up with JWM via email with additional questions and draft email language. |
| 2/3/2021 | Ji-Eun Lee | $220.00 | 0.3 | $66.00 | Review email from JWM and Pacer Search for filings and follow up with JWM via email. |
| 2/3/2021 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Phone call with JWM re: discuss Heredia matters |
| 2/3/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review Email from JEL and response in re MTK service. |
| 2/3/2021 | Jason Moy | $717.00 | 1 | $717.00 | Review BBC Panorama report. |
| 2/3/2021 | Jason Moy | $717.00 | 0.7 | $501.90 | Draft email for RD to send to Mr. Gibson in Spain in re service and associated research regarding waiver and translation. |
| 2/3/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Mr. Bash in re letter to commission. |
| 2/3/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Search docket report and follow up with JWM via email re the proposed order and show cause. |
| 2/3/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | combine Lynnay declaration. |

7

| 2/4/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Daily reminder email to the Dubai firm re the status of the assistance in serving MTK and Mr. Kinahan in UAE. (No Charge Recommended). |
|---|---|---|---|---|---|
| 2/4/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Email to JWM re follow up questions re email to the Dubai Firm. (No Charge Recommended). |
| 2/4/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Review email from JWM and pull up docket report for JWM. |
| 2/4/2021 | Ji-Eun Lee | $220.00 | 0.4 | $88.00 | Review email from JWM and additional research re MTK business in the US and follow up with JWM via email. |
| 2/4/2021 | Carol Thompson | $697.00 | 0.1 | $69.70 | Review email from SB; place call to JWM to discuss. |
| 2/5/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Daily reminder email to the Dubai firm re the status of the assistance in serving MTK and Mr. Kinahan in UAE. (No Charge Recommended). |
| 2/5/2021 | Eric Montalvo | $751.00 | 0.9 | $675.90 | Phone call with JWM |
| 2/5/2021 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Conference call with CAT, JWM, WC re: strategy |
| 2/5/2021 | Eric Montalvo | $751.00 | 0 | $0.00 | Series of emails to JWM and Bash re: draft |
| 2/6/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Response email to Dubai firm re receipt confirmation. (No Charge Recommended). |
| 2/8/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Review the email from JWM and email to the process server company encl amended complaint and summons. |
| 2/8/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Research serving a foreign corporation in domestic subsidiary |
| 2/8/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Call to the clerk's office and connect JWM and follow up email to JWM re summons. |
| 2/8/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Online research and emails with the process service company re service in AZ and other states. |
| 2/8/2021 | Ji-Eun Lee | $220.00 | 0.3 | $66.00 | Telephone call with ESM, CAT, JWM in re serving MTK |
| 2/8/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Telephone call from ESM, CAT, JEL in re serving MTK |
| 2/8/2021 | Carol Thompson | $697.00 | 0.3 | $209.10 | Conference call regarding service of MTK. |
| 2/8/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review news article sent by RH. |

| 2/9/2021 | Ian Hargreaves | $520.00 | 2.9 | $1,508.00 | Research into Frampton/McGuigan case in Northern Ireland High Court; locating lawyers for MTK/Kinahan; email to Jason with results |
|---|---|---|---|---|---|
| 2/9/2021 | Carol Thompson | $697.00 | 0.6 | $418.20 | Research alternatives for service. |
| 2/9/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Response email to the Dubai firm re the status of the assistance in serving MTK and Mr. Kinahan in UAE. |
| 2/9/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to IH and YY on MTK service. |
| 2/9/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call from Mr. Bash |
| 2/9/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Emails to the process server company re the status of the service and invoice. |
| 2/9/2021 | Ya You | $220.00 | 3.6 | $792.00 | Researching Irish lawsuit filings concerning MTK and Kinahan |
| 2/9/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to ESM, ROD on MTK service |
| 2/10/2021 | Jason Moy | $717.00 | 0.6 | $430.20 | Research international service issues; email to IH to conduct additional case law research. |
| 2/10/2021 | Jason Moy | $717.00 | 1.5 | $1,075.50 | Research service of process in Spain |
| 2/10/2021 | Ian Hargreaves | $520.00 | 1.7 | $884.00 | Research into UAE service under 4(f)(2)(C)(ii) and email to Jason with results |
| 2/10/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Review research completed by IH on time limit to serve foreign citizens. |
| 2/10/2021 | Ian Hargreaves | $520.00 | 0.4 | $208.00 | Email to Jason with research on foreign service under FRCP 4(m) |
| 2/10/2021 | Ian Hargreaves | $520.00 | 2.2 | $1,144.00 | Research into foreign service requirements; research into local rules |
| 2/10/2021 | Ian Hargreaves | $520.00 | 0.3 | $156.00 | Reviewing Jason email detailing foreign service question and attached materials on FRCP 4(m)/service in foreign countries |
| 2/10/2021 | Jason Moy | $717.00 | 0.7 | $501.90 | Research service of process in UAE |
| 2/10/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Research power of attorneys in Dubai |
| 2/10/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Telephone call from ESM |
| 2/10/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Confer with the client intake and prepare general POA for Moses Heredia for JWM's review. |
| 2/10/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Emails to the process server company re the status of the service. |
| 2/10/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Review email and res in re Dubai service |
| 2/10/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Review Spanish process server website and requested a quote. |
| 2/10/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Dubai firm |
| 2/11/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Telephone call from RD in re service |

9

| 2/11/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to JEL in re service in AZ |
|---|---|---|---|---|---|
| 2/11/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Email to the process server company re the status of the service. (No Charge Recommended). |
| 2/11/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Spanish service company |
| 2/11/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call from ESM in re Dubai service |
| 2/11/2021 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Email to Cestero re: Waiver of Service |
| 2/11/2021 | Eric Montalvo | $751.00 | 0.8 | $600.80 | Conference call with JWM, Heredia's, Bash |
| 2/11/2021 | Ya You | $220.00 | 3.5 | $770.00 | researching Rule 4(f)(2)(C)(ii) service of process in UAE |
| 2/11/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re service in Dubai |
| 2/12/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Follow up with JWM/RD re complete service and response email to the process server re invoice. (No Charge Recommended). |
| 2/12/2021 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Series of email to Heredia's re: Waiver of Service |
| 2/12/2021 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Email to reporter re: statement |
| 2/12/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review Email from YY on UAE service |
| 2/12/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download the waiver of service and NOA via PACER and follow up with the attorneys via email. |
| 2/13/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Review news articles |
| 2/13/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review Email from RH and Mr. Bash in re payment. |
| 2/15/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review Email from DC for scheduling Dubai call. |
| 2/17/2021 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Phone call to JWM re: service |
| 2/17/2021 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Zoom call with JWM/RD/PM/BND and Dubai firm re: Heredia invoice |
| 2/17/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Telephone call from ESM in re service. |
| 2/17/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to ROD in re new summons will be needed soon. |
| 2/17/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Spanish Service Company for translation costs |
| 2/17/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Meeting with Dubai firm for service of process |
| 2/18/2021 | Jason Moy | $717.00 | 0.6 | $430.20 | Telephone call to ESM, Heredia's, and Bash |

| 2/18/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Response email to the process server in AZ re copies of affidavit and follow up with JWM/RD via email (No Charge Recommended). |
|---|---|---|---|---|---|
| 2/18/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Telephone call to ESM, ROD, Heredia's, and Mr. Bash |
| 2/18/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review emails from Steve Bash. |
| 2/18/2021 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Conference call with JWM/RD Heredia's, Steve Bash |
| 2/18/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to ESM on costs of Spanish service (Gibson) |
| 2/22/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Draft letter to Mr. Servais |
| 2/22/2021 | Eric Montalvo | $751.00 | 0.7 | $525.70 | Phone call with JWM re: case update |
| 2/22/2021 | Jason Moy | $717.00 | 0.7 | $501.90 | Telephone call from ESM in re case update |
| 2/22/2021 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Email to JWM re: MTK response letter |
| 2/22/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Research emailing parties with complaint. |
| 2/22/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re JoJo MTK contract and MTK address |
| 2/22/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re Dubai Firm and new invoice |
| 2/23/2021 | Jason Moy | $717.00 | 1 | $717.00 | Draft reply |
| 2/23/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review news article sent by RH in re MTK Global |
| 2/23/2021 | Jason Moy | $717.00 | 0.4 | $286.80 | Telephone call to Mr. Steve Bash |
| 2/24/2021 | Jason Moy | $717.00 | 0.4 | $286.80 | Telephone call to ESM to discuss reply and case |
| 2/24/2021 | Eric Montalvo | $751.00 | 0.4 | $300.40 | Phone call to JWM to discuss reply and case |
| 2/24/2021 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Phone call to JWM in re: backbrief |
| 2/24/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Telephone call from ESM in re backbrief |
| 3/1/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re invoice for Dubai Firm |
| 3/1/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re Feliciano contact information. |
| 3/1/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Dubai firm in re revised proposal |
| 3/3/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Revise second amended complaint |
| 3/3/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Prepare notes |
| 3/3/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Telephone call to Mr. Reynolds for Spanish Service |
| 3/3/2021 | Jason Moy | $717.00 | 0.4 | $286.80 | Research Mr. Gibson and MTK website - sent email to Spanish service company; |

11

| | | | | | |
|---|---|---|---|---|---|
| | | | | | took screen shot of JoJo's new page on the MTK website |
| 3/3/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Spanish process server cc'ing Bethany |
| 3/3/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call from ESM |
| 3/4/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download notice of dismissal via PACER and follow up with the attorneys via email. |
| 3/4/2021 | Jason Moy | $717.00 | 0.4 | $286.80 | Conference with ROD and ESM on amended complaint |
| 3/4/2021 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Conference call with RD/JMW re: Second amended complaint |
| 3/8/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Email to UAE firm for Service to Kinahan and MTK Global |
| 3/8/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence with Spanish Process Server |
| 3/9/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence with BD and PM for invoices on Spanish and Dubai service. |
| 3/10/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Spanish process server for address of Mr. Gibson |
| 3/10/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Dubai firm with summons for Mr. Kinahan and MTK Global |
| 3/10/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Research on whether civil summons expire. |
| 3/10/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re UAE service |
| 3/11/2021 | Jason Moy | $717.00 | 1.3 | $932.10 | Telephone call to ESM, RH, MH, Mr. Steve Bash. |
| 3/11/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re appellate counsel |
| 3/11/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re service in Spain billing (recommend no charge) |
| 3/11/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Email to Skylar with res task with detailed explanation. |
| 3/11/2021 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Phone call to JWM re: discuss call |
| 3/11/2021 | Eric Montalvo | $751.00 | 1.2 | $901.20 | Conference call with Heredia, Bash |
| 3/11/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to UAE firm with redacted passport |
| 3/15/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to UAE firm with unredacted copy of passport per requirements |
| 3/16/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Moses to get authorization letters signed. |

| 3/16/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Email to Dubai Firm with MTK information and request for Kinahan address, email and phone number. (research as well) |
|---|---|---|---|---|---|
| 3/17/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Emails to Finucane Toner (possible firm that represents Mr. Kinahan) and Brandsmith (possible firm that represents Kinahan / MTK Global) |
| 3/17/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Prepare signed letters to be sent via email to UAE firm. and email to UAE firm. |
| 3/18/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Case related email correspondence and attached documents in re UAE service |
| 3/18/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Case related email correspondence in re Spanish service |
| 3/18/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review Email from Mr. Finucane in re no authority to accept service. |
| 3/28/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to UAE firm |
| 4/6/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Confer with JWM and email to the Dubai firm re defendant's answer due under the UAE law. |
| 4/8/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Telephone call to JEL in re service dates in UAE and timeline for responses. |
| 4/8/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Confer with JWM and email to the Dubai firm re delivery/read receipt of the email with summons to MTK global. |
| 4/8/2021 | Ji-Eun Lee | $220.00 | 0.3 | $66.00 | Review FRCP and emails re UAE service status to calculate the defendants' answer due and follow up email to JWM. |
| 4/12/2021 | Ji-Eun Lee | $220.00 | 0.4 | $88.00 | Review the emails and docket report and draft the affidavit of Mr. Abdultaiyab Bahrainwala re service in UAE and follow up with JWM via email. |
| 4/15/2021 | Eric Montalvo | $751.00 | 1 | $751.00 | Review Reply for Rule 60b Motion |
| 4/15/2021 | Eric Montalvo | $751.00 | 1 | $751.00 | Review and revise Second Amended Complaint |
| 4/15/2021 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Zoom call to Dubai Firm in re: service update |
| 4/15/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Zoom call to Dubai Firm in re service update |
| 4/15/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Prepare for zoom call with Dubai Firm |
| 4/16/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Review the joint stipulation and request for extension and calendar the deadlines. |
| 4/19/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the Joint Stipulation and Request for Extension of Time via |

| | | | | | PACER and follow up with the attorneys via email. |
|---|---|---|---|---|---|
| 4/21/2021 | Jason Moy | $717.00 | 1.1 | $788.70 | Draft second amended complaint in Heredia v. MTK Global et al |
| 4/22/2021 | Jason Moy | $717.00 | 1.7 | $1,218.90 | Revise second amended complaint in Heredia v. MTK Global; |
| 4/29/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Draft stipulation and order |
| 4/29/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | File third stipulation and proposed order |
| 4/30/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the order via PACER and follow up with the attorneys and calendar deadlines. |
| 4/30/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the Request for Clerk to Issue Summons via CM ECF and follow up with the attorneys via email. |
| 4/30/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | File revised summons for Mr. Paul Gibson with new address. |
| 4/30/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Draft updated summons for Mr. Gibson with full address found by process servers. |
| 4/30/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the joint stipulation and request for extension of time via PACER and follow up with the attorneys via email. |
| 5/3/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Mr. Jim Reynolds - service in Spain for Gibson - sent updated summons with new address. |
| 5/3/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review 21 Days Summons via PACER and follow up with the attorneys via email. |
| 5/3/2021 | Jason Moy | $717.00 | 1.2 | $860.40 | Revise affidavit for UAE firm; email to UAE firm |
| 5/5/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Research on UAE service law. |
| 5/5/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Revise declaration for service. |
| 5/6/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Research and email to Steve Bash on when we should submit the accounting to Diaz. |
| 5/10/2021 | Eric Montalvo | $751.00 | 2 | $1,502.00 | Review Second Amended Complaint |
| 5/10/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Review emails and attachments from ESM in re amended complaint and arbitration. |
| 5/12/2021 | Carol Thompson | $697.00 | 0.7 | $487.90 | Conduct research of Fed. R. Civ. P 15 and local rules and engage in email communication re same. |

| 5/18/2021 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Phone calls (2) with JWM re: Heredia complaint |
| 5/18/2021 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Email to JWM re: Heredia Amended Complaint |
| 5/18/2021 | Eric Montalvo | $751.00 | 6 | $4,506.00 | Revise Amended Complaint |
| 5/19/2021 | Eric Montalvo | $751.00 | 3 | $2,253.00 | Draft Amended Complaint [PLEASE REVIEW TIME] |
| 5/20/2021 | Jason Moy | $717.00 | 2 | $1,434.00 | Revise amended complaint; research on the issues |
| 5/20/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Draft redline for amended complaint |
| 5/21/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Draft extension of time, proposed order |
| 5/22/2021 | Jason Moy | $717.00 | 1 | $717.00 | Research amended complaint under rule 15 and default judgment issues. |
| 5/24/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Review email from Cestero and filing with redline. |
| 5/24/2021 | Eric Montalvo | $751.00 | 0.8 | $600.80 | Phone call to JWM re discuss matter. |
| 5/25/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the joint stipulation and request for extension via PACER and follow up with the attorneys via email. |
| 5/25/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Review the joint stipulation and motion for extension and calendar deadlines. |
| 5/26/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the declarations via PACER and follow up with the attorneys via email. |
| 6/3/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Review the motion and calendar the deadlines. |
| 6/11/2021 | Daniel Bickel | $220.00 | 0.6 | $132.00 | Drafted memo outlining antitrust caselaw issues in raising claim in the case. |
| 6/11/2021 | Daniel Bickel | $220.00 | 1.4 | $308.00 | Research into anti-trust caselaw relating to case and outlining possible claims that could be raised. |
| 6/12/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Research on amending complaint |
| 6/12/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Review email from MH concerning Paul Gibson, research on whether he may still be at MTK Global, reply to the same. |
| 6/16/2021 | Jason Moy | $717.00 | 1 | $717.00 | Meeting with ESM to review Heredia manager closing, amended complaint, and June 18 status conference. |
| 6/16/2021 | Jason Moy | $717.00 | 2.3 | $1,649.10 | Revise written closing and resend out via email. |
| 6/17/2021 | Jason Moy | $717.00 | 4.3 | $3,083.10 | Revise Second Amended Complaint - 137 - 1600; 1630- |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 6/21/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the joint stipulation and motion for extension of time via PACER and follow up with attorneys via email. |
| 6/21/2021 | Jason Moy | $717.00 | 0.4 | $286.80 | Review Vargas promotion agreement and Cestero email in re breach of K with Vargas. |
| 6/22/2021 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Confer with RD and Steve Bash re case update. |
| 7/1/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review emails in re Feliciano |
| 7/13/2021 | Jason Moy | $717.00 | 1.2 | $860.40 | Revise second amended complaint. |
| 7/13/2021 | Eric Montalvo | $751.00 | 0.7 | $525.70 | Telephone call to JWM re amended complaint. |
| 7/13/2021 | Jason Moy | $717.00 | 0.7 | $501.90 | Telephone call from ESM in re amended complaint |
| 7/14/2021 | Jason Moy | $717.00 | 2.5 | $1,792.50 | Revise second amended complaint |
| 7/15/2021 | Jason Moy | $717.00 | 0.7 | $501.90 | Revise SAC, create redline |
| 7/16/2021 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Call to JWM re SAC, Feliciano. |
| 7/16/2021 | Jason Moy | $717.00 | 1.2 | $860.40 | Draft JS to file SAC and proposed order, research concerning the same. |
| 7/16/2021 | Jason Moy | $717.00 | 0.4 | $286.80 | Revise and file JS to grant leave for SAC. |
| 7/16/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the stipulation and proposed order via PACER and follow up with the attorneys via email. |
| 7/18/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the joint stipulation for leave and exhibits via PACER and follow up with the attorneys via emails. |
| 7/20/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Email to the client encl copies of the stipulations and order. |
| 7/20/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Review the order/proposed order and email to JWM re calendaring. (No Charge Recommended) |
| 7/20/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Review the order and calendar the deadlines. |
| 7/21/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Email to JWM re current calendaring. (No Charge Recommended) |
| 7/21/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Review the order and calculate the deadlines and calendar. |
| 7/21/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Email to the client encl a copy of order. |
| 7/21/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the order and transcript order via PACER and follow up with the attorneys via emails. |
| 7/22/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Texts with MH in re news |

| 7/23/2021 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review email from JWM re Feliciano bout offer. |
|---|---|---|---|---|---|
| 7/27/2021 | Jason Moy | $717.00 | 0.3 | $215.10 | Draft CV 71 for SAC and email the same to ROD for filing subject to ESM approval. |
| 7/28/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to ROD with information needed for filing of SAC. |
| 7/28/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Telephone call to ROD to discuss filing of second amended complaint. |
| 7/29/2021 | Christopher Lin | $220.00 | 2.1 | $462.00 | Research available remedies for tortious interference with contract in California. |
| 7/29/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Research value of tortious interference claims in CA |
| 7/29/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Email to the client encl a copy of the second amended complaint and exhibits. |
| 7/29/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the second amended complaint and exhibits via PACER and follow up with the attorneys via email. |
| 7/30/2021 | Christopher Lin | $220.00 | 0.3 | $66.00 | Telephone call with JWM regarding research assignment on tortious interference of contract claim (Cal.) |
| 7/30/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Review CL research on damages for TIWC. |
| 7/30/2021 | Christopher Lin | $220.00 | 2 | $440.00 | Draft research memorandum on available remedies for tortious interference with contract claims (Cal.) |
| 7/31/2021 | Christopher Lin | $220.00 | 3.7 | $814.00 | Research possibility to recover damages for tortious interference with contract from third party after contract has been rescinded (Cal.) |
| 7/31/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Telephone call to LA County prosecutor contact for information on reporting crime |
| 8/1/2021 | Christopher Lin | $220.00 | 2.6 | $572.00 | Draft research memorandum on recovering compensatory damages for tortious interference with contract after contract has been rescinded (Cal.) |
| 8/2/2021 | Jason Moy | $717.00 | 0.8 | $573.60 | Draft summons for MTK Global, MTK Global USA, Paul Gibson, and Mr. Kinahan and associated legal research. |
| 8/2/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review research on damages for MTK's TI. |
| 8/2/2021 | Christopher Lin | $220.00 | 0.2 | $44.00 | Email to JWM regarding recovering compensatory damages for tortious interference with contract after contract has been rescinded (Cal.) |

| 8/4/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to admin for creation of two invoices. (recommend no charge) |
|---|---|---|---|---|---|
| 8/4/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to KhairAllah UAE firm for quote (recommend no charge) |
| 8/4/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Spanish process server for quote (recommend no charge) |
| 8/4/2021 | Ji-Eun Lee | $220.00 | 0.2 | $44.00 | Review the email from JWM and search/contact a process service company in DE and follow up with JWM via email. |
| 8/4/2021 | Jason Moy | $717.00 | 0.5 | $358.50 | Research serving process on registered agent in Delaware; email to JEL to get the service prepared. |
| 8/5/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the Summons via PACER and follow up with the attorneys via email. |
| 8/5/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to Paige to create invoices for UAE and MTK GLOBAL USA service (recommend no charge) |
| 8/5/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Review UAE service proposal |
| 8/5/2021 | Ji-Eun Lee | $220.00 | 0.1 | $22.00 | Download/review the request to issue summons via PACER and follow up with the attorneys via email. |
| 8/9/2021 | Jason Moy | $717.00 | 0.4 | $286.80 | Prepare to send out summons |
| 8/9/2021 | Jason Moy | $717.00 | 0.2 | $143.40 | Review research by CL on imputing defamation to MTK and follow up email |
| 8/9/2021 | Jason Moy | $717.00 | 0.1 | $71.70 | Email to CL and admin for updates on service and payment (recommend no charge) |
| 8/10/2021 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Text message to/from Michael Simpson re client's matter. |
| 8/12/2021 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Revise joint stipulation and email from JWM on strategy issues in responding to VGC |
| 10/15/2021 | Eric Cox | $751.00 | 3.3 | $2,478.30 | Draft Answer on behalf of HBM in case we need it by Tuesday, 10/19. |
| 10/27/2021 | Eric Cox | $751.00 | 5.1 | $3,830.10 | Heredia v. MTK: review and revise 26f submission, notice of deposition of Diaz; call w/ L. Berry re: 26f submission and further revisions; review 26(a) disclosures |
| 12/9/2021 | Eric Cox | $751.00 | 0.3 | $225.30 | Heredia v MTK: review MTK RFP; group strategy call |

| 12/10/2021 | Eric Cox | $751.00 | 4 | $3,004.00 | Heredia v. MTK: call w. L. Berry re: discovery; begin to review and respond to MTK's RFPs |
|---|---|---|---|---|---|
| 12/13/2021 | Eric Cox | $751.00 | 5.5 | $4,130.50 | Heredia v. MTK: answer much of the MTK RFP; call w/ S. Koneru re: deadlines and case updates |
| 12/13/2021 | Saroja Koneru | $520.00 | 1 | $520.00 | Researched discovery rules for response to MTK's discovery request. |
| 12/13/2021 | Saroja Koneru | $520.00 | 0.5 | $260.00 | Telephone call with EC to discuss the status of the case. |
| 12/17/2021 | Saroja Koneru | $520.00 | 0.5 | $260.00 | Researched status of service upon defendants, pleadings, and deadlines. |
| 1/6/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Email to process server re follow up on Paul Gibon's service of process affidavit |
| 1/6/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review email correspondence from DC to Process Server re service process to Paul Gibson. |
| 1/6/2022 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Review email correspondence from Cestero, Ricardo re settlement documents; responded to same. |
| 1/10/2022 | Eric Cox | $751.00 | 2.5 | $1,877.50 | Moses v. MTK: finish MTK USA 26(f) report draft |
| 1/11/2022 | Saroja Koneru | $520.00 | 0.7 | $364.00 | Put together and emailed RD proof of service documents to be filed. |
| 1/11/2022 | Eric Cox | $751.00 | 0.5 | $375.50 | Moses v. MTK: call w/ LB, SK re: foreign service of process |
| 1/17/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Sent email correspondence to Michael Mancini re meet and confer. |
| 1/20/2022 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Case related email correspondence to/from EAC and LB re MTD draft for submission to opposing counsel. |
| 1/20/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Case related email correspondence to Michael Mancini re MTD for review. |
| 1/25/2022 | Eric Cox | $751.00 | 3.3 | $2,478.30 | Revise applications for entry of default for MTKG and Kinahan; research service issues on foreign defendants; call w/ L. Berry re: same |
| 1/31/2022 | Eric Cox | $751.00 | 0.3 | $225.30 | Heredia v. MTK: finalize applications for default against MTK Global and Heredia; circulate drafts to team |
| 2/1/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review email from Michael Mancini (Counsel for MTK) re call scheduling. |

| 2/1/2022 | Eric Cox | $751.00 | 1.2 | $901.20 | Heredia v. MTK: review applications for default; email RD re: moving cert of service to application; revise motions for default judgments; email team re: next steps to get default judgment |
| 2/17/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call with MTK Counsel, David Harris. |
| 2/22/2022 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Review case related email correspondence from MTK Counsel re discussion re meet and confer; responded to same. |
| 2/22/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Meet and confer w/ Jason Liang (Kinahan's Counsel). |
| 3/3/2022 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Reviewed docket for entry of appearance by defendants' attorneys. |
| 3/3/2022 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with EAC regarding deadline to move for default judgement. |
| 3/3/2022 | Saroja Koneru | $520.00 | 0.3 | $156.00 | Researched deadlines to move for default judgement. |
| 3/8/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Pull recent filings, email to detailed attorneys |
| 3/8/2022 | Daisy Chung | $220.00 | 0.4 | $88.00 | Pull recent filings, email to detailed attorneys, save internally |
| 3/9/2022 | Eric Cox | $751.00 | 2.6 | $1,952.60 | Review motion to set aside default and exhibits; research law on the issue; email LB; call w ESM re: supplemental production |
| 3/10/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filings, save internally, email to detailed attorneys |
| 3/14/2022 | Eric Cox | $751.00 | 10.7 | $8,035.70 | Emails w/ team re: MTK 55(c); finish my part of the HBM discovery supplement; start Heredia discovery supplement |
| 3/14/2022 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with ROD regarding motion for default judgement. |
| 3/15/2022 | Daisy Chung | $220.00 | 2.4 | $528.00 | Search for supporting documents for Response to MTK's Default Judgment Filing |
| 3/15/2022 | Saroja Koneru | $520.00 | 0.4 | $208.00 | Call with ROD regarding first service upon defendants. |
| 3/15/2022 | Eric Montalvo | $751.00 | 0.8 | $600.80 | Meeting with DC and SK re materials needed for drafting of opposition to default judgment. |
| 3/15/2022 | Saroja Koneru | $520.00 | 1.4 | $728.00 | Searched through client files for exhibits for motion for default judgement. |

| 3/15/2022 | Saroja Koneru | $520.00 | 0.8 | $416.00 | Meeting with ESM and DC regarding exhibits needed for motion for default judgement. |
|---|---|---|---|---|---|
| 3/15/2022 | Daisy Chung | $220.00 | 0.8 | $176.00 | Meeting with ESM, SK re materials needed for drafting of opposition to default judgment |
| 3/16/2022 | Eric Montalvo | $751.00 | 3 | $2,253.00 | Review draft pleadings for filing on Friday. |
| 3/16/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review case related email from SK re information on default judgement legal standard. |
| 3/16/2022 | Daisy Chung | $220.00 | 0.6 | $132.00 | Look into courier service by Dubai firm re MTK and Kinahan, emails to EAC, ROD |
| 3/16/2022 | Eric Cox | $751.00 | 6.5 | $4,881.50 | Draft and finalize MTKG opposition to default; revise R Heredia discovery; review, investigate Kinahan default motion; emails to team with discovery, Kinahan questions |
| 3/16/2022 | Daisy Chung | $220.00 | 1.2 | $264.00 | Continue looking for supporting documents, compile and organize for ESM |
| 3/16/2022 | Daisy Chung | $220.00 | 0.6 | $132.00 | Discussions with SK re supporting materials needed for MTK Default |
| 3/16/2022 | Saroja Koneru | $520.00 | 0.5 | $260.00 | Meeting with DC to review default exhibits. |
| 3/16/2022 | Saroja Koneru | $520.00 | 0.5 | $260.00 | Reviewed and pulled case law regarding default judgement. |
| 3/16/2022 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Email to ESM enclosing information on default judgement legal standard. |
| 3/16/2022 | Saroja Koneru | $520.00 | 1 | $520.00 | Located and organized exhibits for default judgement motion. |
| 3/18/2022 | Daisy Chung | $220.00 | 0.6 | $132.00 | Draft, revise table of contents and table of authorities' page for MTK Default Opp |
| 3/18/2022 | Daisy Chung | $220.00 | 0.9 | $198.00 | Finalize attachments to be used for MTK default motion |
| 3/18/2022 | Daisy Chung | $220.00 | 1.8 | $396.00 | Compile, organize and format 38 attachments re MTK default motion |
| 3/18/2022 | Daisy Chung | $220.00 | 1.3 | $286.00 | Revise and reformat MTK default motion and declaration |
| 3/18/2022 | Daisy Chung | $220.00 | 0.6 | $132.00 | Compile exhibits for MTK default motion |
| 3/18/2022 | Daisy Chung | $220.00 | 0.7 | $154.00 | Meeting with SK re MTK default motion and declaration |
| 3/18/2022 | Daisy Chung | $220.00 | 1.1 | $242.00 | Draft exhibits, attachments table of contents |

21

| 3/18/2022 | Daisy Chung | $220.00 | 1.4 | $308.00 | Meeting with ESM re discuss revisions needed for MTK default motion and declaration |
|---|---|---|---|---|---|
| 3/18/2022 | Eric Montalvo | $751.00 | 1.4 | $1,051.40 | Meeting with DC re discuss revisions needed for MTK default motion and declaration. |
| 3/18/2022 | Saroja Koneru | $520.00 | 0.3 | $156.00 | Researched MTK Global's corporate registration in Dubai. |
| 3/18/2022 | Saroja Koneru | $520.00 | 1 | $520.00 | Reviewed exhibits and attachments for opposition motion with DC. |
| 3/18/2022 | Saroja Koneru | $520.00 | 1.3 | $676.00 | Updated footnotes in opposition motion and reviewed declaration made by ESM. |
| 3/18/2022 | Saroja Koneru | $520.00 | 0.8 | $416.00 | Meeting with ESM and DC to discuss opposition to motion to set aside entry of default. |
| 3/18/2022 | Eric Cox | $751.00 | 4.7 | $3,529.70 | Review, revise Opposition to MTKG 55c, ESM declaration; email team |
| 3/19/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review case related email correspondence from client re news article. |
| 3/20/2022 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Case related email correspondence from client. |
| 3/21/2022 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Review case related email correspondence from EC re Dubai service to Kinahan. |
| 3/21/2022 | Eric Cox | $751.00 | 4.2 | $3,154.20 | Emails w/ Dubai counsel re: Kinahan service; email team re: Dubai service; draft part of Kinahan 55c opposition |
| 3/23/2022 | Eric Cox | $751.00 | 0.8 | $600.80 | Call w/ LB re: Kinahan service; research long arm statutes |
| 3/28/2022 | Eric Cox | $751.00 | 0.4 | $300.40 | Follow-up email to Dubai firm; email team re: Dubai and need for supplemental declaration of service on Kinahan; read MTKG 55c reply |
| 3/30/2022 | Eric Cox | $751.00 | 1.5 | $1,126.50 | Review LB draft declaration for Dubai; email Dubai re: declaration of service on Kinahan; review evidence of courier delivery/receipt; email LB same; call w/ LB re; Dubai declaration for Kinahan service; revise Kinahan opposition in light of new declaration from Dubai |
| 3/31/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review case related email correspondence from Dubai law firm re client's Kinahan service. |

| 3/31/2022 | Daisy Chung | $220.00 | 0.6 | $132.00 | Zoom Meeting to discuss Kinahan's Opp motion and protective order |
| 3/31/2022 | Daisy Chung | $220.00 | 0.6 | $132.00 | Review EAC Kinahan default draft and confirm attachments file |
| 3/31/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Email to EAC re MTK default attachments and exhibits file |
| 3/31/2022 | Eric Cox | $751.00 | 4.5 | $3,379.50 | Revise Kinahan opposition in light of Dubai declaration; assemble exhibits, numerous emails w/ Dubai over Kinahan service; team zoom for status updates; review draft complaint for SK; call w/ SK re criminal intent in complaint |
| 4/1/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filings, save internally, email to detailed attorneys |
| 4/1/2022 | Eric Montalvo | $751.00 | 1 | $751.00 | Case related email correspondence from team re finalization of pleadings for filings, exhibits, etc. |
| 4/1/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | LeapFile final version of all documents for filing to ROD |
| 4/1/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Phone call with EAC re Kinahan Opp filing |
| 4/1/2022 | Daisy Chung | $220.00 | 0.4 | $88.00 | Review and finalize all pleadings and exhibits to be filed today re Opp to Kinahan's Default |
| 4/1/2022 | Daisy Chung | $220.00 | 1.3 | $286.00 | Reformat and draft TOC/TOA for Opposition to Kinahan's Motion to Set Aside Default, format exhibit file, review attachments file |
| 4/1/2022 | Eric Cox | $751.00 | 2.9 | $2,177.90 | Review changes to Kinahan opposition, review final version and prepare for filing; review, revise, and update discovery m&c letter to VGC; call w/ SK re: counterclaim |
| 4/8/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ Barry Whyte (Irish Paper Reporter) |
| 4/9/2022 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Text messages/phone calls to/from client re case status updates. |
| 4/10/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Sent case related email correspondence to Jason Liang re settlement. |
| 4/10/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Sent case related email correspondence to David Harris re settlement. |
| 4/10/2022 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Review case related judgment on client's matter; sent email correspondence to Michael Mancini re settlement; review counsel's response. |

| 4/12/2022 | Eric Cox | $751.00 | 6 | $4,506.00 | Complete gathering documents for default hearings; read OFAC release re: Kinahan as SDN; research OFAC and SDN restrictions; email team re: same; read order dismissing Golden Boy |
|---|---|---|---|---|---|
| 4/13/2022 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Sent case related email correspondence to Michael Mancini re Diaz/VGC settlement purposes. |
| 4/13/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review case related email from ROD w/ article; responded to same. |
| 4/13/2022 | Eric Cox | $751.00 | 6.1 | $4,581.10 | Review new news articles; search DK/MTK/KHK connection; research how to get SDN designation before court; email team; call w/ LB re: judicial notice; draft notice of request for judicial notice; meet & confer call w/ VGC |
| 4/14/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Place order for copies of corporation filings re MTK Global USA LLC |
| 4/14/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Phone call with Delaware Division of Corporations re obtaining copies of all filings for MTK global |
| 4/14/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to LB re: ordering copies of filings for MTK global from Delaware Division of Corporations |
| 4/14/2022 | Eric Cox | $751.00 | 2.2 | $1,652.20 | Finalize gathering info for hearing binders; review article from client re: OFAC; call w/ LB re: case updates; search states for MTK agent info |
| 4/15/2022 | Daisy Chung | $220.00 | 0.5 | $110.00 | Phone call with ESM re discuss Heredia/MTK filings |
| 4/20/2022 | Eric Cox | $751.00 | 5.5 | $4,130.50 | Research preserving testimony of non-party via deposition; revise judicial notice document and call w/ LB; call w/ ESM, LB re: depo of Arum, judicial notice, sanctions |
| 4/21/2022 | Lou Michels | $807.00 | 2.1 | $1,694.70 | Call with E Cox, L Berry, S Koneru concerning deposition of Bob Arum, review of FRCP 27, 26, judgment collection issues and ongoing strategy. |
| 4/22/2022 | Eric Cox | $751.00 | 6.6 | $4,956.60 | MTK: research, draft joint stip and related papers, and meet and confer to depose Bob Arum early |
| 4/25/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to LB re MTK records from DE |

| 4/25/2022 | Eric Cox | $751.00 | 6.5 | $4,881.50 | Review, revise draft of revised MTK complaint |
|---|---|---|---|---|---|
| 4/26/2022 | Lou Michels | $807.00 | 2 | $1,614.00 | Review and provide suggestions for drafting of amended complaint in Heredia, call with Eric Cox regarding drafting options. |
| 4/26/2022 | Eric Cox | $751.00 | 6.7 | $5,031.70 | Continue to amend complaint re: GBP per court's order; Redraft complaint per LM suggestion; call w/ LB re: same |
| 4/27/2022 | Lou Michels | $807.00 | 2.7 | $2,178.90 | Edit draft amended complaint. |
| 4/27/2022 | Lou Michels | $807.00 | 0.5 | $403.50 | Call with E Cox and E Montalvo regarding amended complaint and motion to amend. |
| 4/27/2022 | Eric Cox | $751.00 | 5 | $3,755.00 | MTK: Call w/ team re: amended complaint; revise complaint |
| 4/27/2022 | Eric Cox | $751.00 | 2.2 | $1,652.20 | MTK sanctions: revise joint stipulation |
| 4/27/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Tel conf re MTK w/ team. |
| 4/27/2022 | Ian Hargreaves | $520.00 | 0.6 | $312.00 | Call with Eric, Erik, Rajan, Laura and Lou to discuss amended complaint strategy following court's order |
| 4/27/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Scan, save internally, email to detailed attorneys re: MTK Delaware Corp docs |
| 4/28/2022 | Eric Cox | $751.00 | 2.2 | $1,652.20 | MTK: review LM edits to revised complaint; revise complaint further, email team |
| 4/29/2022 | Saroja Koneru | $520.00 | 0.3 | $156.00 | Call with ROD and EAC regarding amended complaint. |
| 4/29/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Phone calls with EAC re third amended complaint filings due today |
| 4/29/2022 | Eric Montalvo | $751.00 | 8 | $6,008.00 | Draft and review pleadings for filing re MTK; phone calls to/from Heredia team; edit/review final drafts. |
| 4/29/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Calls and text messages w/ clients (Moses and Ralph). |
| 4/29/2022 | Eric Cox | $751.00 | 6.8 | $5,106.80 | Heredia v. MTK: review various revisions to 3rd amended complaint, align them, create master draft, email team, call w/ DC to prepare associated filing documents; call w LB re: status of finalization of docs; call w/ ESM to finalize revisions |
| 5/2/2022 | Eric Cox | $751.00 | 1.7 | $1,276.70 | MTK: dig deeper into ways to seize or freeze defendants' assets |

25

| 5/3/2022 | Eric Cox | $751.00 | 2 | $1,502.00 | Heredia v. MTK: continue to look for way to seize or freeze assets of MTK (in light of being closed) and Kinahan |
| 5/11/2022 | Lou Michels | $807.00 | 0.9 | $726.30 | Review court order regarding default, review stipulation letter. |
| 5/11/2022 | Eric Cox | $751.00 | 3.8 | $2,853.80 | Revise joint stip per LB comments; review Golden Boy meet and confer letter and email team my thoughts in response; review judge's order setting aside MTKG and Kinahan defaults, email team my thoughts on where to serve them |
| 5/13/2022 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Text message to/from client. |
| 5/13/2022 | Eric Montalvo | $751.00 | 1 | $751.00 | Meet and confer with Michael Mancini w/ ROD. |
| 5/15/2022 | Eric Montalvo | $751.00 | 1 | $751.00 | Misc fee (meals, transportation, etc.) |
| 5/15/2022 | Eric Montalvo | $751.00 | 8 | $6,008.00 | Travel to Dublin, Ireland to meet with vics of KOCG. |
| 5/16/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Pull recent filing, save internally, email to detailed attorneys (doc 92) |
| 5/16/2022 | Eric Montalvo | $751.00 | 6 | $4,506.00 | Various meetings with vics of KOCG. |
| 5/18/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Look into Dubai addresses re service of process in the UAE |
| 5/19/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Email to Dubai firm re request for assistance in service of process, attach necessary documents |
| 5/20/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to Dubai firm re Kinahan 3AC service of process |
| 5/20/2022 | Eric Cox | $751.00 | 0.7 | $525.70 | Research D Kinahan address, resident card, other company ownership for purposes of figuring out how to serve him with 3rd amended complaint |
| 5/20/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to detailed attorneys re Dubai counsel's request for Kinahan's full address |
| 5/20/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Review email from Dubai counsel re Kinahan's address and contact information |
| 5/20/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ client re case status updates. |
| 5/20/2022 | Eric Montalvo | $751.00 | 1 | $751.00 | Meet and confer with ROD and MTK opposing counsel. |
| 5/21/2022 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Text message to/from client. |
| 5/24/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to Mr. Gopu re receipt of proposal of address investigation |

26

| | | | | | |
|---|---|---|---|---|---|
| 5/31/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Sent email correspondence to clients re SIGAR corporate resume of Bill Gonzalez. |
| 5/31/2022 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Reviewed news article in preparation for call with ESM. |
| 5/31/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review motions, calendar deadline |
| 5/31/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filings (doc 96), save internally, email to detailed attorneys |
| 5/31/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filings (doc 97), save internally, email to detailed attorneys |
| 6/2/2022 | Eric Cox | $751.00 | 1.1 | $826.10 | Research proper service, summons, requirement for new summons for third amended complaint for parties who have not appeared; emails w/ DC, RD concerning same; messages w RD concerning serving Diaz; call w/ ESM re: open items |
| 6/2/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to ROD re 3AC summonses question |
| 6/2/2022 | Daisy Chung | $220.00 | 0.7 | $154.00 | Pull recent filing (doc 118) and all exhibits (35), save internally, email to detailed attorneys |
| 6/2/2022 | Daisy Chung | $220.00 | 0.4 | $88.00 | Look into summonses for 3AC service, reply emails to EAC |
| 6/3/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Case related email correspondence to team re enforcement default. |
| 6/3/2022 | Daisy Chung | $220.00 | 0.4 | $88.00 | Phone call with ESM and Cristina re exhibits to be filed, follow up email to Cristina sending previously filed attachments |
| 6/3/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Email and reply emails (4) to LB re MTK opposition filings for today |
| 6/3/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Finalize all pleadings to be filed today, email final copies to ROD |
| 6/3/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filing (doc 119), save internally, email to detailed attorneys |
| 6/3/2022 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Case related email correspondence to team for review. |
| 6/4/2022 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Call w/ client. |
| 6/6/2022 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with ESM regarding defamation matter. |
| 6/10/2022 | Saroja Koneru | $520.00 | 0.7 | $364.00 | Researched case law related to special appearances in California. |
| 6/10/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filing (doc 100), save internally, email to detailed attorneys |

| 6/10/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review motion (doc 100), calendar deadlines |
|---|---|---|---|---|---|
| 6/10/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filing (doc 101), save internally, email to detailed attorneys |
| 6/14/2022 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Phone call w/ client re case status updates. |
| 6/14/2022 | Daisy Chung | $220.00 | 0.5 | $110.00 | Look into issued summonses, proof of service, reply emails (5) to EAC questions |
| 6/14/2022 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Call w/ Stephen Breen (Irish Paper) re updates on alleged Kinahan Cartel vics. |
| 6/15/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to ROD re Kinahan summons to be filed |
| 6/15/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Prepare Kinahan summons, reply email to EAC |
| 6/15/2022 | Eric Cox | $751.00 | 0.5 | $375.50 | Review Kinahan service options from Dubai firm; emails w/ Dubai firm confirming compliance with UAE law |
| 6/16/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to EAC re Kinahan summons |
| 6/16/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Draft Kinahan summons, email to ROD |
| 6/17/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with ROD re Kinahan summons for filing |
| 6/17/2022 | Eric Cox | $751.00 | 3 | $2,253.00 | Review emails and revise opposition to sanctions in arbitration matter; emails w Dubai firm re: Moses and POA and serving Kinahan; research legalization and attestation of POA at State Dept and UAE Embassy; call w/ ROD re: sanctions opposition; review final version of sanctions opposition, call w/ LB to confirm changes |
| 6/21/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with ROD re Kinahan summons to file |
| 6/21/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Calendar motions hearing set for 06/24/22 |
| 6/22/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Calendar deadlines (3) |
| 6/27/2022 | Eric Cox | $751.00 | 9.2 | $6,909.20 | Emails w/ Dubai firm re: serving MTK, Kinahan; review local rules to draft untimeliness argument for latest joint stipulation; review prior sanctions order and production for compliance with verification; draft email to VGC re: untimely joint stip; team call; research summon and service rules for 3rd amended complaint; finalize stipulation for continuance; call w/ LB re: R 72 |

| | | | | | motion, begin to research and draft R 72 motion |
|---|---|---|---|---|---|
| 6/29/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ LB re case status updates. |
| 7/14/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Meeting w/ client. |
| 8/1/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to court reporter to retain hearing transcript on 07/29/22 |
| 8/2/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply emails (2) to court reporter re transcript |
| 8/2/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Fill out transcript order on court reporter's website, reply email to court reporter |
| 8/3/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to court reporter re remit payment for transcript |
| 8/3/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull order, review, save internally, email to detailed attorneys |
| 8/3/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Calendar two deadlines per recent order |
| 8/8/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull filing, review, save internally, email to detailed attorneys |
| 8/10/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up email to court reporter re hearing transcript, follow up email to BND re check issued |
| 8/12/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reach out to Edward Mendy re filed complaint in the PA Federal Court against MTK |
| 8/12/2022 | Saroja Koneru | $520.00 | 0.8 | $416.00 | Researched FOIA request requirements and drafted FOIA request for Treasury Department. |
| 8/12/2022 | Saroja Koneru | $520.00 | 0.5 | $260.00 | Prepared subpoenas for customs and border protection and treasury. |
| 8/15/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to BND re payment for transcript |
| 8/17/2022 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Reviewed EAC edits and revised FOIA requests. |
| 8/17/2022 | Saroja Koneru | $520.00 | 0.3 | $156.00 | Drafted FOIA request to customs and border protection. |
| 8/17/2022 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Email to LB and EAC enclosing draft subpoenas and FOIA requests. |

29

| 8/19/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call with Edward Mendy, et al re Kinahan complaint filing. |
|---|---|---|---|---|---|
| 8/19/2022 | Saroja Koneru | $520.00 | 0.7 | $364.00 | Researched case law and rules regarding expedited discovery. |
| 8/19/2022 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with EAC regarding issuance of subpoenas prior to discovery conference. |
| 8/24/2022 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Email to EAC and LB regarding discovery deadlines. |
| 8/29/2022 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Call w/ Stephen Breen (Irish Sun) reporter re case updates. |
| 9/1/2022 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review case related email correspondence from EC re updates on service and POA. |
| 9/1/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reach out to Dubai Firm to discuss MTK and Kinahan Service |
| 9/1/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Calendar all deadlines (5) per order |
| 9/1/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull filing, review, save internally, email to detailed attorneys |
| 9/6/2022 | James C. Asbill | $584.00 | 0.3 | $175.20 | Telephone conference with Laura Berry & Erik Cox re: Rule 26 plan. |
| 9/7/2022 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with LB, EAC, JA, and DC regarding status of matter. |
| 9/7/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Calendar status conference date |
| 9/7/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull filing, review order, save internally, email to detailed attorneys |
| 9/7/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to Mr. Bahrainwala re conference call to discuss MTK service |
| 9/7/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull filing, save internally, review, email to detailed attorneys |
| 9/8/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to secretary at Dubai Firm re ask for clarification on video recording for Zoom |
| 9/19/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ Dubai counsel re case status updates. |
| 9/19/2022 | Saroja Koneru | $520.00 | 0.3 | $156.00 | Call with ESM, LB, DC, and Abdultaiyab Bahrainwala regarding service. |
| 9/19/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Meeting with Dubai Counsel re discuss POA Authentication |
| 9/22/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to Dubai counsel re POA attestation update |
| 9/27/2022 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Phone call with DC re discuss MTK USA counsel appearance not filed last Friday |
| 9/27/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call with ESM re discuss MTK USA counsel appearance not filed last Friday |

| 9/27/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull docket report, review, reply email to LB |
|---|---|---|---|---|---|
| 10/7/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to ROD re missing signatures on Joint Rule 26(f) filing |
| 10/7/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email copy of filed Joint Rule 26(f) Report to clients |
| 10/7/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filing, review, save, email to detailed attorneys |
| 10/12/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Prepare certified mail package containing Heredia's attested POA to UAE Embassy |
| 10/12/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Prepare cover letter to enclose with attested POA to UAE Embassy for authentication re Moses Heredia |
| 10/12/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Look into UAE Embassy Authentication process upon receipt of attested POA from State Department re Moses Heredia |
| 10/13/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to clients re provide update on attested POA from State Department |
| 10/13/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to Dubai local counsel re provide update on attested POA from State Department |
| 10/13/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Review, scan, save copy of attested POA from State Department re Moses Heredia |
| 10/18/2022 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ Stephen Breen re Kinahan updates (recommended no charge). |
| 10/18/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Email to Dubai counsel regarding authority under UAE law to retain outside counsel in other Arab states following discussion with ESM on concerns on Kinahan's current location |
| 10/18/2022 | Daisy Chung | $220.00 | 0.5 | $110.00 | Look into previous documents sent to process server for Gibson service, prepare 3AC, 3AC civil cover sheet and a new summons for Gibson to be re-issued, reply email to LB with collected information and answer questions |
| 10/18/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up email to Process Server re service on Paul Gibson |
| 10/18/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to LB re service of process on Paul Gibson |
| 10/19/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Update ESM calendar re: virtual scheduling conference |

| 10/19/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to Dubai counsel regarding e-notarizing new POA to allow Dubai firm to retain outside counsel for Kinahan service |
| 10/21/2022 | Eric Montalvo | $751.00 | 1.5 | $1,126.50 | Scheduling conference with Judge Holcomb. |
| 10/21/2022 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Phone call to DC re Attested POA. |
| 10/21/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call to ESM re Attested POA |
| 10/21/2022 | Daisy Chung | $220.00 | 0.4 | $88.00 | Scan and save UAE attested POA, email to client to notify of him of update, email to Dubai counsel to notify of attested POA and questions on authority to retain outside counsel |
| 10/21/2022 | Daisy Chung | $220.00 | 0.5 | $110.00 | Compile scheduling conference prep materials for ESM |
| 10/25/2022 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Provide updates on Gibson service for ESM and CL |
| 10/25/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to Mr. Bahrainwala (Dubai counsel) to provide a scanned copy of the outgoing FedEx package containing Moses Heredia's attested POA |
| 10/25/2022 | Daisy Chung | $220.00 | 0.4 | $88.00 | Prepare international FedEx package to Dubai counsel (Khairallah Advocates) containing Moses Heredia's attested POA, scan entire package for internal records, and mail out |
| 10/25/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Provide updates on Gibson service for ESM and CL |
| 10/26/2022 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Debrief phone call with DC following conference call with process server re service on Gibson |
| 10/26/2022 | Daisy Chung | $220.00 | 0.4 | $88.00 | Conference call with process server re Gibson service, how to expedite |
| 10/26/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Debrief phone call with ESM following conference call with process server re service on Gibson |
| 10/26/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Inquiry to potential local counsel in Spain re Gibson service assistance |
| 10/26/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull redlined comparison document for MTK 3AC for translation reasons, email to ESM |
| 10/27/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Pull recent order, save, review, calendar deadlines (3) per order, email to detailed attorneys |

| 10/31/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to Dubai Counsel re ministry stamped POA |
|---|---|---|---|---|---|
| 11/2/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull redlined comparison between 2AC and 3AC and provide to Jim from Process Server One, inquire on estimated costs for translation services for Gibson service |
| 11/4/2022 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Case related email correspondence re payment service on Paul Gibson; responded to same and provided instructions re payment breakdown for client's review. |
| 11/4/2022 | Daisy Chung | $220.00 | 0.5 | $110.00 | Look into local counsel in Spain to request assistance with service on Gibson, provide list to ESM and LEB |
| 11/4/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Provide breakdown of costs for service of process on Gibson to clients, explain breakdown per information provided by process server |
| 11/4/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Provide quote received, request confirmation from ESM and LEB to proceed with service of process on Gibson |
| 11/4/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to process server re inquire on price for investigation service for Gibson's address |
| 11/4/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Confirm receipt of ministry attested POA from Dubai Counsel |
| 11/7/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to client's assistant re clarify the payment made for Gibson's service (2AC vs 3AC) |
| 11/7/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Communication to and from client re Gibson service invoice |
| 11/7/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call with Cristina re Heredia invoices, attempts to re-serve Gibson, breakdown of costs associated with re-service, follow up email to organize what was discussed/clarified |
| 11/8/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Coordinate payment with process server, turnaround time for translation, location, and service of Gibson (3AC) |
| 11/9/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Request check to send to process server for Gibson service |
| 11/10/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Provide documents for third amended complaint service to process server (Laura Sanchez) re Gibson service |

| 11/11/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Provide link and invoice re Gibson service for BND |
|---|---|---|---|---|---|
| 11/22/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply to Dubai Counsel re summons for Kinahan, address needed |
| 11/23/2022 | Daisy Chung | $220.00 | 0.4 | $88.00 | Draft Kinahan and MTK summonses, send to ROD for review and filing |
| 11/29/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Pull issued summonses for Kinahan and MTK, provide them to Dubai Counsel for proper notice through Dubai Courts |
| 12/8/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filing (notice of deficiency), review, save, email to ROD re revisions needed for re-file |
| 12/8/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filing, save, review, email to detailed attorneys |
| 12/12/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with ROD re DOC 126 - Notice of deficiency |
| 12/15/2022 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filing, save, email to detailed attorneys |
| 12/19/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to Dubai firm re MTK and Kinahan notification through Dubai Courts |
| 12/20/2022 | Daisy Chung | $220.00 | 0.1 | $22.00 | Pull recent filing, review, save re application for default against MTK |
| 12/21/2022 | Daisy Chung | $220.00 | 0.3 | $66.00 | Look into Paul Gibson's middle name for service, email to ROD and ESM |
| 1/4/2023 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with LB regarding joint status report. |
| 1/5/2023 | Daisy Chung | $220.00 | 0.6 | $132.00 | Emails to Process Server One re additional translation expenses, look into previously quoted amount, calculate word count |
| 1/5/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up on status of notification re MTK and Kinahan service |
| 1/6/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Review CM/ECF Email Re STATUS REPORT filed by Plaintiffs Moses Heredia, Heredia Boxing Management, Inc. |
| 1/9/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Coordinate internal conference call to discuss matter before upcoming hearing |
| 1/10/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with Dubai counsel re outcome of Kinahan service |
| 1/10/2023 | James C. Asbill | $584.00 | 0.5 | $292.00 | Revise draft of Motion for Default Judgment as to MTK USA to incorporate additional arguments and posture in line with the entry of default. |
| 1/10/2023 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Conference call w/ JA and LEB re MTK discussions; case updates. |

34

| 1/11/2023 | Daisy Chung | $220.00 | 0.9 | $198.00 | Compile emails with VGC regarding protective order per LEB request |
|---|---|---|---|---|---|
| 1/12/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Draft Paul Gibson summons per location report, send to ROD for review |
| 1/12/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Revise Paul Gibson summons, send to ROD |
| 1/13/2023 | Laura Berry | $807.00 | 2.8 | $2,259.60 | Review/revise draft motion for entry of default judgment, email same to JA; continue compiling protective order emails; review/revise Diaz discovery comparison |
| 1/13/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Conference call with Process Server One team re invoice, service on Gibson, provide redlined comparison for 3AC |
| 1/13/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ Jim Reynolds re service to MTK in Dubai. |
| 1/17/2023 | James C. Asbill | $584.00 | 0.6 | $350.40 | Conference call with ESM & LEB re: revisions to plan for addressing MTK default. |
| 1/17/2023 | James C. Asbill | $584.00 | 0.4 | $233.60 | Review LEB's comments to the Motion for Default draft. |
| 1/17/2023 | Daisy Chung | $220.00 | 0.5 | $110.00 | Research on requested information from LEB re MTK's DE Corporation status, tax history, filing history; send to LEB for review |
| 1/17/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to Dubai counsel regarding translated documents received for notifications attempted via Dubai Courts for Kinahan and MTK service |
| 1/17/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Order a copy of the cancellation filing, reply email to LEB re MTK DE Corp. |
| 1/17/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ LEB and JA re Motion for Default Entry Judgment discussion. |
| 1/18/2023 | James C. Asbill | $584.00 | 2.8 | $1,635.20 | Revise Draft of Motion for Default based on LEB comments and additional case law research. |
| 1/18/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with ROD re summons filing for Paul Gibson's service |
| 1/19/2023 | James C. Asbill | $584.00 | 0.3 | $175.20 | Call with LEB to discuss strategy for the 01/20 hearing to present to ESM |
| 1/19/2023 | Laura Berry | $807.00 | 1 | $807.00 | Review revised draft motion for entry of default judgment against MTK USA; tel call with JA re same |

| 1/19/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Email explanation of research request to Jasmin, send background, 3AC, examples of media articles |
|---|---|---|---|---|---|
| 1/19/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Review CM/ECF Email Re request for Clerk to Issue Summons on Amended Complaint/Petition, [85] filed by Plaintiff Moses Heredia, Heredia Boxing Management, Inc. (Dhungana, Rajan) |
| 1/19/2023 | Eric Montalvo | $751.00 | 3 | $2,253.00 | Status Conference call w/ Judge Holcombe and ROD. |
| 1/20/2023 | Laura Berry | $807.00 | 0.2 | $161.40 | Email re revised draft motion for entry of default judgment |
| 1/20/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with ROD re Paul Gibson summons |
| 1/20/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Pull recent issued summons, save, email to detailed attorneys, provide to process server |
| 1/20/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Review CM/ECF Email Re 21 DAY Summons Issued re Amended Complaint/Petition, [85] as to Defendant Paul D Gibson. |
| 1/21/2023 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Call w/ LEB and JA re MTK motion for entry default judgment discussion. |
| 1/23/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Send final copies of proof of service ready to be signed by ESM |
| 1/23/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Email from ESM re service of process of defendants in Dubai and Spain. |
| 1/23/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Email notice re Heredia v. MTK Discovery (Way forward) |
| 1/24/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review minutes, calendar deadline for JSR and status conference hearing |
| 1/24/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Draft final proof of service for all three, email to LEB for review |

| | | | | | |
|---|---|---|---|---|---|
| 1/24/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Review CM/ECF Email Re MINUTES OF VIDEO HEARING RE: STATUS CONFERENCE held before Judge John W. Holcomb: The court AUTHORIZES Plaintiff to conduct discovery in support of its potential Motion for Default Judgment against Defendant MTK Global Sports Management Company, LLC. The Court DIRECTS counsel to file a joint status report on or before March 17, 2023, advising the Court of the posture of the case. The Court SETS a Status Conference for March 31, 2023, at 11:00 a.m., via video conference. The Court DEFERS setting a trial schedule. IT IS SO ORDERED. Court Reporter: Debbie Hino-Spaan. |
| 1/24/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Review CM/ECF Email Re MINUTES OF VIDEO HEARING RE: STATUS CONFERENCE held before Judge John W. Holcomb: The court AUTHORIZES Plaintiff to conduct discovery in support of its potential Motion for Default Judgment against Defendant MTK Global Sports Management Company, LLC. The Court DIRECTS counsel to file a joint status report on or before March 17, 2023, advising the Court of the posture of the case. The Court SETS a Status Conference for March 31, 2023, at 11:00 a.m., via video conference. The Court DEFERS setting a trial schedule. IT IS SO ORDERED. Court Reporter: Debbie Hino-Spaan. |
| 1/26/2023 | James C. Asbill | $584.00 | 0.5 | $292.00 | Conference call with DRK and TSK re: MTK litigation and discovery status. |
| 1/26/2023 | James C. Asbill | $584.00 | 1.1 | $642.40 | Conference call with DRK, TSK, LEB, and ESM re: path forward for developing discovery and damages development against MTK. |
| 1/26/2023 | Laura Berry | $807.00 | 0.9 | $726.30 | Revise FOIA requests |
| 1/26/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Email RE LeapFile Secure File Transfer Service re Discovery Map. |
| 1/26/2023 | David R. Keesling | $782.00 | 0.4 | $312.80 | Document Review RE Discovery Map plan forwarded by ESM. |
| 1/26/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Email from ESM with attachment re signature of Ralph Heredia. |

| 1/26/2023 | David R. Keesling | $782.00 | 1.7 | $1,329.40 | Zoom meeting re service of process and discovery plan to establish damages. |
|---|---|---|---|---|---|
| 1/26/2023 | Timothy S. Kittle | $717.00 | 0.5 | $358.50 | CNF:  Zoom conference: DRK /JCA /TSK . . . Discussed Heredia files and contents. |
| 1/26/2023 | Timothy S. Kittle | $717.00 | 1.6 | $1,147.20 | CNF: Telephonic conference: EM /DRK /LB /JCA /TSK . . . Discussion of case /strategy moving forward. |
| 1/26/2023 | Eric Montalvo | $751.00 | 1 | $751.00 | Conference Call w/ FPG team attorneys re MTK discovery and way forward. |
| 1/26/2023 | Eric Montalvo | $751.00 | 1.5 | $1,126.50 | Conference Call with FPG team re discovery discussion and way forward. |
| 1/27/2023 | James C. Asbill | $584.00 | 0.1 | $58.40 | Review Delaware Certificate of Cancellation. |
| 1/27/2023 | James C. Asbill | $584.00 | 3 | $1,752.00 | Begin drafting Interrogatories to MTK USA |
| 1/27/2023 | Laura Berry | $807.00 | 0.6 | $484.20 | Finalize FOIA draft request; send to ESM |
| 1/27/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Provide copy of cancellation certificate to LEB |
| 1/27/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Email from Laura Berry re MTK Global USA, LLC's May 2022 Delaware certificate of cancellation, as signed by Bob Yalen. |
| 1/27/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Email from Laura Berry re draft FOIA request to DHS. |
| 1/30/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Confirm receipt of service docs from Dubai counsel re service on MTK and Kinahan |
| 1/31/2023 | James C. Asbill | $584.00 | 0.3 | $175.20 | Revise draft of Interrogatories to MTK. |
| 1/31/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to LEB re draft declaration for Bahrainwala in support of proper service on MTK and Kinahan |
| 1/31/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call from ESM re discuss proper service on MTK and Kinahan, status on Gibson service |
| 2/2/2023 | James C. Asbill | $584.00 | 2 | $1,168.00 | Research discovery issues specifically related to RICO claims for assistance in crafting targeted discovery requests. |
| 2/2/2023 | James C. Asbill | $584.00 | 1.2 | $700.80 | Research information regarding MTK and its officers from alternative sources, including public records and social media. |
| 2/2/2023 | James C. Asbill | $584.00 | 0.5 | $292.00 | Continue drafting ROGs to MTK |
| 2/2/2023 | James C. Asbill | $584.00 | 0.2 | $116.80 | Exchange with LEB re: possibility of serving Bob Yalen in the absence of a registered agent. |

| 2/2/2023 | James C. Asbill | $584.00 | 1.8 | $1,051.20 | Research Delaware law regarding service/unwinding an LLC with outstanding liabilities. |
|---|---|---|---|---|---|
| 2/2/2023 | James C. Asbill | $584.00 | 0.1 | $58.40 | Email from LEB re: service issues relating to MTK USA in light of registered agent's refusal to accept service. |
| 2/2/2023 | James C. Asbill | $584.00 | 0.2 | $116.80 | Conference call with DRK and TSK re: ability to reinstate MTK USA in Delaware under Chancery procedures. |
| 2/2/2023 | Laura Berry | $807.00 | 1.5 | $1,210.50 | Email re draft affidavit of service on Kinahan and MTK Global; review email thread on re-service |
| 2/2/2023 | Laura Berry | $807.00 | 0.4 | $322.80 | Review Doc 133 from Paracorp; email to JA re same |
| 2/2/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Coordinate DHL return package for physical copies of publication service for MTK and Kinahan, email to Dubai Counsel |
| 2/2/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull filing (DOC 133), save, email to JA |
| 2/2/2023 | David R. Keesling | $782.00 | 0.5 | $391.00 | Call with ESM re letter from registered agent and plan to oppose the letter, next steps to take in Delaware, local counsel (Ron Diaz), petition to reopen the LLC and petition to appoint a receiver. |
| 2/2/2023 | David R. Keesling | $782.00 | 0.6 | $469.20 | Internal Conference with TSK and JCA re preparing for petitions to the court of chancellery to claw back the shutter of MTK USA and to have a receiver appointed. |
| 2/2/2023 | David R. Keesling | $782.00 | 1.4 | $1,094.80 | Review of applicable Delaware law relating to initiating an action to claw back a dissolved LLC and initiating an action for appointment of a receiver. |
| 2/2/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Email Re C?ECF Doc. 133 re Paracorp no longer serving as registered agent for MTK. |
| 2/3/2023 | James C. Asbill | $584.00 | 3 | $1,752.00 | Begin drafting RFP's to MTK. |
| 2/3/2023 | Laura Berry | $807.00 | 0.1 | $80.70 | Email from UAE counsel re service; email DC re prior process |
| 2/3/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Reply to LEB re look into invoice paid to Dubai Counsel for previous service attempts for MTK and Kinahan |
| 2/7/2023 | James C. Asbill | $584.00 | 2.2 | $1,284.80 | Continue drafting the Requests for Production to MTK USA. |

| 2/7/2023 | James C. Asbill | $584.00 | 0.3 | $175.20 | Revise draft of Interrogatories to MTK USA to add additional questions regarding corporate officers. |
|---|---|---|---|---|---|
| 2/7/2023 | James C. Asbill | $584.00 | 2 | $1,168.00 | Draft RFA's to MTK. |
| 2/8/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Coordinate DHL delivery of physical copies of newspaper service from Dubai Law Office in re MTK and Kinahan service |
| 2/10/2023 | Laura Berry | $807.00 | 1.5 | $1,210.50 | Review draft affidavit; review file for prior order and affidavit |
| 2/13/2023 | Laura Berry | $807.00 | 2.5 | $2,017.50 | Review draft affidavit from UAE firm (cont.); legal research re UAE residency renewal requirements; email to ESM, DC, CL re process; |
| 2/13/2023 | Daisy Chung | $220.00 | 0.7 | $154.00 | Kinahan research re media articles on location, email findings to LEB |
| 2/15/2023 | Laura Berry | $807.00 | 0.1 | $80.70 | Email Khairallah requesting UAE law |
| 2/15/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to LEB re service on Gibson |
| 2/16/2023 | Laura Berry | $807.00 | 1.5 | $1,210.50 | Review Khairallah declaration (cont.); legal research re service of process in UAE; review new UAE law re service of process |
| 2/17/2023 | Laura Berry | $807.00 | 0.7 | $564.90 | Review Khairallah decl., UAE service law (cont.); email Khairallah |
| 2/21/2023 | Laura Berry | $807.00 | 0.1 | $80.70 | Email from UAE counsel clarifying declaration |
| 2/24/2023 | Laura Berry | $807.00 | 2.1 | $1,694.70 | Review Khairallah declaration (cont.); email to DC for review and checking |
| 2/27/2023 | Laura Berry | $807.00 | 1.8 | $1,452.60 | Review/revise Khairallah declaration (cont.); review Doc 87 (Order vacating prior entry of default); legal research re UAE service of process; review reports from Assigned Declarer; email from/to DC |
| 2/27/2023 | Daisy Chung | $220.00 | 1.1 | $242.00 | Review and revise LEB's draft declaration for Jouslin Khairallah re MTK and Kinahan Service, address comments, gather exhibits needed per the declaration, format, and send back to LEB for review |
| 2/28/2023 | Laura Berry | $807.00 | 0.3 | $242.10 | Review/revise Khairallah revised draft declaration; email same to ESM for review and comment |
| 2/28/2023 | Daisy Chung | $220.00 | 0.8 | $176.00 | Review and revise declaration of Jouslin re service for MTK and Kinahan, revise exhibits to file, send to LEB for final review |

| 3/1/2023 | Laura Berry | $807.00 | 0.1 | $80.70 | Email from UAE re whether original newspaper clippings received; email DC re same |
|---|---|---|---|---|---|
| 3/1/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Review email from Dubai counsel re physical copies of newspaper service, reply email to LEB re status update on receipt, reply email to Dubai counsel |
| 3/6/2023 | Laura Berry | $807.00 | 0.1 | $80.70 | Email CL re ESM review of draft service affidavit |
| 3/7/2023 | James C. Asbill | $584.00 | 4.8 | $2,803.20 | Internal conference with TSK, ESM, and DRK on global plan forward on the litigation. |
| 3/7/2023 | David R. Keesling | $782.00 | 4.3 | $3,362.60 | Internal Conference: DRK / ESM / TSK / JCA.  230p to 648p. |
| 3/7/2023 | Eric Montalvo | $751.00 | 4.8 | $3,604.80 | Internal conference with TSK, JA, and DRK on global plan forward on the litigation. |
| 3/13/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review scheduling notice, calendar status conference date and time |
| 3/13/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Phone call from DRK re PHV motion and application |
| 3/14/2023 | Daisy Chung | $220.00 | 0.5 | $110.00 | Draft/ revise PHV application and order, pull certificate of good standing, send to DRK for review |
| 3/16/2023 | Timothy S. Kittle | $717.00 | 1.5 | $1,075.50 | DRAFT:  JSR (status for Moses only) . . . Exchange with EM . . . Will add edits first thing March 17 |
| 3/17/2023 | Timothy S. Kittle | $717.00 | 0.5 | $358.50 | DRAFT: Edited /added to JSR per EM's instructions . . . Emailed to EM for review /approval |
| 3/17/2023 | Timothy S. Kittle | $717.00 | 0.1 | $71.70 | EMAIL: To EM Cc: RD . . . To avoid last minute issues, please advise if approved . . . RD will have to file . . . RD: Can file around 1400 PDT |
| 3/20/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Phone call with ESM re Jouslin's affidavit, send latest draft, send final exhibits |
| 3/20/2023 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Phone call with DC re Jouslin's affidavit, send latest draft, send final exhibits. |
| 3/23/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Confirm receipt of physical newspapers from Dubai counsel |
| 3/23/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Revise DRK's pro hac vice application |
| 3/24/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Finalize DRK's PHV application and order, send to ROD for filing |
| 3/27/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with ROD re DRK's PHV application filing |

| 3/27/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Sent email correspondence to TK re JK declaration, etc. |
|---|---|---|---|---|---|
| 3/28/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 136.pdf |
| 3/28/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 135 JSR.pdf |
| 3/28/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to TK re Jouslin's declaration |
| 3/28/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Review notice, reply email to ESM re DRK's PHV application |
| 3/28/2023 | David R. Keesling | $782.00 | 0.5 | $391.00 | Internal Conference: Re Motion for Default and supporting documentation. |
| 3/28/2023 | Timothy S. Kittle | $717.00 | 2 | $1,434.00 | DRAFT:  Per EM:  Review /edit Declaration from Jouslin Khairallah . . . PHN with DRK to discuss . . . Compared verbiage with FRCP 4, especially (f) and (h) . . . Language demonstrated Jouslin's familiarity with FRCP 4 . . . Added a couple of minor edits . . . Created distinct exhibits for filing |
| 3/29/2023 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Sent email correspondence to DC and CL re research re Probellum USA and Disrupt Promotions - DE corporation filing; review reply sent by DC. |
| 3/30/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Research re Probellum USA and Disrupt Promotions - DE corporation filing, reply email to ESM |
| 3/30/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review TK email re Jouslin's declaration filing, confirm with ROD re filing capabilities |
| 3/30/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Follow up with process server for Paul Gibson, request status update on service |
| 3/30/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review ROD email, review Jouslin's declaration and relevant exhibit, reply email re certificate of translation |
| 3/30/2023 | Rajan Dhungana | $638.00 | 1.3 | $829.40 | Prepare for Status hearing on 03/31/2023 |
| 3/30/2023 | Rajan Dhungana | $638.00 | 0.3 | $191.40 | Filing Declaration of J Khairallah, proof of service by publication |
| 3/30/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review case related email correspondence from TK, ROD and DC re clarification on Joulin's affidavit; responded to same. |
| 3/31/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 142 Declaration of Jouslin Khairallah.pdf |
| 3/31/2023 | Rajan Dhungana | $638.00 | 2.3 | $1,467.40 | Status hearing at the fed court |

| 3/31/2023 | David R. Keesling | $782.00 | 1 | $782.00 | Preparation for Hearing Re FRCP 4 service of process and FRCP 55(b) plan for determination of liability and damages discovery. |
|---|---|---|---|---|---|
| 3/31/2023 | David R. Keesling | $782.00 | 1 | $782.00 | Hearing: Standby for phone appearance by DCJ Holcomb for status conference. 11a-12p PT. |
| 3/31/2023 | Eric Montalvo | $751.00 | 2.3 | $1,727.30 | Attended status conference hearing at federal court with ROD. |
| 3/31/2023 | Eric Montalvo | $751.00 | 2 | $1,502.00 | Review case materials in preparation for Status hearing on 03/31/2023. |
| 4/3/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 143 Minutes of Status Conference.pdf |
| 4/3/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Pull recent filing (DOC 143), save, email to detailed attorneys |
| 4/3/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Review CM/ECF Email Re MINUTES OF HEARING RE: STATUS CONFERENCE held before Judge John W. Holcomb. The Court DIRECTS counsel to file a joint status report on or before August 18, 2023, advising the Court of the posture of the case. The Court SETS a Status Conference for August 25, 2023, at 11:00 a.m., in person. |
| 4/6/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with Process Server One re Gibson service |
| 4/10/2023 | James C. Asbill | $584.00 | 1.3 | $759.20 | Draft Application for Entry of Default against MTK Global Sports Management LLC |
| 4/10/2023 | James C. Asbill | $584.00 | 1.4 | $817.60 | Draft Affidavit for Rajan Dhungana to accompany Applications for Default. |
| 4/10/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with Process Server One re Gibson service |
| 4/11/2023 | James C. Asbill | $584.00 | 5.1 | $2,978.40 | Draft Notice of Motion and Motion for Default as to MTK Global Sports Management, LLC. |
| 4/12/2023 | James C. Asbill | $584.00 | 0.5 | $292.00 | Draft Application for Entry of Default as to Daniel Kinahan. |
| 4/12/2023 | James C. Asbill | $584.00 | 0.2 | $116.80 | Revise draft of Affidavit of Rajan Dhungana to add information on the service of Kinahan. |
| 4/12/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with Process Server One re Gibson service |
| 4/14/2023 | James C. Asbill | $584.00 | 0.7 | $408.80 | Draft Motion for Default Judgment against Kinahan. |

| 4/14/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with Process Server One re status check on Agent at Ministry |
|---|---|---|---|---|---|
| 4/14/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to Jim from Process Server One re no previous email received |
| 4/17/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Request conference call with Process Server One |
| 4/17/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ Riah Pryor (UK based news). |
| 4/25/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with ROD re MTK Global and Kinahan default |
| 5/2/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review ECF filing; forwarded to client. |
| 5/4/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added 2 Documents |
| 5/4/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 145.pdf |
| 5/4/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 145-1.pdf |
| 5/11/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 148.pdf |
| 5/11/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Pull recent filing, save, email to detailed attorneys |
| 5/23/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Pull recent filing, save, email to detailed attorneys |
| 5/23/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review court order, calendar deadlines to show cause re dismissal for lack of prosecution |
| 5/24/2023 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Call to Destyn Stanton re instructions for drafting motions for default judgment. |
| 5/24/2023 | Destyn D. Stanton | $638.00 | 0.6 | $382.80 | Call with Eric Montalvo re instructions for drafting motions for default judgment. |
| 5/24/2023 | Destyn D. Stanton | $638.00 | 6.8 | $4,338.40 | Review case file and California authorities relevant to motion for default judgment and discovery re damages. |
| 5/25/2023 | Destyn D. Stanton | $638.00 | 0.5 | $319.00 | Call with Eric Montalvo re strategy for motions for default judgment and discovery on damages. |
| 5/25/2023 | Destyn D. Stanton | $638.00 | 3.3 | $2,105.40 | Outline for motions for default judgment. |
| 5/30/2023 | James C. Asbill | $584.00 | 0.7 | $408.80 | Revise drafts of Motions for Default Judgment as to all parties. |
| 5/30/2023 | James C. Asbill | $584.00 | 0.6 | $350.40 | Draft Proposed Orders to accompany the Motions for Default Judgment. |
| 5/30/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Review draft pleadings from JA. |
| 5/30/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review case related email correspondence from JA and DS re default judgment. |
| 5/31/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Review draft pleadings for filing; sent to ROD for filing. |
| 6/1/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Added 3 Documents |

| 6/1/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Pull recent filings, save, email to detailed attorneys |
|---|---|---|---|---|---|
| 6/1/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Review minute order, calendar deadlines |
| 6/1/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to Cristina re Paul Gibson service |
| 6/1/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Confirm courtesy copies of default filing will be mailed out to MTK USA |
| 6/2/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Coordinate advanced payment of travel fees for upcoming hearing with client |
| 6/5/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: Outgoing Mail 060523 re Courtesy copies of notice of motion for default judgment filings to MTK USA |
| 6/5/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Mail out courtesy copies of notion of motion for default filings to MTK USA |
| 6/5/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Phone call to Process Server One re speak to Juan to request update on service request on Gibson |
| 6/5/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Meeting with ESM re discuss Paul Gibson service process, where we stand, how to move forward. |
| 6/5/2023 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Meeting with DC re discuss Paul Gibson service process, where we stand, how to move forward. |
| 6/6/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Check for requested status update from Process Server One re Gibson service, send email to follow up |
| 6/16/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call from SK re default against Gibson |
| 6/16/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Forward previous default applications to SK |
| 6/16/2023 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with DC re motion for default |
| 6/16/2023 | Saroja Koneru | $520.00 | 0.9 | $468.00 | Draft application for entry of default |
| 6/26/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to IH re draft application for default for Gibson |
| 6/26/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Revise Gibson's application and affidavit for default judgment |
| 6/26/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Review draft re Paul Gibson 3rd amendment complaint; responded and confirmed for submission. |
| 6/28/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with ROD re filing Gibson's application for default |
| 6/28/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call from ESM re Gibson application for default |

| 6/28/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review case related email correspondence from ROD and DC re amended complaint filed. |
| 6/28/2023 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Phone call to DC re Gibson application for default. |
| 6/29/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Pull recent filings (Doc 155, 155-1), save internally |
| 6/29/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added 2 Documents |
| 7/31/2023 | Destyn D. Stanton | $638.00 | 0.2 | $127.60 | Email exchanges with Eric Montalvo re Court's 7-31-23 Show Cause Order. |
| 8/1/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Send copies of completed service documents for Paul Gibson to DDS |
| 8/1/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ DDS re status updates |
| 8/1/2023 | Destyn D. Stanton | $638.00 | 4.2 | $2,679.60 | Draft Motion for Entry of Default Judgment Against Defendant Paul D. Gibson and proposed Order granting same. |
| 8/1/2023 | Destyn D. Stanton | $638.00 | 0.3 | $191.40 | Email exchanges with Daisy Chung re Proof of Service on Paul D. Gibson. |
| 8/1/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Text status of Motion for Entry of Default Judgment Against Defendant Paul D. Gibson to Eric Montalvo. |
| 8/1/2023 | Destyn D. Stanton | $638.00 | 0.4 | $255.20 | Docket and 7-31-23 Order pertaining to Defendant Paul D. Gibson. |
| 8/1/2023 | Destyn D. Stanton | $638.00 | 0.2 | $127.60 | Call with Eric Montalvo re filing in response to Court's 7-31-23 Show Cause Order. |
| 8/2/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Calendar deadline to file motion for entry of default judgment re Paul Gibson |
| 8/2/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 158.pdf |
| 8/10/2023 | Eric Montalvo | $751.00 | 8 | $6,008.00 | Meeting w/ Barry. |
| 8/10/2023 | Eric Montalvo | $751.00 | 2 | $1,502.00 | Travel to Dublin, Ireland. |
| 8/11/2023 | Eric Montalvo | $751.00 | 2 | $1,502.00 | Meeting w/ Paul Healy. |
| 8/13/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Draft discovery map in preparation for call; sent email correspondence to team; instructed CL to coordinate a call with DDS, CAT, CL and DC. |
| 8/14/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Calendar motion hearing set for August 25, 2023 |
| 8/14/2023 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Conference call with DK and CAT re discovery for damages. |
| 8/14/2023 | Destyn D. Stanton | $638.00 | 0.7 | $446.60 | Conference call with Eric Montalvo and Carol Thompson re discovery task list. |

46

| Date | Name | Rate | Hours | Amount | Description |
|------|------|------|-------|--------|-------------|
| 8/14/2023 | Carol Thompson | $697.00 | 0.6 | $418.20 | Conference call with DK and ESM re discovery for damages. |
| 8/15/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Calendar deadline to file JSR |
| 8/15/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Sent email correspondence to DDS re FRE 408 settlement: stipulation. |
| 8/15/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review email correspondence from DDS re JSR stipulations; responded to same. |
| 8/16/2023 | Destyn D. Stanton | $638.00 | 1.1 | $701.80 | Finalize draft Status Report. |
| 8/16/2023 | Destyn D. Stanton | $638.00 | 0.4 | $255.20 | Email draft Status Report and updated Subpoena to GBP to Eric Montalvo and Carol Thompson; provide update on posture of the case. |
| 8/16/2023 | Carol Thompson | $697.00 | 2 | $1,394.00 | Review and revise the status report and subpoena; simultaneously review the docket report and various pleadings/orders for situational awareness of procedural history. |
| 8/17/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 161 Status Report.pdf |
| 8/21/2023 | Eric Montalvo | $751.00 | 1.5 | $1,126.50 | Podcast Interview w/ Paul Healy. |
| 8/24/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Save GBP proof of service for subpoena serve, send to detailed attorneys |
| 8/24/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Conference call with ESM and DDS re preparation call in advance of hearing scheduled on 8/25/23 |
| 8/24/2023 | Daisy Chung | $220.00 | 0.8 | $176.00 | Prepare ESM's hearing files for tomorrow's scheduled hearing: review all applications for default, include defaults placed by Clerk, motions for each defaulted defendants, and all relevant orders and status reports |
| 8/24/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added 4 Documents |
| 8/24/2023 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Conference call with DC and DDS re preparation call in advance of hearing scheduled on 8/25/23. |
| 8/24/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Email correspondence to clients re hearing details. |
| 8/25/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Conference call with ESM and DDS re post-hearing brief |
| 8/25/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call from ESM re debrief on matters discussed during hearing, preparation for discovery moving forward |

| 8/25/2023 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Conference call with DC and DDS re post-hearing brief. |
|---|---|---|---|---|---|
| 8/25/2023 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Phone call to DC re debrief on matters discussed during hearing, preparation for discovery moving forward. |
| 8/25/2023 | Eric Montalvo | $751.00 | 2.5 | $1,877.50 | Motions Hearing. |
| 9/6/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Conference call with ESM/DDS/ROD re MTK discovery |
| 9/6/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Provide recap email to ESM/ROD/DDS re action items discussed on conference call |
| 9/6/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Conference call w/ DC/ROD/DDS re Diaz discovery roadmap |
| 9/6/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review email correspondence from DC re recap on service, Diaz's upcoming fights, deposition of Robert Diaz. |
| 9/7/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Review order setting hearing on motions for default judgment, calendar deadlines, coordinate internal call with ESM and DDS |
| 9/7/2023 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Review court's order re appearance for discovery, email to DDS and DC for conference call |
| 9/7/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Email correspondence from DDS re motions hearing on default judgments. |
| 9/8/2023 | Daisy Chung | $220.00 | 2.8 | $616.00 | Federal Jury Instruction research on RICO claims and damages, draft memo, send to ESM for review |
| 9/8/2023 | Daisy Chung | $220.00 | 0.5 | $110.00 | Conference call with ESM and DC re Magistrate Judge hearing discussion - clarification on proof of service of hearing notice, request for transcript |
| 9/8/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Look for Court Reporter's information for the August 25, 2023, hearing, send email to request/place order for a copy of the transcript |
| 9/8/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Conference call with DDS and DC re Magistrate Judge hearing discussion |
| 9/8/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Email correspondence from DC re research on Federal Jury Instructions (RICO). |
| 9/8/2023 | Destyn D. Stanton | $638.00 | 0.4 | $255.20 | Call with Eric Montalvo and Daisy Chung re: Order setting Motions for Default Judgment for hearing. |
| 9/11/2023 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Meeting w/DC re pending deadlines |

| 9/11/2023 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Meeting w/SK re amended complaint |
|---|---|---|---|---|---|
| 9/12/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email DDS re ESM availability for motion for continuance |
| 9/13/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with court reporter re August 25, 2023, hearing transcript order |
| 9/13/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with DDS re deposition subpoena for Diaz |
| 9/14/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Draft Diaz's deposition subpoena, send to DDS for review |
| 9/14/2023 | Daisy Chung | $220.00 | 0.7 | $154.00 | Review exhibit A to Diaz's deposition subpoena, send back comments to DDS |
| 9/14/2023 | William Gonzalez | $220.00 | 1 | $220.00 | Meeting with ESM and DC for brief introduction of case. |
| 9/14/2023 | Eric Montalvo | $751.00 | 1.5 | $1,126.50 | Meeting with Bill Gonzalez re discuss discovery efforts, review financial materials from Barry M |
| 9/14/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Email correspondence from DC re recap and action items to DDS; review response from DDS re pending draft. |
| 9/14/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Email exchange with Daisy Chung re drafting of subpoena to J. Diaz. |
| 9/14/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Receipt and review of initial draft of subpoena to J. Diaz from Daisy Chung. |
| 9/14/2023 | Destyn D. Stanton | $638.00 | 0.5 | $319.00 | Add list of documents to subpoena directed to J. Diaz; email same to Daisy Chung and Eric Montalvo for additional comment. |
| 9/14/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Email exchange with Daisy Chung re additional document requests to include in subpoena directed to J. Diaz. |
| 9/15/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Confirm receipt of August 25, 2023, hearing transcript |
| 9/15/2023 | Daisy Chung | $220.00 | 0.5 | $110.00 | Review August 25, 2023, hearing transcript |
| 9/15/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review revised exhibit A to Diaz's deposition subpoena, add definition, send back to DDS |
| 9/15/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Review, finalize, and send final documents for Diaz service to process server |
| 9/15/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email DDS re ESM availabilities in November for Motion for Continuance |
| 9/15/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Correspondence from DDS re updated subpoena for filing. |

| 9/15/2023 | Destyn D. Stanton | $638.00 | 0.8 | $510.40 | Revisions to Subpoena to J. Diaz. |
|---|---|---|---|---|---|
| 9/15/2023 | Destyn D. Stanton | $638.00 | 0.2 | $127.60 | Email exchange with Daisy Chung and Eric Montalvo re revisions to Subpoena to J. Diaz. |
| 9/15/2023 | Destyn D. Stanton | $638.00 | 3.7 | $2,360.60 | Draft Application for Continuance of October 5, 2023, Hearing, proposed order granting same, and Declaration of Eric S. Montalvo ISO Application for Continuance of October 5, 2023, Hearing. |
| 9/15/2023 | Destyn D. Stanton | $638.00 | 0.3 | $191.40 | Review transcript of August 25, 2023, Status Conference. |
| 9/16/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Receipt of transcript of August 25, 2023, Status Conference. |
| 9/16/2023 | Destyn D. Stanton | $638.00 | 0.2 | $127.60 | Email to Court's Deputy Clerk re Heredia v. MTK Global Sports Management, LLC et al. (Case No. 5:20-cv-02618-JWH-KKx - Continuance of October 5, 2023, Hearing. |
| 9/18/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Review and send affidavit of service for Diaz from process server to ESM, ROD, DDS |
| 9/18/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review email re affidavit of service for Diaz from process server. |
| 9/18/2023 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Correspondence from DDS re drafts for application for continuance for filing. |
| 9/18/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Call to deputy clerk; left VM re court's availability to reschedule October 5, 2023, hearing. |
| 9/18/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Email from deputy clerk re court's availability to reschedule October 5, 2023, hearing on October 17 and 19, 2023. |
| 9/18/2023 | Destyn D. Stanton | $638.00 | 0.3 | $191.40 | Revise Plaintiff's Application for Continuance of October 5, 2023, Hearing and Declaration of Eric Montalvo. |
| 9/18/2023 | Destyn D. Stanton | $638.00 | 0.2 | $127.60 | Email draft Plaintiff's Application for Continuance of October 5, 2023, Hearing, Declaration of Eric Montalvo, and proposed order to Eric Montalvo with instruction to review and sign. |
| 9/20/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Respond to email from WG re Diaz subpoena, send a copy of subpoena served |

| 9/21/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to intern re request assistance in looking into information on Roberto Diaz's lawsuit against GBP |
| 9/21/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Search re general information on Roberto Diaz's split with GBP |
| 9/21/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Correspondence to DDS re declaration for application of continuance hearing draft. |
| 9/22/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review research on Roberto Diaz lawsuit from intern, send back comments |
| 9/22/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Continue reviewing updated research on Roberto Diaz from intern |
| 9/22/2023 | Daisy Chung | $220.00 | 1.2 | $264.00 | Research Roberto Diaz, GBP, Ryan Garcia and draft memo on findings, send to ESM for review |
| 9/25/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added 3 Documents |
| 9/25/2023 | Destyn D. Stanton | $638.00 | 1.2 | $765.60 | Finalize Application for Continuance of October 5, 2023, Hearing and Declaration of Eric S. Montalvo; email same along with proposed order to Rajan for filing. |
| 9/25/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Email Application for Continuance to Rajan with instructions for filing. |
| 9/27/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review Court's order (ECF 168) re continuance of hearing, flag service requirement to detailed attorneys, calendar deadlines |
| 9/27/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 168.pdf |
| 9/27/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Email Forwarded from DC re CM/ECF Minute Order. |
| 9/28/2023 | Daisy Chung | $220.00 | 0.6 | $132.00 | Meeting w/ WG re MTK, Kinahan presence in Dubai, journalist connects, local counsel participation |
| 9/29/2023 | Daisy Chung | $220.00 | 0.6 | $132.00 | Locate last known addresses for all Defendants, locate counsel of record per docket for all Defendants (if applicable), send compiled list of address to send out hearing notice to per Judge's order (ECF 168) |
| 9/29/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: Outgoing FedEx and Cert Mail 092923 re Heredia v. MTK Hearing Notices to Defendants and Counsel.pdf |

| 9/29/2023 | Daisy Chung | $220.00 | 0.7 | $154.00 | Prepare and mail out via FedEx International re copy of Court's Order (ECF 168), and current docket to Paul Gibson, MTK Global, and Daniel Kinahan pursuant to Judge's Order |
| 9/29/2023 | Daisy Chung | $220.00 | 0.5 | $110.00 | Prepare and mail out via Certified Mail re copy of Court's Order (ECF 168), and current docket to MTK USA (Registered Agent), counsel of record for MTK Global and Daniel Kinahan pursuant to Judge's Order |
| 9/29/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to detailed attorneys re provide update on mailing out notice of hearing pursuant to Order (ECF 168), provide scanned copies of the outgoing packages to each defendant and counsel of record |
| 10/2/2023 | Daisy Chung | $220.00 | 0.5 | $110.00 | Meeting with ESM and WG re discuss damages |
| 10/2/2023 | William Gonzalez | $220.00 | 1.5 | $330.00 | Researched OFAC/Drug Kingpin sanctions specific to Kinahan. Confirmed OFAC Specially Designated Nationals and Blocked Persons list that includes Kinahans under Transnational Organized Organizations Sanctions Program. |
| 10/2/2023 | William Gonzalez | $220.00 | 1.2 | $264.00 | Strategy meeting with EM and DC regarding Damages to Client, Source update from EM, OFAC Sanctions, and need to obtain services of UAE Attorney for application of available UAE civil laws to identify and apply assets. |
| 10/2/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Meeting with DC and WG re discuss damages |
| 10/3/2023 | William Gonzalez | $220.00 | 1.5 | $330.00 | Researched and attempted to obtain INTERPOL case information and fugitive Red Notices on Kinahan organization. Information is blocked from the public and available only to law enforcement. |
| 10/3/2023 | William Gonzalez | $220.00 | 1.5 | $330.00 | Drafting UAE specific asset recovery taskings to be presented to FPG associate in Dubai. |
| 10/4/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Send copies of subpoena to GBP and notice of objections to SK |
| 10/4/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added 2 Documents |
| 10/4/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: GBP Subpoena - Proof of Service.pdf |
| 10/4/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: Diaz Subpoena (1).pdf |

| | | | | | |
|---|---|---|---|---|---|
| 10/4/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: Diaz Deposition Subpoena - Proof of Service.pdf |
| 10/4/2023 | Daisy Chung | $220.00 | 0.8 | $176.00 | Draft certificate of service per ECF 168, confirm delivery of all packages sent to Defendants and counsel, save proof of deliveries |
| 10/4/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Provide update on service to all defendants per ECF 168 to detailed attorneys |
| 10/4/2023 | Daisy Chung | $220.00 | 0.5 | $110.00 | Prepare and mail via UPS - Next Day Air - copies of ECF 168, full docket to counsel of record for Daniel Kinahan and MTK Global |
| 10/4/2023 | Saroja Koneru | $520.00 | 0.3 | $156.00 | Review GBP response to subpoena |
| 10/5/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Send scans of Barry McGuigan's financial discovery documents to WG for review |
| 10/5/2023 | Daisy Chung | $220.00 | 0.9 | $198.00 | Continue drafting/update certificate of service pursuant to ECF 168, prepare all 7 exhibits to accompany certificate, finalize and send to DDS and ROD for filing tomorrow, October 6th |
| 10/5/2023 | William Gonzalez | $220.00 | 2 | $440.00 | Open source research specific to international seizure activity against Kinahan assets in Ireland and the UAE. Developed list of media sources to interview relative to the seizure activities. |
| 10/6/2023 | David R. Keesling | $782.00 | 0.1 | $78.20 | Review CM/ECF Email Re CERTIFICATE OF SERVICE filed by Plaintiff Moses Heredia, Heredia Boxing Management, Inc., re: Order on Motion to Continue, [168] served on 10/04/2023. (Attachments: # (1) Exhibit Proof of Service to MTK Global Sports Management LLC, # (2) Exhibit Proof of Service to MTK Global Sports Management LLC, Counsel of Record, # (3) Exhibit Proof of Service to MTK Global Sports Management LLC, Counsel of Record, # (4) Exhibit Proof of Service to MTK Global USA, LLC's registered agent, # (5) Exhibit Proof of Service to Daniel Kinahan, # (6) Exhibit Proof of Service to Daniel Kinahan's last counsel of record, # (7) Exhibit Proof of Service to Paul D. Gibson) |
| 10/6/2023 | Saroja Koneru | $520.00 | 1 | $520.00 | Draft meet and confer letter re subpoena issued to GBP |

| 10/10/2023 | William Gonzalez | $220.00 | 2.5 | $550.00 | Review and analysis of financial transactions involving Barry McGuigan, Cyclone Promotions, and Carl Frampton. |
| 10/10/2023 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with TK re meet and confer letter to GBP |
| 10/10/2023 | Saroja Koneru | $520.00 | 3.7 | $1,924.00 | Continue drafting meet and confer letter for GBP's objections to subpoena |
| 10/11/2023 | William Gonzalez | $220.00 | 1 | $220.00 | Drafting additional UAE specific asset recovery taskings to be presented to FPG associate in Dubai. |
| 10/11/2023 | William Gonzalez | $220.00 | 1.2 | $264.00 | Review and analysis of financial transactions involving Barry McGuigan, Cyclone Promotions, and Carl Frampton. |
| 10/11/2023 | Saroja Koneru | $520.00 | 0.4 | $208.00 | Finish drafting meet and confer letter to GBP re subpoena |
| 10/16/2023 | William Gonzalez | $220.00 | 2.5 | $550.00 | Research and identification of potential Irish media sources for outreach regarding asset identification and information they possess on international movements of Kinahan assets. |
| 10/16/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Email from Cristina Lagarde re documents pertaining to hearing on Motions for Default Judgment. |
| 10/17/2023 | William Gonzalez | $220.00 | 2 | $440.00 | Researched U.S. forfeiture laws on "tainted" assets transferred to third parties prior to discussion with UAE associate attorney.  Specific to UAE request will be the existence and identification of possible parallel UAE laws that could be applied against Haizum General Trading, its majority partner Hadif Al Ktebi, or the attorney who has power-of-attorney to act for the Kinahans, Sarfraz Ali Riast Ali. |
| 10/17/2023 | David R. Keesling | $782.00 | 1 | $782.00 | Internal Conference with DDS re damages model prep in advance of hearing on default judgment. |
| 10/17/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Email to Eric Montalvo re documents pertinent to hearing on motions for default judgment. |
| 10/17/2023 | Destyn D. Stanton | $638.00 | 0.3 | $191.40 | Research documents pertinent to hearing on motions for default judgment. |

| 10/17/2023 | Destyn D. Stanton | $638.00 | 0.5 | $319.00 | Internal Conference with David Keesling re damages component of Plaintiff's motions for default judgment. |
| 10/17/2023 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Email to Cristina Lagarde re scheduling call with Eric Montalvo to discuss damages component of Plaintiff's motions for default judgment. |
| 10/18/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: Cert Mail Receipts Rcvd 101723 re MTK hearing notice |
| 10/18/2023 | David R. Keesling | $782.00 | 0.5 | $391.00 | Internal Conference with DDS and ESM to prep for upcoming hearing on liability/ damages. |
| 10/18/2023 | David R. Keesling | $782.00 | 1 | $782.00 | Internal Conference with DDS and JCA in preparation for hearing prep call with ESM re liability/ damages and other inquiries that might be made by the Magistrate. |
| 10/18/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ DDS and DRK re motions hearing. |
| 10/19/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Phone call from ESM re prep materials for today's hearing |
| 10/19/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Send prep files for ESM review in advance of hearing |
| 10/19/2023 | Daisy Chung | $220.00 | 1.7 | $374.00 | Participate in hearing |
| 10/19/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Phone call from ESM re debrief hearing, discuss upcoming deadlines |
| 10/19/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Calendar all deadlines discussed during hearing |
| 10/19/2023 | William Gonzalez | $220.00 | 1.6 | $352.00 | Requested by EM to monitor and analyze hearing before Magistrate Judge Stephanie Christiansen |
| 10/19/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Phone call to DC re prep materials for today's hearing. |
| 10/19/2023 | Eric Montalvo | $751.00 | 1 | $751.00 | Documents in preparation for motions hearing. |
| 10/19/2023 | Eric Montalvo | $751.00 | 1.7 | $1,276.70 | Attend/Participant in Hearing on Motions for Default Judgment. |
| 10/20/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 172 - Minutes from Hearing.pdf |
| 10/20/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review minutes from yesterday's hearing, calendar deadlines |
| 10/23/2023 | Daisy Chung | $220.00 | 1.2 | $264.00 | Begin reviewing prior services to MTK Global (ECF 142 and ECF 62), begin drafting ESM's supplemental affidavit pursuant to Court Order (ECF 172) |

| 10/23/2023 | William Gonzalez | $220.00 | 1 | $220.00 | Research and develop potential sources of Irish members of the media for outreach. |
| 10/24/2023 | William Gonzalez | $220.00 | 1 | $220.00 | Confer with EM on media outreach strategy regarding assets. |
| 10/25/2023 | Daisy Chung | $220.00 | 1 | $220.00 | Meeting with ESM and WG re discovery plan |
| 10/25/2023 | Eric Montalvo | $751.00 | 1 | $751.00 | Meeting with DC and WG re discovery plan |
| 10/26/2023 | Daisy Chung | $220.00 | 0.9 | $198.00 | Continue drafting/revising ESM's supplemental affidavit pursuant to Court's order, prepare copy of arbitration award and transcript |
| 10/26/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Revise certificate of service for email service on defendants per ECF 171, create new exhibit to supplement filing |
| 10/26/2023 | Daisy Chung | $220.00 | 0.8 | $176.00 | Review Heredia v. Diaz arbitration transcript, pull information relevant to issuance/calculation of the award to file on docket per ECF 172 |
| 10/27/2023 | Daisy Chung | $220.00 | 1.6 | $352.00 | Review meeting with ESM re certificate of service for email service, supplemental affidavit, arbitration transcript |
| 10/27/2023 | Daisy Chung | $220.00 | 0.5 | $110.00 | Revise ESM's supplemental affidavit pursuant to meeting, send to DDS for review |
| 10/27/2023 | Daisy Chung | $220.00 | 0.7 | $154.00 | Draft index for arbitration transcript filing per ECF 172, bookmark and highlight relevant portions of transcript file for ESM review |
| 10/27/2023 | Eric Montalvo | $751.00 | 1.6 | $1,201.60 | Review meeting with DC re certificate of service for email service, supplemental affidavit, arbitration transcript |
| 10/27/2023 | Destyn D. Stanton | $638.00 | 0.5 | $319.00 | Review ESM's supplemental affidavit re service on MTK; email Daisy Chung re same. |
| 10/30/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review ESM comments on affidavit, revise, and send back for signature |
| 10/30/2023 | William Gonzalez | $220.00 | 1 | $220.00 | Develop additional UAE related questions and topics of discussion for Associate Counsel and submit. |
| 10/30/2023 | Saroja Koneru | $520.00 | 0.5 | $260.00 | Revise draft meet and confer letter to GBP, review email from ESM and local rules/prior orders re discovery |

| 10/30/2023 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with ESM re meet and confer letter to GBP |
| 10/30/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Call with SK re meet and confer letter to GBP. |
| 10/30/2023 | Eric Montalvo | $751.00 | 2.5 | $1,877.50 | Draft affidavit; sent to DC to clean up and revise. |
| 10/30/2023 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Sent email correspondence to SK re meet and confer letter to GBP, review email from SK and local rules/prior orders re discovery. |
| 10/30/2023 | Eric Montalvo | $751.00 | 1 | $751.00 | DC draft re affidavit; circulated for confirmation and submission. |
| 10/31/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added 8 Documents |
| 10/31/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Review and revise certificate of service per ECF 171, finalize exhibits, send to ROD for filing |
| 10/31/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added 3 Documents |
| 10/31/2023 | Saroja Koneru | $520.00 | 1.1 | $572.00 | Revise draft meet and confer letter re discovery to GBP |
| 11/1/2023 | William Gonzalez | $220.00 | 0.5 | $110.00 | Respond to Associate Counsel in UAE and submit additional topics of discussion for anticipated meeting next week. |
| 11/1/2023 | Saroja Koneru | $520.00 | 1 | $520.00 | Continue revising draft meet and confer letter to GBP |
| 11/2/2023 | Daisy Chung | $220.00 | 0.8 | $176.00 | Discovery conference all with detailed attorneys and client |
| 11/2/2023 | Saroja Koneru | $520.00 | 0.7 | $364.00 | Finalize meet and confer letter re discovery to GBP |
| 11/2/2023 | Eric Montalvo | $751.00 | 0.8 | $600.80 | Discovery conference all with detailed attorneys and client. |
| 11/2/2023 | Destyn D. Stanton | $638.00 | 0.8 | $510.40 | Conference call with ESM and client re discovery. |
| 11/3/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call from ESM and WG re discussion with journalist based in Zimbabwe |
| 11/3/2023 | William Gonzalez | $220.00 | 1.5 | $330.00 | Contacted by EM, CL, and DC regarding new source/victim that needed immediate telephonic interview. Outreach to new source and follow-up telephonic initial interview was conducted. |

| 11/3/2023 | William Gonzalez | $220.00 | 1.5 | $330.00 | Contacted by EM, CL, and DC regarding new source of information/victim with information of value to our case.  EM requested immediate follow-up interview.<br>Source was located and an initial interview was scheduled and conducted by telephone. |
| 11/3/2023 | Eric Montalvo | $751.00 | 1.5 | $1,126.50 | Call w/ WG, CL, and DC regarding new source of information/victim with information of value to our case.  EM requested immediate follow-up interview.<br>Source was located and an initial interview was scheduled and conducted by telephone. |
| 11/6/2023 | William Gonzalez | $220.00 | 2 | $440.00 | Review of source provided material |
| 11/6/2023 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Review email from GBP counsel re meet and confer letter and correspondence with CL re email |
| 11/7/2023 | William Gonzalez | $220.00 | 2.5 | $550.00 | Review of source provided material |
| 11/8/2023 | William Gonzalez | $220.00 | 2 | $440.00 | Meeting with DC and Dubai Attorney Jouslin Khairallah regarding capabilities of her firm to move against seized assets of Kinahan in the UAE. |
| 11/8/2023 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Email to CL re GBP response to meet and confer letter |
| 11/9/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Phone call from client re discuss updates to matter |
| 11/14/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Research local rules for meet and confer letter to GBP, send to SK |
| 11/15/2023 | Ian Hargreaves | $520.00 | 0.2 | $104.00 | Meeting with SK re: motion to compel GBP's discovery responses |
| 11/15/2023 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Meeting with IH re motion to compel GBP's discovery responses |
| 11/15/2023 | Saroja Koneru | $520.00 | 1.9 | $988.00 | Begin drafting joint stip re motion to compel production from GBP |
| 11/16/2023 | William Gonzalez | $220.00 | 1 | $220.00 | Conference call with source in Zimbabwe regarding Kinahan associates in Africa and roles in moving assets for Kinahan OCG. |

| 11/16/2023 | William Gonzalez | $220.00 | 1 | $220.00 | Prep time and meeting with EM, CL, DC, and Dubai Attorney Jouslin Khairallah regarding ability to move against seized assets of Kinahan in the UAE.   Discussion included the need for judgements against Kinahan personally in addition to Dubai based companies before a case can proceed in the UAE. |
| 11/16/2023 | Saroja Koneru | $520.00 | 0.8 | $416.00 | Continue drafting draft stip re motion to compel GBP's responses to subpoena |
| 11/17/2023 | Saroja Koneru | $520.00 | 1.4 | $728.00 | Continue drafting joint stipulation to compel GBP discovery |
| 11/20/2023 | Saroja Koneru | $520.00 | 0.3 | $156.00 | Review case deadlines and calls/correspondence with CL and DC re upcoming deadlines and status of discovery |
| 11/21/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | draft joint stip - provided edits. |
| 11/27/2023 | William Gonzalez | $220.00 | 1.5 | $330.00 | Contacted by source relative to Kinahan assets in Turkey.  Reviewed correspondence and land records sent to FPG that are believed to be owned by Kinahans.  They are believed to worth several million dollars and likely to be titled in the name of Chris Kinahan's wife or other business associate. |
| 11/28/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Send RICO research and list of individuals for depositions to DDS and SK following AM conference call |
| 11/28/2023 | Daisy Chung | $220.00 | 0.4 | $88.00 | Conference call with ESM, DDS, SK re discuss discovery progress |
| 11/28/2023 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Email to ESM and DS re joint stipulation to compel GBP responses to subpoena |
| 11/28/2023 | Eric Montalvo | $751.00 | 0.4 | $300.40 | Conference call with DC, DDS, SK re discuss discovery progress. |
| 11/28/2023 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Call with DDS and Saroja Koneru re research findings on jurisdiction. |
| 11/28/2023 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Call with ESM, DS, and DC re Heredia matters. |
| 11/28/2023 | Eric Montalvo | $751.00 | 0.4 | $300.40 | Conference call with DC, DDS, SK re discuss discovery progress. |
| 11/28/2023 | Destyn D. Stanton | $638.00 | 0.3 | $191.40 | Call with ESM and Saroja Koneru re declarations for damages and SDTs. |
| 11/29/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to SK re GBP's agreement to comply with lawful subpoena |

| 11/29/2023 | William Gonzalez | $220.00 | 1.5 | $330.00 | Document review of material provided by source. |
|---|---|---|---|---|---|
| 11/29/2023 | Saroja Koneru | $520.00 | 1.5 | $780.00 | Revise draft joint stipulation for motion to compel |
| 11/30/2023 | Saroja Koneru | $520.00 | 1 | $520.00 | Further revise draft joint stipulation to compel discovery from GBP |
| 11/30/2023 | Destyn D. Stanton | $638.00 | 0.8 | $510.40 | Review Joint Stipulation and provide feedback to Saroja Koneru. |
| 12/4/2023 | James C. Asbill | $584.00 | 1.3 | $759.20 | Internal conference with DRK and DDS (individually and in collective setting) regarding the GBP subpoena objections; provided insights into case history and events affecting the scope of discovery; worked to develop a more focused discovery plan. |
| 12/4/2023 | James C. Asbill | $584.00 | 1 | $584.00 | Conference call with ESM, DDS, and SK re: new discovery subpoena strategy and background information underlying the various parties we intend to seek discovery from. |
| 12/4/2023 | David R. Keesling | $782.00 | 2.1 | $1,642.20 | Internal Conference with DDS (JCA added later into the conference) re issuance of subpoenas, objections by OPC, joint stipulation for Court to seek an order compelling production, risks of sanctions, and limited scope of discovery to damages. |
| 12/4/2023 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Call with DS re joint stipulation to compel GBP discovery |
| 12/4/2023 | Saroja Koneru | $520.00 | 1 | $520.00 | Call with ESM, DS, and JA re subpoenas |
| 12/4/2023 | Eric Montalvo | $751.00 | 1 | $751.00 | Call with SK, DS, and JA re subpoenas |
| 12/4/2023 | Destyn D. Stanton | $638.00 | 0.5 | $319.00 | Review Joint Stipulation and provide feedback to Saroja Koneru. |
| 12/4/2023 | Destyn D. Stanton | $638.00 | 1 | $638.00 | Call with E. Montalvo, J. Asbill, and S. Koneru re Plaintiff's damages and subpoenas to third parties. |
| 12/4/2023 | Destyn D. Stanton | $638.00 | 0.8 | $510.40 | With D. Keesling and J. Asbill re Plaintiff's damages and subpoenas to third parties. |
| 12/5/2023 | Daisy Chung | $220.00 | 1.1 | $242.00 | Conference call with ESM/DDS/ Steven Bash re discuss MTK discovery |
| 12/5/2023 | William Gonzalez | $220.00 | 0.5 | $110.00 | Strategy meeting with ESM |

| | | | | | |
|---|---|---|---|---|---|
| 12/5/2023 | David R. Keesling | $782.00 | 3.5 | $2,737.00 | Internal Conference with DDS re limits on closed pleadings discovery as it relates to damages.  Further discussion re absence of liability claims in the pleadings as it relates to fraud in the "purse amount" which would legally fall outside of the closed pleadings which are now closed upon the entry of the default judgment.  Development of more targeted and defendable areas of post-judgment discovery via subpoena.  Post Steve Bash review of call and tie back to new subpoenas. |
| 12/5/2023 | Saroja Koneru | $520.00 | 0.7 | $364.00 | Draft subpoena for GBP |
| 12/5/2023 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Review DS revisions to subpoena for GBP |
| 12/5/2023 | Eric Montalvo | $751.00 | 1.1 | $826.10 | Conference call with DC/DDS/ Steven Bash re discuss MTK discovery. |
| 12/5/2023 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review email from DDS re final draft of revised SDT to Golden Boy Promotions and detailed reasoning for same. |
| 12/5/2023 | Eric Montalvo | $751.00 | 1 | $751.00 | Conference call with DC/DDS/ Steven Bash re discuss MTK discovery. |
| 12/5/2023 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ W. Gonzalez re pending matters. |
| 12/5/2023 | Destyn D. Stanton | $638.00 | 1.2 | $765.60 | Conference call with Eric Montalvo, Saroja Koneru, and Steve Bash re: education and damages. |
| 12/5/2023 | Destyn D. Stanton | $638.00 | 2.5 | $1,595.00 | Review revised SDT to Golden Boy draft by S. Koneru; revisions to same in light of pleadings and current orders; email revisions to S. Koneru. |
| 12/5/2023 | Destyn D. Stanton | $638.00 | 1.2 | $765.60 | Internal Conference with David Keesling re revisions to documents requests in revised SDT to Golden Boy Promotions in light of the pleadings and orders |
| 12/5/2023 | Destyn D. Stanton | $638.00 | 0.3 | $191.40 | Email to Eric Montalvo re final draft of revised SDT to Golden Boy Promotions and detailed reasoning for same. |
| 12/6/2023 | Destyn D. Stanton | $638.00 | 0.5 | $319.00 | Email to Ralph Heredia re bullet points in advance of discussion on damages and request to review draft document requests accompanying revised SDT to Golden Boy Promotions. |
| 12/7/2023 | William Gonzalez | $220.00 | 0.5 | $110.00 | Prepared correspondence for ESM relative to media outreach and inbound source information. |

| 12/8/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with court reporter on transcript order for January hearing |
|---|---|---|---|---|---|
| 12/8/2023 | David R. Keesling | $782.00 | 0.2 | $156.40 | Call with ESM re damages model and call notes from Bash and Ralph Heredia that impact case. |
| 12/11/2023 | James C. Asbill | $584.00 | 0.4 | $233.60 | Conference with DDS re: elements of the case that establish the RICO claims against MTK. |
| 12/11/2023 | Destyn D. Stanton | $638.00 | 0.3 | $191.40 | Revise subpoena to Golden Boy; email to Daisy Chung re instructions for serving subpoena. |
| 12/12/2023 | William Gonzalez | $220.00 | 0.7 | $154.00 | Prep for telephonic interview of Irish Times Investigative Reporter |
| 12/12/2023 | William Gonzalez | $220.00 | 1.1 | $242.00 | Discussion with investigative reporter focusing on status of the Kinahan cartel, and the likelihood of identifying assets traceable to the principals and proxies. |
| 12/13/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Draft updated subpoena for GBP, send to DDS for review |
| 12/13/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with court reporter re status of transcript order |
| 12/15/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up on service for GBP revised subpoena with process server |
| 12/18/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Messages to process server re updates on GBP revised subpoena service |
| 12/18/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to DDS re updates on JSR |
| 12/19/2023 | James C. Asbill | $584.00 | 0.1 | $58.40 | Review the Status Report prepared by DDS and provide feedback. |
| 12/19/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to DDS re service of revised subpoena for GBP |
| 12/19/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call from ESM re JSR draft for review/case law research needed |
| 12/19/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to SK re case law research needed for damages for JSR |
| 12/19/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to DDS re case law research needed for damages for JSR |
| 12/19/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Phone call from SK re damages case law for JSR |
| 12/19/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Research jury instructions re lost profits damages, send to ESM |
| 12/19/2023 | Daisy Chung | $220.00 | 0.3 | $66.00 | Review and revise status report, send to DDS and ESM for review |

| 12/19/2023 | Daisy Chung | $220.00 | 0.2 | $44.00 | Messages to and from process server re successful service - GBP revised subpoena |
|---|---|---|---|---|---|
| 12/19/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: GBP Subpoena #2 - Proof of Service.pdf |
| 12/19/2023 | Saroja Koneru | $520.00 | 0.4 | $208.00 | Research case law re actual and lost opportunity damages |
| 12/19/2023 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Phone call to DC re JSR draft for review/case law research needed. |
| 12/20/2023 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 175 JSR.pdf |
| 1/4/2024 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Review ECF notices re transcript and email ESM re deadlines |
| 1/4/2024 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with ESM re transcript redaction deadlines |
| 1/4/2024 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Call to SK re transcript redaction deadlines |
| 1/4/2024 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ Barry McQuigan. |
| 1/5/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: 01-20-2023 Heredia v MTK status conf (1).pdf |
| 1/5/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Review minute order, calendar deadline to file redactions to transcript |
| 1/5/2024 | Saroja Koneru | $520.00 | 0.8 | $416.00 | Draft affidavit outline |
| 1/10/2024 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with DC re notice of redaction for status hearing transcript |
| 1/10/2024 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Review status hearing transcript for potential redactions |
| 1/17/2024 | Daisy Chung | $220.00 | 1.2 | $264.00 | Research jury instructions, draft affidavit outlines for damages |
| 1/18/2024 | Daisy Chung | $220.00 | 0.8 | $176.00 | Continue researching jury instructions, draft affidavit outlines for damages, send to ESM for review |
| 1/18/2024 | Daisy Chung | $220.00 | 1.1 | $242.00 | Draft affidavit outline for boxers re damages discovery, send to ESM |
| 1/18/2024 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Phone call to DC re affidavit outlines for boxers |
| 1/18/2024 | Eric Montalvo | $751.00 | 1 | $751.00 | Status conference call with Judge Chapman. |
| 1/30/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Draft deposition subpoena for Roberto A. Diaz, send to ESM for review |
| 1/30/2024 | Destyn D. Stanton | $638.00 | 0.1 | $63.80 | Exchange with Saroja Koneru re status of subpoena to Golden Boy. |
| 1/31/2024 | Daisy Chung | $220.00 | 0.5 | $110.00 | Draft production request to accompany Roberto A. Diaz's deposition subpoena, send to ESM for review |

| 2/1/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to Steve Bash re send copies of affidavit outline, request conference call to discuss |
| 2/1/2024 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Case related email correspondence from DC re email to Steve Bash re send copies of affidavit outline, request conference call to discuss. |
| 2/2/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Finalize subpoena for Roberto A. Diaz, coordinate with process server on service to home address |
| 2/2/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call with ESM re GBP revised subpoena service, drafting of m&c for no response |
| 2/2/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Email to SK re request drafting of m&c letter to GBP for revised 2nd subpoena service |
| 2/2/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Phone call from SK re draft m&c letter to GBP for revised 2nd subpoena service |
| 2/2/2024 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Email to DS re GBP response to subpoena |
| 2/2/2024 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Review email from DC re meet and confer letter to GBP; call with DS re meet and confer letter |
| 2/2/2024 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Call with ESM re meet and confer letter |
| 2/2/2024 | Saroja Koneru | $520.00 | 1.2 | $624.00 | Draft meet and confer letter to GBP re revised subpoena |
| 2/2/2024 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Call with SK re meet and confer letter. |
| 2/5/2024 | Daisy Chung | $220.00 | 0.4 | $88.00 | Conference call with ESM and Steve Bash re discuss damages affidavit from boxers |
| 2/5/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Review service from process server re successful attempt in serving Roberto A. Diaz with subpoena, request completed proof of service form |
| 2/5/2024 | Eric Montalvo | $751.00 | 0.4 | $300.40 | Conference call with DC and Steve Bash re discuss damages affidavit from boxers |
| 2/6/2024 | James C. Asbill | $584.00 | 1 | $584.00 | Internal conference with DDS regarding the facts relevant to the damages calculation and how those facts intersect with the allegations in the pleadings. |
| 2/6/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Draft proof of service for Roberto A. Diaz subpoena, send to process server for execution |
| 2/6/2024 | Daisy Chung | $220.00 | 0.6 | $132.00 | Search for Crawford v. Top Rank complaint filed, register for Nevada State Court docket search account, request access to pull complaint |

| 2/6/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Calendar deadline for GBP to respond to discovery subpoena |
|---|---|---|---|---|---|
| 2/6/2024 | Daisy Chung | $220.00 | 0.4 | $88.00 | Meeting with ESM re discovery discussion, Kinahan updates, Roberto A. Diaz subpoena successful service |
| 2/6/2024 | Daisy Chung | $220.00 | 1 | $220.00 | Process server fee re Roberto A. Diaz deposition subpoena |
| 2/6/2024 | David R. Keesling | $782.00 | 2.5 | $1,955.00 | Internal Conference with DDS for development of damages model for ESM in advance of March hearing.  Further review of transcript of prior hearing where court addresses necessities for default.  Detailed review of default prerequisites for RICO, specifically two predicate acts.  Discussion on weakness of this specific RICO analysis and need to supplement the pleadings (possible 4th Amended Complaint) with information obtained in Ireland (i.e., money laundering through advances to boxers).  Directed DDS to provide a detailed analysis to ESM for his final determination. |
| 2/6/2024 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Finalize meet and confer letter to GBP |
| 2/6/2024 | Eric Montalvo | $751.00 | 0.4 | $300.40 | Meeting with DC re discovery discussion, Kinahan updates, Roberto A. Diaz subpoena successful service |
| 2/7/2024 | William Gonzalez | $220.00 | 0.5 | $110.00 | Reviewed email regarding asset research and responded with particulars |
| 2/7/2024 | Eric Montalvo | $751.00 | 0.6 | $450.60 | Meeting with DC/SK re initial disclosure preparation |
| 2/7/2024 | Eric Montalvo | $751.00 | 0.4 | $300.40 | Meeting with SK and DC re initial disclosures |
| 2/8/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added 3 Documents |
| 2/8/2024 | Daisy Chung | $220.00 | 0.7 | $154.00 | Review Crawford v. Top Rank complaint, answer, and stipulation of dismissal |
| 2/8/2024 | Daisy Chung | $220.00 | 1 | $220.00 | Access Crawford v. Top Rank Complaint |
| 2/8/2024 | Daisy Chung | $220.00 | 1 | $220.00 | Access Crawford v. Top Rank Answer to Complaint |
| 2/8/2024 | Daisy Chung | $220.00 | 1 | $220.00 | Access Crawford v. Top Rank Stipulation and Order for Dismissal with Prejudice |
| 2/9/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Coordinate with ESM/Cristina re Roberto A. Diaz deposition |
| 2/9/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reach out to court reporter re request remote deposition for Roberto A. Diaz |

| 2/9/2024 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Review case related email from GBP counsel re subpoena. |
|---|---|---|---|---|---|
| 2/12/2024 | Daisy Chung | $220.00 | 0.4 | $88.00 | Review GBP email re subpoena, confirm proper service of GBP revised subpoena with process server, messages w/SK to confirm adequate service |
| 2/13/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Coordinate Zoom deposition of Roberto A. Diaz |
| 2/13/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Send served version of GBP's revised subpoena to SK for re-service |
| 2/13/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Research jury instructions on tortious interference, send to ESM per request |
| 2/13/2024 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with ESM, DC, and GBP counsel re subpoena |
| 2/13/2024 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Case related email from SK to GBP counsel enclosing copy of subpoena previously served. |
| 2/14/2024 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Call with SK re joint discovery plan. |
| 2/15/2024 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Prepare DK withdrawal form |
| 2/15/2024 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ George Gallegos re deposition of Roberto A. Diaz. |
| 2/20/2024 | Daisy Chung | $220.00 | 2 | $440.00 | Attend deposition of Roberto A. Diaz |
| 2/20/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Deposition prep call with ESM in advance of Roberto Diaz depo |
| 2/20/2024 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Follow up email to GBP counsel re subpoena |
| 2/20/2024 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Research federal rules re notice of deposition |
| 2/20/2024 | Eric Montalvo | $751.00 | 2 | $1,502.00 | Deposition of Roberto A. Diaz |
| 2/20/2024 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Deposition prep call with DC in advance of Roberto Diaz depo |
| 2/21/2024 | Daisy Chung | $220.00 | 0.5 | $110.00 | Phone call from client re brief on Roberto Diaz deposition, address any questions |
| 2/22/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Reply email to SK re close of discovery |
| 2/22/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call from ESM re discuss discovery milestones, confirm deadline for submitting memorandum, discuss boxing affidavits, confirm Bash is preparing affidavit |
| 2/22/2024 | Eric Montalvo | $751.00 | 0.2 | $150.20 | Phone call to DC re discuss discovery milestones, confirm deadline for submitting memorandum, discuss boxing affidavits, confirm Bash is preparing affidavit. |
| 2/27/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added 6 Documents |

| 2/27/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review and revise GBP subpoena proof of service for server to confirm correct date of receipt, send email and text message to server to follow up |
| 2/27/2024 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Call with ESM re GBP's response to subpoena |
| 2/27/2024 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Email to GBP counsel re response to subpoena |
| 2/27/2024 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Correspondence with DC re proof of service of subpoena to GBP |
| 2/27/2024 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Call with SK re GBP's response to subpoena. |
| 2/28/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Replace final GBP subpoena service package with corrected proof of service, send to SK for motion to compel discovery |
| 2/28/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Review and revise draft joint stipulation for motion to compel GBP discovery |
| 2/28/2024 | Saroja Koneru | $520.00 | 0.3 | $156.00 | Revise draft joint stipulation to compel GBP's response to subpoena and prepare exhibits |
| 2/28/2024 | Saroja Koneru | $520.00 | 0.4 | $208.00 | Review GBP's response to subpoena; call with ESM regarding response |
| 2/28/2024 | Saroja Koneru | $520.00 | 0.1 | $52.00 | Added 6 Documents |
| 2/29/2024 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Call with ESM re documents received from GBP in response to subpoena |
| 2/29/2024 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Call with SK re documents received from GBP in response to subpoena. |
| 3/1/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Finalize and send meet and confer request as it pertains to GBP's responses to the December 19, 2023, subpoena |
| 3/1/2024 | Saroja Koneru | $520.00 | 0.7 | $364.00 | Review deposition transcript of Roberto Diaz |
| 3/1/2024 | Saroja Koneru | $520.00 | 0.8 | $416.00 | Draft meet and confer letter re GBP's responses to subpoena |
| 3/1/2024 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ Steve Bash. |
| 3/6/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Follow up with counsel for GBP re request for meet and confer for request documents |
| 3/6/2024 | Daisy Chung | $220.00 | 0.5 | $110.00 | Search for associated addresses with Kinahan, provide information to Bill per request |
| 3/6/2024 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Case related email correspondence to WG re MTK updates. |

| 3/7/2024 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ Irish reporter; sent follow up email re quote. |
|---|---|---|---|---|---|
| 3/7/2024 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Case related email correspondence from opposing counsel re requested documents and meet & confer letter. |
| 3/7/2024 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ Conor Lally - Irish Times. |
| 3/8/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Review and Save- Added Document: DOC 180 Withdrawal of DRK.pdf |
| 3/11/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added 2 Documents - GBP supplemental production to subpoena |
| 3/11/2024 | Saroja Koneru | $520.00 | 0.2 | $104.00 | Review supplemental discovery production received from GBP |
| 3/14/2024 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Call w/ Darragh McIntyre (BBC) re updates re Kinahan matter. |
| 3/15/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Save - DOC 181 Order on DRK Withdrawal |
| 3/18/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Conference call with ESM/IH re discuss brief ISO default judgment/damages |
| 3/18/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Research re CA case law/previous Court orders/templates for motion for default judgment on damages, send case to IH |
| 3/18/2024 | Ian Hargreaves | $520.00 | 0.2 | $104.00 | Call w/ ESM and DC |
| 3/18/2024 | Ian Hargreaves | $520.00 | 0.5 | $260.00 | Researching default damages |
| 3/18/2024 | Eric Montalvo | $751.00 | 0.5 | $375.50 | Conference call with DC/IH re discuss brief ISO default judgment/damages. |
| 3/18/2024 | Eric Montalvo | $751.00 | 4 | $3,004.00 | Draft past lost earnings in preparation for filing; sent to clients for review. |
| 3/19/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Send copies of filed motion for judgments for all 4 defendants, and 3AC to IH per request |
| 3/19/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call from IH re discuss damages brief, case law research needed |
| 3/19/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Phone call from IH re discuss damages brief formatting - how to breakdown damages for each defendant |
| 3/19/2024 | Daisy Chung | $220.00 | 0.8 | $176.00 | Research case law - precise amount of damages in complaints for default judgment, law on requirements for sum certain/demanded in complaint, send findings to ESM and IH |
| 3/19/2024 | Daisy Chung | $220.00 | 0.4 | $88.00 | Conference call w/ESM and IH re discuss case law on tying up damages to complaint |

| 3/19/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Research local rules on seeking extensions, send findings to ESM |
|---|---|---|---|---|---|
| 3/19/2024 | Daisy Chung | $220.00 | 0.7 | $154.00 | Review supplemental memo, continue drafting damages section, send to IH for next round of revisions/review |
| 3/19/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Begin compiling exhibits to be filed with supplemental memorandum |
| 3/19/2024 | Daisy Chung | $220.00 | 0.4 | $88.00 | Phone call from IH re discuss latest version of supp. memorandum draft, clarification on arbitration enforcement judgment and BK filings, including bout contracts and payout sheets as exhibits |
| 3/19/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Phone call from ESM re discuss changes to stipulation to extend deadline to file supp. memo. ISO damages |
| 3/19/2024 | Daisy Chung | $220.00 | 0.4 | $88.00 | Revise stipulation to extend deadline to file supp. memo. ISO damages per phone call with ESM, finalize, and send to ROD for filing |
| 3/19/2024 | Daisy Chung | $220.00 | 0.7 | $154.00 | Draft stipulation to request extension re Supp. Memo ISO damages, send to IH for review |
| 3/19/2024 | Ian Hargreaves | $520.00 | 1.1 | $572.00 | Reviewing file documents, research, and emails to DC |
| 3/19/2024 | Ian Hargreaves | $520.00 | 0.3 | $156.00 | Call w/ DC |
| 3/19/2024 | Ian Hargreaves | $520.00 | 0.6 | $312.00 | Reviewing and categorizing damages re default damages memo |
| 3/19/2024 | Ian Hargreaves | $520.00 | 0.4 | $208.00 | Reviewing file documents and damages |
| 3/19/2024 | Ian Hargreaves | $520.00 | 0.3 | $156.00 | Call w/ DC and ESM |
| 3/19/2024 | Ian Hargreaves | $520.00 | 0.1 | $52.00 | Email to DC |
| 3/19/2024 | Ian Hargreaves | $520.00 | 0.3 | $156.00 | Call w/ DC |
| 3/19/2024 | Ian Hargreaves | $520.00 | 0.4 | $208.00 | Revising draft memo ISO motion for default to incorporate discussion points w/ DC |
| 3/19/2024 | Saroja Koneru | $520.00 | 0.3 | $156.00 | Correspondence with IH and DC re joint stip to continue deadlines |
| 3/19/2024 | Eric Montalvo | $751.00 | 0.4 | $300.40 | Conference call w/ DC and IH re discuss case law on tying up damages to complaint. |
| 3/19/2024 | Eric Montalvo | $751.00 | 0.1 | $75.10 | Phone call to DC re discuss changes to stipulation to extend deadline to file supp. memo. ISO damages |
| 3/20/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: DOC 182 Stipulation to Extend.pdf |

| 3/20/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review draft affidavit from Steve Bash, send copy to IH for review |
| 3/20/2024 | Ian Hargreaves | $520.00 | 1.8 | $936.00 | Reviewing arbitration brief and file documents for damages |
| 3/21/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Review order on stipulation for request for extension, calendar new deadline |
| 3/21/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Save - DOC 183 ORDER ON STIPULATION |
| 3/21/2024 | Daisy Chung | $220.00 | 0.9 | $198.00 | Continue finalizing exhibits for Supp. Memo ISO damages |
| 3/21/2024 | Ian Hargreaves | $520.00 | 1.1 | $572.00 | Revising supplemental memo on damages for default |
| 3/27/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: Roberto A. Diaz - Depo Errata.pdf |
| 3/28/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Meeting w/ESM re discuss drafting affidavit template from outline (Espinoza), discuss reviewing prior affidavits for clients |
| 3/29/2024 | Daisy Chung | $220.00 | 1.6 | $352.00 | Begin drafting Stephen Espinoza's affidavit ISO Supp. Memo for damages, send to IH for initial review and revisions |
| 3/29/2024 | Ian Hargreaves | $520.00 | 0.3 | $156.00 | Initial review of DC draft affidavit for Espinoza |
| 4/1/2024 | Daisy Chung | $220.00 | 1.2 | $264.00 | Review Moses and Ralph Heredia declarations filed for arbitration, draft affidavit ISO damages memo., send to ESM and IH for review |
| 4/1/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Send previous RH declaration to ESM for review/drafting |
| 4/1/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review revised Espinoza affidavit from IH |
| 4/1/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review revised Moses affidavit from IH, review comments for consideration |
| 4/1/2024 | Ian Hargreaves | $520.00 | 0.8 | $416.00 | Reviewing/revising DC affidavit draft of S. Espinoza |
| 4/1/2024 | Ian Hargreaves | $520.00 | 0.4 | $208.00 | Reviewing/revising M. Heredia draft affidavit |
| 4/2/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review and update draft of Moses Heredia's affidavit ISO damages per client's feedback, send to ESM and IH for review |
| 4/2/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Compile all Word documents: affidavit outline for Moses Heredia, Steven Bash, Stephen Espinoza, Ralph Heredia, and draft motion for damages, send to ESM per request |

| 4/2/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Phone call from ESM re discuss affidavit outlines and draft motion for damages |
| 4/2/2024 | Eric Montalvo | $751.00 | 0.3 | $225.30 | Phone call to DC re discuss affidavit outlines and draft motion for damages. |
| 4/3/2024 | Daisy Chung | $220.00 | 0.6 | $132.00 | Review revised Espinoza affidavit, and damages motion ahead of call w/ESM and IH |
| 4/3/2024 | Daisy Chung | $220.00 | 0.9 | $198.00 | Conference call with ESM and IH to discuss changes to Espinoza's affidavit, revisions to make for RH and MH affidavits, updates for draft memo ISO damages, fee petition preparation |
| 4/3/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Send updated affidavit and supp. memo ISO damages to Steve Bash, request call w/ESM |
| 4/3/2024 | Daisy Chung | $220.00 | 0.5 | $110.00 | Review revised affidavit of Moses Heredia from IH, make further revisions, address comments, send 2012 boxer manager contract for IH review |
| 4/3/2024 | Daisy Chung | $220.00 | 0.8 | $176.00 | Draft Ralph Heredia's affidavit, incorporate information from Moses' affidavit, send to IH for review |
| 4/3/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Added Document: 2012 Boxer Manager Contract.pdf |
| 4/3/2024 | Daisy Chung | $220.00 | 0.2 | $44.00 | Review expense list from Florian, send back with additional questions |
| 4/3/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Review IH revisions for Ralph's affidavit, continue making further revisions, send back to IH/ESM for approval to send to Ralph for his input |
| 4/3/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Review and send current versions of all 4 affidavits to ESM |
| 4/3/2024 | Daisy Chung | $220.00 | 0.9 | $198.00 | Revise memorandum, incorporate citations, begin drafting exhibits. Send updated draft to ESM and IH for review |
| 4/3/2024 | Daisy Chung | $220.00 | 0.4 | $88.00 | Phone call from ESM re discuss final revisions to make to Espinoza's affidavit |
| 4/3/2024 | Daisy Chung | $220.00 | 0.3 | $66.00 | Make final revisions to make to Espinoza's affidavit, finalize for execution, send to Espinoza for review/signature |
| 4/3/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Send current versions of MH and RH affidavits to clients for both of their input |

| Date | User | Cost | Quantity | Total | Description |
|---|---|---|---|---|---|
| 4/3/2024 | Daisy Chung | $220.00 | 0.1 | $22.00 | Phone call from IH re discuss changes to affidavit prior to sending to ESM for review, discuss review of memorandum for citation updates |
| 4/3/2024 | Daisy Chung | $220.00 | 0.8 | $176.00 | Review and make additional revisions to attorney fee petition/expenses, send back to FA for recalculation of final number |
| 4/3/2024 | Ian Hargreaves | $520.00 | 0.8 | $416.00 | Reviewing current affidavit and motion drafts |
| 4/3/2024 | Ian Hargreaves | $520.00 | 0.8 | $416.00 | Call w/ ESM and DC re damages motion and supporting documents |
| 4/3/2024 | Ian Hargreaves | $520.00 | 0.7 | $364.00 | Revising S. Bash affidavit |
| 4/3/2024 | Ian Hargreaves | $520.00 | 1 | $520.00 | Revising M. Heredia affidavit |
| 4/3/2024 | Ian Hargreaves | $520.00 | 2.1 | $1,092.00 | Revising memo ISO default |
| 4/3/2024 | Ian Hargreaves | $520.00 | 0.3 | $156.00 | Revising S. Espinoza Affidavit draft and email to ESM and DC |
| 4/3/2024 | Ian Hargreaves | $520.00 | 0.4 | $208.00 | Revising R. Heredia affidavit |
| 4/3/2024 | Ian Hargreaves | $520.00 | 0.1 | $52.00 | Revising affidavit for R. Heredia |
| 4/3/2024 | Ian Hargreaves | $520.00 | 0.1 | $52.00 | Call w/ DC |

Total Fees:   **$492,136.60**

## Costs

| Date | User | Cost | Quantity | Total | Description |
|---|---|---|---|---|---|
| 1/14/2021 | Admin | $2,000.00 | 1 | $2,000.00 | Invoice for Service in Dubai. Invoice #025340 |
| 2/11/2021 | Admin | $2,646.00 | 1 | $2,646.00 | Professional fee: provide assistance to notify Company and Mr. Kinahan about US case via email and newspaper. Invoice #026336 |
| 2/11/2021 | Admin | $529.00 | 1 | $529.00 | Notification by publication charges (newspaper). Invoice #026336 |
| 2/18/2021 | Ji-Eun Lee | $95.00 | 1 | $95.00 | Invoice from Arizona Quick Serve in the MTK matter. Invoice #5335046. |
| 3/8/2021 | Jason Moy | $5,729.35 | 1 | $5,729.35 | Process server fee. Invoice #3505 |
| 5/10/2021 | Admin | $12.20 | 1 | $12.20 | Meal charges (Starbucks) |
| 6/12/2021 | Eric Montalvo | $826.42 | 1 | $826.42 | Eric Montalvo's Hotel charges at the Ritz Carlton Marina Del Rey. |
| 6/12/2021 | Admin | $50.00 | 1 | $50.00 | Parking Expense |

| 6/12/2021 | Admin | $25.72 | 1 | $25.72 | Meal charges (Los Angeles International Airport) |
|---|---|---|---|---|---|
| 6/12/2021 | Jason Moy | $19.69 | 1 | $19.69 | Uber fare |
| 7/13/2022 | Rajan Dhungana | $202.96 | 1 | $202.96 | Rajan Dhungana's Airfare to and from Las Vegas and Orange County, CA. |
| 7/27/2022 | Rajan Dhungana | $464.78 | 1 | $464.78 | Rajan Dhungana's Hotel charges at the Hilton Hotel & Resorts. |
| 7/27/2022 | Rajan Dhungana | $18.42 | 1 | $18.42 | Uber fare |
| 1/31/2023 | Denise Rogers | $75.00 | 1 | $75.00 | Westlaw Research Charges |
| 2/2/2023 | Daisy Chung | $174.19 | 1 | $174.19 | DHL International Shipping Label for Dubai Counsel to send copies of newspaper publication as it relates to MTK and Kinahan process of service |
| 3/28/2023 | Daisy Chung | $500.00 | 1 | $500.00 | David Keesling - PHV Application Fee |
| 3/30/2023 | Rajan Dhungana | $31.79 | 1 | $31.79 | Uber from SNA to Anaheim Office |
| 3/30/2023 | Rajan Dhungana | $19.18 | 1 | $19.18 | Uber to LAS for status hearing 03/31/2023 |
| 3/31/2023 | Rajan Dhungana | $308.18 | 1 | $308.18 | Hotel for status hearing on 03/31/2023 |
| 3/31/2023 | Rajan Dhungana | $507.96 | 1 | $507.96 | Southwest airlines flight from LAS to SNA for status hearing on 03/31/2023 |
| 3/31/2023 | Rajan Dhungana | $19.77 | 1 | $19.77 | Uber from Hyatt Regency to Federal District Court for Status hearing |
| 6/5/2023 | Daisy Chung | $9.00 | 1 | $9.00 | Mail re courtesy copies of notice of motion for default judgment to MTK USA |
| 8/3/2023 | Daisy Chung | $125.00 | 1 | $125.00 | Translation Service of Paul Gibson's Process Service Documents |
| 8/7/2023 | Eric Montalvo | $2,300.00 | 1 | $2,300.00 | Airfare |
| 8/10/2023 | Eric Montalvo | $700.00 | 1 | $700.00 | Hotel |
| 8/10/2023 | Eric Montalvo | $500.00 | 1 | $500.00 | Miscellaneous |
| 8/15/2023 | Destyn D. Stanton | $20.00 | 1 | $20.00 | DE Secretary of State status report for Defendant MTK Global Sports Management, LLC. |
| 8/25/2023 | Daisy Chung | $125.00 | 1 | $125.00 | Fee for process server to serve subpoena for discovery documents on GBP |
| 9/8/2023 | Daisy Chung | $142.00 | 1 | $142.00 | Transcript order for August 25, 2023, Hearing |
| 9/29/2023 | Daisy Chung | $80.13 | 1 | $80.13 | FedEx to Spain- copy of Court's order (ECF 168) to Paul Gibson notifying him of hearing pursuant to Judge's order |
| 9/29/2023 | Daisy Chung | $93.71 | 2 | $187.42 | FedEx to UAE- copy of Court's order (ECF 168) to MTK Global and Daniel Kinahan notifying them of hearing pursuant to Judge's order |

| | | | | | |
|---|---|---|---|---|---|
| 9/29/2023 | Daisy Chung | $10.21 | 1 | $10.21 | Send Cert Mail re copy of Court's order (ECF 168) to MTK USA Registered Agent notifying them of hearing pursuant to Judge's order |
| 9/29/2023 | Daisy Chung | $9.73 | 2 | $19.46 | Send Certified Mail re - copy of Court's order (ECF 168) to counsel of record for both MTK Global and Daniel Kinahan notifying them of hearing pursuant to Judge's order |
| 9/30/2023 | Florian Amega | $28.48 | 1 | $28.48 | Westlaw Research Charges (September 2023) |
| 10/4/2023 | Daisy Chung | $25.22 | 2 | $50.44 | UPS - Next Day Air - Copies of ECF 168 and full docket report to counsel of record for Daniel Kinahan and MTK Global |
| 10/31/2023 | Florian Amega | $142.19 | 1 | $142.19 | Westlaw Research Charges (October 2023) |
| 10/31/2023 | Florian Amega | $187.23 | 1 | $187.23 | Westlaw Research Charges (October 2023) |
| 11/28/2023 | Daisy Chung | $3.18 | 1 | $3.18 | Binding fee for paper copy of local rules per ESM request |
| 12/13/2023 | Daisy Chung | $85.02 | 1 | $85.02 | Transcript Order: 1/20/2023 Heredia v. MTK Global Sports (via Check) |
| 12/31/2023 | Florian Amega | $103.46 | 1 | $103.46 | Westlaw Research Charges (November 2023) |
| 12/31/2023 | Florian Amega | $188.81 | 1 | $188.81 | Westlaw Research Charges (December 2023) |
| 2/1/2024 | Florian Amega | $38.60 | 1 | $38.60 | Westlaw Research Charges (January 2024) |
| 2/6/2024 | Daisy Chung | $145.00 | 1 | $145.00 | Process server fee re Roberto A. Diaz deposition subpoena |
| 2/8/2024 | Daisy Chung | $11.84 | 1 | $11.84 | Access Crawford v. Top Rank Complaint |
| 2/8/2024 | Daisy Chung | $10.30 | 1 | $10.30 | Access Crawford v. Top Rank Answer to Complaint |
| 2/8/2024 | Daisy Chung | $3.09 | 1 | $3.09 | Access Crawford v. Top Rank Stipulation and Order for Dismissal with Prejudice |
| 3/5/2024 | Florian Amega | $1,421.12 | 1 | $1,421.12 | Court Reporter Fee from Gregory Edwards in the Heredia v. MTK case. |
| 4/3/2024 | Daisy Chung | $125.00 | 1 | $125.00 | Process server fee for GBP subpoena - Served December 19, 2023 |

Total Costs: **$21,017.59**