Rajan O. Dhungana (SBN: 297794)
rdhungana@fedpractice.com
Eric S. Montalvo (*Pro Hac Vice*)
emontalvo@fedpractice.com
FEDERAL PRACTICE GROUP
431 N Brookhurst St, Suite 130
Anaheim, CA 92801
Telephone: (310) 795-6905
*Attorney for Plaintiff*
Moses Heredia

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### (EASTERN DIVISION)

| | |
|---|---|
| MOSES HEREDIA,<br><br>                 Plaintiff,<br><br>vs.<br><br>MTK GLOBAL SPORTS MANAGEMENT, LLC; MTK GLOBAL USA, LLC; GOLDEN BOY PROMOTIONS, INC.; PAUL D. GIBSON; and DANIEL KINAHAN,<br><br>                 Defendants. | Case No.: 5:20-cv-02618-JWH-KKx<br>*Assigned to Magistrate Judge Stephanie S. Christensen*<br><br>**PLAINTIFF MOSES HEREDIA'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTIONS FOR DEFAULT JUDGMENT AS TO DEFENDANTS MTK GLOBAL SPORTS MANAGEMENT, LLC; MTK GLOBAL USA, LLC; DANIEL KINAHAN, AND PAUL D. GIBSON**<br><br>Date:          April 30, 2024<br>Time:          1:30 P.M.<br>Courtroom:    790<br>Judge: Magistrate Judge Stephanie S. Christensen |

# **TABLE OF CONTENTS**

ARGUMENT AND AUTHORITIES……………………………………...- 1 -

 I. THE COURT SHOULD GRANT DEFAULT DAMAGES AGAINST DEFENDANTS MTK GLOBAL, MTK USA, DANIEL KINAHAN, AND PAUL D. GIBSON ……………………………………………………...- 1 -

    A.    Standard Governing Default Damages..............................- 1 -

    B.    Plaintiff is Entitled to Recover for the Damages Caused to Him by Defendants……………………………………………………… - 4 -

        i. But-for Defendants' Interference, The Contract Been Performed Through Completion and Plaintiff Would Not Have Been Denied $360,000 in Contractually-Obligated Compensation……………….........-4-

        ii. Defendants' Interference Has Also Deprived Mr. Heredia of Substantial Earnings for High Profile Matches..............................- 6 -

        iii. Lost Future Income in Managing Diaz ...........................- 9 -

        iv.Future Income Lost Due to Intentional Interference with Prospective Economic Relations.........................................................- 12 -

        v. Other Damages Caused to Plaintiff................................- 15 -

        vi.Plaintiff Is Entitled to $10,732,500 in Total, When Accounting for Treble Damages..............................................................- 16 -

    C.    Awarding Plaintiff Litigation Costs and Attorney's Fees Pursuant to Default is Appropriate...........................................................- 17 -

CONCLUSION………………………………………………...- 18 -

# **TABLE OF AUTHORITIES**

**Cases**

*Berholtz v. P4 Meditech Analytics, LLC*, 600 F. Supp. 3d 1128, 1135 (S.D. Cal. 2022)..........................................................................................- 2 -

*Greyhound Exhibitgroup, Inc. v. E.L.U.L Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992)............................................................................................- 1 -

*Landstar Ranger, Inc. v. Parth Enterprises*, Inc., 725 F. Supp. 2d 916, 923 (C.D. Cal. 2010)..........................................................................................- 2 -

*McConnell v. MEBA Med. & Benefits, Plan,* 778 F.2d 521, 525 (9th Cir. 1985)- 17-

**Statutes**

Fed. R. Civ. P. 54(c).............................................................................- 2 -

**PLAINTIFF MOSES HEREDIA'S MEMORANDUM IN SUPPORT OF MOTIONS FOR DEFAULT JUDGMENT AS TO DEFENDANTS MTK GLOBAL USA, LLC, MTK GLOBAL, MTK USA, DANIEL KINAHAN, AND PAUL D. GIBSON**

Plaintiff Moses Heredia, by and through undersigned counsel, hereby submits his Memorandum in Support of Plaintiff's Motions for Default Judgment [Docs 150-152, 159], pursuant to the Court's October 19, 2023, order. [Doc 172.] Per discovery as to the issue of damages, as also authorized on October 19, 2023, Plaintiff reiterates its prior requests for default judgment and asks that the Court grant final entry of judgment in favor of Plaintiff.

## ARGUMENT AND AUTHORITIES

### I. THE COURT SHOULD GRANT DEFAULT DAMAGES AGAINST DEFENDANTS MTK GLOBAL, MTK USA, DANIEL KINAHAN, AND PAUL D. GIBSON

#### A. Standard Governing Default Damages[1]

"The plaintiff's burden in "proving up" damages is relatively lenient. If proximate cause is properly alleged in the complaint, it is admitted upon default." *Greyhound Exhibitgroup, Inc. v. E.L.U.L Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992). Evidence of sales occurring, where a plaintiff alleges being deprived of commission, is sufficient to prove damages on default when coupled with contract

---

[1] Having already covered the Eitel Factors in Plaintiff's previous filings, Plaintiff does not restate them here, and instead incorporates them by reference. This memorandum focuses on the extent of damages owed to Plaintiff.

language. *See Berholtz v. P4 Meditech Analytics, LLC*, 600 F. Supp. 3d 1128, 1135 (S.D. Cal. 2022) ("The consulting agreement provides that Plaintiff would be paid $12,500 per month in fees for a period of three months, as well as a bonus of $0.01 for each product sold by Defendant P4. […] Plaintiff presents evidence that at least 2,000,000 sales of P4's products occurred during the timeframe of the contract.")

Damages in the event of a default judgment must be tied to the damages pleaded in the complaint. *See* Fed. R. Civ. P. 54(c). Courts, however, may award default damages for types of damages that are not immediately discernible at the time of filing, provided that the Plaintiff's complaint addresses the category of damages and gives meaningful notice of the possibility that such amounts would be awarded. *See, e.g.*, *Landstar Ranger, Inc. v. Parth Enterprises*, Inc., 725 F. Supp. 2d 916, 923 (C.D. Cal. 2010) (listing cases and discussing recoverable types of damages on default, including such categories as interest and punitive damages, where the court did not allow recovery of pre-judgment interest only because "Landstar did not allege entitlement to prejudgment interest in its first amended complaint."); *see also Berholtz, LLC*, 600 F. Supp. 3d at 1136 (notice as to consequences of default "anticipates that defendants will look to the demand clause to understand their exposure in the event of default").

Plaintiff's complaint is sufficient and raises detailed substantive claims of damages caused to Plaintiff due to Defendants' actions. Plaintiff's Third Amended

Complaint against Defendants arises out of the following: Racketeer Influenced and Corrupt Organizations (RICO) claims under 18 U.S.C. § 1962(a) for Acquiring an Interest in an Enterprise by Use of Income, 18 U.S.C. § 1962(b) for Acquiring or Maintaining an Interest in or Control of an Enterprise, 18 U.S.C. § 1962(c) for Conducting the Affairs of the Enterprise, and 18 U.S.C. § 1962(d) for Conspiracy to Conduct the Affairs of the Enterprise; Tortious Interference with the Boxer-Manager Contract between Plaintiff and Joseph Diaz, Jr.; Tortious Interference with the Promoter-Manager Contract between Diaz and Golden Boy Promotions; Inducing Breach of the Boxer-Manager Contract; Intentional Interference with Prospective Economic Relations; and Negligent Interference with Prospective Economic Relations.[2]

As set forth in the Third Amended Complaint, Defendants' efforts to lure Diaz away from Plaintiff, breaching the agreements between them, deprived Plaintiff of the benefit of the contracts between Plaintiff and Diaz, as well as the agreement between Diaz and GBP. This also interfered with the prospective economic benefit of continuing to manage Diaz's career. The extent of the damages are detailed herein.

---

[2]Although the 8 Causes of Action ["COA"] listed in the Third Amended Complaint reference different combinations of Defendants, the alleged damages overlap considerably from one COA to the next. In short, Defendants leveraged illegal gains and mounted a smear campaign with the intent of destroying the contractual and economic relationship that Plaintiff held with Mr. Diaz, potential clients, and other industry players.

**B. Plaintiff is Entitled to Recover for the Damages Caused to Him by Defendants**

The actions of Defendants caused Plaintiff substantial losses, including: (i) contract-stipulated management fees for the duration of the then-current 2017-2022 contract period, (ii) manager fees for high-profile matches that were thwarted as a direct result of Defendants' interference, (iii) loss of future fees from managing Mr. Diaz into a new contract term, (iv) deprivation of management fees for boxers who elected not to sign with him, loss of business relationships and reputation, and (v) other general harms, including adverse health effects and emotional strain.

**i.      But-for Defendants' Interference, The Contract Been Performed Through Completion and Plaintiff Would Not Have Been Denied $360,000 in Contractually-Obligated Compensation**

Plaintiff's Boxer-Manager contract was signed on February 23, 2017, with an agreed-upon end date of February 22, 2022. In accordance with the contract, Plaintiff was to be paid 18% of Mr. Diaz's bout income as a management fee. Plaintiff's manager status was interfered with in August 2020, however. As part of the interference, Mr. Diaz was directed to not provide Plaintiff's contract-mandated 18% fee for the remainder of the 2017 contract. *See* Third Amended Complaint ("3AC") [ECF 85] at ¶¶ 185-189, 195-197. The following fights (with their listed purse) occurred subsequent to Defendants' interference:

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTIONS FOR DEFAULT JUDGMENT
AS TO DEFENDANTS

| Fight Opponent | Date of Fight | Purse Amounts | Plaintiff's Expected Management Fee (at 18%) | Amount Paid to Plaintiff |
|---|---|---|---|---|
| Rakhimov | February 13, 2021 [3] | $500,000.00[4] | $90,000.00 | $90,000.00 |
| Fortuna | July 09, 2021[5] | $500,000.00[6] | $90,000.00 | $0.00[7] |
| Haney | December 04, 2021 | $1,500,000.00[8] | $270,000.00 | $0.00[9] |
| **Total:** | | $2,500,000.00 | $450,000.00 | |

Mr. Diaz was paid $2.5 million over these 3 fights, for which Plaintiff was set to receive 18%, or $450,000. Plaintiff, however, was only paid $90,000.00

---

[3] Plaintiff, through intentional exclusion from all communication, was unable to negotiate and schedule Mr. Diaz's engagement in a title defense fight on February 13, 2021 (ECF 85, P72).

[4] *See* Exhibit N for a copy of JoJo Diaz's Bout Agreement dated November 23, 2020

[5] Plaintiff, through intentional exclusion from all communication, was unable to negotiate and schedule Mr. Diaz's engagement in another bout on July 09, 2021 (ECF 85, P 76).

[6] *See* Exhibit O for a copy of JoJo Diaz's Bout Agreement dated May 12, 2021

[7] Per an arbitration initiated by Plaintiff, Diaz was ordered to pay Plaintiff $80,000.00 for the Fortuna and Haney fights, at a severely reduced commission of 4%. Diaz's subsequent bankruptcy filing has prevented payment of the arbitration award to Plaintiff. *See* Exhibit L.
However, the arbitration was only binding with respect to Mr. Diaz and Plaintiff. Defendants were not party to the arbitration, meaning the arbitration decision has no binding authority on the tortious damage caused by Defendant to Plaintiff. But-for their interference, Plaintiff would have received the full 18% commission for both fights, or an additional $360,000.00. *See N. Carolina Mut. Life Ins. Co. v. McKinley Fin. Serv., Inc.,* 386 F. Supp. 2d 648, 655 (M.D.N.C. 2005) (a tort action and a breach of contract action can co-exist if the alleged tort does not pertain to the performance of the contract).

[8] *See* Exhibit P for a copy of JoJo Diaz's Bout Agreement dated December 03, 2021

[9] *Id.*

during this period. Plaintiff was therefore denied $360,000.00 as a result of Defendants' interference.

In accordance with Defendants' default, the facts and allegations are to be construed in a light most favorable to Plaintiff. The facts are clear—had Defendants' interference not occurred, Mr. Heredia would have received his contractually-guaranteed $450,000.00, his contracted-for 18% from $2.5 million total worth of bouts. Instead, he has only received a total of $90,000.00.[10] In other words, the interference from Defendants directly deprived Mr. Heredia of $360,000.00 in lost earnings and profits.

### ii. Defendants' Interference Has Also Deprived Mr. Heredia of Substantial Earnings for High Profile Matches

The interference from Defendants has deprived Plaintiff of substantial future earnings. *See* "3AC" [ECF 85] at ¶¶ 185-189.  As of January 30, 2020, Plaintiff and his prize boxer, Mr. Diaz, had just won the World Title. This achievement represented years of investment on the part of Plaintiff, and both Plaintiff and Mr. Diaz were poised to capitalize on the championship victory. Specifically, Plaintiff expected to receive a higher amount of income from bouts, since Mr. Diaz, now

_____

[10] *See supra* note 5. As noted, Plaintiff was awarded an additional $80,000.00 in arbitration, but has not received this amount. More importantly, the arbitration was only binding with respect to Mr. Diaz and Plaintiff. Defendants were not party to the arbitration, meaning the arbitration decision has no binding authority on tortious damage caused by Defendant to Plaintiff.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTIONS FOR DEFAULT JUDGMENT
AS TO DEFENDANTS

champion, would command higher rates per fight, which by extension would increase Plaintiff's per-fight income. Plaintiff had also rightfully earned a prestigious reputation, given his herculean accomplishment of having raised a fighter from cradle to champion, an almost unheard-of feat in the world of boxing. Based on this hard-earned enhanced status, Plaintiff was poised to take advantage of increased professional and business opportunities.

One of the greatest missed opportunities for Plaintiff and Mr. Diaz in the wake of the title victory was a high-profile match that would have featured Mr. Diaz. Mr. Stephen Espinoza, a titan match maker in the professional boxing world was ready to make a fight happen between Diaz and Gevontra ("Tank") Davis.[11] *See* Affidavit of S. Espinoza; Affidavit of M. Heredia; Affidavit of R. Heredia.

---

[11] Mr. Espinoza was until recently the President of Sports & Event Programming at Showtime Networks, Inc. Through his position, he regularly facilitated high level matches for Showtime, guiding the network into a pioneer of pay-per-view boxing and a juggernaut in sports entertainment. He has been directly involved with a number of the most famous boxers in history, including Mike Tyson and Oscar De La Hoya. Even more impressively, he has overseen the three largest grossing televised boxing matches in history, including Mayweather vs. Pacquiao (over $400 million in pay-per-view revenue), Mayweather vs. McGregor (over $600 million in pay-per-view revenue), and Mayweather vs. Canelo (over $150 million in pay-per-view revenue). *See* Affidavit of S. Espinoza; *see also Floyd Mayweather V Manny Pacquiao Shatters Boxing PPV Records*, Sky Sports (May 19, 2015), https://www.skysports.com/boxing/news/12183/9847786/floyd-mayweather-manny-pacquiao-shatters-boxing-pay-per-view-records; Dan Rafael, *Floyd Mayweather-Conor McGregor Pulled In 4.3M Domestic PPV Buys, $600M*, ESPN (Dec. 14, 2017), https://www.espn.com/boxing/story/_/id/21770652/floyd-mayweather-conor-mcgregor-43-million-domestic-ppv-buys-600-million; Dan Rafael, *Mayweather Win Top-Grossing Fight*, ESPN (Sep. 19, 2013), https://www.espn.com/boxing/story/_/id/9694996/floyd-mayweather-canelo-alvarez-top-grossing-ppv-fight.

Plaintiff respectfully provides his affidavit to provide additional context as to the damages caused to Plaintiff, and humbly, but strongly believes his credibility on matters involving the boxing industry to be unsurpassed and paramount.

Although a potential Davis v. Diaz fight had been in the works since late 2019, Mr. Diaz's title in early 2020 elevated the profile of the fight substantially. Tank Davis, himself a former champion [12] who routinely and consistently commanded high levels of attention, substantial purses, and high audience appeal, required a suitable opponent. *Id.* As a quickly rising star, Mr. Diaz's fighting style promised to compliment Mr. Davis's fighting style, thereby providing the potential for a high-quality match, which is precisely what brought Mr. Diaz to Mr. Espinoza's attention in the first place. As a champion, however, Mr. Diaz created the opportunity for a champion v. champion fight, with huge potential for pay-per-view generation and wide audience interest.[13] In other words, this fight would have taken place but for the interference from Defendants. *Id.*

In Mr. Espinoza's considerable opinion, informed by a career in arranging extremely profitable matches, the Davis-Diaz match would have generated, at minimum, $15,000,000. *See* Affidavit of S. Espinoza. Of that, Mr. Diaz would have received at least 50% of the gross, $7,500,000, meaning Plaintiff would have

---

[12] Mr. Davis had won the title of IBF World Super Featherweight Champion in 2017 and the title of WBA Super World Super Featherweight Champion in 2018.

[13] In an interview, Mr. Diaz can be seen discussing the serious prospect of a Gervonta Davis match, as well as potential matches with Ryan Garcia and Devin Hanye. *See* ESNEWS, JoJo Diaz Predicts His Fights vs. Ryan Garcia and Devine Hayne Calls Out Gervonta Davis, Youtube (July 10, 2021), https://www.youtube.com/watch?v=6Y3M82EuCKg at 2:50, 3:46, 4:20. The interview demonstrates that Mr. Diaz was considered to be in the upper echelon of boxing talent and shows the extent to which his candidacy for high-profile matches was being explored.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTIONS FOR DEFAULT JUDGMENT
AS TO DEFENDANTS

earned 18%, or $1,350,000.[14] *See* Affidavit of S. Bash (addressing minimum 50% share to Diaz in post-title matches); Affidavit of M. Heredia; Affidavit of R. Heredia.

However, given the extremely high ceiling and untold earning potential for high-level fights like the prospective Davis v. Diaz fight, it is more than reasonable to suggest the $15 million total gross estimate is conservative. Fighters at Diaz's level, such as Tank Davis and Ryan Garcia, today participate in fights generating $100,000,000.

In short, Defendants' actions directly prevented this fight from being scheduled, and deprived Plaintiff of a minimum of 1,350,000. *See* 3AC [ECF 85] at ¶¶ 173-179, *see also* at 157-167, 185-189.

### iii.   Lost Future Income in Managing Diaz

As conceded by Defendants' default, Plaintiff was deprived of his success due to Defendants' purposeful interference with Plaintiff's contract and relationship with Mr. Diaz. As a direct result of Defendants' undue influence, Plaintiff was deprived of a substantial amount of income, not just for the remaining period under the contract with Diaz through to February 22, 2022, but also in the form of future income. *See* 3AC [ECF 85] at ¶¶ 173-179, *see also* at 157-167, 185-

---

[14] A 50% share is typical in the industry, especially for title champions. *See* Affidavit of S. Bash.

189. It is reasonably certain, that Plaintiff would have continued to manage Diaz, and would have entered into a new contract, but-for the unlawful interference caused by Defendants.[15]

Evidence of this all-but-certain future relationship includes a July 24, 2020, text from Mr. Diaz to Plaintiff's brother and business partner, Ralph Heredia, in which Mr. Diaz stated, "Thanks [sic] you, I'm excited for this new journey as well. Big things to come, the future is bright. […] We gotta a [sic] lot to accomplish still and a lot of money to make." *See* Exhibit F (brackets added). The Heredias had elevated Diaz from rags to riches, had guided him to a title, represented him fiercely in negotiations, and were developing plans to feature Diaz in high-level fights. For his part, Diaz was thoroughly satisfied with the Heredias until Defendants unlawfully interfered in the contractual relationship, which he had held with the Heredias for 8 years.

There is similarly no doubt that without undue interference, Mr. Diaz would have continued his climb to stardom.[16] When operating under Plaintiff and his brother's guidance, Mr. Diaz had a strategic selection of opponents and was able

---

[15] *See* Exhibit E – A video of Mr. Diaz and Mr. Feliciano personally speaking highly of HBM's consistent support. Link to Video

[16] *See* Exhibit M, showing Diaz and Ralph Heredia in 2014, at a boxing event posing for a picture with actor Vin Diesel.

to keep his self-destructive tendencies in check. *See* Affidavit of R. Heredia. Having steered and managed Diaz to a title and having started negotiations for high-profile matches against well-known opponents at the top of the boxing world,[17] there is little doubt that the next 5 years would have seen Mr. Diaz reap the benefits of his newly acquired status.[18]

Moreover, assuming terms remained similar to the 2017 agreement,[19] Diaz and Plaintiff would have participated in a minimum of 2 fights per year, for the duration of the 5-year contract. In other words, had Diaz remained under contract and guidance of Plaintiff, Diaz would have participated in at least 10 fights, earning a premium per fight. After winning his title, Diaz's average rate per fight from January 2020 to late 2022 was $737,500.00.[20] With Plaintiff's expertise and shrewd

---

[17] *See supra* n. 10. The positive effect of the Heredia team on Diaz and his boxing career is easily contrasted by reviewing Diaz's record under Heredia management and "post" Heredia management. While under Heredia management Diaz had a 25 win/1 loss record.  The one and only loss was a title fight with the then WBC World Feather Weight Champion Gary Allen Russel Jr ending with a split decision. The MTK/ post Heredia period has resulted in a record of 2 wins, 4 losses, and 1 Draw. *See* Exhibit G. This losing record is further compounded given that these fights were against lower ranked less experienced fighters. The actual fights also brought in significantly less revenue given his stature.

[18] The longevity of champions' ability to command high purses is evident in viewing Mr. Tank Davis' career. *See* Affidavit of S. Espinoza. Mr. Davis, having won titles in 2017 and 2018, continues to command high fees and audiences. Other contemporaries such as Ryan Garcia continue to receive high billing and pay outs as well.

[19] Comparison to the 2012 and 2017 agreements shows there is little reason to expect the parties would have deviated from the 5-year term consisting of 2 matches per year. *See* Exhibits H and I.

[20] Understanding that the COVID-19 pandemic greatly limited fighting opportunities, the 4 matches following Diaz's title, from 2020 through 2022, netted Diaz payments of $500,000.00 (on two occasions), $1,500,000.00, and $450,000.00. The average is $737,500.00, although the $1.5 million fight shows the potential purse that Diaz was able to command post-title with adequate management.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTIONS FOR DEFAULT JUDGMENT
AS TO DEFENDANTS

matchmaking contacts, Diaz would have conservatively earned $7,375,000.00 in a 5-year follow on contract, from 2022 to 2027.[21] Assuming Plaintiff's rate remained the same at 18%, Plaintiff would have received $1,327,500.00 total. Instead, the interference from Defendants deprived Plaintiffs of the ability to manage Diaz's career.[22]

### iv.    Future Income Lost Due to Intentional Interference with Prospective Economic Relations

As noted, as of Mr. Diaz's title victory in January 2020, Plaintiff was poised to take advantage of increased professional and business opportunities. This included the increased stock of fighters who were interested in joining Plaintiff's stable of fighters. Each new fighter presented a high-level earning potential, for which Plaintiff was set to receive substantial sums.

However, Defendants, acting with deliberate intent, have disseminated defamatory statements within the boxing community. Two out of the three top promoters, Top Rank (who was working directly with Daniel Kinahan on making

---

[21] Plaintiff's ability to cultivate profitable fights is well-documented, and is perhaps best observable in the careful matchmaking process that led to Diaz winning the title in the first place.

[22] Without Plaintiff's expertise and contacts, Diaz has lacked suitable management, and as such has not been able to consistently maintain weight or command the same rates.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTIONS FOR DEFAULT JUDGMENT
AS TO DEFENDANTS

fights with Tryson Fury)[23] and Golden Boy (working with MTK sans licensure), took adverse public positions against the Heredias. *See, e.g.*, Affidavit of S. Bash. To a prospective boxer, this embargo on the Heredias by two top promoters meant that even if the prospect wanted to sign with Plaintiff, they would have to accept that it would be virtually impossible to secure any fights and/or significant purses. Further, the false, yet widely pushed allegations that the Heredias were stealing from their fighters' proceeds created further suspicion. The result is that the Heredias were rendered unapproachable.

The defamatory statements have significantly and adversely affected the reputation of the Plaintiff and caused irreparable harm to the Plaintiff's standing within the community, thereby impeding the Plaintiff's ability to attract new talent and expand their professional endeavors. *See* 3AC [ECF 85] at ¶¶ 179, 190-192.

The extent of this harm is demonstrable, and there is tangible, observable evidence of the persisting damaging effects. Prior to the defamatory statements, the Heredias were at the pinnacle of their management profession having groomed and guided an amateur fighter into a world champion. *See* Affidavit of S. Bash; Affidavit of S. Espinoza. The business side successes were also significant by

---

[23] *See* Exhibit J. Tyson Fury pictured alongside Daniel Kinahan in Dubai. Per the exhibits attached to Mr. Bash's affidavit, the hostility from Top Rank is plainly indicated by the comments of Top Rank chairman Bob Arum. *See* Affidavit of S. Bash.

negotiating higher purse amounts that other fighters were not achieving.[24] They had successfully managed three other champions. All eyes were on the Heredias.

Yet due to the false allegations, the Heredias lost out on signing (conservatively) a minimum of 3-5 high caliber, new fighters. See Affidavit of S. Bash; Affidavit of R. Heredia; Affidavit of M. Heredia. Fighters such as Terence Crawford would have garnered at a minimum of $100,000 purses per bout at two fights per year. *Id.* HBM, receiving an 18-20% management fee, would have received $36,000 per year, per fighter. With 3-5 fighters generating a minimum of $108,000 to $180,000 per year, over the course of five years, HBM would have received approximately $540,000 to $900,000 in revenue from these additions to HBM's stable.

A review of Mr. Bash's affidavit demonstrates that this estimate is woefully conservative when comparing the stellar reputation of the Heredias to their less successful counterparts in the industry. In the vacuum of MTK's collapse and the absence of the Heredia's due to the negative stigma unfairly imposed upon them, other, less-qualified managers are adding greater numbers of fighters to their stables. *See* Affidavit of S. Bash. Given the kinds of talent that the Heredias were attracting, each candidate had a chance of breaking through, and thereby earning

---

[24] *See* Exhibit K. Transcript of Arbitration between Moses Heredia and Joseph Diaz Jr., June 10, 2021.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTIONS FOR DEFAULT JUDGMENT
AS TO DEFENDANTS

higher purses and more lucrative bouts. Specific evidence of the conservative nature of the estimate is in the astounding recent success of Terence Crawford. *See* Affidavit of R. Heredia; *see also* Affidavit of M. Heredia. Mr. Crawford was an up-and-coming talent who was in discussions to join HBM's stable following Mr. Diaz's title victory in January 2020. *Id.* Due to the false information circulated by Defendants, Crawford instead signed with MTK. He is currently the number one Welter Weight in the world. Mr. Crawford recently earned approximately $10,000,000 for one fight. This one fight alone would have generated $1,800,000 in management fees.

It can be reasonably projected that Plaintiff would have earned a minimum of $540,000 in profits by signing at least 3 additional boxers. *See* Affidavit of S. Bash; Affidavit of R. Heredia; Affidavit of M. Heredia. *See also* ¶¶ 179, 190-192. When accounting for the breakthrough success of any given prospect, the number could have been far higher, including at least $1,800,000 for managing Mr. Crawford, plus an additional $720,000 for 4 other prospective clients, for a higher estimate of $2,520,000.

### v.   Other Damages Caused to Plaintiff

Plaintiff has also suffered general non-economic damages due to Defendants' actions. *See* 3AC [ECF 85] ¶¶ 190-191, 202-203. Under California law, Plaintiff is

entitled to recover for the non-economic damages caused to him. *See* CACI 3905A: Physical pain, mental suffering, and emotional distress.

The harm caused to the business of HBM disrupted over a decade of dedication, hard work, and strategic building. Instead of reaching new heights and taking advantage of the well-earned reputation following the title, the Heredias were faced with wrongful interference in their business relationship with their top fighter, were deprived of the opportunity to grow their stable with top prospects, and were forced to fight for their reputation against malicious rumors. *See* Affidavit of M. Heredia, Affidavit of R. Heredia. The stress caused to the Heredia brothers, in their 50s, has been tangible and real, and will continue to have effects into the future. *Id.* For this reason, they are also entitled to recover for the emotional harm that this ordeal has caused.

### vi.  Plaintiff Is Entitled to $10,732,500 in Total, When Accounting for Treble Damages.

In total, at minimum, Plaintiff has suffered $360,000 in contractually obligated income, $1,350,000 in lost income from high-profile fights, $1,327,500 in lost future contract income, and $540,000 in lost income from adding new boxer-clients, as well as an indeterminate amount in other emotional damages, for a minimum total of $3,577,500 in damages. In accordance with RICO, Plaintiff is entitled to treble damages. *See also* 3AC [ECF 85] ¶ 149 (and more generally,

causes of action 1-4). As such, Plaintiff is entitled to a minimum recovery of $10,732,500 as a result of Defendants' actions.

### C. Awarding Plaintiff Litigation Costs and Attorney's Fees Pursuant to Default is Appropriate.

The Court should award Plaintiff litigation costs and reasonable attorney's fees. The federal RICO statute provides that a prevailing party in a civil RICO action "shall recover threefold damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(c). In the absence of special circumstances, it is an abuse of discretion for the district court to *deny* a prevailing plaintiff attorneys' fees. *McConnell v. MEBA Med. & Benefits, Plan,* 778 F.2d 521, 525 (9th Cir. 1985). Accordingly, Plaintiff's request for litigation costs and attorney's fees should be granted.

Over 36 plus months of litigation, Plaintiff has incurred $492,136.60 in attorney fees and $21,017.59 in legal costs, for a total of $513,154.19.[25]

---

[25] *See* Exhibit Q. Plaintiff's Attorney's Fees/Expenses List.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTIONS FOR DEFAULT JUDGMENT AS TO DEFENDANTS

## **CONCLUSION**

WHEREFORE, Plaintiff Moses Heredia respectfully prays the Court:

(1) Enter an order granting Plaintiff's Motions for Default Judgment against Defendants MTK GLOBAL SPORTS MANAGEMENT, LLC, MTK GLOBAL USA, LLC; PAUL D. GIBSON, and DANIEL KINAHAN;

(2) Enter default judgment as to the issue of liability against Defendants MTK GLOBAL SPORTS MANAGEMENT, LLC, MTK GLOBAL USA, LLC; PAUL D. GIBSON, and DANIEL KINAHAN; and

(3) Award final award of $10,732,500 in damages, and $513,154.19 in litigation costs and attorney fees.

Dated:  April 04, 2024

Respectfully submitted,

 _/s/ Rajan O. Dhungana_____
Rajan O. Dhungana (SBN: 297794)
FEDERAL PRACTICE GROUP
431 N Brookhurst St, Suite 130
Anaheim, CA 92801
Telephone: (310) 795-6905
rdhungana@fedpractice.com
*Attorney for Plaintiff*
Moses Heredia