1

2

3

4

5 UNITED STATES DISTRICT COURT

6 CENTRAL DISTRICT OF CALIFORNIA

7

8 MOSES HEREDIA,                          Case No. 5:20-cv-02618-JWH-SSC

9                    Plaintiff,

10           v.

11 MTK GLOBAL SPORTS                       REPORT AND
                                           RECOMMENDATION OF
12 MANAGEMENT, LLC, et al.,                UNITED STATES MAGISTRATE
                                           JUDGE
13                    Defendants.

14

15

16

17        The Court submits this Report and Recommendation to the

18 Honorable John W. Holcomb, United States District Judge, pursuant to

19 28 U.S.C. § 636 and General Order 05-07 of the United States District

20 Court for the Central District of California.

21                              **REPORT**

22        Before the Court are Plaintiff Moses Heredia's motions for default

23 judgment against all Defendants.[1]  Having considered the moving

24 papers, the affidavits and exhibits attached thereto, the non-

25

26        _____

         [1] The remaining Defendants in this action are MTK Global Sports
27 Management, LLC; Paul D. Gibson; Daniel Kinahan; and MTK Global
   USA, LLC.  All other previously named defendants have been dismissed
28 from this action.  (ECF 29, 30, 116.)

participation by Defendants in these proceedings, as well as the Court's record, the Court recommends granting Heredia's motions for default judgment, and awarding damages, attorney's fees, and costs as outlined below.

# I

This case involves a dispute between Plaintiff Moses Heredia, a professional boxing manager who represented boxer Joseph "JoJo" Diaz Jr., and Defendants who allegedly interfered with that representation. Heredia accuses Defendants MTK Global Sports Management, LLC (MTK Global); Paul D. Gibson; Daniel Kinahan; and MTK Global USA, LLC (MTK USA) of engaging in racketeering, which interfered with Heredia's contractual relationship with Diaz.  The facts as alleged in the operative Third Amended Complaint (TAC) are as follows.[2]

Heredia managed Diaz's professional boxing career for eight years, beginning in 2012.  (ECF 85 at 3, 6.)  As relevant here, Heredia and Diaz entered into a five-year-boxer-manager contract on February 23, 2017.  (*Id.* at 7, 32.)  While under this contract, Diaz signed a lucrative promotion agreement with Golden Boy Promotions, Inc. that ran from March 22, 2017 to March 21, 2022.  (*Id.* at 6–7.)  In the

---

[2] Defendants did not file an answer to the TAC, so for purposes of considering Heredia's motions for default judgment, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."  *Blumenthal Distrib., Inc. v. Comoch Inc.*, 652 F. Supp. 3d 1117, 1126 (C.D. Cal. 2023) (quoting *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987)); *see* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied.  If a responsive pleading is not required, an allegation is considered denied or avoided.").

promotion agreement, Diaz listed Heredia and his brother, Ralph Heredia, as his representatives.  (*Id.* at 7, 11.)

During this time, Kinahan was the co-founder and operator of MTK Global and MTK USA, and Gibson acted as MTK Global's Chief Strategy Officer.  (*Id.* at 4, 7, 10–11.)  Kinahan also ran the day-to-day operations of the Kinahan Organized Crime Group, which "is believed to be one of Europe's biggest criminal cartels."  (*Id.* at 4, 7, 12.)  Kinahan created legitimate businesses, including MTK Global and MTK USA, to launder proceeds from criminal activity.  (*Id.* at 7–8, 12–13.)

On August 4, 2020, while under contract with Heredia, Diaz signed a business-advisory agreement with MTK USA, which was facilitated by MTK Global.  (*Id.* at 11–12, 15.)  Pursuant to the advisory agreement, MTK USA advanced Diaz $100,000, funds Heredia believes to have been generated through criminal activity by Kinahan and the Kinahan Organized Crime Group and laundered through MTK Global. (*Id.* at 12–13, 17.)  Although the agreement between Diaz and MTK USA purported to be for the purpose of business advisement, in actuality it was a boxing-management contract.  (*Id.* at 18, 20–21.)  The advisory agreement with Diaz was not the only one of its sort, as Kinahan and MTK Global engaged in a pattern of racketeering activity by entering into advisory agreements with multiple boxers in the United States for the purpose of laundering money.  (*Id.* at 12–14.)

After signing the advisory agreement with MTK USA, Diaz stopped communicating with the Heredia brothers and, through MTK Global, MTK USA, and Gibson, negotiated to engage in fights without Heredia's authorization.  (*Id.* at 15–18.)  Diaz engaged in fights after he stopped communicating with Heredia, which, under the 2017 boxer-

1   manager contract, should have resulted in payment to Heredia of his

2   18% fees for each fight. (*Id.* at 16.) Heredia did not receive any

3   payment from Diaz until 2021 when he received an arbitration award in

4   his favor. (*Id* at 16–17.) During the arbitration proceedings, the

5   remainder of the 2017 boxer-manager contract was canceled because

6   the relationship between Heredia and Diaz was irreconcilable, an action

7   that further damaged Heredia. (*Id.* at 20.)

8        On April 11, 2022, the United States Department of Treasury's

9   Office of Foreign Assets Control designated KOGC as a Transnational

10  Criminal Organization. (*Id.* at 4.) The Treasury Department has

11  further designated Kinahan as a Specially Designated National and has

12  imposed sanctions prohibiting United States persons or businesses from

13  doing business with Kinahan or the Kinahan Organized Crime Group.

14  (*Id.*)

15       Given these circumstances, the advisory agreement between Diaz

16  and Defendants, which involved laundered racketeering income, caused

17  the breach and disruption of the contractual relationship between

18  Heredia and Diaz, and, but for Defendants' interference, Diaz would

19  have performed his obligations to Heredia through the entirety of the

20  2017 boxer-manager contract. (*Id.* at 12, 15, 19–20.) Not only has

21  Heredia been damaged by being denied his owed benefit under the 2017

22  boxer-manger contract between himself and Diaz, he has been further

23  damaged by "Defendants['] . . . years-long campaign to ruin Mr.

24  Heredia's reputation in the community through lies, surrogates, and

25  blatantly false allegations, and frivolous/ legally unsupportable

26  complaints," resulting in Heredia's inability to recruit future clients.

27  (*Id.* at 22–23.)

28

## II

Defendants have not responded to the TAC.  Since the filing of the FAC, except for counsel for MTK USA filing a motion to withdraw and a statement of non-opposition to motions filed by Golden Boy Promotions, Inc. (ECF 111, 113), neither Defendants nor their counsel have appeared in this action in any manner.  Specifically, as to MTK USA, when the District Judge granted counsel's motion to withdraw, he noted that counsel had advised MTK USA that it could not appear in this action *pro se*, directed this defendant to engage new counsel and cause new counsel to file a Notice of Appearance no later than September 23, 2022, and directed relieved counsel to give notice to MTK USA of the Court's order.  (ECF 117 at 2–3.)

On December 14, 2022, Heredia applied for entry of default against MTK USA (ECF 127), and the Clerk entered default on December 20, 2022 (ECF 128).  On May 1, 2023, Heredia applied for entry of default against Kinahan (ECF 145) and MTK Global (ECF 146), and the Clerk entered default on May 11, 2023 (ECF 148).  On June 28, 2023, Heredia applied for entry of default against Gibson (ECF 155), and the Clerk entered default on June 29, 2023 (ECF 156).

On May 31, 2023, Heredia moved for default judgment against MTK USA, MTK Global, and Kinahan.  (ECF 150–52.)  On August 4, 2023, Heredia moved for default judgment against Gibson.  (ECF 159.)  Heredia moved for default judgment against all Defendants on the ground that they failed to answer the TAC, and against MTK USA for failing to retain new counsel to represent it in this action.  (ECF 150 at 5–7; ECF 151 at 4; ECF 152 at 4; ECF 159 at 4.)

On October 19, 2023, the Court held a hearing on Heredia's motions for default judgment (ECF 172), at which Defendants did not appear.

## III

A threshold consideration is whether each Defendant was served properly with the summons, TAC, and motions for default judgment where required.[3]  The Court finds that they were.

---

[3] The Court notes that a plaintiff must ordinarily serve the summons and complaint within 90 days of the filing of the complaint. Fed. R. Civ. P. 4(m).  This 90-day limit does not apply to service in a foreign country, such as the service here on Defendants MTK Global, Kinahan, and Gibson.  *Id.*  "However, 'the amount of time allowed for foreign service is not unlimited.'"  *Sport Lisboa e Benfica - Futebol SAD v. Doe 1*, No. CV 18-2978-RSWL-E, 2018 WL 4043182, at *4 (C.D. Cal. Aug. 21, 2018) (quoting *Nylok Corp. v. Fastener World Inc.*, 396 F.3d 805, 807 (7th Cir. 2005)).  "[T]he court may set reasonable limits on the time to effect service in a foreign country under the court's inherent authority to manage its docket."  *United Fin. Cas. Co. v. R.U.R. Transp., Inc.*, No. 22CV333-LL-WVG, 2022 WL 16747283, at *3 n.1 (S.D. Cal. Nov. 7, 2022) (citing cases); *see Sport Lisboa e Benfica - Futebol SAD*, 2018 WL 4043182, at *4.  A court may choose not to set a deadline for accomplishing international service where the plaintiff is making a good-faith effort to locate a foreign defendant and accomplish service in a foreign country.  *Sport Lisboa e Benfica - Futebol SAD*, 2018 WL 4043182, at *4.  Here, the Court is satisfied that Heredia undertook a good-faith effort to serve the foreign Defendants as timely as possible.

In addition, the record reflects that all Defendants had actual notice of this action before Heredia filed his motions for default judgment, as MTK USA, MTK Global, and Kinahan have all made some form of an appearance in this case, and, as explained below, Gibson was served personally with the summons and TAC.  Thus, now having found that Heredia properly served the Defendants, should the District Judge adopt this Report and enter default and judgment, and should any Defendant in the future move to vacate the default judgment based on improper service, the moving Defendant would "bear[] the burden of

## A

Generally, the Court considers the adequacy of service of process before evaluating the merits of a motion for default judgment. *See Indian Hills Holdings, LLC v. Frye*, 572 F. Supp. 3d 872, 884–85 (S.D. Cal. 2021) (considering adequacy of service as a threshold question and noting that "not only were [d]efendants properly served, ample evidence exists in the record to show [d]efendants' awareness of this lawsuit"); *DFSB Kollective Co. v. Bourne*, 897 F. Supp. 2d 871, 877 (N.D. Cal. 2012) ("The Court is also required to assess the adequacy of the service of process on the party against whom default is requested." (internal quotation marks omitted)); *see also Mason v. Genisco Tech. Corp.*, 960 F.2d 849, 851 (9th Cir. 1992) (stating that if party "failed to serve [defendant] in the earlier action, the default judgment is void and has no res judicata effect in this action.").

This is necessary because "[a] federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with [Rule 4 of the Federal Rules of Civil Procedure]." *Travelers Cas. & Sur. Co. of Am. v. Brenneke*, 551 F.3d 1132, 1135 (9th Cir. 2009) (quoting *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986)). "Rule 4 is a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint." *Benny*, 799 F.2d at

---

proving that service did not occur." *S.E.C. v. Internet Sols. for Bus. Inc.*, 509 F.3d 1161, 1163 (9th Cir. 2007) ("[A] defendant moving to vacate a default judgment based on improper service of process, where the defendant had actual notice of the original proceeding but delayed in bringing the motion until after entry of default judgment, bears the burden of proving that service did not occur."); *but see Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004) ("Once service is challenged, plaintiffs bear the burden of establishing that service was valid under Rule 4.").

492 (quoting *United Food & Com. Workers Union v. Alpha Beta Co.*, 736 F.2d 1371, 1382 (9th Cir.1984)).[4] "However, neither actual notice nor simply naming the defendant in the complaint will provide personal jurisdiction without 'substantial compliance with Rule 4.'" *Id.* (quoting *Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982)).

In addition to service of the summons and complaint, Rule 55 of the Federal Rules of Civil Procedure requires service of the application for default judgment, "[i]f the party against whom a default judgment is sought has appeared personally or by a representative." Fed. R. Civ. P. 55(b)(2). "A failure to satisfy the notice requirement specified in Rule 55(b)(2) is considered a serious procedural error that usually justifies reversal on appeal or setting aside of a default." *Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141 (9th Cir. 1989).

**B**

MTK USA was served sufficiently with the summons and the operative pleadings.  MTK USA was first named as a defendant in this action in the second amended complaint (SAC).  Heredia was obligated to serve MTK USA with the summons and SAC pursuant to Rule 4.  *See Est. of Touloudjian v. Cal. Dep't of Corr. & Rehab.*, No. 2:20-cv-00520-FLA (KSx), 2021 WL 4812318, at *1–2 (C.D. Cal. Aug. 2, 2021) (contemplating time for service of newly named defendant under Rule

---

[4] Once jurisdiction over a defendant has been accomplished by means of service of a summons and complaint under Rule 4, whether a later amended pleading must be served on a defaulted defendant pursuant to Rule 4 or Rule 5 turns on whether the operative amended complaint adds additional claims that were not presented in the previously served pleading.  Fed. R. Civ. P.  5(a)(2).  If an amended complaint adds new claims, it must be served pursuant to Rule 4.  If the amended complaint does not add new claims, it can be served pursuant to Rule 5.

4). Heredia did not file with the Court a proof of service of the summons and SAC on MTK USA. Yet MTK USA initially appeared in this action through counsel and filed an answer to the SAC. (ECF 55–56.) MTK USA's filing of the answer, without contesting service, waived any potential defects in service. Fed. R. Civ. P. 12(h)(1)(B)(ii) (responsive pleading by a defendant that fails to contest sufficiency of service will waive any defect in service). There being no assertion of a defect in service of the summons and SAC under Rule 4, later service of the TAC on MTK USA, which did not include any new claims against that Defendant, was then governed by Rule 5. Fed. R. Civ. P. 5(a)(1)(B), (a)(2).

Where a party is represented by counsel who is a registered user of the Court's electronic filing system, Rule 5 allows for service on counsel by means of electronic filing. Fed. R. Civ. P. 5(b)(2)(E); C.D. Cal. L. R. 5-3.2.1. Here, counsel was a registered user of the Court's CM/ECF electronic filing system and continued to represent MTK USA until after the filing of the TAC. (ECF 111, 117.) Thus, MTK USA was automatically electronically served with the TAC through counsel at the time it was filed. C.D. Cal. L. R. 5-3.2.1; (ECF 85).

MTK USA was also served properly with Heredia's motion for default judgment. Before Heredia filed his motion for default judgment against MTK USA, counsel for MTK USA withdrew. (ECF 117.) No new counsel has appeared in this action on MTK USA's behalf, and MTK USA could not have appeared in this action without counsel because organizations and entities are not permitted to appear *pro se* in this Court. C.D. Cal. L. R. 83-2.2.2. Because MTK USA was not represented by counsel and could not have appeared *pro se* at the time Heredia filed his motion for default judgment, Heredia contends that he

1   was not required to serve MTK USA with the motion for default

2   judgment pursuant to Rule 55(b)(2), and that, even if he was required to

3   serve MTK USA, he has adequately done so.  (ECR 188-1 at 4–5.)

4        As discussed above, Rule 55(b)(2) requires service of the motion on

5   a party that "has appeared personally or by a representative."

6   Although MTK USA could not have personally appeared in this action

7   without counsel and was not represented by counsel at the time Heredia

8   filed the motion for default judgment against it (ECF 117, 150), MTK

9   USA had appeared in this action through counsel prior to Heredia filing

10   the motion for default judgment and, thus, it seems service of the

11   motion on MTK USA was required under Rule 55(b)(2).  *Compare*

12   *Pivotal Sys. Corp. v. Connect Elecs. USA, Inc.*, No. 18-cv-01909-JSW

13   (SK), 2019 WL 12198810, at *2 (N.D. Cal. Nov. 4, 2019) (where counsel

14   for defendant corporation withdrew from representation and defendant

15   failed to retain new counsel, denying motion for default judgment, in

16   part, because "Plaintiff has not demonstrated that it has given

17   Defendant notice of any of the proceedings, including of the motion for

18   default judgment, after Defendant's counsel withdrew" (citing Fed. R.

19   Civ. P. 55(b)(2))), *report and recommendation adopted*, No. 18-cv-01909-

20   JSW, 2019 WL 12209647 (N.D. Cal. Dec. 20, 2019) *with Syntex*

21   *Healthcare Prod. Co. v. McCreless Enterprises, LLC*, No. EDCV 21-593-

22   JGB (SPx), 2023 WL 4503528, at *4 (C.D. Cal. June 2, 2023) (where

23   counsel for defendant corporation withdrew from representation and

24   defendant failed to retain new counsel, granting motion for default

25   judgment and noting, "[e]ven if not strictly required by the Federal

26   Rules of Civil Procedure or Local Rules, Plaintiffs have also served

27   Defendant with the FAC, Default Request, Entry of Default, and Motion

28   to ensure that Defendant has notice of the instant proceedings").

1    　　　Regardless, MTK USA was served properly with the motion for

2    default judgment.  Service of the motion is governed by Rule 5 of the

3    Federal Rules of Civil Procedure and a proof of service must be

4    submitted pursuant to Rule 5-3.1.2 of the Local Civil Rules for the

5    Central District of California ("Local Rules" or "C.D. Cal. L. R."). *Lustig*

6    *v. AzGen Sci. Holdings PLC*, No. 18-cv-07503-HSG, 2020 WL 2614778,

7    at *5 (N.D. Cal. May 21, 2020) (where defendant had appeared in case,

8    service of a motion for default judgment required under Rule 55(b)(2)

9    would be governed by Rule 5); Fed. R. Civ. P. 5(a)(1)(D) (requiring

10   service of "a written motion"), (b) (establishing procedures for service);

11   C.D. Cal. L. R. 5-3.2.1 (describing procedure for service of electronically

12   filed documents).  Under Rule 5, service of a motion may be made by

13   mailing to the opposing party's last known address and service is then

14   deemed "complete upon mailing."  Fed. R. Civ. P. 5(b)(2)(C).  Under

15   Local Rule 5-3.2.1, where a document is filed electronically and the

16   opposing party has appeared in the action, service of the Court's Notice

17   of Electronic Filing (NEF), which is automatically generated through

18   the CM/ECF docketing system, "will constitute proof of service."  C.D.

19   Cal. L. R. 5-3.2.1.

20   　　　Here, Heredia filed his motion for default judgment against MTK

21   USA electronically.  (ECF 150.)  The Court's CM/ECF system then

22   automatically generated an NEF, which was mailed directly to MTK

23   USA at its last known business address via First Class U.S. Mail.  (*Id.*)

24   Service of the motion was complete at the time of mailing and the

25   automatic service of the NEF constituted proof of service.

26

27

28

C

Heredia also properly served Gibson, a resident of Spain (ECF 159-1 at 65–66), with the summons and TAC.[5]

When the defendant is in a foreign country, Rule 4 of the Federal Rules of Civil Procedure requires that the individual be served "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents" (the Hague Convention).  Fed. R. Civ. P. 4(f)(1).  Where the Hague Convention applies, compliance with its provisions is mandatory.  *Volkswagenwek Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988).  Both the United States and Spain are parties to the Hague Convention.  Hague Conference on Private International Law, https://www.hcch.net/en/home (select Members & Parties) (last visited July 11, 2024).

---

[5] Because, as explained below, the Court finds that Heredia properly served Gibson with the summons and TAC under the more onerous Rule 4, it does not need to consider whether Heredia properly served Gibson with the SAC or whether service of the TAC was then governed by Rule 4 or Rule 5.  The Court notes, however, that Heredia did not file a proof of service of the TAC.  It appears he intended to file a proof of service with his application for the Clerk to enter default against Gibson.  (ECF 155 at 2 (citing Ex. A, Proof of Service); ECF 155-1 at ¶ 4 ("Process Server One's efforts to serve Defendant Gibson are known to me personally, and are documented by the proof of service filed with this Court concurrently with Heredia's Application for Entry of Default.").)  But no proof of service was attached to the application for entry of default.  (ECF 155; ECF 155-1.)  Still, as explained below, the Court finds that Heredia properly served Gibson with the summons and TAC, and "[f]ailure to prove service does not affect the validity of service."  Fed. R. Civ. P. 4(l)(3).

1      The Hague Convention provides that "[e]ach contracting state

2  shall designate a Central Authority which will undertake to receive

3  requests for service coming from other contracting States."  Hague

4  Convention, art. 2.  The Central Authority can then serve the document

5  itself, or have it served "by a method prescribed by its internal law for

6  the service of documents in domestic actions upon persons within its

7  territory" or "by a particular method requested by the applicant."

8  Hague Convention, art. 5.  The Central Authority "shall complete a

9  certificate" that "shall state that the document has been served and

10 shall include the method, the place and the date of service and the

11 person to whom the document was delivered."  Hague Convention, art.

12 6.  A signed certificate of service from the central authority of the

13 country in which service took place is *prima facie* evidence of valid

14 service in compliance with the laws of that country.  *See Northrup King*

15 *Co. v. Compania Productora Semillas Algodoneras Selectas*, *S.A.*, 51

16 F.3d 1383, 1390 (8th Cir. 1995) ("The Spanish Central Authority's

17 return of a completed certificate of service is prima facie evidence that

18 the Authority's service on [defendant] was made in compliance with

19 Spanish law."); *Stephen Gould Corp. v. Osceola*, No. 2:22-cv-08347-

20 SVW-AGR, 2023 WL 3551737, at *1 (C.D. Cal. Apr. 6, 2023) (accepting

21 confirmation of service from Swiss central authority as proof that

22 service had been made); *Oak Point Partners, Inc. v. Lessing*, No. 11-CV-

23 03328-LHK, 2012 WL 4121109, at *3 (N.D. Cal. Sept. 18, 2012) ("[T]he

24 German Central Authority certified that service was properly effected

25 under German law.  This certificate constitutes prima facie evidence of

26 proper service."); *Campbell v. Logue*, No. 10–CV–1821–JM–DHB, 2012

27 WL 3202506, at *1 (S.D. Cal. Aug. 3, 2012) ("[C]ourts generally decline

28 to look behind the certificate of service when the relevant authority of

the country effecting service has certified service under their own procedures." (internal quotations omitted)); *Unite National Retirement Fund v. Ariela, Inc.*, 643 F. Supp. 2d 328, 335 (S.D.N.Y. 2008); *In re Vitamins Antitrust Litigation*, No. MISC. 99-197 (TFH), 2001 WL 34088810, at *1 (D.D.C. Mar. 9, 2001).

Under the Hague Convention, a court shall not issue a default judgment unless "(a) the document was served by method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory, or (b) the document was actually delivered to the defendant . . . ." Hague Convention, art. 15, cl.1.

Here, Heredia submitted for service on Gibson, the summons and TAC to the Spanish Ministry of Justice, Spain's central authority for purposes of service under the Hague Convention. *See Northrup King Co.*, 51 F.3d at 1386, 1390 (recognizing Spain's Ministry of Justice as the central authority). The Ministry of Justice returned a certificate of completed service, indicating that personal service on Gibson had been successfully completed. (ECF 159-1.) The Court accepts this certificate as *prima facie* evidence that Gibson was properly served with the summons and the TAC. *See Northrup King Co.*, 51 F.3d at 1390; *Stephen Gould Corp.*, 2023 WL 3551737, at *1.

Heredia was not required to serve Gibson with the motion for default judgment pursuant to Rule 55(b)(2). Gibson has not appeared at any time in this action, either personally or through counsel. Fed. Rule. Civ. P. 55(b)(2) ("If the party against whom a default judgment is sought *has appeared personally or by a representative*, that party or its representative must be served with written notice of the application at least 7 days before the hearing." (emphasis added).)

## D

Heredia also has served properly MTK Global and Kinahan.[6]
MTK Global is located in Dubai, United Arab Emirates (ECF 173-5),
and Kinahan resides in Dubai, (ECF 142 at ¶ 18; ECF 142-3 at 2–3).

### 1

"The UAE is not a party to the Hague Convention and . . . no
other internationally agreed upon means of service exist between the
United States and the UAE." *Smallwood v. Allied Pickfords*, LLC, No.
08cv2196 BTM (RBB), 2009 WL 3247180, at *12 (S.D. Cal. Sept. 29,
2009), *on reconsideration in part*, No. 08cv2196 BTM (RBB), 2010 WL
11508273 (S.D. Cal. Feb. 5, 2010), *aff'd sub nom. Smallwood v. Allied
Van Lines, Inc.*, 660 F.3d 1115 (9th Cir. 2011).  Rather, as relevant
here, under Rule 4(f), an individual may be served in the UAE "by a
method that is reasonably calculated to give notice . . . as prescribed by
the foreign country's law for service in that country in an action in its
courts of general jurisdiction . . . ."  Fed. R. Civ. P. 4(f)(2)(A).  Rule
4(h)(2) governs service on a foreign corporation, partnership, or other
unincorporated association outside a judicial district of the United
states and provides that, unless otherwise provided by federal law,
service may be accomplished in the manner prescribed by Rule
4(f)(2)(A).  Fed. R. Civ. P. 4(h)(2) (a corporation, partnership, or
association served outside any judicial district of the United States

---

[6] Because the District Judge previously found that Heredia had
not properly served MTK Global and Kinahan with the SAC pursuant
to Rule 4 (ECF 87 at 4–8), the Court considers whether Heredia has
properly executed service of summons and the TAC under Rule 4 rather
than Rule 5.

1   must be served "in any manner prescribed by Rule 4(f) for serving an

2   individual, except personal delivery under (f)(2)(C)(i)").[7]

3        On January 2, 2023, a new law—Federal Decree by Law No. (42)

4   of 2022 Promulgating the Civil Procedure Code—governing the service

5   of process, took effect in the UAE.  UAE Government Legislation

6   Platform, https://uaelegislation.gov.ae/en (select Legislations; then filter

7   by Law type: Federal Decree-Law and Year: 2022; then select

8   Legislation number 42) (last visited July 11, 2024); (ECF 142 at ¶ 8).

9   Under this law, service must first be attempted in any of four possible

10   ways:  (1) "Audio or video recorded call, SMS to mobile phone, smart

11   applications, email, fax, other modern means of communication or by

12   any other means to be agreed upon by the parties from among the

13   means of service described herein"; (2) "By hand delivery to the

14   Defendant at his / her place of residence or domicile, or to his / her

15   attorney," or, failing personal delivery, "the process shall be served

16   upon any person cohabitating with the intended person; i.e. his / her

17   spouse, relative by blood or marriage or servant," or, failing delivery on

18   a cohabitant, "the process server shall either directly post the process

19   visibly on the outer door of the intended recipient's place of residence, or

20   post the same on the court's website"; (3) "At the elected domicile of the

21   Defendant"; or (4) "At the place of work of the Defendant," or "to his

22   boss, any person in charge of the management of the Defendant, or his /

23   her colleague, with the exception of the service of process relating to

24

---

25        [7] The Court notes that service in a foreign country may also be

26   accomplished "by other means not prohibited by international agreement, as the court orders."  Fed. R. Civ. P. 4(f)(3).  Here, however, the Court did not order service by any means other than those

27   contemplated in Rule 4(f)(2), and Heredia did not request leave to serve

28   the foreign Defendants by any other means.

1  personal status proceedings, which shall be served upon the Defendant

2  in person at his / her place of work."  UAE Government Legislation

3  Platform, Federal Decree by Law No. (42), *supra*, art. 9, cl. 1.

4      This law further provides that, "[i]f the Defendant cannot be

5  served as indicated in Clause [1] of this Article, the matter shall be

6  referred to the Case Management Office, the competent judge or the

7  chief justice of the court, as the case may be, in order to gather

8  information from at least one relevant entity and then serve the notice

9  upon the intended person either by posting on the court's website or by

10  publication in both a widely-circulated electronic or paper daily

11  newspaper that is published in the State in Arabic, and a foreign

12  newspaper published in a foreign language, if necessary, where the

13  Defendant intended to be served is a foreigner."  *Id.* at cl. 3.

**2**

15      Heredia properly served MTK Global with the summons and TAC.

16  Jouslin Chibli Khairallah, a UAE lawyer to whom Heredia gave power

17  of attorney to act on his behalf to serve the TAC on Kinahan and MTK

18  Global, declared that he sent copies of the summons and TAC to the

19  Dubai Courts Notary Public for service on MTK Global.  (ECF 142 at

20  ¶ 9.)  The "Assigned Declarer by Dubai Courts" attempted to serve MTK

21  Global with the TAC at its last known address but did not locate the

22  business there.  (*Id.* at ¶ 10; ECF 142-2 at 2; ECF 173-5.)  The Assigned

23  Declarer called the phone number listed for MTK Global but the

24  number was disconnected.  (ECF 142 at ¶ 11.)  Khairallah then caused

25  to be carried out an investigation by the National Economic Register

26  but the investigation failed to locate a new address for MTK Global.

27  (*Id.* at ¶ 13.)  Next, Khairallah sought, and received, permission from

28  Dubai Courts to serve the TAC on MTK Global by publication.  (*Id.* at

¶ 14.)  MTK Global was then served by publication, which, according to Khairallah, constituted valid service under UAE law.  (*Id.* at ¶¶ 15–17; ECF 142-5 at 2–3.)  Khairallah's sworn proof of service "constitutes prima facie evidence of valid service . . . ."  *Internet Sols. for Bus. Inc.*, 509 F.3d at 1163.  Accordingly, the Court finds that MTK Global was properly served with the TAC in accordance with UAE law.

As to the motion for default judgment, MTK Global, through counsel David S. Harris, previously made an appearance in this action for the purpose of contesting a prior entry of default against it.  (ECF 71.)  Counsel deemed this a "special appearance" only for purposes of bringing a motion to set aside the previously entered default.  (*Id.* at 2 n.1.)  Even assuming that this appearance triggered the Rule 55(b)(2) obligation for motion service, Heredia has executed sufficiently such service.  *See Wilson v. Moore & Assocs., Inc.*, 564 F.2d 366, 368–69 (9th Cir. 1977) ("No party in default is entitled to 55(b)(2) notice unless he has 'appeared' in the action.  The appearance need not necessarily be a formal one, i.e., one involving a submission or presentation to the court.  In limited situations, informal contacts between the parties have sufficed when the party in default has thereby demonstrated a clear purpose to defend the suit."); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, No. CV 14-3053-MWF (AFMx), 2018 WL 10878531, at *3 (C.D. Cal. July 18, 2018) ("The Federal Rules do not distinguish between 'special' and 'general' appearances, so defendants need not choose between contesting jurisdiction via special appearance or defending on the merits via general appearance."); *Hamilton v. Willms*, No. 1:02-CV-6583 AWI SMS, 2007 WL 2904286, at *3 (E.D. Cal. Oct. 4, 2007) ("[T]echnical distinctions between general and special appearances have been abolished and the rulemakers wisely concluded

that no end is accomplished by retaining those terms in federal practice."). As explained in Section III.B., above, service of the motion for default judgment is governed by Rule 5. *Lustig*, 2020 WL 2614778, at *5. Service of the motion under Rule 5 may be made on counsel by means of filing with the Court's electronic filing system, if the party is represented and counsel is a registered user of the Court's system. Fed. R. Civ. P. 5(b)(1), (2)(E). Under Local Rule 5-3.2.1, where a document is filed electronically, counsel of record will be served electronically by email and this electronic service "will constitute proof of service." C.D. Cal. L. R. 5-3.2.1.

Here, Heredia filed the motion for default judgment against MTK Global through the Court's electronic filing system. (ECF 151.) Counsel for MTK Global was automatically served by email through the Court's electronic system at the time the motion was filed. (*Id.*) As noted, counsel purported to make a special appearance on behalf of MTK Global for the sole purpose of contesting the entry of default. (ECF 71 at 2 n.1.) Although deeming the appearance limited, after litigating the motion to set aside entry of default, counsel never made any attempt to withdraw as counsel of record for MTK Global. "An attorney may not withdraw as counsel except by leave of the court," and a request to withdraw must be made by written motion, "supported by good cause," and "given reasonably in advance to the client and to all other parties who have appeared in the action." C.D. Cal. L. R. 83-2.3.2; *See Darby v. City of Torrance*, 810 F. Supp. 275, 276 (C.D. Cal. 1992) ("An attorney may not withdraw as counsel except by leave of court."); *Bride v. Snap Inc.*, No. 2:21-cv-06680-FWS-MRW, 2022 WL 18278585, at *2–3 (C.D. Cal. Nov. 2, 2022) (quoting the Court's standardized form for moving to withdraw as counsel, G-01, as requiring court permission

to withdraw as counsel "if no member of the withdrawing attorney's firm or agency will remain as counsel of record" and encouraging use of the standardized form); *see also Stiles v. Walmart, Inc.*, Nos. 2:14-CV-2234-KJM-DMC, 2:19-CV-1218-KJM-DMC, 2:19-CV-2144-KJM-DMC, 2:19-CV-2145-KJM-DMC, 2:19-CV-2146-KJM-DMC, 2020 WL 9160834, at *2 (E.D. Cal. July 14, 2020) (citing Cal. R. Prof. Conduct 1.16(c)) ("The California Rules of Professional Conduct provide that if the rules of a court require permission for an attorney to withdraw, the attorney may not withdraw from employment in a proceeding without the permission of such court."). The record of the court continues to reflect that MTK Global is represented in this action by counsel. Accordingly, Heredia properly served the motion for default judgment on MTK Global through automatic electronic service on counsel of record at the time the motion was filed.

**3**

Heredia also properly served Kinahan with the summons and TAC. Khairallah declared that he obtained an official report from the Federal Authority for Identity and Citizenship confirming that Kinahan continued to reside in the UAE. (ECF 142 at ¶ 18; ECF 142-3 at 2–3.) Khairallah then sent copies of the summons and TAC to the Dubai Courts Notary Public for service on Kinahan. (ECF 142 at ¶ 19.) The "Assigned Declarer by Dubai Courts" attempted to serve Kinahan at the address of his immigration visa sponsor. (*Id.* at ¶ 20; ECF 142-4 at 2.) Neither Kinahan nor his sponsor could be located at the address of record. (ECF 142 at ¶ 21; ECF 142-4 at 2.) Khairallah then attempted to serve Kinahan via text message on the mobile phone number listed in the report from the Federal Authority for Identity and Citizenship, but the text message could not be delivered. (ECF 142 at ¶¶ 22–23.)

Khairallah next sought, and received, permission from Dubai Courts to serve Kinahan by publication. (*Id.* at ¶¶ 24–25.) Kinahan was then served by publication, which, according to Khairallah, constituted valid service under UAE law. (*Id.* at ¶¶ 26–28; ECF 142-6 at 2–3.) Khairallah's sworn proof of service "constitutes prima facie evidence of valid service . . . ." *Internet Sols. for Bus. Inc.,*, 509 F.3d at 1163. Accordingly, the Court finds that Kinahan was properly served in compliance with UAE law.

As to service of the motion for default judgment, Kinahan, through counsel Jason L. Liang and John K. Ly, previously made an appearance in this action for the purpose of contesting a prior entry of default against it. (ECF 73.) As with MTK Global, Kinahan's counsel deemed this a "special appearance" only for purposes of bringing a motion to set aside the previously entered default. (*Id.* at 4 n.1.) As explained above, even assuming that this appearance triggered Rule 55(b)(2) service obligations, Heredia has sufficiently executed such service on Kinahan in accordance with Rule 5, *see Lustig*, 2020 WL 2614778, at *5.

Here, although deeming their appearance limited, after litigating the motion to set aside entry of default, counsel never made any attempt to withdraw as Kinahan's counsel of record. Accordingly, the record of the court continues to reflect that Kinahan is represented in this action by counsel. *See* C.D. Cal. L. R. 83-2.3.2; *Darby*, 810 F. Supp. at 276; *Bride*, 2022 WL 18278585, at *2–3; *Stiles*, 2020 WL 9160834, at *2. Heredia filed the motion for default judgment against Kinahan through the Court's electronic filing system. (ECF 152.) Kinahan's counsel was automatically served by email through the Court's electronic system at the time the motion was filed. (*Id.*) Accordingly, Heredia properly served the motion for default judgment on Kinahan

1   through automatic electronic service on counsel of record at the time the

2   motion was filed.

3                                      **IV**

4            Having determined that Defendants were served properly, the

5   Court next examines whether the claims in the TAC were pleaded

6   adequately.

7                                      **A**

8            Rule 55(b)(2) of the Federal Rules of Civil Procedure authorizes a

9   district court to grant default judgment after the Clerk of Court enters

10  default under Rule 55(a).  Fed. R. Civ. P. 55(b).  Additionally, Rule 55-1

11  of the Local Civil Rules for the Central District of California requires

12  the party seeking default judgment to submit a declaration that

13  includes: (1) when and against what party the default was entered; (2)

14  the pleading on which default was entered; (3) whether the defaulting

15  party is an infant or incompetent person, and if so, whether that person

16  is represented by a general guardian, committee, conservator, or other

17  representative; (4) that the Servicemembers Civil Relief Act does not

18  apply; and (5) that notice has been served on the defaulting party, if

19  required by Rule 55(b)(2).  C.D. Cal. L. R. 55-1

20           Once default has been entered, the factual allegations in the

21  complaint, except those concerning the amount of damages, are deemed

22  admitted by the non-responding party.  *See* Fed. R. Civ. P. 8(b)(6);

23  *TeleVideo Sys., Inc.*, 826 F.2d at 917–18; *Geddes v. United Fin. Grp.*,

24  559 F.2d 557, 560 (9th Cir. 1977).  However, default judgment is not

25  automatic upon the Clerk's entry of default; rather, it is left to the

26  sound discretion of the court.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092–93

27  (9th Cir. 1980).  In *Eitel v. McCool*, the Ninth Circuit directed district

28  courts to consider several factors when deciding whether to enter

default judgment: (1) the possibility of prejudice to plaintiff; (2) the merits of plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning the material facts; (6) whether defendant's default was the product of excusable neglect; and (7) the strong public policy favoring decisions on the merits.  782 F.2d 1470, 1471–72 (9th Cir. 1986).  "In applying this discretionary standard, default judgments are more often granted than denied."  *PepsiCo v. Triunfo–Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999).

**B**

In the instant case, Heredia satisfied the procedural requirements.  Pursuant to Rule 55(a), the Court Clerk properly entered default against Defendants.  As required by Local Civil Rule 55-1, Heredia provided declarations that: (1) default was entered against each Defendant on the dates specified; (2) the operative pleading to which default was entered is the TAC; (3) Defendants are neither infants nor incompetent persons; (4) the Soldiers' and Sailors' Civil Relief Act of 1940 does not apply; and (5) Defendants were properly served, or were not subject to the service requirement.  (ECF 188-1.) Finally, the motions comply with Rule 54(c) in that they request a remedy that is not different in kind from that prayed for in the TAC. Thus, the Court, in its discretion, may order a default judgment against Defendant based on the *Eitel* factors outlined below.

**C**

The first *Eitel* factor considers whether the plaintiff will suffer prejudice if default judgment is not entered.  Potential prejudice to Heredia favors granting a default judgment.  If Heredia's motions for default judgment are not granted, Heredia will likely be without other

1  recourse for recovery.  *PepsiCo, Inc. v. Cal. Sec. Cans.*, 238 F. Supp. 2d

2  1172, 1177 (C.D. Cal. 2002).

3      The second and third *Eitel* factors are the merits of the

4  substantive claim, and the sufficiency of the complaint.  *Eitel*, 782 F.2d

5  at 1471–72.  The Ninth Circuit has suggested that these two factors

6  require that a plaintiff "state a claim on which the [plaintiff] may

7  recover."  *Kloepping v. Fireman's Fund*, No. C 94-2684 TEH, 1996 WL

8  75314, at *2 (N.D. Cal. Feb. 13, 1996) (quoting *Danning v. Lavine*, 572

9  F.2d 1386, 1388 (9th Cir. 1978)).

10     In the TAC, Heredia brings several claims under the Racketeer

11  Influenced and Corrupt Organizations (RICO) Act, specifically 18

12  U.S.C. § 1962(a)–(d).[8]  (ECF 85 at 23–32.)  He has pleaded each

13  sufficiently as discussed below.

14     *Section 1962(a).* To plead a civil claim under 18 U.S.C. § 1962(a),

15  Heredia must allege an injury arising from Defendants' investment or

16  improper use of racketeering income.  *See Nugget Hydroelectric, L.P. v.*

17  *Pacific Gas & Elec. Co.,* 981 F.2d 429, 437 (9th Cir.1992).  Specifically,

18  § 1962(a) prohibits "a person who has received any income

19  derived . . . from a pattern of racketeering activity . . . [from] us[ing] or

20  invest[ing] . . . any part of such income, or the proceeds of such income,

21  in acquisition of any interest in, or the establishment or operation of,

22  any enterprise which is engaged in, or the activities of which affect,

23  interstate or foreign commerce."  18 U.S.C. § 1962(a).  To satisfy this

24  requirement, Heredia must allege facts, not general conclusory

25

26     [8] As explained in Section V.C.5., below, Heredia has not proven an
    entitlement to damages with respect to his state-law claims.
27  Accordingly, the Court addresses here the adequacy of the TAC with
28  respect to Heredia's federal claims only.

1   statements, establishing his injury.  *See Nugget Hydroelectric L.P. v.*

2   *Pac. Gas and Elec. Co.*, 981 F.2d 429, 437 (9th Cir. 1992).

3       Heredia has pleaded a claim under § 1962(a).  Specifically, he has

4   alleged that Defendants (1) derived income from a pattern of

5   racketeering activity (ECF 85 at 24); (2) participated as a principal in

6   the pattern of racketeering activity (*id.* at 25); (3) some of that income,

7   or proceeds of that income, was used to acquire or maintain an interest

8   in, or to operate, an enterprise (*id.*); and (4) the enterprise engaged in,

9   or had some effect on, interstate or foreign commerce (*id.* at 24).

10      *Section 1962(b).*  To plead a civil claim under 18 U.S.C. § 1962(b),

11  Heredia must allege Defendants' activities led to their control or

12  acquisition over a RICO enterprise, *see Dorian v. Harich Tahoe Dev.*,

13  Nos. C–94–3387 DLJ, C–95–2112 DLJ, 1996 WL 925859 at *3 (N.D.

14  Cal. Jan. 16, 1996)), and Heredia suffered an injury as a result, *see U.S.*

15  *Concord, Inc. v. Harris Graphics Corp.*, 757 F. Supp. 1053, 1060 (N.D.

16  Cal. 1991).  As written, § 1962(b) prohibits a "person through a pattern

17  of racketeering activity . . . [from] acquir[ing] or maintain[ing], directly

18  or indirectly, any interest in or control of any enterprise which is

19  engaged in, or the activities of which affect, interstate or foreign

20  commerce."  18 U.S.C. § 1962(b).

21      Heredia's allegations in the TAC plead sufficiently a claim under

22  § 1962(b).  Specifically, he has alleged that Defendants (1) engaged in a

23  pattern of racketeering activity (ECF 85 at 27); (2) through this activity

24  acquired or maintained an interest in, or control of, an enterprise (*id.* at

25  26); (3) the enterprise engaged in, or had some effect on, interstate or

26  foreign commerce (*id.*); and (4) he suffered injury as a result in the form

27  of harm to Heredia's professional reputation and interference with

28

1  ability to engage in business relationships with Diaz and other

2  prospective boxing clients (*id.* at 27).

3      *Section 1962(c)*.  To plead a civil claim under 18 U.S.C. § 1962(c),

4  Heredia must allege Defendants participated in the conduct of a RICO

5  enterprise through a pattern of racketeering activity, resulting in an

6  injury to Heredia.  *See Sebastian Int'l, Inc. v. Russolillo*, 186 F. Supp. 2d

7  1055, 1068 (C.D. Cal. 2000).  Specifically, § 1962(c) prohibits a "person

8  employed by or associated with any enterprise engaged in, or the

9  activities of which affect, interstate or foreign commerce, [from]

10  conduct[ing] or participat[ing] . . . in the conduct of such enterprise's

11  affairs through a pattern of racketeering activity . . . ."  18 U.S.C.

12  § 1962(c).

13      Heredia pleaded sufficiently a claim under § 1962(c).  He alleged

14  that Defendants (1) participated in the operation of management of an

15  enterprise engaged in, or the activities of which affect, interstate or

16  foreign commerce (ECF 85 at 28–29); (2) through a pattern of

17  racketeering activity (*id.* at 28–29); and (3) the conduct caused injury to

18  Heredia's business (*id.* at 30).

19      *Section 1962(d)*.  To plead a civil claim under 18 U.S.C. § 1962(d),

20  Heredia must allege "a conscious agreement among the defendants" to

21  further a conspiracy to violate the RICO Act, in addition to an injury to

22  Heredia caused by Defendants' predicate acts.  *See Sebastian Int'l, Inc.*,

23  186 F. Supp. 2d at 1068.  As written, § 1962(d) prohibits a "person

24  [from] conspire[ing] to violate any of the provisions of [§ 1962]."  18

25  U.S.C. § 1962(d).  Heredia has pleaded sufficiently a claim under

26  § 1962(d), as he has alleged an agreement by Defendants to commit a

27  substantive violation of the RICO statute (ECF 85 at 31), which

28  resulted in injury to Heredia in the form of interference with Heredia's

1  contractual relationship with Diaz, harm to Heredia's professional

2  reputation, and interference with Heredia's ability to engage in

3  business relationships with Diaz and other prospective boxing clients

4  (*id.* at 32).

5       Under the fourth *Eitel* factor, the Court must consider the amount

6  of money at stake in relation to the seriousness of the defendant's

7  conduct.  *PepsiCo, Inc.*, 238 F. Supp. 2d at 1176–77.  "Default judgment

8  is disfavored where the sum of money at stake is too large or

9  unreasonable in relation to defendant's conduct."  *Ameris Bank dba*

10  *Balboa Cap. Corp. v. Old Pylon Trucking, LLC*, No. SACV 23-02368-

11  CJC (KESx), 2024 WL 2406693, at *3 (C.D. Cal. Apr. 16, 2024) (cleaned

12  up).  Here, the sum of money involved is considerable.  Heredia requests

13  $10,732,500 in damages.  (ECF 185 at 19–20.)  However, the amount

14  sought is commensurate with the seriousness of the claims against

15  Defendants and is in keeping with the evidence Heredia has submitted

16  showing that Defendants engaged in activity aimed at laundering ill-

17  gotten gains by means of interfering with Heredia's lawful contract with

18  Diaz and disrupting Heredia's ability to sign future contracts with other

19  boxers.  Diaz was a world champion boxer and was paid accordingly.  In

20  addition, the amount at stake is substantially higher here than it might

21  otherwise have been because, by the very terms of the RICO statutes at

22  issue, Heredia is entitled to treble damages.  18 U.S.C. § 1964(c).  On

23  balance, the Court concludes that this factor will not preclude default

24  judgment.  *See Farmer v. Thar Process, Inc.*, No. 1:22-cv-01076-AA,

25  2023 WL 8448498, at *7 (D. Or. Dec. 6, 2023) (finding amount at stake

26  did not weigh against default judgment where plaintiff sought

27  $6,900,000 in breach-of-contract suit); *Abu-Assal v. Abu-Assal*, No.

28  EDCV 01-0153 GAF (SGLx), 2010 WL 11508162, at *4 (C.D. Cal. Feb. 8,

2010) (finding "[t]he amount-at-stake factor also weighs in favor of

entering default judgment" where plaintiff sought $30,000,000 in RICO

action).

The fifth *Eitel* factor considers the possibility of dispute as to any

material facts in the case.  Upon entry of default, all well-pleaded facts

in the complaint are taken as true, except those relating to damages.

*See* Fed. R. Civ. P. 8(b)(6); citing *TeleVideo Sys., Inc.*, 826 F.2d at 917–

18; *Geddes*, 559 F.2d at 560.  Due to Defendant's failure to participate,

there is no dispute over material facts.  Accordingly, no genuine dispute

of material facts would preclude granting Heredia's motions.  *See*

*Corson v. Luxury House Search LLC*, No. 2:23-cv-05528-CAS-AGRx,

2024 WL 1396412, at *5 (C.D. Cal. Mar. 28, 2024) (citing *Philip Morris*

*USA, Inc. v. Castworld Products, Inc.*, 219 F.R.D. 494, 500 (C.D. Cal.

2003)).

The sixth *Eitel* factor considers the possibility that the default

resulted from excusable neglect.  As explained above, Defendants were

properly served with the TAC.  Although Defendants did not respond to

the TAC, they are aware of the action and, in the case of Kinahan, MTK

Global, and MTK USA, have appeared in this action, even if for a

limited purpose.  Given the proper service and Defendants' clear

knowledge of this action, the possibility of excusable neglect is remote.

*Id.*

Finally, as to the seventh factor *Eitel* cautions that "[c]ases should

be decided upon their merits whenever reasonably possible." *Eitel*, 782

F.2d at 1472.  Yet the availability of default judgment under Rule 55

indicates that "this preference, standing alone, is not dispositive,"

*Kloepping*, 1996 WL 75314, at *3.  Defendants' failure to answer

Heredia's TAC makes a decision on the merits impractical, if not

impossible.  Under Rule 55, termination of a case before hearing the merits is allowed whenever a defendant fails to defend an action.  Thus, "the preference to decide cases on the merits does not preclude a court from granting default judgment."  *Id.*  The Court is not precluded from entering default judgment against Defendants.

**V**

Next, the Court examines the damages Plaintiff seeks.

**A**

"If the court determines that the allegations in the complaint are sufficient to establish liability, it must then determine the 'amount and character' of the relief that should be awarded."  *Landstar Ranger, Inc. v. Parth Enterprises, Inc.*, 725 F. Supp. 2d 916, 920 (C.D. Cal. 2010) (citations omitted).  This process is limited by Rule 54 of the Federal Rules of Civil Procedure, which states that "[a] judgment by default shall not be different in kind or exceed in amount that prayed for in the [complaint]."  Fed. R. Civ. P. 54(c).

"The measure of civil damages under RICO is the harm caused by the predicate acts constituting the illegal pattern."  *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 451 (9th Cir. 1991) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)).  "These damages must be 'established by competent proof, not based upon mere speculation and surmise.'"  *Id.* (quoting *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989)).

"Upon entry of default, the well-pleaded allegations of the complaint relating to a defendant's liability are taken as true, with the exception of the allegations as to the amount of damages.  Thus, the plaintiff is required to provide proof of all damages sought in the complaint," *PepsiCo, Inc.*, 238 F. Supp. 2d at 1175 (citing *TeleVideo*

29

*Sys., Inc.*, 826 F.2d at 917–18), and "the demand for relief must be specific." *Abu-Assal*, 2010 WL 11508162, at *4 (citing Fed. R. Civ. P. 8(a)).

"Courts apply the preponderance of the evidence standard to a plaintiff's damages case on default judgment." *AdoreMe, Inc. v. Watson*, No. CV 19-8830 FMO (AGRx), 2020 WL 5769083, at *3 (C.D. Cal. July 14, 2020); *accord Vargas v. Oh*, No. 19-00116 LEK-WRP, 2024 WL 946510, at *4 (D. Haw. Feb. 1, 2024), *report and recommendation adopted sub nom. Vargas v. City & County of Honolulu*, No. CV 19-00116 LEK-WRP, 2024 WL 943605 (D. Haw. Mar. 5, 2024); *Rosen v. Fasttrak Foods LLC*, No. CV-19-05292-PHX-DWL, 2021 WL 9098239, at *2 (D. Ariz. Sept. 2, 2021). "Plaintiff has the burden of proving damages through testimony or written affidavit." *Bd. of Trustees of the Boilermaker Vacation Trust v. Skelly, Inc.*, 389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005); *Century 21 Real Est. LLC v. William Clement Co.*, No. SACV 13–1648 DOC(DFMx), 2014 WL 2472471, at *3 (C.D. Cal. May 30, 2014); Fed. R. Civ. P. 55(b)(2). Under Rule 55 of the Federal Rules of Civil Procedure, "[t]he Court may conduct hearings . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages." Fed. R. Civ. P. 55(b)(2)(B). "A default judgment may be entered without a hearing on damages when the amount claimed is capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." *Taylor Made Golf Co. v. Carsten Sports, Ltd.*, 175 F.R.D. 658, 661 (S.D. Cal. 1997). "Rule 55 does not require the court to conduct a hearing on damages, so long as it ensures there is an adequate basis for the damages awarded in the default judgment." *United States v. Yermian*, No. SACV 15-0820-DOC (RAOx), 2016 WL 1399519, at *3 (C.D. Cal. Mar. 18, 2016). Ultimately,

1   "granting damages is within 'wide latitude' of the district court's

2   discretion." *Elektra Ent. Grp. Inc. v. Crawford*, 226 F.R.D. 388, 394

3   (C.D. Cal. 2005) (quoting *James v. Frame*, 6 F.3d 307, 310 (9th Cir.

4   1993)).

5                                    **B**

6       Heredia requests the following damages, apparently with respect

7   to his RICO claims only:[9] (1) $360,000 in contractually obligated

8   compensation; (2) $1,350,000 in future earnings from an anticipated

9   fight between Diaz and Gevontra Davis; (3) $1,327,500 in future income

10  from a renewed manger contract between Heredia and Diaz; and (4)

11  between $540,000 and $2,520,000 in future income from new business

12  opportunities. (ECF 185 at 7–18.) When accounting for treble damages

13  under the RICO statutes, Heredia requests a total of $10,732,500 in

14  damages. (*Id.* at 19–20.) In addition, Heredia seeks an unspecified

---

16      [9] Heredia does not expressly designate what damages he is
    seeking with respect to his RICO claims and what damages he is
17  seeking with respect to his state-tort claims. Heredia tallies all of the
    damages alleged and then triples them to come to what he contends is
18  the treble damages he is due under the RICO statutes (ECF 185 at 19–
    20), thereby indicating that he seeks all the specified monetary
19  damages pursuant to his RICO claims. Yet, Heredia states that he is
    entitled to between $540,000 and $2,520,000 for "[f]uture [i]ncome [l]ost
20  [d]ue to [i]ntentional [i]nterference with [p]rospective [e]conomic
    [r]elations" (*id.* at 15), language that mirrors the state-law claim that
21  he has raised in the TAC (ECF 85 at 39). Heredia also has alleged
    within his RICO claims that Defendants interfered with "prospective
22  commercial relations" (*id.* at 26–27, 30, 32), and thus, it is reasonable to
    construe his request for damages for loss of prospective economic
23  relations as related to both his state-law claim and his RICO claims. In
    addition to damages for his RICO claims, it appears Heredia seeks
24  damages for "[p]hysical pain, mental suffering, and emotional distress"
    strictly under state law. (ECF 185 at 18–19.) However, as explained
25  below, he submits no evidence of such.

31

amount for "non-economic damages," such as "[p]hysical pain, mental suffering, and emotional distress." (*Id.* at 18–19.) Heredia further requests $513,154.19 in attorney's fees and $21,017.59 in costs. (*Id.* at 20.) The relief sought is consistent with the relief requested in the TAC (ECF 85 at 26–27, 30, 32 (RICO claims against MTK Global, MTK USA, Kinahan, and Gibson), 42). But the Court finds that Heredia has submitted evidence supporting only a portion of the damages, attorney's fees, and costs requested.

C

The Court first address damages. Heredia has proven $3,172,500 (instead of $3,577,500) in actual damages with respect to his RICO claims, for a total of **$9,517,500** (instead of $10,732,500) in treble damages under the RICO framework. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter . . . shall recover threefold the damages he sustains . . . ."). The Court addresses each damages category below.

1

Regarding contractually obligated compensation, Heredia has provided sufficient proof to support an award for **$270,000**, rather than the requested $360,000. (ECF 185 at 7–9.) His request is based upon the $450,000 Diaz allegedly owed him from three fights Diaz participated in during the contractual period, minus $90,000 that Diaz has already paid pursuant to an arbitration decision. (*Id.*) The three fights at issue were between Diaz and (1) Shavkat Rakhimov on February 13, 2021; (2) Javier Fortuna on July 9, 2021; and (3) Devin Haney on December 4, 2021. (*Id.* at 8.) Heredia alleges that Diaz's purses for these fights were $500,000, $500,000, and $1,500,000, respectively, which yields 18% fees owed to Heredia of $90,000, $90,000,

32

1    and $270,000, respectively.  Heredia has shown proof that Diaz engaged

2    in these fights during the relevant contractual period, that Heredia's

3    expected fee for those fights was 18% of Diaz's purses, and that Diaz

4    earned $1,500,000 for the Haney fight, which resulted in a fee owed to

5    Heredia of $270,000.  (*Id.* at 8; ECF 185-1 at 6, 9, 13–14, 24–25, 28, 30,

6    74, 85, 360, 367, 369, 375, 377.)  However, Heredia has not sufficiently

7    proven the amount of Diaz's purse, and Heredia's corresponding

8    contractually obligated share, for the Rakhimov fight, or that Heredia

9    has not already recovered the fees owed him for the Rakhimov and

10    Fortuna fights.

11      *The Rakhimov and Fortuna fights.*  In his request for damages,

12    Heredia claims that Diaz earned $500,000 for the Rakhimov fight,

13    which would amount to a fee of $90,000 owed to Heredia.  (ECF 185 at

14    8.)  As proof of Diaz's $500,000 earnings for the Rakhimov fight,

15    Heredia submits his affidavit, and that of his brother, that $500,000

16    was the "contracted" amount for the fight.  (ECF 185-1 at 13, 28).

17    However, in the TAC, the allegations of which the Court accepts as true

18    here, Heredia asserted that Diaz was penalized $100,000 for missing

19    weight before the Rakhimov fight, and, based on Diaz's actual purse

20    amount, Heredia was owed $72,000 in fees for this fight.  (ECF 85 at

21    16.)

22      Further, the arbitration decision confirms that Heredia was

23    entitled to $72,000, not $90,000, for the Rakhimov fight.  In the related

24    arbitration between Heredia and Diaz before California's State Athletic

25    Commission, the arbitrator awarded Heredia $72,000 for the Rakhimov

26    fight.  *Heredia v. Diaz*, Cal. State Athletic Comm'n Arb. (2021) (Foster,

27    Arb.) at 6, 13–15; California Department of Consumer Affairs, State

28    Athletic Commission, Manager-Fighter Contract Arbitration Decisions,

https://www.dca.ca.gov/csac/forms_pubs/contract_arbitration_decisions.shtml (select Diaz, J. and Heredia, M.) (last visited July 11, 2024).[10] Although the decision does not explicitly state the purse amount, the arbitrator determined that Heredia was due 18% of Diaz's purse from the Rakhimov fight, and that Heredia's share was $72,000. *Id.* at 3, 6, 13–15. Ultimately, because the affidavits of the Heredia brothers are contradicted by other evidence, including Heredia's own allegations in the TAC, he has not established sufficiently an entitlement to a fee of $90,000 for the Rakhimov fight. The Court finds only $72,000.

Regardless of whether Heredia was owed $72,000 or $90,000 for the Rakhimov fight, he has not shown that he is entitled to recover the funds in this action. The arbitrator ordered Diaz to pay Heredia's share

---

[10] Although Heredia has provided the Court with a copy of the transcript of the hearing before the arbitrator, he has not provided a copy of the arbitrator's decision. (ECF 173-1.) The Court takes judicial notice of the arbitrator's decision, as judicial notice may be taken of orders and decisions taken by administrative agencies, such as the California Department of Consumer Affairs, State Athletic Department, the agency that conducted the arbitration at issue here. *Papai v. Harbor Tug & Barge Co.*, 67 F.3d 203, 207 (9th Cir. 1995), *overruled on other grounds by Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548 (1997); *see also Doran v. Aus*, 308 F. App'x 49, 50 (9th Cir. 2009) (unpublished) ("Materials from a proceeding in another tribunal are appropriate for judicial notice."); *Crafty Prods., Inc. v. Fuqing Sanxing Crafts Co. Ltd.*, No. 15-cv-719-BAS-JLB, 2018 WL 4357740, at *1 n.3 (S.D. Cal. Sept. 13, 2018) (taking judicial notice of the amount awarded by arbitrator); *Kurtcu v. U.S. Parking Inc.*, No. C 08-02113 WHA, 2008 WL 2445080, at *2 (N.D. Cal. June 16, 2008) (taking judicial notice of an arbitration award by a federal agency); *but see Precision Orthopedic Implants Inc. v. Limacorporate S.P.A.*, No. 2:16-cv-02945-ODW (PLA), 2016 WL 7378878, at *3 n.3 (C.D. Cal. Dec. 20, 2016) (recognizing *Kurtcu* but declining to take judicial notice of record produced in arbitration decision before a private arbitration entity).

for these fights.  *Id.* at 3, 6–7, 13–15.  Heredia contends that he is entitled to collect the balance from these Defendants instead because he is not able to collect this amount from Diaz, who has filed for bankruptcy.  (ECF 185 at 8 n.7.)  A plaintiff may recover from a different defendant damages related to an injury for which plaintiff was awarded compensation in a separate action against a separate defendant, but only if the plaintiff can show he has not actually recovered the amount of awarded compensation from the defendant in the initial action.  *See GemCap Lending I, LLC v. Quarles & Brady, LLP*, No. 2:14-cv-07937-RSWL-E, 2015 WL 4914399, at *5 (C.D. Cal. Aug. 13, 2015) (rejecting the defendants' argument that the plaintiff would receive a double-recovery if awarded damages against a defendant in a separate action based on a previous award for the same injury against a different defendant in a prior action, and finding that the defendants' had not shown the plaintiff had "*received* any money" from the other defendant); *see also Lovejoy v. Murray*, 70 U.S. 1, 17 (1865) ("[W]hen the plaintiff has accepted *satisfaction in full* for the injury done him, from whatever source it may come, he is so far affected in equity and good conscience, that the law will not permit him to recover again for the same damages." (emphasis added)).

Here, Heredia has not sufficiently established that he has not received full compensation for the $162,000 awarded him by the arbitrator for the Rakhimov and Fortuna fights.  Heredia concedes that he has received $90,000 pursuant to the arbitrator's award and contends that he should be able to collect through this action the remaining amount due him under the arbitration decision, which the

1  Court finds to be $72,000.[11]  (ECF 185 at 8–9.)  However, Heredia has

2  not met his burden to show that he did not receive the outstanding

3  $72,000 owed him.  Heredia and his brother have declared that Diaz did

4  not pay more than the initial $90,000 due under the arbitrator's award.

5  (ECF 185-1 at 15, 30.)  However, as explained above, the affidavits from

6  the Heredia brothers have been found to be unreliable in other respects.

7  Moreover, the TAC, the allegations of which the Court credits as true,

8  alleges that Diaz paid to Heredia the sum awarded by the arbitrator.[12]

9

10  _____

    [11] Heredia alleges that he is still owed $80,000 from the

11  arbitration award, rather than the $72,000 the Court indicates herein.
    (ECF 185 at 9 n.10.)  Heredia claims that the arbitrator awarded him

12  this $80,000 "for the Fortuna and Haney fights," and also states that it
    was awarded "at a severely reduced commission of 4%." (*Id.* at 8 n.7.)

13  This is inaccurate.  The arbitrator awarded Heredia $72,000 for the
    Rakhimov fight and $90,000 for the Fortuna fight.  *Heredia*, Cal. State

14  Athletic Comm'n Arb. at 15.  The arbitrator did not award Heredia any
    amount for the Haney fight, *id.*, likely because the December 4, 2021

15  fight had not occurred by the time of the arbitrator's decision, which
    took effect on July 9, 2021.  Moreover, the arbitrator did not award this

16  amount "at a severely reduced commission of 4%." (*Id.*)  Rather, the
    arbitrator's reference to 4% was related to the order by which Heredia

17  was to collect the remaining $72,000 owed.  Specifically, the arbitrator
    ordered Diaz to pay the outstanding $72,000 to Heredia from his next

18  three fights occurring after July 9, 2021 but before January 1, 2023 at a
    rate of 4% per fight, and that if Diaz did not earn enough from those

19  fights to satisfy the remaining $72,000 of the award, or if Diaz failed to
    fight three fights by January 1, 2023, no additional withholdings would

20  be required.  (*Id.*)

21      [12] The Court concedes that the TAC does not define what "sum"
    was paid and that it is possible the "sum" referenced only the $90,000

22  payment Heredia concedes was paid by Diaz.  The problem continues to
    be, however, that the lack of evidence provided by Heredia leaves the

23  Court unable to determine what was paid and what might remain
    outstanding.  The Court finds that an additional hearing on the issue of

(ECF 85 at 16–17 ("Mr. Diaz did not pay [the sum awarded] until 10 days after ordered to in the arbitration award.").)  And, under the arbitrator's award, California's State Athletic Commission was to "assist in the execution of [the arbitrator's] Order" by withholding money from Diaz's future purses, *Heredia*, Cal. State Athletic Comm'n Arb. at 15, thereby indicating that Diaz could not have unilaterally failed to pay.[13]  Because Heredia has not provided sufficient credible proof that he has not been paid the entire $162,000 owed him for the Rakhimov and Fortuna fights, he has not carried his burden here of providing sufficient specific proof to support his claim to damages for

---

damages would not remedy Heredia's lack of proof.  *See* Fed. R. Civ. P. 55(b)(2)(B) ("The Court may conduct hearings . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages.").  After an extended period to conduct discovery on the issue of damages, Heredia has stood on the evidence now before the Court (ECF 185-1), which largely consists of four affidavits and pages printed from the internet (*id.* at 1–69, 72–77, 357–58).  At a hearing, Heredia could present live testimony from the affiants, but he has given the Court no reason to believe that such testimony would be any more credible or enlightening than the affidavits.  In addition, Heredia has not given any indication that he could offer at a hearing additional demonstrative evidence to support his claims for damages.

[13] It is conceivable that, because Diaz's fight against Haney took place in Las Vegas, Nevada (ECF 185-1 at 74), California's State Athletic Commission was unable to withhold money from Diaz's purse from that fight.  Again, the Court simply does not know because Heredia has not provided any proof, other than his own word, of what was paid and what might remain outstanding.  However, the Court can glean no reason why the State Athletic Commission could not, or would not, have withheld money from Diaz's purse related to his next fight, that against William Zepeda Segura on October 29, 2022, in San Diego, California.  (*Id.*)  The affidavits fail to address these fights.

1  these fights.  The Court finds that Heredia has not adequately proven

2  this amount.

3  *The Haney fight*.  While Heredia has not shown entitlement to an

4  award based on the Rakhimov and Fortuna fights, he has shown an

5  entitlement to the contractually obligated fee of **$270,000** for the Haney

6  fight.  Specifically, Heredia has submitted a copy of his contract with

7  Diaz for the period covering the Haney fight, which provides that

8  Heredia will receive an 18% share of Diaz's purse amounts (ECF 185-1

9  at 85–87), the affidavits of Heredia and his brother indicating an 18%

10 manager fee (*id*. at 6, 24–25), Diaz's internet biography showing he

11 engaged in the Haney fight (*id*. at 74), and a copy of the bout agreement

12 for the Diaz-Haney fight showing Diaz's contracted purse amount of

13 $1,500,000 (*id*. at 377).

14                                              **2**

15         Regarding lost anticipated income, Heredia has provided sufficient

16 proof to support an award of **$1,080,000**, rather than the requested

17 $1,350,000, in lost future earnings from a contemplated fight between

18 Diaz and Gevontra Davis.  (ECF 185 at 10–12.)  The affidavits of

19 Stephen Espinoza and Steven Bash support a finding that the deal for a

20 Diaz-Davis fight had been in negotiations at the time Defendants

21 interfered with the contract and that it would have resulted in a total

22 revenue of at least $15,000,000.  (ECF 185-1 at 41–42, 54.)  Heredia

23 asserts that Bash's affidavit supports a finding that Diaz would have

24 been entitled to 50% of the $15,000,000 prospective revenue.  (ECF 185

25 at 11–12.) But Bash's affidavit states that Diaz would have been

26 entitled to 40–60%.  (ECF 185-1 at 49.)  Because Heredia has offered no

27 proof that Diaz would have been entitled to the high end of the

28 prospective percentages, the Court finds it reasonable to conclude that

Heredia has shown damages based on a 40% formula.  Accordingly, Heredia has shown that a potential Diaz-Davis fight would have resulted in $15,000,000 in revenue, 40% of which, or $6,000,000, would have been paid to Diaz.  In turn, Heredia would have been entitled to 18% of Diaz's purse, or $1,080,000.

Heredia is thereby entitled to **$1,080,000** from Defendants as damages for their interference with Heredia's ability to negotiate a fight between Diaz and Davis.

**3**

Regarding lost compensation from the anticipated renewal of a five-year contract with Diaz, these damages border on speculative.  Not only does it assume that the contract would be renewed for another five years under the same terms, it also assumes that Diaz would continue to fight at his past rate.  While such assumptions might not persuade if opposed, Heredia provides the evidence required to meet the low bar for damages on default.  Still, as explained below, Heredia has shown **$1,282,500** in damages, rather than the $1,327,500 he requests.  (ECF 185 at 12–15.)

Although the relationship between Heredia and Diaz soured before the end of the contractual period at issue here, the allegations in the FAC, taken as true, show that the cause of the animosity was the interference by Defendants.  The evidence in the record shows that, before Defendants' interference, the parties intended to maintain their relationship into the future.  Specifically, Heredia and Diaz had already extended their contractual relationship once (ECF 185-1 at 79–83, 85–87), at least one third-party recognized their relationship as strong and likely to have continued absent Defendants' interference (*id.* at 53), and, just weeks before Defendants' interference, Diaz indicated to Heredia

1   that the relationship was positive and he was looking forward to future
2   opportunities with the Heredia brothers (*id.* at 11–12, 19, 71.)  Heredia
3   has provided specific, sworn evidence to support his claim that he and
4   Diaz would have renewed their contract in the future.  Thus, although a
5   closer call, the Court finds Heredia's proffered evidence sufficient as to
6   contract renewal generally.

7       This is not true for the amount itself, however.  Heredia contends
8   that he should be awarded $1,327,500 based on a calculation of his 18%
9   fee and an expected two fights per year over the course of a five-year
10  contract, with Diaz's purse amount calculated at an average rate of
11  Diaz's prior earnings since winning his 2020 championship.  (ECF 185
12  at 14–15.)  It is reasonable to award Heredia an award based on an 18%
13  fee calculation, multiplied by two fights a year.  (ECF 185-1 at 73–77
14  (Diaz's fight schedule showing an average of two fights a year between
15  2017 and 2022);[14] ECF 185-1 at 79–83, 85–87 (Heredia received fees of
16  18% and 20% under prior contracts with Diaz).)  However, Heredia
17  calculates Diaz's average prospective earnings as $737,500 per fight
18  based, in part, on Diaz's alleged purse of $500,000 for the Rakhimov
19  fight.  (ECF 185 at 14 n.20 (claiming Diaz "netted . . . payments of
20  $500,000.00 (on two occasions), $1,500,000.00, and $450,000.00")  As
21  explained above, the record before the Court does not support a finding
22  that Diaz made $500,000 from the Rakhimov fight, but only $400,000.

23  _____

24      [14] The current version of the same online resource Heredia has
25  submitted to establish Diaz's fight history shows that Diaz has
    continued to fight at least twice a year since 2022.  Specifically, Diaz
26  fought Mercita on March 18, 2023, Jerry Perez on July 8, 2023, Jesus
27  Antonio Perez Campos on February 15, 2024, and Oscar Duarte Jurado
    on April 27, 2024.  BoxRec, https://boxrec.com/en/box-pro/634717 (last
28  visited July 12, 2024).

1       However, Heredia calculates Diaz's average prospective earnings

2  as $737,500 per fight based, in part, on Diaz's alleged purse of $500,000

3  for the Rakhimov fight.  (ECF 185 at 14 n.20.)  As explained above, the

4  record before the Court does not support a finding that Diaz made

5  $500,000 from the Rakhimov fight, but only $400,000.  The recalculated

6  average is $712,500 per fight.  Two $712,500 fights per year for five

7  years yields $7,125,000, and 18% of this yields $1,282,500 for Heredia.

8  **4**

9       Regarding lost compensation for unrealized clients due to

10 diminished reputation, this too borders on speculative.  Nevertheless,

11 the Court finds that Heredia has met the minimal evidence standard for

12 default judgment damages.  Heredia has provided sufficient proof to

13 support a damages award for **$540,000** in potential proceeds attributed

14 to the potential signing of future clients.  (ECF 185 at 15–18.)  Heredia's

15 request is supported by Bash's affidavit stating that, but for the damage

16 to Heredia's reputation caused by Defendants, Heredia could have

17 expected to sign at least three new boxers to five-year contracts, each of

18 whom would have fought twice per year over the course of their

19 contracts for purses of $100,000 per fight, for a total of $3,000,000 in

20 prospective purse amounts.  (ECF 185-1 at 52–53.)  Applying Heredia's

21 18% fee, he could have expected to earn $540,000 from these future

22 clients.

23 **5**

24      As for the last damages category, Heredia contends that he is

25 entitled to an award under state law for "non-economic damages."  (ECF

26 185 at 18–19.)  Heredia has not even attempted to establish an amount

27 certain that he believes he is due for "[p]hysical pain, mental suffering,

28

41

1    and emotional distress." (*Id.*)  Accordingly, Heredia has not shown an

2    entitlement to any damages for his state-law claims.

3                                           ***

4         As detailed above, Heredia has provided sufficient proof to support

5    an award of $3,172,500 in actual damages, for a total of **$9,517,500** in

6    treble damages under the RICO statute.  These damages should be

7    awarded jointly and severally against all Defendants.  *See Oki*

8    *Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775

9    (9th Cir. 2002) ("Holding RICO conspirators jointly and severally liable

10   for the acts of their co-conspirators reflects the notion that the damage

11   wrought by the conspiracy 'is not to be judged by dismembering it and

12   viewing its separate parts, but only by looking at it as a whole.'"

13   (quoting *Investor Prot. Corp. v. Vigman*, 908 F.2d 1461, 1468 (9th Cir.

14   1990)).

15                                          **D**

16        As to attorney's fees, Heredia requests $513,154.19.  (ECF 185 at

17   20.)  Under 18 U.S.C. § 1964(c), "any person injured in his business or

18   property by reason of a [RICO] violation . . . shall recover . . . the costs

19   of suit, including a reasonable attorney's fee[.]"  This language

20   mandates that a party injured by a RICO violation receive attorney's

21   fees and costs.  *See Valadez v. Aguallo*, No. C-08-03100 JW, 2009 WL

22   10680866, at *4 (N.D. Cal. Dec. 10, 2009) (collecting cases), *aff'd*, 433 F.

23   App'x 536 (9th Cir. 2011).  Because Heredia has won on each of his

24   RICO claims by default, he is entitled to attorney's fees and costs.

25   However, the Court finds Heredia is entitled to **$171,000** in attorney's

26   fees—the scheduled amount under the applicable Local Rule—not the

27   requested $513,154.19.

28

**1**

Under Local Rule 55-3, a plaintiff who has obtained a default judgment in his favor pursuant to a statute that contemplates an award of attorney's fees may be awarded attorney's fees pursuant to the schedule set out in the rule.  C.D. Cal. L. R. 55-3.  The rule further states that "[a]n attorney claiming a fee in excess of this schedule may file a written request at the time of entry of the default judgment to have the attorney's fee fixed by the Court," and "[t]he Court shall hear the request and render judgment for such fee as the Court may deem reasonable." *Id.*

Heredia's counsel has not recognized the existence, let alone the applicability, of Local Rule 55-3.  The Court construes counsel fee request as one for an award of attorney's fees in excess of the scheduled amount, as allowed by the Local Rule.  The Court denies the request for attorney's fees in excess of the scheduled amount because, as explained below, the request is unreasonable.

"To determine what constitutes a reasonable fee award, the Court uses the lodestar method," which "is the hours reasonably expended by counsel multiplied by counsel's reasonable hourly fee." *In re Outlaw Lab'ys, LP Litig.*, No. 18-cv-840-GPC-BGS, 2023 WL 6522383, at *3 (S.D. Cal. Oct. 5, 2023).  To determine the reasonable hourly rate under the lodestar calculation, courts must identify the relevant community and assess the prevailing hourly rate in that community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).  "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Id.* "To inform and assist the court in the exercise of its discretion, the

1    burden is on the fee applicant to produce satisfactory evidence—in

2    addition to the attorney's own affidavits—that the requested rates are

3    in line with those prevailing in the community for similar services by

4    lawyers of reasonably comparable skill, experience and reputation." *Id.*

5    at 980 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984)); *see*

6    *also Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("[T]he fee applicant

7    bears the burden of establishing entitlement to an award and

8    documenting the appropriate hours expended and hourly rates.").

9    Further, with respect to the hours reasonably expended, "[t]he

10   applicant should exercise 'billing judgment' with respect to hours

11   worked and should maintain billing time records in a manner that will

12   enable a reviewing court to identify distinct claims." *Hensley*, 461 U.S.

13   at 437 (citation omitted).

**2**

15       Due to Heredia's lack of proof to support his claimed attorney's

16   fees, the Court is unable to determine the correct lodestar amount.

17   Specifically, Heredia has failed to offer any evidence of the reasonable

18   market rate, but simply provides the Court with an itemization of hours

19   worked and the hourly rate attributed to the person who performed the

20   work.  (ECF 185; ECF 185-1 at 379–450.)  The itemization does not

21   show what work was performed by attorneys versus support staff,

22   stating only the name of the person who performed the work.  (ECF

23   185-1 at 379–450.)  To the extent work was done by attorneys, counsel

24   has not shown what type of background and experience those attorneys

25   have to warrant the hourly rate attributed to them.  (*Id.*)

26       Even if the Court could determine the correct lodestar amount, a

27   downward departure would likely be warranted.  "Although in most

28   cases, the lodestar figure is presumptively a reasonable fee award, the

district court may, if circumstances warrant, adjust the lodestar to account for other factors which are not subsumed within it." *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 n.4 (9th Cir. 2001).  Factors in considering whether to adjust the lodestar amount include:  "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases." *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *abrogated on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992).

These factors would weigh in favor of adjusting any lodestar calculation.  As to the first factor, Heredia has received judgment in his favor by default, and thus, the time and labor required was far less substantial than if the case were taken to trial or even settled.  As to the fourth factor, Heredia and his counsel have not alleged that their work in this action precluded them from accepting other cases.  As to the fifth, sixth, and twelfth factors, Heredia has offered no evidence regarding the customary fee or awards in a case such as this.  As to the seventh factor, Heredia and his counsel were under no undue time limitations in this action.  As to the eighth factor, although Heredia's counsel have obtained a positive result, it has come by way of default rather than any particular effort by Heredia and counsel.

1    Most importantly, as to the third and ninth factors, given the

2    inconsistencies in Heredia's assertions and the fact that the Court

3    found his arguments and submitted proof lacking in several aspects, it

4    cannot find that this action was litigated with particular skill or

5    reflected complimentary experience and ability by counsel.  Heredia has

6    done nothing more than state that attorney's fees may be awarded

7    under the RICO statutes, provide a statement of hours expended and

8    the hourly rate attributed to that work, and then offer a total of

9    requested attorney's fees amounting to the total hours worked

10   multiplied by the hourly rate.  (ECF 185 at 20.)  As stated, counsel has

11   not recognized the Local Rule applicable to the request for attorney's

12   fees.  In addition, counsel has not even attempted to discuss the

13   standard applicable to a request for attorney's fees in excess of the

14   Local Rule's schedule.  (*Id.*)

15       Although the second, tenth, and eleventh lodestar factors could

16   conceivably weigh in favor of Heredia, these are insufficient to outweigh

17   the other nine factors.  This is particularly true when considered in the

18   context of this case, as further discussed below.

19       The Court has carefully reviewed the itemization counsel has

20   submitted and finds, seemingly, intermingling of work performed on the

21   instant action and work performed on the companion case of *Diaz v.*

22   *Heredia, et al*, No. 5:20-cv-02332-JWH-kk.  (ECF 185-1 at 379 (entries

23   for October 30, 2020 through November 13, 2020 (work including review

24   of file, complaint, jurisdictional issues, and "12b6 research" following

25   removal of complaint from state court and opening Case No. 5:20-cv-

26   02332-JWH-kk on November 9, 2020, despite complaint in instant

27   action not being filed until December 18, 2020)), 380 (entries for

28   December 8 and 17, 2020 (work done on motion to dismiss and

46

calendaring deadlines corresponding to docket in Case No. 5:20-cv-
02332-JWH-kk)), 381 (entries for December 17, 18, 21, and 27, 2020
(work done on proposed order and motion to dismiss in Case No. 5:20-
cv-02332-JWH-kk)), 382 (entries for December 28, 2020 and January 4,
2021 (work done on motion to dismiss and reviewing court discrepancy
notice in Case No. 5:20-cv-02332-JWH-kk)), 383 (entries for January 14,
19, and 20, 2021 (work done on motion to dismiss in Case No. 5:20-cv-
02332-JWH-kk)), 384 (entries for January 23, 26, 27, 28, 29, and 30,
2021 (work done on research and motion to dismiss in Case No. 5:20-cv-
02332-JWH-kk)), 385 (entries for February 1 and 3, 2021 (work done on
filing and proposed order in Case No. 5:20-cv-02332-JWH-kk)), 386
(entry for February 5, 2021 (emails re draft in Case No. 5:20-cv-02332-
JWH-kk)), 389 (entries for February 23 and 24, 2021 (work done on
reply in support of motion to dismiss in Case No. 5:20-cv-02332-JWH-
kk)), 391 (entry for April 15, 2021 (review reply to motion filed in Case
No. 5:20-cv-02332-JWH-kk)), 393 (entries for May 26 and June 3, 2021
(review activity in Case No. 5:20-cv-02332-JWH-kk)), 394 (entries for
July 20 and 21, 2021 (review activity in Case No. 5:20-cv-02332-JWH-
kk)), 396 (entries for August 12 and October 15, 2021 (review and draft
documents filed in Case No. 5:20-cv-02332-JWH-kk)), 405 (entries for
June 2 and 3, 2022 (pull documents filed in Case No. 5:20-cv-02332-
JWH-kk)), 408 (entries for August 19 and 24, 2022 (work on discovery
issued in Case No. 5:20-cv-02332-JWH-kk)).)  Moreover, counsel alleges
that extensive hours were expended on discovery on the issue of
damages (*id.* at 427–32, 434–46, 448), yet the request for damages
currently before the Court is supported by nothing more than evidence
available to Heredia before the start of the prolonged discovery period
in this matter and affidavits from himself, his brother, and two

1   individuals, at least one of whom had long been consulting with counsel

2   on this matter (*id.* at 382–94).

3       Given this failure by counsel to comply with the burden of proving

4   attorney's fees under the lodestar formula, the burden would be on the

5   Court to conduct the analysis to calculate a reasonable award.  It

6   declines to do so.  Thus, the Court finds an award of attorney's fees in

7   excess of the scheduled amount contemplated in Local Rule 55-3 would

8   be unreasonable.  Pursuant to Local Rule 55-3, Heredia should be

9   awarded attorney's fees in the amount of **$171,000**, calculated as $5,600

10  plus 2% of the judgment amount over $100,000.  The attorney's fees

11  should be awarded jointly and severally against all Defendants.  *See*

12  *Ally Bank v. Karakasevic*, No. 11-cv-00896-YGR (MEJ), 2016 WL

13  7971245, at *6–7 (N.D. Cal. Dec. 19, 2016) (considering appropriateness

14  of awarding attorney's fees and costs jointly and severally against RICO

15  defendants), *report and recommendation adopted sub nom. Fid. Nat'l*

16  *Title Ins. Co. v. Castle*, No. 11-cv-896 YGR, 2017 WL 11628063 (N.D.

17  Cal. Jan. 24, 2017).

18                              **E**

19      As for Heredia's request for costs, he is entitled to **$19,798.61**,

20  rather than the $21,017.59 he seeks.  The Court finds it unreasonable to

21  award costs for meal and travel expenses incurred on May 10, 2021, and

22  June 12, 2021 (ECF 185-1 at 450–51), as they do not relate clearly to

23  any matter occurring in this case on those dates, and Heredia has not

24  provided any proof that those costs relate to this case.  In addition, the

25  Court awards $250, rather than the requested $500, in costs for the *pro*

26  *hac vice* application fee for David Keesling, as that cost was incurred for

27  both this action and the related action of *Diaz v. Heredia, et al.*, No.

28  5:20-cv-02332-JWH-kk (ECF 165).  Finally, the costs should be awarded

jointly and severally against all Defendants.  *Ally Bank*, 2016 WL 7971245, at *6–7.

## RECOMMENDATION

For the reasons above, IT IS RECOMMENDED that the District Court issue an Order: (1) accepting and adopting this Report and Recommendation; (2) granting Heredia's motions for default judgment against Defendants MTK USA, MTK Global, Kinahan, and Gibson (ECF 150–152, 159); and (3) awarding Heredia $9,517,500 in treble damages against Defendants, jointly and severally; $171,000 in attorney's fees against Defendants, jointly and severally; and $19,798.61 in costs against Defendants, jointly and severally.

DATED: July 12, 2024

_____

HONORABLE STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE